# EXHIBIT "B"



**FIU** | **Human Resources**
FLORIDA INTERNATIONAL UNIVERSITY

<u>**AMENDED COPY**</u>

September 14, 2020

Elie Nehme
**Delivered Electronically**
**To** enehm002@med.fiu.edu

Re:  Case No. 2020-05-054
**PERSONAL AND CONFIDENTIAL**

Dear Mr. Nehme,

Please be advised that Florida International University's (FIU) Office of Inclusion, Diversity, Equity, and Access (IDEA) has conducted and completed an amended report as it relates the allegation that Dr. Nancy Havas may have violated FIU-106 Regulation as it pertains to discrimination based on disability. To ensure you are fully informed of the investigative findings and conclusion, attached is a copy of the **AMENDED** summary report prepared by IDEA.

If you should have any questions or concerns regarding the content of this correspondence, you can contact me at (305) 348-2785.

Sincerely,

Shirlyon J. McWhorter, Esq.,
Director & Title IX Coordinator
Inclusion, Diversity, Equity, and Access

Attachment

**DIVISION** OF **HUMAN RESOURCES**
Modesto A. Maidique Campus, PC-224, Miami, Florida 33199 • Tel: 305.348.2190 • Fax: 305.348.2872 • hr.fiu.edu
Equal Opportunity/Access Employer and Institution • TDD via FRS 1-800-955-8771

<u>**AMENDED COPY**</u>

**CASE# 2020-05-054**
**SUMMARY OF THE INVESTIGATION OF THE COMPLAINT OF DISABILITY**
**DISCRIMINATION**

| | |
|---|---|
| **Complainant:** | <u>**Elie Nehme**</u><br><u>**Medical Student – Period 3**</u><br><u>**Herbert Wertheim College of Medicine**</u> |
| **Respondent:** | <u>**Dr. Nancy Havas**</u><br><u>**Associate Dean of Student Services**</u><br><u>**Herbert Wertheim College of Medicine**</u> |

On May 13, 2020, Florida International University (FIU) student, Elie Nehme (Complainant), filed an official complaint with the Office of Inclusion, Diversity, Equity & Access (IDEA) against employee, Dr. Nancy Havas – alleging discrimination based on disability. FIU commenced an investigation into the alleged violations of FIU Regulation 106, the University's Regulation on Non-Discrimination, Harassment and Retaliation (The Regulation).

**PERSONS INVOLVED**

| | |
|---|---|
| Complainant: | Elie Nehme, Medical Student – period 3 |
| Witness 1: | Maria Santacruz, Testing & Assessment Manager |
| Witness 2: | Dr. Rodolfo Bonnin, Director of Assessment and Evaluation |
| Witness 3: | Maritere Williams, Associate Director of Academic Support Services |
| Witness 4: | Dr. Jenny Fortun, Assistant Dean for Foundational Sciences Curriculum |
| Witness 5: | Adrian Jones, Interim Executive Associate Dean of Student Affairs |
| Witness 6: | Dr. Vivian Obeso, Associate Dean for Curriculum and Medical Education |
| Witness 7: | Dr. Stephen Loynaz, Access Consultant Manager, Disability Resource Center |
| Witness 8: | Amanda Niguidula, Director, Disability Resource Center |
| Witness 9: | Teresa "Terry" Reyes-Gavilan, Academic Support Services Administrator |
| Witness 10: | Innah Lachica, Program Coordinator, Academic Affairs |
| Respondent: | Dr. Nancy Havas, Associate Dean of Student Services |

**EXHIBITS**

| | |
|---|---|
| Exhibit 1: | Discrimination Complaint Form completed by Elie Nehme |
| Exhibit 2: | Nehme's Accommodation Letter from the Disability Resource Center |
| Exhibit 3: | Email from Dr. Bonnin addressing Nehme's concerns pertaining to his testing accommodation provided by Dr. Stephen Loynaz |
| Exhibit 4: | HWCOM Student Handbook |
| Exhibit 5: | Audit of Elie Nehme's Testing provided by Maria Santacruz |
| Exhibit 6: | HWCOM Assessment Department Accommodation Procedure provided by Adrian Jones |

| Exhibit 7: | Email documenting Nehme's excused and unexcused absences provided by Dr. Nancy Havas |
|---|---|
| Exhibit 8: | MSEPC Letter provided to Nehme from April 9, 2020 Meeting provided by Elie Nehme |

## SPECIFIC ALLEGATION(S)

The Complainant made the following specific allegation(s) as addressed in his statement and (**Exhibit 1**):

- Nehme alleges that the HWCOM administrators changed the language of several in-class professional (CanvasMed) quizzes to "readiness assignments" to avoid providing Nehme DRC-approved testing accommodations. He further contends that, because there was a point value added to the quizzes, the absence of necessary testing accommodations caused burdensome stress to Nehme during period 2 year (this includes the repeat period 2 year as well), which affected his health and academic success.

- Nehme contends that, on March 2, 2020, the HWCOM administrators did not administer the High-Stake Psychiatry shelf[1] (retake) examination in the proper minimal distraction room. Nehme states that he was placed in AHC2, 495, which he believes did not meet the requirements for a proper minimal distraction room, based on his prior experiences taking exams in AHC 1, room 335. Nehme failed the High-Stake Psychiatry shelf examination, which he contends was a primary contributor to HWCOM's recommendation that he voluntarily withdraw from the program. Nehme alleges that from July 28, 2017 to present day (period 2 – period 3), he has been negatively impacted by the lack of testing accommodations provided to him by HWCOM.

- Nehme alleges that on February 24, 2020 he received an email from Dr. Nancy Havas requiring him to leave his pediatric rotation at Nikolas Children Hospital and report to her office for a drug test. According to Nehme, Dr. Havas did this to cause him further stress. Nehme said Dr. Havas knew he was dealing with stress because he was studying for a remediation Shelf Exam for Psychiatry Clerkship.

## STANDARD OF EVIDENCE: PREPONDERANCE OF THE EVIDENCE

Findings in this investigation report are based on a "**preponderance of the evidence**" standard. In other words, after reviewing all of the evidence, including the relative credibility of the parties and their statements during interviews, whether it is more likely than not that the conduct occurred as alleged. If the conduct did occur as alleged, then an analysis is completed to determine whether the conduct violated University Regulation. (Please note: the report's findings do not make conclusions whether the alleged conduct violated state or federal laws, but instead addresses whether the University's regulations were violated.)

---

[1] High Stake examinations - High-stakes assessment refers to any test given where results lead to major/significant consequences, or any test that is a basis of a major decision.

**COMPLAINANT STATEMENT – Elie Nehme**

Nehme was interviewed via telephone on May 27, 2020.[2] Nehme was advised of the Regulation, the investigation process, confidentiality, and FIU's prohibition against retaliation. Nehme completed an IDEA Discrimination Complaint Processing Form, in which he alleges that from July 28, 2017 to present day (period 2 – period 3), he has been an active medical student that has been negatively impacted by the lack of testing accommodations, which exacerbated an illness that resulted in him taking a leave of absence (LOA) from school.[3] (**Exhibit 1**) At the time of this report, Nehme  was in the process of completing coursework as part of his period 3.

According to Nehme, he has "done well in medical school and [has] received numerous positive recognitions" from preceptors[4] at hospitals where he has performed his medical rotations. Nehme stated that his health continued to be a factor in his academics, so he requested and was granted a LOA from January 18, 2018 – April 2, 2018. Nehme added that this LOA provided him the opportunity to take care of his ailment.

Nehme stated that when he began his time as a student at HWCOM, he was experiencing difficulties with a primary illness. He indicated this was an illness he was dealing with before he began his time as a student. According to Nehme, the stress affiliated with Medical school exacerbated his illness and, as a result, he obtained numerous excused absences. This ultimately resulted in his three course failures and a referral to the Medical Student Evaluation and Promotion Committee (MSEPC).[5] The failures were due to Nehme not passing the High-Stakes examination administered by the National Board of Medical Examiners (NBME). These exams are proctored by the HWCOM Office of Assessment and Evaluation and overseen by Dr. Rodolfo Bonnin (Witness 2).

Table 1: Elie Nehme timeline submitted July 7, 2020.

| Date | Event | Notes |
|---|---|---|
| August 1, 2016 | Date of matriculation | N/A |

---

[2] Interviews were conducted via telephone, Zoom, and Microsoft Teams because of the university (including faculty, staff, and students) transitioning to remote work on March 16, 2020.

[3] HWCOM identifies a "period" as a year of study. As such, a student in period 3 is in their third year of study.

[4] A practicing physician who gives personal instruction, training, and supervision to a medical student or young physician.

[5] The Medical Student Evaluation and Promotion Committee (MSEPC) is the committee that evaluates all aspects of each medical student's performance for the purpose of promotion and graduation. The assessment includes evaluation of whether a student meets established academic standards and professionalism standards as more fully described in this HWCOM Medical Student Handbook. The MSEPC evaluation includes an assessment of both honors and deficiencies.

| October 3, 2016 | Student failed Genes, Molecules, and Cells (BMS6001) | N/A |
|---|---|---|
| May 24, 2017 | Failed Cardiovascular and Respiratory Systems (BMS6633) | N/A |
| July 10, 2017 | Failed Cardiovascular and Respiratory System (BMS 6633 remediation) | Passed the final during April 2018, as part of Period 2 remediation. |
| July 19, 2017 | MSEPC Hearing Notice Sent | As a result of failed BMS 6633 |
| July 27, 2017 | MSEPC Hearing #1 | MSEPC Recommendation: allowed to continue with Class of 2020: must meet with Dr. Toonkel to develop a plan for self-study; academic probation |
| December 15, 2017 | PIR filed by Dr. Obeso | Student had multiple issues identified after our mid-period 2 review session.<br><br>1. Multiple unexcused absences across courses<br><br>2. Multiple request to delay exam across course<br><br>3. Professionalism issue regarding a quiz in Reproduction. |
| January 6, 2018 | Student failed System Based Practice (BMS6067) | Nehme did not receive accommodations for the final exam. Nehme confirm that he received accommodations when he retook the final exam as part of his Period 2 Remediation. |
| January 18, 2018 | Nehme began LOA | N/A |
| February 28, 2018 | MSEPC Hearing Notice Sent | N/A |
| March 8, 2018 | MSEPC Hearing #2 | MSEPC Recommendation: Allowed to repeat Period 2; academic probation. Student will now continue with Class of 2021. |
| April 2, 2018 | Nehme returned from LOA | Nehme would begin Period 2 with Class of 2021. |
| February 17, 2020 | Student failed the Psychiatry Subject Exam | N/A |

| March 3, 2020 | Student failed the Psychiatry Subject Exam retake and as a result, the Psychiatry Clerkship | N/A |
| March 4, 2020 | MSEPC Hearing Notice Sent | Student asked the meeting to be postponed.  Hearing notice was rescinded |
| April 1, 2020 | MSEPC Hearing Notice Sent | N/A |
| April 9, 2020 | MSEPC Hearing #3 | MSEPC Recommendation: Nehme was provided the option to voluntarily withdraw from HWCOM; if he does not take this option, he will be involuntarily withdrawn. |

Nehme indicated that his failure in the Cardiovascular & Respiratory Systems course, along with other family stressors, exacerbated his illness. Nehme contends that after this experience, he determined that he needed to request further academic assistance. After the July 2017 MSEPC meeting, Nehme recalled visiting with the Director of the Medical Student Counseling and Wellness Center, Dr. Nathaly Desmarais, numerous times for Testing and Evaluation.[6][7] According to Nehme, the results revealed that Nehme would need ADA accommodations. Dr. Desmarais issued Nehme a letter to seek ADA accommodations assistance from the DRC. Nehme added that he arrived at the DRC to meet with Dr. Stephen Loynaz; at that time, Nehme was told that his testing accommodations were approved, and that the DRC would communicate directly with HWCOM. Nehme was provided his accommodation on July 28, 2017. (**Exhibit 2**)

Nehme stated that days later, he began to worry because he had not heard from the HWCOM Testing and Evaluation department about criteria for his accommodation for his BMS 6643 course final examination, scheduled for August 18, 2017.[8] Nehme recalled sending Dr. Bonnin an email dated August 14, 2017 asking for assistance in discussing "the process of obtaining the approved disability accommodations." In an August 14, 2017 email, Dr. Bonnin addressed Nehme's concerns pertaining to his testing accommodation and advised that "Nehme would have his accommodations on that exam". (**Exhibit 3**) Nehme stated this was his first experience receiving a testing accommodation; he passed that exam and achieved a high score. Nehme added that he was feeling better and it reflected in his grades.

TRANSITION According to Nehme, after failing his System Based Practice course in January 2018, he petitioned the MSEPC Committee to be remediated, which meant that he would repeat period 2. The MSEPC Committee Chairperson (Dr. Sergio Gonzalez Arias) advised Nehme that the committee would consider his request. Nehme mentioned that the MSEPC Committee granted his LOA on January 18, 2018. Nehme stated that while on his LOA, he received a call from Dr.

---

[6] Nehme was not able to provide an accurate number of visits he has had with the Wellness Center.

[7] Nehme did not recall specific dates when he visited with Dr. Desmarais.

[8] The course title for BMS 6643 is "Integumentary System: The Skin"

Havas advising him that he must attend a MSEPC hearing on March 8, 2018; this meeting was scheduled to occur during his LOA. Nehme stated that he attended the MSEPC hearing and was told that his request to repeat his period 2 year had been granted, and upon his return from his leave of absences, he would start with the Class of 2021.

**In-Class Testing:**

According to Nehme, he was neither invited, nor did he participate in any ADA student orientation; therefore, he was unable to address his ADA accommodations, as mentioned in the HWCOM student handbook. (**Exhibit 4**) Nehme commented that this would have been instrumental to his success because he would have known more about the HWCOM ADA testing process. Nehme stated that he never understood the steps or process in making sure that he had his testing accommodations. Nehme further stated that, after he was provided his testing accommodations, he realized that he was not receiving testing accommodations for professional course examinations/quizzes being administered in CanvasMed. Nehme stated that he received notice that the quizzes were now called "readiness assignments," however there was still a graded component for these assessments. Nehme provided a list of courses where he took an in-class quiz and was not provided testing accommodations:

> BMS 6016 Clinical Skills II
> BMS 6633 Cardiovascular & Respiratory Systems[9]
> BMS 6634 Gastrointestinal System and Medical Nutrition
> BMS 6637 Reproductive Systems
> BMS 6067 System-Based Practice
> BMS 6638 Renal System
> BMS 6631 Hematopoietic and Lymphoreticular Systems

As Nehme understands it, courses are built into CanvasMed by the course professor.[10] Nehme added that the readiness assignments are administered on CanvasMed and are typically issued as pop quizzes, flipcharts quizzes and course assignments. Nehme stated that the courses listed quizzes on the various syllabi as point driven; however, he had never received a testing accommodation for these assignments. Nehme stated that although he has never failed a quiz, he has scored low on them, which ultimately affected his final grade. Nehme further stated that he received a testing accommodation in BMS 6066 Evidence-Based Medicine and Complementary

---

[9] This refers to the second instance where Nehme took this exam, which was after he returned from the LOA.

[10] CanvasMed is HWCOM's Learning Management System (LMS) and offers a central location for hosting and accessing learning materials, submitting assignments, proctoring examinations, and connecting instructors and students both online and in the classroom. (https://medicine.fiu.edu/about/administrative-offices/information-technology/services/index.html)

and Alternative Medicine's Individual Readiness Assurance Test (IRAT) quiz that was worth 15% of his final grade. [11]

According to Nehme, on March 3, 2020, he did not receive his minimal distraction room accommodation for his High-Stake Psychiatry Shelf examination. Nehme stated that he was assigned to AHC2 495, a room he had never been assigned to before; he added that he had no idea what the room looked like until the day of the examination. Nehme indicated that he usually takes his exams in AHC1 335, which he believes was a minimum distraction room, because it has no windows, nor is it positioned in a busy hallway. According to Nehme, AHC2 495 is a conference room that has mirrored windows which you can partially see out of, and that the room was in a main hallway near classrooms. [12] He believes the room was not appropriate because it was in a busy hallway where there were many offices and high student traffic near an elevator. He added that the environment was extremely distracting. Nehme added that on the day of his exam, many students were walking and talking loudly which caused him to become distracted. Nehme stated that he did not inform the proctor of his concerns.

According to Nehme, he attempted to bring up his testing accommodation concerns during his April 9, 2020 MSEPC meeting; however, he contends that the committee members refused to address this matter. Nehme stated that he felt intimidated by the presence of the MSEPC chair (Dr. Helen Tempest); Dr. Obeso had previously submitted a professional incident report (PIR) on behalf of Dr. Tempest against Nehme. Nehme added that because of the PIR, he never felt comfortable mentioning to anyone that he was not receiving his testing accommodations. [13]


**Drug Testing:**

Nehme stated that on February 24, 2020, he received a voicemail message from Dr. Nancy Havas asking him to report to HWCOM for a meeting. Nehme stated that there was an email that followed Nehme stated Dr. Havas's contacted him with a "vague" subject line that read "check in meeting."

---

[11] Nehme further indicated that there was one course where he did get his testing accommodation and that resulted in him getting a high score.

[12] According to DRC a minimal distraction room creates an environment which minimizes distractions for the student. Each student has different levels of distractibility and different stimuli which may distract them. Typically, students need an environment which minimizes both auditory and visual distractions. A distraction reduce environment does not necessitate the student's testing in a private room, nor does it mean that an environment in completely distraction-free.

[13] On August 23, 2020 Nehme stated the MSEPC began asking questions that were unrelated to the shelf examination and that they were asking questions about his previous courses. This was his first-time using zoom and he felt intimidated when Dr. Tempest's photo appeared enlarge on his screen and she would respond to his questions with a frown. Nehme stated that Dr. Tempest also appeared as if she was not interested. Nehme said that he felt that if he would have said anything there was going to be retaliation.

Nehme felt that this meeting was important, so he left his Pediatric rotation for the meeting. Nehme shared that when he arrived at the meeting, he was told by Dr. Havas that he was selected for random drug testing. Nehme stated that Dr. Havas had not disclosed to him her reason for selecting him for the random drug testing, nor did she disclose the process for taking the test. Nehme stated that since he was already overwhelmed with the stressors of Pediatrics Rotations, he felt embarrassed and worried that everyone knew that he was being drug tested. Nehme added that he went to the Student Health Clinic to take the test. Nehme stated that he received a voicemail on March 4, 2020 from Dr. Havas saying that the results of the drug test were back, and that they did not find anything that they did not expect. Nehme says that he does not know what she meant by that and that he never received a written confirmation of his results.

## WITNESS STATEMENTS

The witnesses were interviewed regarding the complaint. They were informed of the Regulation, the investigation process, confidentiality, and FIU's prohibition against retaliation.

### Witness 1 – Maria Santacruz

Maria Santacruz was interviewed remotely on June 10, 2020. Santacruz currently serves as the Testing & Assessment Manager for HWCOM; Santacruz has served in this capacity for five years. However, she has been an employee at HWCOM for 10 years.

With regards to the assessment and testing accommodation process, Santacruz advised that she receives emails from DRC representatives addressing HWCOM student accommodations. According to Santacruz, in either 2018 or 2019, she started a process that consisted of sending information to students confirming that they would receive their testing accommodations.[14] Santacruz further clarified that she sends students email notifications detailing the type of testing accommodation they will receive. Santacruz indicated that after she sends the email to Director of Testing and Evaluation Dr. Rodolfo Bonnin, Associate Dean of Student Services Dr. Nancy Havas, Associate Dean of Curriculum and Medical Education Dr. Vivian Obeso, Assistant Director of Academic Support Services Janel Fernandez, and Assistant Director of Support Services Maritere Williams.

Santacruz shared she administers the NBME and Examsoft exams. She shared that her primary function is to administer the High-Stakes testing from the National Board of Medical Examiners (NBME). Santacruz stated that exams on CanvasMed had very small weight on a student's grade and were administered by course coordinators.[15]

Santacruz indicated that she uploads and creates examinations in Examsoft based on the information that the faculty provide to her. Santacruz then creates profiles for all students, including those who require testing accommodations. She added that she communicates with students about their testing accommodations before they sit for a test, and she provides them with instructions on the type of testing accommodation(s) that they will be receiving. For example,

---

[14] Santacruz acknowledged that this type of notification had not been previously communicated to students.

[15] According to Santacruz, course coordinators administer/manage course testing or activities.

Santacruz shared that if a student is to receive extra time for testing, they will receive a message in the Examsoft system advising the student of how much time they will receive. She stated that the process for NBME exams is slightly different because she only creates the profiles, while the professor creates the exams on the NBME website, assigns it to the student, and grades them. Similar to Examsoft, at the start of the exam, students are notified of the extra time they will receive as part of their testing accommodation.

Santacruz stated that she co-manages the work of seven course coordinators who are responsible for periods 1 and 2, Clinical Skills, and Social Sciences (courses that are not basic sciences). She stated that the course coordinators are the test administrators for CanvasMed and also assist as proctors for some examinations. She commented that course coordinators also report to different individuals such as Dr. Jenny Fortun, and some report to Dr. Maria Stevens (Director of Clinical Skills). Santacruz stated that after March 2020, she obtained access to CanvasMed and oversaw testing requirements for HWCOM students using this platform. With regards to accommodations, she (Santacruz) would send coordinators emails reminding them that students who had testing accommodations for extra time should be provided the necessary additional time in the system.

According to Santacruz, a minimal distraction room is a room with no distractions where a student may take an exam. She further clarified that she is not the individual responsible for assigning the student's minimal distraction rooms. Santacruz advised that Maritere Williams or Teresa Reyes Gavilan (Academic Support Services Administrator) assign the distraction rooms for students. Santacruz mentioned that she (Santacruz) has been told that there are new ways of notifying students who are expected to test in a minimal distraction room and that students now receive an email one hour before their exam time; this notification informs students that there will be an activity scheduled for the them and that they (the students) should report to AHC 2 495. Santacruz noted that this is the process for "little quizzes" (e.g., pop quizzes or readiness assignments). Further, considering Santacruz is not responsible for assigning minimal distraction rooms, she stated she is not familiar with the actual testing room locations.

Santacruz commented that, since assessments are being conducted online due to remote learning, students will take CanvasMed tests through Honorlock (where accommodations will be provided) and NBME assessments will be monitored through Zoom.[16]

According to Santacruz, the ADA committee is an ad hoc committee that meets once a month to discuss students with accommodations. She said that the chairperson of the committee is Adrian Jones and the other committee members include Santacruz, Dr. Fortun, Dr. Bonnin, Dr. Obeso, Dr. Havas, Janelle Fernandez, and former Dean of Students Dr. Karin Esposito. Santacruz further stated the following:

> This committee is procedure-based and if there are any student issues that come up, we discuss it as a committee. In Fall 2019, the members of the ADA committee decided to create an ADA procedure manual; I helped to create this manual. It was created for the purpose of streamlining and uniformity in the accommodation process. Before then, I followed some procedures, however there was no manual in

---

[16] Honorlock is a proctoring solution that helps protect the academic integrity of assessments created within your Canvas course while offering students the convenience of taking exams at their convenience (within the time frame allotted by the instructor). (https://online.fiu.edu/faculty/resources/technology/honorlock-proctoring.php)

place; these procedures were instructed by administration. We had a shared drive that had testing accommodations, so what we decided was to put the documents into a manual. The students did not have any tangible guide to help them through the testing accommodations process. The students were told to go to the DRC for assistance.

Santacruz said that she follows the DRC recommendations, and if there are accommodations she does not understand, she requests assistance from Dean Jones. Santacruz further attested:

My job is to assist with all student requests in an efficient manner. If a student asks me for an accommodation, I will direct them to the DRC for assistance. At the DRC, they would be able to get an official testing accommodation so that (HWCOM) can implement their testing accommodation.

According to Santacruz, if a student says that they are not receiving their time accommodations, there are provisions in place that allow for that student's exam to be stopped, as well as manually adding extra time to that exam. For NBME exams, she can communicate with the proctors to stop the test. She shared that if a student did not get an email advising them of their testing accommodation, "we can rapidly assist them on where to go. We do everything that we can to make sure that the accommodations are granted."

Santacruz stated that she did not know much about the pop quizzes/readiness assignments, because she mostly dealt with High-Stakes testing. She indicated her understanding is that the reason why students were not receiving testing accommodations for pop quizzes/readiness assignments was that it would "disrupt the flow" of the class. According to Santacruz, if a student is taking the pop quiz/readiness assignment with their extended time and the class ends before the student finishes their assignment, they will be late to the next class. She shared that this was the situation for exams that made up a "very low" percentage of a student's total grade; she added that some of the quizzes were team-based and "it would have been complicated [to accommodate students] because they did not know who their partner would be and if they would get the extra time."

Santacruz acknowledged that on March 10, 2020, HWCOM began using the term "Readiness Assignments" for coursework that was previously referred to as "in-class quizzes." Santacruz recalled there being a discussion about student concerns regarding them reportedly not receiving testing accommodations for in-class quizzes. She stated that the explanation provided was that since these examinations had little point value to a student's final grade, there would be no testing accommodations. However, she does not recall who specifically made the statement. Santacruz added that, as of April 2020, the professors began providing testing accommodations for pop quizzes/readiness assignments.

Santacruz shared that students have always been given testing accommodations for NBME examinations. She shared that if a student stated they did not receive their testing accommodations for extra time on the NBME exams, she could verify their claim by contacting the NBME administrators. She also stated that the students had been instructed to inform her via a zoom link immediately so that she can stop and restart the exam with the testing accommodations. Santacruz stated that she was not advised by any student about not receiving minimal distraction room accommodations.

According to Santacruz, she was unsure of the process for the High-Stake shelf exams (High Stake) because Maritere Williams handles these during period 3. Santacruz stated that shelf exams are a part of the period 3 experience in medical school. Santacruz further stated that period 3 is based on clerkships in Psychiatry, Neurology, Family Practice, Gynecology/Obstetrics, and Pediatrics. She (Santacruz) stated that the NBME and Examsoft both have portions of shelf examinations; both testing portals are monitored/proctored by the period 3 administrator Maritere Williams. She advised that her only responsibility for period 3 testing is to communicate the names of students who have testing accommodations.

According to Santacruz, she provides one-to-one assistance to students with accommodations. Santacruz added that there are many medical students with accommodations and sometimes this can make the accommodation process difficult; there are times in which there are large testing cycles and she is the person responsible for inputting the data for student's testing accommodation.

Santacruz stated that she is familiar with Nehme as a DRC student with testing accommodations. Santacruz noted that she was certain Nehme had received all NBME testing accommodations for period 3. Santacruz mentioned that it is important to state that she recognizes that Nehme did not receive any testing accommodations during periods 1 and 2. Santacruz shared that a testing audit was conducted for Nehme where tests were reviewed; she confirmed that there were some CanvassMed quizzes where Nehme did not receive accommodations, however here were other CanvassMed quizzes he did receive his testing accommodations. (**Exhibit 5**) According to Santacruz, she also conducted an audit in the NBME system, proving that Nehme received his requested testing accommodations for NBME examinations. As it relates to Nehme's minimal distraction room assignment, Santacruz commented that this was facilitated by Maritere Williams. Santacruz added that based upon Nehme's class 2 period, she was also sure that Nehme had not received his testing accommodations for in-class pop quizzes/readiness assignments as indicated by the audit.

According to Santacruz, the ADA committee is currently creating an ADA manual to provide a better understanding of the process for students requiring ADA accommodations.

### Witness 2 – Dr. Rodolfo Bonnin

Dr. Rodolfo Bonnin was interviewed remotely on June 10, 2010. Dr. Bonnin serves as the Director of Assessment and Evaluation for HWCOM. Dr. Bonnin has been employed at the university for 11 years.

According to Dr. Bonnin, his responsibilities consist of reviewing performance outcomes for students in the Physician Assistant (PA) program as well as other HWCOM students. Dr. Bonnin stated that he creates summaries, reports, and recommendations, based on the performance outcomes from the PA and HWCOM students, for professors. Dr. Bonnin indicated that the Office of Assessment and Evaluation is responsible for the High-Stakes "third-party" vendors and advised that the third-party testing vendor is the NBME.

Dr. Bonnin stated that the NBME system has some "limitations" in data collection and flexibility; however, they have not had issues with inputting students' testing accommodations. Dr. Bonnin

mentioned that it took "three weeks to gain NBME's permission to give tests remotely." He added that NBME's primary concern is the confidentiality of their testing.

Dr. Bonnin stated that he supervises the Testing and Assessment Manager, Maria Santacruz, and her team of course coordinators. Dr. Bonnin stated that Santacruz manages this system "very well" and that it is her responsibility to troubleshoot any student's concerns, including monitoring the student's testing accommodations. According to Dr. Bonnin, Santacruz's primary function is to manage the High-Stakes examinations. Dr. Bonnin added that Santacruz provides proctors, testing accommodations, and technical support to the medical students. Dr. Bonnin described the testing accommodations process as the following:

- Santacruz receives an email from the DRC detailing students' DRC-approved accommodations.
- Santacruz coordinates scheduling and creates the students' profiles on the testing platform.
- Santacruz informs students that she is in receipt of their DRC-approved testing accommodations and relays this information to the course coordinators.[17]
- Santacruz reserves rooms for those students who need testing accommodations.

According to Dr. Bonnin, the problem with students getting their testing accommodations exists within the CanvasMed system. Dr. Bonnin stated that it was not until one year ago that he gained "any knowledge" about the CanvasMed examinations. Dr. Bonnin added that these examinations (pop quizzes/readiness assignments) were solely monitored by the course coordinators, and they were "never alerted that any particular student was not receiving their testing accommodations." Dr. Bonnin stated that this was a part of a systemic problem, in which he "would take some part of the blame." He continued by saying, "I was not aware of this until all the issues came to the forefront sometime last year."[18] According to Dr. Bonnin, Dr. George Dambach (former Associate Dean of Curriculum and Medical Education) was previously the person who supervised the testing accommodation process. Dr. Bonnin stated that Dr. Dambach was the originator of the testing accommodation process, and that it was he (Dambach) who decided to let the course coordinators have that responsibility for accommodations. Dr. Bonnin added that Dr. Dambach retired in 2017, and that Dr. Karin Esposito was his successor, and, as of June 2019, Dr. Obeso serves in that capacity. Dr. Bonnin further mentioned that the testing accommodations have always been a practice.

Dr. Bonnin shared that at one point, when the ADA committee was made up of Dr. Bonnin, Dr. Bob Dollinger, Dr. Heidi von Harscher (Director of Medical Student Support Services), Dr. Yerko Berrocal, Dr. Karin Esposito (Executive Associate Dean of Student Affairs), and Dr. Rebecca Toonkel (Assistant Dean for Curriculum, Clinical Education), the committee decided that "small assignments that did not have much weight would not receive testing accommodations." Additionally, Dr. Bonnin advised that the ADA committee determined that for "anything related

---

[17] Dr. Bonnin added that the course coordinators monitor CanvasMed for courses, and it is their (course coordinators) responsibility to set up the testing accommodations with the Information Technology (IT) department.

[18] The issue that Dr. Bonnin is referencing is when some students complained about not receiving their testing accommodations.

to clinical work, students would not receive testing accommodations." Dr. Bonnin added that to his recollection, this was not escalated to the Dean of HWCOM.

Dr. Bonnin recalled that it was not until last year "sometime in October 2019" when students started asking questions about their accommodations. Dr. Bonnin further recalled that while attending an ADA Committee meeting, a committee member brought up a discussion about formulating a plan for students who were not receiving testing accommodations with online, take-home, or essay exams. Dr. Bonnin stated that because of the concerns involving that issue, in October 2019, his team became in charge of all the testing accommodations. Dr. Bonnin stated that Dr. Jenny Fortun provided a list of approved and disapproved testing accommodations. Dr. Bonnin stated that this list did not involve the NBME or Examsoft testing because they are monitored by different departments. Dr. Bonnin advised that, at that time, Santacruz's responsibility was to consider the list, only alert the course coordinators and verify that the students testing accommodations had been inputted into CanvasMed. Dr. Bonnin stated that as of April 2020, this list is no longer in use; another decision was made by the current ADA committee to give the students all of their testing accommodations for all assignments.

Dr. Bonnin stated that it is important to get the context of the testing accommodation process within the HWCOM. Dr. Bonnin added that the testing accommodation process was originally solely with the DRC, but it was transitioned slowly to the colleges after the DRC became "overwhelmed".

According to Dr. Bonnin, he is "positive" that Nehme was not given testing accommodation for his in-class quizzes or activities. Dr. Bonnin added that, during that time, Nehme was still in his period 1 and 2 years, wherein the college was still following the old practice. Dr. Bonnin stated that he was not sure if Nehme repeating the year or if any of his course failures were a result of Nehme not receiving his testing accommodations. Dr. Bonnin said that Nehme had received his testing accommodations for the High-Stakes examinations. Dr. Bonnin referred the matter of the minimal distraction room for Nehme to Maritere Williams and added that HWCOM has severe space issues. Dr. Bonnin added that his concerns are always for the student, therefore he would never intentionally not give a student their testing accommodation.

## Witness 3 – Maritere Williams

Maritere Williams was interviewed remotely on June 11, 2020. Williams serves as the Associate Director of Academic Support Services for HWCOM. Williams has been employed at the university for 7 years.

According to Williams, her responsibilities are to provide support to period 3 students as well as seven mandatory clerkships. Williams added that clerkships are specialty areas, such as Family Medicine, Internal Medicine, Neurology, Obstetrics and Gynecology, Pediatrics, Psychiatry, Radiology, and Surgery. Williams stated that she orders NBME High-Stakes shelf examinations, assigns the proctors, and sets up the examination room. Williams noted that she contacts Academic Support Services Administrator, Teresa "Terry" Reyes Gavilan, who manages the classroom management system. Williams added that Terry is usually the person that recommends the minimal distraction rooms and advised that this is the practice since there is limited spacing throughout the college. Williams stated that she assigns the proctors for the examination and it typically requires two proctors.

According to Williams, her understanding of the ADA process is that students must submit a request to be reviewed by the testing accommodation department. Williams added that she is not a part of that process; usually, she receives notification by the assessment department, which is led by Dr. Bonnin and his team. Williams stated that testing accommodations are sent to her in a document that has a list of the student names and the type of accommodation to be provided.

Williams stated that she was not sure if accommodating students while in the testing room was considered an accommodation; however, sometimes the rooms are too cold so she will submit a request to lower the temperature. Williams added that one time when she was notified, through a proctor (course coordinator) that a specific student as "very cold," she sent her personal heater to the room to make the student comfortable. Williams stated that these are not necessary accommodations, but she wanted the students to be comfortable. According to Williams, she has never seen an ADA manual, she has never received any training on accommodations, nor has she ever attended any ADA meetings. Williams stated that she is very familiar with the NBME's testing manual. Williams noted that she keeps a log of the students' testing occurrences, which is required by the NBME. Williams added that the log serves to monitor the students' presence while taking their exams. Williams stated that she understands her position and that she trains everyone that works with her to make sure that they know the requirements. Williams added that she has never received a complaint from the students.

According to Williams, the course coordinators not only proctor examinations, they also manage the content of the students' course work with CanvasMed. Williams stated that the course director advises the course coordinators of the quiz dates, mostly in period 2. Williams noted that her responsibilities are for period 3, including ensuring that students attend their clerkships. Williams added that part of the clerkship is the NBME shelf-exam that they take at the end of their clerkship.[19] Williams added that some OSCE course coordinators report to Dr. Rebecca Toonkel's team, some coordinators report to Dr. Fortun and some coordinators report to her.

Williams shared that the course coordinators have a "dotted line" report to the course directors. Williams stated that a course director is the person that determines the type of testing and which coordinators are responsible for setting up the courses in CanvasMed. Williams added that the clerkships do not have the same type of course structures; for instance, the Objective Structures Clinical Examinations (OSCE)[20] occurs during period 3 in a clinical setting where students demonstrate their clinical skills virtually and are allowed to interview standardized patients. Williams stated that course coordinators also coordinate the clinical setting.

According to Williams, she verified Nehme's Psychiatry shelf exam testing accommodations with the NBME representatives. Williams added that she also confirmed Nehme was given his testing accommodations of extra time for all of the NBME High-Stakes examinations and the System

---

[19] A clerkship is a consultation service where hospital visits occur at several sites during the rotation.

[20] Objective Structured Clinical Examination *(OSCE)* is a form of performance-based testing used to measure candidates' clinical competence. During an **OSCE**, candidates are observed and evaluated as they go through a series of stations in which they interview, examine, and treat standardized patients (SP) who present with some type of medical problem.

Based Practice that is administered by Examsoft. Williams stated that Examsoft is a High-Stake testing systems that she monitors, however, the testing documents are uploaded by the individual program directors.

Williams further stated that Teresita "Terry" issued a minimal distraction room, which was a common room that they have used before. Williams recalled getting permission from Terry to place Nehme inside AHC2 495, since "that was the only conference room available." Williams stated that she never received a complaint from Nehme about the conference room he was placed in. Williams commented that she has used AHC2 495 before as a minimal distraction room and has never received any complaints.

According to Williams, she described room AHC2 495 as a conference room with mirrored windows; however, to ensure that the building's area remains quiet, she posted a note on the door that indicates that students are testing. Williams described a minimal distraction room as a room without windows and should be away from heavy foot traffic areas.[21] Williams added that HWCOM has limited rooms and Teresita attempts to match the description as mentioned by the University. William stated that AHC1 335 is also a room utilized for minimal distraction. She described this room as conference room that does not have any windows. When comparing the two locations Williams stated that the only difference between the rooms were the mirrored windows in AHC 2 495. Williams further stated that when she requested a minimal distraction room, Terry assigned her a room that was available at that time. Williams added that she believes that both locations (AHC1 335 and AHC2 495) meets the student accommodation needs. Williams stated that she wants the student to be successful.

### Witness 4 – Dr. Jenny Fortun

Dr. Jenny Fortun was interviewed remotely on June 17, 2020. Fortun serves as the Assistant Dean for Foundational Sciences Curriculum at HWCOM. She also serves as an adjunct professor in the Occupational Therapy program in the Nicole Wertheim College of Nursing and Health Sciences. In addition, Fortun has been a faculty member at the university since 2009, the inaugural year of HWCOM.

According to Fortun, she oversees the first two years of medical school in terms of curriculum, logistics (class assignments), coordination between classes, and scheduling. Fortun stated that period 1 and period 2 is considered preclinical and occurs mostly in the classroom. Fortun further stated that clerkships, which she does not handle, take place during period 3. Fortun defined a period year as being from August to March.

According to Fortun, HWCOM has had many changes in the ADA process. Fortun stated that currently the process starts outside of HWCOM, with the DRC reviewing student accommodation needs. Fortun indicated that the DRC sends HWCOM communications on the specifics pertaining to the students' needs.

Fortun further stated that the ADA accommodation committee is responsible for overseeing the accommodation of all students. She indicated that if the examination is proctored by the Office of Assessment and Evaluation, the committee will send the student accommodations to that

---

[21] Williams clarified that she did not consider the mirrored glasses as windows, nor did she consider the courses scheduled on that day when selecting a room.

department for processing. Fortun mentioned that as of March or April 2020, the Office of Assessment and Evaluation communicates to students the date and time of their in-class quizzes; she added that the Office of Assessment and Evaluation does not necessarily proctor tests. Fortun clarified that, for a pre-quiz, the student will be notified that they are expected to take the examination before 7:30 a.m.; for a post quiz, the Office of Assessment and Evaluation schedules the exam after the class and provides proctoring assistance. Fortun commented that for this process to work, the Office of Assessment and Evaluation must manage their testing schedules, and the course coordinators must give feedback. Fortun mentioned that the Office of Assessment and Evaluation had not tested the new process due to the Covid-19 crisis.

Fortun supervises Natalie Dwarika (Program Manager), who manages course coordinators that are responsible for the daily academics for periods 1 and 2. Fortun stated that every syllabus comes to her office and is reviewed for academic logistics and scheduling purposes, including identifying the exams of student that require ADA accommodations. Fortuned added that she and Dwarika coordinate with the Office of Assessment and Evaluation by sharing the dates and times the students with accommodations will be taking their tests.

According to Fortun, she is responsible for the Examsoft products that are administered through the Office of Assessment and Evaluation. Fortun stated that in March of 2020, the course professors administer the post quizzes mentioned earlier; however, the course coordinators make sure that HWCOM has inputted the exam into CanvasMed.

Fortun stated that before March 2020, student testing accommodations were not considered for in-class exams; however, they were always a part of the "bigger" test. Fortun indicated that the bigger test is the NBME and Examsoft portals. Fortun stated that the ADA committee decided that quizzes would not receive ADA testing accommodations because the significant difference is that the quizzes are meant to support specific classroom activities. Fortun indicated that certain quizzes are valued at 1% of the total grade. Fortun added that this is why the ADA committee members decided to designate these low weight quizzes as readiness assignments. According to Fortun, the students were sent an email advising them about the language change to "Readiness Assignments."

The academic reason for readiness assignments is to check a student's understanding of the course topics. Fortun also stated that the readiness assignments had such a low point value and, in some cases was offered fewer times in a course, that she could not imagine that the assignment would significantly affect a student's grade. Nevertheless, Fortun added that she was working with the course directors to educate them on how to minimize the number of readiness assignments so that it did not affect the student grade.

According to Fortun, she has never denied any students their ADA accommodations. Fortun added that she has never denied Nehme any accommodations. Fortun stated that she was aware that he was a student that was having some difficulties, only because his name was mentioned during ADA committee meetings. Fortun indicated that she does not believe that the weight of the readiness assignments on the student's total grade harms the students; she added, "at that moment, those were the rules we had." Fortun states that these were the original rules set by the ADA committee when she first arrived at the university. Fortun indicated that she does not know where the rules originated. Fortun believes the ADA committee is familiar with the rules, and now they

are working on documenting the rule. According to Fortun, MDR accommodations are handle by the Office of Testing and Evaluation and she is not familiar with MDR accommodations

**Witness 5 – Adrian Jones**

Dean Adrian Jones was interviewed remotely on June 3, 2020 and July 1, 2020. Jones currently serves as the Interim Executive Dean of Students at HWCOM and has been employed with the university since 2014.

According to Jones, he manages all the operations in the Office of Student Affairs (OSA), Enrollment Management, Financial Aid, Records Management, Student Support Services and Career Services for HWCOM. Jones added he is currently managing the HWCOM Office of Diversity & Inclusion on an interim basis. Jones stated that he has served on the ADA committee since 2015; he advised that before him, Dr. Bob Dollinger served as the inaugural chair of that committee until Dollinger's retirement. Jones advised that Dr. Nancy Havas is the current chairperson for the ADA committee.[22]

Jones advised that the testing process started with Dr. Dollinger, who managed the systems and the ADA process. According to Jones, Dr. Dollinger established an agreement with the DRC from 2008 to 2015 where the DRC agreed to administer the High-Stakes examinations. Jones stated that when the DRC was assisting HWCOM, managing the testing accommodation process was very easy, since the DRC was also in possession of all the High-Stake exams. Jones stated that this process was efficient until the DRC became "overwhelmed." Jones stated that his understanding was that the DRC's resources were getting scarce due to being utilize for both the HWCOM and the College of Law. Jones added that a decision was made by the DRC to return the High-Stakes testing back to the individual colleges. He stated that a decision was made for these responsibilities to be assigned to Dr. Rodolfo Dr. Bonnin in the Office of Assessment and Evaluation.

According to Jones, he established a practice of meeting with students who had accommodations and informed them that their testing accommodations would only apply to High-Stakes testing. According to Jones, when he meets with a student that has requested a testing accommodation, he explains to the students their process for in-class testing and clinical rotations. Jones added that his explanation to the student consisted of educating them on the accommodation process and equating it in a hospital setting. Jones stated that he never received any push back from the students. Jones noted that he feels that it is important to be an advocate for students in his position.

According to Jones, there were numerous meetings with the ADA committee, DRC, IDEA and Office of General Counsel (OGC) to discuss the testing accommodation concerns. After a particular meeting, there was a decision that it may be more suitable to change the name of "in-class quizzes" to "readiness assignments." Jones added that everyone approved the readiness assignment title, and an email was sent out to the students, informing them of the change. Jones further mentioned there was still a matter of changing the name from "quizzes" to "readiness assignments" in the CanvasMed learning management system. Jones added that the issue is currently being addressed by their IT department. Jones added that the name change provided a

---

[22] In a follow up interview, Jones clarified that in the weeks after his initial interview, Dr. Havas had been appointed chair of the ADA committee.

better description of what the professor was attempting to achieve in the course. Jones contends that it is his belief that course professors are only trying to "get a feel" of student's knowledge.

According to Jones, in April of 2020, after several discussions and meetings with DRC, IDEA and Office General of Counsel (OGC), a decision was made to reevaluate the testing accommodations. Jones stated that a new testing accommodation process had recently been proposed to the ADA committee including an ADA manual and a change in the course schedule. Jones expressed that these changes would now allow students to get their testing accommodation in their courses.

According to Jones, Nehme is a respectful young man that "will be a great doctor, someday." Jones stated that he has had to meet with Nehme on several occasions to discuss his educational process. Jones added that he was aware of Nehme's recent High-Stakes test failure and the recommendation of dismissal from MSEPC. (**Exhibit 6**) Jones said that Nehme had never mentioned that he had not received any of his testing accommodations. However, Jones further stated that he reviewed Nehme's testing accommodations and agree that Nehme did not receive some of his testing accommodations for in-class quizzes/readiness assignments. Jones stated that Nehme had been given testing accommodations for his High-Stake examinations. Jones contends that because HWCOM has limited room vacancies, it is possible Nehme was placed in a room that was not conducive to a minimal distraction room. Jones added that he does not know what the specification for minimal distraction room are; Jones indicated that if Nehme had mentioned what he was experiencing, he (Jones) would have been able to intervene on his behalf with the MSEPC committee.

According to Jones, Dr. Havas mentioned that she was going to select Nehme for a random drug test because of some behaviors he exhibited during his clinical rotation. Jones added that Dr. Havas was the designee to handle the drug testing area; he did not need to know the reason why students were selected. Jones stated that Dr. Havas stated there was a report from a Clinical Affiliate (Sarah Stumbar, Assistant Dean for Clinical Education) that indicated that Nehme appeared tired, distracted and not present. According to Jones, Havas explained to Nehme that he was selected for a random drug test. Jones stated that Nehme was upset and felt that he was targeted, and he did not understand why he was chosen. Jones added that he explained to Nehme that his drug testing was to protect him and the university from potential liability, and that it was not a punishment, but some help for him.

## Witness 6 – Dr. Vivian Obeso

Dr. Vivian Obeso was interviewed remotely on June 17, 2020. Dr. Obeso currently serves as the Associate Dean for Curriculum and Medical Education at HWCOM, a position she has held since 2018. In addition, Dr. Obeso previously served as the Medical Director of the Albert and Debbie Tano Simulation Center at FIU HWCOM.

Dr. Obeso indicated that she oversees the entire four-year medical student process through the Office of Medical Education within the Academic Affairs department at HWCOM. Dr. Obeso stated her understanding of the ADA testing accommodations is that the DRC speaks with the students and sends communication to HWCOM OSA for processing of testing accommodations. Dr. Obeso added that the notification is sent across divisions to divisional directors. Dr. Obeso stated that after receiving an ADA notice, OSA takes charge to discuss those accommodations,

and they work with the Office of Assessment and Evaluation. Dr. Obeso advised that separate coordination and review is conducted by the ADA committee, which is managed by OSA. She shared that the committee is chaired by Dean Jones and that she (Dr. Obeso) does not serve on that committee.

Dr. Obeso advised that the ADA committee meets to discuss and monitor the needs of the students testing accommodations. Dr. Obeso stated that Dr. Rodolfo Bonnin was the Director of Assessment, and he has since taken over all testing accommodations. Dr. Obeso said that she has never personally denied any student their accommodations.

According to Dr. Obeso, students have never received accommodations on readiness assignments, even when they were called "quizzes." Dr. Obeso stated that students did not receive accommodations for these assignments because adding time to these assessments would compromise the activity. She specified that it would be a challenge to implement these accommodations because when one course ends, the next course begins shortly thereafter. She further stated that the quizzes made up a "very small" percentage of the student's grade. She indicated these reasons together influenced the decision to not provide student accommodations for these types of activities.

According to Dr. Obeso, Dr. George Dambach (former Curriculum Dean) and Dr. Karin Esposito (who are no longer at the university) advised her that if testing accommodations compromise the activity and the sequencing of the course, and if the percentage is lower than 10%, then no testing accommodations would be granted. Dr. Obeso stated that it is her understanding that the testing protocols had been in place since the college's existence, and there has never been this type of testing accommodations for in-class quizzes. Dr. Obeso recalled having a conversation with Dr. Loynaz about concerns raised by a group of students, regarding them reportedly not receiving testing accommodations. Dr. Obeso was unable to provide the specific date and time. However, while further conversing with Dr. Loynaz about the concerns shared by the students, Dr. Obeso stated that Dr. Loynaz advised her that the university's policy is that when a student requests an ADA accommodation, it must be granted. Dr. Obeso recalled Dr. Loynaz stating that quizzes should receive an accommodation. Dr. Obeso stated that Dr. Loynaz advised her to change the names of the quizzes to readiness assignments. Obeso stated in January of 2020, the college decided to stop using the word "quiz" for those quizzes that were link to flipped-based classroom activities. According to Dr. Obeso, as of January 2020, exercises that are part of an in-class activity are called "readiness assignments" in all syllabi and in Canvas.

Dr. Obeso stated that she could not recall any written notice, policy, or procedure that indicated that this was the process for these types of accommodations. Dr. Obeso said that Dr. Bonnin had shared with her that previous administrators had conversations about these issues, so she started asking why these testing protocols had not been changed by anyone. According to Dr. Obeso, she started asking the DRC if there was an ADA policy written, and no one could provide her an ADA policy.

According to Dr. Obeso, she works closely with DRC and the Office of Assessment and Evaluation and leans on their administrators for advice. Dr. Obeso added that with limited policies on testing accommodation, she believed that their decision to continue with the current standard was the right thing to do. Dr. Obeso stated that she decided to provide accommodations for all readiness

assignments; despite being "very short quizzes," when they are weighted and added together, they may impact a student's grade.

According to Dr. Obeso, she became familiar with Nehme's allegations that he was not receiving his testing accommodations when Dr. Bonnin addressed it at an ADA committee meeting. Dr. Obeso shared that she was assured by Maria Santacruz that Nehme had received all of his testing accommodations for the High-Stake examinations and that his placement in a minimal distraction room was done properly. Dr. Obeso advised that HWCOM has limited rooms and that it takes a lot of planning to reserve a room. Dr. Obeso stated that Nehme would not have received testing accommodation for his in-class readiness assignments because it was not a part of the testing protocols during that time.

**Witness 7 – Dr. Stephen Loynaz**

Dr. Stephen Loynaz was interviewed remotely on August 20, 2020. Dr. Loynaz currently serves as the Access Consultant Manager for the DRC. Dr. Loynaz has held the position since 2011. Dr. Loynaz certified Nehme in July 2017.

According to Dr. Loynaz, he is responsible for working with HWCOM medical students that may request ADA accommodations. Dr. Loynaz added that he processes the DRC student accommodation requests by reviewing their documentation and sending the request to HWCOM administrators. Dr. Loynaz shared that over the years there has been some concerns with the accommodation process, specifically how to address the testing accommodations. According to Dr. Loynaz, he advised students that in-class assignments were not as important as the high-stake testing. Dr. Loynaz indicated that his understanding is that, sometime in December of 2019, the matter of testing accommodations was brought to HWCOM's attention by various students. Dr. Loynaz indicated that the students were asking why they were not receiving testing accommodations. Dr. Loynaz stated that he began to communicate with HWCOM administrators to resolve the concerns of the students.

According to Dr. Loynaz, he was told by previous HWCOM administrators that implementing accommodations for these assessments would fundamentally alter the curriculum schedule and the weight of the assessment was inconsequential to the student's success and therefore they did not merit being accommodated. Furthermore, the DRC were also told that HWCOM administrators did not have the resources to accommodate these assessments such as proctors and space.

Dr. Loynaz stated that Dean Jones sent him an email on December 7, 2015 that says that the college does not have the ability to monitor quizzes and provide accommodations for quizzes, only exams. According to Dr. Loynaz, Dean Jones requested to speak with him on the phone after he provided some alternatives. Dr. Loynaz added that the phone call concluded with a decision that the DRC would no longer provide ADA Accommodations for the HWCOM.

Dr. Loynaz indicated that he became aware of Nehme when he processed his accommodation request in July of 2017. **(Exhibit 2)** Dr. Loynaz recalled receiving complaints from students regarding a course taught by Dr. Obeso in fall 2019; Students alleged that the terminology used

in the syllabus (quizzes) was not the same terminology used in the course itself (readiness assignment). Dr. Loynaz stated that Nehme was not one of the students making complaints.

According to Dr. Loynaz, during a roundtable meeting with HWCOM administrators and members from IDEA, the DRC, and OGC, Dr. Bonnin said that the college has never had the resources to accommodate readiness assignments and that this is the reason why the college decided to only provide accommodations for assignments that made up at least 15% of the total grade. Dr. Loynaz further added that the DRC did not coin the term "readiness assignments." He also commented that he believes the decision came from Dr. Obeso who instructed Dr. Bonnin and the Office of Assessment and Evaluation to implement this process. According to Dr. Loynaz, a minimum distraction room offers a less distracting environment, for example, fewer people and fewer windows. Dr. Loynaz stated in the DRC publishes an accommodation glossary that defines the minimum distraction room as an environment that minimizes distractions for the student.

### Witness 8 – Amanda Niguidula

Amanda Niguidula was interviewed remotely on August 20, 2020. Niguidula currently serves as the Director for Disability Resource Center (DRC). Niguidula position she has held since 2006.

According to Niguidula, she has reviewed the ADA Accommodation process for HWCOM from the very onset of the college in 2009. Niguidula stated that from years 2009 – 2014, there was pushback from the then-current HWCOM administrators who were hesitant to provide accommodations to students with physical disabilities. Niguidula commented that the reason cited was that it would be a fundamental alteration of the program. She contends that she and Dr. Loynaz continue to receive similar pushback from the current HWCOM Administrators, specifically for students who have testing accommodations. Niguidula shared that the DRC provided assistance to HWCOM with regards to testing accommodations from the college's inception. She added that members from the DRC staff (including Dr. Loynaz) would regularly administer and proctor High Stake exams at HWCOM, and that they provide a similar service to the College of Law at the same time. Niguidula commented that the testing accommodation process was transitioned back to the individual colleges sometime in 2014 when it was determined that the DRC would not be able to continue to provide this service to the colleges. She added that the DRC continued to work with Dr. Bonnin and others at the college to develop the best practices for providing testing accommodations. Niguidula stated that when the process was transitioned to the college, there was an increase in the number of complaints from students saying that they were not being properly accommodated.

Niguidula recalled that during meetings with HWCOM Administrators in or about 2016, the sentiment expressed by the college was that they would not provide testing accommodations for lower-weight assessments because they had to be done in real time. She further added that the college communicated that students with accommodations would be at a disadvantage if they were provided accommodations on these "15-minute contextual real-world assessments" because it

would require pulling them out of class and thereby making them late for their next class.[23] Niguidula shared that the administrators at the time were of the belief that extending or modifying the times for these contextual learning opportunities would  dilute the experience and purpose of these assessments and thus would hinder the ability to properly evaluate them (the assessment).[24]

Niguidula commented that accommodations provided to students must be documented to ensure that the University can support that such accommodations were in fact provided. She added that there have been instances in the past when HWCOM provided certain accommodations to students that were not documented. Niguidula attests that it is the DRC's position that an appropriate accommodation should be provided for something designated as a quiz, even if it has been renamed to "readiness assignment."

Niguidula stated that the term "readiness assignment" came from Dr. Bonnin. She added that during a roundtable meeting, the HWCOM administrators indicated that any assignment worth less than 15% of the total grade would not be eligible for accommodations. Niguidula commented that HWCOM needs to decide what term and criteria they will be using and be consistent in implementing it so that students have the proper guidance with regards to expecting accommodations.

Niguidula indicated that she was not familiar with Nehme or his case but is aware of similar complaints that have been brought to the attention of the DRC throughout the years by HWCOM students.

### Witness 9 – Teresa "Terry" Reyes-Gavilan

Gavilan was interviewed via telephone on August 24, 2020. Gavilan currently serves as the Academic Support Services Administrator for HWCOM and has been employed with the University since 2012.

Gavilan shared that she uses the Wellsky scheduling system to coordinate room reservations, reserve spaces and minimal distraction rooms. According Gavilan, she is a retired Special Education teacher and is familiar with 504 and Individualized Education Program (IEP) plans.[25] Gavilan defined a minimal distraction as a room that must be away from extraneous stimuli and that students must be able to sit an arm's length apart with minimal noise. According to Gavilan, the scheduling system process for minimal distraction rooms entails her receiving a request from

---

[23] Niguidula clarified that this means that students would be late because the classes in the Medical program were scheduled with very brief breaks in between each class.

[24] The terms "contextual real-world assessments" and "contextual learning opportunities" refer to in-class quizzes and Readiness Assignments, as mentioned throughout this report.

[25] The IEP, Individualized Education Program, is a written document that is developed for each public-school child who is eligible for special education.

OAE representatives Melissa Largo or Maria Santacruz; she added that she also receives requests from Maritere Williams.

Gavilan stated that she uses six conference rooms with AHC1, AHC2, and AHC4 as options for minimal distractions rooms. She added that she prefers using AHC1 335 and AHC2 495 for students who need minimal distraction room because they are the most isolated locations and are near office spaces. Gavilan shared that both rooms qualify as minimal distraction rooms because they give students the sense of being in an anonymous environment because other students will not be able to see them.[26] She commented that AHC2 495 has its own entrance and is on a floor where there are no classrooms; however, the room does have a frosted window that is visual to the main hallway as well as two doors that are accessible to other conference rooms as OSCE simulation rooms. She said that AHC1 335 is in a separate building where there are only offices and a hallway that leads to individual office spaces and two windows that have an external view of the outside.

According to Gavilan, on March 2, 2020, the day Nehme took his shelf examination, there were several meetings in the conference rooms and three OSCI simulation rooms near AHC2 495, where Nehme was testing. These meetings had approximately 20 participants each. Gavilan added that no student should have been assigned to take a test in AHC2 495 because of the amount of people on that floor. She stated that she normally catches these situations and understands that a student may have felt uncomfortable with the arrangement.

**Witness 10 – Innah Lachica**

Innah Lachica was interviewed remotely on August 31, 2020. Lachica currently serves as the Program Coordinator for Academic Affairs at HWCOM, a position she has held since 2018. Lachica states she reports to Academic Support Assistant Director Michelle Montero. According to Lachica, one of her job duties is to serve as a proctor for HWCOM students, which includes:

1. Observing students take their exams,
2. Accompany students to the restroom during their breaks,
3. Starting the exam by providing students with the exam code, and
4. Ending the exam by submitting the student's exam and confirming the roster on the NBME website.

Lachica stated that she was made aware that she would serve as the proctor for Nehme's exam by Ms. Maritere Williams. According to Lachica, she was cc'd in an email to Nehme on 2/17/2020, advising the student of his Psychiatry NBME test failure. On 2/18/2020, Williams sent Lachica a sign in sheet for the student and an Outlook invitation regarding Nehme's retake exam that was scheduled to take place in room AHC2 495. Lachica stated no other exam information or instructions were provided, except for the student's name, Elie Nehme and Class of 2021 period 3. When specifically asked if she was provided the reason for the accommodation, Lachica

---

[26]   Gavilan clarified that an "anonymous environment" is a private setting.

responded, "No, I was not told the room needed to be a quiet room or a minimum distraction room." Lachica also stated she has not received ADA training. However, it is her understanding that ADA accommodations require a room is quite with very few distractions.

According to Lachica, on the Friday before the exam, she prepared the documents that were needed for the testing day. Lachica stated she printed the sign-in sheet, activity log, and the "Quiet Please Testing in Progress" door signs. She stated she also made sure that she had pens, clean laminated green boards, board wipes, and ear plugs. Lachica said Nehme was the only student in the class on 3/2/2020, She instructed Nehme that the exam would begin after she provided him with the exam code, restroom breaks are only allowed after 60 minutes of testing, he would be escorted to the restroom, food and drinks are not allowed in the testing room, and he must put his personal belongings away.

La Chica stated that the room was not free from distractions. She said the student complained to her about the temperature in the room. He asked her if she could turn the temperature up because it was too cold in the room. According to Lachica, she noticed Nehme would close his eyes for a few minutes and continue taking his exam. She said she thought this was his way of pacing himself and to take breaks in between answering questions, until Nehme stated he was not comfortable with the temperature in the room. Lachica stated the temperature is a common problem in ACH2 495. Lachica said she was cold and other students have made the same complaint in the past. According to Lachica, she reached out to her supervisor, Michelle Montero and asked if she could borrow her heater. Montero delivered the heater to the room and they placed it next to the student.

According to Lachica, ACH2 495 is a conference room with a table that seats approximately twelve people. The room has a glass wall that is like a frosted window that has transparent gaps that allows you to see shadows of people as they walk by. Lachica said that ACH2 495 is not the preferred room for accommodations because of its location near a large conference room, accessibility to the stairs and the elevator, and the room temperature. According to Lachica, there were meetings/sessions and an observed standardized clinical examinations (OSCE) session taking place during the exam. Lachica stated all of these things were distractions and she was able to hear noises outside of the room off and on throughout the exam. Lachica remembers there were a few times that groups of students were passing by in the hallway talking just outside of the testing room. However, Lachica stated Nehme never mentioned anything about the noise. Lachica said, "I was not able to do anything about it because, I felt like I needed to stay inside the room with the student at all times. I also felt that me going up and walking to the door multiple times would cause more distractions for him. I posted the Testing in Progress door signs and they were ignored." According to Lachica, ACH2 335 is the preferred room for accommodations because it has less traffic and double doors outside of the conference room that can be locked to prevent entrance into the conference room area.

## RESPONDENT STATEMENT - Dr. Nancy Havas

Dr. Nancy Havas was interviewed remotely on June 12, 2020. Dr. Havas serves as the Associate Dean for Student Services for HWCOM and has been employed with the university since 2017; she advised that she is also a medical doctor.

According to Dr. Havas, she oversees the Panther Learning Committee, student activities, and student compliance matters, including the student absence process. Dr. Havas shared that she has also become the person responsible for students who are experiencing hardships, whether they are personal or family-oriented in nature. Dr. Havas stated that sometimes these hardships require that the student take time off from school. Dr. Havas stated that she is a part of the MSEPC committee with Dean Jones, where she assists with promotional committee promotions and any other professional invitations. Dr. Havas stated that she became the chair of the ADA committee in June of 2020; her predecessor was Dean Jones after Dr. Karin Esposito departed from the university.

According to Dr. Havas, she is currently serving as the Chairperson of the ADA committee, and the purpose of the committee is to serve as an oversight of the HWCOM ADA process. The members of the ADA committee are Dean Adrian Jones, Dr. Rodolfo Bonnin, Dr. Jenny Fortun and Maria Santacruz. Dr. Havas stated that committee keeps all members on the same page as it relates to the students and their partnership with the DRC.

Dr. Havas further stated that the committee members should have a thorough understanding of the accommodations, how to execute them consistently, and how to address any concerns that arise. Dr. Havas provided the following example:

> For instance, if a student needs to stand up and move around every 15 minutes, this will disrupt the other students; so, we would need to make accommodations for that student to be tested in another location and get extra time. The students can be successful and (the ADA Committee) can be consistent so that we do not undermine the success of other students.

According to Dr. Havas, the more common types of testing accommodations that are provided are extra time and minimal distraction testing rooms. Dr. Havas added that there are additional medical testing accommodations that are provided; this includes allowing students to have medical equipment (such as a glucose monitor) near them, bottles of water, and some situations where students need flexible schedules.

According to Dr. Havas, she worked with Dean Jones, Dr. Bonnin, and Dr. Loynaz to create an ADA manual that specified that if a student needs an accommodation, they should be referred to the DRC. The manual further outlined that the DRC would provide the HWCOM ADA committee with a notice of the student's accommodation need and, if it was an emergency, they would enact the accommodation immediately; otherwise, Dr. Havas indicated they would wait until their next monthly committee meeting. If the ADA committee members had any questions, the committee would contact the DRC for clarification and/or support. However, more recently, due to the nature of some of the student accommodation requests, the committee has invited members of the DRC to several meetings of the ADA committee.

Dr. Havas indicated that the burden is on the student to make sure that they can meet professional and technical standards. Dr. Havas further clarified that students must sign an agreement where they consent to meeting the professional standards every year, despite their accommodations. She commented that she has been able to provide some assistance to students who were unaware that they needed accommodations; she shared that she has recommended students to the DRC to obtain their testing accommodations.

According to Dr. Havas, she has not taught Nehme as a faculty member; she has only interacted with him in her Associate Dean capacity. Dr. Havas stated that she assisted Nehme in preparation for several MSEPC meetings, approved several of his excused absence requests, and have acted in a role of general support, including addressing several questions that he had during his enrollment at HWCOM.

According to Dr. Havas, Nehme struggled academically from the start and administrators had referred him to the HWCOM Student Counseling and Wellness Center for counseling and help with the recommendation of accommodations. Dr. Havas continued by stating that she is saddened to see him not progress within his medical studies:

> At first, we tried to give (Nehme) the benefit of the doubt. We thought maybe he had a bad first year, but he never got better in his academics. This is noted by the amount of times he has had to go to MSEPC. We are still hoping that things turn around, but it is quite disappointing.

According to Dr. Havas, Nehme met with the MSEPC committee on the following dates:

1. On July 27, 2017 [27] Nehme was allowed to continue with the class of 2020.[28] Dr. Havas stated that Nehme was advised that he would not be allowed to continue in medical school if he had any other course failures.

   According to Dr. Havas, in October of 2017, Nehme experienced some dental issues and in November 2017 he mentioned he was experiencing family issues. Dr. Havas stated that her assistant Tatiana Felix (Assistant Director of Student Support Services) brought to her attention that Nehme had received numerous absences, with a lot of them relating to medical issues. These absences caused Nehme to miss several examinations. Dr. Havas recalled that in December 2017, she and Dean Jones met with Nehme to discuss his course absences and his tardiness to HWCOM events and expressed how "problematic" those instances were for him during that semester.

   Dr. Havas further stated that she and former Executive Dean of Students, Dr. Karen Esposito discussed that referring Nehme to MSEPC was not an effective strategy to address the behaviors. Dr. Havas commented "It seems like it was not appropriate for MSEPC to make a ruling on [his absences], we needed to work with him because the absences were becoming a problem."

2. On January 6, 2018, Nehme failed another course, which resulted in his referral to MSEPC. The result of this meeting was that Nehme would be allowed to take a leave of absences (LOA) and repeat period 2.

3. On March 8, 2018, Dr. Havas was reviewing who would need to go before the MSEPC and Nehme's name came up because he was on a medical LOA effective January 18, 2018, and

---

[27] Dr. Havas indicated that Nehme appealed twice: on August 7, 2017 and August 23, 2017.

[28] Nehme's original cohort/period was class of 2019. As such, after the first MSEPC, Nehme could continue with the next cohort/period – the class of 2020.

he had failed the System-Based Practice course. In March 2018, Dr. Havas cited a letter stating that MSPEC was very concerned about his academics and that he would only be allowed to move forward with the class of 2021. Dr. Havas recalled Nehme agreeing to now being a member of class of 2021. Dr. Havas reported that the letter reminded him that if there were any additional failures, Nehme would be dismissed from the HWCOM.

According to Dr. Havas, throughout the 2019 – 2020 academic year, Nehme had ongoing issues with absence requests and providing supportive documentation for the absences. (**Exhibit 7**) Dr. Havas stated that she decided that Nehme should submit to a random drug test because he had numerous absences. Dr. Havas added that HWCOM student handbook notifies the student that they can be subject to random drug testing. (**Exhibit 4**) Dr. Havas indicated that there are no specified criteria for drug testing outlined written anywhere. She added that the decision to drug screen a student is based on the administrators' years of experience in working with and teaching students, the past performance of each individual student, any recent reports of changes in behaviors regarding a student, and general "best practices". Dr. Havas referenced an article from the National Institutes of Health's (NIH) National Library of Medicine (NLM) that speaks about substance use among medical students.[29] She further commented that numerous absences alone would not be sufficient to warrant drug testing; she shared that absences would be considered if they are related to academic difficulty and/or other behaviors that may suggest possible substance use as a complicating factor

Dr. Havas stated that the process described above is the practice that is consistently used with all HWCOM students if they demonstrate performance of concern. She further defined "performance of concern" as some combination of poor academic performance, attendance concerns, behavioral concerns, legal/police involvement, or reports of concern from other students, staff, or faculty.

Dr. Havas stated that she serves as Dr. Esposito's delegate with regards to the administration of drug testing. Dr. Havas said that Dr. Esposito, after consulting with Dr. Havas and other leadership, would decide if a student needed drug testing. Dr. Havas added that Dr. Esposito would regularly delegate Dr. Havas to meet with students and order the drug screening at the Student Health Center (SHC). Dr. Havas shared that she personally orders initial drug testing on rare occasions (by Dr. Havas' own decision without consulting her peers) when she receives a report from another faculty member or student concerning a student who appears to be impaired or who they (the faculty or reporting student) have directly witnessed using drugs.

Dr. Havas indicated that Nehme was the only student scheduled to take a drug test on February 24, 2020. Dr. Havas added that typically only one (1) student is tested on any particular day because of the need to coordinate with Dr. Havas, the students, and the SHC's availability. She elaborated that the process typically consists of contacting a SHC nurse to schedule for a student to be tested; Dr. Havas plans for a test to be conducted shortly after the test is ordered and she does not want to provide advanced notice to the student. She further indicated that when an appointment is scheduled, she meets with the student to discuss the need for the test and directs them to SHC. She

---

[29] The article Dr. Havas referenced is "Prevalence, perceptions, and consequences of substance use in medical students" and is available at the following link: https://pubmed.ncbi.nlm.nih.gov/29072119/.

stated that in any given year, approximately three (3) to eight (8) students are tested one or more times randomly throughout the year.

Dr. Havas described the drug testing process as follows:

> Students are tested in the health center and my usual procedure is to meet with them to advise them that they must take a mandatory drug test, and if they have any concerns about not passing, they should share them with me.

According to Dr. Havas, she met Nehme prior to him taking his drug test and advised him that his behavior, attendance, and academic performance often raised concerns within the MSEPC. The concern was, "is this student somehow impaired by substance use?"

> Dr. Havas said "given the years of experience I have in this role, I have learned to counsel students to undergo drug testing prior to appearing before a promotion (MSEPC) hearing so that when/if the question is raised to the student during the hearing, the student can confidently say that I ordered drug testing for them 3 days ago and it was negative, as expected."

> Dr. Havas further stated "this prevents the mandate for drug testing to be entered into the record of the meeting as an adverse action, and also empowers the student to reveal any issues with substance abuse to me prior to a hearing. The idea is to support the student's wellness and avoid bringing any issues of substance abuse unnecessarily to the MSEPC."

Dr. Havas added that there is no closeout letter for drug testing, and that she usually informs them of their results via telephone. Dr. Havas said that she does not tend to put drug testing in writing because she would not want to have such a document in a student's file. Dr. Havas said that her role is to advocate for all students and make sure they have great attendance. Dr. Havas stated that she does not have anything against Nehme nor any other student with a disability.

Dr. Havas stated that Nehme was being dismissed because he had been performing poorly and he had failed some courses. Dr. Havas added that Nehme's pending dismissal was a recommendation of the MSEPC and the concerns surrounding the dismissal involved his continued lack of academic performance. **(Exhibit 8)** Dr. Havas further stated that she did not believe that testing accommodations/readiness assignments were a factor in the reason for Nehme's dismissal.

## ANALYSIS

Florida International University is required to provide reasonable accommodations pursuant to FIU Regulation 106 to ensure equal access to students with documented disabilities as long as the accommodations do not fundamentally alter the integrity of any course or program of study.

To establish a successful claim of discrimination based on disability pursuant to FIU Regulation 106, the following questions must be answered:

**1) Is Nehme a qualified individual within the meaning of the University regulation?**

Nehme is a **qualified individual** based upon an evaluation from a qualified professional, Dr. Desmarais of the HWCOM Student Counseling and Wellness Center. The Testing and Assessment Department received documentation from a qualified professional who made an individualized assessment of Nehme that supports the need for the requested testing accommodations. Based on his need for an accommodation and his documented illness, Nehme was designated as a student with a disability by DRC.

2) **Was Nehme excluded from participation in, denied benefits of, services, programs, or activities for which the university is responsible, or is otherwise being discriminated against by the university?**

In reviewing all of the information provided, it appears that Nehme's testing accommodations for the professional test (i.e.: CanvasMed) were not granted and the use of AHC2 495 for the High-Stake Psychiatry shelf examination did not meet the standard for minimal distraction. There is evidence to corroborate his belief that:

(1) Nehme's placement in AHC2 495 (a conference room) did not meet the standard for a minimal distraction room identified by the ADA and this impacted his ability to effectively concentrate while taking his High-Stakes Psychiatry shelf exam which violated his disability testing accommodation;

(2) Nehme did not receive testing accommodations for pop quizzes/readiness assignments, which were assessed by issuing a pass/fail grade.

Williams and Santacruz advised that selection of a minimal distraction room is based on space availability. Williams also described a minimal distraction room as "free from outside noise and windows," however she advised that placing Nehme in AHC2 495 was based on the room availability. Neither Williams nor Santacruz could provide an answer to support that a minimum distraction room was provided. Gavilia stated that on the day that Nehme was taking his Shelf Examinations there was a Neurology lecture being held across the hall from the conference room, three OSCI stimulation sessions and Clinical Skills sessions, all of which occurred down the hall from the conference room. Furthermore, the proctor, Lachica corroborated Gavilia's statement that, on the day of Nehme's test, ACH2 495 was very busy with a lot of traffic due to the different sessions that were occurring during the same time. Lachica stated that the student was distracted, not only because of the noise, but also due to the temperature in the room.

- In a notice provided to HWCOM administrators responsible for testing and assessment, the DRC states the following (**Exhibit 6**):

  The student is tested in an environment which minimizes distractions for the student. Each student has different levels of distractibility and different stimuli which may distract them. Typically, students need an environment which minimizes both auditory and visual distractions. A distraction-reduced environment does not necessitate the student's testing in a private room, nor does it mean that an environment is completely distraction-free.

In reviewing the information provided, it appears that HWCOM failed to provide testing accommodations to Nehme for low-weight assignments; referred to as quizzes and readiness assignments.

- Dr. Bonnin, Dr. Havas, Fortun, Dr. Obeso, Dean Jones and Santacruz admitted that the professional testing accommodations were not granted to any student at HWCOM. Fortun stated that there had never been a tangible student testing accommodations policy. Dr. Obeso stated that the professional testing was put in place by the previous administration. Out of concern, Dr. Obeso asked Dr. George Dambach about the testing accommodations for in-class assessments and was advised that, because of the minimal point value, these would not affect the final grade. However, Dr. Obeso shared that, after receiving student concerns, she had a conversation with Dr. Stephen Loynaz who advised her to change the name of the assignment from "quizzes" to "readiness assignment," which the college did. Dr. Obeso added that testing accommodations are important to the success of the students.

### 3) Was the exclusion, denial of benefits, or discrimination by reason of his disability?

READINESS ASSIGNMENTS: Students have a right to reasonable accommodations and faculty have a right to evaluate learning. Reasonable accommodations are not required if they fundamentally alter the nature of the activity in question. The goal of accommodating a "pop quiz/readiness assignments" is to ensure reasonable accommodation and maintain the integrity of the evaluation process, such that the accommodation does not fundamentally alter the evaluation process.

Testing accommodations are changes to the regular testing environment and services that allow students with disabilities to demonstrate their true aptitude or achievement level on standardized exams or other high-stakes tests.

It appears that HWCOM encountered difficulties in providing testing (quizzes/readiness assignments) accommodations as recommended by the DRC for students with disabilities due to scheduling conflicts. It is understood that the nature of the testing accommodations needed by the student (i.e., extended time, distraction-reduced setting, etc.), must be granted rather before, during or after class. Obeso indicated that the ADA committee decided that testing accommodations would not be provided for low-weight assignments. This protocol was in place during the time when Nehme was completing coursework at HWCOM. Niguidula, Director of the DRC, attests that it is the DRC's position that an appropriate accommodation should have been provided for quizzes and or Readiness Assignments. The label that was given to the low weight assignments is irrelevant. The denial to provide the accommodation was by reason of Nehme's disability.

MINIMUM DISTRACTION ROOM: Several witnesses attested to the space issues at HWCOM. According to the witnesses, minimum distraction rooms are selected based on room availability. Gavilan's stated the room where Nehme tested on March 2, 2020 for his High-Stake Psychiatry shelf exam did not meet the standards for a minimum distraction room, as communicated by the DRC, because of the presence of heavy foot traffic and noise in the surrounding areas. Nehme also stated that the activity in the hallway distracted him as he took his exam. Based on this information,

IDEA believes that the lack of space was not a legitimate, nondiscriminatory reason for scheduling Nehme to test in a room that did not meet the standards of a minimum distraction room.

DRUG TESTING: Dr. Havas indicated in her statement that Nehme was selected for random drug testing because of behaviors that he had exhibited, attendance issues, and academic performance which resulted in an MSEPC hearing. Dr. Havas further commented that her decision to schedule Nehme for a drug test was to ensure that if asked at the MSEPC hearing, Nehme could confirm that substance use was not a factor in his change in behavior and academic performance. The HWCOM Student Handbook indicates that "additional testing may be required by HWCOM or its clinical affiliates at any time." Nehme's statement that he had to leave his pediatric rotation and report to Dr. Havas for a drug test and this caused him stress is simply an allegation. Nehme has failed to show that the drug testing was a result of his disability, where the requirement as outlined in the student handbook is a legitimate, nondiscriminatory reason for the request.

Nehme contends Havas did not explain the process for the drug testing, nor did she advise him of the reason that she selected him for drug testing. Havas contends she provided Nehme with the information. This is his word against her word and there is no external evidence to prove or disprove the allegation.

**FINDING**
Based on the totality of the circumstances of the investigation, there is sufficient evidence to support a violation of FIU-106 as it pertains to disability discrimination as outlined below in #1 and #2. However, there is insufficient evidence to support a violation as it pertains to #3. Therefore, the allegations are SUBSTANTIATED IN PART ONLY:

1) Lack of Accommodations for Readiness Assignments
   a. Unsubstantiated - Havas
      Substantiated - HWCOM
2) Providing Non-Compliant Minimal Distraction Rooms
   a. Unsubstantiated - Havas
   b. Substantiated - HWCOM
3) Improper Drug Testing – Unsubstantiated – Dr. Havas

**RETALIATON**

There is to be no retaliation against any person who has filed a complaint of discrimination or who provides information to the Office of Inclusion, Diversity, Equity, and Access (IDEA) to aid in the investigation of a complaint. Any attempt to penalize a student, employee, or agent for initiating a complaint or cooperating with the investigation through any form of retaliation, shall be treated as a separate allegation of discrimination.

**APPEAL**

Either party (Complainant and/or Respondent) may seek review of the findings by filing an appeal with the Vice President of Human Resources, El pagnier K. Hudson, within seven (7) business

days of receipt of these findings. The request shall specify the basis for the appeal, and shall be based on one or more of the following:

i.    Related evidence that was not reviewed.
ii.   New evidence is available.
iii.  The factual evidence was insufficient to support the findings.

The request shall be written and shall set forth the issues to be considered in the appeal. Copies of the appeal shall be provided to the Director of Inclusion, Diversity, Equity and Access.

Shirlyon J. McWhorter, Esq.
Director & Title IX Coordinator
Inclusion, Diversity, Equity, and Access (IDEA)

# EXHIBIT 1

## I. COMPLAINANT INFORMATION

(any individual who alleges that they experienced discriminatory actions)

| | |
|---|---|
| **Name** | Elie Nehme |
| **Email** | enehm002@fiu.edu |
| **Mobile Phone** | (561) 386-9508 |
| **Employee/Panther ID** | 3121165 |
| **Gender** | Male |
| **Race/Ethnicity** | Middle Eastern |
| **Affiliation with FIU** | - Student |

**To be completed if you are an Employee:**

## II. NATURE OF COMPLAINT

| | |
|---|---|
| **Have you filed a federal complaint with the following agencies within the last two years? if so, check all that apply** | - I have not filed a federal complaint with the above listed agencies within the last two years |
| **Basis of Discrimination (check all that apply)** | - Disability<br>- Retaliation |

## III. RESPONDENT INFORMATION

(any individual or group who is being accused of engaging in discriminatory actions)

| | |
|---|---|
| **Name** | Nancy Havas |
| **Email** | nhavas@fiu.edu |
| **Phone** | (305) 348-9167 |
| **Division/Department** | Student Affairs |
| **Title** | Associate Dean for Student Services |
| **Date of Discriminatory Action** | Feb 24, 2020 |

## IV. DETAILS OF COMPLAINT

**Please provide a detailed description of the incident/concern that is being reported. Be as specific as possible by including date(s), description of incident(s), name of person(s) involved, and name(s) of witness(es). If additional space is needed, it is encouraged to attach supplementary pages or materials that may aid IDEA in the investigative process.**

On February 24, 2020, Dean Havas directed me via phone voicemail at 10:28 am and email invitation at 12:31 pm to meet with her at 2 pm the same day. The voicemail does not indicate why she wanted to meet and neither does the email invitation, apart from the vague subject line "check-in meeting."

This occurred while I was on my pediatrics rotation in the midst of taking care of patients. Dean Havas was fully aware of where I was: In her voicemail to me, Dean Havas states that she had contacted my Pediatric Clerkship Directors regarding the check-in meeting. The required meeting caused me not to attend a mandatory lecture.

The mandatory check in meeting culminated with what I was informed was a "random" drug test. To my knowledge, I am the only one in my clerkship to participate in a random drug test. Dean Havas tells me that she scheduled me for a random" drug test at the FIU Student Health Clinic without my knowledge.

Dean Havas knew I was dealing with numerous stressors at that time, studying for a remediation Shelf Exam for

Psychiatry Clerkship, and that I receive testing accommodations for my disability.

The reason for this random drug test was never stated or clarified.

She never disclosed to me her systematic assessment which she thought was deserving of me having to do this test. In addition, she stated that if I refuse to take the test, I can be kicked out. Being forced to take this drug test in turn forced me to disclose the medicine I take for my illnesses, information that I would have rather kept private. Instead of helping me as it is her duty being a part of the Student Services, Dean Havas distracted me from my clerkship and the time I was supposed to be focusing on my remediation exam, as well as accused me of being on drugs. I was coerced and forced to take the "random" drug test with fear of retaliation and threat of dismissal. This was harassment resulting in a hostile environment.

According to FIU's HWCOM student handbook "Drug testing may be ordered by the Executive Associate Dean of Student Affairs or MSEPC, as applicable."
The Executive Associate Dean of Student Affairs is Dr. Karin Esposito. Dr. Nancy Havas is the Associate Dean for Student Services, and she is not part of MSEPC.
Dr. Esposito's name was not mentioned once, and I do not believe she ordered or even knew about this "random" drug test.

It is also mentioned in the handbook: "Findings on any drug test are reviewed by the Executive Associate Dean of Student affairs and discussed with the student"

On March 4, 2020, Dean Havas left me a voicemail stating that the results of the drug test were back and they did not find anything they did not expect. As per student handbook, the Executive Associate Dean of Student Affairs is tasked with discussing results of drug tests with student which was not the protocol that Dean Havas followed.
To my knowledge I have not given authorization to discuss results over the phone due to other family members having access to the phone and the voicemail system. Thus, Dean Havas did not follow due process in regards to my results. Most importantly, I was not provided with a copy of my results.

There has been a recurrent pattern of behavior from Dean Havas which I believe is an abuse of power to target students with disabilities.
I was treated unfairly and inappropriately pulled out of the hospital in the middle of taking care of patients in my Pediatric clerkship.

I feel humiliated and embarrassed in front of my peers and faculty. This student mistreatment has caused the adverse event of failing my Psychiatry Shelf Exam remediation and subsequently being called in front of MSEPC, who recommended an adverse dismissal. My disability has not limited my ability to perform but has made me a target for Dean Havas' student mistreatment.

**What are you seeking as a resolution to this complaint?**
A resolution to this complaint is to be treated with equality in order to graduate medical school with my class.

I affirm that, to the best of my knowledge, the information contained in this form is true and accurate. I understand that the filing of a complaint with IDEA does not extend the time for filing a complaint with an outside agency, or in a court of law.

**Date filed**                    May 18, 2020

# EXHIBIT 2

**TO:**      Adrian Jones
            Assistant Dean for Student Affairs
            Herbert Wertheim College of Medicine

**FROM:**    Stephen Peter Loynaz, Associate Director
            Disability Resource Center

**SUBJECT:**  Request for Accommodations

**DATE:**     Tuesday, August 25, 2020

Under the Americans with Disabilities Act (ADAAA) as amended in 2008, student Nehme, Elie (PID: 3121165) has been qualified and is eligible for accommodations on the basis of disability.

The Disability Resource Center supports providing reasonable accommodations to the student on the basis of disability. The following accommodations requested by the student are to be considered by the College:

- **50% Extra time on exams**

- **Minimal Distraction Testing Room**

Sincerely,

Stephen Peter Loynaz
Associate Director/Access Consultant
Disability Resource Center
Florida International University

# EXHIBIT 3

From: **Rodolfo Bonnin** rbonnin@fiu.edu
Subject: RE: Disability Accommodation
Date: August 14, 2017 at 1:24 PM
To: Elie Nehme (Medical Student) enehm002@fiu.edu
Cc: Adrian Jones adjones@fiu.edu, Maria Santacruz msantacr@fiu.edu

Hi Elie,
  I have advised the assessment team and they will initiate your accommodation for the next exam. There is no requirement to inform your faculty about accommodations. Whenever a proctored test is coming up you will receive an e-mail from the Assessment and Testing department prior to the exam date notifying you of the exam and where you need to be.
Thanks
Dr. Bonnin

**From:** Elie Nehme (Medical Student)
**Sent:** Monday, August 14, 2017 12:02 PM
**To:** Rodolfo Bonnin <rbonnin@fiu.edu>
**Subject:** Disability Accommodation
**Importance:** High

Dear Dr. Bonnin,

I am e-mailing you with a sense of urgency to respectfully request a meeting to discuss the process of obtaining the approved disability accommodations. I am unsure if I should inform the course director for "BMS 6643 Integumentary System: The Skin", or if I automatically receive instructions from the testing center on when and where to go for taking the final exam which will be this coming Friday (8/18/17).

Thank you,

Elie.

# EXHIBIT 4



**Herbert Wertheim College of Medicine**
FLORIDA INTERNATIONAL UNIVERSITY

# Medical
# Student
# Handbook

# Table of Contents

Overview.................................................................................................6

Welcome.................................................................................................6

Preamble.................................................................................................7

Herbert Wertheim College of Medicine Mission, Vision, and Values...................9

Accreditation.................................................................................................9

Diversity and Inclusion.................................................................................10

HWCOM Administrative Offices.....................................................................11

Definitions.................................................................................................12

Curriculum.................................................................................................14

Competencies.................................................................................................14

Strands.................................................................................................14

Periods of Study.................................................................................................16

Affiliated Clinical Sites.................................................................................18

Service Learning through NeighborhoodHELP ................................................19

Principles of Medical Ethics...........................................................................19

Learning Environment.................................................................................20

AAMC Statement on the Learning Environment..............................................20

Professionalism Standards..............................................................................20

Code of Professional Conduct for Student–Faculty Relationships ....................21

Professional Attributes.................................................................................23

Professionalism Commendations and Incident Reporting................................24

Student Evaluations.................................................................................26

Description.................................................................................................26

Medical Student Professionalism....................................................................26

Medical Student Evaluation and Promotion Process for Evaluation of Academic
Performance and Professionalism....................................................................28

Appeals Process.................................................................................................34

Student Grievances.................................................................................37

Medical Student Grievance Committee. ..........................................................37

Technical Standards.................................................................................42

Academic Standards and Assessment of Performance......................................45

Exam Grades.................................................................................................45

Course Grades.................................................................................................45

Remediation and Repeating a Period..............................................................46

Academic Watch .............................................................................................47

Probation .......................................................................................................48

Period Performance Grades and Promotion ....................................................48

Main Residency Match Eligibility and Participation Requirements .................49

Graduation Requirements ...............................................................................50

Matriculation and Retention...........................................................................51

Matriculation and Retention Requirements.....................................................51

Medical History and Physical Examination ....................................................52

Immunization and Screening Policy.................................................................52

Health Insurance.............................................................................................54

Disability Insurance .......................................................................................55

Criminal Background Checks ..........................................................................55

Drug Testing...................................................................................................56

N-95 Respirator Mask Fit Test .......................................................................57

Liability Coverage...........................................................................................57

Florida Residency Status.................................................................................57

Student Services ..............................................................................................58

Student Academic Success Services .................................................................58

Career and Professional Guidance ..................................................................60

Financial Assistance........................................................................................60

Personal Counseling and Wellness ..................................................................61

HWCOM Ombuds Office .................................................................................62

Medical Student Support Navigation...............................................................62

University Student Services .............................................................................63

Administrative Policies and Procedures ..........................................................64

Biosafety, Bloodborne Pathogen, and Needlestick Injury Policies.....................64

Communicable Disease Policy .........................................................................65

Drugs, Alcohol, and Tobacco Policies ............................................................66

Academic Policies............................................................................................66

Attendance and Excused Absence Policies .......................................................68

Excused Absences Processes ...........................................................................69

Student Mistreatment and Reporting Procedures.............................................70

Student Protections from Sexual Misconduct, Discrimination, Harassment, and Retaliation.....................................................................................................73

Facilities and Guidelines for Use ....................................................................74

FIU Herbert Wertheim College of Medicine

Financial Policies ........................................................................................................ 77

Leaves of Absence ...................................................................................................... 82

Lost and Found ........................................................................................................... 84

Media Requests for Student Interviews ...................................................................... 84

Medical Library Policies ............................................................................................. 85

Student Education Records Policies ............................................................................ 85

Students with Disabilities ........................................................................................... 86

Technology Policies .................................................................................................... 87

Student Activities and Organizations .......................................................................... 92

Panther Learning Communities .................................................................................. 92

Medical Student Organizations ................................................................................... 93

Student Professionalism and Ethics Committee ......................................................... 94

# Overview

## *Welcome*

State universities in Florida have been charged with the responsibility of providing students an educational experience that prepares them to participate in a rapidly changing world and to do so with a commitment to the highest moral and ethical standards. The Florida International University Student Conduct and Honor Code (FIU-2501) addresses honesty, respect for the law, and respect for people. We encourage you to read these statements and integrate them into your daily life.

*View the FIU Student Conduct and Honor Code https://studentaffairs.fiu.edu/get-support/student-conduct-and-academic-integrity/student-conduct-and-honor-code/index.php*

As a student at FIU, you should take responsibility to serve as a leader in promoting compassion for others and challenging prejudice against all individuals and groups, whether due to age, color, creed, disability, gender, gender expression, gender identity, genetic information, national origin, race, religion, sex, sexual orientation, or veteran status.

Being part of the university community provides many opportunities to exercise individual rights, but it also requires the assumption of responsibilities. Enjoy your university and medical school experience, and maintain a level of personal integrity and caring that will reflect well upon you and the university you have elected to attend.

We wish you the very best of success.

— The Faculty and Staff of Florida International University

### Preamble

This *HWCOM Medical Student Handbook* is maintained by the Florida International University (FIU) Herbert Wertheim College of Medicine (HWCOM) Office of Student Affairs, with collaborative input from faculty, administrators, and staff from HWCOM and FIU. The policies and procedures herein apply to all medical students and serve as a guide throughout your academic, clinical, and extracurricular life as a member of the FIU community and specifically as a medical student. At all times on and off campus, medical students must abide by all FIU regulations and policies including the FIU Student Conduct and Honor Code, the FIU Student Handbook, and the policies and guidelines in this *HWCOM Medical Student Handbook*.

The basic premise for these student guidelines is the understanding that individual rights are also accompanied by responsibilities. By enrolling as a medical student at HWCOM, you become a member of the larger FIU community and thus acquire rights in and responsibilities to the entire university community.

All policies and procedures described in this *HWCOM Medical Student Handbook* and FIU regulations and policies including the FIU Student Handbook are subject to amendment at any time and without notice. Such revisions are applicable to all medical students upon publication unless otherwise stipulated in the amendment. The ultimate responsibility for knowing FIU, including HWCOM, requirements and regulations rests with the student. Students are urged to review the most recent information periodically and when updates are announced.

Questions regarding the content of this *HWCOM Medical Student Handbook* should be directed to the HWCOM Office of Student Affairs at 305-348-0644 or the appropriate FIU department. Information can be found at https://medicine.fiu.edu/resources/current-students/md-resources/student-affairs/index.html

## MESSAGE FROM THE DEAN

*On behalf of the entire faculty and staff, and those of the greater FIU community, I offer you a warm welcome to the Herbert Wertheim College of Medicine (HWCOM).*

*Our College of Medicine has now completed its first ten years of operation, and, as we now embark on the next phase of our remarkable growth, this Student Handbook has been modified to better inform you, as HWCOM medical students, on the institutional policies that frame the academic and professional activities that you will undertake in your studies at HWCOM.*

*We greatly appreciate your attention to, and familiarity with, the contents of this Student Handbook.  It is expected that you will adhere to all policies detailed in this Handbook.  Should you have any questions related to the contents of this Handbook, please reach out to the faculty and staff.*

*Your education is the very core of our institutional mission, and all of us at HWCOM are dedicated to guiding you in maximizing your growth and development in achieving the necessary knowledge and skills to enable each of you to become highly competent, thoughtful, and compassionate physicians.*


*Yours sincerely,*

*Robert Sackstein, MD, PhD*

### Herbert Wertheim College of Medicine Mission, Vision, and Values

**Mission.** By providing an environment enhanced by diversity, clinical innovation and research, Florida International University Herbert Wertheim College of Medicine prepares socially accountable, community-based physicians, scientists, and health professionals who are uniquely qualified to transform the health of patients and communities.

**Vision.** Florida International University Herbert Wertheim College of Medicine is a national leader in transforming the health of communities through its purposeful integration of education, research, and clinical care.

**Values.** The conduct, ideals, and ethics that drive our operations:

- Scholarship
- Innovation
- Inclusion
- Integrity
- Service

### Accreditation

The Liaison Committee on Medical Education (LCME) is the accrediting body for medical schools in the United States and solely determines the accreditation status of every medical program leading to the Doctor of Medicine degree. To be accredited, a medical program must meet comprehensive standards that answer to the quality, integrity, and educational objectives required by the LCME. FIU HWCOM is fully accredited by the LCME.

HWCOM hosts LCME accreditation visits on the FIU campus at least every 8 years. Students play a central role in the accreditation process by participating in a variety of ways, including through college-wide student surveys and in student evaluations of courses and clerkships, which are reviewed and considered by LCME in their determination of compliance with LCME standards; through independent student analysis of the medical education, student services, the learning environment, and the educational resources available to students; and through face-to-face meetings with LCME survey teams. Additional information regarding accreditation can be found at www.lcme.org

Florida International University is accredited by the Southern Association of Colleges and Schools Commission on Colleges (SACSCOC) to award associate, baccalaureate, masters, and doctoral degrees, including the HWCOM Doctor of Medicine degree.

### *Diversity and Inclusion*

*Click here to view the HWCOM Diversity and Inclusion Policy online. https://medicine.fiu.edu/a bout/administrative-offices/diversity-and-inclusion/_assets/fiu-hwcom-diversity-and-inclusion-policy.pdf*

At the Herbert Wertheim College of Medicine, diversity and inclusion are integral to our mission and to our entire academic enterprise. Diversity among faculty, staff, and students enriches the educational environment and expands the knowledge base of everyone. The college's diversity and inclusion efforts aim to increase representation of racial and ethnic populations that are underrepresented in the medical profession among HWCOM students, faculty, and staff. Activities include recruiting and retaining faculty, staff, and students that reflect the institution's commitment to diversity; creating and evaluating diversity initiatives; developing educational and training sessions for faculty, staff, and students to ensure cultural competency; and engaging the community through programs to increase diversity in the health care profession.

### HWCOM Administrative Offices

*Contact OAA:*
*305-348-0616*

**Office of Academic Affairs.** The Office of Academic Affairs (OAA) provides oversight of the medical education curriculum, research activities, and faculty affairs. It provides the infrastructure and processes by which the faculty define educational objectives for medical students. The HWCOM faculty define expectations through the Curriculum Committee, which communicates with the Associate Dean for Curriculum and Medical Education for this purpose. Academic advising, student promotions, and assessment of professionalism fall under the aegis of Academic Affairs.

Within the Office of Academic Affairs, the **Office of Medical Education** (OME) coordinates the design, implementation, and evaluation of the medical degree program, emphasizing innovative curricula designed to advance a passion for scientific inquiry, critical thinking, and comprehensive clinical expertise. OME also provides academic advising and academic success services.

*Contact OCA:*
*305-348-0607*

**Office of Clinical Affairs.** The Office of Clinical Affairs (OCA) arranges affiliations with various hospitals where students will rotate and other clinical sites within the area that hold an active interest in medical student education. The OCA is also responsible for overseeing the development of several programs in Graduate Medical Education (GME) and Continuing Medical Education (CME).

*Contact OSA:*
*305-348-0644*

**Office of Student Affairs.** The Office of Student Affairs (OSA) provides support programs and services for all medical students from the time of recruitment to commencement and beyond. Activities include recruitment of students; the admissions process; maintenance of grades and records; mentorship of students; academic, career, and financial counseling; personal counseling and wellness programs; medical student learning communities; student organizations; transition to residency; and alumni services. The OSA provides learning opportunities outside of the formal classroom and clinical settings that are designed to complement and enhance the overall educational experience and to promote personal and professional success.

**Office of Research.** The Office of Research (OR) provides oversight of the graduate medical educational and basic science research activities and related training to all MD and PhD students and to faculty. It provides the requisite resources, administrative/regulatory assistance, and related career development opportunities. Research directions and emphases, while initiated and executed through individual faculty expertise or clinical/basic science department missions, are monitored by the OR, the Executive Associate Dean for Research, the Executive Associate Dean for Academic Affairs, the Executive Associate Dean for Student Affairs, and the Dean of Medicine to ensure the optimal immersion of our trainees/students with research opportunities and commensurate achievement of the educational mission.

## Definitions

**Academic period or period.** The MD degree program is divided into four academic segments, also known as academic periods or simply "periods." A description of the academic periods can be found in this handbook under the section "Periods of Study." Each medical student must pass each of the four successive academic periods of study to successfully complete the doctor of medicine degree program.

**Adverse Action or Adverse Recommendation.** Any recommendation of the Medical Student Evaluation and Promotion Committee (MSEPC), unless stated otherwise, arising out of a medical student's failure to meet academic requirements or Professionalism Standards. An Adverse Recommendation mandates that a student take specific actions or refrain from taking specific actions.

**Business days.** A day when the University is open for regular business operations from 8:00 a.m. up to 5:00 p.m., Eastern Time. For email correspondence, the day of delivery is not included in a designated time period.

**Consent Agreement.** An agreement voluntarily entered into by HWCOM and a medical student arising from alleged violations of Professionalism Standards.

**Executive Associate Dean for Academic Affairs.** Executive Associate Dean for Academic Affairs refers to the individual in that role or his or her designee.

**Executive Associate Dean for Student Affairs.** Executive Associate Dean for Student Affairs refers to the individual in that role or his or her designee.

**Executive Associate Dean for Research.** Executive Associate Dean for Research refers to the individual in that role or his or her designee

**Good academic standing.** Students who are registered and entitled to progress in the curriculum are in good academic standing. Good standing for conduct purposes shall be determined by the FIU Office of Student Conduct and Conflict Resolution. Satisfactory academic progress for financial aid eligibility is defined in the section on "Financial Assistance" in this handbook.

**HWCOM community.** The students, faculty, staff, and administration of HWCOM.

**MSEPC.** Medical Student Evaluation and Promotion Committee.

**Medical students.** Students enrolled in the Doctor of Medicine program at HWCOM.

**Probation.** The MSEPC may place a student on probation which signals the student that the MSEPC is carefully scrutinizing performance due to academic failure or breaches of Professionalism Standards. Probation is an adverse action.

**Professionalism Incident Report.** The form completed by a member of the HWCOM community to identify a possible breach of Professionalism Standards by another member of the learning community in accordance with the process established in this *HWCOM Medical Student Handbook.*

**Professionalism Advocacy Reporting System (PARS).** The electronic reporting system used to file professionalism incident reports and commendations.

**Professionalism Standards.** The standards of professionalism set forth in this *HWCOM Medical Student Handbook.*

**Preponderance of the Evidence.** When the information that is presented supports a finding that it is more likely than not that a violation occurred.

**Provost.** The Provost of Florida International University.

# Curriculum

### Competencies

The four-year course of study leading to the Doctor of Medicine (MD) degree at Herbert Wertheim College of Medicine (HWCOM) is based on development of competencies in nine domains:

- Patient care,
- Knowledge for practice,
- Practice-based learning and improvement,
- Interpersonal and communication skills,
- Professionalism,
- Systems-based practice,
- Interprofessional collaboration,
- Personal and professional development, and
- Social accountability.

These competency domains are derived from the American Association of Medical Colleges Physician Competency Reference Set and the Accreditation Council on Graduate Medical Education competencies, with the additional competency domain of social accountability being core to the mission of HWCOM. The competency domains align with the HWCOM Educational Program Objectives (below) and the core entrustable professional activities (EPAs) for entering residency. The educational program is broad and general, preparing students for postgraduate study in their chosen fields of medical specialization, licensure, and medical practice. The curriculum is entirely course-based; all educational objectives are addressed in formal courses.

### Strands

The curriculum is built upon study in five major strands:

- Human Biology;
- Disease, Illness, and Injury;
- Clinical Medicine;
- Professional Development; and
- Medicine and Society.

Each course in the curriculum is assigned to a strand. Strands are organized for both horizontal and vertical integration of content within courses.

### *Educational Program Objectives*

The HWCOM educational program objectives encompass the knowledge, skills, behaviors, and attitudes students are expected to exhibit as evidence of their achieving competencies necessary for graduation and awarding of the Doctor of Medicine degree. The HWCOM Curriculum Committee uses these educational program objectives to guide decisions regarding specific course content, student learning, and assessments:

1. Identify the major principles of the sciences foundational to medicine.
2. Explain how the body responds to change, and how it adjusts the functions of cells, organs, and organ systems to maintain homeostasis.
3. Apply the principles of foundational sciences to propose and interpret diagnostic tests, and to determine the etiology, pathophysiology, prevention, and treatment of human disease/disorders.
4. Communicate effectively with patients, families, and healthcare providers, including those situations involving cultural and linguistic differences (and including the effective use of professional interpreters).
5. Conduct and document complete patient histories and physical examinations using the requisite fundamental clinical skills, and incorporating relevant social, behavioral, and medical factors.
6. Identify and propose initial therapy for acute life-threatening situations.
7. Identify, propose, and coordinate prevention and management plans for acute and chronic disease while working effectively in various healthcare settings.
8. Apply medical knowledge and critical thinking to develop differential diagnoses.
9. Perform basic procedural skills correctly with attention to patient comfort.
10. Obtain and manage patient information from the medical record.
11. Use evidence-based medicine to provide quality health care to individuals and populations.
12. Apply scientific methods to answer research questions.
13. Identify core principles of health system science including the impact of finance, laws, organizational structures, and health policy on patients and populations.
14. Identify the personal skills and systems-level processes that support continuous quality improvement and patient safety, and use standard precautions in the health care setting.
15. Apply knowledge of complementary and integrative medicine to patient care.
16. Identify end-of-life care issues from the physician's and patient's perspectives.
17. Demonstrate skills and habits to sustain lifelong personal and professional growth.
18. Integrate epidemiologic, socioeconomic, behavioral, cultural, and community factors into patient care.
19. Advocate for improved health outcomes at the community level through analysis of social determinants of health, engagement, and reflection.
20. Demonstrate patient-centered counseling techniques and engage patients in collaborative planning to improve health behaviors.

21. Collaborate as a member of an interprofessional team.
22. Anticipate ethical issues encountered in clinical care and research, explain ethically justifiable options and consequences from multiple perspectives, and manage ethical challenges.

## Periods of Study

The curriculum is divided into four periods of study, comprising foundations of medicine (Period 1), organ systems-based pathophysiology (Period 2), core clinical clerkships (Period 3), and advanced clinical rotations (Period 4). Students may be provisionally promoted into Period 2 at the end of Period 1 by the Medical Student Evaluation and Promotions Committee (MSEPC), even if a student is pending completion of Period 1 courses in the summer. Students must pass all Period 1 and Spring Period 2 courses, and any remediations if necessary, to be permitted to continue in Period 2 in August. All remaining Period 2 courses must be successfully completed, including successful remediation if necessary, prior to a student's advancement to Period 3. Promotions and advancement decisions for all students are made by the MSEPC.

Course work is multidisciplinary and features a case-based format in which basic science is learned in a clinical context. Clinical experiences in primary care and emergency settings begin in the first period of study with coordinated opportunities for practical application of basic knowledge, skills, and reasoning. Students engage with families, households, and communities in the longitudinal service-learning NeighborhoodHELP (Health Education Learning Program) in collaboration with FIU students from other colleges and disciplines, including nursing, social work, physician assistant, public health, education, and law.

Students begin clinical training by encountering basic medical conditions in outpatient settings; clinical training advances progressively to include exposure to more complex cases and conditions in hospital settings and culminates in subinternship experiences. Independent scholarship and broad elective opportunities in the third and fourth periods encourage students to explore personal interests and build competency in preparation for advanced postgraduate study and practice in a specialty area. Student learning is guided by objectives for every course, required clinical experiences (core cases), standards of competency in specific clinical skills, and standards of professional behavior. Students document their progress in achieving educational objectives of each required clinical experience and are monitored for progressive development of essential skills and general competencies.

*Period 1* focuses on study of the foundations of medicine in core basic, clinical, social sciences, and ethics. Core basic medical sciences include medical genetics, cellular biology, anatomy, physiology, pharmacology, immunology, microbiology, and pathology. These courses combine elements of the Human Biology and Disease, Illness and Injury strands. An introduction to clinical skills in the Clinical Medicine strand focuses on doctor–patient communication, general physical exam skills, foundations of

evidence-based medicine and quantitative measurements, and medical research. Period 1, within the Professional Development and Medicine and Society strands, also focuses on medical ethics, regional cultures in relation to health and medicine, self-reflection, and professionalism in doctor–patient relationships. At the beginning of the period, students become certified in basic life support (BLS) in preparation for half-day primary care clinics and voluntary emergency department shifts throughout the period. Medical simulations, standard patient experiences, and virtual case studies complement classroom study and prepare students for patient-centered clinical experiences.

*Period 2* is organized around in-depth study of human biology, disease, illness, and injury in an organ-system-based approach. Pathology, physiology, anatomy, pharmacology, genetics, and human behavior are emphasized in case-based study of the major organ systems: hematopoietic and lymphoreticular, endocrine, reproductive, musculoskeletal, skin, gastrointestinal, renal/urinary, cardiovascular, respiratory, and nervous. Students develop clinical skills by conducting physical exams, forming differential diagnoses, and understanding how to interpret and use laboratory medicine data and imaging technologies. Clinical skills are taught together with each of the integrated organ-systems courses. Courses in the strands of Professional Development and Medicine and Society continue in Period 2, with study of health care systems and policy, interprofessional health care, community health, end-of-life care, and evidence-based medicine. Students continue their service-learning study with participation in NeighborhoodHELP. Students can participate in voluntary emergency room clinical experiences.

*Period 3* involves core clerkships in Family Medicine, Internal Medicine, Neurology, Obstetrics and Gynecology, Pediatrics, Psychiatry, Radiology, and Surgery. Study in Period 3 is predominantly preceptor-guided; students encounter patients with increasingly complex medical conditions in outpatient and hospital settings. Students are given progressively greater responsibility as they gain experience managing the care of patients. Students learn how to apply skills learned in the simulation laboratory and demonstrate competency in performing core procedural skills. Learning is enhanced by the inclusion of simulation and virtual cases. Elective opportunities in the Internal Medicine and Surgery clerkships allow students to explore specialty areas. Students continue to participate in NeighborhoodHELP during Period 3, and weekly conferences provide opportunities for students to work together on comprehensive, in-depth study of major medical conditions. Also included in the Period 3 curriculum is a case-based, self-directed learning course, with integrated learning objectives from basic sciences forming part of each case. Students are required to pass Step 1 of the United States Medical Licensing Examination® (USMLE) at the end of the period and to demonstrate general competency in basic biomedical sciences, diagnosis of disease, and clinical case management.

*Period 4* focuses on the study of advanced medicine, including scholarship and exploration of specialty areas to facilitate a student's choice of postgraduate study. Students select individualized schedules that best serve their long-term career goals. Period 4 requirements include a geriatrics rotation; a longitudinal capstone course; a community medicine practicum; individual research projects; one subinternship; one selective in medicine or surgery; one selective in emergency medicine; and electives. Students continue to participate in NeighborhoodHELP during Period 4. Required subinternships and selectives must be completed at HWCOM-affiliated clinical sites under supervision of HWCOM faculty. The longitudinal capstone includes professional development workshops on career management and a clinical medicine experience designed to hone clinical skills and prepare students for residency. Students must receive passing scores on the USMLE Step 1 and Step 2 Clinical Knowledge to be eligible to participate in the Main Residency Match through the National Resident Matching Program (NRMP); passing scores on all three USMLE exams (Step 1, Step 2 Clinical Knowledge, and 2 Clinical Skills) are requirements for graduation.

To graduate from HWCOM with the MD degree, students must satisfactorily complete all course work within six (6) years from the date of matriculation. An exception to this can be made for those students seeking dual professional degrees such as MD and a PhD degree.

A student must take and pass all required USMLE Step exams within six (6) years of matriculation. Failure to take and/or pass any Step exam within the six (6) period will result in dismissal from HWCOM.

### Affiliated Clinical Sites

The educational program leading to the MD degree is controlled by HWCOM faculty. The college has partnered with a variety of health systems, hospitals, clinics, and private physician practices throughout South Florida to provide clinical faculty and clinical venues for medical education. Medical students are scheduled with HWCOM clinical faculty for all educational experiences. In some venues, students will work with postgraduate students (residents) who also are under the guidance of HWCOM faculty. Affiliation agreements with these entities have been codified to ensure medical students have adequate access and exposure to the patient types and clinical conditions required to achieve the objectives of the educational program. These agreements also define the shared responsibility of the clinical affiliate and the medical school for creating and maintaining an appropriate learning environment. Site-specific resources and requirements are specified in course and clerkship syllabi. Clinical affiliates have the right to dismiss or remove any student from a clinical experience based upon the clinical affiliate's determination that a student has engaged in unprofessional behavior or is a threat to patient safety. HWCOM and the FIU Office of Student Conduct and Academic Integrity will independently assess the alleged unprofessional behavior in accordance with the processes set forth in this *HWCOM Medical*

*Student Handbook* or the FIU Student Conduct and Honor Code to determine whether any other action is appropriate.

### Service Learning through NeighborhoodHELP

The Liaison Committee on Medical Education defines service learning as a structured learning experience that combines community service with preparation and reflection. Medical students engaged in service learning provide community service in response to community-identified concerns and learn about the context in which service is provided, the connection between their service and their academic coursework, and their roles as citizens and professionals.

The Community Engaged Physician courses work with the Green Family Foundation NeighborhoodHELP (Health Education Learning Program) to provide students with a required curricular service-learning experience that encourages interprofessional collaboration and teamwork, facilitates the development of cultural competence through longitudinal patient interactions with people of diverse cultures and belief systems, and emphasizes the value of preventive medicine and primary care.

Through NeighborhoodHELP, medical students are brought together with FIU students from other colleges and disciplines—nursing, social work, physician assistant, public health, education, and law—to learn to function collaboratively on health care teams. Teams are assigned to visit medically underserved households in South Florida with the goal of coordinating access to services and improving health and quality of life of participating household members. Through repeated interactions with people of diverse cultures and belief systems, medical students learn to recognize and appropriately address gender and cultural biases in themselves, in others, and in the health care delivery process.

In addition to its curricular goals, NeighborhoodHELP is a novel academic–community partnership model that aims to increase use of preventive health measures while reducing dependency on emergency departments as a primary source for health care in participating communities.

### Principles of Medical Ethics

As stated in the American Medical Association Principles of Medical Ethics, "the medical profession has long subscribed to a body of ethical statements developed primarily for the benefit of the patient. As a member of this profession, a physician must recognize responsibility to patients first and foremost, as well as to society, to other health professionals, and to self." HWCOM has adopted these AMA principles as its code of medical ethics.

### Learning Environment

HWCOM endorses the AAMC Statement on the Learning Environment, which was developed by the Association of American Medical Colleges (AAMC) Council of Deans, with input from and endorsement by a broad spectrum of AAMC professional development groups. The statement underscores the importance of creating a learning environment that fosters respect, resilience, integrity, and excellence across the continuum and the multiple dimensions of health professions that interact to deliver patient care.

### AAMC Statement on the Learning Environment

We believe that the learning environment for medical education shapes the patient care environment. The highest quality of safe and effective care for patients and the highest quality of effective and appropriate education are rooted in human dignity.

We embrace our responsibility to create, support, and facilitate the learning environment shared by our patients, learners, and teachers. In this environment, our patients witness, experience, and expect a pervasive sense of respect, collegiality, kindness, and cooperation among health care team members. This includes all professionals, administrators, staff, and beginning and advanced learners from all health professions. This includes research as well as patient care environments.

We affirm our responsibility to create, support, and facilitate a learning environment that fosters resilience in all participants. It is our responsibility to create an atmosphere in which our learners and teachers are willing to engage with learning processes that can be inherently uncomfortable and challenging.

We affirm our commitment to shaping a culture of teaching and learning that is rooted in respect for all. Fostering resilience, excellence, compassion, and integrity allows us to create patient care, research, and learning environments that are built upon constructive collaboration, mutual respect, and human dignity.

For more information and to view a library of resources, visit https://www.aamc.org/initiatives/learningenvironment/.

## Professionalism Standards

The HWCOM MD curriculum is based on nine domains of competence that are of critical importance to all physicians (see section entitled "Overview of the Doctor of Medicine Degree Program"). HWCOM's educational program objectives are linked to these competency domains when applicable. All nine of these domains incorporate attributes of professionalism in the evaluation of student competency. Medical schools must teach and assess professionalism, and professional behavior is expected at all times by

students, faculty, and staff in the learning environment. Breaches of expected professional behavior may result in disciplinary action by HWCOM.

Professionalism Standards at HWCOM are defined by (1) a code of professional conduct guiding interactions between learners and teachers, (2) professional attributes (behaviors and attitudes) that medical students are expected to develop, (3) principles of medical ethics, and (4) the learning environment statement. The code, attributes, principles, and learning environment statement are found below, followed by a non-exhaustive list of behaviors that represent academic and professional misconduct and violate the HWCOM Professionalism Standards.

## Code of Professional Conduct for Student–Faculty Relationships

Preparing for a career in medicine requires the acquisition of a large fund of knowledge, a variety of professional skills, entrustable professional behaviors required to deliver safe and effective patient care, and a commitment to self-directed lifelong learning. HWCOM is committed to promoting academic and professional success for learners and teachers at all levels. An atmosphere of mutual respect, collegiality, fairness, integrity, and trust is essential. Students (learners) and faculty (teachers) bear significant responsibility in creating and maintaining this atmosphere.

Students (learners) commit to:

- Treat all faculty and fellow learners with respect and fairness.
- Demonstrate adherence to high professional standards in all interactions.
- Demonstrate trustworthiness in all interactions with teachers and peers.
- Be conscientious in committing the effort necessary to achieve the goals and objectives of the curriculum and completing all requirements on time.
- Be fully prepared and on time for scheduled activities, and inform instructors about absences or tardiness in advance whenever possible.
- Demonstrate discernment in self-study, seeking guidance and assistance appropriately.
- Routinely reflect to identify personal strengths and weaknesses and to set personal learning goals.
- Willingly assist and contribute to learning experience of their peers.
- Maintain high professional standards in all interactions with fellow students, faculty, and staff.
- Conscientiously support an effective learning environment, and notify appropriate faculty and staff members in a timely manner of any problems that adversely affect the learning environment.

- Respond to official communication within 72 hours (or within 24 hours throughout the duration of a course).
- Participate in the process of program evaluation and improvement.
- Pursue confidential mental and physical support for any conditions that might compromise achievement of their educational goals or might compromise patient care.
- Adhere to all policies, regulations, and responsibilities outlined in course syllabi and in the FIU Regulations and policies, and *HWCOM Medical Student Handbook.*
- Work collaboratively and responsibly in team learning environments.
- Meet all deadlines for formal educational activities.

Faculty (teachers) commit to:

- Treat all learners and colleagues with respect and fairness.
- Demonstrate adherence to high professional standards in all interactions.
- Provide effective formats (e.g., cases, laboratories, discussion groups) for learning.
- Manage the learning venue and the activity for optimal learning by assuring effective communication (e.g., repeating questions for the class; prohibiting disruptive activities, including late entry and early exit from the venue, extraneous verbal communications, and use of electronic devices for alternative purposes).
- Plan teaching activities appropriate for the time period and venue, coordinated within the overall curriculum longitudinally and vertically (ensure knowledge of the curriculum in relation to the session).
- Respect student preparedness and time commitment by avoiding redundancy and clearly identifying essential material.
- Provide guidance for students to adequately prepare in advance in a timely manner.
- Be present and start activities on time for didactic, investigational, and clinical encounters, and end activities on time, respectful of others' time and responsibilities.
- Provide timely feedback with constructive suggestions and opportunities for improvement or remediation.
- Grade/assess performance based on learning objectives and level of achievement.
- Be available for contact and timely response through various means of communication—including official university email and phone—and have regular office hours during formal teaching periods.
- Respond to official communication within 72 hours (or within 24 hours throughout the duration of a course).
- Abstain from requesting learners to perform personal services or errands unrelated to the didactic, investigational, or clinical situation at hand.

- Nurture both the intellectual and professional development of learners.
- Pursue confidential mental and physical support for any conditions that might compromise the learning environment and/or patient care.
- Abide by the values of the college outlined in the *HWCOM Medical Student Handbook.*
- Adhere to all rules and responsibilities outlined in the *HWCOM Medical Student Handbook* and curriculum policies.
- Maintain strict confidentiality of all personal and academic information and privileged communications.
- Create a respectful and effective learning environment for all formal educational activities.

## *Professional Attributes*

To be entrusted to care for patients—whether as medical students under direct supervision or later as residents, under indirect supervision—trainees must demonstrate professionalism at all levels of medical education. At HWCOM, the following professional attributes are assessed (see course syllabi for methods of assessment):

- **Ability to Work with Others Collaboratively.** Student effectively works with others in teams, including teams comprising peers, faculty, and other health care professionals. Student demonstrates a patient-centered approach in working with patients. Student demonstrates a respectful approach that includes openness and flexibility.
- **Accountability.** Student demonstrates a willingness to accept responsibility for actions and admit error and is accountable to self, team, patients, and society. Accountability includes the ability to self-assess balance and emotional well-being and to seek help if unable to carry out duties.
- **Commitment to Continuous Self-Improvement.** Student is responsive to feedback and is willing to assess self and set personal learning goals. This includes assessing personal coping strategies, managing conflicts between personal and professional responsibilities, adjusting to change, and seeking help appropriately when needed.
- **Commitment to Ethical Principles.** Student demonstrates ethical behavior. Student is compliant with laws, policies, and regulations.
- **Conscientiousness.** Student demonstrates thoroughness in data gathering and dependability in following through with assigned tasks.
- **Critical Thinking.** Student uses an investigatory and analytic approach to clinical situations. Student is inquisitive, thoughtful, and able to work through a problem.

- **Discernment.** Student demonstrates awareness of the limits of his or her own knowledge or skills and applies knowledge and skills appropriately for his or her level of training.
- **Emotional Intelligence.** Student demonstrates awareness of emotions of self and others and uses this information to interact in a sensitive, respectful manner.
- **Respect.** Student demonstrates proper regard toward faculty, staff, patients, and peers in diverse settings and interactions. Student uses the skill of active listening to encourage others to express themselves.
- **Truthfulness.** Student demonstrates truth telling and absence of deception in his or her interactions with supervisors and others.

### *Professionalism Commendations and Incident Reporting*

*Link to the Professionalism Advocacy Reporting System (PARS)*

The Professionalism Advocacy Reporting System (PARS) is used by HWCOM for reporting and documenting professional attitudes or behaviors that are either excellent (commendations; "PCF") or concerning (incidents; "PIR"):

A Professionalism Commendation Form (PCF) is a way to identify positive, honorable, and notable behaviors or actions. A PCF can be submitted by any member of the HWCOM community when any other member demonstrates exemplary professional behavior. Commendation forms must include the name of the submitter, the name of the individual to be commended, the date and location of the incident, and a description of the exemplary behavior. When a student has received a commendation, the PCF will be maintained in the permanent education record and may be noted in the Medical Student Performance Evaluation (MSPE).

A Professionalism Incident Report (PIR) can be submitted whenever any member of the HWCOM community's behavior raises concerns about an individual's professional conduct. Anyone may raise a concern regarding the attitudes or behaviors of a member of HWCOM's community, including students, faculty, and staff, by completing a PIR. The name of the concerned observer submitting the PIR is not required; however, anonymous PIRs may limit the ability of the Executive Associate Dean for Student Affairs and the Executive Associate Dean for Academic Affairs to redress the concerning behavior. If a person who is not affiliated with the university wishes to report a professionalism incident to HWCOM, he/she/they must inform a HWCOM faculty member, chair, or dean, who would submit the report in the PIR system and will notify the Executive Associate Dean for Academic Affairs. Professionalism incidents can also be reported, including anonymously, via Ethical Panther at https://compliance.fiu.edu/hotline/convercent/

Incident reports must include the name of the individual of concern, the date and location of the incident, and a description of the behavior. The Executive Associate Dean for Student Affairs and the Executive Associate Dean for Academic Affairs will review or refer to the appropriate office all reported incidents. Incidents that potentially violate the FIU Student Conduct and Honor Code will follow the process described below.

### *Academic Misconduct and Unprofessional Behavior: FIU Student Conduct and Honor Code*

By accepting membership in the FIU and HWCOM community, medical students acquire certain rights and responsibilities related to conduct and academic integrity. Students are expected to abide by the FIU Student Conduct and Honor Code as outlined in FIU Regulation 2501 found at https://studentaffairs.fiu.edu/get-support/student-conduct-and-academic-integrity/student-conduct-and-honor-code/index.php All incidents of academic misconduct and behavior misconduct set forth in the FIU Student Conduct and Honor Code will be handled by the FIU Office of Student Conduct and Academic Integrity.

Students are strongly encouraged to report suspected violations of the Student Conduct and Honor Code by visiting https://cm.maxient.com/reportingform.php?FloridaIntlUniv emailing conduct@fiu.edu, or calling (305) 348-3939.

HWCOM may impose adverse action against students engaged in unprofessional behavior. Examples of unprofessional behavior include, but are not limited to, the following: **Failure to comply with administrative requirements.** Administrative requirements include but are not limited to the provisions of this *HWCOM Medical Student Handbook.*

**Other Unprofessional Conduct.** Examples include but are not limited to behaviors that fail to meet the professionalism expectations of HWCOM as outlined in the section on "Professionalism Standards."

**Violation of the Student Code of Conduct and Honor Code.** If a student is found responsible for violating FIU Regulation 2501 Student Conduct and Honor Code, HWCOM may then process the matter as a Professionalism Violation if deemed appropriate.

# Student Evaluations

## Description

This section sets forth a description of the medical student evaluation process—including due process—that takes place in circumstances of poor academic performance, including breaches of professionalism standards. All references to Executive Associate Deans are also references to their designees to whom they may assign duties.

## Medical Student Professionalism

Medical students are required to exhibit professional behaviors in line with HWCOM's Professionalism Standards and the FIU Student Conduct and Honor Code. Reports of unprofessional behavior will be initially investigated by HWCOM's Office of Student Affairs.  Unprofessional behavior that violates the FIU Student Conduct and Honor Code will be processed by the Office of Student Conduct and Academic Integrity  in accordance with Student Conduct and Honor Code available at https://studentaffairs.fiu.edu/get-support/student-conduct-and-academic-integrity/student-conduct-and-honor-code/index.php. Reports of unprofessional behavior will also be processed by HWCOM.

**1. Reports of unprofessional behavior.** Any report of unprofessional behavior may be referred to the MSEPC for further action and for the overall evaluation of a student's professionalism in accordance with the provisions of this *HWCOM Medical Student Handbook.* The MSEPC is responsible for evaluating each medical student's academic performance and professionalism; all facets of a student's performance are considered when a student is evaluated by the MSEPC. Students may not have lawyers accompany them in any meetings with faculty or staff.

**2. Filing Complaints.** Any medical student, faculty member, or staff member who is aware of a potential breach of professionalism standards must provide notification of the alleged breach by completing a professionalism incident report (PIR) utilizing the electronic Professionalism Advocacy Reporting System.

Complaints regarding discrimination, harassment, or sexual misconduct should be made directly to the FIU Office of Inclusion, Diversity, Equity and Access at idea@fiu.edu or (305) 348-2785 and will be referred there by HWCOM when appropriate. Complaints under the jurisdiction of the Office of Inclusion, Diversity, Equity and Access and the Office of Student Conduct and Academic Integrity  are handled outside and independent of HWCOM. If appropriate, these matters may be referred to HWCOM after resolution to evaluate reports of unprofessional behavior.

Complaints regarding violations of the Student Conduct and Honor Code should be made directly to the Office of Student Conduct and Academic Integrity at conduct@fiu.edu or (305) 348-3939 and will be referred there by HWCOM when appropriate.

**3. Student's Academic Status during Evaluation for Poor Academic Performance or Unprofessional Behavior.** Professionalism Incident Reports are reviewed and evaluated by the Executive Associate Deans for Student Affairs and for Academic Affairs. Students are required to participate in the evaluation of complaints. In the event that the complaint states facts or circumstances that could, in the judgment of the Executive Associate Deans for Student Affairs and/or Academic Affairs, result in harm to a patient or other person, the Executive Associate Deans for Student Affairs and/or Academic Affairs will consult with the Office of Student Conduct and Academic Integrity and/or the University Police Department. The student may be removed from clinical settings and placed on administrative leave pending further investigation.

**4. Preliminary Review.** When a PIR is received that alleges a violation of Professionalism Standards, the Executive Associate Deans for Academic Affairs and/or Student Affairs will review the PIR and may seek additional information regarding the incident at any time during evaluation of the alleged incident(s).

**5. Meeting to Review PIR.** In the event that an initial determination is made that the complaint is credible, the Executive Associate Deans for Academic Affairs and/or Student Affairs will inform the student of the allegations and meet with the student to:

- Review the allegation(s);
- Provide the student with information gathered regarding the allegations
- Give the charged student the opportunity to respond to the complaint and information presented before a determination about disposition is made; and
- Provide the charged student with information about the PIR resolution process including hearing rights and obligations.

The Executive Associate Deans for Academic Affairs and/or Student Affairs may request attendance by the individuals alleging unprofessional behavior. If a student fails to attend the meeting, the evaluation may proceed at the sole discretion of the Executive Associate Deans for Academic Affairs and/or Student Affairs.

**6. Resolution Options.** After initial meeting, one of the following actions will be taken:

    **a.**   **Dismissal.** The complaint is dismissed.

    **b.**   **Consent Agreement.** If the Executive Associate Deans for Student Affairs and Academic Affairs determine that the alleged violation of Professional Standards is not deemed to be egregious, the matter may be resolved as part of a Consent Agreement. Consent Agreements may only be utilized twice. A student must agree to all terms of a Consent Agreement. In the event that the student does not agree, the matter will be referred to the MSEPC.

    **c.**   **Referral to MSEPC.** If the student is not eligible to enter into a Consent Agreement or the Executive Associate Dean for Academic Affairs and/or the Executive Associate Dean for Student Affairs determine that the alleged unprofessional behavior is egregious, the matter will be referred to the MSEPC for consideration. A medical student may be referred to the MSEPC at any time by the Executive Associate Dean for Academic Affairs and/or the Executive Associate Dean for Student Affairs regardless of the number of prior incidents or Consent Agreements.

If the allegation is not dismissed or resolved through a Consent Agreement within 20 business days of the date on which the student was notified of the allegations, the matter will be referred to the MSEPC unless both the student and the Executive Associate Dean for Academic Affairs agree to extend the time to reach informal resolution.

## Medical Student Evaluation and Promotion Process for Evaluation of Academic Performance and Professionalism

    **a.**   **Statement of Purpose.** The purpose of the MSEPC is:

        i.   To ensure that each student who graduates from HWCOM possesses the skills and knowledge necessary to competently assume the responsibilities of a medical doctor;

        ii.   To evaluate academic performance in the required curriculum, to assess promotion to the next academic period (as this term is defined in this *HWCOM Medical Student Handbook*), **and to recommend appropriate intervention in the event of unacceptable academic performance; and**

        iii.   To evaluate personal qualities which bear on a student's professionalism and fitness to become a physician and to recommend appropriate intervention. The MSEPC relies upon the cooperation, advice, and judgment of faculty, students, and administration to perform these duties, and on outside assessment of fitness when deemed appropriate by the MSEPC in its sole discretion.

b. **Functions.** The MSEPC has two functions:

i. **Ongoing Academic, Technical, and Professional Assessment for Promotion and Graduation.** The MSEPC evaluates the academic and professional progress that a student has made during each academic period and recommends whether the student should be promoted to the next academic period or graduate, as applicable. This function mandates that the MSEPC consider each student's aggregate performance and consider all information available regarding both the student's academic performance and fitness to become a physician, including, without limitation, professional behavior. In addition, the MSEPC may evaluate a student's performance at any time based upon poor academic performance and/or alleged unprofessional behavior.

Each student's academic progress will be continuously monitored to assess progress. The Executive Associate Dean for Academic Affairs may refer a student to the MSEPC for evaluation at any time. Recommendation will be made by the MSEPC based upon all facts available to it and each student's cumulative progress will be considered during each evaluation.

ii. **Assessment for a Specific Determination of Professional Fitness.** The MSEPC also evaluates each student's ability, without limitation, to meet technical standards, and to adhere to:

– Professionalism Standards;

– Policies of institutions with which HWCOM has affiliation or clinical education agreements; and

– Applicable policies and procedures of the HWCOM and FIU, including the FIU Student Conduct and Honor Code.

c. **Authority.** The MSEPC has the authority to gather information relevant to any matter before it conducts a hearing or during the hearing process. The MSEPC has the authority to continue and reconvene a hearing and to engage in additional investigation(s). The MSEPC has the authority to (i) recommend that a student repeat a course or academic period of study or to recommend a student be suspended or dismissed from medical school based on its assessment of the student's academic performance and/or adherence to Professionalism Standards and (ii) consider grade grievances brought by students under review by the MSEPC.

Any information provided during the MSEPC or Appeals process alleging discrimination will be provided to the Office of Inclusion, Diversity, Equity, and Access (IDEA) for evaluation. If IDEA determines the discrimination claim may impact the MSEPC or Appeals process and warrants further review, the HWCOM will provide all relevant information regarding the discrimination claim to IDEA upon request. While IDEA is reviewing the discrimination claim, the MSEPC or Appeals process shall be stayed and notice of this action shall be provided to the student. No later than ten (10) business days after receipt of the claim, IDEA will either communicate to the student and HWCOM its resolution of the matter or the specific amount of additional time needed. The MSEPC or Appeals process shall recommence including any recommendation or appeal deadlines after IDEA's evaluation or determination.

d. **Composition and Selection of the Medical Student Evaluation and Promotion Committee.** The MSEPC shall have 12 voting members. Six (6) members shall be elected by the HWCOM Faculty Assembly and six (6) shall be faculty members appointed by the Executive Associate Dean for Academic Affairs, subject to approval by the Dean. The Chair of the MSEPC shall be selected from among the committee members and appointed by the Dean. The term of appointment for each faculty member is three (3) years. Faculty members may be reappointed and/or elected to the MSEPC for two (2) consecutive terms. A faculty member who serves two (2) terms may be reappointed or elected after one (1) year has expired. If an MSEPC member, including the Chair, is not able to attend a hearing due to an emergency or other occurrence, the Executive Associate Dean for Academic Affairs may make an ad hoc appointment to the MSEPC for the purpose of conducting the hearing.

Voting members of the MSEPC shall not participate in any process which involves the evaluation of the findings and recommendation of MSEPC, such as those processes that involve the Appeals Committee. The Executive Associate Dean for Academic Affairs may appoint students from the Student Professionalism and Ethics Committee (SPEC) who are in good academic standing as nonvoting advisory members to the MSEPC. The appointed students will not participate in hearings or MSEPC deliberations but may be called upon by the Chair of the MSEPC to provide information regarding any matter before it. The students may attend when invited by the Chair of the MSEPC.

e. **Quorum.** A quorum is no fewer than seven (7) voting members.

    **f.  Notifications for MSEPC and Student Grievance Procedures.** All notifications to be given under the MSEPC and Student Grievance processes will be made by electronic delivery to the student's official university email address.  This will constitute full and adequate notice.

**Promotion and Graduation.** At the end of each academic period, the MSEPC will review the academic, professionalism, and conduct records of each matriculated medical student to determine whether each student will be promoted to the next academic period or will be recommended for graduation. The MSEPC will consider summary information from the leadership of each academic period in making promotions decisions. Promotion is dependent upon satisfactory academic progress and upon maintaining the degree of professionalism necessary to become a physician, as determined by the MSEPC. The MSEPC will forward its recommendation for promotion or graduation for each student to the Executive Associate Dean for Academic Affairs for review and approval. Students whose professionalism, behavior, or poor academic performance are under review by the MSEPC, or another FIU department, will not be forwarded to the Executive Associate Dean for Academic Affairs for consideration until the matter has concluded, unless the review is immaterial to the promotion or graduation determination. In addition, in the event that a student has failed to remediate a course failure in accordance with the standard established by the Curriculum Committee, the student will be required to repeat the course unless the student files a grievance with the Grievance Committee and the committee recommends that the student receive a passing grade.

The MSEPC will review the academic accomplishments and professionalism of each Period 4 medical student to determine whether all requirements for graduation from HWCOM have been met. The MSEPC will forward to the Dean the names of students who have met all requirements for graduation. The names of students whose professionalism and/or poor academic performance are under review by the MSEPC, provided such review is material to the evaluation of such student(s) for graduation, and/or who have not passed all courses and/or the USMLE Steps 1, 2 Clinical Knowledge, and 2 Clinical Skills examinations, will not be forwarded.

A student who is not recommended for promotion to the next academic period (or graduation for Period 4 students), has the right to appeal the recommendation to the Appeals Committee. In the event that a student is not promoted because the student is under review by the MSEPC, or has not passed USMLE Steps 1, 2 Clinical Knowledge, and 2 Clinical Skills examinations prior to graduation, there will be no right to appeal the determination.

**Hearing Process for MSEPC.**

a. **Notice of Hearing.** Students will be provided a minimum of five (5) Business Days written notice of the MSEPC meeting with the student to consider a matter within its jurisdiction unless waived by the student. The notice will state:

- A description of the matter under consideration;
- The time, date, and place of the hearing;
- That the student will have the opportunity to review the documents that the MSEPC reviews to make its determination;
- A list of witnesses the MSEPC may call, if any. The witness list may be modified by the MSEPC up to three (3) Business Days before the hearing, and the student will be notified of any changes in the witness list; and
- That the student may call witnesses provided such information is provided to the MSEPC at least three (3) Business Days prior to the hearing.
- A list of MSEPC members who will be present at the hearing.

b. **Challenge to MSEPC Member's Participation in a Hearing.** The student has the right to challenge any MSEPC member's participation in the hearing. The challenge must be made in writing addressed to the Chair of the MSEPC at least three (3) Business Days prior to the scheduled hearing. For ad hoc appointment(s) to the MSEPC, the objection must be made within 24 hours of the hearing or at the MSEPC hearing, whichever is earlier. The challenge must be in writing (unless done at the hearing) and show actual bias (such as a conflict of interest, animosity, or influence) that would preclude a fair and impartial hearing. Knowledge of a student's poor academic performance, personal information, or failures of professionalism do not alone constitute bias. The Chair of the MSEPC will determine whether to grant such challenge in his or her discretion, and such a decision is final. In the event that an MSEPC member is excused from participation in a hearing, the Executive Associate Dean for Academic Affairs may appoint a substitute ad hoc member(s) for that hearing.

c. **Documents Relied Upon by the MSEPC or Student.** The student has the right to inspect all documents that will be considered by the MSEPC at least three (3) Business Days prior to the hearing upon request. The right to inspect documents will close 2 hours prior to the start of the MSEPC meeting. The student must make an appointment to review the documents.  The student must submit any information he/she intends to use at a hearing at least three (3) Business Days prior to the hearing. The Chair of the MSEPC has the discretion to allow such documents at the hearing.

d. **Record of Hearing.** Written decisions of the MSEPC will serve as the official records of a hearing.

**e. Hearing Procedures.**

1. All student meetings will be conducted in private.  The hearing may be conducted in person, or by virtual technology, at the discretion of the committee chair.

2. The burden of proof rests with HWCOM. The standard of proof is a Preponderance of the Evidence.

3. If the student fails to appear at the hearing, the hearing may proceed and a decision will be rendered in the student's absence.

4. The decision of the MSEPC shall be based solely on the information and/or testimony presented during the hearing.

5. During the hearing, the student will again be advised of the information that forms the basis of the inquiry or allegation; the student will then have an opportunity to respond to the information presented.

6. The student may have an individual present to provide support and advice; however, that individual may only advise the student and may not speak during the hearing or otherwise participate in the hearing. The individual providing support and advice may not be a witness in the hearing. The student does not have the right to be represented by an attorney. Student academic advisors may not accompany the student in hearings.

7. The MSEPC will allow witnesses to the incident to present pertinent information at the meeting with the student. Both the MSEPC and the student may call witnesses to the incident. The Chair of the MSEPC has the authority to exclude witnesses who provide redundant or duplicative information. Character witnesses shall not be permitted to testify at hearing. If witnesses make presentations at any hearing, the student and the MSEPC members shall be entitled to pose relevant questions to such witnesses.

8. If additional information is needed, the MSEPC may elect to continue a hearing to another date.

9. Deliberations of the MSEPC are held outside of the presence of the student.

10. The MSEPC will consider the information it has gathered and any information provided by the student and make written findings of fact and recommendations.

**MSEPC Recommendations.** Within ten (10) Business Days of the Hearing the MSEPC shall notify the student in writing of its recommendation and an explanation of the right to appeal. The MSEPC will make one (1) or more of the following recommendations:

- No further action;
- Issue a written reprimand or warning;
- Allow the student to repeat courses or otherwise remediate academic deficiencies as per Academic Policy;
- Allow the student to continue on a modified academic schedule per Academic Policy;
- Refer the student for counseling or psychological evaluation, including by Florida's Professional Resource Network if appropriate;
- Place the student on probation with such conditions as deemed appropriate; Once placed on academic probation, a student will remain on probation for a minimum of twelve calendar months. The duration of academic probation may be modified by the MSEPC, given extenuating circumstances, continuing academic risk, or other factors that may affect a student's progress. Probationary status is removed by the action of the MSEPC. Students will be notified in writing when placed on or removed from probationary status.
- Mandate that the student repeat an academic year (Period); or
- Dismissal of the student from HWCOM. In the event that the MSEPC recommends dismissal, the student may be removed from the clinical setting and interactions with patients during the hearing and appeal process.

The decision of the MSEPC shall be final unless timely appealed. Unless noted above, student's status shall remain unchanged and all sanctions placed on hold during the appeals process. Requirements set by the MSEPC are considered adverse actions and will be noted in the Medical Student Performance Evaluation.

## Appeals Process

**1. The Appeals Committee.**

    a. **Statement of Purpose.** The Appeals Committee is the forum for medical students to appeal recommendations of the MSEPC and recommendations of the Grievance Committee that are Adverse Recommendations as defined herein.

    b. **Composition and Selection of the Appeals Committee.** The Appeals Committee shall have seven (7) voting members. The members must be faculty members and will be appointed by the Dean. The Chair of the Appeals Committee shall be selected from among the committee members and appointed by the Dean. The term of appointment for each faculty member is three (3) years. Faculty members may be reappointed and/or elected to the Appeals Committee for two (2) consecutive terms. A faculty member who

serves two (2) terms may be reappointed or elected after one (1) year has expired. If an Appeals Committee member, including the Chair, is not able to attend a hearing due to an emergency or other occurrence, the Dean may make an ad hoc appointment to the Appeals Committee for the purpose of conducting the hearing.

Any person who has participated in the MSEPC or the Grievance Committee with respect to the matter under appeal or who has otherwise been involved in the evaluation of the incident that triggered an appeal must recuse himself or herself from consideration of the matter under appeal.

**c.** **Quorum and Voting.** A quorum is four (4) voting members of the committee. A recommendation is adopted when approved by a simple majority of the members of the committee.

**2. Grounds for Appeal.** Requests for appeal must be in writing and be based on one (1) or more of the following:

**a.** Material failure to provide a student his or her due process rights as set forth in this *HWCOM Medical Student Handbook* that affected the outcome of the hearing. Such appeals will be limited to a review of the record of the hearing.

**b.** New information, which was not available at the time of the hearing and therefore could not be presented. The student must show that the new information is likely to have substantially affected the outcome of the hearing. The nature of the information must be described in full detail in the written request for appeal, including an explanation of the reason the information could not have been presented at the hearing.

**c.** For MSEPC or Dean's recommendations alone, the severity of the sanction is clearly excessive in light of the nature of the offense and the totality of the student's academic performance, including indicia of professionalism.

**3. Procedure to Request an Appeal.** When appealing an adverse recommendation of the MSEPC or the Grievance Committee, a medical student must deliver a letter, which can be attached to an email, requesting appeal to the Executive Associate Dean for Academic Affairs. The letter requesting appeal must be delivered within ten (10) business days of the date that the notification of the decision triggering a right to appeal is sent to the medical student.

**4. Appeals Committee Responsibilities and Actions.** The following procedures shall govern the appeals process:

    a.   **Filing Request for Appeal.** The student's request for appeal must state the grounds (as provided above) upon which the appeal is based, the facts supporting the student's assertion, and a request for specific relief from the determination being appealed. The burden of proof rests with the student to clearly demonstrate that an error occurred during the MSEPC or Grievance Committee hearing process. The appeals process is not a rehearing of the matter under appeal and shall be based solely on the documents considered by the MSEPC (or Grievance Committee), the determinations of the MSEPC (or Grievance Committee), and the documents submitted by the student.

    b.   **Appellate Review.** The Chair of the Appeals Committee shall convene a meeting of the Appeals Committee within ten (10) Business Days from the date that an appeal was properly requested. The Appeals Committee shall meet and shall determine whether the student's written grounds for appeal are supported by the Preponderance of the Evidence.

    c.   **Written Recommendations.** The Appeals Committee will provide its written recommendation to affirm, modify, or remand to the MSEPC to the Dean within ten (10) Business Days of the date of the meeting of the Appeals Committee.

**5. Dean's Determination.** The Dean will review the Appeals Committee's recommendation and affirm, amend, and/or remand to the Appeals Committee or MSEPC for specific consideration the reason(s) for the remand. The HWCOM Office of Academic Affairs will provide notification to the student of the Dean's decision within three (3) Business Days of receiving the signed paperwork from the Dean. In the event that the MSEPC recommends dismissal from HWCOM, the student may be immediately removed from the clinical setting and interactions with patients during the appeal process.

The decision of the Dean shall be final unless timely appealed. Unless noted above, student's status shall remain unchanged and all sanctions placed on hold during the appeals process.

**7. Grounds to Appeal of the Dean's Determination to the Provost.** A student may appeal the determination of the Dean to the Provost or designee within five (5) Business Days after the delivery of the Dean's determination. The reason for appeal must be based on at least one (1) of the following and must be clearly identified in the request for the consideration of the appeal:

a.      Material failure to provide a student his or her due process rights as set forth in this HWCOM Medical Student Handbook that affected the outcome of the hearing. Such appeals will be limited to a review of the record of the hearing.

b.     New information, which was not available at the time of the hearing and therefore could not be presented. The student must show that the new information is likely to have substantially affected the outcome of the hearing. The nature of the information must be described in full detail in the written request for appeal, including an explanation of the reason the information could not have been presented at the hearing.

c.     For MSEPC or Dean's recommendations alone, the severity of the sanction is clearly excessive in light of the nature of the offense and the totality of the student's academic performance, including indicia of professionalism.

# Student Grievances

## *Medical Student Grievance Committee.*

a.   **Preamble.** Medical education is most effective in an environment of informality, mutual respect, cooperation, and open communication. Students in HWCOM must not only satisfy university standards but also the professional expectations of faculty members. Academic and clinical faculty members and advisors have an obligation to communicate professional and academic standards applicable to medical students. Medical students have a concomitant obligation to pursue and satisfy these standards. They are bound to observe and respect the policies, rules and regulations of the university, and of HWCOM and its faculty.

Occasionally, a conflict develops that cannot be resolved informally. When all means of informal resolution have been exhausted, medical students have the right to bring grievances against a faculty or staff member concerning academic or professionalism matters covered by this grievance procedure.

b.   **Purpose.** The purpose of these policies and procedures is to provide a means for medical students to seek investigation and possible resolution of academic and professionalism grievances, as defined below.

c.   **Grounds.** The Chair of the Grievance Committee will evaluate each complaint to determine if any of the following grounds are credibly alleged:

- Unprofessional conduct by a faculty or staff member that adversely affects a student's ability to achieve academic expectations commensurate with his or her ability to perform in the classroom, lab, or clinical setting;
- Unprofessional conduct by a faculty or staff member that violates HWCOM Professionalism Standards;

- Failure to respect the student's right to privacy;
- Arbitrary and capricious grading of coursework, examinations, or research projects, or in clinical clerkships; and/or
- Arbitrary and capricious decision to deny promotion, or dismissal from a course.

In the event that it is determined that a filed grievance does not allege facts that could constitute grounds for a grievance, the Chair of the Grievance Committee will notify the student filing the grievance. Students may not use the grievance process to appeal or otherwise contest determinations made by any other committee or individual. In addition, in the event that a student alleges grounds for a grievance and he or she has been referred to or is under review by the MSEPC, the allegations must be reviewed by the MSEPC and the Grievance Committee will not have jurisdiction.

d. **Notifications Student Grievance Procedures.** All notifications will be sent to the official University email address and will constitute full and adequate notice.

e. **Filing a Grievance against an FIU Faculty or Staff Member.** Any student, staff member or faculty member may file a PIR alleging that an FIU faculty or staff member has engaged in conduct constituting grounds for filing a grievance against such faculty member. If a PIR is filed by an individual other than an affected medical student(s), the Executive Associate Dean for Academic Affairs will meet with the medical student(s) affected by the alleged conduct to determine whether i) the alleged conduct meets the grounds for a grievance and ii) such individual(s) wish(es) to proceed with the grievance procedure. If both conditions are met, the grievance procedure shall be followed including the opportunity for informal resolution of grievances. If not, the grievance shall not proceed, and the matter will be referred to the faculty member's or staff member's supervisor for consideration.

**Informal Grievance Procedure.** Medical students are expected to resolve grievances as soon as possible through an informal meeting with the faculty or staff member whenever possible. The student should initiate such informal resolution by contacting the faculty or staff member in writing with a copy to the Executive Associate Dean for Academic Affairs, no later than 60 days after the event(s) triggering the grievance occurred. Untimely grievances will not be considered. A mutually agreeable resolution shall be formalized through a notation in the student's file/record, which is initialed by the student and the faculty or staff member. If the matter cannot be resolved through this process or the student notifies the Executive Associate Dean for Academic Affairs in writing stating good cause for not pursuing an informal meeting with the faculty member (including if the faculty or staff member cannot be reached or does not respond), the student must meet with the Executive Associate Dean for Academic Affairs to discuss the grievance

before filing a petition for a hearing before the Grievance Committee (a "Grievance Hearing").

The Executive Associate Dean for Academic Affairs or designee will work with the Executive Associate Dean for Student Affairs to facilitate an informal resolution to the grievance that is acceptable to the grieving student. If an informal resolution cannot be reached within 30 Business Days after the initial informal contact with the faculty or staff member or the Executive Associate Dean for Academic Affairs, the student then has the right to seek a formal resolution through the grievance procedure.

**Formal Grievance Hearing Process.**

When a complaint is unable to be resolved informally, the Executive Associate Dean for Academic Affairs will refer the matter to the Grievance Committee. The Grievance Committee will be appointed by the Executive Associate Dean for Academic Affairs on an ad hoc basis for each grievance under consideration. The Grievance Committee shall be faculty members who have experience with the medical student curriculum. If the behavior generating the complaint occurred in an affiliated clinical setting, the faculty members of the Committee will include at least one (1) faculty members from academic or patient care units outside of the facility where the event giving rise to the grievance allegedly occurred. The Chair of the Grievance Committee will be selected by the Executive Associate Dean for Academic Affairs. In the event that a committee member is unable to attend the committee meeting, the Executive Associate Dean for Academic Affairs will appoint a substitute member.

**Grievance Hearing Procedure.**

a. **Filing a Complaint.** The formal grievance procedure is initiated by the grieving student filing a formal written complaint with the Executive Associate Dean for Academic Affairs. The complaint must be consistent with the allegations in the informal complaint and filed within ten (10) business days of the date the informal resolution process ends, or as applicable, within 60 days of grades being released to the students (whichever is later).

Within ten (10) Business Days of receiving the formal grievance, the Executive Associate Dean for Academic Affairs shall review the complaint for timeliness and jurisdiction, and to determine whether sufficient alleged facts exist to justify a Grievance Hearing. If the Executive Associate Dean for Academic Affairs determines that the complaint is within the jurisdiction of the Grievance Committee, that it is timely, and that sufficient alleged facts exist, he or she will order a hearing by the Grievance Committee.

**b. Grievance Hearing Schedule and Notice of Hearing.**

Grievance Hearing shall be scheduled as soon as possible but no later than 45 Business Days after receipt of the written grievance. Students and affected faculty or staff members will be provided written notice at least five (5) business days prior to the Grievance Hearing by the Chair of the Grievance Committee or his or her designee. The Chair of the Grievance Committee will notify the student, faculty, or staff member(s) involved in the grievance of the Grievance Hearing. Notification will be made by electronic delivery to the student's, faculty member's, or staff member's officially designated university email address. The notice will state:

- a description of the matter under consideration;

- the time, date and place of the hearing; and

- a list of witnesses, if any.

**c. Notification That the Complaint is Not Within the Purview of the Grievance Committee.** If the complaint does not fall within the scope of this policy, then the student shall be so notified.

**d. Information Gathering.** The Grievance Committee has the authority to gather information concerning the allegations asserted in the complaint to assist with its deliberation and evaluation of a matter. Faculty, staff, and administrators must comply with all reasonable requests for relevant information that will assist the student in presenting his or her case and the committee in reaching a recommendation. The Grievance Committee may meet prior to the hearing to gather information and prepare for the hearing.

**e. Quorum and Voting.** The Grievance Committee will be comprised of up to seven (7) members and a quorum is at least four (4) members. A recommendation is adopted when approved by a simple majority of the members present.

**f. Record of Hearing.** Written decisions will serve as the official records of the meeting.

**g. Meeting.**

i. All grievance hearings and committee meetings will be conducted in private.

ii. During the grievance hearing, the student and the faculty or staff member against whom the grievance is made will be advised of the substance of the inquiry/allegation.

iii. The student must attend the meeting and will have the opportunity to present his or her complaint and may call

witnesses to participate with the prior consent of the Chair of the committee.

iv.   The affected faculty and/or staff member(s) will have an opportunity to make a presentation and to call witnesses to participate with the prior consent of the Chair of the committee. The student and affected faculty and/or staff member must provide a list of witnesses at least three (3) business days prior to the date of the Grievance Hearing. The student and affected faculty and/or staff member(s) will have an opportunity to respond to the information presented and will have the opportunity to review documents 48 hours prior to the meeting.

v.   The parties do not have the right to be represented by an attorney.

vi.   At the Chair's discretion, either party can present his or her case in writing no later than five (5) Business Days before the committee meets to consider the grievance. All relevant documents should be in the possession of the Committee Chair no later than five (5) Business Days before the committee meets to consider the grievance. Any documents received after this date may be excluded at the discretion of the Committee Chair.

vii.   The Committee will only consider the information presented at the meeting and make written findings of fact and recommendations based upon its assessment of such information. Its deliberations will take place outside the presence of the parties.

**h.   Determination.** A written report including findings of facts, conclusions, and recommendations shall be prepared and forwarded to the Dean. The affected student and the faculty and/or staff members will be sent copies of the Dean's determination by electronic delivery to their official university email address. If a student is contesting the award of a grade, the Dean's determination regarding the student's evaluation will be binding on the faculty member. The matter shall be referred to the staff member and/or faculty member's supervisor and any further actions will be taken in accordance with applicable HWCOM faculty bylaws and HWCOM and university policies and procedures.

**Formal Academic Grievance.** In the event that the student is not in agreement with the determination made by the Dean, a student may file a formal academic grievance with the FIU Faculty Fellow for Academic Integrity within 15 Business Days of the date of the Dean's decision or within 20 Business Days after classes begin in the semester following that in which the complaint arose, whichever is later.  Grounds for appeal are:

A. Arbitrary and Capricious awarding of grades

B. Unprofessional conduct by a professor that affects adversely either the student's ability to satisfy academic expectations, whether in the classroom, a field setting, a laboratory or other setting, or the student's actual performance

C. Inappropriate or inadequate academic advising concerning requirements not published in official University documents

D. Arbitrary dismissal from a graduate course or program except as defined in FIU's grievance Policy

E. Irregularities in the implementation of policies or procedures in grievance hearings at HWCOM.

More information including where to submit the appeal is available at http://integrity.fiu.edu/grievances.html.

**Support Services.** In addition to the Grievance Process, students are encouraged to make full use of the services available at the FIU Counseling and Psychological Services Center, FIU Victim Empowerment Program, HWCOM Medical Student Counseling and Wellness Center, the Office of Student Affairs, and the Office of Academic Affairs.

**Support Procedure to Address Misconduct against Medical Students in Clinical or Professional Settings by Individuals who are not FIU Faculty or Staff Members.** Any medical student, staff member or faculty member may notify the FIU Office of Inclusion, Diversity, Equity and Access Director or Executive Associate Dean for Student Affairs that a medical student has been subject to misconduct in a clinical or other educational setting by a person who is not an FIU faculty or staff member.

The Executive Associate Dean for Student Affairs shall promptly notify the FIU Office of Inclusion, Diversity, Equity, and Access Director for guidance. Only at the direction of the FIU Office of Inclusion, Diversity, Equity, and Access Director, will the HWCOM take further action as appropriate.

# Technical Standards

Qualified applicants to HWCOM must be able to complete all requirements leading to the MD degree. Because the MD degree signifies that the holder is a physician prepared for entry into the practice of medicine within a graduate training program, the recipient must have the knowledge and skills to function in a broad variety of clinical situations, and to render a wide spectrum of patient care as required by the curriculum.

In addition to proven academic ability and other relevant personal characteristics, HWCOM students must possess and be able to demonstrate the skills, attributes, and qualities defined in the HWCOM Technical Standards, without undue dependence on technology or intermediaries to a

degree that compromises independent judgment. The use of a trained intermediary is not acceptable in many clinical situations because that would require that a student's judgment be mediated or interpreted by someone else's power of selection and observation. Should, despite reasonable accommodation (whether the student chooses to use the accommodation or not), a student's existing or acquired disability interferes with patient or peer safety, or otherwise impedes the ability to complete the HWCOM medical education program and advance to graduation, residency training or license, the student may be separated or dismissed from HWCOM.

Candidates for the MD degree must be able to fully and promptly perform the essential functions in each of the following five categories listed below. Students must annually confirm and attest to their ability to meet these standards with or without reasonable accommodations as defined by the Americans with Disabilities Act (ADA).

1. **Observation.** A candidate must be able to observe demonstrations and experiments in the basic sciences including, but not limited to, physiological and pharmacological demonstrations in animals, microbiologic cultures, and microscope studies of microorganisms and tissues in normal and pathologic states. A candidate must be able to accurately observe a patient from a distance and at close range, obtain a medical history directly from the patient, and directly observe a patient's medical condition. Observation necessitates the functional use of the senses of vision and sensation. It is enhanced by the functional use of the sense of smell.

2. **Communication.** A candidate must be able to elicit information from patients, describe changes in mood, activity and posture, and perceive nonverbal communications. A candidate must be able to communicate effectively and sensitively with patients. Communication includes not only speech but reading and writing. A candidate must be able to communicate effectively and efficiently with health professionals, teachers, staff, and peers in settings where communication is typically oral or written, in both immediate and recorded modes, or when the time span available for communication is limited.

3. **Motor/Sensory.** Candidates should have sufficient motor and sensory function to elicit information from patients by palpation, auscultation, percussion, and other diagnostic maneuvers. A candidate should be able to conduct basic laboratory tests (urinalysis, CBC, etc.), carry out diagnostic procedures (thoracentesis, paracentesis, etc.) and interpret EKGs and radiologic imaging studies. A candidate should be able to execute motor movements reasonably required to provide general care and emergency treatment to patients. Examples of emergency treatment reasonably required of physicians are cardiopulmonary resuscitation, the administration of intravenous fluids and medication, the application of pressure to stop bleeding, the opening of obstructed airways, the suturing of simple wounds, and the performance of simple obstetrical maneuvers.

Such actions require coordination of both gross and fine muscular movements, equilibrium, and functional use of the senses of touch and vision.

4. **Intellectual-Conceptual, Integrative, and Quantitative.** A candidate must be able to acquire, assimilate, interpret, integrate, and apply information from direct observation, oral and written communication, digital pathology and radiologic imaging, electrocardiograms, and other studies. A candidate must also be able to comprehend three-dimensional and spatial relationships and continually exercise the skills of inquiry and intellectual advancement in the profession.

5. **Behavioral/Social.** A candidate must possess the emotional health required for full utilization of his or her intellectual abilities, exercise good judgment, promptly complete all responsibilities attendant to the diagnosis and care of patients, and develop mature, sensitive, and effective relationships with patients, staff, peers, and faculty members. Candidates must be able to tolerate physically taxing workloads and to function effectively under stress. They must be able to adapt to changing environments, to display flexibility, and to function in the face of uncertainties inherent in the clinical problems of many patients. Compassion, integrity, interpersonal skills, interest, and motivation are assessed during the admissions and education processes. A candidate must be willing to interview, physically examine, and provide care to all patients regardless of their race, ethnicity, gender, culture, religion, or sexual orientation.

**Information in the Course Syllabus.** The syllabus for each course contains expectations for tasks that students must be able to perform to demonstrate technical proficiency. Students should understand that course grades may be impacted by their ability to demonstrate technical proficiency in one or more areas.

**Assessment of Student Performance.** Assessments in many courses provide summative evaluation of a student's academic, technical, and/or professional performance in the course, in addition to the grade. Assessments of students are used in the Medical Student Performance Evaluation (MSPE), also known as the dean's letter. More information on assessment is found in the section below.

**Grievances.** In the event that a student believes that a grade or assessment of technical proficiency is inaccurate or unfounded, the student has the opportunity to appeal said grade or assessment using the student grievance process set forth in this Handbook or FIU's Academic Grievance process found at http://integrity.fiu.edu/grievances.html

**Adverse Actions.** If the Medical Student Evaluation and Promotion Committee (MSEPC) believes a student is unable to meet the technical standards set forth by HWCOM, it may recommend an Adverse Action up to and including dismissal from the MD program.

# Academic Standards and Assessment of Performance

### Exam Grades

Students individually receive their own exam results, including information that allows them to evaluate their performance relative to the cohort. General class performance on individual exams is provided to students in the results report.

### Course Grades

The HWCOM Curriculum Committee designates grading scales and grading methods. Course directors establish performance standards, assess student knowledge and achievement, and assign grades. Period directors and strand leaders monitor grading schemes. Grading schemes are described in course syllabi and include grading scale, assessment formats, and weight for each assignment.

Course grades are determined and assigned on a numeric or pass/fail basis for each course, clerkship, and rotation. The numeric grading scheme uses a 0-100–point scale. In this scale, 75 is the minimum passing grade; grades of 75–79, while passing, indicate marginal competency; a grade of 80 is the minimum grade that designates competency.

The following course grade designations are used: U/XX, U/75, P, F, F/P, I, and W. The (U/XX) grade indicates a final unsatisfactory numeric score below 75. The (U/75) grade indicates successful remediation of a course grade initially below 75. The (P) grade indicates a passing course grade. The (F) grade indicates a failing course grade in a pass/fail course. The (F/P) grade indicates successful pass/fail remediation of an initially failed pass/fail course. The (I) grade is temporary and indicates an incomplete grade; students who have not completed all course requirements but have received permission from the course director to complete the work within an allotted time may be assigned this grade. After expiration of the allotted time extension, (I) grades are converted to the appropriate designation. Students who have completed all course requirements cannot receive an (I) grade. The (W) grade indicates student withdrawal from a course after the start date and before the end date. Individual course grades are released to students in a timely manner. Beginning with the class of 2024 numeric grades will no longer be reported on the transcript. Only the following course grade designations will be reported on the transcript: P, F, F/P, I, W.   The Clerkships in period 3 will be reported as Honors (H), Near Honors (NH), Pass (P), Fail (F), Incomplete (I) or Withdrawal (W).

### *Remediation and Repeating a Period*

**Remediation and Repeating a Period**

- Students who fail a course in Periods 1 or 2 due to unsatisfactory academic performance may be offered the opportunity to demonstrate competency with satisfactory performance on a remediation assessment, usually a comprehensive exam.

- A course failure is documented on the transcript as a U for Unsatisfactory. A student that successfully completes a remediation will receive a U/75 or P/F for that course. An attempt at remediation of a course is counted as a repeat of that course. Failure of a remediation assessment or plan, and failure to take a remediation assessment or complete a remediation plan without an excused absence, is considered equivalent to a second failure of that course. All students with failed remediations will be referred to the MSEPC for evaluation of academic progress.

- The MSEPC may evaluate student performance at any time. Evaluation is mandatory upon failure of two or more courses in a single academic period and students may be subject to adverse action, such as probation, repeat of the academic year, or dismissal.

- Students who have failed two or more courses will require review by the MSEPC before being given permission to take additional remediation assessments.

- Any course failure during a period of probation requires evaluation by the MSEPC and the student may be subject to adverse action. Remediation will not be permitted unless authorized by the MSEPC.

- A student who has failed a course and its remediation, after review by the MSEPC, may be given the opportunity to repeat that course (as the third attempt), either through attending that course again, by repeating an academic period, or through a self-directed study plan. However, failure of this third attempt cannot be remediated and will result in dismissal from the HWCOM.

Course directors set standards for achievement on remediation assessments.

Remediation assessments in Periods 1 and 2 are offered at the ends of course blocks, three times per year. Remediation assessments for Period 1 and Period 2 courses ending August to December are administered during the first week of classes in January. Remediation assessments for courses ending January to April are administered during Spring Break week. Remediation assessments for Period 2 courses ending April to June are administered in late June or early July, during the summer break.

Assessment formats, dates, and performance standards are communicated directly to remediating students. Remediation of some courses may require skill performance assessments or other assignments

**Clinical Rotations – Period 3 and Period 4**

In Period 3, failure of a clerkship or poor shelf exam performance, may also result in review by the MSEPC. Poor clinical performance that does not meet academic and/or professionalism expectations, will require review by the MSEPC and may result in adverse action such as probation, repeating the academic year or dismissal.

Any student who has been required to repeat an academic period as an adverse action by the MSEPC is not eligible to repeat any other academic period due to academic performance. In the event that the MSEPC recommends a student for dismissal, the student will be removed from clinical settings pending outcome of the appeals process.

## *Academic Watch*

The purpose of placing students on academic watch is to notify students of minimally acceptable performance and intervene early enough in the academic program to provide timely support, to monitor and track academic progress to improve performance, and to ensure academic success. Students may be placed on academic watch if they fail any course in any academic period, have a grade average below 80, or perform just above passing standards in any course. Course and clerkship directors and period coordinators, along with the Office of Academic Affairs, identify students for placement on academic watch. Placement on academic watch does not affect a student's academic standing and is not an Adverse Action or Adverse Recommendation. Consequently, students on academic watch are not entitled to a hearing or appeal. Academic watch is not recorded as part of a student's Medical Student Performance Evaluation.

Recommendations for students on academic watch are voluntary and may include, but are not limited to:

- Participation in tutoring;
- Reduction or cessation of extracurricular activities;
- Seeking approval for involvement in extracurricular activities;
- Regular meetings with academic advisors who monitor academic activity;
- Information about
  - o The HWCOM Medical Student Counseling and Wellness Center for evaluation;
  - o The learning specialist for assistance developing time-management.

o The FIU Disability Resource Center if appropriate.

Students remain on academic watch for one year before undergoing re-evaluation. Students who pass the remainder of courses in a period with grades above 80 are removed from academic watch after 12 months.

## *Probation*

Probation is an adverse action. Probation indicates unsatisfactory progress toward the medical degree and can be a precursor to dismissal from medical school.  It is an official notification that a student must improve academic and/or professional standards set forth by the MSEPC. The MSEPC has the authority to place any student on probation based on poor academic performance or failure to meet HWCOM Professionalism Standards. When considering whether to place a student on probation, the MSEPC will review performance in each period and overall performance.

Once placed on academic probation, a student will remain on probation for a minimum of twelve calendar months. The duration of academic probation may be modified by the MSEPC, given extenuating circumstances, continuing academic risk, or other factors that may affect a student's progress. Probationary status is removed by the action of the MSEPC. Students will be notified in writing when placed on or removed from probationary status. A student whose academic performance does not improve and who fails to meet the terms of probation may be recommended for dismissal by the MSEPC. In the event that the MSEPC recommends a student for dismissal, the student may be removed from clinical settings pending outcome of the appeals process.

## *Period Performance Grades and Promotion*

Students may be provisionally promoted into Period 2 by the MSEPC at the end of Period 1 if a student is pending completion of Period 1 courses in the summer.  Students must pass all Period 1 and Spring Period 2 courses, and any remediation(s) if necessary, to be permitted to continue in Period 2 in August.  All remaining Period 2 courses must be successfully completed, and remediated if necessary, prior to a student's advancement to Period 3. All promotions decisions are made by the MSEPC.

Student grade averages are determined at the ends of Periods 1 and 2 and cumulatively at the end of each period. Period grade averages are determined by student course grades weighted by course credit hours. For courses that have been repeated, period grade averages are determined from the total grade points earned weighted by the total credits completed. Averages of 80 to 100 fulfill academic expectations for promotion. At the ends of Periods 1 and 2, the Medical Student Evaluation and Promotion Committee (MSEPC) awards designations of Honors (H) and Near Honors (NH) to no less than the top 10% and no less than the next 15%, respectively, of students in that

period. Honors and Near Honors designations are awarded for individual clerkships in Period 3. Students who have failed one or more courses or who have cumulative grade averages of 75–79 may be placed on academic watch at any time and may be subject to a performance review by the MSEPC.

The MSEPC promotes students to the next period of study based on satisfactory academic performance, demonstration of appropriate professional behavior, and completion of required assessments, including:

- Summative clinical OSCE after completing Period 3 courses and clerkships, which serves as the skills competency assessment for promotion to Period 4.
- Passing score on Step 1 of the United States Medical Licensing Examination® (USMLE) prior to proceeding with Period 4 rotations;
- Promotion to Period 4 is provisional if the USMLE Step 1 has been taken (i.e., a score is pending) and all other requirements have been fulfilled. A passing score on USMLE Step 1 is required to resume Period 4.
- Passing score on USMLE Step 2 Clinical Knowledge before certification for match and graduation.
- Passing score on USMLE Step 2 Clinical Skills before certification for graduation. A student with a pending score on this exam will be certified for match.

Class rank is determined for each period of study during the first three periods and is cumulative through graduation. Class rank is based on numerical course grades weighted by credit hours.

## Main Residency Match Eligibility and Participation Requirements

Medical school officials are required to verify the graduation credentials of their students and prior-year graduates to participate in the Main Residency Match. At HWCOM, this is a responsibility of the Executive Associate Dean for Student Affairs and the Medical Registrar. Only students and graduates who are eligible to enter graduate medical education (GME) on July 1 in the year of the Match can participate.

Under the terms of the Match Participation Agreement, applicants must meet all requirements for entry into GME as prescribed by the Accreditation Council for Graduate Medical Education (ACGME) in Section II of the ACGME Institutional Requirements (www.acgme.org). Medical schools may have additional graduation requirements.

HWCOM has established the following criteria for determining a student's Match eligibility:

1. The senior student MUST be on track to graduate before July 1st in the year of the Match.

2. The senior student MUST receive passing scores for USMLE Step 1 and Step 2CK prior to the Rank Order List Deadline (typically during the third week of February).

Students who do not meet these requirements will be withdrawn from Match participation.

Verification and student withdrawals MUST be completed by 9:00 p.m. ET on the Rank Order List Certification Deadline.

## Graduation Requirements

Students' academic and professional records are reviewed by the MSEPC prior to graduation. Students must receive the MSEPC's recommendation for graduation and receipt of the Doctor of Medicine (MD) degree; this recommendation must be approved by the HWCOM Dean. To receive the MSEPC's recommendation for graduation and receipt of the MD degree from HWCOM, students must demonstrate proficiency in each area:

**Courses:** Students must pass all required courses and the required number of elective rotations.

**Licensing exams:** Students must pass Step 1 of the USMLE (required for promotion to Period 4) and pass both Step 2 Clinical Knowledge and Clinical Skills of the USMLE.

**Competency assessments:** Students must meet standards in nine competency domains (domains adapted from the Association of American Medical College Physician Competency Reference Set).

**Professional performance:** Students must consistently display professional behaviors and values appropriate for the practice of medicine.

To graduate from HWCOM with the MD degree, students must satisfactorily complete all course work within six (6) years from the date of matriculation. An exception to this can be made for those students seeking dual professional degrees such as MD and a PhD degree.

A student must take and pass all required USMLE Step exams within six (6) years of matriculation. Failure to take and/or pass any Step exam within the six (6) period will result in dismissal from HWCOM.

Commencement ceremonies are held once each spring. Students with pending graduation requirements at the time of spring ceremonies may be prohibited from participation in ceremonies.

# Matriculation and Retention

### *Matriculation and Retention Requirements*

Students must meet certain requirements to matriculate and to reenroll annually. The requirements are summarized in the table below:

| Requirement | Prematriculation | Period 1 | Period 2 | Period 3 | Period 4 |
|---|---|---|---|---|---|
| Medical History and Physical Examination | X | | | | |
| Technical Standards Attestation | X | | X | X | X |
| Immunizations | X | | | | |
| Flu Vaccine | | X | X | X | X |
| Tuberculosis Screening | X | | X | X | X |
| Health Insurance | X | | X | X | X |
| Disability Insurance | X | | X | X | X |
| Level 2 Criminal Background Check* | X | | X | X | X |
| 10-Panel Drug Test* | X | | X | X | X |
| N-95 Respirator Mask Fit Test | | X | | X | X |
| BLS Certification | | X | | X | |
| Online Student Mistreatment and Online Title IX training | | X | | X | |
| Online training for OSHA and HIPAA | | X | X | X | X |

*Additional testing may be required by HWCOM or its clinical affiliates.

Once an applicant accepts an offer to enroll and matriculate at HWCOM, he or she must comply with all prematriculation requirements. Each accepted student receives a welcome notification from the HWCOM Office of Student Affairs with a link to Orientation information on the college's website; this information lists all prematriculation requirements and forms. Students are notified of annual reenrollment requirements prior to promotion to each subsequent period of study.

### Medical History and Physical Examination

*Link to Complio login page*

HWCOM requires all medical students to visit a licensed physician or health care provider of their choice and undergo a medical history and physical examination within in one (1) year prior to matriculation. HWCOM utilizes Complio, an online screening service, to facilitate submission and verification of student requirements. Students access the Complio Applicant Management System at https://fiumed.complio.com/Login.aspx  Failure to complete and submit these forms prior to Orientation results in a hold placed on the student's registration until all documents have been submitted and processed.

### Immunization and Screening Policy

Prematriculation health evaluations are required for all students enrolled at HWCOM. A completed Immunization Documentation Form must be submitted prior to enrollment and all immunization forms must carry the original signature of a physician or a licensed medical practitioner and the license number, office stamp, and office address.

*Link to Immunization Documentation form*

Medical students must maintain compliance with immunization requirements throughout the educational program. HWCOM follows immunization guidelines issued by the Centers for Disease Control and Prevention (CDC) and regulations issued by the State University System of Florida Board of Governors. Immunization requirements are summarized below.

**Measles, mumps, and rubella.** As a prerequisite to matriculation or registration, the State University System of Florida requires all students born after 1956 to present documented proof of immunity to measles, mumps, and rubella. More information may be found at https://studentaffairs.fiu.edu/health-and-fitness/student-health/forms/immunization/index.php.

**Tetanus/Diphtheria immunization.** Matriculating students who have not had a tetanus booster within the past two (2) years should receive the tetanus, diphtheria, and pertussis (Tdap) vaccine. A single dose of Tdap must be administered for adults aged 19 through 64 years who have not received a dose of Tdap previously. After initial Tdap vaccination, adults should receive a tetanus/diphtheria (Td) booster every 10 years.

**Hepatitis B immunization series.** Students must provide documented proof of vaccination and immunity to Hepatitis B as described below:

- A total of three doses of hepatitis B vaccine and a positive quantitative hepatitis B serum surface antibody titer.
- A second series of hepatitis B vaccinations administered and the antibody titer repeated (if the hepatitis B surface antibody titer is negative).
- Proof of completion of the hepatitis B immunization series prior to clearance for direct patient contact.

Students who have negative hepatitis B surface antibody titers receive individual counseling on how best to protect themselves, prevent infecting others, and follow special procedures after a needlestick injury.

**Chickenpox (varicella).** Students must show proof of positive varicella antibody titer verifying immunity.

**Tuberculosis (TB) screening.** Students are required to undergo a tuberculin skin test (TST) or Quantiferon blood testing prior to matriculation at HWCOM:

- A student who has not been screened for Mycobacterium tuberculosis infection in the past 12 months must undergo a two-step test that consists of intracutaneous Mantoux injections administered a minimum of one to 3 weeks apart.

- TB skin testing and/or Quantifereon blood testing is required prior to matriculation and annually thereafter; follow-up includes:

  - A positive TST must be assessed by a health care provider; students must provide evidence of a chest radiograph that reveals no acute cardiopulmonary process and/or documentation of a complete symptom screening by a physician prior to matriculation and annually thereafter. Students are required to complete the TB screening questionnaire with the primary care physician and submit documentation via Complio.
  - A chest radiograph is mandatory for a student with a new or previous positive reaction; if positive, the student must document proof of receiving appropriate treatment.
  - Students vaccinated with bacille Calmette–Guérin (BCG) more than 18 months prior to matriculation are required to undergo a TST.

Decisions concerning the ability of a student who is receiving treatment for active TB to pursue coursework and/or clinical rotations are made on an individual basis based on recommendations made by the student's personal physician.

**Additional requirements.** Medical students may be required to receive additional vaccines and/or undergo scheduled or random drug testing or other medical tests prior to starting classes or clinical clerkships, as required by HWCOM and its affiliated clinical education sites. Additional periodic evaluations or tests may be required as indicated, or if exposure to an infected patient or infectious pathogen occurs.

**Monitoring Immunization Compliance.** Medical students are required to maintain compliance with HWCOM immunization requirements throughout their enrollment at HWCOM. HWCOM utilizes Complio, an online screening service, to facilitate submission and verification of student requirements. Students access the Complio Applicant Management System at https://fiumed.complio.com/Login.aspx Failure to complete and submit these forms prior to Orientation results in a hold placed on the student's registration until all documents have been submitted and processed. HWCOM Office of Student Affairs will monitor student compliance and note any deficiencies prior to Orientation.

*Link to Complio login*

Students who fail to prove compliance with immunization requirements are not eligible to attend clinical rotations until all requirements are met. Exceptions may be granted in the event of valid medical contraindications, for religious reasons, or if a student is in the process of receiving the complete vaccine series (e.g., hepatitis B, varicella).

### Health Insurance

HWCOM students are required to maintain current and adequate medical insurance to cover the cost of emergencies and common medical problems that might occur during their educational training period and are outside of the scope of services provided on campus (e.g., specialty care, diagnostic testing, and hospitalization). Health insurance specifically designed for medical students is available through the group student health insurance plan (Gallagher & Co.) endorsed by FIU and meets the minimum standards required by HWCOM. *Link to Gallagher & Co. Health Insurance information*

*Link to Gallagher & Co. Health Insurance information*

The cost of medical insurance is borne by the student; fees vary according to the plan selected. Annual coverage for all students begins on August 1 of each year.

Alternatively, students may satisfy the medical insurance requirement with documentation of a valid medical insurance plan already in effect that meets the following minimum standards:

- continuous coverage for the entire period the insured is enrolled as a medical student and must be renewable;

- in-network and out-of-network coverage for physician, hospital, diagnostic, and therapeutic coverage in local facilities for both emergency and nonemergency outpatient and inpatient services in

the South Florida area (Miami-Dade, Broward, Palm Beach, and/or Monroe counties);

- must not unreasonably exclude coverage for perils inherent in the student's program of study, such as coverage for needlestick injuries and charges related to the post exposure diagnosis and treatment of bloodborne pathogens;

- coverage for outpatient and inpatient mental health care, prescription drugs, and ambulance services; and

- Students traveling to foreign countries must have evacuation and repatriation coverage.

As part of the prematriculation process, all students must sign the Health Insurance Verification Form (https://medicine.fiu.edu/resources/current-students/md-resources/forms-policies-and-procedures/_assets/health-insurance-verification.pdf ) that attests to continuous health insurance coverage by a plan providing the required minimum benefits, including coverage for needlestick injuries.

### Disability Insurance

Medical students are required to enroll in a disability insurance plan selected by HWCOM to cover chronic disability that occurs as a result of injuries received during their educational training period. Students are responsible for payment and are informed about this requirement and annual fee prior to Orientation. Disability premiums are collected by the Office of Student Affairs. Disability insurance must be renewed annually for the entire period the insured is enrolled as a medical student. (For more information please reference the disability policy:  Add link to disability insurance)

### Criminal Background Checks

All applicants to HWCOM undergo a Level 1 criminal background check administered by the American Medical College Application Service (AMCAS). Upon acceptance to HWCOM, and again prior to Periods 2, 3 and 4, students are required to complete a Level 2 criminal background check with fingerprinting. Criminal background checks are ordered online through American DataBank (http://www.fiumedicinescreening.com). Students pay a fee for this service.

Additional background checks may be required by HWCOM or its clinical affiliates. HWCOM will report the results of a criminal background check to clinical affiliates, state licensing agencies, and other entities to comply with federal, state, or university policies.

Findings in a criminal background check may affect a student's admission and ability to participate in clinical experiences, complete the medical degree program, or obtain a medical license. FIU and HWCOM reserves the right to rescind an offer of admission to a prematriculant who fails to complete a background check, who misreports a history of criminal activity, who is arrested after admission and prior to matriculation, or whose Level 1 or Level 2 criminal background checks identify a disqualifying offense.

An enrolled student who fails to complete a required criminal background check is subject to dismissal from HWCOM. Results of criminal background checks are reviewed by individuals designated by the Executive Associate Deans for Student Affairs and/or Executive Associate Dean for Academic Affairs. Potential violations of Professionalism Standards arising out of criminal background checks may be referred to the MSEPC in accordance with the provisions of this *HWCOM Medical Student Handbook*.

### Drug Testing

Upon acceptance to HWCOM, and again prior to Periods 2, 3 and 4, students must undergo 10-panel drug testing. These tests are ordered online through Complio (http://www.fiumedicinescreening.com). Students must pay a fee for this service.

Additional testing may be required by HWCOM or its clinical affiliates at any time. HWCOM reserves the right to rescind an offer of admission to a prematriculant who fails to complete a required drug test or who has a positive finding. Drug test results may affect a student's admission or eligibility to participate in clinical experiences, to complete the medical degree program, or to obtain a medical license.

An enrolled student who fails to undergo a required 10-panel drug test is subject to dismissal from HWCOM. Findings on any drug test are reviewed by the Executive Associate Dean for Student Affairs and discussed with the student. A student with a positive drug test may be referred to the MSEPC, HWCOM Medical Student Counseling and Wellness Center, Florida Professionals Resource Network, or other health care agencies or organizations as deemed appropriate when they are in violation of HWCOM Professionalism Standards. Positive drug test results are reported to the Office of Academic Affairs and the MSEPC for further investigation; disciplinary action may occur if a student is in violation of any HWCOM Professionalism Standards. Findings may prevent a student from participating in educational experiences, including clinical rotations, and may result in a student losing eligibility to complete the medical degree program.

HWCOM will report the results of drug testing to clinical affiliates, state licensing agencies, and other entities to comply with federal, state, or university policies.

### N-95 Respirator Mask Fit Test

During Periods 1, 3, and 4, medical students are required to undergo N-95 respirator mask fit testing. Testing sessions are scheduled by the Office of Student Affairs. Students are required to pay a fee for this service. Students who fail mask fit testing may be precluded from participating in certain clinical experiences unless they sign a waiver.

### Liability Coverage

**Liability Coverage.** Students enrolled in HWCOM are covered by the FIU self-insurance program when participating in approved activities of HWCOM. The State University System of Florida Board of Governors Self-Insurance website (https://flbog.sip.ufl.edu/ ) features liability insurance information and several free online continuing medical education (CME) programs designed to address current risk management issues facing health care providers today.

### Florida Residency Status

**General Guidelines for Residency Reclassification.** Residency reclassification for tuition purposes is governed by Section 1009.21 of the Florida Statues and FIU regulations and policies. A student who comes to Florida for the purpose of receiving an education is not normally eligible for reclassification. Reclassification for tuition purposes requires clear and convincing documentation that supports permanent legal residency in Florida for at least 12 consecutive months, rather than temporary residency for the purpose of pursuing an education. Medical students requesting reclassification must complete the Residency Reclassification form, which can be found at https://onestop.fiu.edu/_assets/docs/registrar/Residency_Reclassification.pdf.

HWCOM reclassifies students one time per year. All documents for reclassification must be submitted to the HWCOM Registrar no later than July 1. All documents submitted must be dated at least 12 months prior to the first day of classes for the period in which the student is requesting residency status reclassification (generally in late July; exact dates need to be confirmed with the registrar). A student requesting reclassification must ensure that all addresses listed in the student's Panthersoft account are Florida addresses.

**Marriage.** A married, non-resident student who comes to Florida for the purpose of attending HWCOM may not claim Florida residency on the basis of his or her spouse's status if he or she was married prior to initial enrollment at FIU.

# Student Services

HWCOM uses a holistic approach to medical student development. Providing students a wide array of supportive resources maximizes their educational experience and enhances both their professional and personal growth as future physicians.

## *Student Academic Success Services*

Within the Office of Academic Affairs, academic support is provided to all HWCOM medical students through a formal Academic Advising program and through tutoring and learning specialist services provided through HWCOM Student Academic Success Services. If students wish to seek academic counseling or advice from individuals who have no role in evaluation or promotions decisions, they should access services provided by the Office of Student Affairs.

*Link to HWCOM Student Academic Success Services*

**Academic Advising.** HWCOM is committed to helping students achieve their academic and professional goals through quality academic advising. The college's formal Academic Advising Program is within the Office of Academic Affairs. Beginning in Period 1, students are assigned to an academic advisor and must meet with that advisor at least once per academic period. These mandatory Academic Advising sessions focus on reviewing academic progress, assessing progress in developing self-directed learning skills, setting academic goals, and planning for postgraduate study. Students are expected to prepare for these advising sessions using self-reflection to assess their own progress, strengths, weaknesses, and learning goals. Students can request additional advising sessions at any time. Academic advisors also meet with students who are referred by a course director or by the Office of Academic Affairs due to poor performance in a course or for other reasons that may impact academic success, such as failure to demonstrate the standards of professionalism expected of medical students. Advisors subsequently monitor remediation and progress.

Academic advisors have in-depth knowledge of the curriculum and support services available to HWCOM students, such as tutoring, learning specialist services, and personal counseling, and are thus able to make appropriate referrals. In addition, academic advisors are responsible for advising students about career choices in relation to academic performance; assisting students in choosing subinternships, electives, and selective rotations for the fourth period; and providing guidance to students concerning other academic pursuits, including research. Academic advisors also assist the Executive Associate Dean for Academic Affairs in preparing the Medical Student Performance Evaluations—the final summative letters documenting each student's medical school performance—which accompany residency applications.

**Tutoring.** Tutoring assistance is available, at no cost, to all enrolled medical students via the HWCOM Tutoring Program. Students experiencing academic difficulty are encouraged to participate in tutoring. The primary

goal of the HWCOM Tutoring Program is to offer tutoring services to promote and enhance student learning outside the classroom environment. Tutoring is provided by faculty and select medical students (peer tutors) in their second, third, or fourth years of medical school.

Tutoring is offered in individual and small-group formats and in the form of class review sessions. In some courses, faculty members provide review sessions as supplements to formal instruction. Those serving as tutors act as facilitators of the learning process. The tutor fills in content gaps as needed and assesses and modifies the tutee's reasoning and problem-solving skills. In the case of individualized tutoring, the tutor creates a personalized tutoring plan to specifically address an individual student's needs. Students interested in obtaining any of these services may self-refer for tutoring by contacting the director or coordinator of the HWCOM Tutoring Program who will assign and schedule the services based primarily on need and availability of tutors. It is recommended that students take advantage of tutoring assistance at the earliest indication of academic difficulty within a course. In addition to self-referrals, students may be referred for tutoring by the Office of Academic Affairs, a Course Director, the Medical Student Evaluation and Promotion Committee (MSEPC), Learning Specialist, or their academic advisors. Although tutoring is a voluntary form of academic assistance, under certain circumstances, such as course remediation, a student may be required to attend formal tutoring sessions as part of a remediation agreement.

Those medical students selected to become peer tutors receive formal training and financial compensation. In addition, this tutoring experience provides an opportunity for the tutors to reinforce their own knowledge and critical thinking skills.

**Learning Specialists.** The HWCOM Learning Specialists provide comprehensive academic support to all HWCOM students. The Learning Specialists support students in developing effective learning strategies and study techniques to enhance their academic success in medical school. The Learning Specialists work with students on an individual or group basis, addressing learning and study techniques such as time management, note-taking skills, study routines, critical thinking, test-taking skills, and the use of learning tools. Students learn to evaluate their skills and strategies in becoming successful medical students. Students may request meetings with a Learning Specialist at any time to discuss strategies for reaching their full potential as medical students.

Students may be required to work with the Learning Specialist as part of a study skills remediation plan mandated by the Medical Student Evaluation and Promotion Committee (MSEPC). Referrals also may be made by the Office of Academic Affairs, Office of Student Affairs, academic advisors, course directors, and the HWCOM Tutoring Program.

### Career and Professional Guidance

HWCOM offers a variety of formal and informal career and professional guidance services to assist medical students. These services are designed to:

- Help students identify and achieve personal and professional goals,
- Assist students in the process of selecting a career,
- Support students in the residency matching process, and
- Guide students in the transition from undergraduate medical education to residency training.

Career and professional guidance is provided by HWCOM faculty, including deans, department chairs, course and clerkship directors, and academic advisors. A list of clinical faculty with specialty-specific expertise also is disseminated to students annually; students are encouraged to seek career guidance from these faculty members. The Office of Student Affairs provides a series of formal career and professional guidance programs for all students; these programs aid students in meeting their requirements as professionals, and guide students in the residency application process. Student interest groups and Panther Learning Communities also provide guidance to students regarding career choices. Numerous online and print resources are available to HWCOM students to support their career investigations, including the Association of American Medical Colleges (AAMC) Careers in Medicine Program website, recordings of HWCOM town hall meetings and other career activities, and an HWCOM alumni catalog. Career and Professional Guidance staff members in the Office of Student Affairs are available to facilitate student access to career advising resources.

### Financial Assistance

The Office of Financial Assistance, located in the Office of Student Affairs, provides support to help students achieve their educational aspirations while successfully managing their finances. Financial Assistance staff are committed to providing students with the best possible financial resources, counseling, and customer service throughout their medical education. Services include counseling to guide students through the financial aid application process; assistance in identifying availability of federal, private, and institutional funds; debt management counseling; and coordination of student travel. Students can meet with staff in the Office of Financial Assistance from Monday through Friday. Extended office hours are available upon request. Financial assistance sessions may be mandatory and require an excused absence if the student is unable to attend the meeting.

### Personal Counseling and Wellness

HWCOM students may utilize counseling and wellness services available at the FIU Counseling and Psychological Services (CAPS) or the HWCOM Medical Student Counseling and Wellness Center (MSCWC). FIU and HWCOM Counseling and Psychological Services offer free and confidential personal counseling services and wellness programs.

Clinical services are provided by licensed clinical psychologists who maintain the highest standards of ethical, competent, and confidential care. With expertise and certification in health psychology, biofeedback training, personality theory, mindfulness, health coaching, aromatherapy, and therapeutic assessment, these professionals are dedicated to promoting student wellness and facilitating students' adjustment to the physical and emotional demands of medical education.

Content of evaluation and treatment is confidential. Unless a student signs a release of information form, information about the student, including whether or not they seek or participate in therapy, is not released to anyone. Psychologists providing services through FIU or the MSCWC have no involvement in the academic evaluation or promotion of HWCOM medical students.

**Office Location.** The FIU Counseling and Wellness Center is located at SHC 270 and more information is available at https://studentaffairs.fiu.edu/health-and-fitness/counseling-and-psychological-services/. The MSCWC is located in a dedicated suite of offices in the Green Library (entrance room 340B) located near the Medical Library.

*Contact the Medical Student Counseling and Wellness Center at 305-348-1460 or medwellness@fiu.edu*

**Policy on Provision of Health Services to Medical Students.** In compliance with the Liaison Committee on Medical Education (LCME) accreditation standards, it is imperative that the health professionals who provide health services, including psychiatric/psychological counseling, to a medical student have no involvement in the academic assessment or promotion of the medical student receiving those services. Because many of the HWCOM clinical training programs take place under the supervision and care of clinical faculty who maintain practices at various outpatient and inpatient settings in Miami-Dade and Broward counties, it is possible that a student may seek medical care and/or psychological counseling from a practice in which a faculty member sees patients or clients. Health care professionals who provide psychiatric/psychological counseling or other sensitive health care services (e.g., treatment for sexually transmitted diseases, substance abuse, rape) to medical students shall not be involved in the evaluation or promotion of those students.

HWCOM discourages faculty members who already have an evaluative relationship with a student from providing psychological counseling or medical care to that student; however, for emergent health care needs such

faculty–student relationships should not preclude the student from seeking medical care from providers who can offer the best available care. In such cases, or when a student has received psychological counseling or medical care from a faculty member prior to entering an evaluative relationship, the student may request to be evaluated by a different faculty member based on the perceived conflict. Such requests are to be made to the Executive Associate Dean for Student Affairs, who will determine the most appropriate resolution. Similarly, a faculty member who has provided psychological counseling or medical care to a student prior to entering an evaluative relationship will request reassignment of the student to another faculty member.

### HWCOM Ombuds Office

The FIU and HWCOM Ombuds Offices provide medical students a confidential, independent, and informal forum in which to clarify concerns, identify goals, and consider all options in managing or resolving conflicts. However, the Ombudsman will not guarantee confidentiality under the following conditions: a report of sexual assault, sexual violence, intimate partner violence, or stalking; a crime is witnessed or reported; there appears to be imminent harm to self or others; or matters involving minors.

The Ombudsman does not take sides, and functions in a neutral role, independent of usual administrative authorities or other FIU and HWCOM structures.

For the FIU HWCOM Ombudsman, please see

https://medicine.fiu.edu/resources/current-students/md-resources/student-affairs/ombuds-office/index.html

For more information about the FIU Ombuds visit https://studentaffairs.fiu.edu/get-support/ombudsman/index.php.

### Medical Student Support Navigation

To assist students with accessing services, the Director of Medical Student Support Services, in the Office of Student Affairs, serves as a central point of contact for medical students seeking information, consultation, or guidance about the many programs, opportunities, and services available to them within HWCOM and FIU. The Director of Medical Student Support Services assists students who are experiencing academic, professional, or personal difficulty. Medical students are encouraged to consult with this office regarding academic and leadership interests, intra- and interpersonal communication, and wellness and positive growth opportunities. Students will be referred to appropriate services.

## *University Student Services*

**Preventive and Therapeutic Health Services.** Medical and mental health services available include primary medical care; health education for the prevention, diagnosis, and treatment of routine illness and injury; and personal counseling. Students may receive medical services at FIU Student Health Services, a convenient ambulatory care center located on the Modesto A. Maidique campus. FIU Student Health Services houses a clinic, pharmacy, Wellness Center, and Counseling and Psychological Services. FIU Student Health Services provides women's health, men's health, immunization, and laboratory services. Clinic, lab, and pharmacy services are typically available Monday through Friday 8:00 a.m. to 6:30 p.m. Ultrasound diagnostic exams are available by appointment. Students who require diagnostic radiology services (radiograph, CT, MRI, nuclear medicine testing) are referred to community diagnostic centers that accept applicable insurance benefits plans.

**Clinical Care Services.** Appointments are recommended, but not required, for clinical care services. Nominal fees are charged for such ancillary services as vaccines, laboratory tests, medications, and office procedures.

**Wellness Center Services.** Services at the Wellness Center include one-on-one consultations, computerized fitness assessments, and anonymous human immunodeficiency virus (HIV) testing and counseling. Alternative therapies include massage therapy, aromatherapy, acupuncture, and chiropractic services. Appointments are required to access Wellness Center services and for personal consultations.

**FIU Pharmacy.** The FIU pharmacy is a complete outpatient pharmacy staffed by a licensed pharmacist. The pharmacy fills prescriptions written by FIU medical staff and outside physicians. Over-the-counter medications are available on site.

**FIU Student Resources: Contact Information**

- FIU 24-Hour Emergency Line, 305-348-5911
- FIU Police Department and Public Safety, 305-348-2626, http://police.fiu.edu
- FIU Alert, Department of Emergency Management, 305-348-0670, http://dem.fiu.edu
- FIU Student Health Center, 305-348-2401, http://studenthealth.fiu.edu
- Victim Empowerment Program, 305-348-3000, http://advocacy.fiu.edu
- FIU Wellness and Recreation Center, http://www.recreation.fiu.edu
- FIU Department of Parking and Transportation, 305-348-3615, http://parking.fiu.edu

# Administrative Policies and Procedures

### Biosafety, Bloodborne Pathogen, and Needlestick Injury Policies

*Link to FIU Bloodborne Pathogen Exposure Control Plan*

HWCOM follows the institutional policies of FIU regarding exposure to infectious and environmental hazards on campus, and the institutional policies of its clinical affiliates regarding exposure to infectious and environmental hazards at clinical sites. The purpose of the FIU Bloodborne Pathogens Exposure Control Plan is to protect students from the risks of being occupationally infected with HIV, HBV, or other bloodborne pathogens, and to implement the United States Department of Labor Occupational Safety and Health Administration (OSHA) Standard 29 CFR Section 1910.1030 Bloodborne Pathogens.

**Educating Students about Methods of Prevention.** Ultimately, each student is responsible for his or her health and safety in the clinical/educational setting; therefore, it is the goal of HWCOM that all students learn appropriate policies and procedures to follow in the event that they are injured or potentially exposed to bloodborne pathogens or other communicable diseases. HWCOM medical students receive information about airborne and bloodborne pathogens, handling biohazardous waste, and personal protective equipment through an online course that each student completes annually.  Additional information about needlestick injury and prevention is included in orientation and in the clinical skills course.  All students are required to participate in N-95 respirator fit test training and to have an N-95 respirator mask fit test performed in Periods 1, 3 and 4; any student who is unable to be fitted with a respirator mask must sign a waiver. Students who are unable to be fitted may be unable to rotate with clinical affiliates that require successful mask fitting.

**Procedures for Post-Exposure Care and Treatment, including Needlestick Injuries.** A student who becomes exposed to airborne or bloodborne biohazardous materials, including needlestick injuries and respiratory pathogens, must follow established protocols at HWCOM to receive timely diagnostic and therapeutic care. Students who experience needlestick and other types of injuries at any location (i.e., on campus, hospitals, ambulatory clinics, or neighborhood households) must immediately notify their clinical instructor or attending physician. Any student exposed to biohazardous material should receive immediate first aid and initial care at the site where the injury occurred.

Immediately after a known exposure, medical students must first contact their clinical instructor or attending physician and report the name of the source patient and diagnosis. Students who become exposed to biohazardous materials while at an HWCOM-affiliated clinical site (or other institution) must follow established protocols at that site for immediate care and treatment after exposure. All affiliation agreements with clinical care sites contain provisions for the care of students who sustain injuries and other types of exposures.

*Link to FIU Exposure Incident Report form (FIU Username and Password required to access)*

In addition to completing required incident report forms at the clinical sites, all exposures must be reported to the HWCOM Office of Student Affairs. The Office of Student Affairs provides guidance to students filing the required Exposure Incident Report with the FIU Department of Environmental Health and Safety in accordance with the FIU Bloodborne Pathogen Exposure Control Plan.

Students may receive follow-up care and treatment for exposures that occur at off-campus clinical or household sites either at the affiliated clinical site, at the FIU Student Health Services clinic, or from their private physicians.

Students are responsible for the payment of fees associated with the diagnostic and therapeutic services associated with airborne exposures, needlesticks, and other types of injuries, including filing health insurance claims. A student may request the assistance of HWCOM by discussing their needs with a dean in the Office of Student Affairs.

### Communicable Disease Policy

HWCOM's communicable disease policy follows guidelines established by the Centers for Disease Control for health care personnel (https://www.cdc.gov/infectioncontrol/guidelines/healthcare-personnel/index.html). No HWCOM student (or visiting student) with a communicable disease or condition will be permitted to engage in patient contact until such conditions have been resolved as documented by FIU Student Health Services in consultation with the student's physician(s) or health care provider. Persons with any of these conditions are prohibited from engaging in patient contact unless they obtain medical clearance: (1) active chickenpox, measles, German measles, herpes zoster (shingles), acute hepatitis, and tuberculosis; (2) oral herpes with draining lesions; (3) group A streptococcal disease (i.e., strep throat) until 24 hours after treatment has been received; (4) draining or infected skin lesions (e.g., Methicillin-resistant Staphylococcus aureus (MRSA). A student who is unsure whether he or she should participate in patient care should consult with his or her personal health provider or with FIU Student Health Services.

Any student who has a communicable disease must obtain written medical clearance from FIU Student Health Services (in consultation with the student's health care provider). It is the responsibility of the medical student to notify the Office of Student Affairs of any inability to perform clinical work; appropriate documentation from FIU Student Health Services is required (See also Excused Absence Policy).

Medical students with hepatitis B virus (HBV) or human immunodeficiency virus (HIV) seropositivity may continue to attend classes and participate in clinical clerkships and preceptorships. Medical students with HBV/HIV seropositivity must undergo periodic physical examinations by their health care providers to obtain written health clearance for participation in clinical

activities. Medical students are not obligated to answer patient questions related to their own HBV/HIV status, nor must they answer such questions related to other students, other health care personnel, or patients.

### Drugs, Alcohol, and Tobacco Policies

**Abuse Prevention.** FIU is committed to providing a safe work and educational environment and fostering the well-being and health of its students and employees. This commitment is jeopardized when any student or employee of FIU violates the law or FIU regulations and policies regarding alcohol on University premises.  See Drug-Free Campus/Workplace Drug and Alcohol Abuse Prevention Policy Number 1705.002 and FIU-2505: Alcoholic Beverages (https://regulations.fiu.edu/regulation=FIU-2505).

**Tobacco and Smoke-Free Campus Policy.** Florida International University is a tobacco-free, smoke-free university. Smoking and/or use of any tobacco product is prohibited in all areas of the university campus. The FIU policy prohibiting smoking is available online at http://regulations.fiu.edu/regulation=FIU-113.

### Academic Policies

HWCOM workload policies aim to ensure students have sufficient time for independent study to allow them to develop the skills of lifelong learning. Workload policies also aim to enable students to achieve appropriate work–life balance.

**Student Workload during Period 1 and Period 2.** All curriculum content during Periods 1 and 2 is delivered in formal courses, and all courses are assigned credits. The number of credits assigned for each course is determined based on workload expectations, where one credit is equivalent to approximately 15 hours of formal instruction; total workload expectation per credit is equivalent to approximately 45 hours, including instruction, study, and assessments. A 3- to 4-hour laboratory, case-based, or clinic session is quantitatively equivalent to one formal instructional hour and presumes that the activity time includes most of the study or preparation normally associated with 1 hour of formal instruction. The limit for formal instruction during Periods 1 and 2 is 25 hours weekly averaged over 4 weeks, which results in a weekly workload of up to 75 hours.

**Student Workload during Period 3 and Period 4.** Student workload during Periods 3 and 4 is designed to ensure an appropriate balance between formal teaching and service. The HWCOM policy is modeled after the Accreditation Council for Graduate Medical Education (ACGME) guidelines for residents. All medical students rotating through clerkships, electives, selectives, and subinternships are required to comply with these HWCOM limitations on duty hours: Duty hours should be limited to 80 hours per week, averaged over a 4-week period and inclusive of all in-house call activities. Continuous on-site duty, including in-house call, should not exceed 24 consecutive hours.

Students may remain on duty for up to 6 additional hours to participate in didactic activities, transfer care of patients, conduct outpatient clinics, and maintain continuity of medical and surgical care. Students must be provided with one day in seven free from all educational and clinical responsibilities, averaged over a 4-week period and inclusive of call. Students must be provided adequate time for rest and personal activities. This should optimally be a 10-hour time period between all daily duty periods and after in-house call.

**Specialty Study during Period 4.** Period 4 is intended for advanced general clinical study as preparation for residency, with opportunities for students to gain exposure to subspecialty areas and core disciplines. Students are encouraged to use electives to pursue a broad range of interests in addition to their chosen specialty. The maximum total time allowed in the same specialty or subspecialty area during Period 4 is 12 weeks. All rotations in Period 4 are graded on a pass/fail basis.

**Electives.** During Period 4, HWCOM students may apply to take extramural electives in the following categories:

- Electives listed in the Association of American Medical Colleges (AAMC) Visiting Student Application Service (VSAS).

- Electives at accredited medical schools in the United States or Canada that are not listed in VSAS. A student may submit a proposal describing the rotation and learning objectives and identifying the supervising instructor/preceptor. Proposals must be reviewed and approved in advance.

- Electives at international host schools (primarily in Central and South America) that HWCOM has affiliation agreements with to ensure appropriate learning environments, patient experiences, clinical supervision, and safety for HWCOM students. A student may submit a proposal for an international elective at a nonaffiliated site; such proposals must be consistent with HWCOM International Study Policies and must be reviewed and approved in advance.

**International Study.** A student who seeks to participate in an elective or extracurricular experience outside the United States must complete the application process prior to travel. HWCOM's approval of a clinical elective is designed to protect students and patients, while minimizing potential challenges to ethical and professionalism standards adopted by HWCOM.

The application process requires the host institution to submit a letter to HWCOM that includes affirmation that: (1) the institution agrees to supervise the student during the course of his or her clinical training and will facilitate access to emergency care as needed; (2) the student's clinical activities will be appropriately supervised at all times; (3) the level of responsibility delegated to the student will be appropriate for a fourth-year

medical student; (4) the activities undertaken by the student will be within the scope of practice of those supervising his training; (5) at the conclusion of the experience the institution agrees to submit a completed and signed HWCOM evaluation form of the student's performance, including a grade of pass or fail.

HWCOM reserves the right to deny an elective if it is deemed dangerous (e.g., potentially exposes the student to natural disasters, political instability, or disease)

### Attendance and Excused Absence Policies

**Attendance Policy.** Attendance policies differ by course and clerkship and are specified in each course and clerkship syllabus.

**Excused Absences Policy.** The excused absence policy is designed to provide medical students the opportunity to attend to personal matters while minimizing disruptions to the medical education program and the needs of teachers and other learners. Students do not need to request an excused absence to miss non-mandatory sessions. Excused absences are generally granted for many different planned and unplanned events as listed below. If there is a personal conflict with a mandatory session and a student is unsure of policy or believes an exception to policy is warranted, he or she should consult with the Associate Dean for Student Services for guidance and assistance.

Excused absence requests are generally granted for these events (submission of supportive documentation may be required):

- Acute illnesses (a note written by a health care provider is required for absences of 3 or more days and/or for absences occurring on the day of an exam)
- Accidents
- Death of immediate family members (documentation may be required)
- Routine healthcare (nonacute)
- Religious observances
- Weddings (of a student or immediate relative)
- Maternity/paternity
- Funerals
- Military orders or officer training
- Administrative matters
- Jury duty or other legal matters
- Professional activities (participation in professional development or representation of HWCOM; summer activities)
- Scholarly activities (presentation of scholarly work at meetings)
- Academic activities (e.g., United States Medical Licensing Examination®, academic remediation)
- Other emergencies or critical events.

Excused absence requests typically are not granted for:

- Professional, scholarly, or academic activities occurring while a student is on academic probation
- Weddings (other than that of a student or immediate relative)
- Graduations
- Social events
- Family vacations and reunions

### Excused Absences Processes

**Emergencies.** In the event of unplanned absence, students must contact the Office of Student Affairs at 305-348-0644 as soon as possible. If on a clinical rotation, the student must also contact the clerkship director or coordinator as soon as possible. If preliminary approval of the unplanned absence is granted, the student must submit an Excused Absence Request Form to the Office of Student Affairs as soon as possible and within 24 hours following the unplanned absence utilizing the Excused Absence Request System https://go.fiu.edu/EAForm

Supporting documentation (e.g., a physician's note) may be required. A student absent for 3 or more days due to illness must submit a note written by a health care provider documenting and attesting to the student's illness. Students who are requesting an excused absence for any exam due to illness must notify the course director prior to the exam and must submit documentation from a physician.

**Planned absences.** All requests for excused absences due to planned activities must be submitted to the Office of Student Affairs using the Excused Absence Request Form. These requests should be made at least 4 weeks in advance of the planned absence. The only exception to this policy is for Period 4 students who seek an excused absence to attend a residency interview. Such requests for excused absences to attend residency interviews must be submitted to the Period 4 coordinator in the Office of Medical Education at comperiod4@fiu.edu.

The Office of Student Affairs reviews and makes a determination for each excused absence request. The Office of Student Affairs consults with course directors, course coordinators, or period coordinators on all matters that impact academic or clinical obligations.

**Monitoring and Reporting.** All absences (excused and unexcused) are recorded in an electronic database to screen for patterns of repetitive, undesirable, or suspicious behavior. Repetitive, undesirable, or suspicious behavior will be reported to the Office of Academic Affairs via the Professionalism Advocacy Reporting System (PARS).

**Notification and Follow Up.** The Office of Student Affairs notifies students via the Excused Absence Request System whether excused absence requests are granted or denied. If an excused absence request is granted, the Office of Student Affairs informs course directors and period coordinators that an excused absence has been granted. Students are required to contact course directors to determine how and when to make up missed activities. Course directors are responsible for rescheduling activities or providing suitable alternatives to the missed activities for students with approved excused absence requests.

If a student's request for an excused absence is denied, the student is expected to report to all required activities. Students who fail to report to required activities do not receive any credit for those activities. Course directors are under no obligation to provide students with make-up activities due to unexcused absences. An unexcused absence may result in the submission of a professionalism complaint or failure of the course.

### *Student Mistreatment and Reporting Procedures*

In keeping with its commitment to create and maintain a professional learning environment that fosters respect, resilience, integrity, and excellence, HWCOM provides medical students avenues to seek guidance and to report incidents of suspected medical student mistreatment. Examples of mistreatment include situations in which a medical student is publicly embarrassed, publicly humiliated, threatened with physical harm, physically harmed, required to perform personal services, subjected to unwanted sexual advances, asked to exchange sexual favors for grades or other rewards, denied opportunities for training or rewards based solely on gender, subjected to offensive sexist remarks or names, given lower evaluations or grades solely because of gender, denied opportunities for training or rewards based solely on race or ethnicity, subjected to racially or ethnically offensive remarks or names, given lower evaluations or grades solely because of race or ethnicity, denied opportunities for training or rewards based solely on sexual orientation, subjected to offensive remarks or names related to sexual orientation, or given lower evaluations or grades solely because of sexual orientation rather than performance.

Students who believe they have been or are being subjected to mistreatment or have other concerns about other negative influences (or positive influences) in the learning environment can report such incidents in person, by telephone, in writing, by email, or electronically as follows:

- A student may report mistreatment in the Professionalism Advocacy Reporting System (PARS).

- Students may report misconduct of an academic or behavioral nature committed by another student believed to be a violation of the Student Conduct and Honor Code directly to the Office of Student Conduct and Conflict Resolution.

- A student may report mistreatment to or seek guidance from the deans in the Offices of Student Affairs or Academic Affairs; his or her academic advisor, or the FIU or HWCOM Ombuds.

- A student is encouraged to report discrimination, harassment, or related misconduct including that of a sexual nature directly to the Title IX Coordinator by calling 305-348-2785 or emailing idea@fiu.edu.

All allegations of discrimination, harassment, or retaliation are reviewed and investigated, if appropriate, by the Title IX Coordinator or Office of Student Conduct and Academic Integrity as required by FIU Regulation 105.

**1. Student Mistreatment.** Medical students have the ability to file complaints against faculty or staff members alleging behavior that constitutes student mistreatment. There are three processes for handling allegations of student mistreatment. Based on their nature, incident reports are forwarded to the appropriate individuals or offices for investigation and action. The processes are:

a. **Student Mistreatment Constituting a violation of FIU Regulations Governing Sexual Misconduct (Title IX) or Discrimination.** Allegations of sexual misconduct or discrimination based on a protected class will be reported to the FIU Office of Inclusion, Diversity, Equity and Access (IDEA)

Any student who has experienced or person who has witnessed discrimination, harassment, or sexual misconduct by a faculty member, staff, or student can file a complaint with the FIU Office of IDEA by filing an anonymous complaint using the Ethical Panther Reporting Hotline at 844-312-5358 or online at https://compliance.fiu.edu/hotline.html. A student may also speak with a Title IX Coordinator by calling 305-348-2785 or emailing idea@fiu.edu.

b. **Student Mistreatment Affecting Grades Triggering a Right to Formal Grievance Hearing.** Medical students may request a formal hearing for student mistreatment affecting grades or evaluations. In addition, medical students have a right to file a grievance against a faculty member on the basis of receiving a grade that was awarded on an arbitrary and capricious basis even if the faculty member awarding the grade did not mistreat the student. In the event that the student is under review by the MSEPC for poor grades or a PIR has been filed against a student, the student may provide information to the MSEPC regarding the grade grievance.

   c. **Student Mistreatment Not a Violation of FIU Regulations and not Affecting Grades or Evaluations.** An informal process is described under *Grievances* to address student mistreatment that is not a violation of FIU regulations and does not affect grades or evaluations.

**2. Process for Addressing Student Allegations of Mistreatment.** In the event that a PIR is filed by a student, faculty member, or staff member alleging that a faculty member or staff member mistreated a student, the Executive Associate Dean for Academic Affairs and the Executive Associate Dean for Student Affairs will meet with the person who submitted the complaint to obtain information about the alleged mistreatment. The Executive Associate Dean for Academic Affairs will meet with the student who is alleged to have been mistreated (if not the complainant), and may meet with the individual against whom the PIR is filed to obtain information about the allegations. In the event that a student who is alleged to have experienced mistreatment does not include his or her name on the PIR or chooses not to meet with the Executive Associate Dean of Academic Affairs, the evaluation process will continue to the extent possible. The Executive Associate Dean for Academic Affairs may, after initial fact finding take the following actions:

   a. In the event that the alleged mistreatment may meet the grounds for a Grievance Hearing, advise the student(s) that he or she (or they) may initiate the Grievance Hearing procedures beginning with informal resolution as provided below.

   b. In the event that the alleged mistreatment is unlikely to meet the grounds for a Grievance Hearing, attempt resolution through informal meetings between the aggrieved student(s) and the individual who is alleged to have mistreated the student(s). In the event that the aggrieved student(s) or the Executive Associate Dean for Academic Affairs believes that such a meeting is deemed counter to the interests of the student(s), it will not take place. If the Executive Associate Dean for Academic Affairs concludes that the faculty member or staff member may have violated FIU regulations, policies or procedures, he or she will refer the matter to the Director of IDEA and HWCOM human resources for investigation and possible disciplinary action. The aggrieved student will be notified that the process has been referred but will not be apprised of its outcome.

   c. In the event that the mistreatment constitutes a violation of FIU regulations governing discrimination, sexual misconduct, or harassment, the matter will be referred to the Office of IDEA in accordance with FIU Regulations 105 and 106.

### Student Protections from Sexual Misconduct, Discrimination, Harassment, and Retaliation

FIU is committed to providing work and academic environments free from sexual misconduct and any form of discrimination, including race, color, sex, pregnancy, religion, age, disability, national origin, marital status, and veteran status in accordance with FIU Regulation 105 and 106. Any student who has experienced or witnessed sexual misconduct, discrimination, harassment, or retaliation involving faculty, staff, or other students can file a complaint, including an anonymous complaint, with the Title IX Coordinator in the FIU Office of IDEA by calling (305) 348-1509, using the Ethical Panther Reporting Hotline at 844-312-5358 or online at http://www.convercent.com/report/

**Student Safety and Security: On Campus.** The FIU Police Department is comprised of sworn law enforcement officers with jurisdiction over the entire university, including HWCOM, and provides a full range of security protection services to the university community at all times.  More information about the services provided by the FIU Police Department are available at https://police.fiu.edu/.  HWCOM provides additional security by employing police service technicians who serve as security guards for HWCOM facilities located on the FIU campus. These police service technicians' primary responsibility is to ensure the safety of students, faculty, and staff.

In case of any on-campus emergency on the Modesto A. Maidique Campus, students can contact the FIU Police Department at 305-348-5911; in case of any emergency occurring on the Biscayne Bay Campus, students should contact the FIU Police Department at 305-919-5911.

For any nonurgent safety concerns occurring on the Modesto A. Maidique Campus, students should contact the FIU Police Department at 305-348-2626; for any nonurgent safety concerns occurring on the Biscayne Bay Campus, students should contact the FIU Police Department at 305-919-5559.

**Student Safety and Security: Off Campus.** Students must be aware of the need for personal safety and act accordingly to minimize risks inherent in situations requiring contact with the public. Students review safety and security practices prior to community and clinical experiences. Students participate in educational training programs regarding such topics as universal precautions, needlestick prevention, response to needlestick or bodily fluid exposure, de-escalation techniques when dealing with angry patients, and emergency procedures involving medical care (e.g., CPR), natural disasters, terrorism, assault, and illegal activity.

Each core clinical site where students are engaged has safety measures in place to protect employees, patients, students, and the public. While working at core clinical sites and in other community settings, including hospitals,

clinics, households, and other off-campus venues, medical students should take appropriate precautions to ensure safety (e.g., students should be aware of their surroundings, travel in pairs whenever possible, lock car doors, and close car windows). In case of any off-campus emergency or urgent situation involving safety, students should call 911.

Students can contact HWCOM Office of Student Affairs to address these issues and seek guidance regarding nonurgent situations that occur on or off campus. Students can call 305-348-0644 Monday through Friday from 8:00 a.m. to 5:00 p.m. to discuss nonurgent situations, and can call 305-348-0696 for urgent matters during nights and weekends.

### *Facilities and Guidelines for Use*

**Study Space.** HWCOM medical students can access a variety of spaces conducive to individual or group study. Dedicated spaces include nine small-group rooms on the sixth floor of the Academic Health Center 2 (AHC2), dual-purpose clinical training/small group study rooms and larger clinical skills rooms in the Albert and Debbie Tano Medical Simulation Center in AHC2, small-group study rooms on the first floor of the Academic Health Center 4 (AHC4), and a dedicated medical library located on the third floor of the main university library with single study carrels, large and small group tables, and a small group study room. Group study rooms feature wall-mounted high-definition televisions, wireless internet access, and liquid marker writing surfaces. Students may access study rooms by swiping their FIU One Cards, which are coded to student identification numbers. Several of the study spaces available in open areas on the fifth floor of AHC2 also serve as work stations during OSCEs.

Lecture halls used for formal curricular presentations during normal operating hours are available for quiet study after hours and on weekends. Students also may reserve these rooms in advance to conduct group meetings (e.g., student interest groups and medical student organizations) and social activities.

The Albert and Debbie Tano Medical Simulation Center on the fourth and fifth floors of AHC2 comprises exam rooms equipped with patient training manikins and adjacent conference areas featuring closed circuit TV for live observation and video recording. Students may request time with simulation center equipment to practice clinical skills they have already been taught by faculty throughout the course of the HWCOM curriculum. Equipment loans are supervised and must occur during regular business hours. These rooms also may be reserved for individual and group study after hours.

AHC2 360 is a 960-square-foot multipurpose conference room adjacent to the Panther Learning Community suites; the room provides students additional space for meetings or group study. Students have access to this room at all times by swipe of their FIU One Cards.

The HWCOM Medical Library, located on the third floor of the FIU Steven and Dorothea Green Library, is reserved for use only by HWCOM students. The medical library consists of approximately 7,000 square feet of dedicated space and houses all library services for HWCOM, including access to electronic information systems, publications and materials, printing and copying equipment, a small-group study room, a lounge space with chairs and sofas, and individual study carrels. The medical library also has a small lounge area with a refrigerator, hot/cold water dispenser, coffee machine, and unassigned lockers. During clinical clerkship rotations, medical students have access to personal lockers and medical staff lounge areas at affiliated clinical sites.

**Lounge and Relaxation Areas.** Medical students enjoy exclusive use of several lounge and relaxation areas located on the third floor of AHC2. Four distinct student Panther Learning Community suites are equipped with sofas, chairs, tables, cable TV, computers, kitchen areas with refrigerators and microwaves, and personal lockers for each student. Medical students may access their assigned Panther Learning Community suites by swiping their FIU One Cards. It is the responsibility of the students to maintain a safe and clean environment and promote common community values of respect for others.

The FIU Graham Center, located in close proximity to HWCOM facilities, serves as the main center for student recreation and social events held at FIU. The Graham Center has more than 8,000 square feet of student lounge space and more than 4,000 square feet of recreational space, offering a variety of services and amenities to all FIU students.

Numerous dining options are available on campus and offer additional space for relaxation. The Graham Center houses a cafeteria and several restaurants, and the first floor of the PG5 Market Station—located north of the AHC buildings—features a dining hub with indoor and outdoor seating. Additional dining options and outdoor seating areas are available throughout the campus.

The FIU Wellness and Recreation Center is located west of FIU Student Health Services within a short walking distance from any location on campus. The 50,000-square-foot center features more than 2,300 square feet of lounge areas; a two-court gym for intramural and recreational basketball, volleyball, and badminton; a 12,500-square-foot fitness area equipped with free weights, resistance machines, and cardio equipment; two multipurpose rooms for group fitness classes; large men's and women's locker rooms (each with more than 200 lockers); and a sidewalk café. The center offers group fitness classes, body composition assessments, and a pro shop that offers towel and laundry service, equipment checkout, and retail sales of energy drinks, protein bars, and fitness accessories. A 60,000-square-foot expansion of the recreation center was completed in 2017; the expansion includes additional basketball courts, free weight and cardio training areas, group fitness and training rooms, locker room space, and lounge space. A

swimming pool located on the west side of the Modesto A. Maidique campus is available to all FIU students.

**Guidelines for Use of HWCOM Facilities.** Guidelines have been established to ensure that the personal, social, and safety needs of all medical students are met in a fair manner:

- **Identification.** Students are required to wear or carry their FIU One Card (ID badge) at all times when on campus. Students using FIU or HWCOM facilities without possession of their One Card may be asked to leave the premises.

- **Guests.** All guests must be accompanied by an FIU medical student unless prior permission is obtained from the HWCOM Office of Student Affairs.

- **Lockers.** Personal lockers located in the Panther Learning Community suites provide storage space for students' laptops, medical equipment, white coats, and other items. Students are required to purchase their own locks to appropriately secure their valuables; students are expected to periodically clean their lockers. Lockers must be emptied and cleaned on or before the last day of classes. Any items left in lockers after the last day of classes will be discarded.

- **Common Amenities.** The use of televisions, microwaves, furniture, games, videos, books, journals, copy machines, fax machines, vending machines, and other community amenities is mutually decided on a first-come, first-served basis. When conflicts arise, it is expected that students will work together and come to a compromise or consensus. If an agreement cannot be reached, the issue should be taken to the Office of Student Affairs.

- **Refrigerators.** Refrigerators are provided for short-term storage of perishable foods. To ensure sufficient space for all medical students, students may store food of a quantity sufficient only for a two-day period of time; this includes frozen food. All food must be removed weekly; all food remaining in refrigerators after 6:00 p.m. on Fridays may be discarded.

- **Secure Access.** HWCOM facilities are properly secured each evening to safeguard property. Only faculty, staff, and students with proper identification and University One Card access are admitted after hours. In addition to the University One Cards, HWCOM faculty and staff have badges identifying them as HWCOM employees.

Students must not circumvent safety and security measures. Students should not prop open secure doors or provide unauthorized individuals access to secure areas. Students who fail to comply with this policy may be asked to leave the premises and are subject to review and disciplinary action by the Medical Student Evaluation and Promotion Committee.

### *Financial Policies*

**Debt Management and Loan Exit Counseling Policy.** Counseling is available throughout the academic year to students who want more information about financial aid, personal budgeting, debt management, or other financial issues. Every first-year medical student receiving financial aid is required to schedule a one-on-one appointment with staff in the Office of Financial Assistance to discuss cost of attendance, budgeting, and financial aid questions and concerns before the second disbursement of funds in January. Continuing students are required to participate in financial aid presentations and online modules covering a broad range of topics regarding debt and money management.

To ensure students understand their responsibility to repay student loans, the federal government requires all student loan borrowers to undergo Exit Counseling prior to graduating or leaving college and entering into repayment. General debt and loan repayment strategies including loan consolidation, loan forgiveness, and deferment/forbearance options are addressed during counseling sessions. Students are encouraged to discuss any issues or concerns they may have regarding their debt during their Exit Counseling sessions. Failure to follow through with mandatory debt management programs and requirements could result in a professionalism violation.

**Satisfactory Academic Progress for Financial Aid Eligibility.** The Office of Financial Assistance (OFA) is required by federal regulations to monitor the academic progress of financial aid recipients. Financial aid recipients must comply with the Satisfactory Academic Progress (SAP) Policy as a condition of initial or continued eligibility.

#### Glossary

**Financial aid probation:** A status a school assigns to a student who is failing to make SAP and who successfully appeals. Eligibility for aid may be reinstated for one payment period.

**Academic probation:** An adverse action that indicates unsatisfactory progress toward the medical degree based on poor academic performance and/or failure to meet HWCOM professionalism standards as designated by the Medical Student Evaluation and

Promotion Committee (MSEPC). See HWCOM Medical Student Handbook.

## HWCOM Standards for Satisfactory Academic Progress

**Maximum Time Frame Standard- -** A medical student cannot exceed 160% of the published length of the medical degree program based on total credit hours. The current medical degree requires 189 credit hours, 160% = 303 total credit hours. Students must complete the program within 6 years from the date of matriculation, except for those students seeking dual professional degrees such as MD and a PhD degree.

Maximum time frame as calculated at 160% would allow students to graduate within the 6-year time frame. This time frame cannot be appealed.

**Quantitative Measure of Progress Standard -** A medical student must progress through the medical degree program to ensure that they will graduate within the maximum time frame. The pace at which a student is progressing is measured by dividing the total number of credit hours the student has successfully completed by the total number of credit hours attempted including courses that a student failed, received a W for withdrawal, and/or repeated. Incompletes do not affect pace calculations. A student not meeting a completion rate of 63% or higher must submit a SAP appeal to the HWCOM OFA.

**Qualitative Measure of Progress Standard -** A medical student is expected to successfully complete each period of study and be promoted to the next level of medical education. A student placed on academic probation (as indicated in the HWCOM Medical Student Handbook) and is repeating an academic period must submit a SAP appeal to the HWCOM OFA.

## Evaluation, Appeals, and Reestablishing Aid Eligibility

**Academic Progress Evaluation -** Medical students who receive Title IV aid (Direct Loans), scholarships, and/or grants must meet SAP. SAP Standards are reviewed by the HWCOM OFA annually at the end of each academic period of study. All prior academic progress is evaluated to determine eligibility for financial aid even if a student has not previously received financial aid.

**Appeals.** A student who fails to meet SAPs, and remains a HWCOM student, must submit a SAP Appeal to the HWCOM OFA. Unfortunate or unforeseen circumstances may occur in the lives of students, and these events can adversely affect student's academic progress. For this reason, students must submit a SAP Appeal Form

and a personal statement that explains any mitigating situations, why the student failed to make SAP, and what has changed that will allow the student to make SAP at the next evaluation. Supporting documentation may be submitted along with appeals to HWCOM OFA. Students with approved appeals are placed on a financial aid probationary status which allows for financial aid award packaging and disbursement. Denied appeals will lose all aid eligibility.

**Reestablishing Eligibility.** A student may receive Title IV and other financial aid during the financial aid probationary period. If at the annual evaluation, the student has successfully met SAP, the financial aid probationary status ends and the student may continue to receive Title IV and other financial aid in good standing. If at the end of the financial aid probationary period the student does not meet SAP, eligibility is changed from approved appeal to denied aid eligibility. Students in the status of denied aid eligibility are not allowed to receive financial aid moving forward until the standards of SAP are successfully met.

### Leave of Absence and Scholarship Policies

**Leaves of Absence (LOA).** A student returning from an approved LOA will have the same SAP status as when he or she began the LOA as long as the standards of SAP are met. The student may continue to receive scholarships, Title IV, and other financial aid upon his or her return to HWCOM provided that the LOA was not granted because of poor academic performance and/or being placed on academic probation due to unsatisfactory progress towards the medical degree. If the LOA is in conjunction with not meeting SAP, the student submits a SAP Appeal to HWCOM OFA upon return to HWCOM.  A LOA designated as medical and/or personal are evaluated on a case by case basis.

**Scholarship Recipients.** HWCOM Scholarship policy requires students to maintain satisfactory academic progress. A student who fails to meet HWCOM Standards of Academic Progress loses eligibility to receive their scholarship.  Once the standards of SAP are being met and the financial aid probationary period has ended, the student may then submit a scholarship appeal to the HWCOM Scholarship Committee for consideration of reinstatement. Reinstatement of scholarship is not guaranteed.

**Return of Title IV Funds.** If a student's award package includes federal funds and the student is granted a leave of absence or withdraws prior to completing 60 percent period of enrollment, federal regulations require that a portion of the student's federal aid be returned to the Department of Education. For purposes of calculating the refund, the aid year is divided into two separate enrollment periods, which coincide with the disbursement of aid. The portion of aid to be returned is determined by a federally mandated calculation based on the number of days remaining in the payment period; the refund due to the aid programs is credited in the following order first to outstanding balances on Federal GradPLUS Loans, and then to outstanding balances on Federal Unsubsidized Stafford Loans.

**Financial Aid Leave of Absence.** HWCOM students who are granted a voluntary LOA must meet certain requirements and be informed of the Financial Aid implications per Federal Student Aid regulations. Medical students should be aware that taking an LOA may affect student loan deferment, grace period, loan repayment, and financial aid eligibility. Students are advised to investigate these implications as they pertain to their personal situations prior to applying for LOA.

- **Leave of Absence Requirements for Financial Aid.** Upon initiation of the LOA process, a student is required to meet with a financial aid specialist in the HWCOM Office of Financial Assistance for an exit interview to discuss the specific financial aid implications and obtain the required signature on the LOA request form. Upon return from LOA status, the student is required to participate in an entrance interview with a financial assistance specialist to discuss specific financial aid implications and/or future financial aid eligibility.

- **Scholarship Recipients.** A student granted an approved LOA may continue to receive a scholarship upon return to HWCOM if the student meets all scholarship requirements.

**HWCOM Graduate Need Grant Policy.** The graduate need-based grant is an institutional award based on financial need that does not have to be repaid. A student must file a Free Application for Federal Student Aid (FAFSA) to be eligible. A student receiving an HWCOM scholarship or reported outside scholarship greater than $5,000 is not eligible for an HWCOM Graduate Need Grant.

**Tuition Refund Policy.** HWCOM tuition refunds are based on the timing of withdrawal:

- 100 percent of tuition and fees is refunded if a student officially withdraws or is dismissed from HWCOM in writing before the last day of Orientation (for students in Period 1) or the last day of the first week of classes of each term during which tuition is applied (for students in Periods 2, 3, and 4).

- 50 percent of tuition is refunded if a student officially withdraws or is dismissed from HWCOM in writing before the end of the fourth week of classes of each term during which tuition is applied. There is no refund of fees.

- 25 percent of tuition is refunded if a student officially withdraws or is dismissed from HWCOM in writing between the beginning of the fifth week and the end of the sixth week of classes of each term during which tuition is applied. There is no refund of fees.

**Tuition Accommodation Policy.** A medical student enrolled in HWCOM may seek accommodation of tuition when:

- A medical student enrolled in HWCOM may qualify for an accommodation of tuition when that student has been approved for a repeat academic year at full time status retaking all required course for that academic year. This accommodation must be reviewed and approved by the Office of Academic Affairs and the Office of Student Affairs on a case by case basis. The accommodation will be applied during the student's M4 graduating academic year.

- The student has been approved for enrollment at a less than full-time status in a given tuition period. This accommodation must be reviewed and approved by the Office of Academic Affairs and the Office of Student Affairs on a case-by-case basis.

- A medical student enrolled in HWCOM may qualify for an accommodation of tuition when that student has been approved for a Research, Medical, or Personal Leave of Absence or any joint degree program (MD-HCMBA, MD-MPH) that has the student completing a Period term twice so that the student does not accrue additional tuition charges in their HWCOM career. The accommodation for Leave of Absence qualifies as long as it is not in conjunction with an adverse action from the MSEPC resulting in a repeat year. This accommodation must be reviewed and approved by the Office of Academic Affairs and the Office of Student Affairs on a case by case basis.

## *Leaves of Absence*

A leave of absence (LOA) is a temporary period of separation from the MD degree program which may be voluntary or administrative. Except as provided by FIU regulation or policy, granting a voluntary LOA is within the discretion of HWCOM. Classifications for voluntary LOAs are described below. All LOA's are included in the six-year time limit.

**Voluntary Leave of Absence.** A student may request a voluntary LOA as follows:

- **Voluntary LOA for Academic Purposes.** A student may request an Academic LOA for academic purposes to pursue research, an advanced degree, a medically related fellowship, extended USMLE preparation, or other education program. The student must be in good academic standing. The student must meet with his or her academic advisor and/or one of the deans in the HWCOM Office of Academic Affairs, after which time he or she must complete the Leave of Absence/Change of Status form.

- **Voluntary LOA for Financial Purposes.** A student may request a voluntary LOA for financial purposes if he or she is unable to pay tuition or other educational financial obligations for all or part of an academic period. The student must meet with the HWCOM Director of Financial Aid, after which time he or she must complete the Leave of Absence/Change of Status form.

**Voluntary LOA for Medical Reasons.** HWCOM is interested in supporting the success of its students and the safety and welfare of the community. Students should consider requesting a medical leave of absence (MLOA) for situations that significantly limit the ability to function successfully or temporarily prevents the student from meeting curriculum requirements. The student must meet with a Dean in the Office of Student Affairs as an initial step in the process.  Examples of such conditions include:

- Severe and prolonged illness
- Surgery
- Pregnancy

The student must complete the Leave of Absence/Change of Status form. The student must also obtain a written statement from his or her personal physician, delineating the range of dates during which the student is recommended to miss classes. The statement must be submitted to the Executive Associate Dean for Student Affairs. The Executive Associate Dean for Student Affairs is responsible for granting the LOA (with or without restrictions) or denying the request.

- **Reinstatement from Voluntary Leave for Medical Reasons.** Reinstatement after the leave must be approved by the Executive Associate Dean for Student Affairs (or designee) upon receipt of written clearance from a licensed clinician that the student is again ready to handle the academic rigors of the curriculum.

- **Voluntary LOA for Personal Reasons.** A student may request a personal LOA if required to dedicate primary attention and effort to personal circumstances or situations that inhibit or interfere with his or her academic performance or progress. A personal LOA usually may not exceed 12 months, and a student may not request this type of leave more than once in an academic year. To be to be considered for a personal LOA, a student must be in good academic standing at the time the leave is requested. The student must meet with one of the deans in the HWCOM Office of Student Affairs, after which time he or she must complete the Leave of Absence/Change of Status form. A student returning from a Personal LOA may be required to meet certain stipulations set by HWCOM.

**General Guidelines for Voluntary LOA.** Students should be aware that taking a voluntary LOA may have significant impact on academic progress, cost of attendance, financial aid, student debt, and competitiveness for residency training. Prior to applying for a LOA, students should consider these implications as they pertain to their personal situations.

If a student wishes to pursue a voluntary LOA, he or she should consult with the Associate Dean for Student Affairs and/or the HWCOM Registrar to review the process.

All students, regardless of which office they meet with initially, must discuss the leave and obtain clearance by obtaining the appropriate signatures on the Leave of Absence/Change of Status form, which is available at http://medicine.fiu.edu/_assets/docs/leave-of-absence-form.pdf.

The maximum amount of time granted for a voluntary LOA is 12 months. The Executive Associate Dean for Student Affairs and the Executive Associate Dean for Academic Affairs are responsible for granting or denying the request (with or without special conditions) and affix their signatures on the Leave of Absence/Change of Status form. Upon completion, the form is sent to the HWCOM Registrar to be maintained with the student's records.

Students returning from a voluntary LOA may be required to meet certain conditions before being allowed to return. In general, those conditions are outlined at the time the LOA is approved but may be developed during a student's leave. When a student is scheduled to return from a voluntary LOA, he or she is required to meet with the Associate Dean for Student Affairs and the HWCOM Registrar to ensure that he or she complies with the process required for return.

A student who determines that he or she is not returning at the scheduled date must consult with the Executive Associate Dean for Student Affairs as early as possible before the scheduled return date; this ensures that sufficient time remains to determine whether an extension will be granted. If the extension is not granted, the student must return by the end of the leave; otherwise, the student is deemed to have voluntarily withdrawn from HWCOM.

**Refund of fees.** A student who is granted a voluntary LOA may receive a refund of tuition and fees in accordance with HWCOM policy.

**Administrative LOA.** A student may be placed on administrative LOA if the student exhibits behavior that could, in the judgment of the Executive Associate Deans for Student Affairs and/or Academic Affairs, result in harm to a patient or other person. In such an event, the Executive Associate Deans for Student Affairs and/or Academic Affairs will consult with the Office of Student Conduct and Academic Integrity and/or the University Police Department, and the student may be removed from clinical settings and be placed on administrative leave pending further investigation. Administrative LOA may impact tuition, fees, and financial aid.

### Lost and Found

Articles found in classrooms or other public areas within HWCOM should be brought to the Office of Student Affairs. Students who have lost an item should first contact the Office of Student Affairs at 305-348-0644. If the missing item is not there, students may also wish to contact the Department of Public Safety at 305-348-2626 or the reception desk in the Office of the Dean at 305-348-0570.

### Media Requests for Student Interviews

All student interviews must comply with FIU Media Policy 175.105 (https://policies.fiu.edu/files/570.pdf), which mandates central coordination of all press conferences, press releases, and media inquiries that relate to or involve a unit of the university, with the exception of those media inquiries that seek a personal opinion from any member of the university community in his or her individual capacity.

Because casual or incomplete answers to media queries can have serious ethical or legal repercussions and could breach HIPAA or FERPA regulations, medical students are encouraged to consult with faculty or staff in the HWCOM Office of Student Affairs prior to agreeing to or participating in media interviews related to the college or any of its programs.

### Medical Library Policies

The Medical Library is located on the third floor of the Green Library, in GL 380, on the Modesto A. Maidique Campus. The Medical Library follows the policies of the university. The medical library offers ample study space, computer workstations, wireless connection, and a wide variety of library services including copying, printing, interlibrary loan, reference services, and individual assistance in using databases and other virtual resources. For online access, visit https://medicine.fiu.edu/resources/medical-library/index.html. Library policies have been established to maintain an environment conducive for study and are available at https://libguides.medlib.fiu.edu/COMlibrary/policies . Professional Dress Guidelines

As representatives of the medical profession, all medical students at HWCOM are expected to convey a professional demeanor, not only in their behavior but also in their dress and appearance. A professional image conveys credibility, trust, respect, and confidence to one's colleagues and patients. In all educational settings—classroom, laboratory, clinical environment—students are expected to be clean, well groomed, and dressed in a manner appropriate to their responsibilities and the standards of their assigned clinical sites. When patient contact is part of the educational experience (including interactions with standardized patients), students are expected to dress professionally and wear a clean white coat unless otherwise instructed by HWCOM faculty. Site-specific dress codes may apply for compliance with institutional infection control, legal, and safety requirements. Medical students are expected to wear their FIU identification badges to all academic functions and on the premises of HWCOM.

### Student Education Records Policies

**Academic Records (Education Records).** HWCOM maintains all student records in accordance with federal, state, and university requirements and Association of American Medical Colleges (AAMC) guidelines. The Family Educational Rights and Privacy Act (FERPA) provides students with access to and other rights over their education records.  HWCOM is the records custodian for records originating within HWCOM.  Any member of the HWCOM community with concerns that an education record has been handled inappropriately should immediately notify the HWCOM Registrar at: comregistrar@fiu.edu. For more information regarding FERPA including the FERPA Annual notice visit FIU regulation 108 and https://onestop.fiu.edu/student-records-myfiu/personal-records/privacy-ferpa/.

Transcript requests must be submitted via official school email, via my.FIU.edu, or in writing to the HWCOM Office of Student Affairs. A transcript request form can be downloaded at https://medicine.fiu.edu/resources/current-students/md-resources/student-affairs/grades-and-records/index.html Requests are usually honored within 2 business days unless the custodian or designee is not available.

**Requests for Information in Connection with Research.** Requests for academic research involving data from student education records shall be referred to the FIU Registrar and the Provost in compliance with Regulation 108. Such requests must be in writing and must set forth specifically the types of information to which access is requested and the intended scope of the research project.

*Contact the HWCOM Registrar*

*Contact the FIU Student Affairs Disability Resource Center at 305-348-3532, Graham Center (GC) Room 190.*

## Students with Disabilities

**Medical Student Disability Accommodations Policy.** HWCOM is committed to the principals of equitable and accessible education and to providing reasonable accommodations to students with disabilities in collaboration with the FIU Disability Resource Center (DRC). The DRC is responsible for assisting students with obtaining appropriate and reasonable academic accommodations based on a documented disability.

It is the responsibility of the HWCOM student who needs an accommodation to self-disclose to the DRC and complete the DRC registration process. Any student who fails to register and complete the registration process with DRC, shall not be considered to be claiming or receiving accommodations to meet HWCOM technical standards. Students are encouraged to register with DRC prior to the beginning of their first or subsequent semester or as soon as a perceived disability occurs in order to ensure access to accommodations to the fullest extent possible. Although there is no deadline by which a student must register to receive accommodations, because an onset of a disability can occur at anytime, accommodations are not applied retroactively. Students are accountable for their performance, with or without accommodations. No student will be assumed to have a disability based on poor performance alone and a disability-related explanation in and of itself will not negate poor performance. All technical and academic standards need to be met with or without an accommodation.

Once the DRC has determined a HWCOM student is eligible for an accommodation, the DRC will collaboratively work with the HWCOM Medical Student Accommodations Committee to determine the most appropriate accommodation(s). The DRC will make a final determination and the student will be notified in writing of the accommodations. Once the student is notified of the accommodation(s), it is recommended that the student follows-up with the HWCOM Medical Student Accommodations Committee for implementation details.

Students should be aware that being granted testing accommodations for HWCOM exams does not imply that similar accommodations will be granted by the NBME for USMLE Step 1 and Step 2. Students must follow the specific process for requesting such accommodations as described online at http://www.usmle.org/test-accommodations. Students are urged to begin this application process to the USMLE for accommodations at least six (6) months in advance of taking an examination.

## Technology Policies

Students must abide by these FIU policies on the use of information technology:

- Data Stewardship
- Digital Millennium Copyright Act
- Code of Computing Practice
- Gramm-Leach-Bliley Act: Safeguards to Protect Confidential Financial Information
- Information Technology Security
- IT Security Procedure: Sharing Access to IT Resources; Password Management
- IT Security Procedure: System and Application Management
- Use and Disclosure of Protected Health Information for Purposes of Treatment, Payment, Operations, and Research
- EMR Access Using Personal Devices
- Use of Email and Texting to Communicate Protected Health Information
- Security Incident Reporting
- Access Controls to Systems Containing Electronic Protected Health Information

Students must maintain confidentiality of all health information; students may not disclose any such information unless necessary and appropriate to fulfill educational and/or patient care needs. State of Florida and federal laws govern the confidentiality, privacy, and security of health information and records; students become educated about and abide by laws, policies, and procedures regarding the use, disclosure, and dissemination of health information. In particular, health information accessed and retained electronically must be kept private and secure via encryption using SharePoint as the storage system of sensitive documents or designated clinical applications such as the NeighborhoodHELP Portal, Centricity Practice Solution (CPS), electronic medical records (EMR), etc. The Health Insurance Portability and Accountability Act of 1996 (HIPAA) and its amendments establish the minimum protections for health information. State of Florida and federal laws also require special consent for disclosure of sensitive health information (e.g., the HIV status or mental health records of a patient).

In preparation for clinical experiences, students are oriented to the policies of HWCOM clinical affiliates and policies adopted by HWCOM. HWCOM provides students access to network resources such as computers, printers, network peripherals, software, data storage, email, and internet access for academic purposes. Students must abide by the technology policies and regulations governing both the university and those specific to HWCOM Information Technology (HWCOM IT). The policies contained in this document are to ensure that technological resources provided by HWCOM are utilized in a manner consistent with the educational goals of HWCOM and the university.

**Email Policy.** Use of the FIU email services is permitted and encouraged where such use supports the university's academic goals and facilitates communication between faculty and students. Use of email to transmit sensitive information (i.e., electronic personal health information [ePHI]) must do so in accordance with HWCOM or university policy and procedure. A student who uses email in an unacceptable manner is subject to sanctions (including deactivation of his or her campus email account) and a professionalism incident report may be filed as described in Appendix A.

**Unacceptable Use of Email.** Unacceptable uses of email include:

- Distributing, disseminating, or storing images, text, or materials that might be considered discriminatory, offensive, or abusive, in that the context is a personal attack, sexist or racist, or might be considered as harassment.
- Using email systems for any purpose restricted or prohibited by laws or regulations.
- "Spoofing" (i.e., impersonating another device or user).
- "Snooping" (i.e., obtaining unauthorized access to the files or email of others).
- Attempting unauthorized access to email or attempting to breach any security measures on any email system, or attempting to intercept any email transmissions without proper authorization.
- Sending chain mail.
- Introducing any form of computer virus or malware into the network.
- Violating copyright laws by including the work of others in email communications or sending copies of documents protected by copyright.

FIU Herbert Wertheim College of Medicine

**Laptops and Mobile Devices Assigned to Medical Students by HWCOM.**
HWCOM provides laptop computers and accompanying accessories and devices (e.g., power adapter, DVD player, Ethernet dongle) to medical students. Students may also be provided mobile devices (i.e. iPads) as a tool for curriculum programs. These laptops and mobile devices are the property of FIU, must be returned to FIU upon completion of enrollment, are configured for FIU security standards, are subject to random software scans and software updates, and are for educational purposes only. The laptops contain the necessary operating system and software used throughout the MD curriculum. The laptops are leased to students, and students have no reasonable expectation of privacy with respect to the use of laptops or with respect to the information stored with them. The laptop has a standard image; personal customization of laptops is not permitted. Students are responsible for the security of the laptops, software, and data in their care. In the event that a laptop is misused or damaged, the student is responsible for the replacement cost of the computer. Students must abide by these additional regulations pertaining to the use of HWCOM laptops:

- Students may access laptops or network resources only with accounts authorized to them by FIU HWCOM.
- Student may not through any means alter or modify the BIOS and/or operating system and/or circumvent the security measures and configuration of the laptop.
- Students must not install unauthorized or unlicensed software to the laptop.
- Students must ensure that the laptop is not used by unauthorized persons.
- Students must take all reasonable steps to ensure that the laptop is not damaged through misuse.
- Students must not access pornographic material using the laptop; doing so is a violation of university policy.

HWCOM IT retains spare laptops in the event that a student's device requires repair or maintenance. Students are personally responsible for maintaining a backup of all data on the laptop. Students must ensure that a recent backup is completed before taking a laptop in for IT service. HWCOM is not responsible for the loss of any data stored on laptops.

Laptops should never be left unattended in public places. Laptops should not be left unattended in vehicles, but if absolutely necessary, laptops must be stored in the trunk or out of sight; the student must ensure that the vehicle is locked. Students must return the laptop to HWCOM IT in a timely manner as specified by HWCOM for regular maintenance checks, updates, or as requested by HWCOM. Should a possible security incident occur (e.g., a laptop stolen or misplaced), the student must immediately report the incident to HWCOM Information Technology. If a laptop is lost or stolen, a police report must be filed and the case number reported to the HWCOM IT Help Desk. If the incident is suspected to have occurred on FIU campus, the FIU

Police Department must be notified; otherwise, contact the police department that has jurisdiction for the location.

**Personal Device Policy.** Personal devices (laptops, smartphones, and other devices such as iPads) used to access sensitive FIU data and information systems must be approved, and users must abide by FIU and HWCOM policies and procedures (e.g., EMR Access Using Personal Device Policy).

**Social Media Policy.** HWCOM welcomes the responsible use of social media technologies to support and engage learning. Social media includes:

- Communication via email or text message, or transfer of photographs of file documents using computers, smart phones, portable communication devices, or other technology
- The use of web-based applications such as, but not limited to, Facebook, LinkedIn, YouTube, Flickr, blogs, wikis, and other outlets where comments are posted in network-based public settings and
- Any other technology that permits internet-based information sharing

Students must abide by the laws, rules, regulations, and policies governing the protection of confidential information; these laws include HIPAA, which governs the dissemination of health information, and the Family Education Rights and Privacy Act (FERPA), which governs the dissemination of education records. Confidential information must be protected at all times and must never be shared on any social media site. Confidential information includes:

- Health information about anyone other than the student posting the information. (Posting health information about oneself could be deemed unprofessional behavior if it breaches written standards established by HWCOM.)
- Personal information about FIU, students, employees, or alumni (e.g., private email addresses, grades, health information, demographic information, information about interactions with patients, and photographs of patients or the care environment—some of which may be protected under FERPA).

Students are expressly prohibited from:

- Acting as an official representative or spokesperson for FIU or HWCOM on social media. Student must identify opinions as their own and not representative of the views of FIU or HWCOM;
- Using FIU and HWCOM logos or personal identification numbers in any social media postings; and
- Creating personal social media sites using FIU email addresses or computer equipment.

Students who violate this social media policy will be referred to the Office of Student Conduct and Conflict Resolution and/or the MSEPC. This policy does not replace other HWCOM and FIU policies governing social media or disclosure of confidential information, including protected health information and education records.

Students should:

- Manage privacy settings to maintain appropriate balance of personal and professional identity and to avoid theft of personal data.
- Identify opinions as their own and not representative of the views of FIU or HWCOM.
- Be professional and respectful; text and photos on social media site should meet the standards of professionalism expected of HWCOM medical students; anything posted to a social media platform reflects not only a student's professionalism but also that of the institution.
- Refrain from posting while angry, stressed, or otherwise unable to carefully review posted material; anything shared via social media is not private, cannot be retracted by the author, and can be shared, stored, or spread globally by others.
- Be timely and accurate, and check facts, grammar, and spelling of all content before posting.
- Prohibited activities. These activities may represent violations of the law or university policy and may result in academic discipline or legal sanctions:
  - Communicating or connecting with patients via social media
  - Posting patient information, including protected health information or photos, on any social networking sites, blogs, or instant or text message services
  - Taking photos of patients or procedures; photos of patients may only be taken when students are instructed to do so by clinical faculty and when proper protocols are followed and permissions obtained
  - Using cell phones, fax machines, or email to transmit confidential information
  - Posting photos that show or appear to show offensive behavior, including, intoxication or substance abuse
  - Posting potentially inflammatory or unflattering material about another person, group, or institution
  - Posting educational records or other student information protected by FERPA

o Using smart phones, portable communication, or other devices with access to social media for personal or nonemergent reasons during encounters involving patients or patients' families and friends, including in patient hospital rooms, exam and treatment areas, operating rooms, emergency rooms; in outpatient clinics; in physician or patient lounges, nurses stations, or hospital hallways, waiting rooms, elevators; during patient care rounds or didactic presentations that discuss specific patients; or during household visits (i.e., through Green Family Foundation NeighborhoodHELP)

Students can find policy guidelines published by the Federation of State Medical Boards for the appropriate use of social media and social networking in medical practice at: https://www.fsmb.org/siteassets/advocacy/policies/social-media-and-electronic-communications.pdf

# Student Activities and Organizations

### *Panther Learning Communities*

Panther Learning Communities (PLCs) support the professional development of HWCOM medical students by fostering an environment of academic excellence, professionalism, leadership, health and wellness, teamwork, mentorship, community service, and pride in the alma mater. PLCs empower medical students to create and administer programs that complement and support the doctor of medicine degree program, with emphasis on service learning through Green Family Foundation NeighborhoodHELP™ initiatives and other community service and professional development activities.

HWCOM has four PLCs, each named after a notable physician or medical scientist: Anderson, Hippocrates, Pasteur, and Semmelweis. Medical students are assigned to one of the four PLCs upon matriculation and remain in the same assigned PLC throughout their medical school experience. Each PLC has its own designated lounge/activity room and is supported by faculty and staff. Programs within the PLCs are overseen by student leaders selected by committees comprising medical students, faculty, and staff. Strategic oversight of the PLCs is provided by a steering committee of members of the administration, faculty, staff, and student body.

Additional information about PLCs can be found on the HWCOM website.

### *Medical Student Organizations*

Students at HWCOM can form groups based on common beliefs and interests; they may express their views through these student organizations as permitted by the Constitution of the Herbert Wertheim College of Medicine Medical Student Council.

Organizations using HWCOM facilities for their activities and meetings must be recognized by the institution. Deans in the Office of Student Affairs have the power to grant and suspend recognition of student organizations. To formally request to form new medical student organizations, students must meet with the Student Organizations and International Programs Coordinator for guidance on the process of application as outlined in the Bylaws of the Herbert Wertheim College of Medicine Medical Student Council. Documentation regarding the proposed group must be submitted to the Medical Student Council for review and evaluation. Approval is granted based on review of presented information, with consideration of the group's overall mission and its alignment with the HWCOM mission statement. Prior to approval and formation of a new medical student organization, students must select an advisor. Advisors must be approved in advance by the Office of Student Affairs; a faculty member may serve as advisor for a maximum of two student organizations.

Students must agree to conduct all meetings with due regard to the laws governing defamation, and comply with all policies and procedures of FIU and HWCOM. Libelous defamatory statements are not constitutionally protected and could subject a student group and its members to legal action. Unauthorized use of copyrighted material may violate trademark or copyright laws. Students must ensure that all publications are free of libelous statements and contain adequate citations to original sources. All major student publications (e.g., yearbook, humanities journal) must be reviewed and approved by the Office of Student Affairs.  Leadership of student groups is subject to terms of the officer agreement.

**Specialty Interest Groups and FIU Chapters of National Medical Student Organizations.** All HWCOM medical student organizations—including specialty interest groups and chapters of national medical student organizations—are student-initiated and under the auspices of the Office of Student Affairs. Through active participation, student members are exposed to more professional, scholarly, networking, and cultural opportunities than those afforded by the formal MD degree curriculum. Members can participate in student-led clinical activities under the direction of faculty advisors, including at community health fairs and educational presentations.

**Medical Student Council.** The Medical Student Council is the voice of the medical student body and has the administrative authority to pass nonbinding resolutions on medical school policies and procedures by serving as the formal liaison between faculty members, administrators, and medical students. The Medical Student Council manages and allocates funds to other medical student organizations in a consistent and fair manner that contributes to the education of students. Application forms and guidelines for requesting funds to support student activities are available on CanvasMed in the Medical Student Council modules.

### Student Professionalism and Ethics Committee

The Student Professionalism and Ethics Committee (SPEC) is a group of student representatives who function to promote a student-driven culture of professionalism at HWCOM. The SPEC's advice and guidance regarding matters in this handbook, including due process, do not constitute guidance from HWCOM faculty or staff and are not binding on HWCOM. Students in evaluation processes should consult with the Office of Academic Affairs and Office of Student Affairs, and not the SPEC.

**1. Responsibilities of the Student Professionalism and Ethics Committee (SPEC).** Individually, each member is expected to exemplify the highest degree of ethical and professional standards. SPEC members are required to be formally trained in professional expectations and oriented to various committees and organizations, including those within HWCOM, and those relevant at the state and national levels.

    a.  **Duties of the SPEC.**

- Assist students in navigating and understanding support resources;

- Assist students in resolving issues identified by class leadership to be the concern of his or her constituency by serving as a point of mediation;

- Collaborate with the HWCOM Associate Dean for Student Services to design and implement Student Professional Development Initiatives;

- Collaborate with the Course Directors and Faculty of the Professional Development Strand;

- Create and facilitate a presentation for incoming medical students during the week of orientation to introduce the concept of professionalism in medicine;

- Maintain familiarity with the processes outlined by Medical Student Evaluations and Promotion Committee and aid students in understanding the steps involved;

- Analyze aggregate data from administration on Professionalism Incident Reports to identify trends and opportunities for future professional development programming;

- Serve in a consultative role to the Medical Student Evaluation and Promotion Committee when called upon;

- Work with and maintain open communication with the faculty advisor.

**2. Composition, Selection, and Terms of the Student Professionalism and Ethics Committee (SPEC).**

a. **Composition.** The Committee comprises of two SPEC representatives per class, for a total of eight student representatives. A faculty advisor oversees SPEC processes. The SPEC representatives cannot simultaneously hold a position on the Medical Student Council or Class Council. SPEC representatives must remain in good academic, conduct, and professional standing.

b. **Selection.** The Class Council must release nomination forms for the committee to their respective classes within the first two (2) weeks of their term. Self- or peer-nominations for SPEC representatives will be collected over a defined period. Nominee interest should be confirmed prior to deliberations and a unanimous decision must be made by the Class Council within one (1) week of closing the nomination period. The names of the two (2) selected SPEC representatives must be promptly submitted to the Executive Associate Dean for Student Affairs.

c. **Term of SPEC Membership.** The term of office for members representing all classes will be from the time they are appointed by the Executive Associate Dean for Student Affairs until:

- April 1 the year following appointment;

- Resignation;

- Removal by the Executive Associate Dean for Student Affairs; or

- Probation or academic watch (results in automatic relinquishment of position due to poor academic performance).

d. **Membership on the SPEC.** Membership is a privilege, not a right. Dismissal from membership on the SPEC is not an Adverse Action and the student will not be entitled to a hearing.

---

FIU Herbert Wertheim College of Medicine

e. **Filling SPEC Vacancies.** In the event of a vacancy, the current SPEC members will nominate a candidate by majority vote as soon as reasonably possible. Upon receiving consent from the nominee, the committee should submit a name to the Executive Associate Dean for Student Affairs for appointment.

f. **SPEC Chair.** During the final meeting of each academic year, the SPEC will elect a new Chair to serve during the following academic year. The Chair Elect should be a student entering Period 4. It shall be the Chair's responsibility to manage the operation of the SPEC, with oversight provided by the faculty advisor.

# EXHIBIT 5

| Date | Exam Name | Standard Time | Student used |
|---|---|---|---|
| Aug-17 | | | |
| 18-Aug | BMS 6643 Final Exam | 72 min | 80 min |
| Sep-17 | | | |
| 1-Sep | BMS 6635 Midterm | 75 min | 128 min |
| Oct-17 | | | |
| 2-Oct | BMS 6634 Midterm | 97 min | 137 min |
| 16-Oct | BMS 6634 Final | 21 min | 24 min |
| 18-Oct | BMS 6071 Midterm | 76 min | 65 min ( extra time granted, not used) |
| 30-Oct | BMS 6632 Midterm | 52 min | 59 min |
| Nov-17 | | | |
| 28-Nov | BMS 6632 Final | 69 min | 67 min |
| Dec-17 | | | |
| 4-Dec | BMS 6637 Repro Diagnostic Reasoning Exam | 120 min | 180 min |
| 11-Dec | BMS 6637 Final | NBME Exam | |
| Jan-18 | | | |
| 3-Jan | BMS 6635 Final (make-up) | NBME Exam | |

LOA - From January-2018 to April -2018 and joined Class of 2021. Student was formerly Class of 2020.

| Date | Exam Name | Standard Time | Student used |
|---|---|---|---|
| Apr-18 | | | |
| Apr-20 | BMS 6066 Quiz 1 - Canvasmed | 12 min | 10 min (extra 6 min were granted but not used) |
| 9-Apr | BMS 6633 Anatomy Quiz 1 (8am-9am) | 60 min | 33 min ( extra time granted, not used) |
| 13-Apr | BMS 6066 Quiz 2 - Canvasmed | 12 min | 8 min (extra 6 min granted but not used) |
| 20-Apr | BMS 6633 DXR Clinical Reasoning Exam | 60 min | 56 min ( extra time granted, not used) |
| 23-Apr | BMS 6633 Test 1 (8am-10am) | 90 min | 120 min |
| 30-Apr | BMS 6633 Anatomy Quiz 2 (9am-10am) | 60 min | 34 min ( extra time granted, not used) |
| May-18 | | | |
| May-18 | BMS 6066 Quiz 3 - Canvasmed | 12 min | 5 min (extra 6 min were granted but not used) |
| May-18 | BMS 6066 Quiz 4 - Canvasmed | 12 min | Did not take quiz (extra 6 min were granted but not used) |
| 18-May | BMS 6633 Test 2 (8am-10am) | 82 min | 85 min |
| 18-May | BMS 6066 Quiz 5 - Canvasmed | 12 min | 9 min (extra 6 min were granted but not used) |

| Date | Exam | | | |
|---|---|---|---|---|
| 21-May | BMS 6633 Final NBME & DXR Clinical Reasoning Exam (8am-12pm) | | 90 min | 124 min |
| Jun-18 | | | | |
| 4-Jun | BMS 6631 Midterm (8am-12pm) | | 55 min | 86 min |
| 14-Jun | BMS 6016 Exam 1 (1pm-3pm) | | 84 min | 88min |
| 15-Jun | BMS 6066 CAM Final (11am-12pm) | | | |
| 18-Jun | BMS 6631 Final (8am-12pm) | | 70 min | 59 min |
| Aug-18 | | | | |
| 17-Aug | BMS 6643 Final (8am-10am) | | 64 min | 88 min |
| 30-Aug | BMS 6067 Module due (CanvasMed) | | 120 min | 100min (Extra 60min granted) |
| Sep-18 | | | | |
| 4-Sep | BMS 6635 Anatomy (12:30pm-1:30pm) | | 60 min | 90 min |
| | BMS 6635 Midterm (2:30pm-4:30pm) | | 77 min | 116 min |
| 17-Sep | BMS 6635 Final NBME (8am-10am) | | | |
| | BMS 6635 Final In-house (10:15pm-12pm) | | 102 min | 80 min |
| Oct-18 | | | | |
| 1-Oct | BMS 6634 Midterm (9am-11am) | | 91 min | 136 min |
| 12-Oct | BMS 6634 DXR Clinical Reasoning Exam (8am-10am) | | 90 min | 81 min |
| 15-Oct | BMS 6634 Final NBME and In-House (12:30pm-4pm) | | 30 min | 33 min |
| 17-Oct | BMS 6071 Midterm (1pm-3pm) | | 66 min | 53 min |
| 29-Oct | BMS 6632 Midterm (12:30pm-3pm) | | 55 min | 35 min |
| Nov-18 | | | | |
| 9-Nov | BMS 6632 Final (8am-12pm) | | 64 min | 49 min |
| Dec-18 | | | | |
| 3-Dec | BMS 6637 DxRx (9am-11am) | | 150 min | 232 min |
| 10-Dec | BMS 6637 Final (9am-11am) | | NBME | |
| Jan-19 | | | | |
| 7-Jan | BMS 6638 Midterm (9:30am-12pm) | | 65 min | 69 min |
| 23-Jan | BMS 6638 Final (8am-12pm) | | 42 min | 38 min |
| Feb-19 | | | | |
| 13-Feb | BMS 6636 Midterm (8am-12pm) | | | |
| March | | | | |
| 7-Mar | BMS 6636 Final (8am-12pm) | | 108 min | 165 min |
| 8-Mar | BMS 6064 Final (10 am-12 pm) | | 120 min | 130 min |
| 28-Mar | BMS 6016 Final (1pm-3pm) | | 79 min | 78 min |

29-Mar | BMS 6840 Final (9am-12pm)

NBME

# EXHIBIT 6

# COLLEGE OF MEDICINE ASSESSMENT DEPARTMENT ACCOMMODATION PROCEDURE

**Accommodation Set-Up and Notification Procedures**

- Accommodation notification sent via e-mail from the Disability Resource Center to Adrian Jones, JD, Nancy Havas, MD, Rodolfo Bonnin, PhD, Maria Santacruz.
  A confirmation email is sent to confirm that the accomodations have been implemented and sent from the Assessment team (Rodolfo Bonnin and Maria Santacruz)
- Bonnin/Santacruz review letter for accommodation specifics (time allowed, additional requirements,etc)
- Assessment department places student on accommodation list
- Assessment department sends accommodation notification to student (Appendix 1)
- Assessment department initiates accommodation set up: ExamSoft/NBME extra time (Appendix 2)
- Assessment department notifies course coordinators about new student accommodation (Course Coordinators are provided with a list of student names and the assessments that qualify for accommodation) (Appendix 3)

> **Commented [CR1]:** Do we want to state anything about "immediate implementation for exams even if other requirements cannot be immediately implemented" e.g. in case of confusion or need for more clarity etc

**Proctored Exams Procedure**

- Two days prior to exam administrations: accommodation students are notified via e-mail about the date, time, and location of the exam administration. E-mails are stamped "Request a Read Receipt" – Notification asks students to reply to e-mail and confirm accommodation attendance (Appendix 4).
- Assessment department coordinate accommodation date, location, time, and personnel to assure coverage. Supplies for exam administration and IT support.

**Coordinator Supervised Assessments**

- Prior to the commencement of every course, course coordinators are provided with a list of student names and the assessments that qualify for accommodation (Appendix 5)
- Assessment department notifies course coordinators when new student accommodations are received
- Assessment department contacts each student (cc's coordinator) about the upcoming accommodated assessment with date, location and requirements for assessment. E-mails are stamped "Request a Read Receipt." Notification asks students to reply to e-mail and confirm accommodation attendance (Appendix 6)
- Email notification send to students for pop-up iRAT (Appendix 7).
- Email notification send to students for a take home exam or assignment (appendix 8).
- Assessment administered

**Quality Assurance**

Mandatory Monthly Accommodation Committee Meetings

- At each meeting, a member from the assessment department reviews the list of current P1-3 students with accommodation awards.
- Review of students includes accommodation status, deadline, temporary status, requests, any difficulties, etc.
- Review of exam administrations (issues with student tardiness, quiet locations, equipment, IT).
- Set up a meeting with each student who receives accommodations initially and then annually thereafter, to review the accommodations and send them an official notification from HWCOM DRC highlighting all the accommodations, expectations and pathways for success.
- Meet quarterly with the University DRC to discuss any issues or concerns and invite them to the HWCOM DRC meetings for better collaboration efforts.

1

*Attachments*

**APPENDIX 1**

Email notification send to student to inform of special accommodations procedures.

*Subject*: Testing Accommodations

Dear Student,

As it pertains to your DRC approved accommodations, please note that you will be receiving two (2) email communications regarding upcoming exams. One of the emails will be sent to everyone in the class (Listserv) the other email will be directed to you with specific instructions for your scheduled exam. It will say "Exam Accommodation Notice" in the subject.  The content of the email will state time and location for your exam. Please note when possible we schedule your exam at the same time as your classmates. However, due to your schedule, availability and resources, we may need to  start the special accommodations exams at a different time.

Please note you should be receiving this email approximately two business days before the exam. Should you not receive it please feel free to reach out to us at com-test@fiu.edu.

Regards,

Assessment & Testing

Office of Medical Education



FIU | Herbert Wertheim College of Medicine

FLORIDA INTERNATIONAL UNIVERSITY

2

**APPENDIX 2**

**Sample NBME adding additional time to a student profile**



**Sample ExamSoft adding additional time to a student profile**



3

**APPENDIX 3**

Email notification send to course coordinators identifying accommodation students and assessments

**Assessment Type and Accommodation Status**

| Course No. | Course Name | Quiz - In Class Activity | Weight (%) | SA Decision |
|---|---|---|---|---|
| BMS 6633 | Cardiovascular and Respiratory Systems | EBM Activity | 0.25 | YES |
| | | Physiology Activity (Pre)Readiness Assignment | 1 | No |
| | | Physiology Activity (Post) Readiness Assignment | 1 | No |
| | | Genetics Readiness (Pre) Readiness Assignment | 0.5 | No |
| | | Genetics Readiness (Post) Readiness Assignment | 0.5 | No |
| | | Antibiotics Activity (Pre) Readiness Assignment | 1.25 | No |

| PID | Last Name | First Name | Accommodations | Active | Grad Year |
|---|---|---|---|---|---|
| 1780438 | Doe | Juan | 25% Extra Time, Minimal Distraction Testing Room | Yes | 2020 |
| 2975465 | Jones | Arianna | 50% Extra Time, Minimal Distraction Testing Room | Yes | 2020 |
| 2711523 | Johns | Edna | 50% Extra Time, Minimal Distraction Testing Room | Yes | 2020 |
| 3280720 | Don | Alisha | 25% Extra Time, Minimal Distraction Testing Room | Yes | 2020 |
| 3117153 | Raul | Sydney | 25% Extra Time, Minimal Distraction Testing Room | Yes | 2020 |

4

## APPENDIX 4

Email notification send to students with special accommodation two days before proctored exams.

***Please find below specific instructions for your scheduled exam as it pertains to your individual DRC approved accommodations.***

Good morning Students,

The BMS 6603 Pathology Quiz 4 will take place on **Monday February 3, 2020** in room GL 482 at 8:30am. Please arrive at least 15 minutes before start time; the exam will commence promptly. As per policy, once the exam starts students will not be allowed to enter the room to take the examination.

Should you have any questions or concerns regarding this exam administration please feel free to contact us by replying to this email.

Please confirm your attendance by replying to this email.

⤷ This exam will be administered through **Examplify**. Please remember to bring your panther ID number and Examplify password.

On the day of the exam **testing computers will be distributed.**

❖ As per exam procedure once you enter the room place your bags and/or personal items in your designated area.

✓ Please be considerate of your fellow classmates **by arriving on time**, starting the exam when instructed, limiting food consumption and exiting quietly once you have finished your exam
✓ Once you have completed your exam, please be **mindful of noise.** Out of consideration for those still taking the exam, please, **do not group outside of the lecture hall** (classroom).

**The following items are prohibited during all examinations:**

o iPads/tablets
o Cell Phones – Make sure that your cellphones are off during the exam and inside backpacks/bags.
o Paging devices
o iPod, radio, or media devices
o Calculators (a calculator is built into the exam for examinee use)
o Recording/filming devices
o Reference materials (books, notes, papers)
o Watches with alarms, computer or memory capability
o Headwear (religious headwear is allowed)
o iWatch, Smartwatch or any derivative
o Headphones are prohibited– wireless or wired. Please note you will be provided with earplugs.
    o If need be, you may use noise cancelling ear muffs, however these must be approved and registered by a proctor prior to the commencement of the exam.
*Always protect your answers and please remember that the content of the exam should remain with you alone in order to comply with HWCOM Honor Code policy and expectation of professional responsibility*

• Test administrators are required to report any irregular, improper or disruptive behavior. Irregular, improper or disruptive behavior is any behavior that undermines, disrupts or threatens the integrity or validity of the examination administration. Examples of irregular or improper behavior include, but in no way is limited to: giving or obtaining information or aid, looking at the test material of others, bringing unauthorized items into the examination room, failing to comply with time limits or instructions or other improper behaviors.

Testing & Assessment

-----------------------------------------------------------------------------------------------------------

5

**APPENDIX 5**

Email notification send to students with special accommodation at the beginning of each course.

Good afternoon Students,

For the course BMS 6840 Nervous System and Behavior II the following activities:

- Final NBME
- Final In-House

Will conform to your individual DRC approved accommodations as it relates to individually prescribed additional time and minimal distraction testing room.

As you know before each exam you will be receiving two (2) email communications regarding upcoming exams. One of the emails will be sent to everyone in the class (Listserv) the other email will be directed to you with specific instructions for your scheduled exam. It will say "Exam Accommodation Notice" in the subject.  The content of the email will state time and location for your exam. Please note when possible we schedule your exam at the same time as your classmates. However, we may need to  start the special accommodations exams at a different time due to your schedule, availability and resources.

Please note you should be receiving this email approximately two business days before the exam. Should you not receive it please feel free to reach out to us at com-test@fiu.edu.

Regards,

---------------------------------------------------------------------------------------------------------------------------

6

**APPENDIX 6**

Email notification send to students with special accommodations for makeup and remediation exams:

Good afternoon Student Name:

      Please be advised that you have been scheduled for the BMS 6632 Endocrine System NBME & In-house Final make-up Exam. The exam will take place on Tuesday November 12, 2019 at 12:30pm in room GL (Green Library) 482. This room can be quite cold, so please dress accordingly.

Please confirm your attendance by replying to this email.

Should you have any questions or concerns regarding this exam administration please feel free to contact us by replying to this email.

*This session conforms to your individual DRC approved accommodations.*

Regards,



**Herbert Wertheim College of Medicine**

FLORIDA INTERNATIONAL UNIVERSITY

Assessment & Testing

Office of Medical Education

7

**APPENDIX 7**

Email notification send to students with special accommodations for pop-up iRAT.

Good afternoon Students,

In order to comply with your individual DRC approved accommodations, please report to room **AHC 2 460A tomorrow January 17th 2020 at 10.00am** for a graded activity for the course **BMS 6880 Clinical Epidemiology and Quantitative Research.**

**Please arrive on time, we will commence promptly.**

Please note that for the remainder of the BMS 6880 Clinical Epidemiology and Quantitative Research you must be at FIU at least one hour before the class is set to start. On specific days in which there will be an iRAT you will receive an email message prior to class commencement with instructions on how to proceed.

Should you have any questions or concerns please feel free to contact us by replying to this email or your course coordinator included in this communication.

Regards,

Testing & Assessment

Office of Medical Education



---

Good morning Students,

In order to comply with your individual DRC approved accommodations, please report to room **AHC 2 460A today Friday, February 7th 2020 at 10.00am** for a graded activity for the course **BMS 6880 Clinical Epidemiology and Quantitative Research.**

**Please arrive on time, we will commence promptly.**

Should you have any questions or concerns please feel free to contact us by replying to this email or your course coordinator included in this communication.

Regards,

Testing & Assessment

Office of Medical Education

8

---------------------------------------------------------------------------------------------------

**APPENDIX 8**

Email notification send to students with special accommodations for a take home exam or assignment.

Good afternoon Students,

The BMS 6827 Foundations for the Community-Engaged Physician **Midterm Take-Home** Exam due on Friday 12/6, conforms to your individual DRC approved accommodations as it relates to individually prescribed additional time.

Should you have any questions or concerns regarding this exam administration please feel free to contact us by replying to this email or your course coordinator included in this communication.

Regards,

Testing & Assessment

Office of Medical Education



----------

Good afternoon Students,

The BMS 6636 Nervous System and Behavior I Checkpoint Quiz 1, 2, 3 and 4, comply with your individual DRC approved accommodations as it relates to individually prescribed additional time.

Should you have any questions or concerns regarding this administration please feel free to contact us by replying to this email or your course coordinator included in this communication.

Regards,

Testing & Assessment

Office of Medical Education



9

# EXHIBIT 7

| Created on | Student | Reason For Request | CourseFirstDT2 | CourseLastDT | Period | Provisionally Approval | Decision | Final Decision Comments | Clerkship |
|---|---|---|---|---|---|---|---|---|---|
| 10/12/16 12:43 PM | Elie Nehme (Medical Student) | Illness | 10/12/2016 | 10/12/2016 | Period 1 | Automatic OSA Approval | | | |
| 11/18/16 1:14 PM | Elie Nehme (Medical Student) | Health / Illness (non-acute) | 11/21/2016 | 11/21/2016 | Period 1 | Need more documentation | Approved | | |
| 12/5/16 8:53 AM | Elie Nehme (Medical Student) | Other unplanned event/emergency | 12/5/2016 | 12/5/2016 | Period 1 | Need more documentation | Approved | | |
| 2/14/17 10:04 AM | Elie Nehme (Medical Student) | Illness | 2/14/2017 | 2/14/2017 | Period 1 | Automatic OSA Approval | | | |
| 3/13/17 6:43 PM | Elie Nehme (Medical Student) | Illness | 3/13/2017 | 3/15/2017 | Period 1 | Automatic OSA Approval | | | |
| 4/19/17 3:38 PM | Elie Nehme (Medical Student) | Illness | 4/19/2017 | 4/19/2017 | Period 2 | Automatic OSA Approval | | | |
| 5/31/17 11:29 AM | Elie Nehme (Medical Student) | Other unplanned event/emergency | 5/31/2017 | 5/31/2017 | Period 2 | Automatic OSA Approval | | | |
| 6/6/17 11:53 AM | Elie Nehme (Medical Student) | Illness | 6/6/2017 | 6/6/2017 | Period 2 | Automatic OSA Approval | | | |
| 6/9/17 1:58 PM | Elie Nehme (Medical Student) | Other unplanned event/emergency | 6/9/2017 | 6/9/2017 | Period 2 | Need more documentation | Approved | | |
| 6/19/17 1:36 PM | Elie Nehme (Medical Student) | Illness | 6/19/2017 | 6/19/2017 | Period 2 | Automatic OSA Approval | | | |
| 9/1/17 10:19 AM | Elie Nehme (Medical Student) | Illness | 9/1/2017 | 9/1/2017 | Period 2 | Automatic OSA Approval | | | |
| 10/11/17 9:21 AM | Elie Nehme (Medical Student) | Illness | 10/11/2017 | 10/11/2017 | Period 2 | Need more documentation | Approved | | |
| 10/12/17 1:57 PM | Elie Nehme (Medical Student) | Illness | 10/12/2017 | 10/12/2017 | Period 2 | Automatic OSA Approval | | | |
| 10/15/17 11:17 PM | Elie Nehme (Medical Student) | Illness | 10/16/2017 | 10/16/2017 | Period 2 | Automatic OSA Approval | | | |
| 11/5/17 11:36 PM | Elie Nehme (Medical Student) | Other unplanned event/emergency | 11/1/2017 | 11/3/2017 | Period 2 | Automatic OSA Approval | | | |
| 11/12/17 8:05 PM | Elie Nehme (Medical Student) | Illness | 11/13/2017 | 11/13/2017 | Period 2 | Need more documentation | Approved | | |
| 11/30/17 5:26 PM | Elie Nehme (Medical Student) | Professional activity (e.g. professional conference, representing HWCOM, summer activity) | 2/1/2018 | 2/2/2018 | Period 2 | Forward to Course Director/Coordinator | Cancelled | As per your request, this has been cancelled. | |
| 12/11/17 9:12 AM | Elie Nehme (Medical Student) | Other unplanned event/emergency | 12/8/2017 | 12/8/2017 | Period 2 | Automatic OSA Approval | | | |
| 12/15/17 4:59 PM | Elie Nehme (Medical Student) | Illness | 12/11/2017 | 12/11/2017 | Period 2 | Automatic OSA Approval | | | |
| 5/1/18 6:55 PM | Elie Nehme (Medical Student) | Other unplanned event/emergency | 4/30/2018 | 4/30/2018 | Period 2 | Automatic OSA Approval | | | |
| 6/11/18 3:45 PM | Elie Nehme (Medical Student) | Other unplanned event/emergency | 6/6/2018 | 6/6/2018 | Period 2 | Automatic OSA Approval | | | |
| 11/6/18 1:12 PM | Elie Nehme (Medical Student) | Other unplanned event/emergency | 11/6/2018 | 11/6/2018 | Period 2 | Automatic OSA Approval | | | |
| 1/10/19 10:24 AM | Elie Nehme (Medical Student) | Illness (acute) | 1/10/2019 | 1/10/2019 | Period 2 | Automatic OSA Approval | | | |
| 1/22/19 11:01 AM | Elie Nehme (Medical Student) | Illness (acute) | 1/23/2019 | 1/23/2019 | Period 2 | Need more documentation | Approved | | |
| 3/6/19 2:55 PM | Elie Nehme (Medical Student) | Illness (acute) | 3/6/2019 | 3/6/2019 | Period 2 | Automatic OSA Approval | | | |
| 3/18/19 7:32 AM | Elie Nehme (Medical Student) | Illness (acute) | 3/18/2019 | 3/18/2019 | Period 3 | Automatic OSA Approval | | | |
| 5/31/19 1:27 PM | Elie Nehme (Medical Student) | Other unplanned event/emergency | 5/31/2019 | 5/31/2019 | Period 3 | Automatic OSA Approval | | | Internal Medicine |
| 7/23/19 10:50 PM | Elie Nehme (Medical Student) | Illness (acute) | 7/23/2019 | 7/23/2019 | Period 3 | Automatic OSA Approval | | | Surgery |
| 8/14/19 12:40 AM | Elie Nehme (Medical Student) | Other unplanned event/emergency | 8/14/2019 | 8/14/2019 | Period 3 | Automatic OSA Approval | | | Family Medicine |
| 8/22/19 10:07 PM | Elie Nehme (Medical Student) | Other unplanned event/emergency | 8/23/2019 | 8/23/2019 | Period 3 | Automatic OSA Approval | | | Family Medicine |
| 9/13/19 12:54 PM | Elie Nehme (Medical Student) | Accident | 9/13/2019 | 9/13/2019 | Period 3 | Need more documentation | Approved | | Family Medicine |
| 10/15/19 5:26 PM | Elie Nehme (Medical Student) | Illness (acute) | 10/16/2019 | 10/16/2019 | Period 3 | Automatic OSA Approval | | | Neurology |
| 12/9/19 8:53 PM | Elie Nehme (Medical Student) | Illness (acute) | 12/9/2019 | 12/9/2019 | Period 3 | Automatic OSA Approval | | | Obstetrics and Gynecology |
| 1/7/20 2:13 PM | Elie Nehme (Medical Student) | Illness (acute) | 1/7/2020 | 1/7/2020 | Period 3 | Automatic OSA Approval | | | Psychiatry |
| 2/5/20 2:11 PM | Elie Nehme (Medical Student) | Other unplanned event/emergency | 2/5/2020 | 2/5/2020 | Period 3 | Automatic OSA Approval | | | |
| 2/18/20 2:38 PM | Elie Nehme (Medical Student) | Other unplanned event/emergency | 2/18/2020 | 2/18/2020 | Period 3 | Automatic OSA Approval | | | Pediatrics |