```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 SOUTHERN DISTRICT OF FLORIDA

 3                 CASE NO. 1:20-CV-24649-CANNON

 4

 5   ELIE NEHME,

 6         Plaintiff,

 7   vs.

 8   FLORIDA INTERNATIONAL UNIVERSITY
     BOARD OF TRUSTEES,
 9
           Defendant.
10   _____

11
     LOCATION:             Remote Audio-Video
12                         Communication
                           Pursuant to Supreme Court of
13                         Florida
                           Administrative Order No.
14                         SCAO21-17

15

16   DATE:                 January 13, 2022

17   TIME:                 9:00 AM ET to 12:00 PM ET

18

19

20         DEPOSITION OF SHIRLYON MCWHORTER

21      Taken before Leila Harris, LCR, Stenographic

22   Court Reporter, Notary Public State of Florida,

23   pursuant to Notice of Taking Deposition in the

24   above-styled cause.

25
```



1          But we did -- I did advise Val Hall --

2   Valerie Hall to do that, and she did that.

3      Q.    Okay.

4      A.    Uh-huh.

5      Q.    It was only as to the quizzes or

6   readiness assignments that you did that?

7      A.    Quizzes, readiness assignment, and I

8   think there was one other thing that she looked

9   at.  Just looking to see if it impacted the grades

10  in any way.

11     Q.    Okay.  Did you ever tell Ms. Bejar --

12  Dr. Bejar, I'm sorry.  Did you ever tell Dr. Bejar

13  that -- that the substantiation of Mr. Nehme's

14  allegation about the taking of the -- retaking of

15  the Psychiatric Shelf Exam and this failure to be

16  accommodated for that did not have an adverse

17  impact upon his academic performance?

18     A.    Did I specifically tell Dr. Bejar that?

19     Q.    Yes, at any time.

20          MS. WYDLER:  Form.

21     A.    I don't recall that conversation with

22  her.  Might have had it, but I don't recall.

23  BY MR. HANNAH:

24     Q.    If you'd told her that, that would be

25  contrary to what your report found.



Jeannie Reporting
Your Wish Is Our Job!
305-577-1705

1     **CERTIFICATE OF REPORTER**

2     STATE OF FLORIDA        )

3     COUNTY OF WALTON      )

4         I, Leila Z. Harris, LCR (Tennessee), Court

5     Reporter, certify that I was authorized to and did

6     stenographically report the foregoing deposition;

7     and that the transcript is a true record of the

8     testimony given by the witness; Per Federal Civil

9     Procedure Rule 30(e) deponent witness did request

10    to read and sign transcript.

11        I further certify that I am not a relative,

12    employee, attorney, or counsel of any of the

13    parties, nor am I a relative or employee of any of

14    the parties' attorney or counsel connected with

15    the action, nor am I financially interested in

16    this action.

17

18    _____

19    Leila Z. Harris, LCR (Tennessee)
      Stenographic Court Reporter

20

21

22

23

24

25



**Jeannie Reporting**
Your Wish Is Our Job!
305-577-1705



**FIU** | **Human Resources**

FLORIDA INTERNATIONAL UNIVERSITY

August 25, 2020

Elie Nehme
**Delivered Electronically**
**To enehm002@med.fiu.edu**

Re:  Case No. 2020-05-054
**PERSONAL AND CONFIDENTIAL**

Dear Mr. Nehme,

Please be advised that Florida International University's (FIU) Office of Inclusion, Diversity, Equity, and Access (IDEA) has conducted and completed its review into the allegation that Dr. Nancy Havas may have violated FIU-106 Regulation as it pertains to discrimination based on disability. To ensure you are fully informed of the investigative findings and conclusion, attached is a copy of the summary report prepared by IDEA.

If you should have any questions or concerns regarding the content of this correspondence, you can contact me at (305) 348-2785.

Sincerely,

Shirlyon J. McWhorter, Esq.,
Director & Title IX Coordinator
Inclusion, Diversity, Equity, and Access

Attachment



**DIVISION** OF **HUMAN RESOURCES**
Modesto A. Maidique Campus, PC-224, Miami, Florida 33199 • Tel: 305.348.2190 • Fax: 305.348.2872 • hr.fiu.edu 000726
Equal Opportunity/Access Employer and Institution • TDD via FRS 1-800-955-8771



**FIU** | **Human Resources**

FLORIDA INTERNATIONAL UNIVERSITY

August 25, 2020

Dr. Nancy Havas
**Delivered Electronically**
**To nhavas@fiu.edu**

Re: Case No. 2020-05-054
**PERSONAL AND CONFIDENTIAL**

Dear Dr. Havas,

Please be advised that Florida International University's (FIU) Office of Inclusion, Diversity, Equity, and Access (IDEA) has conducted and completed its review into the allegation that you may have violated FIU-106 Regulation as it pertains to discrimination based on disability. To ensure you are fully informed of the investigative findings and conclusion, attached is a copy of the summary report prepared by IDEA. The allegations that you violated FIU's regulation as it relates to the complaint is **UNSUBSTANTIATED**.

If you should have any questions or concerns regarding the content of this correspondence, you can contact me at (305) 348-2785.

Sincerely,

Shirlyon J. McWhorter, Esq.,
Director & Title IX Coordinator
Inclusion, Diversity, Equity, and Access

Attachment

cc:     Dr. Robert Sackstein, Dean, HWCOM
        El pagnier Hudson, Vice President, Human Resources
        Dr. Elizabeth Bejar, Sr. Vice President, Academic and Student Affairs
        Joann Cuesta Gomez, Director, Employee and Labor Relations

CASE# 2020-05-054
SUMMARY OF THE INVESTIGATION OF THE COMPLAINT OF DISABILITY
DISCRIMINATION

**Complainant:**    **Elie Nehme**
                    **Medical Student – Period 3**
                    **Herbert Wertheim College of Medicine**

**Respondent:**     **Dr. Nancy Havas**
                    **Associate Dean of Student Services**
                    **Herbert Wertheim College of Medicine**

On May 13, 2020, the Florida International University (FIU) Office of Inclusion, Diversity, Equity, and Access (IDEA) received a complaint of disability discrimination. According to the complaint, Nehme has not received testing accommodations during his time as a student in the Herbert Wertheim College of Medicine (HWCOM), despite being approved for testing accommodations by the Disability Resource Center (DRC). Nehme believes that Dr. Nancy Havas' decisions not to accommodate him, as well as selecting him for a drug testing, has impacted his performance in various courses, including some course and exam failures.

On May 13, 2020, Florida International University (FIU) student, Elie Nehme (Complainant), filed an official complaint with the Office of Inclusion, Diversity, Equity & Access (IDEA) against employee, Dr. Nancy Havas – alleging discrimination based on disability. FIU commenced an investigation into the alleged violations of FIU Regulation 106, the University's Regulation on Non-Discrimination, Harassment and Retaliation (The Regulation).

## PERSONS INVOLVED

| | |
|---|---|
| Complainant: | Elie Nehme, Medical Student – period 3 |
| Witness 1: | Maria Santacruz, Testing & Assessment Manager |
| Witness 2: | Dr. Rodolfo Bonnin, Director of Assessment and Evaluation |
| Witness 3: | Maritere Williams, Associate Director of Academic Support Services |
| Witness 4: | Dr. Jenny Fortun, Assistant Dean for Foundational Sciences Curriculum |
| Witness 5: | Adrian Jones, Interim Executive Associate Dean of Student Affairs |
| Witness 6: | Dr. Vivian Obeso, Associate Dean for Curriculum and Medical Education |
| Witness 7: | Dr. Stephen Loynaz, Access Consultant Manager, Disability Resource Center |
| Witness 8: | Amanda Niguidula, Director, Disability Resource Center |
| Witness 9: | Teresa "Terry" Reyes-Gavilan, Academic Support Services Administrator |
| Respondent: | Dr. Nancy Havas, Associate Dean of Student Services |

## EXHIBITS

| | |
|---|---|
| Exhibit 1: | Discrimination Complaint Form completed by Elie Nehme |
| Exhibit 2: | Email from Dr. Bonnin addressing Nehme's concerns pertaining to his testing accommodation provided by Dr. Stephen Loynaz |
| Exhibit 3: | HWCOM Student Handbook |

FIU_000728

| Exhibit 4: | Audit of Elie Nehme's Testing provided by Maria Santacruz |
|---|---|
| Exhibit 5: | Email documenting Nehme's excused and unexcused absences provided by Dr. Nancy Havas |
| Exhibit 6: | Nehme's Accommodation Letter from the Disability Resource Center |
| Exhibit 7: | MSEPC Letter provided to Nehme from April 9, 2020 Meeting provided by Elie Nehme |
| Exhibit 8: | HWCOM Assessment Department Accommodation Procedure provided by Adrian Jones |

## SPECIFIC ALLEGATION(S)

The Complainants made the following specific allegation(s) (**Exhibit 1**):

- Nehme alleges that the HWCOM administrators changed the language of several in-class professional (CanvasMed) quizzes to "readiness assignments" to avoid providing Nehme DRC-approved testing accommodations. He further contends that, because there was a point value added to the quizzes, the absence of necessary testing accommodations caused burdensome stress to Nehme during period 2 year (this includes the repeat period 2 year as well), which affected his health and academic success.

- Nehme contends that, on March 2, 2020, the HWCOM administrators did not administer the High-Stake Psychiatry shelf[1] (retake) examination in the proper minimal distraction room. Nehme states that he was placed in AHC 2, room 495, which he believes did not meet the requirements for a proper minimal distraction room, based on his prior experiences taking exams in AHC 1, room 335. Nehme failed the High-Stake Psychiatry shelf examination, which he contends was a primary contributor to HWCOM's recommendation that he voluntarily withdraw from the program.

- Nehme alleges that from July 28, 2017 to present day (period 2 – period 3), he has been negatively impacted by the lack of testing accommodations provided to him by HWCOM.

- Nehme alleges that on February 24, 2020 he received an email from Dr. Nancy Havas requiring him to leave his pediatric rotation at Nikolas Children Hospital and report to her office for a drug test. According to Nehme, Dr. Havas did this to cause him further stress. Nehme said Dr. Havas knew he was dealing with stress because he was studying for a remediation Shelf Exam for Psychiatry Clerkship.

## STANDARD OF EVIDENCE: PREPONDERANCE OF THE EVIDENCE

Findings in this investigation report are based on a **"preponderance of the evidence"** standard. In other words, after reviewing all the evidence, including the relative credibility of the parties and their statements during interviews, whether it is more likely than not that the conduct occurred as alleged. If the conduct did occur as alleged, then an analysis is completed to determine whether the conduct violated University Regulation. (Please note: the report's findings do not make

---

[1] High Stake examinations - High-stakes assessment refers to any test given where results lead to major/significant consequences, or any test that is a basis of a major decision.

FIU_000729

conclusions whether the alleged conduct violated state or federal laws, but instead address whether the University's regulations were violated.)

## COMPLAINANT STATEMENT – Elie Nehme

Nehme was interviewed via telephone on May 27, 2020.[2] Nehme was advised of the Regulation, the investigation process, confidentiality, and FIU's prohibition against retaliation. Nehme completed an IDEA Discrimination Complaint Processing Form, in which he alleges that from July 28, 2017 to present day (period 2 – period 3), he has been an active medical student that has been negatively impacted by the lack of testing accommodations, which exacerbated an illness that resulted in him taking a leave of absence (LOA) from school.[3] (**Exhibit 1**) At the time of this report, Nehme was in the process of completing coursework as part of his period 3.

According to Nehme, he has "done well in medical school and [has] received numerous positive recognitions" from preceptors[4] at hospitals where he has performed his medical rotations. Nehme stated that his health continued to be a factor in his academics, so he requested and was granted a LOA from January 18, 2018 – April 2, 2018. Nehme added that this LOA provided him the opportunity to take care of his ailment.

Nehme stated that when he began his time as a student at HWCOM, he was experiencing difficulties with a primary illness. He indicated this was an illness he was dealing with before he began his time as a student. According to Nehme, the stress affiliated with Medical school exacerbated his illness and, as a result, he obtained numerous excused absences. This ultimately resulted in his three course failures and a referral to the Medical Student Evaluation and Promotion Committee (MSEPC).[5] The failures were due to Nehme not passing the High-Stakes examination administered by the National Board of Medical Examiners (NBME). These exams are proctored by the HWCOM Office of Assessment and Evaluation and overseen by Dr. Rodolfo Bonnin (Witness 2).

---

[2] Interviews were conducted via telephone, Zoom, and Microsoft Teams because of the university (including faculty, staff, and students) transitioning to remote work on March 16, 2020.

[3] HWCOM identifies a "period" as a year of study. As such, a student in period 3 is in their third year of study.

[4] A practicing physician who gives personal instruction, training, and supervision to a medical student or young physician.

[5] The Medical Student Evaluation and Promotion Committee (MSEPC) is the committee that evaluates all aspects of each medical student's performance for the purpose of promotion and graduation. The assessment includes evaluation of whether a student meets established academic standards and professionalism standards as more fully described in this HWCOM Medical Student Handbook. The MSEPC evaluation includes an assessment of both honors and deficiencies.

FIU_000730

Table 1: Elie Nehme timeline submitted July 7, 2020.

| Date | Event | Notes |
|---|---|---|
| August 1, 2016 | Date of matriculation | N/A |
| October 3, 2016 | Student failed Genes, Molecules, and Cells (BMS6001) | N/A |
| May 24, 2017 | Failed Cardiovascular and Respiratory Systems (BMS6633) | N/A |
| July 10, 2017 | Failed Cardiovascular and Respiratory System (BMS 6633 remediation) | Passed the final during April 2018, as part of Period 2 remediation. |
| July 19, 2017 | MSEPC Hearing Notice Sent | As a result of failed BMS 6633 |
| July 27, 2017 | MSEPC Hearing #1 | MSEPC Recommendation: allowed to continue with Class of 2020: must meet with Dr. Toonkel to develop a plan for self-study; academic probation |
| December 15, 2017 | PIR filed by Dr. Obeso | Student had multiple issues identified after our mid-period 2 review session.<br><br>1. Multiple unexcused absences across courses<br><br>2. Multiple request to delay exam across course<br><br>3. Professionalism issue regarding a quiz in Reproduction. |
| January 6, 2018 | Student failed System Based Practice (BMS6067) | Nehme did not receive accommodations for the final exam. Nehme confirm that he received accommodations when he retook the final exam as part of his Period 2 Remediation. |
| January 18, 2018 | Nehme began LOA | N/A |
| February 28, 2018 | MSEPC Hearing Notice Sent | N/A |
| March 8, 2018 | MSEPC Hearing #2 | MSEPC Recommendation: Allowed to repeat Period 2; academic probation. Student will now continue with Class of 2021. |

FIU_000731

| April 2, 2018 | Nehme returned from LOA | Nehme would begin Period 2 with Class of 2021. |
| February 17, 2020 | Student failed the Psychiatry Subject Exam | N/A |
| March 3, 2020 | Student failed the Psychiatry Subject Exam retake and as a result, the Psychiatry Clerkship | N/A |
| March 4, 2020 | MSEPC Hearing Notice Sent | Student asked the meeting to be postponed.  Hearing notice was rescinded |
| April 1, 2020 | MSEPC Hearing Notice Sent | N/A |
| April 9, 2020 | MSEPC Hearing #3 | MSEPC Recommendation: Nehme was provided the option to voluntarily withdraw from HWCOM; if he does not take this option, he will be involuntarily withdrawn. |

Nehme indicated that his failure in the Cardiovascular & Respiratory Systems course, along with other family stressors, exacerbated his illness. Nehme contends that after this experience, he determined that he needed to request further academic assistance. After the July 2017 MSEPC meeting, Nehme recalled visiting with the Director of the Medical Student Counseling and Wellness Center, Dr. Nathaly Desmarais, numerous times for Testing and Evaluation.[6][7] According to Nehme, the results revealed that Nehme would need ADA accommodations. Dr. Desmarais issued Nehme a letter to seek ADA accommodations assistance from the DRC. Nehme added that arrived at the DRC to meet with Dr. Stephen Loynaz; at that time, Nehme was told that his testing accommodations were approved, and that the DRC would communicate directly with HWCOM. Nehme was provided his accommodation on July 28, 2017. (**Exhibit 6**)

Nehme stated that days later, he began to worry because he had not heard from the HWCOM Testing and Evaluation department about criteria for his accommodation for his BMS 6643 course final examination, scheduled for August 18, 2017.[8] Nehme recalled sending Dr. Bonnin an email dated August 14, 2017 asking for assistance in discussing "the process of obtaining the approved disability accommodations." In an August 14, 2017 email, Dr. Bonnin addressed Nehme's concerns pertaining to his testing accommodation and advised that "Nehme would have his accommodations on that exam". (**Exhibit 2**) Nehme stated this was his first experience receiving a testing accommodation; he passed that exam and achieved a high score. Nehme added that he was feeling better and it reflected in his grades.

---

[6] Nehme was not able to provide an accurate number of visits he has had with the Wellness Center.

[7] Nehme did not recall specific dates when he visited with Dr. Desmarais.

[8] The course title for BMS 6643 is "Integumentary System: The Skin"

FIU_000732

According to Nehme, after failing his System Based Practice course in January 2018, he petitioned the MSEPC Committee to be remediated, which meant that he would repeat period 2. The MSEPC Committee Chairperson (Dr. Sergio Gonzalez Arias) advised Nehme that the committee would consider his request. Nehme mentioned that the MSEPC Committee granted his LOA on January 18, 2018. Nehme stated that while on his LOA, he received a call from Dr. Havas advising him that he must attend a MSEPC hearing on March 8, 2018; this meeting was scheduled to occur during his LOA. Nehme stated that he attended the MSEPC hearing and was told that his request to repeat his period 2 year had been granted, and upon his return from his leave of absences, he would start with the Class of 2021.

**In-Class Testing:**

According to Nehme, he was neither invited, nor did he participate in any ADA student orientation; therefore, he was unable to address his ADA accommodations, as mentioned in the HWCOM student handbook. **(Exhibit 3)** Nehme commented that this would have been instrumental to his success because he would have known more about the HWCOM ADA testing process. Nehme stated that he never understood the steps or process in making sure he had his testing accommodations. Nehme further stated that, after he was provided his testing accommodations, he realized that he was not receiving testing accommodations for professional course examinations/quizzes being administered in CanvasMed. Nehme stated that he received notice that the quizzes were now called "readiness assignments," however there was still a graded component for these assessments. Nehme provided a list of courses where he took an in-class quiz and was not provided testing accommodations:

> BMS 6016 Clinical Skills II
> BMS 6633 Cardiovascular & Respiratory Systems[9]
> BMS 6634 Gastrointestinal System and Medical Nutrition
> BMS 6637 Reproductive Systems
> BMS 6067 System-Based Practice
> BMS 6638 Renal System
> BMS 6631 Hematopoietic and Lymphoreticular Systems

As Nehme understands it, courses are built into CanvasMed by the course professor.[10] Nehme added that the readiness assignments are administered on CanvasMed and are typically issued as pop quizzes, flipcharts quizzes and course assignments. Nehme stated that the courses listed quizzes on the various syllabi as point driven; however, he had never received a testing accommodation for these assignments. Nehme stated that although he has never failed a quiz, he has scored low on them, which ultimately affected his final grade. Nehme further stated that he

---

[9] This refers to the second instance where Nehme took this exam, which was after he returned from the LOA.

[10] CanvasMed is HWCOM's Learning Management System (LMS) and offers a central location for hosting and accessing learning materials, submitting assignments, proctoring exams and connecting instructors and students both online and in the classroom. (https://medicine.fiu.edu/about/administrative-offices/information-technology/services/index.html)

FIU_000733

received a testing accommodation in BMS 6066 Evidence-Based Medicine and Complementary and Alternative Medicine's Individual Readiness Assurance Test (IRAT) quiz that was worth 15% of his final grade. [11]

According to Nehme, on March 3, 2020, he did not receive his minimal distraction room accommodation for his High-Stake Psychiatry Shelf examination. Nehme stated that he was assigned to AHC 2 495, a room he had never been assigned to before; he added that he had no idea what the room looked like until the day of the examination. Nehme indicated that he usually takes his exams in AHC 1 335, which he believes was a minimum distraction room, because it has no windows, nor is it positioned in a busy hallway. According to Nehme, AHC 2 495 is a conference room that has mirrored windows which you can partially see out of, and that the room was in a main hallway near classrooms. [12] He believes the room was not appropriate because it was in a busy hallway where there were many offices and high number of student traffic near an elevator. He added that the environment was extremely distracting. Nehme added that on the day of his exam, many students were walking and talking loudly which caused him to become distracted. Nehme stated that he did not inform the proctor of his concerns.

According to Nehme, he attempted to bring up his testing accommodation concerns during his April 9, 2020 MSEPC meeting; however, he contends that the committee members refused to address this matter. Nehme stated that he felt intimidated by the presence of the MSEPC chair (Dr. Helen Tempest); Dr. Obeso had previously submitted a professional incident report (PIR) on behalf of Dr. Tempest against Nehme. Nehme added that because of the PIR, he never felt comfortable mentioning to anyone that he was not receiving his testing accommodations. [13]

**Drug Testing:**

Nehme stated that on February 24, 2020, he received a voicemail message from Dr. Nancy Havas asking him to report to HWCOM for a meeting. Nehme stated that there was an email that followed Dr. Havas's call with a "vague" subject line that read "check in meeting." Nehme felt this meeting was important, so he left his Pediatric rotation for the meeting. Nehme shared that when he arrived

---

[11] Nehme further indicated that there was one course where he did get his testing accommodation and that resulted in him getting a high score.

[12] According to DRC a minimal distraction room creates an environment which minimizes distractions for the student. Each student has different levels of distractibility and different stimuli which may distract them. Typically, students need an environment which minimizes both auditory and visual distractions. A distraction reduce environment does not necessitate the student's testing in a private room, nor does it mean that an environment in completely distraction-free.

[13] On August 23, 2020 Nehme stated the MSEPC began firing questions that were unrelated to the shelf examination and they were asking about his previous courses. This was his first-time using zoom and he felt intimidated when Dr. Tempest photo appeared enlarge on his screen and she would respond to his questions with a frown. Nehme stated Dr. Tempest also appeared as if she was not interested. Nehme said that he felt as if he would have said anything there was going to be retaliation.

FIU_000734

at the meeting, he was told by Dr. Havas that he was selected for random drug testing. Nehme stated that Dr. Havas had not disclosed to him what was her reason for selecting him for the random drug testing, nor did she disclose the process for taking the test. Nehme stated that since he was already overwhelmed with the stressors of Pediatrics Rotations, he felt embarrassed and worried that everyone knew that he was being drug tested. Nehme added that he went to the Student Health Clinic to take the test. Nehme stated that he received a voicemail on March 4, 2020 from Dr. Havas saying that the results of the drug test were back, and they did not find anything they did not expect. Nehme says that he does not know what she meant by that and that he never received a written confirmation of his results.

## WITNESS STATEMENTS

The witnesses were interviewed regarding the complaint. They were informed of the Regulation, the investigation process, confidentiality, and FIU's prohibition against retaliation.

### Witness 1 -- Maria Santacruz

Maria Santacruz was interviewed remotely on June 10, 2020. Santacruz currently serves as the Testing & Assessment Manager for HWCOM; Santacruz has served in this capacity for five years. However, she has been an employee at HWCOM for 10 years.

With regards to the assessment and testing accommodation process, Santacruz advised that she receives emails from DRC representatives addressing HWCOM student accommodations. According to Santacruz, in either 2018 or 2019, she started a process that consisted of sending information to students confirming that they would receive their testing accommodations.[14] Santacruz further clarified that she sends students email notifications detailing the type of testing accommodation they will receive. Santacruz indicated that after she sends the email to Director of Testing and Evaluation Dr. Rodolfo Bonnin, Associate Dean of Student Services Dr. Nancy Havas, Associate Dean of Curriculum and Medical Education Dr. Vivian Obeso, Assistant Director of Academic Support Services Janel Fernandez and Assistant Director of Support Services Maritere Williams.

Santacruz shared she administers the NBME and Examsoft exams. She shared that her primary function is to administer the High-Stakes testing from the National Board of Medical Examiners (NBME). Santacruz stated that exams on CanvasMed had very small weight on a student's grade and were administered by course coordinators.[15]

Santacruz indicated that she uploads and creates examinations in Examsoft based on the information that the faculty provide to her. Santacruz then creates profiles for all students, including those who require testing accommodations. She added that she communicates with students about their testing accommodations before they sit for a test, and she provides them with instructions on the type of testing accommodation(s) they will be receiving. For example, Santacruz shared that if a student is to receive extra time for testing, they will receive a message

---

[14] Santacruz acknowledged that this type of notification had not been previously communicated to students.

[15] According to Santacruz, course coordinators administer/manage course testing or activities.

FIU_000735

in the Examsoft system advising the student of how much time they will receive. She stated that the process for NBME exams is slightly different because she only creates the profiles, while the professor creates the exams on the NBME website, assigns it to the student, and grades them. Similar to Examsoft, at the start of the exam, students are notified of the extra time they will receive as part of their testing accommodation.

Santacruz stated that she co-manages the work of seven course coordinators who are responsible for periods 1 and 2, Clinical Skills, and Social Sciences (courses that are not basic sciences). She stated that the course coordinators are the test administrators for CanvasMed and also assist as proctors for some examinations. She commented that course coordinators also report to different individuals such as Dr. Jenny Fortun, and some report to Dr. Maria Stevens (Director of Clinical Skills). Santacruz stated that after March 2020, she obtained access to CanvasMed and oversaw testing requirements for HWCOM students using this platform. With regards to accommodations, she (Santacruz) would send coordinators emails reminding them that students who had testing accommodations for extra time should be provided the necessary additional time in the system.

According to Santacruz, a minimal distraction room is a room with no distractions where a student may take an exam. She further clarified that she is not the individual responsible for assigning the student's minimal distraction rooms. Santacruz advised that Maritere Williams or Teresa Reyes Gavilan (Academic Support Services Administrator) assign the distraction rooms for students. Santacruz mentioned that she (Santacruz) has been told that there are new ways of notifying students who are expected to test in a minimal distraction room and that students now receive an email one hour before their exam time; this notification informs students that there will be an activity scheduled for the them and that they (the students) should report to AHC 2 495. Santacruz noted that this is the process for "little quizzes" (e.g., pop quizzes or readiness assignments). Further, considering Santacruz is not responsible for assigning minimal distraction rooms, she stated she is not familiar with the actual testing room locations.

Santacruz commented that, since assessments are being conducted online due to remote learning, students will take CanvasMed tests through Honorlock (where accommodations will be provided) and NBME assessments will be monitored through Zoom.[16]

According to Santacruz, the ADA committee is an ad hoc committee that meets once a month to discuss students with accommodations. She said that the chairperson of the committee is Adrian Jones and the other committee members include Santacruz, Dr. Fortun, Dr. Bonnin, Dr. Obeso, Dr. Havas, Janelle Fernandez and former Dean of Students Dr. Karin Esposito. Santacruz further stated the following:

> This committee is procedure-based and if there are any student issues that come up, we discuss it as a committee. In Fall 2019, the members of the ADA committee decided to create an ADA procedure manual; I helped to create this manual. It was created for the purpose of streamlining and uniformity in the accommodation process. Before then, I followed some procedures, however there was no manual in place; these procedures were instructed by administration. We had a shared drive

---

[16] Honorlock is a proctoring solution that helps protect the academic integrity of assessments created within your Canvas course while offering students the convenience of taking exams at their convenience (within the time frame allotted by the instructor). (https://online.fiu.edu/faculty/resources/technology/honorlock-proctoring.php)

FIU_000736

that had testing accommodations, so what we decided was to put the documents into a manual. The students did not have any tangible guide to help them through the testing accommodations process. The students were told to go to the DRC for assistance.

Santacruz said that she follows the DRC recommendations, and if there are accommodations she does not understand, she requests assistance from Dean Jones. Santacruz further attested:

> My job is to assist with all student requests in an efficient manner. If a student asks me for an accommodation, I will direct them to the DRC for assistance. At the DRC, they would be able to get an official testing accommodation so that (HWCOM) can implement their testing accommodation.

According to Santacruz, if a student says that they are not receiving their time accommodations, there are provisions in place that allow for that student's exam to be stopped as well as manually adding extra time to that exam. For NBME exams, she can communicate with the proctors to stop the test. She shared that if a student did not get an email advising them of their testing accommodation, "we can rapidly assist them on where to go. We do everything that we can to make sure that the accommodations are granted."

Santacruz stated that she did not know much about the pop quizzes/readiness assignments, because she mostly dealt with High-Stakes testing. She indicated her understanding is that the reason why students were not receiving testing accommodations for pop quizzes/readiness assignments was that it would "disrupt the flow" of the class. According to Santacruz, if a student is taking the pop quiz/readiness assignment with their extended time and the class ends before the student finishes their assignment, they will be late to the next class. She shared that this was the situation for exams that made up a "very low" percentage of a student's total grade; she added that some of the quizzes were team-based and "it would have been complicated [to accommodate students] because they did not know who their partner would be and if they would get the extra time."

Santacruz acknowledged that on March 10, 2020, HWCOM began using the term "Readiness Assignments" for coursework that was previously referred to as "in-class quizzes." Santacruz recalled there being a discussion about student concerns regarding them reportedly not receiving testing accommodations for in-class quizzes. She stated that the explanation provided was that since these examinations had little point value to a student's final grade, there would be no testing accommodations. However, she does not recall who specifically made the statement. Santacruz added that, as of April 2020, the professors began providing testing accommodations for pop quizzes/readiness assignments.

Santacruz shared that students have always been given testing accommodations for NBME examinations. She shared that if a student stated they did not receive their testing accommodations for extra time on the NBME exams, she could verify their claim by contacting the NBME administrators. She also stated that the students had been instructed to inform her via a zoom link immediately so that she can stop and restart the exam with the testing accommodations. Santacruz stated that she was not advised by any student about not receiving minimal distraction room accommodations.

According to Santacruz, she was unsure of the process for the High-Stake shelf exams (High Stake) because Maritere Williams handles these during period 3. Santacruz stated that shelf exams are a

FIU_000737

part of the period 3 experience in medical school. Santacruz further stated that period 3 is based on clerkships in Psychiatry, Neurology, Family Practice, Gynecology/Obstetrics, and Pediatrics. She (Santacruz) stated that the NBME and Examsoft both have portions of shelf examinations; both testing portals are monitored/proctored by the period 3 administrator Maritere Williams. She advised that her only responsibility for period 3 testing is to communicate the names of students who have testing accommodations.

According to Santacruz, she provides one-to-one assistance to students with testing accommodations. Santacruz added that there are many medical students with accommodations and sometimes this can make the accommodation process difficult, because there are times in which there are large testing cycles and she is the person responsible for inputting the data for student's testing accommodation.

Santacruz stated that she is familiar with Nehme as a DRC student with testing accommodations. Santacruz noted that she was certain Nehme had received all NBME testing accommodations for period 3. Santacruz mentioned that it is important to state that she recognizes that Nehme did not receive any testing accommodations during periods 1 and 2. Santacruz shared that a testing audit was conducted for Nehme where tests were reviewed one by one; she confirmed that there were some CanvassMed quizzes where Nehme did not receive accommodations, however there where some CanvassMed quizzes he did received his testing accommodation. (**Exhibit 4**) According to Santacruz, she also conducted an audit in the NBME system, proving that Nehme received his requested testing accommodations for NBME examinations. As it relates to Nehme's minimal distraction room assignment, Santacruz commented that this was facilitated by Maritere Williams. Santacruz added that based upon Nehme's class 2 period, she was also sure that Nehme had not received his testing accommodations for in-class pop quizzes/readiness assignments as indicated by the audit.

According to Santacruz, the ADA committee is currently creating an ADA manual to provide a better understanding of the process for students requiring ADA accommodations.

### Witness 2 – Dr. Rodolfo Bonnin

Dr. Rodolfo Bonnin was interviewed remotely on June 10, 2010. Dr. Bonnin serves as the Director of Assessment and Evaluation for HWCOM. Dr. Bonnin has been employed at the university for 11 years.

According to Dr. Bonnin, his responsibilities consist of reviewing performance outcomes for students in the Physician Assistant (PA) program as well as other HWCOM students. Dr. Bonnin stated that he creates summaries, reports, and recommendations, based on the performance outcomes from the PA and HWCOM students, for professors. Dr. Bonnin indicated that the Office of Assessment and Evaluation is responsible for the High-Stakes "third-party" vendors and advised that the third-party testing vendor is the NBME.

Dr. Bonnin stated that the NBME system has some "limitations" in data collection and flexibility; however, they have not had issues with inputting students' testing accommodations. Dr. Bonnin mentioned that it took "three weeks to gain NBME's permission to give tests remotely." He added that NBME's primary concern is the confidentiality of their testing.

FIU_000738

Dr. Bonnin stated he supervises the Testing and Assessment Manager, Maria Santacruz, and her team of course coordinators. Dr. Bonnin stated that Santacruz manages this system "very well" and that it is her responsibility to troubleshoot any student's concerns, including monitoring the student's testing accommodations. According to Dr. Bonnin, Santacruz's primary function is to manage the High-Stakes examinations. Dr. Bonnin added that Santacruz provides proctors, testing accommodations, and technical support to the medical students. Dr. Bonnin described the testing accommodations process as the following:

- Santacruz receives an email from the DRC detailing students' DRC-approved accommodations.
- Santacruz coordinates scheduling and creates the students' profiles on the testing platform.
- Santacruz informs students that she is in receipt of their DRC-approved testing accommodations and relays this information to the course coordinators.[17]
- Santacruz reserves rooms for those students who need testing accommodations.

According to Dr. Bonnin, the problem with students getting their testing accommodations exists within the CanvasMed system. Dr. Bonnin stated that it was not until one year ago that he gained "any knowledge" about the CanvasMed examinations. Dr. Bonnin added that these examinations (pop quizzes/readiness assignments) were solely monitored by the course coordinators, and they were "never alerted that any particular student was not receiving their testing accommodations." Dr. Bonnin stated that this was a part of a systemic problem, in which he "would take some part of the blame." He continued by saying, "I was not aware of this until all the issues came to the forefront sometime last year."[18] According to Dr. Bonnin, Dr. George Dambach (former Associate Dean of Curriculum and Medical Education) was previously the person who supervised the testing accommodation process. Dr. Bonnin stated that Dr. Dambach was the originator of the testing accommodation process, and that it was he (Dambach) who decided to let the course coordinators have that responsibility for accommodations. Dr. Bonnin added that Dr. Dambach retired in 2017, and that Dr. Karin Esposito was his successor, and, as of June 2019, Dr. Obeso serves in that capacity. Dr. Bonnin further mentioned that the testing accommodations have always been a practice.

Dr. Bonnin shared that at one point, when the ADA committee was made up of Dr. Bonnin, Dr. Bob Dollinger, Dr. Heidi von Harscher (Director of Medical Student Support Services), Dr. Yerko Berrocal, Dr. Karin Esposito (Executive Associate Dean of Student Affairs), and Dr. Rebecca Toonkel (Assistant Dean for Curriculum, Clinical Education), the committee decided that "small assignments that did not have much weight would not receive testing accommodations." Additionally, Dr. Bonnin advised that the ADA committee determined that for "anything related to clinical work, students would not receive testing accommodations." Dr. Bonnin added that to his recollection, this was not escalated to the Dean of HWCOM.

---

[17] Dr. Bonnin added that the course coordinators monitor CanvasMed for courses, and it is their (course coordinators') responsibility to set up the testing accommodations with the Information Technology (IT) department.

[18] The issue Dr. Bonnin references is that some students complained about not receiving their testing accommodations.

FIU_000739

Dr. Bonnin recalled that it was not until last year "sometime in October 2019" when students started asking questions about their accommodations. Dr. Bonnin further recalled that while attending an ADA Committee meeting, a committee member brought up a discussion about formulating a plan for students who were not receiving testing accommodations with online, take-home, or essay exams. Dr. Bonnin stated that because of the concerns involving that issue, in October 2019, his team became in charge of all the testing accommodations. Dr. Bonnin stated that Dr. Jenny Fortun provided a list of approved and disapproved testing accommodations. Dr. Bonnin stated that this list did not involve the NBME or Examsoft testing because they are monitored by different departments. Dr. Bonnin advised that, at that time, Santacruz's responsibility was to consider the list and only alert the course coordinators and verify that the students testing accommodations had been inputted into CanvasMed. Dr. Bonnin stated since April 2020, this list is no longer in use because another decision was made by the current ADA committee to give the students all their testing accommodations for all assignments.

Dr. Bonnin stated that it's important to get the context of the Testing accommodation process within the HWCOM. Dr. Bonnin added that the testing accommodation process was originally solely with the DRC, but it was transitioned slowly to the colleges after the DRC became "overwhelmed".

According to Dr. Bonnin, he is "positive" that Nehme was not given testing accommodation for his in-class quizzes or activities. Dr. Bonnin added that, during that time, Nehme was still in his period 1 and 2 years, wherein the college was still following the old practice. Dr. Bonnin stated that he was not sure if Nehme repeating the year or if any of his course failures were a result of Nehme not receiving his testing accommodations. Dr. Bonnin said that Nehme had received his testing accommodations for the High-Stakes examinations. Dr. Bonnin referred the matter of the minimal distraction room for Nehme to Maritere Williams and added that HWCOM has severe space issues. Dr. Bonnin added that his concerns are always for the student, therefore he would never intentionally not give a student their testing accommodation.

### Witness 3 – Maritere Williams

Maritere Williams was interviewed remotely on June 11, 2020. Williams serves as the Associate Director of Academic Support Services for HWCOM. Williams has been employed at the university for 7 years.

According to Williams, her responsibilities are to provide support to period 3 students as well as seven mandatory clerkships. Williams added that clerkships are specialty areas, such as Family Medicine, Internal Medicine, Neurology, Obstetrics and Gynecology, Pediatrics, Psychiatry, Radiology, and Surgery. Williams stated that she orders NBME High-Stakes shelf examinations, assigns the proctors, and sets up the examination room. Williams noted that she contacts Academic Support Services Administrator, Teresa "Terry" Reyes Gavilan, who manages the classroom management system. Williams added that Terry is usually the person that recommends the minimal distraction rooms and advised that this is the practice since there is limited spacing throughout the college. Williams stated that she assigns the proctors for the examination and it typically requires two proctors.

According to Williams, her understanding of the ADA process is that students must submit a request to be reviewed by the testing accommodation department. Williams added that she is not a part of that process; usually, she receives notification by the assessment department, which is led

by Dr. Bonnin and his team. Williams stated that testing accommodations are sent to her in a document that has a list of the student names and the type of accommodation to be provided.

Williams stated she was not sure if accommodating students while in the testing room was considered an accommodation, however sometimes the rooms are too cold, so she will submit a request to lower the temperature. Williams added that one time when she was notified, through a proctor (course coordinator) that a specific student as "very cold," she sent her personal heater to the room to make the student comfortable. Williams stated that these are not necessary accommodations, but she wanted the students to be comfortable. According to Williams, she has never seen an ADA manual, she has never received any training on accommodations, nor has she ever attended any ADA meetings. Williams stated that she is very familiar with the NBME's testing manual. Williams noted that she keeps a log of the students' testing occurrences, which is required by the NBME. Williams added that the log serves to monitor the student presence while taking exams. Williams stated that she understands (her) position and trains everyone that works with her to make sure they know the requirements. Williams added that she has never received a complaint from the students.

According to Williams, the course coordinators do not only proctor examinations, but they manage the content of the students' course work with CanvasMed. Williams stated that the course director advises the course coordinators of the quiz dates, mostly in period 2. Williams noted that her responsibilities are for period 3; for instance, it is her responsibility to make sure that the students attend their clerkships. Williams added that part of the clerkship is the NBME shelf-exam that they take at the end of their clerkship.[19] According to Williams, this means the course coordinator's work objectives are given different values and multiple supervisors to report to. Williams added that OSCE course coordinators report to Dr. Rebecca Toonkel's team, some coordinators report to Dr. Fortun and some coordinators report to her.

Williams shared that the course coordinators have a "dotted line" report to the course directors. Williams stated that a course director is a person that determines the type of testing, and coordinators are responsible for setting up the courses in CanvasMed. Williams added that the clerkships do not have the same kind of course structures; for instance, the Objective Structures Clinical Examinations (OSCE)[20] occur during period 3 in a clinical setting where students demonstrate their clinical skills virtually and are allowed to interview standardized patients. Williams stated that course coordinators also coordinate the clinical setting.

According to Williams, she verified Nehme's Psychiatry shelf exam testing accommodations with the NBME representatives. Williams added that she also confirmed Nehme was given his testing accommodations of extra time for all the NBME High-Stakes examinations and the System Based Practice that is administer by Examsoft. Williams stated that Examsoft is a High-Stake testing

---

[19] A clerkship is a consultation service where hospital visits occur at several sites during the rotation cycle.

[20] OSCE - stands for Objective Structured Clinical Examination. During an OSCE, students go through a series of stations in which they encounter standardized patients who present with a medical problem.

FIU_000741

systems, that she monitors, however the testing documents are upload by the individual program directors.

Williams further stated that Teresita "Terry" issued a minimal distraction room, which was a common room they have used before. Williams recalled getting permission to place Nehme inside AHC 2 room 495 from Terry, since "that was the only conference room available." Williams stated that she never received a complaint from Nehme about the conference room he was placed in. Williams commented that she has used AHC 2 495 before as a minimal distraction room and has never received any complaints.

According to Williams, she described room AHC 2 room 495 as a conference room with mirrored windows; however, to ensure that the building's area remains quiet, she posted a note on the door that indicates that students are testing. Williams described a minimal distraction room as a room without windows and should be away from heavy foot traffic areas.[21] Williams added that HWCOM is limited with room space, and Teresita attempts to match the description as mentioned the University. William stated that AHC 1 335 is also a room for utilized for minimal distraction, she describes this room to have no windows and a conference room. When comparing the two locations Williams stated that the only difference between the rooms where the mirrored windows in AHC 2 495. Williams further stated that when asked for a minimal distraction room she was given what Teresita had available at that time. Williams added that she believes that both locations (AHC 1 335 and AHC 2 495) are rooms that meet the student accommodation needs. Williams stated that she wants the student to be successful.

**Witness 4 – Dr. Jenny Fortun**

Dr. Jenny Fortun was interviewed remotely on June 17, 2020. Fortun serves as the Assistant Dean for Foundational Sciences Curriculum at HWCOM. She also serves as an adjunct professor in the Occupational Therapy program in the Nicole Wertheim College of Nursing and Health Sciences. In addition, Fortun has been a faculty member at the university since 2009, the inaugural year of HWCOM.

According to Fortun, she oversees the first two years of medical school in terms of curriculum, logistics (class assignments), coordination between classes, and scheduling. Fortun stated that period 1 and period 2 is considered preclinical and occurs mostly in the classroom. Fortun further stated that clerkships, which she does not handle, take place during period 3. Fortun defined a period year as being from August to March.

According to Fortun, HWCOM has had many changes in the ADA process. Fortun stated that currently the process starts outside of HWCOM, with the DRC reviewing student accommodation needs. Fortun indicated that the DRC sends HWCOM communications on the specifics pertaining to the students' needs.

Fortun further stated that the ADA accommodation committee is responsible for overseeing the accommodation of all students. She indicated that if the examination is proctored by the Office of Assessment and Evaluation, the committee will send the student accommodations to that department for processing. Fortun mentioned that as of March or April 2020, the Office of

---

[21] Williams clarified that she did not consider the mirrored glasses as windows, nor did she consider the courses scheduled on that day when selecting a room.

FIU_000742

Assessment and Evaluation communicates to students the date and time of their in-class quizzes; she added that the Office of Assessment and Evaluation does not necessarily proctor tests. Fortun clarified that, for a pre-quiz, the student will be notified that they are expected to take the examination before 7:30 p.m.; for a post quiz, the Office of Assessment and Evaluation will schedule the exam after the class and provide proctoring assistance. Fortun commented that for this process to work, the Office of Assessment and Evaluation must manage their testing schedules, and the course coordinators must give feedback. Fortun mentioned that the Office of Assessment and Evaluation had not tested the new process due to the Covid-19 crisis.

According to Fortun, she supervises Natalie Dwarika (Program Manager), who manages course coordinators that are responsible for the daily academics for periods 1 and 2. Fortun stated that every syllabus comes to her office and is reviewed for academic logistics and scheduling purposes; this includes identifying the exams so that the ADA accommodations can be provided for students. Fortuned added that she and Dwarika also coordinate with the Office of Assessment and Evaluation by sharing the dates and times the students with accommodations will be taking their tests.

According to Fortun, she is responsible for the Examsoft products that are administered through the Office of Assessment and Evaluation. Fortun stated that in March of 2020, the course professors administer the post quizzes mentioned earlier; however, the course coordinators make sure that HWCOM has inputted the exam into CanvasMed.

Fortun stated that before March 2020, student testing accommodations were not considered for in-class exams; however, they were always a part of the "bigger" test. Fortun indicated that the bigger test is the NBME and Examsoft portals. Fortun stated that the ADA committee decided that quizzes would not receive ADA testing accommodations because the significant difference is that the quizzes are meant to support specific classroom activities. Fortun indicated that certain quizzes are valued at 1% of the total grade. Fortun added that this why the ADA committee members decided to designate these low weight quizzes as readiness assignments According to Fortun, the students were sent an email advising them about the language change to Readiness Assignments.

Fortun described the academic reasons for readiness assignments is to check a student's understanding of the course topics. Fortun also stated that these readiness assignments had such a low point value and, in some cases was offered fewer times in a course, that she could not imagine that the assignment would significantly affect a student's grade; nevertheless, Fortun added that she was working with the course directors to educate them on how to minimize the number of readiness assignments so that it did not affect the student grade.

According to Fortun, she has never denied any students their ADA accommodations. Fortun added that she has never denied Nehme any accommodations. Fortun stated that she was aware that he was a student that was having some difficulties, only because his name was mentioned during ADA committee meetings. Fortun indicated that she does not believe that the weight of the readiness assignments on the student's total grade harms the students; she added, "at that moment, those were the rules we had." Fortun states that these were the original rules set by the ADA committee when she first arrived at the university. Fortun indicated that she does not know where the rules originated. Fortun believes the ADA committee is familiar with the rules, and now they

FIU_000743

are working on documenting the rule. According to Fortun, MDR accommodations are handle by the Office of Testing and Evaluation and she is not familiar with MDR accommodations

## Witness 5 – Adrian Jones

Dean Adrian Jones was interviewed remotely on June 3, 2020 and July 1, 2020. Jones currently serves as the Interim Executive Dean of Students at HWCOM and has been employed with the university since 2014.

According to Jones, he manages all the operations in the Office of Student Affairs (OSA), Enrollment Management, Financial Aid, Records Management, Student Support Services and Career Services for HWCOM. Jones added he is currently managing the HWCOM Office of Diversity & Inclusion on an interim basis. Jones stated that he has served on the ADA committee since 2015; he advised that before him, Dr. Bob Dollinger served as the inaugural chair of that committee until Dollinger's retirement. Jones advised that Dr. Nancy Havas is the current chairperson for the ADA committee.[22]

Jones advised that the testing process started with Dr. Dollinger, who managed the systems and the ADA process. According to Jones, Dr. Dollinger established an agreement with the DRC from 2008 to 2015 where the DRC agreed to administer the High-Stakes examinations. Jones stated that when the DRC was assisting HWCOM, managing the testing accommodation process was very easy, since the DRC was also in possession of all the High-Stake exams. Jones stated that this process was efficient until the DRC became "overwhelmed." Jones stated that his understanding was that the DRC's resources were getting scarce due to being utilize for both the HWCOM and the College of Law. Jones added that a decision was made by the DRC to return the High-Stakes testing back to the individual colleges. He stated that a decision was made for these responsibilities to be assigned to Dr. Rodolfo Dr. Bonnin in the Office of Assessment and Evaluation.

According to Jones, he established a practice of meeting with students who had accommodations and informed them that their testing accommodations would only apply to High-Stakes testing. According to Jones, when he meets with a student that has requested a testing accommodation, he explains to the students their process for in-class testing and clinical rotations. Jones added that his explanation to the student consisted of educating them on the accommodation process and equating it in a hospital setting. Jones stated that he never received any push back from the students. Jones noted that he feels that it is important to be an advocate for students in his position.

According to Jones, there were numerous meetings with ADA committee, DRC, IDEA and Office of General Counsel (OGC) to discuss the testing accommodation concerns. After a particular meeting, there was a decision that it may be more suitable to change the name of "in-class quizzes" to "readiness assignments." Jones added that everyone approved the readiness assignment title, and an email was sent out to the students, informing them of the change. Jones further mentioned there was still a matter of changing the name from "quizzes" to "readiness assignments" in the CanvasMed learning management system. Jones added that the issue is currently being addressed by their IT department. Jones added that the name change provided a better description of what

---

[22] In a follow up interview, Jones clarified that in the weeks after his initial interview, Dr. Havas had been appointed chair of the ADA committee.

FIU_000744

the Professor was attempting to achieve in the course. Jones contends that it is his belief that course Professors are only trying to "get a feel" of student's knowledge.

According to Jones, in April of 2020, after several discussions and meetings with DRC, IDEA and Office General of Counsel (OGC), a decision was made to reevaluate the testing accommodations. Jones stated that a new testing accommodation process has recently been proposed to the ADA committee; the process includes an ADA manual and a change in the course schedule. Jones expressed that these changes would now allow students to get there testing accommodation in their courses.

According to Jones, Nehme is a respectful young man that "someday will be a great doctor." Jones stated that he has had to meet with Nehme on several occasions to discuss his educational process. Jones added that he was aware of Nehme's recent High-Stakes test failure and the recommendation of dismissal from MSEPC. (**Exhibit 7**) Jones said that Nehme had never mentioned that he had not received any of his testing accommodations. However, Jones further stated that he reviewed Nehme's testing accommodations and agree that Nehme did not receive some of his testing accommodations for in-class quizzes/readiness assignments. Jones stated that Nehme had been given testing accommodations for his High-Stake examinations. Jones contends that because HWCOM has limited room vacancies, it is possible Nehme was placed in a room that was not conducive to a minimal distraction room. Jones added that he does not know what the specification for minimal distraction room are; Jones indicated that if Nehme had mentioned what he was experiencing, he (Jones) would have been able to intervene on his behalf with the MSEPC committee.

According to Jones, Dr. Havas mentioned that she was going to select Nehme for a random drug test because of some behaviors he exhibited during his clinical rotation. Jones added that Dr. Havas was the designee to handle the drug testing area; he did not need to know the reason why students were selected.  Jones stated that Dr. Havas stated there was a report from a Clinical Affiliate (Sarah Stumbar, Assistant Dean for Clinical Education) that indicated that Nehme appeared tired, distracted and not present. According to Jones, Havas explained to Nehme that he was selected for a random drug test. Jones stated that Nehme was upset and felt that Nehme was targeted, and he did not understand why Nehme was chosen.   Jones added that he explained to Nehme that his drug testing was to protect him and the university from potential liability, and that it was not a punishment, but some help for him.

According to Jones, Dr. Havas mentioned that she was going to select Nehme for a random drug test because of some exhibited during his clinical rotation. Jones added that Dr. Havas was the designee to handle the drug testing area; he did not need to know the reason why students were selected. Jones stated that Dr. Havas said there was a report from a Clinical Affiliate (Sarah Dunbar, third-year clinical rotation director); he appeared tired, distracted, and not present. According to Jones, he was presented Havas explained to Nehme that he was taking a drug randomly.

We talk about his behavior, and we told him about the clinical and that he was our student. Jones stated that Nehme was upset and felt that he targeted him; he did not understand why, and he indicated that this was peculiar to why he was chosen.

FIU_000745

Jones added that was to protect him the university and him from potential liability and that it was not punished, but some help him. This would have been a good time to ask Jones the MDR questions I've listed earlier in this report.

### Witness 6 – Dr. Vivian Obeso

Dr. Vivian Obeso was interviewed remotely on June 17, 2020. Dr. Obeso currently serves as the Associate Dean for Curriculum and Medical Education at HWCOM, a position she has held since 2018. In addition, Dr. Obeso previously served as the Medical Director of the Albert and Debbie Tano Simulation Center at FIU HWCOM.

Dr. Obeso indicated that she oversees the entire four-year medical student process through the Office of Medical Education within the Academic Affairs department at HWCOM. Dr. Obeso stated her understanding of the ADA testing accommodations is that the DRC speaks with the students and sends communication to HWCOM OSA for processing of testing accommodations. Dr. Obeso added that the notification is sent across divisions to divisional directors. Dr. Obeso stated that after receiving an ADA notice, OSA takes charge to discuss those accommodations, and they work with the Office of Assessment and Evaluation. Dr. Obeso advised that separate coordination and review is conducted by the ADA committee, which is managed by OSA. She shared that the committee is chaired by Dean Jones and that she (Dr. Obeso) does not serve on that committee.

Dr. Obeso advised that the ADA committee meets to discuss and monitor the needs of the students testing accommodations. Dr. Obeso stated that Dr. Rodolfo Bonnin was the Director of Assessment, and he has since taken over all testing accommodations. Dr. Obeso said that she has never personally denied any student of their accommodations.

According to Dr. Obeso, students have never received accommodations on a readiness assignments, even when they were called "quizzes." Dr. Obeso stated that students did not receive accommodations for these assignments because adding time to these assessments would compromise the activity. She specified that it would be a challenge to implement these accommodations because when one course ends, the next course begins shortly thereafter. She further stated that the quizzes made up a "very small" percentage of the student's grade. She indicated these reasons together influenced the decision to not provide student accommodations for these types of activities.

According to Dr. Obeso, Dr. George Dambach (former Curriculum Dean) and Dr. Karin Esposito (who are no longer at the university) advised her that if testing accommodations compromise the activity of and the sequencing of the course, and if the percentage is lower than 10%, then no testing accommodations would be granted. Dr. Obeso stated that it is her understanding that the testing protocols had been in place since the college's existence, and there has never been this type of testing accommodations for in-class quizzes. Dr. Obeso recalled having a conversation with Dr. Loynaz about concerns raised by a group of students, regarding them reportedly not receiving testing accommodations. Dr. Obeso was unable to provide the specific date and time. However, while further conversing with Dr. Loynaz about the concerns shared by the students, Dr. Obeso stated that Dr. Loynaz advised her that the university's policy is that when a student requests an ADA accommodation, it must be granted. Dr. Obeso recalled Dr. Loynaz stating that quizzes should receive an accommodation. Dr. Obeso stated that Dr. Loynaz advised her to change the

FIU_000746

names of the quizzes to readiness assignments. Obeso stated in January of 2020, the college decided to stop using the word "quiz" for those quizzes that where link to flipped-based classroom activities. According to Dr. Obeso, as of January 2020, exercises that are part of an in-class activity are called "readiness assignments" in all syllabi and in Canvas.

Dr. Obeso stated that she could not recall any written notice, policy, or procedure that indicated that this was the process for these types of accommodations. Dr. Obeso said that Dr. Bonnin had shared with her that previous administrators had conversations about these issues, so she started asking why these testing protocols had not been changed by anyone. According to Dr. Obeso, she started asking the DRC if there was an ADA policy written, and no one could provide her an ADA policy.

According to Dr. Obeso, she works closely with DRC and leans on their administrators for advice. Dr. Obeso added that it is the same with the Office of Assessment and Evaluation; she requires that the employees in OAE provide the students with the best service. Dr. Obeso added that with limited policies on testing accommodation, she believed that their decision to continue with the current standard was the right thing to do. Dr. Obeso stated she decided to provide accommodations for all readiness assignments. She added that her reasoning for this was that, despite the fact that readiness assignments are "very short quizzes," when they are weighted and added up, they may impact a student's grade.

According to Dr. Obeso, she became familiar with Nehme's allegations of not receiving his testing accommodations when Dr. Bonnin addressed an at an ADA committee meeting. Dr. Obeso shared that she was assured by Maria Santacruz that Nehme had received all his testing accommodations for the High-Stake examinations and that his placement in a minimal distraction room was done properly. Dr. Obeso advised that HWCOM has minimal room space and that it takes a lot of planning to reserve a room. Dr. Obeso stated that Nehme would not have received testing accommodation for his in-class readiness assignments because it was not a part of the testing protocols during that time.

## Witness 7 – Dr. Stephen Loynaz

Dr. Stephen Loynaz was interviewed remotely on August 20, 2020. Dr. Loynaz currently serves as the Access Consultant Manager for the DRC. Dr. Loynaz has held the position since 2011. Dr. Loynaz certified Nehme's ADA accommodations on July 28, 2017.

According to Dr. Loynaz, he is responsible for working with HWCOM medical students that may request ADA accommodations. Dr. Loynaz added that he processes the DRC student accommodation requests by reviewing their documentation and sending the request to HWCOM administrators. Dr. Loynaz shared that over the years there has been some concerns with the accommodation process, specifically how to address the testing accommodations. According to Dr. Loynaz, he advised these students that in-class assignments were not as important as the high-stake testing. Dr. Loynaz indicated that his understanding is that, sometime in December of 2019, the matter of testing accommodations was brought to HWCOM's attention by various students. Dr. Loynaz indicated that the students were asking why they did not receive testing

FIU_000747

accommodations. Dr. Loynaz stated that he began to communicate with HWCOM administrators to resolve the concerns of the students.

According to Dr. Loynaz, he was told by previous HWCOM administrators that implementing accommodations for these assessments would fundamentally alter the curriculum schedule and the weight of the assessment was inconsequential to the student's success and therefore they did not merit being accommodated. Furthermore, the DRC were also told that HWCOM administrators did not have the resources to accommodate these assessments such as proctors and space.

Dr. Loynaz stated that Dean Jones sent him an email on December 7, 2015 that says that the college does not have the ability to monitor quizzes and provide accommodations for quizzes, only exams. According to Dr. Loynaz, Dean Jones requested to speak on the phone with Dr. Loynaz after Dr. Loynaz provided some alternatives. Dr. Loynaz added that the outcome of the meeting was that the DRC longer supported the ADA Accommodations for the HWCOM.

Dr. Loynaz indicated that he became aware of Nehme when he processed his accommodation request in July of 2017. (**Exhibit 6**) Dr. Loynaz recalled receiving complaints from students regarding one of Dr. Obeso's courses in Fall 2019; the students alleged that the terminology used in the syllabus (quizzes) was not the same terminology (readiness assignment) used in the course itself. Dr. Loynaz stated that Nehme was not one of the complaining students.

According to Dr. Loynaz, during a roundtable meeting with HWCOM administrators and members from IDEA, the DRC, and OGC, Dr. Bonnin said that the college has never had the resources to accommodate readiness assignments and that this is the reason why the college decided to only provide accommodations for assignments that made up at least 15% of the total grade. Dr. Loynaz further added that the DRC did not coin the term "readiness assignments." He also commented that he believes the decision came from Dr. Obeso who instructed Dr. Bonnin and the Office of Assessment and Evaluation to implement this process. According to Dr. Loynaz, a minimum distraction room offers a less distracting environment, for example, fewer people and fewer windows.   Dr. Loynaz stated in the DRC publishes an accommodation glossary that defines the minimum distraction room as an environment that minimizes distractions for the student.

### Witness 8 – Amanda Niguidula

Amanda Niguidula was interviewed remotely on August 20, 2020. Niguidula currently serves as the Director for Disability Resource Center (DRC). Niguidula position she has held since 2006.

According to Niguidula, she reviewed ADA Accommodation process for HWCOM from the very onset of the college in 2009.  Niguidula, stated that from the years 2009 – 2014, there was pushback from the HWCOM administrators at the time who were hesitant to provide accommodations to students with physical disabilities. Niguidula commented that the reason cited was that it would be a fundamental alteration of the program. She contends that she and Dr. Loynaz continue to receive similar pushback from the current HWCOM Administrators to this day, specifically for students who have testing accommodations. Niguidula shared that the DRC provided assistance to HWCOM with regards to testing accommodations from the college' inception. She added that members from the DRC staff (including Dr. Loynaz) would regularly administer and proctor High

FIU_000748

Stake exams at HWCOM, and that they provide a similar service to the College of Law at the same time. Niguidula commented that the testing accommodation process was transitioned back to the individual colleges sometime in 2014, when it was determined that the DRC would not be able to continue to provide this service to the colleges. She added that the DRC continued to work with Dr. Bonnin and others at the college to develop the best practices for providing testing accommodations. Niguidula stated, when the process was transitioned to the college, there was an increase in the number of complaints from students saying they were not being properly accommodated.

Niguidula recalled that during meetings with HWCOM Administrators in or about 2016, the sentiment expressed by the college was that they would not provide testing accommodations for lower-weight assessments because they had to be done in real time. She further added that the college communicated that students with accommodations would be at a disadvantage if they were provided accommodations on these "15-minute contextual real-world assessments" because it would require pulling them out of class and thereby making them (the students) late for their next class.[23] Niguidula shared that the administrators at the time were of the belief that extending or modifying the times for these contextual learning opportunities would also dilute the experience and purpose of these assessments and thus would hinder the ability to properly evaluate them (the assessment).[24]

Niguidula commented that accommodations provided to students must be documented to ensure that the University can support that such accommodations were in fact provided. She added that there have been instances in the past when HWCOM provided certain accommodations to students that were not documented. Niguidula attests that it is the DRC's position that an appropriate accommodation should be provided for something designated as a quiz, even if it has been renamed to "readiness assignment."

Niguidula stated that the term "readiness assignment" came from Dr. Bonnin. She added that during a roundtable meeting, the HWCOM administrators indicated that any assignment worth less than 15% of the total grade would not be eligible for accommodations. Niguidula commented that HWCOM needs to decide what term and criteria they will be using and be consistent in implementing it so that students have the proper guidance with regards to expecting accommodations.

Niguidula indicated that she was not familiar with Nehme or his case but is aware of similar complaints that have been brought to the attention of the DRC throughout the years by HWCOM students.

---

[23] Niguidula clarified that this mean that students would be late because the classes in the Medical program were scheduled with very brief breaks in between each class.

[24] The terms "contextual real-world assessments" and "contextual learning opportunities" refer to in-class quizzes and Readiness Assignments, as mentioned throughout this report.

FIU_000749

**Witness 9 – Teresa "Terry" Reyes-Gavilan**

Gavilan was interviewed via telephone on August 24, 2020. Gavilan currently serves as the Academic Support Services Administrator for HWCOM and has been employed with the University since 2012.

Gavilan shared that she uses the Wellsky scheduling system to coordinate room reservations, reserve spaces and minimal distraction rooms. According Gavilan, she is a retired Special Education teacher and is familiar with 504 and Individualized Education Program (IEP) plans.[25] Gavilan defined a minimal distraction as a room that must be away from extraneous stimuli and that students must be able to sit an arm's length apart with minimal noise. According to Gavilan, the scheduling system process for minimal distraction rooms entails her receiving a request from the OAE representatives Melissa Largo or Maria Santacruz; she added that she also receives requests from Maritere Williams.

Gavilan stated that she uses six conference rooms in AHC1, AHC2, and AHC4 as options for minimal distractions rooms. She added that she prefers using AHC1 room 335 and AHC2 room 495 for students who need minimal distraction room because they are the most isolated locations and are near office spaces. Gavilan shared that both rooms qualify as minimal distraction rooms because they give students the sense of being in an anonymous environment because other students will not be able to see them.[26] She commented that AHC2 room 495 has its own entrance and is on a floor where there are no classrooms; however, the room does have a frosted window that is visual to the main hallway as well as two doors that are accessible to other conference rooms as OSCE simulation rooms. She said that AHC1 room 335 is in a separate building where there are only offices and a hallway that leads to individual office spaces and two windows that have an external view of the outside.

According to Gavilan, on March 2, 2020, the day Nehme took his shelf examination, there were several meetings in the conference rooms and three OSCI simulation rooms near AHC2 room 495, where Nehme was testing. These meetings had approximately 20 participants each. Gavilan added that no student should have been assigned to take a test in AHC2 room 495 because of the amount of people on that floor. She stated that she normally catches these situations and understands that a student may have felt uncomfortable with the arrangement.

**RESPONDENT STATEMENT - Dr. Nancy Havas**

---

[25] The IEP, Individualized Education Program, is a written document that's developed for each public school child who is eligible for special education.

[26]  Gavilan clarified that an "anonymous environment" is a private setting.

Dr. Nancy Havas was interviewed remotely on June 12, 2020. Dr. Havas serves as the Associate Dean for Student Services for HWCOM and has been employed with the university since 2017; she advised that she is also a medical doctor.

According to Dr. Havas, she oversees the Panther Learning Committee, student activities, and student compliance matters, including the student absence process. Dr. Havas shared that she has also become the person responsible for students who are experiencing hardships, whether they are personal or family-oriented in nature. Dr. Havas stated that sometimes these hardships require that the student take time off from school. Dr. Havas stated that she is a part of the MSEPC committee with Dean Jones, where she assists with promotional committee promotions and any other professional invitations. Dr. Havas stated that she became the chair of the ADA committee in June of 2020; her predecessor was Dean Jones after Dr. Karin Esposito departed from the university.

According to Dr. Havas, she is currently serving as the Chairperson of the ADA committee, and the purpose of the committee is to serve as an oversight of the HWCOM ADA process. The members of the ADA committee are Dean Adrian Jones, Dr. Rodolfo Bonnin, Dr. Jenny Fortun and Maria Santacruz. Dr. Havas stated that committee keeps all members "on the same page" as it relates to the students and their partnership with the DRC.

Dr. Havas further stated that the committee members should have a thorough understanding of the accommodations, how to execute them consistently, and how to address any concerns that arise. Dr. Havas provided the following example:

> For instance, if a student needs to stand up and move around every 15 minutes, this will disrupt the other students; so, we would need to make accommodations for that student to be tested in another location and get extra time. The students can be successful and (the ADA Committee) can be consistent so that we do not undermine the success of other students.

According to Dr. Havas, the more common types of testing accommodations that are provided are extra time and minimal distraction testing rooms. Dr. Havas added that there are additional medical testing accommodations that are provided; this includes allowing students to have medical equipment (such as a glucose monitor) near them, bottles of water, and some situations where students need flexible schedules.

According to Dr. Havas, she worked with Dean Jones, Dr. Bonnin, and Dr. Loynaz to create an ADA manual that specified that if a student needs an accommodation, they should be referred to the DRC. The manual further outlined that the DRC would provide the HWCOM ADA committee with a notice of the student's accommodation need and, if it was an emergency, they would enact the accommodation immediately; otherwise, Dr. Havas indicated they would wait until their next monthly committee meeting. If the ADA committee members had any questions, the committee would contact the DRC for clarification and/or support. However, more recently, due to the nature of some of the student accommodation requests, the committee has invited members of the DRC to several meetings of the ADA committee.

Dr. Havas indicated that the burden is on the student to make sure they can meet professional and technical standards. Dr. Havas further clarified that students must sign an agreement where they consent to meeting the professional standards every year, despite their accommodations. She commented that she has been able to provide some assistance to students who were not cognizant

FIU_000751

of the fact that they needed accommodations; she shared that she has recommended students to the DRC to obtain their testing accommodations.

According to Dr. Havas, she has not taught Nehme as a faculty member; she has only interacted with him in her Associate Dean capacity. Dr. Havas stated she assisted Nehme in preparation for several MSEPC meetings, and approved several of his excused absence requests, and have acted in a role of general support, as with all students. Dr. Havas further stated she addressed several questions Nehme had during his enrollment at HWCOM.

According to Dr. Havas, Nehme has struggled academically from the start; they (the administrators) have referred Nehme to the HWCOM Student Counseling and Wellness Center for counseling and help with the recommendation of accommodations. Dr. Havas continued by stating that Nehme has struggled with his academics and that she is saddened to see Nehme not progress within his medical studies. Dr. Havas reported:

> At first, we tried to give (Nehme) the benefit of the doubt. We thought maybe he had a bad first year, but he never got better in his academics. This is noted by the amount of times he has had to go to MSEPC. We are still hoping that things turn around, but it is quite disappointing.

According to Dr. Havas, Nehme has been to the MSEPC committee on the listed dates:

1. On July 27, 2017 [27] Nehme was allowed to continue with the class of 2020.[28] Dr. Havas stated that Nehme was advised that he would not be allowed to continue in medical school if he had any other course failures.

   According to Dr. Havas, in October of 2017, Nehme experienced some dental issues and in November 2017 he mentioned he was experiencing family issues. Dr. Havas stated that her assistant Tatiana Felix (Assistant Director of Student Support Services) brought to her attention that Nehme had received numerous absences, with a lot of them relating to medical issues. These absences caused Nehme to miss several examinations. Dr. Havas recalled in December 2017 she and Dean Jones met with Nehme to discuss the course absences and his tardiness to HWCOM events and expressed how "problematic" those instances were for him during that semester.

   Dr. Havas further stated that she and, former Executive Dean of Students, Dr. Karen Esposito discussed that referring Nehme to MSEPC was not an effective strategy to address the behaviors. Dr. Havas commented: "Because it seems like it was not appropriate for MSEPC to make a ruling on (his absences), we needed to work with him because the absences were becoming a problem."

2. On January 6, 2018 Nehme failed another course, which resulted in referral to MSEPC. The result of this meeting was that Nehme would be allowed to take a leave of absences (LOA) and repeat period 2.

---

[27] Dr. Havas indicated that Nehme appealed twice: on August 7, 2017 and August 23, 2017.

[28] Nehme's original cohort/period was class of 2019. As such, after the first MSEPC, Nehme could continue with the next cohort/period – the class of 2020.

FIU_000752

3. On March 8, 2018 Dr. Havas was reviewing who would need to go before the MSEPC and Nehme's name came up because he was on a medical LOA effective January 18, 2018, and he had failed the System-Based Practice course. In March 2018, Dr. Havas cited a letter stating that MSPEC was very concerned about his academics and that he will only be allowed to move forward with the class of 2021. Dr. Havas recalled Nehme agreeing to now being a member of class of 2021. Dr. Havas reported that the letter reminded him that if there any additional failures, Nehme would be dismissed from the HWCOM.

According to Dr. Havas throughout 2019 – 2020, Nehme had ongoing issues with absence requests and providing supportive documentation for the absences. (**Exhibit 5**) Dr. Havas stated that she decided that Nehme should submit to a random drug test because he had numerous absences. Dr. Havas added that HWCOM student handbook notifies the student that they can be subject to random drug testing. (**Exhibit 3**) Dr. Havas indicated that there are no specified criteria for drug testing outlines or written anywhere. She added that the decision to drug screen a student is based on the administrators' years of experience in working with and teaching students, the past performance of each individual student, any recent reports of changes in behaviors regarding a student, and general "best practices". Dr. Havas referenced an article from the National Institutes of Health's (NIH) National Library of Medicine (NLM) that speaks about substance use among medical students.[29] She further commented that numerous absences alone would not be sufficient to warrant drug testing; she shared that absences would be considered if they are related to academic difficulty and/or other behaviors that may suggest possible substance use as a complicating factor

Dr. Havas stated that the process described above is the practice that is consistently used with all HWCOM students if they demonstrate performance of concern. She further defined "performance of concern" as some combination of poor academic performance, attendance concerns, behavioral concerns, legal/police involvement, or reports of concern from other students, staff, or faculty.

Dr. Havas stated that she serves as Dr. Esposito's delegate with regards to the administration of drug testing. Dr. Havas said that Dr. Esposito, after consulting with Dr. Havas and other leadership, would decide if a student needed drug testing. Dr. Havas added that Dr. Esposito would regularly delegate Dr. Havas to meet with students and order the drug screening at the Student Health Center (SHC). Dr. Havas shared that she personally orders initial drug testing on rare occasions (by Dr. Havas' own decision without consulting her peers) when she receives a report from another faculty member or student concerning a student who appears to be impaired or who they (the faculty or reporting student) have directly witnessed using drugs.

Dr. Havas indicated that Nehme was the only student scheduled to take a drug test on February 24, 2020. Dr. Havas added that typically only one (1) student is tested on any particular day because of the need to coordinate with Dr. Havas', the student's, and the SHC's availability. She elaborated that the process typically consists of contacting a SHC nurse to schedule for a student to be tested;

---

[29] The article Dr. Havas referenced is "Prevalence, perceptions, and consequences of substance use in medical students" and is available at the following link: https://pubmed.ncbi.nlm.nih.gov/29072119/.

FIU_000753

Dr. Havas plans for a test to be conducted shortly after the test is ordered and she does not want to provide advanced notice to the student. She further indicated that when an appointment is scheduled, she meets with the student to discuss the need for the test and directs them to SHC. She stated that in any given year, approximately three (3) to eight (8) students are tested one or more times randomly throughout the year.

Dr. Havas described the drug testing process as follows:

> Students are tested in the health center and my usual procedure is to meet with them before to advise them that they must take a mandatory drug test, and if they would have any concerns for not passing, they should share them with me.

According to Dr. Havas, she met Nehme prior to him taking his drug testing and advised him that his behavior, attendance, and academic performance often raised concerns within the MSEPC. The concern was, "is this student somehow impaired by substance use?"

> Dr. Havas said "given the years of experience I have in this role, I have learned to counsel students to undergo drug testing prior to appearing before a promotion (MSEPC) hearing  so that when/if the question is raised with the student during the hearing, the student can confidently say that I ordered drug testing 3 days ago for me and it was negative, as expected."

> Dr. Havas further stated "this prevents the mandate for drug testing to be entered into the record of the meeting as an adverse action, and also empowers the student to reveal any issues with substance abuse to me prior to a hearing. The idea is to support the student's wellness and avoid bringing any issues of substance abuse unnecessarily to the MSEPC."

Dr. Havas added that there is no closeout letter for drug testing, and that she usually she informs them of their results via telephone. Dr. Havas said that she does not tend to put drug testing in writing because she would not want to have such a document in a student's file. Dr. Havas said that her role is to advocate for all students and make sure they have great attendance. Dr. Havas stated that she does not have anything against Nehme nor any other student with a disability.

Dr. Havas stated that Nehme was being dismissed because he had been performing poorly and he had failed some courses. Dr. Havas added that Nehme's pending dismissal was a recommendation of the MSEPC and the concerns surrounding the dismissal involved Nehme's continued lack of academic performance. (**Exhibit 7**) Dr. Havas further stated that she did not believe that testing accommodations/readiness assignments where a factor in the reason for Nehme's dismissal.

## ANALYSIS

Under the Americans with Disabilities Act of 1990 (ADA), Florida International University is required to provide reasonable accommodations to ensure equal access to students with documented disabilities as long as the accommodations do not fundamentally alter the integrity of any course or program of study. Under Section 309 of the ADA, any person (including both public and private entities) that offers standardized examinations or high stakes examinations related to applications, licensing, certification, or credentialing for postsecondary education, professional

FIU_000754

(i.e.: law and medicine) or trade purposes must offer such examinations "in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals."

According to the Department of Justice's regulation implementing Title II of the ADA, public entities offering examinations must ensure that their exams do not provide qualified persons with disabilities with aids, benefits, or services that are not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others, and may not administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability. Both the title II and title III regulations also require public and private testing entities to provide modifications and auxiliary aids and services for individuals with disabilities unless the entity can demonstrate an applicable defense.

The University recognizes and supports the standards set forth in Section 504 of the Rehabilitation Act of 1973 and the Americans with Disabilities Act (ADA) of 1990, as amended and similar state laws, which are designed to eliminate discrimination against qualified individuals with disabilities.

To establish a successful claim of disability discrimination under Section 504 of the Rehabilitation Act and the ADA, Nehme must show that: (1) he is a qualified individual within the meaning of the ADA; (2) he was excluded from participation in, or being denied benefits of, services, programs, or activities for which the university is responsible, or is otherwise being discriminated against by the university; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability.

1) **Is Nehme a qualified individual within the meaning of the ADA?**
   Nehme is a qualified individual based upon an evaluation from a qualified professional, Dr. Desmarais from the HWCOM Student Counseling and Wellness Center. The Testing and Assessment Department was sent the documentation from a qualified professional who made an individualized assessment of Nehme that supports the need for the requested testing accommodations. Based on his need for an accommodation and his documented illness, Nehme was designated as a student with a disability by Dr. Desmarais and DRC.

2) **Was Nehme excluded from participation in, or being denied benefits of, services, programs, or activities for which the university is responsible, or is otherwise being discriminated against by the university?**

In reviewing all the information provided, Nehme's testing accommodations for the professional test (i.e.: CanvasMed) were not granted and the use of AHC2 room 495 for the High-Stake Psychiatry shelf examination did not meet the standard for minimal distraction. There is evidence to corroborate his belief that:

   (1) Nehme's placement in AHC 2 495 (a conference room) did not meet the standard for a minimal distraction room identified by the ADA and this impacted his ability to effectively concentrate while taking his High-Stakes Psychiatry shelf exam which violated his disability testing accommodation;

   (2) Nehme did not receive testing accommodations for pop quizzes/readiness assignments.

FIU_000755

- In previous years, the DRC provided their minimal distraction location for HWCOM; however, due to the overwhelming demand, DRC was not able to continue providing that service. As mentioned earlier in the report, Williams and Santacruz advised that selection of a minimal distraction room is based on space availability. Williams also described a minimal distraction room as "free from outside noise and windows," however she advised that placing Nehme in AHC2 495 was based on the room availability. Neither Williams nor Santacruz could provide an answer to support that a minimum distraction room was provided. Gavilia stated that on the Nehme was taking his Shelf Examinations there was a Neurology lecture being held across the hall from the conference, three OSCI stimulation sessions and Clinical Skills sessions all of which was occurring down the hall from the conference.

- In a notice provided to HWCOM administrators responsible for testing and assessment, the DRC states the following:

  The student is tested in an environment which minimizes distractions for the student. Each student has different levels of distractibility and different stimuli which may distract them. Typically, students need an environment which minimizes both auditory and visual distractions. A distraction-reduced environment does not necessitate the student's testing in a private room, nor does it mean that an environment is completely distraction-free.

- Dr. Bonnin, Dr. Havas, Fortun, Dr. Obeso, Dean Jones and Santacruz admitted that the professional testing accommodations were not granted to any student at HWCOM. Fortun stated that there had never been a tangible student testing accommodations policy. Dr. Obeso stated that the professional testing is put in place by the previous administration. Out of concern, Dr. Obeso asked Dr. George Dambach about the testing accommodations for in-class assessments and was advised that, because of the minimal point value, these would not affect the final grade. However, Dr. Obeso shared that, after receiving student concerns, she had a conversation with Dr. Stephen Loynaz who advised her to change the name of the assignment from "quizzes" to "readiness assignment", which the college did. Dr. Obeso added that testing accommodations are important to the success of the students.

3) **Was the exclusion, denial of benefits, or discrimination by reason of his disability?**

Students have a right to reasonable accommodations and faculty have a right to evaluate learning. Reasonable accommodations are not required if they fundamentally alter the nature of the activity in question. The goal of accommodating a "pop quiz/readiness assignments" is to ensure reasonable accommodation and maintain the integrity of the evaluation process, such that the accommodation does not fundamentally alter the evaluation process.

Testing accommodations are changes to the regular testing environment and services that allow students with disabilities to demonstrate their true aptitude or achievement level on standardized exams or other high-stakes tests.

It appears that HWCOM encountered difficulties in providing testing (quizzes/readiness assignments) accommodations as recommended by the DRC for students with disabilities due to

FIU_000756

scheduling conflicts. It is understood that the nature of the testing accommodations needed by the student (i.e., extended time, distraction-reduced setting, etc.), must be granted rather before, during or after class. Obeso indicated that the ADA committee decided that testing accommodations would not be provided for low-weight assignments. This protocol was in place during the time when Nehme was completing coursework at HWCOM. Niguidula, Director of the DRC, attests that it is the DRC's position that an appropriate accommodation should be provided for something designated as a quiz, even if it has been renamed to Readiness Assignment. Based on these statements and the information provided, IDEA believes that there was not a legitimate, nondiscriminatory reason for not providing Nehme and other HWCOM students with testing accommodations for Readiness Assignments.

As it pertains to the minimum distraction rooms, several witnesses attest to the space issues at HWCOM. According to several witnesses, minimum distraction rooms are selected based on room availability. According to Gavilan's statement, the room where Nehme tested on March 2, 2020 for his High-Stake Psychiatry shelf exam did not meet the standards, as communicated by the DRC, for a minimum distraction room because of the presence of heavy foot traffic in the surrounding areas. Nehme also states that the activity in the hallway was distracting for him as he took his exam. Based on this information, IDEA believes that there was not a legitimate, nondiscriminatory reason for scheduling Nehme to test in a room that did not meet the standards of a minimum distraction room.

As it pertains to drug testing, Dr. Havas indicated in her statement that Nehme was selected for random drug testing because of behaviors he had exhibited, attendance issues, and academic performance which resulted in an MSEPC hearing. Dr. Havas further commented that her decision to schedule Nehme for a drug test was to ensure that if asked at the MSEPC hearing, Nehme could confirm that substance use was not a factor in his change in behavior and academic performance. Because the HWCOM Student Handbook indicates that "additional testing may be required by HWCOM or its clinical affiliates at any time", IDEA believes that there was a legitimate, nondiscriminatory reason for Nehme's random drug testing.

**Drug Testing**

As it pertains to Nehme's claim that he was wrongfully drug tested, IDEA has determined that Dr. Havas's decision to require Nehme to perform a drug test was in compliance with HWCOM's random drug testing policy as outlined in the HWCOM Student Handbook. (**Exhibit 3**) There is insufficient evidence to determine that Nehme was singled out or treated differently based on disability.

**FINDING**

In consideration of all the evidence in this case, it is determined that the "preponderance of the evidence" does not support Nehme's allegations against Dr. Havas. Based on the totality of the circumstances of this investigation, there is insufficient evidence to support a violation of FIU-106 as it pertains to discrimination based on disability. Therefore, the allegations against Dr. Havas are UNSUBSTANTIATED.

**ADDITIONAL FINDINGS**

FIU_000757

Based on the totality of the circumstances of this investigation, there is sufficient evidence to support a violation of FIU-106 as it pertains to discrimination based on disability against the HWCOM.

1) Lack of Accommodations for Readiness Assignments – Substantiated
2) Providing Non-Compliant Minimal Distraction Rooms – Substantiated
3) Violating Random Drug Testing Protocol – Unsubstantiated

**Additional Information:**

In examining the information in its totality, it would be difficult for one to argue the following points of contention:

- The history of denying students testing accommodations in quizzes, flipped-chart assignments, and classroom activities dates back to the inception of HWCOM in 2009.

- HWCOM administrators acknowledged that the college provided testing accommodations for students on an inconsistent basis.

- There were many meetings to address testing accommodation concerns, with no resolution achieved.

- The information suggests the HWCOM administrators' complicity and awareness of the testing accommodations process.

- Although HWCOM's intentions may not have been malicious in nature, it violated the student's rights. HWCOM has addressed this matter by communicating to students that Readiness Assignments are now receiving testing accommodations and a process for accommodations has been outlined by the college. (**Exhibit 8**)

## RETALIATON

There is to be no retaliation against any person who has filed a complaint of discrimination or who provides information to the Office of Inclusion, Diversity, Equity, and Access (IDEA) to aid in the investigation of a complaint. Any attempt to penalize a student, employee, or agent for initiating a complaint or cooperating with the investigation through any form of retaliation, shall be treated as a separate allegation of discrimination.

## APPEAL

Either party (Complainant and/or Respondent) may seek review of the findings by filing an appeal with the Vice President of Human Resources, El pagnier K. Hudson, within seven (7) business days of receipt of these findings. The request shall specify the basis for the appeal, and shall be based on one or more of the following:

i.   Related evidence that was not reviewed.
ii.  New evidence is available.
iii. The factual evidence was insufficient to support the findings.

FIU_000758

The request shall be written and shall set forth the issues to be considered in the appeal. Copies of the appeal shall be provided to the Director of Inclusion, Diversity, Equity and Access.

Shirlyon J. McWhorter
Director & Title IX Coordinator
Inclusion, Diversity, Equity, and Access (IDEA)

FIU_000759