# EXHIBIT D

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2               SOUTHERN DISTRICT OF FLORIDA

 3              CASE NO. 1:20-CV-24649-CANNON

 4

 5    ELIE NEHME,

 6         Plaintiff,

 7    vs.

 8    FLORIDA INTERNATIONAL UNIVERSITY
      BOARD OF TRUSTEES,
 9
           Defendant.
10    _____

11
      LOCATION:              Remote Audio-Video
12                           Communication
                             Pursuant to Supreme Court of
13                           Florida
                             Administrative Order No.
14                           SCAO21-17

15

16    DATE:                  January 13, 2022

17    TIME:                  2:00 PM ET to 5:40 PM ET

18

19

20              DEPOSITION OF INNAH LACHICA

21         Taken before Leila Harris, LCR, Stenographic

22    Court Reporter, Notary Public State of Florida,

23    pursuant to Notice of Taking Deposition in the

24    above-styled cause.

25
```



```
 1        A.    I -- I don't know.  She just approves
 2   of it, but she doesn't necessarily is the one
 3   that, you know, decides that which room we're
 4   going to -- like, we have to send in a request to
 5   her, and she approves it if it is available.
 6        Q.    What person had the responsibility to
 7   ensure that the students who were taking the exams
 8   who needed special accommodations got those
 9   special accommodations?
10        A.    I believe it's Maritere.  She's the one
11   that coordinates the rooms that -- whenever we
12   have shelf exams.
13        Q.    It wasn't your responsibility?
14        A.    No.
15        Q.    How about if you were in a situation as
16   a proctor where you realized that the room wasn't
17   minimal distraction, did you have any
18   responsibility in that regard to stop the exam
19   or -- or alert somebody to the fact that this was
20   not a minimal distraction room?
21             MS. WYDLER:  Objection.  Form.
22   BY MR. HANNAH:
23        Q.    You can answer.
24        A.    Yes.  I do.  Whenever we have shelf
25   exams, we're always in communication with Mary to
```



```
 1   let her know if anything is going on.
 2        Q.    So if you went to a room, the person
 3   needed to be in a minimal distraction room and
 4   there were a lot of distractions, it would've been
 5   your responsibility to alert Maritere Williams to
 6   that fact?
 7        A.    Yes.
 8             MS. WYDLER:  Objection.  Form.
 9   BY MR. HANNAH:
10        Q.    Was that a yes, your answer?
11             MS. WYDLER:  Form.
12   BY MR. HANNAH:
13        Q.    You can answer.
14        A.    Yes.
15        Q.    Did anyone tell you you had to do that
16   or were you trained in that regard?
17        A.    Mary just tell us to let her know if
18   anything is going on, that if ever we need help or
19   any assistance with anything.
20        Q.    What was your understanding of what
21   Ms. Williams if you alerted her to some issues
22   involving the condition of accommodations during
23   an exam?
24        A.    She usually --
25             MS. WYDLER:  Objection.  Form.
```



```
 1   minimum distraction room in your understanding of
 2   what that was?
 3        A.    It's closed in enough that we won't
 4   hear anything from the inside.
 5        Q.    So you couldn't hear any noise from the
 6   outside on the inside of that room?
 7        A.    I mean, you can, but not if -- if --
 8   not like the other ones.
 9        Q.    Did that room have windows?
10        A.    It did, yes.
11        Q.    Could you see through those windows?
12        A.    One of the walls is a -- it's like a
13   glass wall with translucent, I guess, like,
14   squares so you can kind of see through it, but
15   not -- not clearly.
16        Q.    Can you see shadows of people walking
17   down the hallway outside?
18        A.    Yes, you can.
19        Q.    Can you see people walking by, at least
20   the shadows?
21        A.    Yes.
22        Q.    Could you hear people walking by and
23   talking?
24             MS. WYDLER:  Form.
25        A.    When they're -- when they're --
```



```
1   BY MR. HANNAH:

2        Q.    If they -- if they were talking,

3   would -- could you hear it inside?

4              MS. WYDLER:   Form.

5        A.    When they're talking loudly, yes.

6   BY MR. HANNAH:

7        Q.    Were there actually gaps around the

8   windows too that you could see out actually into

9   the hallway?

10       A.    Uh-huh, yes.

11       Q.    And was it close to offices and other

12  conference rooms, that particular conference room?

13       A.    It was -- it was sort in front of a --

14  of another conference -- a bigger conference room.

15  And then, right next to it is two offices, and

16  then a cubicle area.  And then, on the other side

17  are more offices.

18       Q.    Did you ever tell anyone that -- that,

19  with regard to that particular day, that no one

20  told you that the room needed to be a quiet room

21  or a minimum distraction room?  Did you ever say

22  that to anybody?

23       A.    Can you rephrase it?

24       Q.    Did you ever tell anybody that that

25  particular day March 2nd, 2020, when Mr. Nehme
```



```
1     took the psychiatric shelf examination, the
2     retake, that you were not told that the room
3     needed to be a quiet room or a minimum distraction
4     room?
5          A.    I'm sorry.  I -- I'm --
6          Q.    Did you ever make that statement to
7     somebody that you were unaware, that you were not
8     told that the room needed to be a quiet room or a
9     minimum distraction room?
10         A.    I mean, no, no one told me that it had
11    to be minimum distraction.  It was kind of assumed
12    that it had to be.
13         Q.    So you knew it had to be, right?
14         A.    (Moving head back and forth.)
15         Q.    Yes?
16         A.    Yes.
17         Q.    You said there was a sign-in sheet for
18    the exam that day for Mr. Nehme to sign, correct?
19         A.    Yes.
20         Q.    I'm going to show you a document that
21    we're going to have marked as Plaintiff's Exhibit
22    Number 1.
23               (Exhibit 1 was marked for
24         identification)
25
```



```
 1   BY MR. HANNAH:
 2        Q.     If we take a look at the screen, do you
 3   see that document?
 4        A.     I do, yes.
 5        Q.     It appears to be a sign-in sheet with
 6   you --
 7        A.     Yes.
 8        Q.     -- as proctor for March 2nd, 2020 for
 9   Mr. Nehme taking the exam for the psychiatry
10   clerkship, correct?
11        A.     Yes.
12        Q.     Do you recall this was the sign-in
13   sheet that you were given and you had to have
14   Mr. Nehme sign, right?
15        A.     Yes.
16        Q.     And he did sign it, correct?
17        A.     Yes.
18        Q.     This is something you're always given
19   before every exam you proctor, right?  A sign-in
20   sheet for all the students who are going to be
21   taking exams, correct?
22        A.     Yes, that's correct.
23        Q.     And was there also a special sheet that
24   had to be filled out any time a student took a
25   break, bathroom break?
```

72

```
1        A.      Yes.

2        Q.      They had to indicate when they're

3   leaving and when they're coming in?

4        A.      Yes, that's correct.

5        Q.      Would they -- would they have to fill

6   it out, or would you fill it out?

7        A.      It depends.  Usually, I fill it out.

8   Sometimes, the student does.  In the regular exam,

9   we -- we do it for the students so it doesn't take

10  them any more time than it has to.  And the same

11  for --

12       Q.      That's called -- I'm sorry.  Go ahead.

13       A.      And the same for special

14  accommodations.  We do it for them so they don't

15  have to.

16       Q.      Now, that would be what's called a

17  Shelf Exam and Activity Log?

18       A.      Yes.

19       Q.      Take a look at that.

20               See the document -- do you recognize

21  that document on the screen?

22       A.      Yes.

23       Q.      That's for the date in particular of

24  the psychiatry exam retake by Mr. Nehme, that

25  would be the activity log that was completed,
```

1  correct?

2       A.    Yes, that's correct.

3            MR. HANNAH:   This would be Plaintiff's

4       Exhibit Number 2.

5            (Exhibit 2 was marked for

6  identification)

7  BY MR. HANNAH:

8       Q.    And information that's contained on

9  here, it shows like three breaks; is that correct?

10      A.    Uh-huh.   Yes.

11      Q.    Like a one-minute break, then a

12  three-minute break, and then, like, a no-time

13  break.

14      A.    Yes.

15      Q.    Those are all bathroom breaks?

16      A.    I don't remember.

17      Q.    Do you remember -- is this something

18  you filled out?

19      A.    Yes.

20      Q.    So you would have filled out that --

21  first restroom break was 9:43 a.m., and you came

22  back at 9:44 a.m.?

23      A.    Yes.

24      Q.    So it was a one-minute bathroom break?

25  Was the bathroom right outside the door or



```
1   something?  Or where was the bathroom?

2        A.    It's -- it's sort of close.  Maybe less

3   than 30 feet away.

4        Q.    Just one minute to take a bathroom

5   break?  Is that a bathroom break or some other

6   kind of break?

7        A.    Some --

8              MS. WYDLER:  Objection.  Form.

9              You can answer.

10  BY MR. HANNAH:

11       Q.    You can answer.

12       A.    It depends.  Some students take a break

13  just to drink some water, and then we -- it

14  doesn't usually take that much time.

15       Q.    Do you remember what this break was

16  for, the first one?

17       A.    I don't remember.

18       Q.    Do you remember accompanying Mr. Nehme

19  on any break at all during that day, bathroom

20  break or otherwise?

21       A.    Yes.

22       Q.    How many times did you accompany him?

23       A.    It would have to be three.

24       Q.    So do you recall specifically three

25  incidents, or are you saying has to be three
```



```
 1   because there's three entries on this log?
 2        A.    Yeah.  I'm saying three because of the
 3   log.
 4        Q.    Even the last one was a bathroom break?
 5        A.    That one, I'm not sure.  Could have
 6   been a water break.
 7        Q.    When you say "water break," you just --
 8   at the seat, the student's allowed to drink some
 9   water for however long it takes?
10        A.    Yes.
11        Q.    Why would you have to log a water
12   break?  Why would you have to log that?
13        A.    Because if they have to get out of the
14   room, we still have to put it in.
15        Q.    Do you recall -- specifically, as we
16   sit here today, you recall accompanying Mr. Nehme
17   on three occasions that day of the exam.
18        A.    Yes.
19        Q.    And were they always outside the room,
20   or were they within the room?  Or what did you
21   accompany him to?
22        A.    It would be outside the conference
23   room.
24        Q.    Where did you go?
25        A.    Well, I remember letting him leave his
```



```
 1   water bottle just outside the testing room so he

 2   can easily access the -- the water bottle.  And

 3   then I must have been on of the breaks he did have

 4   to go outside the hallway to the elevators where

 5   the restrooms are.

 6        Q.    Did you -- do you recall if all three

 7   of these were bathroom breaks or two of them were

 8   water breaks and one was a bathroom break?  Do you

 9   have any recollection about that?

10        A.    Not that I can confidently say.  I

11   don't know if it's just -- I'm -- I'm assuming

12   that the 12:14 to 12:14 is just a water break.

13        Q.    Did you have any discussions with

14   Mr. Nehme at any of those breaks?  Do you recall

15   any?

16        A.    I don't remember.

17        Q.    Do you have any recollection of any

18   discussions with Mr. Nehme during the taking of

19   the exam?

20        A.    Just the temperature of the room.

21        Q.    What about the temperature did you

22   discuss?

23        A.    That it was too cold in the room.

24        Q.    And when was that discussion held?

25   During what point in the exam?
```



```
 1          A.     I don't remember.

 2          Q.     Was the room very cold?

 3          A.     It was, yeah.

 4          Q.     Cold for you too, right?

 5          A.     Yes.

 6          Q.     And was obviously cold for Mr. Nehme

 7    because he mentioned it to you, right?

 8          A.     Yes.

 9          Q.     Okay.  And that particular room,

10    AHC 2-495, were you aware it had some type of

11    history of always being a very cold room?

12          A.     Yes.

13          Q.     How did you know that?

14          A.     We've had meetings there before.  I've

15    proctored there before.  And all the other times

16    that we've -- we've had to stay in that room, that

17    has always been kind of one of the issues that it

18    had.

19          Q.     Did you notice any adverse effects on

20    the environment in that room on Mr. Nehme during

21    the exam?

22                 MS. WYDLER:  Form.

23          A.     I guess, like, when he would do this or

24    try to warm himself and...

25
```

```
1    BY MR. HANNAH:
2         Q.    Did he do that?
3         A.    Not that I can recall.
4         Q.    You said when he -- when he did that,
5    it makes it sound like you did recall that.
6               So you don't recall him doing anything
7    physical to try to stay warm?
8         A.    No.
9         Q.    You ever see him closing his eyes
10   during the exam?
11        A.    Yes.
12        Q.    Okay.  And how often would -- would he
13   do that?
14        A.    He would do it frequently.  I'm
15   assuming it's him taking a break from the exam.
16        Q.    He would do it frequently?
17        A.    Yes.
18        Q.    And what did you think was happening
19   when he was closing his eyes?
20        A.    Maybe taking a break from reading.
21        Q.    Could it be that he was distracted?
22              MS. WYDLER:  Objection.  Form.
23        A.    No.
24   BY MR. HANNAH:
25        Q.    Do you know if he was being distracted
```



```
 1   by anything?

 2        A.    No.

 3        Q.    Obviously, he was concerned about the

 4   cold, right?

 5             MS. WYDLER:  Form.

 6        A.    Yes.

 7   BY MR. HANNAH:

 8        Q.    Okay.  And were you concerned about

 9   creating distractions for Mr. Nehme?

10        A.    Yes.

11        Q.    What way?

12        A.    If I was making any noises or shuffling

13   too much.

14        Q.    Well, your only concerns about

15   distracting him, making noises and shuffling too

16   much?

17        A.    Yes.

18        Q.    Nothing else you can recall?

19        A.    No.

20        Q.    Okay.  And did you notify anyone about

21   the temperature in the room being too cold?

22        A.    Yes.

23        Q.    Who?

24        A.    Ms. Maritere Williams.

25        Q.    And how did you notify her?
```



```
1          A.     I texted her.
2          Q.     You sent her a text message on your
3   phone?
4          A.     Through the -- the chat that we have
5   on -- on our computer.
6          Q.     And how long into the exam did you
7   first notify her about temperature being an issue
8   in the room?
9          A.     About maybe halfway through the exam.
10         Q.     What time did the exam start?
11         A.     8:00 a.m. or --
12         Q.     8:30?
13         A.     8:00 a.m. or 8:30.  I don't remember.
14         Q.     And what time -- around what time did
15  you notify Ms. Williams about the room being too
16  cold or Mr. Nehme being too cold in the room?
17         A.     I don't remember.
18         Q.     Let me show you this -- this e-mail
19  dated March 2nd, 2020, 10:47 a.m.  Appears to
20  memorialize a conversation you had with Innah --
21  with -- sorry, with Maritere Williams?  You see
22  that?
23         A.     Yes.
24         Q.     So again, how did you communicate this
25  to Ms. Williams?
```

```
 1                      (Simultaneous Speakers.)

 2          A.      It was --

 3   BY MR. HANNAH:

 4          Q.      Like a chat?

 5          A.      Yeah, chat.  Yeah, instant messaging.

 6          Q.      Okay.  And how does it get onto an

 7   e-mail?

 8          A.      She might have copied and pasted it.

 9   There's a -- we -- we kind of have a -- an archive

10   of the conversation, so we can easily go back and

11   check previous conversations, copy and paste it

12   in.  And --

13          Q.      And you did -- you did this?  Looks

14   like you're the author of the e-mail, so did you

15   do this?

16          A.      It looks like it's from me, yes, sir.

17          Q.      You did it the same day?  At 10:47, you

18   chose to memorialize that message?

19          A.      No.  I don't -- I don't know if you're

20   able to do it from the actual messaging, in the

21   actual IM.

22          Q.      It looks like --

23          A.      I don't recall.

24          Q.      -- about a minute after you had a --

25   about a minute after you had the conversation with
```

```
 1   her, you created this e-mail.
 2        A.    I don't --
 3        Q.    You sent it to her and to yourself,
 4   right?
 5        A.    I don't recall sending that.
 6        Q.    Why would you have memorialized the
 7   conversation that day between you and
 8   Ms. Williams?
 9        A.    I really don't recall sending that.
10        Q.    Okay.  This an accurate reflection of
11   your discussion with -- with Ms. Williams that day
12   about the -- getting a -- addressing Mr. Nehme's
13   being very cold?
14        A.    It looks like, yeah.
15        Q.    So this is not you who created this
16   e-mail?
17        A.    I'm -- I'm talking about the instant
18   messaging.  It -- it looks like that is something
19   that I would send her.  But the information at the
20   top, that -- that one, I can't really remember if
21   I was the one who sent that or how -- how it
22   was -- I would -- like, why would -- I would do
23   that.
24        Q.    Looks like you did that, though, right,
25   from what I'm showing you?
```

```
 1              MR. HANNAH:   This will be marked
 2       Plaintiff Exhibit Number 3, by the way.
 3              (Exhibit 3 was marked for
 4    identification)
 5  BY MR. HANNAH:
 6       Q.    Looks like you created this e-mail,
 7    right?
 8       A.    Yes.
 9       Q.    Sending it to yourself for some reason
10    and to Maritere Williams, right?
11       A.    Yes.
12       Q.    Why -- why would you send it to
13    yourself?
14       A.    I really don't remember sending it
15    to -- to myself.  I don't see the purpose of me
16    sending that to myself.
17       Q.    Do you deny that you created this
18    e-mail?
19       A.    I'm not denying it, but I don't
20    remember -- remember it.
21       Q.    Okay.  You can't think of any reason
22    why you would memorialize this message
23    conversation that you had with Maritere Williams,
24    correct?
25       A.    No.
```



```
 1        Q.     Okay.   Let's take a look at the actual

 2   back and forth in the message that's contained

 3   here.   The conversation with Innah Lachica,

 4   indicates you saying at 10:41 a.m., Hi, Mary.

 5               See that?

 6        A.     Yes.

 7        Q.     All right.   And going through the

 8   conversation back and forth, do you recall this as

 9   being the actual instant message conversation you

10   had with Maritere Williams that day?

11        A.     I mean, it looks like it's something

12   that I would write, yeah.

13        Q.     All right.   Says, Hi, Mary.   And then

14   the next minute, continued by saying, The student

15   retaking the shelf is wondering if we can provide

16   him with a heater since the room is freezing cold.

17               See that?

18        A.     Yes.

19        Q.     You told Ms. Williams that?

20        A.     Yes.

21        Q.     And was the room freezing cold as you

22   say here?

23        A.     I mean, it -- it was cold, yes.

24        Q.     Freezing cold, that's your words,

25   right?
```



```
1           A.      Yes.

2           Q.      You felt that too, correct?

3           A.      Yes.

4           Q.      Consider that a distraction that the

5      room was freezing cold?

6                   MS. WYDLER:  Objection.  Form.

7      BY MR. HANNAH:

8           Q.      You can answer.

9           A.      Yes.

10          Q.      Do you believe it was a distraction for

11     Mr. Nehme that day because he actually told you

12     about it?

13          A.      Yes.

14          Q.      Did Mr. Nehme ask you for a heater?  Or

15     is that --

16          A.      Yes --

17          Q.      -- something you on your own asked for?

18          A.      I mean...

19                  I -- I don't remember.

20          Q.      All right.  Did Ms. Williams actually

21     provide a heater that day to the room?

22          A.      Yes, she did.

23          Q.      When did that heater arrive?

24          A.      Moments after we had that conversation.

25          Q.      How did it come to the room?  Somebody
```



```
1   come in and set up, open the door and all that?
2        A.    I had to open the door and take it from
3   her.
4        Q.    Okay.  Did you have to get up from
5   the -- from your able, the conference room table
6   to do that?
7        A.    Yes.  I had to stand up and walk
8   towards the door, take it from her.
9        Q.    And did you have to set it up after you
10  took it from her?
11       A.    Yes.
12       Q.    Where did you put it when you set it
13  up?
14       A.    By Mr. Nehme.
15       Q.    Okay.  Did it make a lot of noise, that
16  process?
17             MS. WYDLER:  Form.
18  BY MR. HANNAH:
19       Q.    Do you recall?
20       A.    I don't remember.
21       Q.    Do you know if that was disruptive to
22  him at all in any way, you getting up and moving
23  and getting a heater, a space heater and bringing
24  it in and setting it up next to him?
25             MS. WYDLER:  Objection.  Form.
```



Jeannie Reporting
Your Wish Is Our Job!
305-577-1705

```
1   BY MR. HANNAH:
2        Q.    You can answer.
3        A.    I would say yes.
4        Q.    Okay.  Do you know if Mr. Nehme was
5   distracted by that whole process of bringing in a
6   heater?
7             MS. WYDLER:  Objection.  Form.
8   BY MR. HANNAH:
9        Q.    You can answer.
10       A.    I don't know if he was distracted.
11       Q.    Could've been a distraction for him,
12  right?
13       A.    Could have been, yes.
14       Q.    In fact, you were concerned that
15  getting up and moving things around, your papers
16  around could be a distraction for him, right?
17       A.    Yes.
18       Q.    Do you know if that's a minimal
19  distraction or it could've been a major
20  distraction for him?
21             MS. WYDLER:  Objection.  Form.
22  BY MR. HANNAH:
23       Q.    You can answer.
24       A.    Minimal.
25       Q.    Were there any other distractions going
```



Jeannie Reporting
Your Wish Is Our Job!
305-577-1705

```
 1   on in that room during the exam besides room being
 2   freezing cold and besides the distraction of you
 3   getting up and from your desk -- from the table
 4   and getting the space heater and setting it up
 5   next to Mr. Nehme?  Were you aware of any other
 6   distractions that were going on during the exam?
 7        A.    Yes.
 8              MS. WYDLER:  Objection.  Form.
 9   BY MR. HANNAH:
10        Q.    You can answer.
11        A.    Yes.
12        Q.    Were there a lot of distractions going
13   on during the exam?
14              MS. WYDLER:  Objection.  Form.
15        A.    Not a lot.
16   BY MR. HANNAH:
17        Q.    Small distractions only?
18        A.    I'm sorry?
19              MS. WYDLER:  Form.
20   BY MR. HANNAH:
21        Q.    There were only small distractions?
22              MS. WYDLER:  Objection.  Form.
23   BY MR. HANNAH:
24        Q.    You can answer.
25        A.    Yes.
```



```
1           Q.      What were those distractions?
2           A.      There were people walking by the room
3   the day of the exam.
4           Q.      You could see them?
5           A.      Yes, I can see them.
6           Q.      You could see their forms or their
7   shapes going by the window?
8           A.      Yes.
9           Q.      Okay.  Did that happen often during the
10  exam?
11          A.      It happened a couple of times?
12          Q.      Just two times?  Or was it constant?
13          A.      No, it wasn't --
14                  MS. WYDLER:  Objection.  Form.
15                  Answer -- you can answer.
16          A.      It wasn't constant.
17  BY MR. HANNAH:
18          Q.      Just two times?
19          A.      More than two.
20          Q.      Were you aware that there was a
21  standardized clinical -- observed standardized
22  clinical exam going on in the next room outside
23  where Mr. Nehme was taking the exam?
24          A.      On that day, no.
25          Q.      Yeah.  Were you aware?
```

```
 1        A.     I'm sorry?
 2        Q.     Were you aware of that, that it was
 3   going on?
 4        A.     No.
 5        Q.     Were you able to hear noises outside of
 6   the room throughout the examination?
 7               MS. WYDLER:  Form.
 8        A.     Yes.
 9   BY MR. HANNAH:
10        Q.     So not just two times.  It happened
11   throughout the examination, right?
12               MS. WYDLER:  Objection.  Form.
13        A.     It wasn't throughout.  It was --
14   BY MR. HANNAH:
15        Q.     Never use -- you never said --
16               MS. WYDLER:  Let her finish -- please
17          let her finish answering the question.
18   BY MR. HANNAH:
19        Q.     Go ahead, Innah.  Sorry.
20               THE REPORTER:  And I hate to interrupt,
21          but there is a lot of overlap between
22          questions, answers, and objections.  And
23          specifically, because we're on Zoom, it cuts
24          you guys out when you do that, and I -- I
25          don't -- I'm missing a word here and a word
```



Jeannie Reporting
Your Wish Is Our Job!
305-577-1705

1    there.

2      MR. HANNAH:  All right.  I'll try to --

3    I'll try to make sure she answers the

4    question totally.

5 BY MR. HANNAH:

6    Q.  Apologize if I interrupted you.

7     So my question is, did you ever tell

8 anyone that there was noises going on outside the

9 room where the exam was being taken throughout the

10 exam?

11    A.  Not throughout.

12    Q.  Were you concerned about telling people

13 to be quiet, getting up and -- from your table or

14 where you were sitting during the exam, getting up

15 and telling people outside to be quiet?  Were you

16 concerned about doing that, causing further

17 distractions?

18    A.  Yes.

19    Q.  Did you ever get up from your able to

20 tell people to be quiet outside?

21    A.  No, I did not.

22    Q.  You just allowed them to be noisy

23 outside the room, correct?

24      MS. WYDLER:  Objection.  Form.

25

```
1    BY MR. HANNAH:
2         Q.    You can answer.
3         A.    Yes.
4         Q.    And you had a sign, though, on the
5    door, right, where Mr. Nehme was taking the exam
6    for people to be quiet because an exam was in
7    session, correct?
8         A.    Yes.
9         Q.    And people ignored that sign?
10        A.    Yes.
11        Q.    And why did you -- again, why did you
12   not get up to tell people to be quiet outside when
13   they were moving around and talking?
14             MS. WYDLER:   Objection.   Form.
15   BY MR. HANNAH:
16        Q.    You can answer.
17        A.    Since I was the only proctor in the
18   room, I felt like I need -- needed to prioritize
19   being inside the room rather than stepping out.
20        Q.    Did you tell anyone that -- with regard
21   to the conditions in the room being too cold --
22   anyone other than Maritere Williams about the
23   conditions of the room being too cold?
24        A.    No.
25        Q.    You didn't tell Michele Montero about
```



```
 1   it?
 2        A.    No.
 3        Q.    Did you anyone that you told Michele
 4   Montero about that --
 5        A.    No.
 6        Q.    -- situation with the room being too
 7   cold?
 8        A.    No.
 9        Q.    Was Michele Montero your supervisor at
10   the time?
11        A.    No, she was not.
12        Q.    Who was Michele Montero?
13        A.    She's my -- she became my supervisor
14   when I became the program coordinator.
15        Q.    Was she part of the program or one of
16   your superiors at that time of the exam,
17   March 2nd, 2020?
18        A.    No.
19        Q.    Who delivered the heater to -- to the
20   room?
21        A.    Ms. Maritere Williams.
22        Q.    Did you ever tell anyone at this room,
23   ACH 2-495 (sic), was not the preferred room for
24   accommodations because of its location near a
25   large conference room, accessibility to the stairs
```



1    and the elevator and the room temperature?  Did

2    you ever -- do you believe that?

3         A.    Yes.

4               MS. WYDLER:  Objection.  Form.

5    BY MR. HANNAH:

6         Q.    Did you ever tell anyone that?

7         A.    Yes.

8         Q.    Did you do anything about that -- the

9    situation and Mr. Nehme being exposed to it during

10   his exam taking to correct the situation while you

11   were there other than to get a heater into the

12   room?

13              MS. WYDLER:  Objection.  Form.

14        A.    No.

15   BY MR. HANNAH:

16        Q.    Did you take any steps to notify

17   somebody that the room had more distractions than

18   were necessary by people walking around outside

19   and talking?

20        A.    No.

21        Q.    Did you ever document anything about

22   the room having distractions during the exam like

23   you did with regard to the -- the room being

24   freezing cold?

25        A.    No.



```
 1        Q.    Did you ever tell anyone after the exam
 2   was over that the room was -- was not free from
 3   distractions and contained quite a few
 4   distractions after it was -- the exam was over?
 5        A.    I don't remember.
 6        Q.    Do you believe that this room,
 7   AHC 2-495, constituted an adequate minimum
 8   distraction room for Mr. Nehme during the exam he
 9   took on March 2nd, 2020?
10              MS. WYDLER:   Objection.   Form.
11        A.    Yes.
12   BY MR. HANNAH:
13        Q.    Even though there were quite a few
14   distractions, right?
15              MS. WYDLER:   Objection.   Form.
16        A.    Yes.
17   BY MR. HANNAH:
18        Q.    Were these distractions for you too,
19   all these people going around outside talking and
20   walking by the room?
21        A.    Yes.
22        Q.    You don't suffer from any type of ADHD
23   or any other type of disability -- emotional,
24   mental disability, correct?
25        A.    No, I do not.
```



```
 1                    MS. WYDLER:   Objection.
 2    BY MR. HANNAH:
 3         Q.    And you yourself during that time of
 4    this exam, you were -- not only were you not --
 5    were you distracted by what was going on outside
 6    the room, you were also distracted by the
 7    temperature in the room too, correct?
 8         A.    Yes.
 9         Q.    Would it be reasonable to assume that
10    Mr. Nehme also was distracted by all that?
11                    MS. WYDLER:   Objection.   Form.
12         A.    Yes.
13    BY MR. HANNAH:
14         Q.    All right.   Do you recall if there was
15    an investigation done in connection with Mr. Nehme
16    making a complaint of not being -- being
17    discriminated against on the basis of a disability
18    in connection with not being provided the proper
19    accommodations for his test taking?   Do you recall
20    there being an investigation along those lines?
21         A.    Yes.
22         Q.    Okay.   And you were interviewed as part
23    of that investigation, correct?
24         A.    Yes.
25         Q.    And do you know -- do you recall who
```



1  was the person who actually interviewed you?

2      A.    No.

3      Q.    Was it a woman or a man?

4      A.    A woman.

5      Q.    Did she identify herself when she

6  interviewed you?

7      A.    She did.

8      Q.    You just don't remember, right, who it

9  was?

10     A.    It -- yes, I don't remember.

11     Q.    Do you know if she was

12 African-American, white, Hispanic?

13     A.    She is African-American.

14     Q.    Did you receive an e-mail about the --

15 your need to be interviewed?

16     A.    I don't remember.

17     Q.    How did you find out about the fact

18 that you had to be interviewed in part of this

19 investigation?

20     A.    I -- I just -- I remember Mary reaching

21 out to me and telling me that I was going to be

22 interviewed at one point, but I don't recall the

23 specific e-mail that was sent out.

24     Q.    Okay.  And you were interviewed

25 remotely; is that correct?



```
1            A.      Yes, I was.
2            Q.      That was on August 31st, 2020, correct?
3  End of -- end of August 2020?
4            A.      Yes.
5            Q.      And was that by Zoom, or was it by
6  telephone?  How was the remote interview done?
7            A.      Through Zoom.
8            Q.      And who was -- who else besides you and
9  the investigative person were involved in that
10 interview; do you know?
11           A.      It was just the two of us.
12           Q.      And did that investigator or the
13 interviewer explain to you what the purpose was of
14 the interview and the investigation?
15           A.      Yes.
16           Q.      And were you under oath at the time, or
17 did you just -- just given questions and asked
18 to -- asked to answer them?
19           A.      I wasn't -- it wasn't under oath.  It
20 was just an interview, questions and answers.
21           Q.      You were never asked to do any kind of
22 affidavit or written statement or sign off on
23 anything like that, right?
24           A.      No.
25           Q.      Was this the one and only time you were
```

```
1  interviewed in connection with Mr. Nehme's
2  internal complaints of discrimination?
3       A.   Yes.
4       Q.   Had anyone at FIU told you what you had
5  to say during the interview or what you should say
6  prior to you being interviewed?
7       A.   No.
8       Q.   And you would agree with me your
9  memory, when you were interviewed back in
10 August 31st, 2020, much clearer than it is today
11 about what happened during the March 2nd, 2020
12 exam, correct?
13      A.   I'm sorry.  Can you repeat that?
14      Q.   You agree with me that your memory
15 about the events of the March 2nd, 2020 shelf exam
16 that Mr. Nehme took were clearer back on the -- at
17 the end of August 2020 than they are today?
18      A.   Yes.
19      Q.   Do you remember how long your interview
20 was?
21      A.   I don't remember.
22           (Recess.)
23 BY MR. HANNAH:
24      Q.   Ms. Lachica, the person who interviewed
25 you -- I'm going to throw out two names, and maybe
```



1   you remember, it may jar your memory who the

2   person was -- Valerie Hall and Shirley Ann

3   McWerter.  Does that refresh your recollection of

4   who was interviewing you?  They're both

5   African-American, so do you remember the names?

6        A.    No.

7        Q.    Okay.  Can you -- can you describe them

8   for me, the person?  Was it an older person,

9   younger?

10       A.    She was much older.  I want to say

11   maybe in her 50s.

12       Q.    All right.  So did she have gray hair;

13   do you remember?

14       A.    No.

15       Q.    Okay.  She didn't have gray hair?

16       A.    No, she didn't.

17       Q.    Or you just don't remember -- she

18   didn't have gray hair.  Okay.

19              Give me a second.

20              All right.  I just pulled up a

21   document, which is -- I'll represent to you is

22   going to be Pages 23 -- I'm sorry, 23 and 24, I

23   believe.  Yes 23 and 24 of the investigative

24   report done on Mr. Nehme's investigation.  And I'm

25   just focusing on those two pages because it



```
 1    indicates the interview that was had with you as
 2    Witness Number 10, Innah Lachica.
 3              You see that?
 4         A.    Yes, I do.
 5         Q.    Have you seen this document before,
 6    these two pages, and read through them?
 7         A.    Yes, I have.
 8         Q.    How did you get ahold of those?
 9              MS. WYDLER:  Objection.  Form.
10         Privileged.  Cats out of the bag, though,
11         right?
12    BY MR. HANNAH:
13         Q.    When -- when did you first see this
14    document?
15         A.    On Monday.
16         Q.    When you had your Zoom discussion with
17    Ms. Wydler, correct?
18         A.    Yes.
19         Q.    These two pages, I'm going to have --
20    I'll have the cover page too so you know where
21    it's from, which is -- hold on.  Sorry.  Got too
22    many pages here.
23              Let me ask you, Ms. Lachica, did you
24    see the entire report or just your excerpt of your
25    statements when you first saw this document?
```



```
 1        A.     Just the section on -- on my part.
 2        Q.     You didn't read about what other people
 3   said?
 4        A.     No, I did not.
 5        Q.     Sorry for the delay.  Give me a second.
 6   It messed up.
 7               (Sotto Voce Discussion.)
 8   BY MR. HANNAH:
 9        Q.     Okay.  Can you read that?  You can see
10   it?  It's the first page of the investigative
11   report, the amended copy of the investigative
12   report.  And that contains your excerpt.  Go down
13   to that, Pages 23...
14               Okay.  All right.  So this -- that
15   first that I showed you of the report plus these
16   two pages will be Exhibit 4, which I'm
17   representing is an excerpt of the entire report.
18               (Exhibit 4 was marked for
19   identification)
20   BY MR. HANNAH:
21        Q.     But it's just focused on what was said
22   by you, Ms. Lachica.  And this is what you have
23   seen prior to today, right?  Just these two pages?
24        A.     Yes.
25        Q.     Okay.  Is there anything in here --
```



```
 1   when you read through it, anything in here that
 2   struck you as being inaccurate?
 3        A.     In the beginning with my position at
 4   FIU HWCOM.
 5        Q.     You're -- says you're a program
 6   coordinator for academic affairs; is that
 7   incorrect?
 8        A.     That -- that I held that position since
 9   2018.
10        Q.     Okay.  You -- you were still doing
11   those duties, I guess, the position (Audio
12   distortion) program specialist was what your
13   duties were at the time of this exam, right?
14        A.     Yes.
15        Q.     How about the time you were interviewed
16   on August 31st, 2020, were you program
17   coordinator?
18        A.     Yes, I was.
19        Q.     So this -- it's accurate then, right?
20   Says you currently serve as a program coordinator.
21        A.     But I didn't held the position on --
22   until 2020.
23        Q.     You had the program specialist, but you
24   were still doing all those program specialist
25   duties as program coordinator since 2018, right?
```



```
1          A.      Yes.

2          Q.      Okay.  And what else was inaccurate

3    about your statements as reflected in this excerpt

4    of the report that you can point to?

5          A.      None so far on the first page.

6          Q.      Okay.  How about your -- the rest of

7    your statements?

8          A.      That I reached out to Ms. Michele

9    Montero.

10         Q.      Right.  I think you corrected that

11   earlier when we talked about it.  I asked you

12   about that specifically, and you said it was not

13   Ms. Montero that you reached out to, but

14   Ms. Williams, right?

15         A.      Yes.

16         Q.      Maritere Williams?

17         A.      Yes.  It was --

18         Q.      And that's incorrect -- that's

19   incorrect, right?

20         A.      Yes, it's incorrect.

21         Q.      Okay.  You didn't fall -- you didn't

22   incorrectly state it to her?  She just may have

23   misunderstood who you were talk -- referring to?

24   Correct?

25         A.      Perhaps.
```

1    Q.    Anything else that's inaccurate on that

2    page?

3    A.    Yeah, no other corrections.

4    Q.    Okay.  So let's take a look at that

5    last paragraph there, which now state is accurate.

6    You're talking about the room where the exam took

7    place, ACH 2-495, correct?

8    A.    Yes.

9    Q.    You refer to as a conference table with

10   a table that seats approximately 12 people,

11   correct?

12   A.    Yes.

13   Q.    But on that day, the only people in

14   that room were you and Mr. Nehme; is that correct?

15   A.    That's correct.

16   Q.    And -- and you described the room,

17   correct, to the interviewer as like a room that

18   had a glass wall that is like a frosted window

19   that has transparent gaps that allows you to see

20   shadows of people as they walk by, correct?

21   A.    Yes.

22   Q.    And then you go on to say in the next

23   sentence, Lachica said that ACH 2-495 is not the

24   preferred room for accommodations because of its

25   location near a large conference room,



```
 1   accessibility to the stairs and the elevator, and

 2   the room temperature.

 3              Did I read that correctly?

 4       A.    Yes.

 5       Q.    Is that an -- that's an accurate

 6   statement, correct?

 7       A.    I mean, it's an -- yes.

 8       Q.    Okay.  And what -- what are the

 9   preferred rooms -- if ACH 2-495 is not the

10   preferred room for accommodations and for minimal

11   distraction?  What -- what are the preferred

12   rooms?

13       A.    We --

14              MS. WYDLER:  Objection.  Form.

15       A.    We usually use AHC 1-335.

16   BY MR. HANNAH:

17       Q.    AHC 1-335 or ACH 2-335 (sic)?

18       A.    AHC 1-335.

19       Q.    You look on further at the bottom of

20   the -- it's like your last sentence there or

21   the -- I mean, the last sentence, According to

22   Lachica, ACH 2-335 is the preferred room for

23   accommodations because it has less traffic and

24   double doors outside of the conference room that

25   can be locked to prevent entrance into the
```

```
 1    conference room area.
 2              Do you see that part?
 3       A.    Yes.
 4       Q.    Is that an inaccurate reflection of the
 5    preferred room?  It should be ACH 1-335?
 6       A.    It's AHC 1.
 7       Q.    A8-- AAC?
 8       A.    AHC 1.
 9       Q.    AHC 1.  So ACH is the wrong way to
10    refer to it?
11       A.    Yes.  It's --
12       Q.    Is that the same for 495 too?  It
13    should be AHC 2-495?
14       A.    AHC 2-495.
15       Q.    So it's just -- it's a mixup on the
16    ordering of the letters, right?
17       A.    Yes.
18       Q.    Okay.  So that's not correct.  So
19    really, what your -- room that Mr. Nehme took the
20    exam in should be AHC 2-495, not ACH 2-495,
21    correct?
22       A.    Yes, that's correct.
23       Q.    And the preferred room would be
24    AHC 2-335?
25       A.    AHC 1-335.
```



```
 1          Q.     So 2 is also incorrect in this
 2   statement, right?
 3          A.     Yes.
 4          Q.     Okay.  So just the numbering of the
 5   room is incorrect, right, according to this
 6   statement, correct?
 7          A.     Yes, that's correct.
 8          Q.     So the actual preferred minimal
 9   distraction room is AHC 1-335, correct?
10          A.     Yes.
11          Q.     And that room has very little
12   distractions in it the way it's configured,
13   correct?
14          A.     Yes.
15          Q.     Do you know what was being -- going on
16   in AHC 1-335 that day?
17          A.     No.
18          Q.     Are you aware of any other preferred
19   rooms for the accommodations of a minimal
20   distraction besides AHC 1-335?
21          A.     No.
22          Q.     That's the only one you're aware of?
23          A.     Yes.
24          Q.     But what you're saying here about
25   AHC 2-495 is correct, that it's not a preferred
```

```
1    room for the taking of exams for people who need
2    accommodations, correct?
3              MS. WYDLER:  Objection.  Form.
4         A.   Yes.
5    BY MR. HANNAH:
6         Q.   Okay.  Then the reason is because
7    it's -- of its location, right?
8              MS. WYDLER:  Form.
9         A.   Yes.
10   BY MR. HANNAH:
11        Q.   One of the reasons is it's located near
12   a large conference room, correct?
13        A.   Yes.
14        Q.   And also, it's very close to a stairway
15   and the elevator, correct?
16             MS. WYDLER:  Form.
17        A.   Yes.
18   BY MR. HANNAH:
19        Q.   And the room temperature has always
20   been a problem in that room, correct?  It's always
21   very cold, correct?
22             MS. WYDLER:  Objection.  Form.
23        A.   Yes.
24   BY MR. HANNAH:
25        Q.   Other students had complained about the
```



```
1   room temperature prior to March 2nd, 2020?

2        A.    I don't remember.

3        Q.    Had you ever proctored exam in that

4   room before March 2nd, 2020?

5        A.    Yes, I have.

6        Q.    Had it always been cold, very cold in

7   there, like freezing cold as you described it?

8              MS. WYDLER:  Form.

9        A.    Yes.

10  BY MR. HANNAH:

11       Q.    You knew that going in that day to

12  proctor Mr. Nehme, right, and his exam, that it

13  was going to be very cold, and it was very cold,

14  correct?

15             MS. WYDLER:  Objection.  Form.

16       A.    Yes.

17  BY MR. HANNAH:

18       Q.    In fact, it was so cold that you had to

19  do something about it to get some kind of space

20  heater there, correct?

21       A.    Yes.

22       Q.    And not only was the room extremely

23  cold or freezing cold, as you described it, but

24  there were also lots of noise and movement

25  distractions as well during the exam, correct?
```



```
 1              MS. WYDLER:  Objection.  Form.
 2       A.    Yes.
 3  BY MR. HANNAH:
 4       Q.    All right.  And you -- that's described
 5  in your interview here as well, right?  If we look
 6  at it a little further, it says here, According to
 7  Lachica, there were meeting -- meeting/sessions
 8  and an observed standardized clinical
 9  examination -- and an observed standard clinical
10  examination, OSCE, session taking place during the
11  exam.
12              Is that -- is that an accurate
13  statement?
14       A.    It is, but I'm not sure if there was
15  any that day.  It was just me assuming that there
16  were because of the movement of the people.
17       Q.    But you told the interviewer that it
18  was taking place that day, correct?
19       A.    I might have.  I don't remember.
20       Q.    That's what it says here, though,
21  right?  And you said that was accurate.
22       A.    I mean, I -- I might have said it, but
23  that's me assuming that there was OSCEs because of
24  the movement of the people (Audio distortion).
25       Q.    But there were meetings and sessions
```



```
 1   taking place, right?
 2        A.    Assuming from the -- the people walking
 3   by.
 4        Q.    You said, I also told the interviewer
 5   that all of these things were distractions,
 6   correct?
 7             MS. WYDLER:  Objection.  Form.
 8        A.    To me, they were.
 9   BY MR. HANNAH:
10        Q.    All right.  Certainly, you are not
11   someone who is as easily distracted as someone who
12   suffers from ADHD like Mr. Nehme, correct?
13             MS. WYDLER:  Objection.  Form.
14        A.    Yes.
15   BY MR. HANNAH:
16        Q.    So they -- it's fair to say that they
17   were distractions to you during the entire time of
18   the exam, correct?
19        A.    Not the --
20             (Simultaneous Speakers.)
21             MS. WYDLER:  Objection.  Form.
22   BY MR. HANNAH:
23        Q.    Certainly at various points during the
24   exam, you were distracted by what was going on
25   outside, correct?
```



```
 1        A.     Yes.

 2        Q.     You both distracted from an auditory

 3   and from a visual standpoint, correct?

 4             MS. WYDLER:  Objection.

 5        A.     I'm not sure --

 6   BY MR. HANNAH:

 7        Q.     Do you understand what I'm asking you?

 8        A.     I'm sorry?

 9        Q.     The distractions were both noise that

10   you heard and, also, the movement of people

11   visually distracting, correct?

12        A.     To me, yes.

13        Q.     You could heard -- actually hear people

14   talking outside while this was going on, right?

15             MS. WYDLER:  Objection.  Form.

16             Go ahead.

17   BY MR. HANNAH:

18        Q.     Answer.

19        A.     I could hear, like, movement and people

20   talking, but not their whole conversation.

21        Q.     Right.  But you heard people's voices

22   and movement of their feet and movement of their

23   bodies around outside, correct?

24             MS. WYDLER:  Objection.  Form.

25        A.     Not them --
```



```
 1  BY MR. HANNAH:
 2       Q.     Answer.
 3       A.     -- walking or stomping.  None of that,
 4  but --
 5       Q.     You could see them, though, right?
 6            MS. WYDLER:  Can you please let her
 7       finish her response?  This is the third
 8       time --
 9            MR. HANNAH:  Thought she had finished.
10       I thought she had finished.
11  BY MR. HANNAH:
12       Q.     Had you finished your response?
13       A.     Sorry.  There was another question I
14  think I missed.
15       Q.     I was asking you, you were able to see
16  the people moving back and forth through the
17  frosted window, correct?
18       A.     I did, yes.
19       Q.     Okay.  It was more than just one or two
20  people.  It was quite a few people doing that,
21  correct?
22            MS. WYDLER:  Objection.  Form.
23       A.     Yes.  They're groups.
24  BY MR. HANNAH:
25       Q.     Did you ever hear slamming of doors,
```



```
 1   anything like that?
 2            MS. WYDLER:  Objection.  Form.
 3        A.    No.
 4   BY MR. HANNAH:
 5        Q.    Did you hear voices of people talking
 6   to each other even if you didn't know exactly what
 7   they were talking about?
 8        A.    Yes.
 9        Q.    Okay.  And it says here that you were
10   able to hear noises outside the room off and on
11   throughout the exam, correct?
12        A.    I'm sorry, what?
13        Q.    Lachica remembers that there -- says
14   here -- I'm sorry.  Says, Lachica stated -- see
15   where I -- it's like in the middle of the
16   paragraph?  Lachica stated all of these things
17   were distractions and she was able to hear noises
18   outside of the room off and on throughout the
19   exam.
20        A.    Yes.
21        Q.    Did I read that correctly?  Is that an
22   accurate statement of what you told the
23   interviewer?
24        A.    Yes.
25        Q.    And then you go on further.  It says,
```



1  Further, Lachica remembers there a few times that

2  groups of students were passing by in the hallway

3  talking just side out of -- just outside of the

4  testing room.

5            Did I read that correctly?

6     A.    Yes.

7     Q.    Is that an accurate statement of what

8  was going on during the exam?

9     A.    I mean, I don't think they were just

10 outside the testing room talking and no, that they

11 are walking to different rooms so they're not

12 just -- they're not just standing just outside,

13 you know, like waiting just outside the testing

14 room, if that makes sense.  They're walking and

15 talking at the same time.

16    Q.    It doesn't say they were waiting.  It

17 says they were passing by in the hallway talking

18 just outside of the testing room.  Is that

19 correct?

20            Is that an accurate statement that you

21 made?

22            Was that an accurate reflection of the

23 statement you made to the interviewer?

24    A.    I mean, no, because I would have said

25 hallway walking and talking.  Not just talking.

```
1    Because it --
2         Q.    You heard people talking, right?
3         A.    Yes.
4               MS. WYDLER:  Form.
5    BY MR. HANNAH:
6         Q.    Okay.  And it goes on.  It says,
7    However, Lachica never mentioned anything about
8    the noise.
9               Did I read that correctly?
10        A.    Yes.
11        Q.    That's accurate, right?
12        A.    Yes.
13        Q.    And then you quoted here as telling the
14   interviewer, Lachica said, quotes, I was not able
15   to do anything about it because I felt like I
16   needed to stay inside the room with the student at
17   all times.  I also felt that me going up and
18   walking to the door multiple times would cause
19   more distractions for him.  I posted the Testing
20   in Progress door signs, and they were ignored.
21   End of quotes.
22               Did I read that correctly?
23        A.    Yes.
24        Q.    Is that an accurate reflection of what
25   you told the interviewer?
```



```
 1                   MS. WYDLER:  Objection.  Form.
 2         A.    Yes.
 3    BY MR. HANNAH:
 4         Q.    You still believe that today?
 5         A.    Yes.
 6                   MS. WYDLER:  Form.
 7    BY MR. HANNAH:
 8         Q.    Okay.  And why -- why couldn't you just
 9    send an e-mail to Ms. Williams like you did with
10    the heater, the heat situation about the noise
11    situation?
12                   MS. WYDLER:  Objection.  Form.
13         A.    Because me reaching out to Ms. Maritere
14    Williams was because the student mentioned
15    something about the temperature of the room.
16    BY MR. HANNAH:
17         Q.    Yeah.  But you were also aware now that
18    there quite a few distractions, physical -- excuse
19    me, visual and auditory distractions going on with
20    all the people moving around outside the room.  So
21    much so that it distracted you, but you didn't
22    take it upon yourself to notify Ms. Williams about
23    that situation, correct?
24                   MS. WYDLER:  Objection.  Form.
25         A.    It was visually distracting to me
```



Jeannie Reporting
Your Wish Is Our Job!
305-577-1705

1  because I was sitting in the room where I could

2  see the hallway peripherally.  So I could see

3  people walking by.  But visually distracting for

4  Mr. Nehme, I -- I didn't think that that was the

5  case.

6  BY MR. HANNAH:

7      Q.    Okay.  So it was visually distracting

8  for you, but Mr. Nehme, who needs accommodations

9  of minimal distraction, you don't believe that was

10  distracting to him.  Is that your testimony?

11      A.    He was -- he was facing the other

12  direction, so he wouldn't really see what's going

13  on on his -- in -- behind him.

14      Q.    But he could hear what was going on,

15  correct?

16      A.    I don't know.

17      Q.    Was he closer to the window than you

18  were?

19      A.    He was closer to the transparent wall,

20  yes.

21      Q.    And it was clear to you that the

22  students were ignoring your sign outside, right?

23      A.    Yes.  They seemed to not see it.

24      Q.    You said -- you used the word they

25  ignored the Testing in Progress door sign,



*Jeannie Reporting*
Your Wish Is Our Job!
305-577-1705

```
 1   correct?
 2        A.    I -- I don't remember if I said that.
 3        Q.    Well, you're being quoted here saying
 4   that, I posted the Testing in Progress door signs.
 5   They were ignored.  You told the interviewer that,
 6   correct?
 7        A.    Yes.
 8        Q.    And you still believe that today,
 9   correct?
10        A.    Yes.
11             MS. WYDLER:  Form.
12   BY MR. HANNAH:
13        Q.    Okay.  And you said you couldn't do
14   anything because you didn't want to cause more
15   distractions for Mr. Nehme, correct?
16        A.    Yes.
17        Q.    But you could've -- couldn't you have
18   sent a instant message to Ms. Williams saying
19   there's a lot of distractions going on here, we
20   need to do something about it?  Could you have
21   done that?
22             MS. WYDLER:  Objection.  Form.
23        Predicate.
24        A.    No.
25
```



```
1   BY MR. HANNAH:

2        Q.    You couldn't do that?

3        A.    No.

4              MS. WYDLER:  Objection.  Form.

5   BY MR. HANNAH:

6        Q.    When you sent her messages -- instant

7   messages about the cold situation?

8        A.    I did, yes.

9        Q.    So why couldn't you do that for the

10  noise situation as well?

11             MS. WYDLER:  Form.

12       A.    Because I didn't know if it was

13  distracting to Mr. Nehme.

14  BY MR. HANNAH:

15       Q.    Did you ask Mr. Nehme if it was

16  distracting?

17       A.    No.

18       Q.    You saw him closing his eyes at times,

19  correct?

20       A.    I did.

21       Q.    Do you know if he was closing his eyes

22  because of the noise that was going on outside?

23       A.    No.

24       Q.    You didn't ask him why he was closing

25  his eyes, right?
```



1        A.      No, I didn't.

2        Q.      But you did observe that, though,

3  correct?

4        A.      Yes.

5        Q.      Do you think eh was closing his eyes

6  because of the cold in the room?

7        A.      No.

8               MS. WYDLER:  Objection.  Form.

9  BY MR. HANNAH:

10       Q.      So just so we're clear, you did not

11  take it upon yourself, no -- even though you were

12  aware of distractions going on outside of the room

13  where Mr. Nehme was taking a test, you did not

14  take it upon yourself to notify Ms. Williams about

15  that situation in any way, shape, or form, right?

16              MS. WYDLER:  Objection.  Form.

17       A.      No.

18  BY MR. HANNAH:

19       Q.      You could've done that, but you chose

20  not to, correct?

21              MS. WYDLER:  Form.

22       A.      Yes.

23  BY MR. HANNAH:

24       Q.      There was nothing preventing you from

25  doing that, correct?



1      A.      Because we've used the room in the past

2    with other students taking their shelf exam with

3    special accommodations, and, you know, it's --

4    it's a room that satisfy minimal distractions.

5    It's a separate room from the rest of the regular

6    taking -- test-taking students.  We can use the

7    room for longer hours, so we can accommodate

8    students that have extra time.

9      Q.      Oh, okay.  And going to your statement

10   again here on the second page at the top there,

11   says, Lachica stated -- also states she has not

12   received ADA training.

13              See that?

14     A.      Yes.

15     Q.      That's -- that's a true treatment,

16   correct?

17     A.      Yes.

18     Q.      Did you ever receive any specialized

19   training on what constitutes a minimal distraction

20   room and what doesn't?

21     A.      No formal training.

22     Q.      So you wouldn't be able to tell

23   where -- whether a room was minimal distraction or

24   not when it comes to the ADA, correct?

25     A.      No.



1      Q.     And you wouldn't even know whether it
2  was a proper minimal distraction room when it
3  comes to the -- FIU's own guidelines to what
4  constitutes a minimal distraction room, correct?
5          MS. WYDLER:  Objection.  Form.
6      Predicate.
7      A.     Yes.
8  BY MR. HANNAH:
9      Q.     Were you familiar what FIU's guidelines
10  are or definition was of minimal distraction room?
11     A.     No.
12     Q.     So you don't if what -- the room that
13  Mr. Nehme took the test on, this ACH 2-495 was, in
14  fact, the proper minimal distraction room,
15  correct?
16          MS. WYDLER:  Objection.  Form.
17     A.     No.
18  BY MR. HANNAH:
19     Q.     The only reason that you felt it was
20  minimal distraction room was that it had been used
21  before for that -- for that purpose?
22          MS. WYDLER:  Objection.  Form.
23     A.     Yes.
24  BY MR. HANNAH:
25     Q.     Do you believe, in fact, it was a



```
1          A.     That's correct, yes.

2          Q.     I mean -- and you experienced the same

3    freezing cold too, right?

4          A.     Yes.

5          Q.     Was it a distraction for you that it

6    was so cold?

7          A.     A little bit.

8          Q.     Okay.  And also, the movement outside,

9    that was happening during that two-hour period

10   before you contacted Ms. Williams, correct?

11         A.     If that was --

12         Q.     The noise, the people moving around

13   outside the room, the talking, ignoring your sign,

14   all of that was happening that two-hour period as

15   well, right?

16                MS. WYDLER:  Objection.  Form.

17         A.     Yes.

18   BY MR. HANNAH:

19         Q.     Okay.  But you chose not to say

20   anything to Ms. Williams about that, correct?

21         A.     Yes.

22         Q.     And you chose not to do anything about

23   that, correct?

24         A.     Yes.

25         Q.     Because you were afraid, if you got up
```



Jeannie Reporting
Your Wish Is Our Job!
305-577-1705

```
 1   and did something about it, that you would cause
 2   more distractions to Mr. Nehme, correct?
 3        A.    Yes.
 4        Q.    Even though you did get up to get the
 5   space heater and set that up, correct?
 6             MS. WYDLER:  Objection.  Form.
 7   BY MR. HANNAH:
 8        Q.    Correct?
 9        A.    Yes.
10             MS. WYDLER:  Form.
11   BY MR. HANNAH:
12        Q.    Are you aware that Mr. Nehme failed the
13   retake?
14        A.    Yes.
15        Q.    How did you find that out?
16        A.    I'm sorry?
17        Q.    When did you find out that he had
18   failed the retake of the exam, the psychiatric
19   shelf exam?
20        A.    I don't remember.
21        Q.    Was this the interview that you -- you
22   did with the person from IDAA -- IDEA, the
23   investigator; is that the first time you notified
24   anybody, Ms. Williams or anyone else in the --
25   your department about the distractions that had
```



```
 1    to maybe -- the most is ten students per session.

 2    So 20 students each classroom in small OSCE rooms,

 3    I have never seen that before.

 4        Q.    You don't know if that's true or not,

 5    though, right?  Because you didn't go and count

 6    how many people were in each of the rooms, right?

 7             MS. WYDLER:  Objection.  Form.

 8             (Simultaneous Speakers.)

 9    BY MR. HANNAH:

10        Q.    You don't know if that statement is

11    true or not because you don't know how many

12    students were in each of those rooms, right?

13        A.    On that day, no.

14        Q.    Okay.  And you know if Ms. Gavilan

15    found that out, how many students were in each of

16    those rooms?

17        A.    I'm sorry?

18        Q.    Do you know if Ms. Gavilan found out

19    how many students or participants were in each of

20    the rooms that day?

21        A.    No.

22        Q.    She never shared that information with

23    you, right?

24        A.    No.

25        Q.    Then, according to this statement of
```



```
 1    Gavilan, Gavilan added that, No student should

 2    have been assigned to take a test in AHC 2-495

 3    because of the amount of people on that floor.

 4              Did I read that correctly?

 5    A.    Yes.

 6    Q.    You agree with that statement?

 7              MS. WYDLER:  Objection.  Form.

 8    A.    I mean, yes, if that is the protocol.

 9    BY MR. HANNAH:

10    Q.    You would defer to Ms. Gavilan on that

11    statement?

12              MS. WYDLER:  Objection.  Form.

13    BY MR. HANNAH:

14    Q.    You can answer.

15    A.    Yes.

16    Q.    She says further, She stated that she

17    normally catches these situations, understands

18    that a student may have felt uncomfortable with

19    the arrangement.

20              Did I read that correctly?

21    A.    Yes.

22    Q.    Do you know if, on this particular

23    occasion with Mr. Nehme, she failed to catch the

24    situation about him being placed in a room that

25    was less than ideal as a minimal distraction room?
```



1        Q.     It's possible that no students walked

2    during that first portion of the morning part of

3    the exam.

4               MR. HANNAH:   Object -- object to the

5        form.

6        A.     I'm not sure.

7    BY MS. WYDLER:

8        Q.     Would you have -- would you -- would

9    you say that combining all the times that there

10   may have been a group of students walking by the

11   outside of a conference room, that it would have

12   been less than seven times during the course of

13   the exam?

14              MR. HANNAH:   Object to the form.

15       A.     I'm not sure.  I don't know.

16   BY MS. WYDLER:

17       Q.     Would it have been 25 times that

18   students were walking past the conference room

19   during the -- the course of the exam?

20              MR. HANNAH:   Object by -- object to the

21       form.

22       A.     It depends on the OSCEs that they're

23   that they --

24   BY MS. WYDLER:

25       Q.     Do you -- I'm sorry to interrupt you.



1    Go ahead.

2         A.    Depending on the OSCEs, they could, you

3    know, stay in their rooms for 15 minutes and then

4    switch to a different room.  And then, in that

5    case, every 15 minutes.

6         Q.    When -- when we talked here today

7    during your deposition for, now, almost four

8    hours, when you have indicated that you're

9    distracted, does that mean that something caught

10   your attention?

11        A.    Yes.

12             MR. HANNAH:  Object to the form.

13   BY MS. WYDLER:

14        Q.    That doesn't necessarily mean that it

15   would have prevented you from doing what you're

16   supposed to be doing while you're in the exam

17   room; is that right?

18             MR. HANNAH:  Object to the form.

19        A.    Yes.

20   BY MS. WYDLER:

21        Q.    Okay.  So it caught your attention when

22   students would pass by the outside of the

23   conference room.  Is that a fair characterization

24   of what you remember the day of the psychiatry

25   retake.



1   BY MR. HANNAH:

2        Q.    So you don't know as we sit here today

3   whether he was distracted, not only by the noise,

4   but also by the shapes of people walking by the

5   window, correct?

6             MS. WYDLER:   Objection.   Form.

7        A.    No.

8   BY MR. HANNAH:

9        Q.    Okay.   And there were a lot of shapes

10  walking by the window, not just one or two people

11  at a time, right?

12       A.    Yes.

13       Q.    Sometimes was crowds of people going by

14  the window, correct?

15            MS. WYDLER:   Objection.   Form.

16       A.    Yes.

17  BY MR. HANNAH:

18       Q.    And it wasn't just one person talking

19  when the crowds went by.   It was numerous people

20  talking sometimes going by, correct?

21       A.    Yes.

22       Q.    Like voices talking over each other and

23  talking at the same time, correct?

24            MS. WYDLER:   Objection.   Form.

25       A.    Yes.



```
 1   BY MR. HANNAH:

 2        Q.    Yes?

 3              Okay.  And sometimes, the amount of

 4   time it took for a crowd of people to go by the

 5   window lasted more than one minute, correct?

 6              MS. WYDLER:  Objection.  Form.

 7        Mischaracterization of testimony.

 8   BY MR. HANNAH:

 9        Q.    You can answer the question.

10        A.    I wouldn't say a minute.

11        Q.    Could have been more than a minute

12   sometimes, right?

13              MS. WYDLER:  Objection.  Form.

14        A.    Not more than a minute.

15   BY MR. HANNAH:

16        Q.    You didn't time it, though.  You didn't

17   look at your watch and see how long it was

18   lasting, right?

19        A.    No.

20        Q.    Or a clock in the room?  You didn't

21   look at a clock in the room to see if it was

22   lasting only a few seconds or a minute or a couple

23   of minutes, correct?

24        A.    No.

25        Q.    Okay.  And isn't it true there was also
```



```
 1    a speaker outside announcing when people could go

 2    back in the room for the OSCE exams?

 3         A.   Yes.

 4         Q.   Okay.  And that was a fairly loud

 5    speaker.  You could actually hear it from where

 6    you were sitting in the room, right?

 7         A.   Yes.

 8         Q.   And the speaker would say at times, You

 9    can now enter the room, correct?  And allow people

10    to enter the room when they --

11         A.   Yes.

12         Q.   -- had to enter the room to do the OSCE

13    exam, correct?

14         A.   Yes.

15         Q.   And that happened repeatedly throughout

16    the entire four hours of the exam being given to

17    Mr. Nehme, correct?

18              MS. WYDLER:  Objection.  Form.

19         A.   Yes.

20    BY MR. HANNAH:

21         Q.   And -- now, I know you testified that

22    the people were not yelling or stomping their

23    feet, but they were talking loudly enough that you

24    could hear it inside your room, correct?

25         A.   Yes.
```

