# EXHIBIT E

```
 1              IN THE UNITED STATES DISTRICT COURT

 2               SOUTHERN DISTRICT OF FLORIDA

 3              CASE NO. 1:20-CV-24649-CANNON

 4

 5   ELIE NEHME,

 6        Plaintiff,

 7   vs.

 8   FLORIDA INTERNATIONAL UNIVERSITY
     BOARD OF TRUSTEES,
 9
          Defendant.
10   _____

11
     LOCATION:            Remote Audio-Video
12                        Communication
                          Pursuant to Supreme Court of
13                        Florida
                          Administrative Order No.
14                        SCAO21-17

15

16   DATE:               January 27, 2022

17   TIME:               1:00 PM ET to 4:45 PM ET

18

19   DEPOSITION OF (CORPORATE REPRESENTATIVE FOR FIU

20   BOARD OF TRUSTEES AND IN HER INDIVIDUAL CAPACITY)

21                   ELIZABETH BEJAR

22        Taken before Leila Harris, LCR, Stenographic

23   Court Reporter, Notary Public State of Florida,

24   pursuant to Notice of Taking Deposition in the

25   above-styled cause.
```



1

2                    **INDEX OF EXHIBITS**

3    Exhibit No.                                            PAGE

4       8          Deposition Notice                    6

5       9          Elie Nehme Timeline                  12

6      10          MSECP Meeting April 9, 2020          15

7      11          Correspondence Between Stephen       34
                   Peter Loynaz and Adrian Jones,
8                  Dated 8/25/20

9      12          Correspondence Between FIU Human     40
                   Resources and Elie Nehme
10                 dated 8/25/20

11     13          Correspondence Between FIU Human     47
                   Resources and Elie Nehme,
12                 dated 9/14/20

13     14          Correspondence Between FIU           75
                   Office of the Provost and
14                 Elie Nehme, dated 9/30/20

15     15          Document Entitled Exhibit 1          116

16     16          Readiness Quizzes                    126

17

18

19

20

21

22

23

24

25



35

```
1    am confused by the date on the form.
2         Q.    I am -- so am I.  So am I.  I'm with
3    you on that because doesn't appear to be an
4    original document.  Appears to have been something
5    that was printed out.  May have changed the date.
6             I assume FIU probably has the original
7    someplace.  I haven't gotten it yet.  And I'm
8    going to ask for it.
9             But in any event, are you aware of --
10   strike that.
11            When you did your -- rendered your
12   decision on the appeal of Mr. Nehme's
13   dismissal/withdrawal recommendation on his final
14   level of appeal, when you rendered that decisions,
15   had you reviewed any of the reports that had been
16   prepared by the FIU Office of inclusion,
17   Diversity, Equity, & Access, IDEA for short?
18        A.    Yes, sir.
19        Q.    Did you review both the original report
20   and the amended report that had been done by that
21   office with regard to Mr. Nehme's internal
22   complaints of discrimination and failure to be
23   accommodated?
24        A.    Yes, sir.
25        Q.    All right.  And did you review all the
```



1    exhibits that were attached to those reports?

2         A.    I did.

3         Q.    You didn't see this document as one of

4    those exhibits?

5         A.    So you -- I -- I saw a lot of

6    documents.  I -- I -- this is a standard statement

7    that would come from our Disability Resource

8    Center.  Consistent with the beginning of any

9    academic semester, that date is consistent with

10   the academic semester.  Mr. Nehme was a student at

11   the beginning of the academic semester of that

12   question.  There may have been one from the prior

13   year.

14              So this document in particular, while I

15   don't remember seeing it, I understand its purpose

16   and form.  It's to ensure that the students are

17   given the -- you know, the -- the students are

18   given the support from the disability --

19   Disability Resource Center.

20        Q.    Were you aware when you rendered your

21   final appellate decision from Mr. Nehme of him

22   being awarded certain accommodations for his

23   disability?

24        A.    Yes, sir.

25        Q.    And were you aware that those two



```
1         Q.     Who in particular at the IDEA office
2    did you ask?
3         A.     Dr. McWhorter.  At the time, she was
4    the director of the office.
5         Q.     So Dr. McWhorter told you that his not
6    being provided the reasonable accommodation of a
7    minimal distraction room on the Psychiatric Shelf
8    Retake Examination did not impact his academic
9    performance?
10             MS. WYDLER:  Objection; form and
11         outside of the designated area of inquiry.
12   BY MR. HANNAH:
13        Q.     Did she tell you that?
14             MS. WYDLER:  Form.
15        A.     She didn't -- she did not tell me that
16   it did, and she did not tell me that it didn't.
17   And that was one of the reasons for the additional
18   report.
19   BY MR. HANNAH:
20        Q.     Do you know for a fact whether or not
21   his not being placed in a minimal distraction room
22   for the Psychiatric Shelf Retake Examination
23   affect his ability to perform on that examination?
24             MS. WYDLER:  Objection; form, outside
25         of the designated area of inquiry.
```



47

1  talking about now?

2      A.    I don't look at reports in the silo.  I

3  looked at the compilation of the entire record.

4      Q.    So I'm going to focus on what

5  documentation you reviewed in order to reach your

6  decision on his appeal.  This is one of those

7  documents, right?

8      A.    It was.

9      Q.    And there's nothing in here that would

10  indicate that -- that the failure to provide him

11  the minimal distraction room, which was

12  substantiated, that's failure to provide him an

13  accommodation, did not affect his academic

14  performance, correct?

15          MS. WYDLER:  Objection; form.

16      A.    There was -- no.  There was nothing to

17  state it one way or the other.

18      Q.    Give me a second.

19          This next document is going to be

20  marked Plaintiff's Exhibit Number 13.

21          Sorry.  It's taking a little bit long

22  to get the document.

23          (Exhibit 13 was marked for

24  identification)

25



1   accommodation had an adverse or non-adverse action

2   based on the review of his record.

3   BY MR. HANNAH:

4        Q.   And did anyone with the IDEA ever tell

5   you that his failure -- the failure to provide the

6   accommodation of the minimal distraction room for

7   the retake of the Psychiatric Shelf Exam had no

8   negative impact upon his performance on that

9   examination?

10       A.   No.

11       Q.   Did you review any document to indicate

12  to you that his -- the failure of the medical

13  school to provide him with a minimal distraction

14  room and that accommodation had no adverse effect

15  on his ability to perform well on that exam?

16            MS. WYDLER:  Objection; form.

17       A.   The -- the folders from the course

18  audit indicated to me that there was enough

19  question on whether receiving the accommodation

20  would impact adversely or not.

21  BY MR. HANNAH:

22       Q.   All right.  Let's talk about the

23  Psychiatric Shelf Exam.  Are you able to sit here

24  today and point to any statement made by anybody

25  or any document provided to you to indicate



```
 1    that -- that the failure to provide him with that

 2    accommodation, the minimal distraction room had an

 3    impact on his ability to perform well on that

 4    exam.

 5              MS. WYDLER:  Objection; form.

 6         A.    I am not.

 7    BY MR. HANNAH:

 8         Q.    Okay.  And so just we're clear, you

 9    understood his allegation to be that the reason he

10    failed the psychiatric retake examination was

11    because he had not been placed in a minimal

12    distraction room as required by the Disability

13    Resource Center, correct?

14         A.    Yes.

15         Q.    So clearly, there -- there could have

16    been -- and his allegation was substantiated by

17    the IDEA, correct?

18         A.    His allegation with respect to?

19         Q.    Not being provided the minimal

20    distraction room on the retake exam, that

21    allegation or the failure to provide him with that

22    accommodation and his poor performance on the

23    retake exam was substantiated, correct?

24         A.    The poor performance on the exam wasn't

25    substantiated by the IDEA office.  The fact that
```



Jeannie Reporting
Your Wish Is Our Job!
305-577-1705

```
1    he was not given -- wasn't provided with a
2    non-compliant minimally distractive room.
3         Q.     Right.  And how do you know or how did
4    you know back then that that failure to provide
5    him with that accommodation didn't negatively
6    impact his performance on that exam?
7              MS. WYDLER:  Object to form.
8         A.     I -- I don't.  But I didn't -- also
9    know that it did.  And my --
10             (Simultaneous speakers)
11   BY MR. HANNAH:
12        Q.     -- right?
13             (Simultaneous speakers)
14        A.     My review of the record.
15   BY MR. HANNAH:
16        Q.     You don't know one way or another
17   whether the failure to accommodate him on the
18   psychiatric retake exam had a negative impact upon
19   his performance, correct?
20             MS. WYDLER:  Objection; form, outside
21        the scope of the designated area of inquiry.
22   BY MR. HANNAH:
23        Q.     You can answer.
24        A.     I did not.
25        Q.     You didn't know it back then, nor do
```



```
 1    you know it today, correct?
 2              MS. WYDLER:  Objection; form.
 3    BY MR. HANNAH:
 4         Q.   Correct?
 5              (Technical interruption.)
 6              (Discussion off the record)
 7    BY MR. HANNAH:
 8         Q.   You don't know as we sit here today
 9    whether the failure to accommodate Mr. Nehme on
10    the psychiatric retake exam had a negative impact
11    upon his performance on that exam, correct?
12              MS. WYDLER:  Objection; form.
13         A.   I don't.
14    BY MR. HANNAH:
15         Q.   And you don't -- you didn't know that
16    back then when you made a decision on his appeal
17    either, right?
18              MS. WYDLER:  Form.
19         A.   Correct.
20    BY MR. HANNAH:
21         Q.   And nobody at IDEA told you --
22    Ms. McWhorter, Valerie Hall, anybody else -- told
23    you that we conclude that the failure to
24    accommodate Mr. Nehme had no negative impact upon
25    his performance on the exam, correct?
```



1   impacted the performance on that Psychiatry Shelf

2   Exam, but I do not believe it is -- that it would

3   have changed the course of his dismissal.

4            He was not dismissed for failing the

5   shelf exam.  He was sent to MSEPC, and a review of

6   his academic record as a medical student was the

7   part of the scope of my responsibility.

8   BY MR. HANNAH:

9        Q.    Wasn't the failure of his performance

10  on the Psychiatric Shelf Exam one of the reasons

11  he was dismissed?

12       A.    It was one of the reasons he was taken

13  to MSEPC.

14       Q.    Wasn't it one of the reasons they

15  decided to or recommend his dismissal?

16       A.    That was one of the reasons.  Not the

17  only reason.

18       Q.    Wasn't that the triggering event that

19  caused him to be called in front of the MSEPC, the

20  failure of the Psychiatric Clerkship?

21       A.    Could have been.

22       Q.    You don't know?

23       A.    That is what they stated.

24       Q.    And didn't they also state that that

25  was one of the reasons why they were dismissing



```
1    produced by FIU in this case.  It's Pages FIU
2    Bates stamps 1,072 through 1,080.  Eight pages.
3    And I'm going to scroll through it and ask you
4    about the -- this is the audit that -- the
5    subsequent audit after the IDEA reports you
6    reviewed in making your decision as to the appeal
7    of Mr. Nehme.
8                   This is the first page.  This is the
9    second page.  This is the third Page.  Fourth
10   page.  Fifth -- fifth page.  The sixth page.
11   Seventh page and last page.
12                  Actually an extra page, sorry.  Nine
13   pages.
14                  Is that what you reviewed as you
15   thought additional audit results or audit document
16   provided to you by IDEA?
17                  MS. WYDLER:  You're on mute.
18        A.      Apologies for mute.  Yes.
19   BY MR. HANNAH:
20        Q.      Okay.  So this is what you asked IDEA
21   to give you, and this is what they gave you.  And
22   this contributed to your decision on the appeal,
23   correct?
24        A.      Yes.
25        Q.      And this indicates various readiness
```



```
1    quizzes and whether he was accommodated for those
2    quizzes or not.  His final grades in various --
3    various courses, correct?
4         A.    Yes.
5         Q.    Did you give them, the IDEA people the
6    parameters of what you wanted, or did they just
7    produce this to you?
8         A.    I did not give them parameters.  I
9    relied on their expertise.
10        Q.    What specifically did you ask them to
11   provide you?
12        A.    I wanted to ask -- address the question
13   of whether the accommodation directly impacted the
14   academic performance.
15        Q.    Is that indicated in here somewhere; do
16   you know?
17        A.    Sir, if you wouldn't mind scrolling
18   down.
19        Q.    No, no.  Trying to find out whether
20   that says something about the --
21        A.    Sir --
22        Q.    -- failure to accommodate on the psych
23   exam would impact his performance.  I'm trying to
24   see where that is.  It's in the first page.  Which
25   covers period, I guess, April 2nd, 2018 to
```



1    March 28, 2019?  Correct?

2        A.    Yes.  This is part of Mr. Nehme's

3    appeal and concerns, which we took very seriously,

4    were whether -- where readiness quizzes impacted

5    his performance.  He wrote that in his appeal,

6    that he did not receive accommodations on the

7    readiness quizzes.

8              So if you see they -- they documented

9    the weighting of the quizzes, whether it had

10   impact -- this impacts his academic record,

11   failure of courses, passes of subsequent courses.

12   If you'll see in the second section, the second

13   set -- second grade final course grade breakdown,

14   the weighting of the grade, the student's final

15   grade, and holding Mr. Nehme harmless if he had

16   scored 100 percent on those quizzes when those

17   accommodations were not provided.  And what the

18   outcome of the final grade would be.

19       Q.    Okay.  So this is -- what course is

20   this for?  All the ones that were listed up here

21   in assignment or -- trying to figure out what

22   courses these grades are for.

23       A.    So if you scroll up or down -- scroll

24   up for just a second.  My apologies.

25       Q.    No problem.



1        A.      Okay.   This one refers to Clinical

2   Skills II.   He claims --

3               (Simultaneous speakers)

4   BY MR. HANNAH:

5        Q.      Up top, Clinical Skills II.

6        A.      So BMS 6016.   He -- he passed this

7   class.   The student's final grade in the class, if

8   you'll see at the very bottom in the middle column

9   is a bolded Number 89.   He -- part of his

10  complaint was he had not received the

11  accommodations, and the accommodations were indeed

12  not provided for this course.   That was part of

13  the substantiation of IDEA's finding.

14               But holding him harmless on not

15  receiving all those accommodations would have

16  given him a 90 in the course.   And so he passed

17  the course irrespective of the accommodation.

18       Q.      Okay.   Those are just based on quizzes,

19  though, right?

20       A.      The quiz analysis is at the top.   At

21  the bottom, it's everything.   The preceptorship,

22  the OSCEs, the written exams.   Everything is laid

23  down.

24       Q.      Okay.

25       A.      Everything --



```
 1              (Simultaneous speakers)
 2   BY MR. HANNAH:
 3        Q.    He wasn't claiming for that course he
 4   wasn't provided accommodations for the exam,
 5   right?
 6        A.    He provided in his claim that he was
 7   not provided accommodations on readiness quizzes.
 8        Q.    Talking about --
 9        A.    Subsequent --
10              (Simultaneous speakers)
11        A.    -- performance as a medical school
12   student.
13   BY MR. HANNAH:
14        Q.    You need to answer my question.
15   There's nothing indicated on here about him not
16   getting accommodations for the written exam,
17   right?  The final exam?
18        A.    No.
19        Q.    Okay.  Then the next page,
20   Cardiovascular and Respiratory Systems, correct?
21        A.    Correct.
22        Q.    Same, you're focusing on the quizzes
23   again, whether he was accommodated or not, right?
24        A.    That was the basis of his claim.
25        Q.    Okay.  Well, part of the basis of his
```



```
 1   claim, right?
 2        A.    Uh-huh.  Yes.
 3        Q.    Okay.  So that was that course.
 4              And then Cardiovascular and Respiratory
 5   Systems, correct?
 6        A.    Yes.
 7        Q.    It's the next page?  That's that
 8   course, correct?
 9        A.    Yes.
10        Q.    Again, you're focusing just on the
11   accommodations as to the readiness quizzes, right?
12        A.    Yes.
13        Q.    Yes?  I didn't hear you.
14        A.    Yes.
15              MS. WYDLER:  She said yes.
16   BY MR. HANNAH:
17        Q.    Okay.  And the next -- looks like two
18   different -- two different courses on this next
19   page.  I don't know if I'm pronouncing this stuff
20   correctly, but Hematopoietic and Lymphoreticular
21   Systems is the first course -- actually, looks
22   like they're two different courses.  Looks like
23   they're both the same course, I'm sorry.
24              All right.  This again is just focusing
25   on that -- those courses for the readiness exams
```



**Jeannie Reporting**
Your Wish Is Our Job!
305-577-1705

1    about the accommodation, correct?

2         A.    Yes.

3         Q.    Whether it affected his performance

4    on -- in the course, correct?

5         A.    Correct.

6         Q.    Then the next page, looks like

7    Gastrointestinal Systems and Medical Nutrition?

8    That's the next course you're looking at, right?

9         A.    Yes.

10        Q.    Again, reviewing the readiness exams,

11   whether it had a failure to accommodate on

12   readiness exams impacted his overall performance

13   in the class, right?

14        A.    Yes.

15        Q.    Are these Period 2 or Period 3 courses?

16        A.    That would be a question -- it's not

17   laid out on the report, and I -- that would be a

18   question for the College of Medicine.

19        Q.    Okay.  You don't know.

20             Next is Reproductive Systems.  Again,

21   same thing.  Looking at the comparing his

22   performance on the readiness exam to his overall

23   performance in the class, correct?

24        A.    Correct.

25        Q.    And these are just readiness quizzes



1   where he was not provided an accommodation, right?

2      A.    Yes.

3      Q.    And you know what accommodations were

4   not provided?  You know if it was a minimal

5   distraction room or time for the exam?  Or both?

6      A.    I -- I don't know.

7      Q.    Okay.  It's not spelled out on any of

8   these charts, correct?

9      A.    His accommodations were not provided.

10  I take that as the totality.

11     Q.    But it doesn't say that on any of these

12  charts, correct?

13     A.    Does not.

14     Q.    And next is Renal System, and the same

15  analysis, correct?

16     A.    Yes.

17     Q.    Yes?

18     A.    Yes.

19     Q.    Okay.  Then the next is Systems Based

20  Practice?  Recognize --

21     A.    Yes.

22     Q.    -- it's a different course and the same

23  analysis done, correct?

24     A.    It's a very consistent analysis.

25     Q.    Right.  That's it, right?  Nothing



1    about any of the clerkships, though, right?

2        A.    One of the bases of his concerns was

3    the readiness exams -- the readiness quizzes.

4        Q.    Right.  But the other concern, the one

5    that we're on this case here for is his -- the

6    failure to provide him the required accommodation

7    of a minimal distraction room for his retake of

8    the Psychiatric Shelf Exam, correct?

9            MS. WYDLER:  Form.

10   BY MR. HANNAH:

11       Q.    Yes?

12       A.    Yes.  And one of my responsibilities

13   to -- was to look at his -- the reasoning for

14   being on academic probation, his consistent poor

15   academic performance.  It was important for me to

16   look at this and be thorough.

17       Q.    All right.  And in your thorough

18   analysis, though, you didn't ask for any written

19   input from IDEA on how the failure to provide him

20   the minimal distraction room on the psychiatric

21   exam may or may not have caused him to fail that

22   exam's retake, correct?

23           MS. WYDLER:  Objection; form.

24       A.    How would -- how would they know that?

25   I wouldn't know that.  How would they know that?



```
 1  BY MR. HANNAH:
 2       Q.    Right.  You don't know, right?  Nor do
 3  they, correct?
 4       A.    Discipline question.
 5       Q.    I'm sorry?
 6       A.    I think that's a discipline question.
 7       Q.    Discipline question.  I'm not sure what
 8  you mean by that.
 9       A.    I'm not an expert in the College of
10  Medicine assessment.
11       Q.    Okay.  But you didn't get any input
12  from anybody as to whether the failure to provide
13  him the minimal distraction room accommodation had
14  a negative impact upon his performance on the
15  Psychiatric Shelf Exam Retake, correct?
16            MS. WYDLER:  Objection; form.
17  BY MR. HANNAH:
18       Q.    You can answer.
19       A.    I did not.
20            MR. HANNAH:  That one's going to be
21       Exhibit Number 16.  Those are all the
22       results.
23            (Discussion off the record)
24            (Exhibit 16 was marked for
25       identification)
```



```
1         Q.    What -- what parts of the report did
2    you need clarification?
3         A.    I wanted to understand, even though the
4    accommodations were not met to the standard,
5    right, of the IDEA office, those were the findings
6    that they substantiated.  I wanted to understand
7    if there is a way to determine if that had a
8    direct impact on his ability to successfully
9    perform academically because he had a consistent
10   record of academic poor performance.
11        Q.    What did they tell you?
12        A.    They issued the audit.  They said we
13   went back to you.
14        Q.    The audit only talks about the
15   readiness quizzes, though, right?
16        A.    Yes.
17        Q.    Did they provide you any information
18   about the failure of the Psychiatric Shelf Exam?
19        A.    No.
20        Q.    So that was never squarely addressed by
21   IDEA, whether that failure to provide that
22   accommodation for that particular exam had any
23   impact upon his ability to continue in medical
24   school, correct?
25              MS. WYDLER:  Objection; form.
```



```
 1          A.      Correct.
 2   BY MR. HANNAH:
 3          Q.      Was your answer correct?
 4          A.      My answer is correct.
 5          Q.      Okay.  I'm going to ask you some
 6   questions about your role as a -- in deciding
 7   appeals of students who have appealed the decision
 8   of the MSEPC regarding recommending discharge.
 9                  I -- I take it Mr. Nehme was not the
10   only appeal you had of a student appealing a
11   decision recommending a discharge, correct -- or
12   dismissal, I should say?
13                  MS. WYDLER:  Objection; form.
14   BY MR. HANNAH:
15          Q.      Prior to Mr. Nehme's appeal, had you
16   handled other appeals of students who were looking
17   for a reversal of an MSEPC recommendation of
18   dismissal?
19          A.      So appeals come to the Office of the
20   Provost, who -- when they are upheld, not just by
21   the MSEPC, but the IDEA Appeals Committee of the
22   MSEPC and the Dean of the College of Medicine.
23   And so it is those -- the appeal of the dean's
24   decision that comes to the Office of the Provost.
25          Q.      Right.  Okay.  I get the process.
```

