# EXHIBIT F

<pre>
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2
                    CASE NO.: 1:20-cv-24649-CANNON
 3
       ELIE NEHME,
 4
            Plaintiff,
 5
       -vs-
 6
       FLORIDA INTERNATIONAL UNIVERSITY
 7     BOARD OF TRUSTEES,

 8          Defendant.
       _____/
 9

10              DEPOSITION OF ADRIAN JONES

11

12     LOCATION:     Remote Audio-Video Communication

13     DATE:         February 2, 2022

14     TIME:         10:13 a.m. - 2:17 p.m.

15

16

17                  Pages 1 through 209

18

19

20

21              Stenographically Reported By:

22         Teresa R. Cruise, RPR, CRR, FPR-C, FPR
                Registered Professional Reporter
23                Certified Realtime Reporter
                 Florida Professional Reporter
24            Notary Public, State of Florida

25
</pre>

1    **A.**    I'm trying to think back.  I think it

2    was just once.

3         **Q.**    Was that in the other case you

4    mentioned, where a student was dismissed from the

5    medical school?

6         **A.**    Correct.

7         **Q.**    That was a student that had a

8    disability?

9         **A.**    The claim was also disability in

10   conjunction with a few other things, but yes.

11        **Q.**    Was that Mr. Goldberg?

12        **A.**    Correct.

13        **Q.**    You say you did -- you weren't deposed

14   in that case?

15        **A.**    I was deposed in that case, correct.

16        **Q.**    All right.  What is your current

17   position with the medical school?

18        **A.**    My current role is the Associate Dean

19   for Student Affairs.

20        **Q.**    How long have you been in that

21   position?

22        **A.**    So I've been in this role -- came to

23   FIU in 2014 as the Associate Dean for Student

24   Affairs.

25             About, I think, the last year, I can't

1      **Q.**    Is there an actual Assistant Dean of

2    Student Affairs position?

3      **A.**    So we have an Assistant Dean for

4    Student Services and they provide -- work with a

5    lot of our more -- they work with our students

6    dealing with things like counseling and wellness,

7    career planning, a lot of our student programming,

8    our learning communities, and so we've divided some

9    of those functions.

10              However, we do cover for each other

11    and we kind of are cross-trained to help in any of

12    those situations, but that's their primary

13    responsibilities.

14      **Q.**    Do you play any type of role in your

15    capacity as Associate Dean for Student Affairs with

16    regard to students who are disabled in medical

17    school?

18      **A.**    Disabled?

19      **Q.**    Suffer from a disability, yes, whether

20    it's a learning disability or a physical

21    disability?

22      **A.**    Yes.

23      **Q.**    So what's your role -- what's your

24    role in regard to that?

25      **A.**    When I first came to the College of

```
 1    Medicine, I assumed the role of Chair of our
 2    Disability Accommodations Committee.  I took that
 3    over from Bob Dollanger, who was my predecessor in
 4    that role, and then I managed that for a few years.
 5              Then, when Dr. Havas came, I
 6    transitioned over since it was more kind of logical
 7    from our student support standpoint, but I worked
 8    very closely with her on the committee.  We manage
 9    and work with our assessment team and the
10    University to work with students who need
11    accommodations.
12         Q.   You facilitate that process somehow?
13         A.   Facilitate is not necessarily the word
14    that I would use.  I think we manage it to some
15    extent.
16              So communications -- students -- we,
17    first of all, communicate to students when they
18    first walk in at orientation asking them if they've
19    ever had accommodations or need accommodations, to
20    reach out to us.  We then set a meeting up with our
21    disability resource center, who they do a complete
22    evaluation and then send us recommendation.
23              From that recommendation, our
24    committee would typically look at it and I would
25    meet with the student to just verify it and then
```

1   tasks, we would make sure that those things were

2   being done.

3           We would communicate if there was

4   issues that were occurring and then also would sit

5   down and meet and talk about accommodations that

6   came in.  There were times where accommodations

7   would come in that we needed additional clarity on

8   and so we would reach out to the DRC to get

9   additional information regarding accommodations

10  that seemed outside the scope of things that we

11  were familiar with.

12          Examples of that is someone wanting a

13  fidget spinner one time.  In trying to accommodate

14  that, we had to understand from the DRC.  So we

15  would meet with them, understand what the

16  accommodation is, how we could incorporate that

17  accommodation and then work with our team to do so.

18          So when you say, oversight, it's a

19  team approach that's managing a complex system

20  where you have individuals doing different tasks

21  and different responsibilities, but we were all

22  accountable to each other.

23      Q.   All right.  What was the purpose of

24  the Disability Accommodations Committee?

25      A.   To ensure and make sure that our

1    students received accommodations, to make sure we

2    understood who was receiving accommodations, to

3    also sit down and work with the DRC to understand

4    how those accommodations were being played out or

5    how they were being incorporated from the College

6    of Medicine.

7         And so -- and, again, it was just a

8    way to make sure that we understood the process and

9    understood that students could -- were receiving

10   their accommodations and so it was a way for us to

11   kind of follow that process along for students.

12        Again, the way the process worked,

13   from the DRC standpoint, is that we didn't receive

14   any of the information that justified the

15   accommodation.  And that was done specifically so

16   therefore, there was no level of bias or we didn't

17   want -- I didn't want to know a student's medical

18   history.  We didn't want to know anything that had

19   to do with the substantiation for the

20   accommodation.

21        That's where the DRC, in this, was a

22   level of protection; so therefore, when we got

23   their recommendation from the DRC, all we had to do

24   was just institute it, and that's kind of the way

25   the process worked.

1    specifically for the students.

2            We had a couple members from our OSA

3    team and we had a few members from the academic

4    team, some of our academic team.

5            Now, the committee makeup has changed

6    over the years and I can't tell you they were all

7    consistent over a period of time because we had

8    some members move in and out of the committee, but

9    the ones that were consistent were myself,

10   Dr. Havas for a period of time, Dr. Bonnin for a

11   period of time, and I can't remember who else was

12   on that.

13        **Q.**   How long were you the chairman of this

14   committee?  From what period of time to what period

15   of time?

16        **A.**   That's a good question.  I can't

17   remember.  I mean, I can guesstimate probably 2015

18   to 2018 maybe, but again, I -- I can't specifically

19   recall when some of those transitions occurred.

20        **Q.**   And you say Dr. Havas took over for

21   you?

22        **A.**   Dr. Havas became the chair of it, yes,

23   and I still remained a member of it and worked with

24   her.

25        **Q.**   Are you still a member today?

```
 1    provided with accommodations for a disability?
 2           A.    Correct.
 3           Q.    Okay.  They're the experts, as you
 4    call them?
 5           A.    Correct.
 6           Q.    And then they report to you --
 7    assuming that a student is determined to be
 8    disabled and requires certain accommodations, they
 9    then would be obligated, as this chart indicates,
10    to report the need for those accommodations to you,
11    to Dr. Havas and Dr. Bonnin; is that correct?
12                 MS. WYDLER:  Objection.  Form.
13                 THE WITNESS:  Please restate your
14                 question because I'm not -- I'm not sure I
15                 understand what you're asking.
16    BY MR. HANNAH:
17           Q.    Well, it says, "Disability Resource
18    Center," at the top and then there's arrows going
19    from there directly to Rodolfo Bonnin, to you,
20    Adrian Jones, and then to Nancy Havas, right?
21           A.    Correct.
22           Q.    And what are those arrows supposed to
23    represent?
24           A.    Just a communication flow.
25           Q.    Okay.  So the Disability Resources
```

1    Center determines that a student needs certain

2    accommodations, they're supposed to report that to

3    you to, to Dr. Bonnin and Dr. Havas, right?

4         **A.**    Correct.

5         **Q.**    And then you're obligated, the three

6    of you, are obligated to implement those

7    accommodations?

8              MS. WYDLER:  Objection to form.

9              THE WITNESS:  Correct.

10              So Dr. Bonnin and his team implement.

11              We meet with the students to inform the

12              students of the process and then below that

13              are individuals based on need to know,

14              because to protect confidentiality, not

15              everybody needs to know what a student's

16              accommodations are.

17              And the way we've set it up is to help

18              a student protect their confidentiality so

19              that not every professor knows that they're

20              getting accommodations; and so therefore,

21              these other individuals are part of our

22              continuum.

23              So therefore, depending on what role

24              they need to fill, that Disability Resource

25              Center is pointing down, but it's also the

```
 1    his e-mails, which I asked him to correct several
 2    times, but if I went into the e-mail right now and
 3    opened it up, it would have today's date.  So --
 4    but I can go back and see when the actual e-mail
 5    date was.
 6              But again, my access to my e-mail is
 7    only two years in my current system, so I have to
 8    reach out to my IT department to figure out when it
 9    specifically came.
10         Q.    That e-mail had an attachment to it?
11         A.    Correct.
12         Q.    What would be in the attachment?
13         A.    It would just be like a Word document
14    with a memo stating that this student, Elie Nehme,
15    received these accommodations.
16         Q.    You see that document, what's
17    previously marked as Exhibit Number --
18         A.    Uh-huh.
19         Q.    -- appears to be -- one second --
20    appears to be Exhibit 11 actually, Plaintiff's
21    Exhibit 11.
22              Appears to be a memorandum to you from
23    Stephen Peter Loynaz, associate director student
24    resource center, regarding -- subject, "Request for
25    accommodations regarding Mr. Nehme."
```

1          Do you recall seeing this before?

2          **A.**   I do.

3          **Q.**   Is this what was attached to your

4    e-mail from Mr. Jones [sic]?

5          **A.**   Yes.

6          MS. WYDLER:   From Mr. Loynaz, Dr.

7          Loynaz.

8    BY MR. HANNAH:

9          **Q.**   I'm sorry, from Mr. --

10         **A.**   Dr. Loynaz.

11         **Q.**   Dr. Loynaz, correct.

12         And you say somehow your e-mail, if

13   you printed out an e-mail it would have a different

14   date than the actual date of the e-mail?

15         **A.**   So looking.

16         MS. WYDLER:   Objection.   Form.

17         Mischaracterization.

18         THE WITNESS:   So on this e-mail --

19   BY MR. HANNAH:

20         **Q.**   This is not an e-mail.

21         **A.**   This memo -- excuse me, this memo,

22   excuse me, you're right -- this memo, there's an

23   auto-date function on this memo that when received,

24   when you open it up, it will indicate the date that

25   it's opened up, not the date it was sent.

```
 1              So in this situation, there's an
 2   auto-date for him where this was opened up
 3   August 25th, 2020.  That's not the date it was
 4   actually sent.  So again, this is just a -- this is
 5   something that happens on his e-mail system.
 6              And I -- again, I can send you -- I
 7   can send you a ton -- a bunch of his other e-mails.
 8   I've asked him to since correct it, but this was
 9   something that was a common practice that he did a
10   while back.
11         Q.    I'm asking about the original e-mail
12   that contained this as an attachment.
13         A.    I understand.  I told you, I don't
14   know when that was sent because I can't access my
15   e-mails from more than two years ago.
16              And in opening this e-mail, that's
17   kind of where this auto correct function is where
18   this -- this memo was opened up on
19   August 25th, 2020, but it doesn't indicate the
20   original date that it was sent.
21         Q.    Do you know when it was sent?
22         A.    No.
23         Q.    Okay.  It would have been sent around
24   the time a determination was made by the Disability
25   Resource Center that Mr. Nehme required certain
```

1    accommodations, correct?

2         **A.**    Correct.

3         **Q.**    All right.  And that certainly was

4    long before August 25th, 2020, correct?

5         **A.**    Correct.

6         **Q.**    So you got this document from

7    Mr. Loynaz that was unsigned?

8         **A.**    This is how he sends his documents.

9         **Q.**    This is how who sends documents?

10        **A.**    This is how Dr. Loynaz sent his

11   documentation.

12        **Q.**    Never sending you a signed memo, just

13   a draft-looking memo with a date that changes every

14   time you open it?

15        **A.**    Yes.

16        **Q.**    So to your knowledge, there's no

17   original signed version of this memo by Dr. Loynaz?

18        **A.**    Not to my knowledge.

19             MS. WYDLER:  Rod, I know you made your

20             request, there's not.

21             MR. HANNAH:  How about the e-mail that

22             supposedly this was attached to?

23             MS. WYDLER:  I'm looking into that.

24             MR. HANNAH:  I think I'm entitled to

25             that.  At least it would not have a

```
 1              changing date.
 2                    All right.  I just wanted to see if
 3              there was something original or not.
 4   BY MR. HANNAH:
 5         Q.    You're not aware of any other
 6   document, other than the way it looks here,
 7   correct?
 8         A.    This is the form that I've received
 9   from Stephen Loynaz consistent over the last number
10   of years I've worked with him.
11         Q.    Okay.  Just give me a second.
12              MR. HANNAH:  You need to take a break
13              or anything, sir?  You okay?
14              THE WITNESS:  Yeah, I can run to the
15              restroom, if you don't mind.
16              MR. HANNAH:  Let's do that.  Let's
17              take a -- I'm trying to find something that
18              might refresh your recollection as to time
19              frame, so let's take a five-minute break,
20              restroom break.
21              MS. WYDLER:  Rod, I don't mind
22              stipulating to the date where he received
23              the e-mail.  It's an idea report.
24              MR. HANNAH:  Might be, but I'd like to
25              see the original document.
```

```
 1                    MS. WYDLER:  That's fine.
 2                    MR. HANNAH:  There's an e-mail with
 3           it.
 4                    MS. WYDLER:  We'll look for it.
 5                    MR. HANNAH:  Okay.
 6                    (A recess was held at 11:34 a.m.)
 7                    (The foregoing deposition resumed
 8           at 11:47 a.m.)
 9   BY MR. HANNAH:
10           Q.   All right.  What was just sent to me
11   by FIU's counsel was a copy of an e-mail dated --
12   there's no date on it.  Let me see.
13                    MS. WYDLER:  The e-mail that I sent
14           had July 28th on it, but in converting it
15           to this form, it lost the date.
16                    MR. HANNAH:  For some reason, it
17           saved -- it didn't save the date.
18                    THE STENOGRAPHER:  Counsel, the date
19           is in the upper right-hand corner if you're
20           looking at the screen.  It's right
21           underneath "Reply," "Reply All," "Forward."
22                    MS. WYDLER:  Oh, I see it.
23                    MR. HANNAH:  Let me see.  I don't see
24           it because I have the videos covering
25           everybody here.
```

```
 1              THE WITNESS:  Yeah, it says
 2         September 18th [sic], 2000 --
 3              MR. HANNAH:  Right.
 4              THE WITNESS:  September 28th, 2017.
 5              MR HANNAH:  Right, right.
 6              THE WITNESS:  I mean -- yes,
 7         September -- no, July -- excuse me -- July,
 8         July 28th.
 9    BY MR. HANNAH:
10         Q.   All right.  I just moved people down a
11    little bit, the pictures.
12              So you see the date, July 28, 2017.
13    So that was the date that Mr. -- or Dr. Loynaz
14    first -- is sending you the accommodations or
15    reasonable accommodations notice for Mr. Nehme,
16    correct?
17         A.   Correct.
18         Q.   If you open that -- that up it shows
19    today's date.  So that's what would happen, what
20    you explained -- right? -- that it switches the
21    date when it opens up, right?
22              I think they sent me -- I saved the
23    one that was actually originally attached to that,
24    so?
25         A.   Yeah, but even still, if the feature
```

1    is still on, you may find that that -- but, again,

2    if you look at the date of the e-mail, that's when

3    it was sent out.

4         Q.    Right.  I think the actual attached

5    memo when Lourdes sent it to me, it had that other

6    date on it.  Let's see if I can get that.

7              Nope, it changes every time you open

8    it.

9         A.    Uh-huh.

10        Q.    Interesting.  Okay.

11              All right.  So --

12              MS. WYDLER:  But you now have the

13         original.

14              MR. HANNAH:  I have the original

15         e-mail with whatever the attachment was.

16              MS. WYDLER:  The original attachment.

17              MR. HANNAH:  That solves that great

18         mystery.

19              All right.  And this will be

20         Plaintiff's Exhibit Number 18, this e-mail.

21              (Plaintiff's Exhibit No. 18 was marked

22         for identification.)

23    BY MR. HANNAH:

24        Q.    All right.  So let's go back to that

25    memo.  We'll go back to Exhibit Number 11.

1          All right.  So this was what was
2   attached, right, with a different date, of course,
3   correct?
4          **A.**    Correct.
5          **Q.**    Okay.  And it indicates that Mr. --
6   Mr. Nehme was required to be provided with two
7   different accommodations for his exams, 50 percent
8   extra time and --
9          **A.**    He is qualified for -- if you look at
10  the language, it says he was qualified for and
11  eligible for those accommodations, not --
12         **Q.**    Right.
13         **A.**    -- required.
14         **Q.**    And that's what the -- that's what the
15  medical school, once it received this information
16  was going to provide Mr. Nehme, right?
17         **A.**    Correct.
18         **Q.**    For his exams, either -- both 50
19  percent extra time on the exams and a minimal
20  distraction testing room, correct?
21         **A.**    Correct.
22         **Q.**    Okay.  Was this the first time you had
23  any knowledge that Mr. Nehme had a disability that
24  required accommodation?
25         **A.**    So in conversations with Elie -- and

1    **Q.**    Anybody else you can recall?

2    **A.**    Whoever the faculty told -- again,

3    Tempest, Obeso, Toonkel, whoever is involved in the

4    process, I will meet and do some fact finding to

5    get their information.

6    **Q.**    How about Dr. Abedi Wiseman.

7    **A.**    Yes.

8    **Q.**    Do you keep notes of all your

9    discussions with them?

10    **A.**    Whatever I report, I put in the

11    professionalism incident report system.

12    **Q.**    Okay.  So Mr. Nehme was allowed to

13    take a leave of absence before he had to repeat his

14    second year, right?

15    **A.**    Correct.

16    **Q.**    What was the leave of absence for?

17    **A.**    A medical leave of absence.

18    **Q.**    Did he request that?

19    **A.**    He did.

20    **Q.**    Okay.  So you -- the school agreed to

21    provide him with that medical leave of absence and

22    then come back and repeat his second year; is that

23    correct?

24    **A.**    The school allowed him to repeat -- to

25    take a medical leave of absence.  As a part of

1          **A.**     Correct.

2          **Q.**     That's the year where the students do

3     clerkships; is that correct?

4          **A.**     That is correct.

5          **Q.**     And at some point in time, Mr. Nehme

6     failed the psychiatric clerkship exam, correct?

7          **A.**     Yes, the shelf exam.

8          **Q.**     The shelf exam that he failed to

9     re-take as well, correct?

10         **A.**     Correct.

11                He also failed his surgery clerkship

12    on his first attempt.  He also failed, I think

13    OB -- no, he passed OB/GYN, but I think he also

14    failed the family medicine on his first attempt.

15    He also failed -- I think he failed three of his

16    shelf exams in his third year and then was allowed

17    to retake them and he subsequently passed them.

18                So he actually failed four shelf exams

19    in his fourth year -- in his third year.

20         **Q.**     I would appreciate, sir -- I know

21    you'd like to tell me all these good things that

22    helps FIU's situation, but I would like you just to

23    answer my questions.

24                I didn't ask you about all these other

25    exams.  I only asked about was the psychiatry

```
 1              MR. HANNAH:   That's -- we're exactly
 2          doing that.   That requires him to answer
 3          the questions I ask him, not to make
 4          speeches about things that are irrelevant
 5          to my question.
 6   BY MR. HANNAH:
 7          Q.   Let me see if I can do this again.
 8               All right.   Did he fail the psychiatry
 9   clerkship exam?   That should be a yes or --
10          A.   Yes, he failed the psychiatry
11   clerkship exam.
12          Q.   Did he fail the remediation of that
13   exam?
14          A.   Yes, he failed the remediation of that
15   exam.
16          Q.   Okay.   Did he pass all his other
17   clerkships up until that point in time when he
18   failed the psychiatry clerkship exam?
19               MS. WYDLER:   Objection.   Form.
20   BY MR. HANNAH:
21          Q.   You can answer.
22          A.   Did he pass --
23          Q.   Yes.
24          A.   -- all of the them?
25          Q.   Yes, yes.
```

121

1          **A.**     No, we do not.

2          **Q.**     Okay.  And so if you -- you're a

3    student in the medical school, the best you can do

4    in all your classes is 76, you pass, right?

5          **A.**     Correct.

6          **Q.**     You're allowed to continue on with

7    your medical school career, correct?

8          **A.**     Uh-huh.

9          **Q.**     Yes?

10          **A.**     Yes.

11          **Q.**     Okay.  So let's take a look at

12    Mr. Nehme's second year.  All right.  We'll blow

13    that up a bit?

14          **A.**     Well, you dismissed the first year,

15    correct?

16          **Q.**     I'm looking at the second year, sir.

17          **A.**     Oh, okay.  All right.  I know because

18    a lot of failures are there as well, but go ahead.

19          **Q.**     No, that's not what we're talking

20    about.  I'm talking about him being allowed to

21    repeat his second year and how well he did.

22          **A.**     I understand.

23          **Q.**     Is that fair?

24          **A.**     That's fair.

25          **Q.**     So he took all these classes and there

```
1     are only two where he got grades in the seventies,

2     right?

3              A.    Yes.

4              Q.    One was a 79 for endocrine system,

5     correct?

6              A.    Yes.

7              Q.    And another was 76 he got for nervous

8     system behavior one, right?

9              A.    Uh-huh.

10             Q.    Yes?

11             A.    Yes.

12             Q.    And all the rest were 80s or 90s,

13    right?

14             A.    Okay.  Yes.

15             Q.    Okay.  Except for, I believe, two were

16    just pass -- there are some courses that are just

17    pass/fail courses?

18             A.    Correct.

19             Q.    All right.  So there are two on there,

20    professional behavior two and community engaged.

21    I'm not sure what the P-H-Y-S stands for --

22             A.    Physician.

23             Q.    -- physician one is also a pass/fail

24    course, right?

25             A.    Correct.
```

```
1              Q.    He passed all of that, correct?

2              A.    Correct.

3              Q.    All right.  And then it shows you as

4     a -- for the GPA that entire term was 84.27,

5     correct?

6              A.    Yep.  Yes.

7              Q.    Is that good or bad?

8              A.    That's okay.

9              Q.    It's a okay performance?

10             A.    It's an okay performance.

11             Q.    That's enough, certainly, to

12    successfully complete your second year of medical

13    school, correct?

14                   MS. WYDLER:  Objection.  Form.

15    BY MR. HANNAH:

16             Q.    You can answer.

17             A.    Yes.  After you've seen it one time,

18    you go back again, the expectation is that you

19    should improve.

20             Q.    Okay.  Let's take a look at his third

21    year, now.

22                   You see his third-year clerkship

23    grades?

24             A.    I do.

25             Q.    All right.  So for the first one it
```

1      shows family medicine clerkship, correct?

2              A.    Uh-huh.

3              Q.    You've got a grade, yes?

4              A.    Yes, he does.

5              Q.    All right.  You need to articulate

6      your answers, please.  Shows he got a grade of 89,

7      right?

8              A.    It does.  After he took the exam once,

9      had a chance to see it and go take it again, he

10     should do better.

11             Q.    But the grade is not just based on the

12     exam, right?

13             A.    Again, a big part of the grade is

14     based on the exam, but every class varies with what

15     their expectation in the grading system is.

16                   He was able to see the exam every --

17     he was able to see the exam and then go back and

18     take the exam again getting additional time to

19     prepare for the exam in three -- four different

20     situations, so he did pass each one of those

21     courses, but he had second attempts at each of

22     those classes.

23             Q.    Every student who fails the exam the

24     first time is allowed to take it a second time,

25     correct?

```
 1          A.      Correct.

 2          Q.      Whether you have a disability or not,

 3   correct?

 4          A.      Correct.

 5          Q.      Okay.  There's no exceptions, correct?

 6          A.      Correct.

 7          Q.      Okay.  So --

 8          A.      However, a student who fails a shelf

 9   exam, continually fails a shelf exam, is exhibiting

10   poor academic knowledge and as a result of that, it

11   puts them in a position where we're concerned about

12   their ability to get through medical school.

13                  Remember, patient safety is first and

14   so we are looking at the ability to have someone

15   who is dealing with a patient and if you're failing

16   something on the first attempt, that means you

17   don't have the knowledge.

18                  Now, you have a chance to go back and

19   see it again to have additional time to prepare for

20   it.  It would assume a student would probably do

21   better on a second attempt if they had a chance to

22   see it the first time.

23          Q.      Okay.  So why are students allowed to

24   take it a second time at all?

25          A.      In most situations, it is, again, to
```

1          Q.    I thought you were supposed to keep

2     track as well as far as how well the students were

3     doing?

4               MS. WYDLER:  Objection.

5               THE WITNESS:  So again, when a -- the

6               track that I keep up is the shelf exam is

7               the triggering point, that's the red flag.

8               So the red flag for me is when a student

9               fails a shelf exam and they are continually

10              performing -- failing shelf exams.  Those

11              are the triggers.

12              What happens on the clinical side,

13              Dr. Obeso -- they manage the clinical

14              portions of that.  The actual grades and a

15              student's performance, the trigger is the

16              shelf exam.  That's the reason why he was

17              called to the promotions committee because

18              he failed the psychiatry shelf exam and the

19              remediation.

20    BY MR. HANNAH:

21              Q.    Okay.  And that was the triggering

22    event for the MSEPC, correct?

23              MS. WYDLER:  Objection to form.

24              THE WITNESS:  Correct, because he

25              was --

1    BY MR. HANNAH:

2         Q.    You can answer.

3         A.    -- he was on probation.

4         Q.    The triggering event for him to be

5    called in front the MSEPC the third time or the

6    reason he was referred to them was because he had

7    failed the psychiatric clerkship, correct?

8         A.    Correct.

9              MS. WYDLER:  Objection.  Form.

10   BY MR. HANNAH:

11        Q.    Thank you.  All right.

12             Then looking at his grades further, it

13   shows internal medicine clerkship, he got an 86 for

14   that, correct?

15        A.    Correct.

16        Q.    Passed that clerkship, correct?

17        A.    Correct.

18        Q.    And then the surgery clerkship was the

19   next one.  He passed that with an 88 grade, right?

20        A.    And he failed the shelf exam on his

21   first attempt.  Correct.

22        Q.    I'm not asking you that, sir.  I'm

23   asking you about passing the surgery --

24        A.    And I am giving you context, correct.

25   Your answer is --

1          **Q.**    Why do you need to give me context?

2  Why do you feel the need to give me context?

3          **A.**    Because when I look at this -- you're

4  looking at it through one lens and I'm trying to

5  give you the perspective of me in my role as I

6  reviewed this information and the information that

7  I have.

8          **Q.**    All right.  I get it.

9          Radiology clerkship, he passed that.

10  Was it pass/fail for that?

11          **A.**    Yes.

12          **Q.**    Okay.  And he passed that clerkship,

13  correct?

14          **A.**    He did.

15          **Q.**    And then the next clerkship was

16  neurology and he got an 83 and he passed that one

17  as well, right?

18          **A.**    Yes.

19          **Q.**    So he passed all of his clerkships in

20  his third year with grades in the '80s prior to his

21  failing the psychiatry clerkship, correct?

22          **A.**    Correct.

23          **Q.**    And up until that time, his term GPA

24  for all the clerkships was 86.23, right?

25          **A.**    According to his transcript, yes.

```
 1              Q.    His grade point average is 86.23,
 2     correct?
 3              A.    I said yes.
 4              Q.    That's what GPA stands for, right
 5     grade point average, right?
 6              A.    Correct.
 7              Q.    All right.  And his total cumulative
 8     GPA throughout his entire time at the medical
 9     school, up until the failure of the psychiatry
10     clerkship was 82.62, correct?
11              A.    Correct.
12              Q.    And that's certainly passing all his
13     medical school classes up until the time of the
14     psychiatric clerkship failure, correct?
15              A.    Mr. Nehme had nine failures while he
16     was in medical school.  Nine.
17              Q.    Had he passed every course and every
18     class and every clerkship that he had to pass,
19     prior to failing the psychiatric clerkship?
20              A.    Yes.  And he had nine failures in his
21     time in medical school.
22              Q.    I didn't ask you about any failures.
23     I'm asking you whether he had passed all his
24     classes and all his clerkships up until the time he
25     took his psychiatric clerkship and failed that,
```

| | |
|---|---|
| 1 | MS. WYDLER:  Objection.  Form. |
| 2 | THE WITNESS:  So to answer your |
| 3 | question, there are a number of students |
| 4 | who probably graduated who have a GPA below |
| 5 | that without having nine failures -- or |
| 6 | five failures on their report card. |
| 7 | BY MR. HANNAH: |
| 8 | Q.    Okay.  So the answer is yes, there are |
| 9 | people who have actually -- |
| 10 | A.    Yes. |
| 11 | Q.    -- passed medical school with lower |
| 12 | GPAs than Mr. Nehme had up until the time he failed |
| 13 | the psychiatry clerkship? |
| 14 | A.    Yes.  Yes. |
| 15 | Q.    And are you aware of any students who |
| 16 | went through their entire -- up through their third |
| 17 | year that had GPAs less than 82.62? |
| 18 | A.    Yes.  And didn't have five failures, |
| 19 | correct. |
| 20 | Q.    Did you ever tell anyone that |
| 21 | Mr. Nehme would be a great doctor someday? |
| 22 | A.    My concern is a student who had that |
| 23 | many failures on his report card, who would want |
| 24 | to, first of all, be -- see him as a physician and |
| 25 | then secondly, with all those failures on his |

1    report card, he would have a very difficult time

2    even getting a residency with his current app --

3    with his current -- rec -- academic record.

4           Q.    Could you answer my question, sir,

5    please?

6           MR. HANNAH:   Madam Reporter, would you

7           read back my question?

8           (A portion of the record was read by

9           the reporter.)

10          THE WITNESS:   No.

11   BY MR. HANNAH:

12          Q.    Never said that to anybody, right?

13          A.    No.

14          Q.    Have you ever seen any of the clinical

15   evaluations that were done for Mr. Nehme for his

16   clerkships?

17          A.    No.

18          Q.    You have access to them?

19          A.    Was that a question?

20          Q.    Yes.   Did you have access to them?

21   That sounds like a question to me.

22          MS. WYDLER:   It cut out in the

23          beginning.

24   BY MR. HANNAH:

25          Q.    Did you have access to those clinical

```
1    saying it.
2           Q.    That would have been your belief back
3    in June and July of 2020 when you met with the
4    interviewer or talked to the interviewer?
5           A.    Possibly.
6           Q.    And that was after his MSEPC hearing
7    already where they had recommended his --
8    Mr. Nehme's dismissal?
9           A.    I don't know when this interview
10   occurred.  Did this occur after his recommendation?
11          Q.    It was in April of 2020.
12          A.    And he was dismissed when?
13          Q.    He was dismissed in September of 2020.
14          A.    So this occurred prior to him being
15   dismissed from medical school.
16          Q.    But after the recommendation was made,
17   though, right, by the MSEPC, correct?
18          A.    So when was the recommendation made?
19          Q.    I just told you, April of 2020.
20          A.    And this interview was done when?
21          Q.    June and July of 2020.
22          A.    Okay.
23          Q.    So that would have been your belief
24   when you were interviewed, right?  That according
25   to you, Mr. Nehme was a respectful young man that
```

152

```
 1   will be a great doctor someday, right?
 2        A.   Okay.
 3        Q.   Does that refresh your recollection as
 4   you telling the investigator that?
 5        A.   If that's what the investigator said I
 6   said, then that's what I said.
 7             Do I think it now?  No.
 8        Q.   Why do you change your mind?
 9        A.   Because again, if you look at the
10   culmination of his performance, he is a very poor
11   student, someone that I would never want to be my
12   physician.
13        Q.   You had all that same information back
14   then when you talked to the IDEA investigator,
15   didn't you?
16        A.   Okay.  Is that a question?
17        Q.   You had all that same information
18   where you claim now that he wouldn't be a good
19   doctor, you had all that same information about his
20   course failures or test failures or exam failures,
21   you had all that same information when you met with
22   the --
23        A.   Okay.
24        Q.   -- interviewer, correct?
25        A.   I don't know if the person took me out
```

```
1              Q.     The room where he took the retake of
2    the psychiatric exam.
3              A.     What room is that?
4              Q.     I believe it was AHC 2495.
5              A.     Oh, okay.  I know that room, yes.
6              Q.     Would you consider that a minimal
7    distraction room?
8              A.     It can be.
9              Q.     You know, on that particular day,
10   whether it was or not?
11             A.     I am not sure.
12             Q.     Do you know what, if any, distractions
13   were occurring in that particular room on the day
14   that Mr. Nehme took the -- or, retook the
15   psychiatric shelf exam?
16                    MS. WYDLER:  Objection.  Form.
17                    THE WITNESS:  I am not sure.
18   BY MR. HANNAH:
19             Q.     Okay.  Going on in your narrative
20   here, it says, "Jones added that he does not know
21   what the specifications for minimal distraction
22   room are.
23                    Jones indicated that if Nehme had
24   mentioned that he was experiencing, he (Jones)
25   would have been able to intervene on his behalf
```

1     with the MSEPC committee?"

2               Did I read that correctly?

3          A.    Yes, you did read that correctly.

4          Q.    Is that a truthful statement?

5          A.    It is.

6          Q.    So it says here you don't know what

7     the specifications for a minimal distraction room

8     are?  I thought you testified you do?

9          A.    So again, this is a part of a process

10    of trying to understand what this is and having

11    this conversation come up subsequent.

12               We have met several times with Stephen

13    Loynaz to get verification and also a better

14    understanding of what that qualifies as.  So yes.

15         Q.    Yes, what?  You do know what a minimal

16    distraction is or you don't?

17         A.    I do yes.  I've met with Stephen

18    Loynaz.  A part of all these discussions have

19    spiked our awareness and so we have now looked at a

20    lot of these different areas to evaluate what that

21    really means.

22               And, in some situations, as I've said

23    to you earlier, where you have a resource, you have

24    a room -- and we have tried to -- we are looking at

25    all the other different possibilities of spacing,

```
1     according to Stephen Loynaz, he explained to me
2     very clearly what it is.
3               At that time, I was unaware of because
4     it wasn't an issue that I managed.  Once we
5     recognized that this was something that was an
6     issue, I made it upon myself to educate myself, but
7     also to look through the process to talk about
8     minimum distraction rooms and understand what that
9     means.
10              And so again, we have -- we've -- have
11    and will continue to grow through this process but
12    at the time, yeah, I probably didn't understand
13    what it was, but I've learned subsequent to that.
14         Q.   Okay.  So when you were interviewed,
15    you didn't know what it was but when but now you
16    do?
17              MS. WYDLER:  Objection.  Form.
18              THE WITNESS:  Right.
19    BY MR. HANNAH:
20         Q.   Okay.  I just wanted to make sure
21    that's what you were testifying.
22              So at the time that you were chairman
23    of this ADA Committee, you didn't know what a
24    minimal distraction room was.
25              MS. WYDLER:  Objection.  Form.
```

```
1     BY MR. HANNAH:

2          Q.    Correct?

3          A.    I'm confused with your question.

4          Q.    At the time you were the chair of this

5     ADA Committee that's being referred to in this

6     interview, you were not aware what a minimal

7     distraction room was or what the specifications

8     were for a minimal --

9          A.    No, no, I was not aware of what the

10    specifications were specifically, no.

11         Q.    Okay.  Do you know what the conditions

12    were of that particular room where Mr. Nehme took

13    the exam, retake of the psychiatric shelf exam

14    were --

15               MS. WYDLER:  Objection.  Form.

16    BY MR. HANNAH:

17         Q.    -- that being room AHC 295?

18               MS. WYDLER:  Form.

19               THE WITNESS:  No.

20    BY MR. HANNAH:

21         Q.    Were you aware, on the day he took his

22    shelf exam, there were several meetings in the

23    conference room next to the room where he took the

24    exam, in 30SCI simulations rooms?

25               MS. WYDLER:  Form.  Predicate.
```

1    incident reports issued for him?

2         A.    None that I can recall.

3         Q.    The only one was the one with

4    Dr. Obeso that was addressed in the second hearing,

5    correct?

6         A.    Correct.

7         Q.    And, to your knowledge, during that

8    period, were there any accommodations issued for

9    Mr. Nehme for his performance in classes or going

10   over and above his normal responsibilities?

11        A.    None that I can recall.

12        Q.    And do you remember when he started

13   again his second year?  Was that in April of 2018?

14        A.    Sounds right.

15        Q.    Okay.  He went in front of the MSEPC

16   the third time in April of 2020, correct?

17        A.    Yes.

18        Q.    So there is a two-year period of time

19   between those events where Mr. Nehme did not engage

20   in any unprofessional conduct that was reported to

21   the medical school, correct?

22        A.    None that I'm aware of.

23        Q.    Okay.  And during that same period of

24   time, again, there was no issues with him coming

25   late to class or not paying attention in class or

1     coming late to exams or anything like that,

2     correct?

3          **A.**    None that was reported to me.

4          **Q.**    During that same period of time, he

5     completed his second year and moved onto his third

6     year, correct?

7          **A.**    Correct.

8          **Q.**    Okay.  And he was completing and

9     passing all of his clerkships in the third year up

10    until the time he failed the psychiatric shelf exam

11    and the psychiatric clerkship, correct?

12             MS. WYDLER:  Form.

13             THE WITNESS:  You're asking if he

14             passed everything?

15    BY MR. HANNAH:

16         **Q.**    He passed everything, yes?

17         **A.**    He did.

18             MR. HANNAH:  I don't have any further

19             questions.

20             MS. WYDLER:  Okay.  No questions and

21             we'll read.

22             THE STENOGRAPHER:  Mr. Hannah, did you

23             want to order this at this time?

24             MR. HANNAH:  Not at this time, but

25             thank you.