# EXHIBIT H

```
             UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF FLORIDA

             CASE NO. 1:20-CV-24649-CANNON

ELIE NEHME,

     Plaintiff,

vs.

FLORIDA INTERNATIONAL UNIVERSITY
BOARD OF TRUSTEES,

     Defendant.
_____/

             DEPOSITION OF STEPHEN P. LOYNAZ

DATE:           February 8, 2022

TIME:           10:07 A.M. to 1:12 P.M.

PLACE:          ZOOM

APPEARANCES:    RODERICK V. HANNAH, ESQUIRE
                Roderick V. Hannah, P.A.
                4800 North Hiatus Road
                Sunrise, Florida   33351-7919
                    For the Plaintiff

                LOURDES E. WYDLER, ESQUIRE
                Marrero & Wydler
                2600 Douglas Road, PH-4
                Coral Gables, Florida   33134
                    For the Defendant

                IRIS A. ELIJAH, ESQUIRE
                FIU Office of the General Counsel
                11200 SW 8th Street, PC 511
                Miami, Florida   33199-2516
                    For the Defendant

ALSO PRESENT:   Lauren Martin

REPORTER:       JESSICA L. WALTER, FPR
```

```
 1   that, I would let them know whether or not it would meet
 2   the criteria for what we consider a minimal distraction
 3   testing room at FIU.
 4        Q.   One of the criteria for a minimal distraction
 5   room in your assessment of it is from what activities
 6   would be going on around the room?
 7        A.   Uh-huh.
 8        Q.   Yes?
 9        A.   Yes.
10        Q.   That would have to be taken into
11   consideration?
12        A.   In most cases, yeah.
13        Q.   Why is that?
14        A.   Well, for example, we wouldn't want to put a
15   room next to a sporting event or something like that, or
16   where there might be, you know, things taking place that
17   would be a distraction.  We would want them in quiet
18   spaces, like administrative suites, things of that
19   nature.
20        Q.   What about rooms with windows?  It's okay to
21   have a window for a minimal distraction room?
22        A.   Yes.
23        Q.   What about if it was a room that was located
24   in a heavy foot traffic area of the school?
25        A.   What we would do in that situation if there
```

```
 1      A.   I'm aware of the room itself.  I'm aware that
 2   testing was done in that room with students with
 3   disabilities, and I'm aware that the room is located
 4   within an administrative suite.  That is what I'm aware
 5   of at this time.
 6      Q.   (By Mr. Hannah)  Are you aware at all of what
 7   the conditions were both inside and outside the room
 8   during the time that Mr. Nemhe was taking that exam?
 9           MS. WYDLER:  Objection, form.  Outside the
10      scope.
11      Q.   (By Mr. Hannah)  You can answer.
12      A.   I am aware that the room was being used for
13   testing.  And that if students usually have a complaint
14   about something, they come to me and they complain.
15   And, you know, we try to resolve that situation for
16   them.  I know that in that area I was informed that some
17   students may have been doing some testing as well
18   outside the room, but that's as much as I know.
19           Like I said before, when there is any foot traffic
20   or anything that's going on outside the room, you know,
21   we usually have signage, proctors usually go and ask
22   students to quiet down, but that's about it.
23      Q.   Okay.  So you're not really familiar with what
24   the conditions were outside that room on the day and at
25   the time that Mr. Nehme was taking the retake of the
```

```
 1              MR. HANNAH:  It sounds like a speaking
 2      objection, but go ahead and answer, sir, please.
 3              MS. WYDLER:  It's called an objection for the
 4      record.
 5              MR. HANNAH:  It's called a speaking objection,
 6      for the record.
 7         Q.   (By Mr. Hannah)  Can you answer the question,
 8    sir, please.  What is your understanding of what the
 9    conditions were both inside and outside Room AHC 2 495
10    on the date and at the time that Mr. Nehme was retaking
11    the Psychiatric Shelf Exam?
12              MS. WYDLER:  Objection, form.
13         Q.   (By Mr. Hannah)  You can answer, sir.
14         A.   Are y'all done?
15         Q.   Yes, of course.
16         A.   Okay.  So, basically, inside the room there
17    was testing happening.  If there were any issues going
18    on within the room, students would typically tell the
19    proctors -- I have a problem with whatever it is that
20    the student might have a problem with -- so we can
21    remedy it.  And outside the room, it is typically an
22    administrative suite.  If there were any student
23    activities or any students in that area, you know,
24    proctors would have asked students to quiet down.  You
25    know, if there was any noise coming or we would have put
```

```
 1   reader/scribes, testing accommodations, such as extended
 2   testing time and minimal distraction testing room,
 3   American sign language, ASL, interpreters, specialized
 4   trainings, workshops and referrals to other campus
 5   resources."
 6        Did I read all of that correctly?
 7        A.   Yes.
 8        Q.   Okay.  So clearly within this very first
 9   paragraph, one of the types of accommodations are
10   testing accommodations; right?
11        A.   Yes.
12        Q.   And one of those accommodations, an example
13   for the testing accommodations is extended testing time;
14   right?
15        A.   Yes.
16        Q.   And the other is minimal distraction testing
17   room; correct?
18        A.   Those are examples of testing accommodations.
19        Q.   Right.  And Mr. Nehme qualified for both those
20   accommodations; correct?
21        A.   So Mr. Nehme produced a document from Dr.
22   Desmarais that certified or qualified him, however you
23   want to say it, as a person with disability with a
24   diagnosis of ADD/ADHD, and that's the one we focused on.
25   Students tend to focus on one diagnoses or the other for
```

1  whatever their reasons are. If I remember correctly, he
2  also had general anxiety disorder listed on that
3  document. And the recommended accommodation or the
4  recommendation provided by Dr. Desmarais, who was a
5  licensed psychologist, was extra time on the exams.
6      She didn't recommend the minimal distraction
7  testing room, you know. So in order for to us implement
8  this accommodation, we had to give him a minimal
9  distraction testing room. It wasn't, at least from that
10 document, medically necessary. And I'm not a doctor,
11 I'm not a licensed psychologist, so I can't certify that
12 type of treatment. But usually doctors tell us the
13 student or my client, the patient, needs X, Y and Z. So
14 they will list it out very clearly what the student
15 needs, and we will move forward with assigning the
16 accommodations.
17     Dr. Desmarais only asked for, or recommended better
18 said, the 50 percent extra time if I'm not mistaken, the
19 extra time on the exam. Unfortunately, we cannot
20 implement that accommodation in secret because -- I'm
21 sorry, I said in secret -- in the actual room because
22 the way tests -- not tests but the way classrooms are
23 scheduled. As soon as one finishes, you know, about 15,
24 20 minutes later, there is another one starting. And
25 depending on when that class already started, 15 to 20

1  minutes before, there was another classroom. So it's
2  impossible for us to provide the accommodation in the
3  actual classroom happening. So we only provided that
4  accommodation to Elie Nehme because it was necessary to
5  implement the actual accommodation that was necessary
6  medically from Mr. Desmarais' letter, which was the
7  extra time.
8  　　　　So I'm surprised we're focusing so much on that and
9  not his medically necessary accommodation according to
10 the doctor, which was (indiscernible). I'm a little
11 confused.
12 　　　　　　　　THE COURT REPORTER: Okay. What --
13 　　　Q.　(By Mr. Hannah) I'm surprised you're so
14 confused. But regardless, one of the accommodations to
15 Mr. Nehme was the DRC determined Mr. Nehme was entitled
16 to was extended time to take the exam; correct?
17 　　　A.　We wanted to help him out as much as we could.
18 So we gave him the accommodation to do --
19 　　　Q.　Could you just answer my question, sir. One
20 of the accommodations that Mr. Nehme was entitled to was
21 extra time to take the exams -- yes or no?
22 　　　　　　　　MS. WYDLER: Wait. You didn't allow me to
23 　　　　　give an objection to the fact that you interrupted
24 　　　　　him while he was giving you a response. I
25 　　　　　understand you are unhappy when people give more

```
 1         than just a "yes" or "no."  But please don't
 2         interrupt him when he's trying to give a response.
 3              You can ask your question, but I'd like for
 4         him to be able to finish whatever it is that he has
 5         got to say in response to your question.
 6              MR. HANNAH:  He gave me a response that was
 7         not responsive.  I need to get a response.  He
 8         didn't -- I didn't interrupt him at all.  I
 9         understand your desire to make me look bad on the
10         record that way.  It doesn't work, okay.  I have
11         been doing this long enough not to be distracted
12         from that.
13         Q.   (By Mr. Hannah)  So let me just ask you again,
14    sir.  Was one of the accommodations that DRC determined
15    Mr. Nehme was entitled to for his disability was extra
16    time to take exams?
17         A.   He was entitled to it because it was necessary
18    to implement the accommodation.  It was medically
19    necessary according to his psychologist, Dr. Desmarais,
20    but it -- it doesn't mean that it was required according
21    to the doctor.  We needed to give it to him, because we
22    wouldn't have been able to give him the extra time.  So
23    that is why it was on there.
24         Q.   Did I ask you if his doctor required it or
25    not, sir?
```

1  as using the signage outside the classroom, if it's, you
2  know, an area that there's going to be people walking by
3  or that there's testing taking place.  We would advise
4  them that the students are complaining to notify us or
5  whoever was in charge of that area to better remedy the
6  situation.
7      We would advise them that students are allowed to
8  use noise canceling headsets or earbuds or white noise
9  machines as necessary to help remedy the distractions or
10 a noise that might be affecting them, that these were
11 all tools available to them.  We have even supplied them
12 with some of these tools from the DRC.  So that was the
13 kind of training that we provided to them.  Other than
14 that, the job of a proctor really is to maintain
15 academic integrity -- to make sure the students are not
16 cheating or using unauthorized resources.
17     Q.  Were proctors -- were proctors able to stop an
18 examination if it was commenced and then it became a
19 distraction -- no longer a distraction-free environment?
20         MS. WYDLER:  Objection, form.  Predicate.
21     Q.  (By Mr. Hannah)  You can answer.
22     A.  If a proctor says that, you know, we can, they
23 do have that power.  I think it is something that has
24 happened before.  At least under my tenure as a proctor,
25 I remember that we were proctoring an exam one day and

Case 1:20-cv-24649-AMC   Document 63-8   Entered on FLSD Docket 04/11/2022   Page 11 of 11

108

```
 1   there was unknown construction happening across the
 2   street and we could hear the construction happening.  So
 3   I stopped the exam, notified the College of Medicine
 4   that we needed to move the exam, and we were able to
 5   move the exam to a room that was not as exposed to that
 6   noise.
 7        Q.   Sure.  I will wait until you are finished.  Go
 8   ahead.
 9        A.   So, yes, the proctor does have that power.
10        Q.   Okay.  Are they instructed along those lines
11   as well?  Do proctors know what a minimal distraction
12   room needs to be; and that if there are distractions,
13   they can stop the exam?
14             MS. WYDLER:  Objection, form.  Predicate.
15        A.   They're informed -- they're informed of
16   situations that can come up that require support from
17   the DRC or the College of Medicine.  So if something was
18   affecting the student, if they complained about it, they
19   would have the ability to do something about it.
20        Q.   (By Mr. Hannah)  What happens if the
21   distraction's -- does it always require the student to
22   complain about it?  Or what happens if the distractions
23   are obvious, like the example that you gave?
24             MS. WYDLER:  Objection, form.
25        A.   There is no such thing as an obvious
```

Jeannie Reporting   www.jeanniereporting.com
Your Wish Is Our Job!   305-577-1705