# EXHIBIT I

```
1              IN THE UNITED STATES DISTRICT COURT

2                 SOUTHERN DISTRICT OF FLORIDA

3                 CASE NO. 1:20-CV-24649-CANNON

4

5    ELIE NEHME,

6         Plaintiff,

7    vs.

8    FLORIDA INTERNATIONAL UNIVERSITY
     BOARD OF TRUSTEES,
9
          Defendant.
10   _____

11
     LOCATION:              Remote Audio-Video
12                          Communication
                            Pursuant to Supreme Court of
13                          Florida
                            Administrative Order No.
14                          SCAO21-17

15

16   DATE:                  February 9, 2022

17   TIME:                  9:00 AM ET to 12:00 PM ET

18

19

20        DEPOSITION OF SHIRLYON MCWHORTER

21      Taken before Leila Harris, LCR, Stenographic

22   Court Reporter, Notary Public State of Florida,

23   pursuant to Notice of Taking Deposition in the

24   above-styled cause.

25
```

1      A.      Estate planning, wills, trust, probate.

2      Q.      And prior to forming McWhorter Law,

3  what did you do, ma'am?

4      A.      I worked at FIU as the equity and

5  diversity officer, Title IX coordinator.

6      Q.      Equity and diversity officer, Title IX

7  coordinator; is that correct?

8      A.      Yes.  Official title was the director.

9      Q.      Director of equity and diversity?

10     A.      Yes.

11     Q.      Was there a department that you were

12  director of?

13     A.      It was out of human resources.  The

14  name of the office was IDEA, I-D-E-A.

15     Q.      That stands for Office of Inclusion,

16  Diversity, Equity, & Access, correct?

17     A.      That's correct.

18     Q.      We'll refer it as IDEA throughout the

19  deposition.

20             And when did you receive your law

21  degree?

22     A.      I received my law degree in '81.

23     Q.      From where?

24     A.      University of Florida Law School.

25     Q.      And where'd you go to undergraduate?

```
1        A.      Bethune-Cookman University in Daytona
2   Beach, Florida.
3        Q.      Could you repeat that, please?
4                (Simultaneous speakers)
5        A.      Bethune-Cookman University, Daytona
6   Beach, Florida.   That's B-E-T-H-U-N-E dash
7   Cookman.
8   BY MR. HANNAH:
9        Q.      And you received a bachelor's degree
10  from there?
11       A.      I did.
12       Q.      What year?
13       A.      1981.
14       Q.      1981, the same year you got your law
15  degree?
16       A.      Law degree was '91.
17       Q.      I'm sorry.   I misheard you then.
18               Any other higher education degrees
19  besides a --
20       A.      No.
21       Q.      -- bachelor's and a law degree?
22       A.      No.
23       Q.      It's my understanding you were --
24  previously were -- were a judge?
25       A.      That's correct.
```

```
1         Q.      When was that?

2         A.      County court judge.

3         Q.      When was that?  What period of time?

4         A.      Like, '94.

5         Q.      One year?

6         A.      For four years.

7         Q.      '94 to '98?

8         A.      Approximately.

9         Q.      That's Miami-Dade County?

10        A.      That's correct.

11        Q.      And see if I can fill in the gaps here.

12                All right.  When you graduated from

13   University of Florida with a law degree, where did

14   you go to work?

15        A.      State attorney's office here in

16   Miami-Dade County.

17        Q.      That would be 1991?

18        A.      Yes.

19        Q.      You were an assistant state attorney?

20        A.      That's correct.

21        Q.      How long did you do that?  Till '94,

22   when you became a county court judge?

23        A.      No.  I worked in the state -- I don't

24   remember the dates exactly, but I worked at the

25   state attorney's office for about six years.  Then
```

```
 1    I went to work for the Dade County PBA, Police
 2    Benevolent Association.
 3        Q.    Around 1997?
 4        A.    I told you, I don't remember the dates.
 5    I'll have to get that for you.
 6        Q.    Okay.  I'm just trying to coordinate it
 7    with you.  You told me you were a county court
 8    judge from '94 to 98.  So were you also an
 9    attorney for the PBA at the same time you were a
10    county --
11        A.    No.
12        Q.    -- court judge?
13        A.    No.  I'm going to have to get -- again,
14    I'll look at the dates and get them for you.  So
15    scratch that date.
16              THE REPORTER:  I'm sorry, Ms.
17        McWhorter.
18              (Simultaneous speakers)
19              THE REPORTER:  I'm sorry.  I just need
20        you to let him go ahead and finish his entire
21        question, especially on Zoom.  When two
22        people talk at the same time, it cuts
23        everybody out, and I'm not able to get it
24        fully on the record.
25
```

```
 1   BY MR. HANNAH:

 2        Q.    Okay.  I'm just trying to see which

 3   dates I got to scratch out.

 4        A.    Yes.

 5        Q.    All those dates?

 6        A.    Yeah.  And I'll get the resume and

 7   provide it to you and get you -- get you the

 8   dates.

 9        Q.    Are you being represented in this

10   deposition by anybody?

11        A.    Not to my knowledge.

12        Q.    Okay.  You did meet prior to today with

13   FIU's attorney, right, Ms. Wydler?  Is that

14   correct?

15        A.    I did, yes.

16        Q.    And when was that?

17        A.    Yesterday.

18        Q.    You do it by -- by telephone or Zoom?

19        A.    Zoom.

20        Q.    How long was that discussion with

21   Ms. Wydler?

22        A.    I'm not exactly sure.  Probably about

23   45 minutes, I think.

24        Q.    Did you review any particular documents

25   in order to prepare yourself for your deposition
```



1    here today?

2         A.    I reviewed a report, yes.

3         Q.    What kind of report did you review?

4         A.    Reviewed the report that my office

5    completed at the time that I signed off on.

6         Q.    An investigative report?

7         A.    That's correct.

8         Q.    Anything else besides that?

9         A.    No.   That's it.

10        Q.    And in your discussion with Ms. Wydler

11   yesterday, was there any discussion about

12   witnesses who already been deposed in this case

13   and testified?

14        A.    No.

15        Q.    I'm not going to hold you to the dates,

16   but I need to get some kind of -- some kind of

17   idea of your employment background.   I know that

18   you -- when you graduated from university --

19   graduated from the of University of Florida in

20   '91, you said that you went to work for Miami-Dade

21   attorney -- attorney's office, Miami-Dade State

22   Attorney's Office.

23             And then, following that employment,

24   you became an attorney for the Police Benevolence

25   Association; is that correct?



```
1        A.      That's correct, yes.

2        Q.      How -- do you remember how long you

3   worked for the PBA?

4        A.      Counsel, before we finish, I'm going to

5   get you all the dates and the times.  I apologize,

6   but I will get that for you.  Okay?

7        Q.      I get that.  I get you're going to get

8   me a resume, but I'm going to have to ask you some

9   questions based on your memory of approximately

10  how long you worked at the PBA.  I mean, you

11  don't -- I'm not going to hold you, it was two

12  years, three years.  Could be -- give me an

13  approximation if you could, please.

14       A.      I don't know.  Three, four.  Not sure.

15       Q.      And after the PBA, is that when you

16  became a county court judge?

17       A.      No.  Went to work for a law firm over

18  in Coral Gables.

19       Q.      What was the name of that law firm?

20       A.      Klein & Self.

21       Q.      The name was Klein with a K?

22       A.      Yes.

23       Q.      Klein, K-L-E-I-N.  And what's the other

24  name?

25       A.      Self.
```



1      Q.      Self, S-E-L-F?

2      A.      That's correct.

3      Q.      What kind of law did you do when you

4   were with Klein & Self?

5      A.      Klein & Self represented many different

6   clients.   They was mainly civil.   Represented

7   Miami-Dade County and other entities.

8      Q.      Civil litigation?

9      A.      Yes.

10      Q.      Did that include employment

11   discrimination cases or employment-related cases?

12      A.      Some.   Yeah.   I think the partner did

13   some of those cases, yeah.

14      Q.      Did that include any kind of Title IX

15   work or --

16      A.      No.

17      Q.      -- type of student discrimination kind

18   of -- kind of cases?

19      A.      No.

20      Q.      And when you were with the PBA, what

21   kind of work did you perform for them?

22      A.      Represented police officers in

23   disciplinary cases.

24      Q.      So that involved litigation of some

25   kind, right, in the administrative process?



```
 1        A.      Administrative, yes.

 2        Q.      And how long, approximately, were you

 3   with Klein & Self --

 4                (Simultaneous speakers)

 5        A.      About two years.

 6   BY MR. HANNAH:

 7        Q.      -- civil litigation?

 8                I'm sorry?

 9        A.      I was there probably about two and a

10   half years.  Not sure exactly.

11        Q.      And after that is when you went to FIU,

12   or did you work somewhere else before FIU?

13        A.      I worked for the Miami-Dade County

14   School Board.

15        Q.      And what did you do for them?

16        A.      Klein & Self, and then the judgeship,

17   and then Miami-Dade County School Board .

18                I worked their Office of Civil Rights

19   Compliance doing similar work to what I did at

20   FIU.

21        Q.      Dealing with issues of discrimination?

22        A.      Yes.

23        Q.      When you say you did work similar to

24   what you did at FIU, you would be the one who

25   would handle internal investigations of students
```



 1    who were claiming some type of discrimination; is

 2    that correct?

 3         A.    Students and/or employees, yes.

 4         Q.    Okay.  Both students and employees,

 5    correct?

 6         A.    Yes.

 7         Q.    And how long did you work for the

 8    Miami-Dade County School Board, approximately?

 9         A.    Maybe about two years.  Not sure.

10         Q.    Those discrimination cases that you

11    would handle for Miami-Dade County School Board,

12    that included cases involving disability

13    discrimination by both students and employees?

14         A.    Some disability, but they did have a

15    separate disability officer that handled a lot of

16    that.

17         Q.    So when you did investigations,

18    sometimes, you could do it on a disability case;

19    but most of the time, it was other types of

20    discrimination matters?

21         A.    That's correct.

22         Q.    I don't know if I got an answer to

23    this.  Approximately how long did you stay with

24    Miami-Dade County School Board?

25         A.    Two -- probably about -- about -- no



```
 1   more than -- probably about two years, I -- I
 2   think.
 3        Q.    Is that when you left to go to work at
 4   FIU?
 5        A.    That's correct.
 6        Q.    And that -- do you remember how long in
 7   total time was that you worked at FIU?  How many
 8   years?
 9        A.    I remember go -- I went to FIU in 2009.
10   I left there -- yeah.
11        Q.    2009 up until about one year ago when
12   you formed your own law firm; is that correct?
13        A.    That's correct, yes.
14        Q.    You left FIU in -- sometime in late
15   2020; is that correct?
16        A.    Yes.  Think it was in November.
17        Q.    And why did you leave FIU to go form
18   your own law firm?
19        A.    It was a mutual agreement.
20        Q.    Did you resign?
21        A.    I ultimately retired.
22        Q.    You retired from working at FIU?
23        A.    Yes, I did.
24        Q.    Did you get retirement benefits?
25        A.    Yes, I do.
```



1   Q.  Were you -- were you asked to retire?

2   A.  No.

3   Q.  Chose to do that on your own?

4   A.  Right.  I realized I had enough years

5 to do that based on all of the state employment

6 that had -- had -- the years of service I had.

7   Q.  And throughout the period of time that

8 you worked at FIU in the IDEA, were you director

9 of the IDEA throughout that time?

10   A.  Yes.

11   Q.  And I take it there were people who

12 worked under you during that time frame?

13   A.  I didn't hear you.  I'm sorry.

14   Q.  Sorry.  I'll speak up.

15    I take it that there were people who

16 were working under you -- you were the head of

17 that office, the IDEA.  There were people working

18 under you during that same time frame --

19   A.  Yes.

20   Q.  -- 2009 to 2020?

21   A.  Yes.

22   Q.  You had a staff of approximately how

23 many people working under you?

24   A.  Approximately three people.

25   Q.  Take you back to the time frame, the --



1    Q.    Do you know if your deposition was

2  transcribed in that...

3    A.    It was.

4    Q.    Was that a matter that you had

5  actually -- you or your office, the IDEA, had

6  conducted some type of internal investigation?

7    A.    Yes, I think so.

8    Q.    Was that a matter where your internal

9  investigation found any kind of substantiation of

10  a discrimination that was being claimed or the

11  unfair treatment that was being claimed?

12    A.    I'm not sure if it went that far, but

13  it would have been unsubstantiated, I think, if we

14  did.  But I'm not sure.

15    Q.    And in your capacity as director of the

16  IDEA at FIU, with regard to claims being made of

17  discrimination by students, have you been involved

18  in more than one investigation?

19    A.    We conducted many investigations, yes.

20    Q.    How about with regard to students who

21  were claiming disability discrimination?  Other

22  than Mr. Nehme, which I know you did, did you

23  handle internal investigations by the IDEA to

24  other students at FIU who were claiming some form

25  of disability discrimination?



```
 1          A.      There were other cases, yes.

 2          Q.      And let me limit my question a little

 3   further.  Did you handle -- did you as the

 4   director of the IDE-- IDEA office at FIU, did you

 5   handle internal investigations into claims of

 6   disability discrimination by medical school

 7   students other than Mr. Nehme?

 8          A.      The office did have other complaints,

 9   yes.

10          Q.      Do you recall how many?

11          A.      No.  I don't recall exactly how many.

12          Q.      Do you recall other complaints of

13   disability discrimination where the complaint was

14   that the student had not received certain

15   accommodations for testing?

16          A.      I think there may have been one other

17   case.

18          Q.      Do you remember when that was?

19          A.      That would have been -- I don't know,

20   but it would have been before Mr. Nehme's case.

21          Q.      Was that somebody by the name of

22   Goldberg?  Was that -- you aware of that name?

23          A.      I'm sorry, what's the name?

24          Q.      Medical student -- medical student,

25   last name Goldberg.
```



```
 1        A.    I don't recall that name.

 2        Q.    The case that you're referring to was

 3   not that person, not a Goldberg, right?  It was

 4   somebody else?

 5        A.    Not -- I don't recall the name, so it

 6   could have been Goldberg.  I'm not sure.

 7        Q.    And that investigation that your office

 8   handled, the one other case that you recall, did

 9   you find substantiation that the accommodations

10   were not provided?

11        A.    No.

12        Q.    Valerie Hall, she left the IDEA before

13   you did, right?

14        A.    Yes.

15              (Discussion off the record)

16   BY MR. HANNAH:

17        Q.    All right.  I'm going to show you -- I

18   have this marked as exhibit number -- I think it's

19   Exhibit Number 35, which would be the next in

20   line.

21              Get it up on the screen.

22              (Exhibit 35 was marked for

23        identification)

24   BY MR. HANNAH:

25        Q.    All right.  Unfortunately, the
```



Jeannie Reporting
Your Wish Is Our Job!
305-577-1705

1    the date that Mr. Nehme's complaint came to light,

2    right?  May 13, 2020?

3         A.    Yes.

4         Q.    That's the first time your office was

5    alerted to his complaint of -- complaints of

6    discrimination, correct?

7         A.    Yes.

8         Q.    And from that point on, it was your

9    office, became responsible for conducting an

10   investigation into Mr. Nehme's complaints,

11   correct?

12        A.    Correct.

13        Q.    And indicates all the -- on the first

14   page -- at least all the witnesses that were

15   interviewed, right, as part of the investigation?

16        A.    Yes.

17        Q.    And also, certain exhibits were also

18   attached that referenced some of your findings,

19   correct -- were referenced in some of your

20   findings, correct?

21        A.    That's correct.

22        Q.    And on this second page here I'm

23   referring you to, indicates what Mr. Nehme's

24   allegations were, correct?

25        A.    Yes.

```
1    BY MR. HANNAH:
2         Q.    Havas, Dr. Havas.
3         A.    Uh-huh.  Yeah.  And that's what he
4    indicated against her.
5         Q.    Okay.  And your signature appears on
6    the last page of this report.  Let me just skip to
7    that so you can see it.
8              This is Page 32 of 32.  That's your
9    signature above where it says, Shirlyon J.
10   McWhorter?
11        A.    That is my signature, Shirlyon
12   McWhorter.
13        Q.    And your signature appears on this.
14   But did you -- did you actually write up this
15   report, or was it done by somebody else?
16        A.    Yes.  My signature appeared on all of
17   the reports as a director of the department;
18   however, that report was completed by the
19   investigator, Valerie Hall.
20        Q.    Who was that?  Valerie Hall?
21        A.    Valerie Hall, yes.
22        Q.    Was Ms. Hall the one who was -- who you
23   delegated to handle this entire investigation?
24        A.    That's correct.
25        Q.    Mr. McHenry was not involved?
```



1        A.      He became involved at some point later.

2   Yeah.

3        Q.      In what capacity?

4        A.      He was the assistant director and just

5   in terms of overseeing, you know, in the offices,

6   we often -- as you can see from the staff --

7   excuse me -- it was a very small office, so we all

8   spoke about the cases, worked on the cases.  But

9   Valerie Hall was the one assigned to this case.

10       Q.      And then did Mr.-- to your knowledge,

11  did Mr. McHenry write any of this report?

12       A.      Not to my knowledge.

13       Q.      That was just Ms. Hall, correct?

14       A.      Yes.

15       Q.      And certainly, you reviewed it

16  carefully before you signed it, correct?

17       A.      Yes.

18       Q.      And you agreed with all the findings

19  and conclusions that were reached in the report,

20  correct, before signing it?

21       A.      Yes.

22       Q.      Did Mr. McHenry also review this report

23  at some point in time before you signing off on

24  it?

25       A.      I don't think so.  That was not -- that

```
 1    was not the way we did things in the office, so
 2    it's not likely that he did.  He might have.  I'm
 3    not sure.
 4         Q.    Okay.  So I'm turning to Page 4 of the
 5    32.  Appears to be some type of chart, like a
 6    timeline chart.  Do you see that?
 7         A.    Yes.
 8         Q.    I think it continues onto the next
 9    page, finishes up on the next page.
10              Is this -- is this something that
11    Ms. Hall compiled?
12         A.    I think so, yes.
13         Q.    And it indicates certain events in
14    Mr. Nehme's career or academic career with FIU's
15    medical school, including certain MSEPC hearings.
16    You see that?
17         A.    Yes.
18         Q.    Turning your attention to the date of
19    January 6, 2018, you see that on the first page of
20    the chart?
21         A.    Yes.
22         Q.    It says, Student failed system-based
23    practice.  There's a course number after that.
24              And then, in the last block, it says,
25    Nehme did not receive accommodations for the final
```



1    exam.   Nehme confirmed -- confirmed that he

2    received accommodations when he retook the final

3    exam as part of his Period 2 remediation.

4             Read that correctly?

5        A.    That's what it says, yes.

6        Q.    Do you know what accommodation

7    Mr. Nehme -- or required accommodation Mr. Nehme

8    did not receive when he first took the

9    system-based practice final exam?

10       A.    I'm sorry.  Can you rephrase your

11   question?

12       Q.    Do you know specifically what

13   accommodation Mr. Nehme did not receive as

14   indicated here for the final exam?

15       A.    No, I don't recall.

16       Q.    Ms. Hall would probably be a better

17   person to ask that question to?

18       A.    That's correct.

19       Q.    You don't recall discussing that with

20   Ms. Hall about him not receiving accommodation on

21   the system-based practice exam?

22       A.    Based on this document, I'm sure

23   that -- that we did.  It says that he didn't

24   receive the accommodation.  And I can't tell you

25   if that is his -- what he's telling her.  It says



```
 1   that he didn't receive it, and he confirmed that

 2   he did receive it, you know, at this -- for Period

 3   2.

 4        Q.     When he did the remediation of

 5   Period 2, correct?

 6        A.     That's correct, yes.

 7        Q.     You understood, also, that Mr. Nehme

 8   was -- when -- the second time he had gone in

 9   front of the MSEPC for a hearing on his academic

10   performance, that he had gone on a leave of

11   absence for about four months?  Do you recall

12   that?

13        A.     I recall that, yes.

14        Q.     For medical reasons, correct?

15        A.     Yes.  I didn't know the particulars of

16   it, but I knew it was for some medical reasons.

17        Q.     And that he was allowed to return to

18   the medical school and complete his entire second

19   period, correct?

20        A.     Right.  That's correct.

21        Q.     That would be the -- what's referred to

22   here in this box as the Period 2 Remediation,

23   correct?

24        A.     Yes.

25        Q.     And you -- as part of the IDEA, you
```



```
 1    these findings, correct?

 2         A.    Yes.

 3         Q.    And let's go to Page 28 of 32.   First

 4    question:  Is Nehme a qualified individual within

 5    the meaning of the ADA?

 6               See that question in boldface?

 7         A.    Yes.

 8         Q.    Do you recall what the determination

 9    was that your office made?

10         A.    Determined that he was qualified.

11         Q.    Qualified individual?

12         A.    Yes.

13         Q.    Who was entitled to certain

14    accommodations for his disability, correct?

15         A.    That's correct.

16         Q.    And then, Item Number 2 in boldface

17    says -- your question was:  Was Nehme excluded

18    from participation in or being denied benefits of

19    services, programs, or activities for which the

20    University is responsible or is otherwise being

21    discriminated against by the University?

22               Did I read that question correctly?

23         A.    Yes.

24         Q.    All right.  And the response to that

25    question follows, correct?
```

```
 1        A.     Yes.

 2        Q.     Says, In reviewing all the information

 3   provided, Nehme's testing accommodation for the

 4   professional test that is CanvasMed were not

 5   granted and the use of AHC 2 Room 495 for the

 6   high-stakes Psychiatry Shelf Examination did not

 7   meet the standards for minimum -- minimal

 8   distraction.

 9               Did I read that correctly?

10        A.     Yes.

11        Q.     Do you still stand by that finding?

12        A.     Yes.

13        Q.     And it goes on further to say, There is

14   evidence to corroborate his belief -- Mr. Nehme's

15   belief that, one, Nehme's placement in AHC 2-495

16   (a conference room) did not meet the standard for

17   a minimal distraction room identified by the ADA,

18   and this impacted his ability to effectively

19   concentrate while taking his high-stakes

20   Psychiatry Shelf Exam which violated his

21   disability as to accommodation.

22               Did I read that correctly?

23        A.     You read it correctly.

24        Q.     And you still stand by that finding

25   based on the thorough investigation that was
```



```
 1   performed by your office?

 2           MS. WYDLER:   Objection.   Form.

 3      A.    Yes.

 4   BY MR. HANNAH:

 5      Q.    Sorry?

 6      A.    Yes.

 7      Q.    So was your finding -- finding by your

 8   office that failure to provide Mr. Nehme the

 9   accommodation -- the required accommodation in the

10   minimal distraction room for his retake of his

11   psychiatry exam had an adverse impact on his

12   ability to perform on that exam, correct?

13      A.    Correct.

14      Q.    And then the second item that you

15   found, Nehme did not receive testing

16   accommodations for pop quizzes/readiness

17   assignments.

18           Did I read that correctly?

19      A.    Correct.

20      Q.    Do you still stand by that finding?

21      A.    Yes.

22      Q.    The next page, there's a bullet

23   point -- let me just ask you this generally.  You

24   stand behind all these findings still?  Would you

25   change any of them, ones that are -- that we're
```

54

```
 1   looking at right now?

 2       A.    No.   At the time of this investigation,

 3   these are the findings that we made, and I stand

 4   by the findings that we made in the investigation

 5   in its entirety.

 6       Q.    And the next bullet point, it says, In

 7   previous years, the DRC provided their minimal

 8   distraction location for HWCOM.   However, due to

 9   the overwhelming demand, DRC was not able to

10   continue providing that service.   As mentioned

11   earlier in the report -- and it mentions two

12   witnesses -- Williams and Santacruz advised that

13   selection of a minimal distraction room is based

14   on space availability.

15            Williams also described a minimal

16   distraction room as both free from outside noise

17   and windows; however, she advised that placing

18   Nehme in AHC 2-495 was based on the room

19   availability.

20            Did I read that correctly?

21       A.    Yes.

22       Q.    Goes further to say, Neither Williams

23   nor Santacruz could provide an answer to support

24   that a minimum distraction room was provided.

25   Cavilia, which is another witness who was
```



 1    interviewed, stated that on -- on the Nehme was

 2    taking the shelf examinations, there was a

 3    neurology lecture being held across the hall from

 4    Conference pre-OSCI stimulation sessions and

 5    clinical skill session, all of which were

 6    occurring down the hall from the conference.

 7              What do you recall is -- were -- from

 8    the investigation, what conditions were in that

 9    room where he took the exam, both in the room and

10    outside the room?

11              MS. WYDLER:  Objection.  Form.

12    BY MR. HANNAH:

13        Q.     If you recall.

14        A.     According to the witnesses, I recall

15    what is stated there in terms of the different

16    things that were happening around and on -- in --

17    outside of the room during the time.

18        Q.     The next bullet point said there's --

19    in a notice provided W-- HWCOM administrators

20    responsible for testing assessment, the DRC states

21    the following.  There's a -- kind of a general

22    definition of what a minimal distraction room is,

23    correct?

24        A.     Yes.

25        Q.     And was the conclusion reached by your



```
1    office after its thorough investigation and

2    interviews of witnesses and looking at all the

3    evidence that the medical school failed to provide

4    Mr. Nehme with a required minimal distraction room

5    for his retake of the Psychiatry Shelf

6    Examination?

7              MS. WYDLER:  Objection.  Form.

8    BY MR. HANNAH:

9         Q.   You can answer.

10        A.   Correct.

11        Q.   And then there's a -- a third question.

12   We'll jump down to the third question.  Boldface,

13   Was the exclusion, denial of benefits, or

14   discrimination by reason of his disability?

15             See that question in boldface?

16        A.   Yes.

17        Q.   And then you provide an answer,

18   correct?

19        A.   Yes.

20        Q.   Let's see.

21             I'm going to the next page where you're

22   answering that question or your report is

23   answering that question.  The first full

24   paragraph.  It says, As it pertains to the minimum

25   distraction room, several witnesses attest to the
```

```
1    space issues at HWCOM.  According to several
2    witnesses, minimum distraction rooms are selected
3    based on room availability.
4              According to Gavilan's statement, the
5    room where Nehme tested on March 2nd, 2020 for his
6    high-stakes Psychiatry Shelf Exam did not meet the
7    standards as communicated by the DRC for a minimum
8    distraction room because of the presence of heavy
9    foot traffic in the surrounding areas.
10             Then he also states that the activity
11   in the hallway is distracting for him as he took
12   his exam.  Based on this information, IDEA
13   believes that there was not a legitimate,
14   nondiscriminatory reason for scheduling Nehme to
15   test in a room that did not meet the standards of
16   a minimal -- minimum distraction room.
17             Did I read all that correctly?
18        A.    Yes.
19        Q.    Do you still stand by that conclusion?
20        A.    I stand by the entire report, yes.
21        Q.    Why do you say that -- that there was
22   not a legitimate, nondiscriminatory reason for
23   scheduling him to that room -- that testing room
24   which you concluded did not meet the standards of
25   a minimum distraction room?
```

```
 1              MS. WYDLER:   Objection.   Form.
 2        A.    Because the witnesses were unable to
 3   provide any reason that was legitimate as to why
 4   they would put him in that room.
 5   BY MR. HANNAH:
 6        Q.    So you did not consider the lack of
 7   availability of other rooms for minimum -- where
 8   the testing was a legitimate reason?
 9        A.    Correct.
10        Q.    What alternatives would you think would
11   have -- should've been provided?
12        A.    I don't know what alternatives the --
13   medical school is a large place, and there are
14   other -- I'm sure that, you know, the idea would
15   have been for them to think about and come up with
16   something that would have been conducive for a
17   minimally distracting room.
18              FIU is a large school, and the
19   accommodation is very important.   And the fact
20   that they didn't accommodate led me to believe
21   that there was no legitimate reason for their
22   action.
23        Q.    Is it fair to state, then -- is it a
24   fair statement to say that the so-called excuse of
25   a lack of room availability is a poor excuse for
```

```
 1   Today?

 2        A.    Yes.

 3        Q.    Okay.  And the very first number

 4   underneath that finding is that lack of

 5   accommodation for any of his assignments, you said

 6   substantiated, correct?

 7        A.    Correct.

 8        Q.    And then, Number 2, it says, Providing

 9   noncompliant minimal distraction room was

10   substantiated, correct?

11        A.    Correct.

12        Q.    And then the third, of course, was a

13   claim of Dr. Havas not giving him a -- requiring

14   him to do a random drug test, and you found that

15   to be unsubstantiated, correct?

16        A.    That's correct.

17        Q.    So you found your -- your

18   investigation, in your thorough internal

19   investigation after all the witnesses were

20   interviewed and the evidence was looked at, it was

21   your determination that one of them, anyway, that

22   Mr. Nehme suffered disability discrimination as a

23   result of not being put in a proper minimal

24   distraction room the day he retook the Psychiatry

25   Shelf Examination, correct?
```



```
 1                    MS. WYDLER:  Objection.  Form.

 2        A.    Correct.

 3   BY MR. HANNAH:

 4        Q.    And it was also your finding that that

 5   failure to put him in the minimal distraction room

 6   had an adverse impact on his performance on the

 7   Psychiatry Shelf Exam retake, correct?

 8                    MS. WYDLER:  Objection.  Form.

 9   BY MR. HANNAH:

10        Q.    You can answer.

11        A.    Correct.

12        Q.    So is it a fair statement to say that

13   the -- Mr. Nehme's failure to be placed in a

14   minimal distraction room was failure to be

15   provided that reasonable accommodation for his

16   disability had -- actually had an adverse impact

17   upon his performance, his academic performance, at

18   least as it pertains to the Psychiatric Shelf

19   Exam?

20                    MS. WYDLER:  Form.

21        A.    I'm not sure -- is that the same

22   question, or how is that question different?

23   BY MR. HANNAH:

24        Q.    Little bit different.  Would it be

25   fair -- a fair statement to say that the
```



Jeannie Reporting
Your Wish Is Our Job!
305-577-1705

```
 1   failure -- substantiated failure of FIU's medical
 2   school to provide to Mr. Nehme with the minimal
 3   distraction room accommodations when he retook the
 4   Psychiatric Shelf Exam had an adverse impact upon
 5   his academic performance, at least as it pertains
 6   to that exam?
 7             MS. WYDLER:  Objection.  Form.
 8        A.   Yes.
 9   BY MR. HANNAH:
10        Q.   Now, I see here, after you've made
11   those findings of substantiated and
12   unsubstantiated -- let me ask you this:  Have you
13   ever found in the past in your investigations into
14   claims by students of disability discrimination
15   failure to be accommodated -- or found, other than
16   Mr. Nehme, findings to be substantiated that they
17   would -- FIU failed to provide an accommodation?
18        A.   I didn't follow you.  Is your question,
19   have I ever --
20        Q.   My question is little bit awkward.  I
21   apologize.  I'll rephrase it.
22        A.   Okay.
23        Q.   Mr. Nehme's case, you found the failure
24   provide an accommodation -- his accommodations or
25   required accommodations to be substantiated in
```



```
1          Q.     Says here, In examining the information
2    in its totality, it would be difficult for one to
3    argue the following points of contention.   Then
4    there's five bullet points.   You see that?
5          A.     Yes.
6          Q.     First, the history of denying students'
7    testing accommodations of quizzes, flip charts,
8    assignments, and classroom activities dates back
9    to the inception of HWCOM in 2009.
10               Did I read that bullet point correctly?
11         A.     Yes.
12         Q.     Is that -- is that one of the findings
13   your office made?
14         A.     Yes.
15               MS. WYDLER:   Form.
16   BY MR. HANNAH:
17         Q.     Still stand behind that finding today?
18         A.     I stand by --
19               MS. WYDLER:   Objection.   Form.
20         A.     -- the entire investigation and
21   everything that's in it.
22   BY MR. HANNAH:
23         Q.     Okay.   Second bullet point, HWCOM
24   administrators acknowledged that the College
25   provided testing accommodations for students on an
```



```
 1    inconsistent basis.

 2              Did I read that correctly?

 3         A.    Yes, you did.

 4         Q.    And that was one of the findings your

 5    office made after its investigation into

 6    Mr. Nehme's matter, correct?

 7              (Simultaneous speakers)

 8              MS. WYDLER:   Objection.   Form.

 9         A.    All the additional information is a

10    finding, yes.

11    BY MR. HANNAH:

12         Q.    Okay.   And the third bullet point,

13    There was many meetings to address testing

14    accommodation concerns with no resolution

15    achieved.

16              And did I read -- read that correctly?

17         A.    Yes.

18         Q.    And that's something that your office

19    found as well as part of its thorough

20    investigation, that fact that there were many

21    meetings to address testing accommodation concerns

22    with no resolution achieved?

23              (Simultaneous speakers)

24              MS. WYDLER:   Objection.   Form.

25         A.    As previously stated, these are -- I
```



```
 1   don't know if -- these are -- it says, Additional
 2   information in examining information.  The
 3   totality would be difficult for one to argue to
 4   follow points of contention.
 5              And so these were not findings in terms
 6   of investigation itself, but these were things
 7   that we were able to ascertain during the
 8   investigation.
 9   BY MR. HANNAH:
10        Q.    Were there --
11              (Simultaneous speakers)
12   BY MR. HANNAH:
13        Q.    I'm sorry.  Go ahead and finish.
14        A.    Based on conversations with various
15   persons at the medical school, including, you
16   know, the staff and faculty and administrators.
17        Q.    Would it be fair to say these were
18   concerns that you were raising about the issue of
19   providing students with accommodations?
20        A.    That's correct.
21        Q.    More like general concerns.  Not
22   necessarily limited just to Mr. Nehme?
23              MS. WYDLER:  Objection.  Form.
24   BY MR. HANNAH:
25        Q.    Is that a fair statement?
```



```
1         A.     That's correct.  That's correct.
2         Q.     What was the purpose of bringing this
3    information to the attention of HWCOM, the medical
4    school?
5         A.     To remedy the problem.
6         Q.     So you saw it as more a systemic
7    problem beyond just Mr. Nehme, correct?
8              MS. WYDLER:  Objection.  Form.
9         A.     Yes.
10   BY MR. HANNAH:
11        Q.     Do you know what I'm referring to as a
12   systemic problem?
13        A.     I said -- and my answer was yes.
14        Q.     Okay.  Thank you.
15             And the fourth bullet point says the
16   information suggests the HWCOM administrators'
17   complicity and awareness of the testing
18   accommodations process.
19             Did I read that correctly?
20        A.     Yes.
21        Q.     What do -- did you mean by that?
22        A.     Exactly what it says.  That, based on
23   the information that we had, it suggests to us
24   that College of Medicine administration was aware
25   of these issues when -- regarding the testing
```

1   accommodation process; and as stated in Number 1,

2   it was something that had been going on for quite

3   sometime.

4        Q.    They were aware of the accommodation

5   process, but were not fulfilling their obligations

6   to apply it consistently; is that fair?

7             MS. WYDLER:  Objection.  Form.

8        A.    Yes.

9   BY MR. HANNAH:

10       Q.    That's not just Mr. Nehme.  That's the

11  medical school, school-wide, correct?

12            MS. WYDLER:  Objection.  Form.

13       Predicate.

14  BY MR. HANNAH:

15       Q.    You can answer.

16       A.    Yes.

17       Q.    And the final bullet point, Although

18  HWCOM's intentions may not have been malicious in

19  nature, it violated the student's rights.

20            Are you referring to Mr. Nehme there?

21       A.    That was a general statement, as all of

22  those are.

23       Q.    Looks like a singular student's.  So

24  I'm not sure if you were referring just to

25  Mr. Nehme.



```
1          A.     Yeah.   Well, that whole section
2    there -- I mean, that would include him, but
3    certainly, it was that -- these are general
4    statements made regarding the College of Medicine
5    in their actions toward the students at the
6    College of Medicine.
7          Q.     And says, HWCOM has addressed this
8    matter by communicating to students that readiness
9    assignments are now receiving testing
10   accommodations and a process for accommodations as
11   been outlined by the College.  And it refers to an
12   Exhibit 8 that we'll take a look at in a minute.
13              I read that correctly?
14        A.     Yes.
15        Q.     Let's take a quick look at that
16   Exhibit 8.  Go back to this.
17              (Recess.)
18   BY MR. HANNAH:
19        Q.     There's something up on the screen.
20   It's a portion of Exhibit Number 15 that was
21   introduced in this case, Plaintiff's Exhibit
22   Number 15.
23              We just looked at your report where you
24   referred to FIU coming up with some kind of
25   procedure for accommodations.  It was in Exhibit
```

```
1    not.  I don't recall it being provided.  We would

2    have looked at it if it were.

3         Q.    Now, after you issued this report, did

4    you have any discussions with anyone at FIU's

5    medical school about the report and your findings?

6         A.    Yes.

7         Q.    Who particularly did you have

8    discussions with that you recall?

9         A.    We had discussions with Dr. Bejar,

10   Elizabeth Bejar.

11        Q.    Anybody else?

12        A.    Initially, no.

13        Q.    That's the only one you remember,

14   Dr. Bejar, talking to you about the report?

15        A.    At some point, we had other

16   discussions, yes.

17        Q.    You and Elizabeth Bejar?

18        A.    Elizabeth Bejar and the legal

19   department.

20        Q.    Do you remember who in particular in

21   the legal department was part of these

22   discussions?

23        A.    Yes.

24        Q.    Who?

25        A.    Iris Elijah.
```



```
 1          Q.     The same person who's the
 2    representative here for FIU in this lawsuit, in
 3    your deposition?
 4               MS. WYDLER:   Form.
 5    BY MR. HANNAH:
 6          Q.     Correct?
 7          A.     I don't know if she's a representative,
 8    but I do see her name on the screen.
 9          Q.     Okay.  Now, at some point in time, you
10    had an amended report prepared.  Do you recall
11    that?
12          A.     Yes.
13          Q.     I've put up on the screen a document.
14    Looks like it says Amended Copy at the top.  It's
15    dated September 14, 2020.  Now, a different letter
16    sent to Mr. Nehme on September 14th, 2020, about a
17    month after the initial report, sending to him an
18    amended -- in all capitals, boldface, Amended
19    Summary Report prepared by IDEA.
20               You see that?
21          A.     Yes.
22          Q.     Do you recall this document?
23          A.     Yes.
24          Q.     This is exhibit number -- Exhibit
25    Number 13.  It's already been put into one of the
```



1    prior depositions.

2            And I'm taking you now to the third

3    page of this exhibit, which is -- appears to be

4    amended copy of the summary of the investigation

5    of the complaint of disability discrimination.

6            You see that?

7       A.    Yes.

8       Q.    You recognize this document.  In fact,

9    you said you still had it on your computer, I

10   think, right?

11      A.    Yes, I recognize it.

12      Q.    Did you review this particular

13   document, this amended or additional or

14   supplemental or amended copy of the summary report

15   prior to your deposition today?

16      A.    Yes, briefly.

17      Q.    So you briefly looked at both the

18   original and the amended copy, correct?

19      A.    Yes, yes.

20      Q.    And looks to me very similar to the

21   first report, but there obviously were changes

22   made between the original and the amended, right?

23      A.    Yes.

24      Q.    Why?

25      A.    After various conversations, it was

1   determined that there were some things that we

2   could -- that we didn't do that we should have

3   done, and we looked into those things.

4       Q.    Can you specify what those things you

5   didn't do that should have been done?

6       A.    There was a -- a witness that we did

7   not speak to, and we spoke to that witness who was

8   the proctor in the case.

9       Q.    That was Innah -- person by the name of

10  Innah Lachica?  Her name appears on this first

11  page as Witness Number 10, correct?

12      A.    Yes.

13      Q.    Who told you you should speak to the --

14  the proctor?

15          MS. WYDLER:  I'm going to object to the

16      extent that it's based on any kind of

17      attorney-client privilege.

18          Don't answer that question.

19  BY MR. HANNAH:

20      Q.    Okay.  Is it -- would it have only been

21  based upon discussions with an attorney involved

22  if that witness was added?

23      A.    Correct.

24      Q.    So I see here, Witness 10, Innah

25  Lachica, you were directed to interview her or



```
1   Ms. Hall was directed to interview her, correct?
2        A.    Correct.
3        Q.    Any other changes that were made
4   between the original and the amended?  Other than
5   additional witness?
6        A.    That's the main thing that I remember.
7        Q.    After interviewing that additional
8   witness, that didn't change your conclusions
9   ultimately, correct?
10       A.    No, it did not.
11       Q.    In fact, isn't it true that Ms. Lachica
12  actually further confirmed your conclusions that
13  Mr. Nehme had not been provided reasonable
14  accommodation of a minimal distraction room for
15  the Psychiatric Shelf Exam retake, correct?
16       A.    Correct.
17       Q.    She actually further confirmed that
18  there were substantial distractions both in and
19  outside the room on the -- the day that Mr. Nehme
20  took the Psychiatric Shelf Exam retake, correct?
21            MS. WYDLER:  Objection.  Form.
22       A.    Yeah.  She did add additional
23  information in terms of what was happening around
24  and outside the room, yes.
25
```

```
 1    BY MR. HANNAH:
 2        Q.    For example, the temperature in the
 3    room being freezing cold or very cold, correct?
 4        A.    Correct.
 5        Q.    In fact, a space heater had to be
 6    brought into the room, correct?
 7        A.    Correct.
 8        Q.    And it was an additional piece of
 9    evidence that further led you to believe that
10    Mr. Nehme was not provided a minimal distraction
11    room for his retake of the Psychiatric Shelf Exam,
12    correct?
13            MS. WYDLER:  Objection.  Form.
14        A.    Correct.
15    BY MR. HANNAH:
16        Q.    Were there any other witnesses that you
17    were supposed to have interviewed that you did not
18    interview --
19        A.    No.
20        Q.    -- as part of your investigation or the
21    preparing the amended copy?
22        A.    No.
23        Q.    Was there any additional evidence that
24    you had to look at or review in order come up with
25    your amended investigative report besides the
```



1  witness, Innah Lachica?

2      A.    I think there were some other -- I'm

3  not looking at it; but if you'll go to the report,

4  I think there were some other things that were

5  different in the report as well.

6      Q.    Well, let's take a look at one I -- I

7  noticed.

8            I'm going to take you back to the first

9  report, I think, so you see.

10     A.    Okay.

11     Q.    All right.  Remember, we looked at this

12 additional information with the bullet points

13 that's on this page of your initial report of the

14 investigation?

15     A.    Yes.

16     Q.    You're pointing out various problems

17 with the system, right?  Systemic problems at

18 FIU's medical school, as far as providing testing

19 accommodations to the students, correct?

20          MS. WYDLER:  Form.

21     A.    Correct.

22          (Sotto Voce Discussion)

23 BY MR. HANNAH:

24     Q.    All right.  You see on the screen, this

25 is from the amended report now, Analysis?



```
1   school was providing students with their required
2   disability -- required accommodations for their
3   disabilities, even though that was all removed
4   after your meetings with the FIU Attorney, do you
5   still stand by those findings today?
6        A.    I still stand by the reports that I
7   completed and my capacity as the director of the
8   office of IDEA at FIU at the time that they were
9   made.
10       Q.    Including those findings about the
11  systemic problems with the providing students with
12  accommodations, correct?
13            MS. WYDLER:  Objection.  Form.
14  BY MR. HANNAH:
15       Q.    You can answer.
16       A.    Nothing has changed.
17       Q.    I just need an answer.  Do you still
18  stand behind those --
19            (Simultaneous speakers)
20       A.    That's my -- that's my response.
21  Nothing has changed regarding my position on the
22  work that I did in the initial report as well as
23  this amended report.
24  BY MR. HANNAH:
25       Q.    Were you unhappy with the fact that you
```



```
 1   or not.
 2        Q.    Did you direct her what parts of the
 3   report to change or to eliminate?
 4        A.    Well, we would have discussed, you
 5   know, the totality of the report and the issues
 6   and the things that we need to look into, yes.
 7        Q.    Okay.  Did you tell Ms. Hall that, when
 8   she prepared the amended report, to eliminate that
 9   whole section on the systemic problems that you
10   uncovered at FIU?
11             MS. WYDLER:  Objection.  Form.
12        A.    Yes.
13   BY MR. HANNAH:
14        Q.    I'm sorry, yes?
15        A.    Yes.
16        Q.    Did you tell her the reasons why that
17   had to be eliminated?
18        A.    I think you just asked me that earlier,
19   and I said I don't recall if we had that in-depth
20   conversation.
21        Q.    Okay.  Now, you did mention or did
22   testify you did discuss your report with
23   Dr. Bejar; is that correct?
24        A.    That's correct.
25        Q.    Can you tell me about those
```



1  discussions?

2      A.    Well, she was the -- was going to be

3  making a decision in terms of the case, and that

4  was not abnormal to talk to, you know,

5  decision-makers -- makers regarding reports and so

6  that they can understand the findings that we

7  made.  So yeah.

8      Q.    Did Dr. Bejar -- your meetings with

9  Dr. Bejar, was it just you and her?

10      A.    I think so.

11      Q.    Was this after the initial report or

12  after the amended report, these discussions you

13  had with Dr. Bejar?

14      A.    Initial report.

15      Q.    Were you aware at the time you were

16  having these discussions with Dr. Bejar that

17  Mr. Nehme was appealing to the Provost's office

18  the decision to dismiss him from the medical

19  school?

20      A.    Yes.

21      Q.    And did you have more than one meeting

22  with Dr. Bejar about your report, or was it just

23  one meeting?

24          MS. WYDLER:  Objection.  Form.

25      A.    I think it was one meeting.  And --



Jeannie Reporting
Your Wish Is Our Job!
305-577-1705

1   yeah, I think it was one meeting.

2   BY MR. HANNAH:

3        Q.    Did she send you any e-mails about

4   these discussions?

5        A.    No.  It was verbal conversations.

6        Q.    By telephone or face-to-face?

7        A.    I think it was telephone.  My -- my

8   recollection is it was over the phone.

9        Q.    What did she tell you?

10       A.    I don't remember exactly what she told

11  me.  We just discussed the report and my findings

12  and the findings in the report and what was there.

13       Q.    Did she ask you to prepare any

14  additional documentation as a result of these

15  discussions with her?

16       A.    She asked me about some -- she asked me

17  additional questions about the report and did we

18  look into certain things, but she didn't compel me

19  to do anything that I had to do or anything like

20  that.

21       Q.    She didn't ask you to prepare some kind

22  of audit --

23       A.    We talked about --

24       Q.    -- for Mr. Nehme's classes or anything

25  like that?



```
1          A.     That was one of the things we talked

2    about that could be done.  Again, just looking at

3    the totality of the report, which what we did

4    was -- you know, the reports, and we completed

5    them.  And that was one of the things that it was

6    determined that we should do.

7          Q.     Did you prepare such an audit?

8          A.     Valerie Hall did.

9          Q.     You didn't prepare any audit, right?

10         A.     No, I did not.

11         Q.     So if she testified in a deposition

12   under oath that she had you prepare the audit,

13   that would not be a truthful statement, correct?

14         A.     Well, I don't know --

15                MS. WYDLER:  Objection.  Form.

16   Objection.

17   BY MR. HANNAH:

18         Q.     You can answer the question.

19                MS. WYDLER:  That's not in evidence.

20   BY MR. HANNAH:

21         Q.     You can answer the question.

22         A.     And -- and that -- and the thing is,

23   just as I signed the reports, the people, you

24   know, faculty, staff at FIU, it would be,

25   Shirlyon, do it.  Not that I would physically be
```



1   doing it, but because I would be responsible.

2   Even if that was said or not, it would be from

3   that perspective.

4           Not necessarily me physically doing it

5   myself, but because of my position in the office,

6   they didn't direct others in the office to do

7   things.  They directed me, and then I directed

8   others.

9       Q.    All right.  Well, did that happen?  Did

10  you direct others to prepare some type of audit

11  for the benefit of --

12      A.    Valerie Hall.  As I indicated --

13      Q.    Let me -- let me --

14      A.    Valerie Hall.

15      Q.    Let me just make sure I get my question

16  out first.

17          Did you direct someone in your office

18  to prepare some type of audit on Mr. Nehme's class

19  performance in relation to his failure to be

20  provided accommodations for the benefit of

21  Dr. Bejar?

22      A.    It wasn't for the benefit of Dr. Bejar.

23  It was for benefit of the client -- of your client

24  to do that, to see if there were some that would

25  make a difference or whatever.

1              But we did -- I did advise Val Hall --

2    Valerie Hall to do that, and she did that.

3         Q.    Okay.

4         A.    Uh-huh.

5         Q.    It was only as to the quizzes or

6    readiness assignments that you did that?

7         A.    Quizzes, readiness assignment, and I

8    think there was one other thing that she looked

9    at.  Just looking to see if it impacted the grades

10   in any way.

11        Q.    Okay.  Did you ever tell Ms. Bejar --

12   Dr. Bejar, I'm sorry.  Did you ever tell Dr. Bejar

13   that -- that the substantiation of Mr. Nehme's

14   allegation about the taking of the -- retaking of

15   the Psychiatric Shelf Exam and this failure to be

16   accommodated for that did not have an adverse

17   impact upon his academic performance?

18        A.    Did I specifically tell Dr. Bejar that?

19        Q.    Yes, at any time.

20              MS. WYDLER:  Form.

21        A.    I don't recall that conversation with

22   her.  Might have had it, but I don't recall.

23   BY MR. HANNAH:

24        Q.    If you'd told her that, that would be

25   contrary to what your report found.

```
1          A.     Maybe I misunderstood what you said.    I
2     thought you were saying that I --
3          Q.     You --
4          A.     -- did tell her that it did.
5          Q.     No.   Did you ever tell her that it
6     didn't affect his academic performance?
7          A.     No.
8          Q.     That would be contrary to your
9     findings, correct?
10         A.     Right.
11         Q.     So Dr. Bejar reached the conclusion
12    that the failure to accommodate Mr. Nehme for his
13    Psychiatric Shelf Exam did not have an adverse
14    effect on his academic performance, that would be
15    false statement, correct?
16                MS. WYDLER:  Objection.  Form.
17         A.     Can you repeat the question or rephrase
18    the question?
19                MR. HANNAH:  Can we have the court
20         reporter read that back, please.
21                (Requested portion read back)
22                MS. WYDLER:  Objection.  Form.
23    BY MR. HANNAH:
24         Q.     You can answer.
25         A.     Yeah.  I'm a little confused by the
```



```
1    Psychiatric Shelf Exam retake, that there was no

2    indication that had an adverse impact on

3    Mr. Nehme's academic performance.

4         A.    On the chart, when you look at the

5    chart, it appears and it shows that these were

6    your grades, this is what you -- you know, how he

7    performed on those quizzes.  I'm not sure if she's

8    referring to that.  And it showed that, when you

9    look at it, that it was not much different than

10   the times when he was accommodated in that.

11            So I don't know if she's referring to

12   that or not.  So I cannot say that Dr. Bejar is

13   being -- you know, being dishonest or that's not

14   true or not true from her perspective.

15            I know that, from my perspective, based

16   on everything that we looked at, including the

17   things before and after, the findings still remain

18   the same, that he was not provided the

19   accommodations that he should have received.

20        Q.    And it did have an adverse impact upon

21   his performance, correct?

22            MS. WYDLER:  Objection.  Form.

23   BY MR. HANNAH:

24        Q.    That was one of your findings with

25   regard to the shelf exam, correct?
```



```
 1              MS. WYDLER:  Objection.  Form.
 2       A.    Yes.
 3  BY MR. HANNAH:
 4       Q.    There's no indication in Dr. Bejar's
 5  letter that excepts that out from her statement
 6  there, right?
 7       A.    Sir, I don't know.  I can't answer
 8  that.
 9       Q.    I'm showing the document -- I'm showing
10  you a document that says, Based upon a subsequent
11  independent review by you, by your office, there
12  is no indication that Mr. Nehme's allegations had
13  an adverse impact on his academic performance.
14              That's a pretty broad statement, okay?
15  But isn't it true, in fact, that your office in
16  its thorough investigation found that the failure
17  to accommodate him for the Psychiatric Shelf Exam
18  did have an adverse impact on his academic
19  performance on that exam, correct?
20       A.    As to the -- as to the findings of my
21  office, you're correct.
22       Q.    You didn't tell Dr. Bejar anything
23  otherwise, right?
24              MS. WYDLER:  Objection.  Form.
25       A.    I didn't tell her anything different
```



Jeannie Reporting
Your Wish Is Our Job!
305-577-1705

```
 1    from -- than my report.
 2    BY MR. HANNAH:
 3        Q.     Did you have any further discussions
 4    with Dr. Bejar about her decision to deny
 5    Mr. Nehme's appeal after that letter I just showed
 6    you?
 7        A.     No, not that I recall.
 8        Q.     Did FIU, the medical school, take any
 9    type of remedial action for your findings of
10    discrimination?
11        A.     I'm sorry?
12        Q.     Did FIU, once you found and reported
13    that discrimination had occurred with regard to
14    Mr. Nehme, he failed to be accommodated, not only
15    for his quizzes and readiness assignments, more
16    specifically for the Psychiatry Shelf Exam retake,
17    what did FIU do to remedy or address the
18    situation, to your knowledge?
19            MS. WYDLER:  Objection.  Form.
20        A.     I don't know.
21    BY MR. HANNAH:
22        Q.     Were they required to do something?
23            MS. WYDLER:  Form.
24    BY MR. HANNAH:
25        Q.     You can answer.
```



Jeannie Reporting
Your Wish Is Our Job!
305-577-1705

```
 1   BY MR. HANNAH:

 2        Q.    And --

 3        A.    I don't know the results of any of

 4   that.

 5        Q.    You weren't aware that that resulted in

 6   his dismissal from the medical school?

 7        A.    Well, I understand that that resulted

 8   in the dismissal.  But in terms of your question,

 9   what did they do regarding that remedial behavior

10   or action, that's what I'm referring to.

11        Q.    Should FIU have taken some type of

12   remedial action when it was called to their

13   attention that they discriminated against him with

14   regard to his retake of the shelf exam?

15        A.    Yes.

16              MS. WYDLER:  Objection.  Form.

17   BY MR. HANNAH:

18        Q.    The answer's yes?

19        A.    Yes.

20        Q.    Can you think of anything that they

21   should have done under those circumstances or

22   should have done in -- to remediate that

23   situation?

24              MS. WYDLER:  Objection.  Form.

25
```



Jeannie Reporting
Your Wish Is Our Job!
305-577-1705

```
1   BY MR. HANNAH:
2        Q.    You can answer.
3        A.    No.  I mean, I don't have any
4   specifics, but, you know, certainly, you know,
5   there are things that -- discussions that I'm sure
6   may have been had.  Certainly, should have been
7   had.  I don't know if they were or were not.  But
8   for sure, something that should have been
9   addressed.
10       Q.    Should he have been allowed to retake
11  the exam another time?
12            MS. WYDLER:  Objection.  Form.
13       A.    I don't know.  Maybe.  Maybe -- maybe
14  not.  I don't know.
15  BY MR. HANNAH:
16       Q.    One remedial act they could've taken
17  was to allow him to remediate the psychiatric
18  clerkship, correct?
19            MS. WYDLER:  Objection.  Form.
20       A.    I don't know the facts of how that
21  works, so I'm not sure exactly what they could
22  have done.
23  BY MR. HANNAH:
24       Q.    You just know they should've done
25  something, right?
```



```
 1        A.     Correct.

 2               MS. WYDLER:   Objection.   Form.

 3   BY MR. HANNAH:

 4        Q.     You do know that they ultimately caused

 5   him to be dismissed from the medical school by the

 6   decision of Dr. Bejar as set forth in that letter,

 7   correct?

 8               MS. WYDLER:   Objection.   Form.

 9        A.     Correct.

10   BY MR. HANNAH:

11        Q.     Did you take any action to address that

12   situation in your capacity as the head of the

13   IDEA?

14        A.     No.

15        Q.     Do you think that was a proper decision

16   made by Dr. Bejar given the findings you made in

17   your report?

18               MS. WYDLER:   Objection.   Form.

19        A.     Well, my position and Dr. Bejar's

20   position are two different things.   She was the

21   appeal person.   And she takes my report, and she

22   reviews it, and she makes her decision.   I don't

23   have -- you know, I didn't have any authority or

24   anything to do with her opinion, her ruling, or

25   any of that.
```



1      Q.     So you're not looked to as the director

2   of the IDEA to discuss issues of how to remedy

3   situations of discrimination?  That's not part of

4   your role?

5              MS. WYDLER:  Objection.  Form.

6      A.     To -- to terms of dealing with

7   remedies, absolutely.  But specifically in this

8   case in terms of what happened, no.

9   BY MR. HANNAH:

10     Q.     But were any remedies whatsoever

11  discussed with anyone by your office and the

12  medical school how to deal with a situation where

13  Mr. Nehme was discriminated against as you found?

14     A.     No, not to my knowledge.

15     Q.     And why not?

16     A.     I don't know.

17     Q.     Should something have been done?

18             MS. WYDLER:  Objection.  Form.

19     A.     As well as asked and answered.

20  BY MR. HANNAH:

21     Q.     Just answer it again.  We're almost

22  done, so I'm just telling you...

23     A.     I said that something should have been

24  done.

25     Q.     Okay.  And if FIU did nothing about the



```
 1    situation, that would not be appropriate remedy,

 2    correct?

 3              MS. WYDLER:  Objection.  Form.

 4       A.    I don't know what --

 5              MS. WYDLER:  Predicate.

 6       A.    I don't know what FIU did.

 7    BY MR. HANNAH:

 8       Q.    If they did nothing -- let's assume

 9    they did nothing --

10              (Simultaneous speakers)

11       A.    I said they should have done something.

12    I said they should have done something.  I don't

13    know if they did do anything.  But my opinion,

14    they should have done something.

15    BY MR. HANNAH:

16       Q.    Okay.  Thank you.

17              Did you have any discussions with

18    Mr. Nehme about your findings in his favor on the

19    failure to provide him with an accommodation?

20       A.    I did not.

21       Q.    You didn't have any discussion with him

22    one way or another about your reports, right?

23       A.    No.

24              (Recess.)

25
```



Jeannie Reporting
Your Wish Is Our Job!
305-577-1705