# EXHIBIT K

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA


ELIE NEHME,

       PLAINTIFF,


-vs-               CASE NO.: 1:20-CV-24649-CANNON

FLORIDA INTERNATIONAL UNIVERSITY BOARD OF TRUSTEES,

       DEFENDANT.

_____


ZOOM VIDEOCONFERENCE DEPOSITION OF VALERIE HALL


TAKEN BY:       RODERICK V. HANNAH, ESQUIRE

DATE:           February 11th, 2022

TIME:           9:30 a.m. to 1:52 p.m.

PLACE:         Via Zoom

REPORTED BY:    Tanya M. Bookout, Court Reporter

Page 11

1      Q    -- in the IDEA office, correct?

2      A    Yes.

3      Q    And when -- when you say you were an adjunct

4    instructor since 2005, was that at other institutions

5    prior to FIU?

6      A    Yes.

7      Q    Okay.  And where did you work prior to FIU, as

8    an adjunct instructor in criminal justice?

9      A    A lot -- a lot of -- a lot of schools.

10          Are you looking for a specific one?

11     Q    The ones you remember.  Tell me which ones you

12   remember.

13     A    Miami-Dade.

14     Q    Miami-Dade College?

15     A    Yes.

16          St. Thomas University, Florida Memorial

17   University.

18     Q    Anywhere else?

19     A    They probably are.  I just don't remember

20   where.  I don't remember where --

21     Q    That's okay.

22     A    It's been a while ago --

23     Q    We're just here based upon what you remember,

24   okay?

25     A    Yes.

Page 12

1       Q     If you don't remember, it's fine.

2             If you do remember during the deposition, you

3       can tell me.   That's fine.

4       A     Okay.   Okay.

5       Q     But under the circumstances, fair to say that

6       you've been performing duties as an adjunct instructor in

7       criminal justice for various universities, including FIU,

8       from 2005 to the present?

9       A     Yes.

10      Q     And at some point in time, you were given, or

11      started performing duties for the FIU Office of

12      Inclusion, Diversity, Equity, and Access, also known as

13      IDEA, correct?

14      A     Yes.

15      Q     Okay.   And -- and what did you specifically do

16      for that -- that office, the IDEA office at FIU?

17      A     My task was to handle Title IX and Title VII

18      investigations.

19      Q     And that included investigations into student

20      complaints of discrimination, correct?

21      A     Yes, yes.

22      Q     And when did you first start doing that in the

23      IDEA at FIU?

24      A     I would say October.   A specific date, I don't

25      know, but the year was 2016.

Page 13

```
 1       Q    Around October of 2016 --

 2       A    No.  It was definitely in October.  The year,

 3  2016, but I don't know the specific date.

 4       Q    That's okay.

 5            So sometime in October of 2016, you first

 6  started performing these investigator duties for the IDEA

 7  office at FIU, correct?

 8       A    Yes.

 9       Q    Okay.  And you did that from October of 2016

10  till when?  When did you stop doing that?

11       A    October 2020.

12       Q    So, basically, a four-year period of time that

13  you were an investigator with IDEA, right?

14       A    Yes.

15       Q    And -- and your supervisor during that time was

16  Shirlyon McWharter; is that correct?

17       A    Yes.

18       Q    And how -- how did you wind up getting that

19  position at FIU, in addition to your adjunct instructor

20  duties?

21       A    I applied and interviewed.

22       Q    And when you applied for that position, what

23  kind of qualifications were necessary for you to be able

24  to perform those duties --

25            Let me ask it a different way.  I'm sorry.  Let
```

Page 14

1   me ask it a different way.  Strike that.

2           What qualifications did you possess at the

3   time, October of 2016, when you became that investigator

4   for IDEA, that qualified you to be a -- an internal Title

5   IX, Title VII investigator?

6           MS. WYDLER:  Form.

7   BY MR. HANNAH:

8       Q    You can answer.

9       A    I'm trying to remember.  I know that I had --

10  at that time, had some training, and I was in an acting

11  capacity as a Title IX coordinator at another university.

12      Q    What university was that?

13      A    Florida Memorial University.

14      Q    How long did you do that for Florida Memorial

15  University, act as a Title IX coordinator, approximately?

16      A    I want to say 2000 -- I don't remember.  I

17  don't remember.  I -- I -- I would confess, 2016.  If I

18  go back -- if I make it back two years, I may be

19  inaccurate, but I -- I could go back two or three years.

20  So we could say 2013, maybe.  I don't know.

21      Q    2013, 2014 time frame; is that fair?

22      A    Yeah, that's fair.

23      Q    I'm not going to hold you to exacts, so...

24      A    Okay.

25      Q    I'm just trying to get some idea of your

Page 15

1    background --

2         A    Yeah.

3         Q    -- and qualifications to perform the job of --

4    of an EEO, or a Title IX, Title VII investigator for FIU.

5         A    Okay.  So I would say 2013.

6         Q    Around that time?

7         A    Yes.

8         Q    So you had some kind of training in that area.

9    What kind of training did you receive specifically?

10        A    Through a firm by the name of by ATIXA.   I

11   believe it's Administration for Title IX Administrators.

12        Q    Was it some courses that you took?

13        A    Yes, a certification.

14        Q    You received some kind of certification in that

15   regard?

16        A    Yes.

17        Q    And when did you receive that certification,

18   approximately?

19        A    2013 or '14.

20        Q    And what was that acronym again that you

21   mentioned?  What is --

22        A    It's a, alpha, t, tango, I, India, x, X-ray, a,

23   alpha.

24        Q    A-T-I-X-A.

25        A    A-T-I-X-A.   ATIXA.

Page 16

```
1        Q     Is that some type of national organization?

2        A     Yes.

3        Q     And you had -- you possessed that certification

4   at the time you applied for the job of the investigator

5   with the IDEA at FIU, correct?

6        A     Yes.

7        Q     Okay.  So any other training you received

8   besides that given by ATIXA?

9        A     There may be some other courses.  I'm unable to

10  recall them at this time, but I know that I have taken

11  quite a bit of courses with them, so...

12       Q     How did you become the Title IX coordinator at

13  Florida Memorial University?

14       A     An outgoing position.  I was the Dean of

15  Students.

16       Q     You were the Dean of Students for that

17  university?

18       A     Yes.

19       Q     During that four-year period that you were an

20  investigator for the IDEA at FIU, October of 2016 to

21  October of 2020, do you recall how many internal

22  investigations you performed?

23       A     No, I don't -- I don't recall.  I don't keep up

24  with that --

25       Q     Was it more than ten in a four-year period?
```

Page 17

```
1       A    Could be, yes.  Could be.

2       Q    Was it more than 50?

3       A    I'm going to say yes.  Maybe --

4       Q    I'm not going to hold you -- I'm not going to

5  hold you to an exact number, so don't --

6       A    Okay.  Well, maybe 50.  50 sounds good.  It's a

7  good number.

8       Q    Around 50 or so?

9       A    Yes.

10       Q    Okay.  Could be a little bit less, it could be

11  a little bit more, correct?

12       A    Uh-huh.

13       Q    Yes?

14       A    Yes.  Uh-uh.

15       Q    Okay.  And when you applied for the position of

16  an IDEA investigator at FIU, you were already an adjunct

17  instructor in criminal justice, correct?

18       A    Not at FIU, no.

19       Q    Okay.  So you were not -- you became an adjunct

20  instructor in the 2017 --

21       A    Yes.

22       Q    -- or 2018 timeframe?

23       A    Yes.

24       Q    Were you -- you weren't working for FIU in

25  October of 2016?
```

Page 18

1      A    I was.

2      Q    Okay.  What were you doing for FIU in October

3   of 2016 then:  Was that your first job with FIU, IDEA

4   investigator?

5      A    That was my first, yes.

6      Q    Okay.  So the first position you actually were

7   hired for at FIU was to be the internal investigator for

8   the IDEA, correct?

9      A    Yes.

10     Q    Okay.  And, at some point, about a year maybe

11  or more later, you became an adjunct instructor in

12  criminal justice at FIU, correct?

13     A    Yes.

14     Q    So there was a period of time where you held

15  both the position of an adjunct instructor of criminal

16  justice at FIU, as well as the investigator for IDEA,

17  correct?

18     A    Yes.

19     Q    Can you tell me what your educational

20  background is, starting, I guess, with college.

21     A    Sure.  I have a bachelor's degree.  I have a --

22     Q    In what area?

23     A    I'm sorry.  Management information systems.

24     Q    So a Bachelor of Science?

25     A    Yes.

Page 19

1      Q    And where did you get that?

2      A    Berry University.

3      Q    What year?

4      A    I don't recall.  I don't recall.  I have to

5  be -- I don't recall.

6      Q    And after getting a Bachelor of Science, did

7  you get a higher level degree?

8      A    Yes.

9      Q    Can you tell me what that was?

10     A    A Master's in Management.

11     Q    From where?

12     A    St. Thomas University.

13     Q    Do you remember what year that was?

14     A    2003.

15     Q    Was that a two-year program for that master's?

16     A    I don't recall.  I don't recall.

17     Q    You don't remember how many years it took you

18  to get your master's?

19     A    No.

20     Q    Okay.  And any other post-graduate degrees that

21  you got, other than a Master's in Management?

22     A    Yes.  I have a post-graduate certificate.

23     Q    A what in what?

24     A    Public management.

25     Q    From where?

Page 20

```
1        A    St. Thomas University.

2        Q    When did you get that?

3        A    The same year, but months later.  So, like,

4   2003 or 2004.

5        Q    2003 to 2004?

6        A    Yes.

7        Q    Is that some type of course you took that got

8   you the certificate, or a series of --

9        A    Yes.

10       Q    -- a series of courses?

11       A    Yes.

12       Q    Okay.  Specifically, in public management,

13  correct?

14       A    Yes.

15       Q    Okay.  Any other higher level degrees?

16       A    Not degrees, no, but coursework.

17       Q    Okay.  And what kind of coursework did you

18  take -- college level coursework that did result in

19  degrees?

20       A    I am Ph.D. candidate.

21       Q    You're currently working on your Ph.D. --

22       A    Yes.

23       Q    -- right now?

24       A    Yes.

25       Q    Okay.
```

Page 21

```
 1      A    Yes.

 2      Q    And what institution is that with?

 3      A    St. Thomas University.

 4      Q    And your Ph.D. is in what area?

 5      A    Leadership.

 6      Q    You're in the process of preparing your thesis

 7  still; is that --

 8           Or what level are you on that program?

 9      A    I wish, I wish.

10      Q    You're not there yet?

11      A    I'm almost, but I'm close.

12      Q    Good luck with that.

13      A    Okay.

14      Q    When did you start that program at St. Thomas

15  University, to get your Ph.D; do you remember?

16      A    I started it 2020.

17      Q    Okay.

18      A    2020.  What year are we in?  2020, 2021.

19      Q    Now, all of these degrees you got and education

20  you got, I don't see anything dealing with the issue of

21  criminal justice, so how did you get into that?

22      A    You didn't ask me the -- the specifications of

23  the degrees.  If you would have asked, I would have told

24  you.

25      Q    Oh, okay.
```

Page 22

1      A     Yeah.

2      Q     Explain that to me and how you got into the

3   area of criminal justice then and became someone who

4   could teach it to others?

5      A     I'm a retired police officer.

6      Q     Okay.  What -- what police department?

7      A     Miami-Dade.

8      Q     So what period of time were you a police

9   officer for Miami-Dade County?

10     A     I started there, 1986.  I don't remember the

11  month.

12           And I retired 2011.  I remember that day, but I

13  retired 2011.  I don't remember the start time.  I don't

14  remember the start time.

15     Q     That was a big day, I'm sure, yeah.

16     A     Yes.

17     Q     Right.

18           So -- and throughout your public service career

19  as a police officer, it was always with Miami-Dade

20  County?

21     A     Yes.

22     Q     Okay.  And what -- what level or rank did you

23  get through at Miami-Dade County as a police officer?

24  Did you -- were you just a regular officer or become a

25  sergeant, higher levels?

Page 23

1       A     I've had various titles.  I had various titles.

2  From, you know, detective to sergeant at arms, so I've

3  had various titles.

4       Q     When you retired, what was the level of your

5  rank?

6       A     Detective.

7       Q     And I -- I take it that as a detective, and as

8  a police officer, it might be kind of -- you did a lot of

9  investigating as well, correct?

10       A     Yes.

11       Q     Okay.  So the investigations you did there were

12  into criminal conduct, correct?

13       A     Yes.

14       Q     Okay.  So is it fair to say that in the period

15  of time that you actually in -- an acting police officer

16  in Miami-Dade County, you were also taking classes and

17  courses and getting your degrees; is that correct?

18       A     Yes.

19       Q     Okay.  And so going back now to FIU and the

20  IDEA, was it -- was it Shirlyon McWharter who hired you

21  for the position of investigator?

22       A     Yes.

23       Q     Were you the only investigator working during

24  that time frame you were an investigator or were there

25  others?

Page 24

1    A    There was -- yes, there was.  There was someone

2  there.  Yes, yes, yes.

3    Q    Was there another person by the name of

4  McHenry, last name McHenry?

5    A    No, he didn't start that time, no.

6    Q    Okay.  Was he there during part of the time you

7  were an investigator?

8    A    Yes, yes.

9    Q    Did he handle investigators as well --

10    A    Yes.

11    Q    -- Mr. McHenry?

12    A    Yes.

13        THE COURT REPORTER:  Ms. Hall, if you could

14        wait just a second to answer and not cut off the end

15        of the question, I would help me out, okay?

16        THE WITNESS:  No worries.

17        THE COURT REPORTER:  All right.  Thank you.

18        THE WITNESS:  Yes.

19        MR. HANNAH:  Yes.  It's hard for her to get

20        both of those down kind of at the same time if we

21        talk over each other.  So just -- just kind of wait

22        a beat, I guess, after I ask my full question.  I'll

23        do the same for you when you give your full answer.

24        It also gives, you know, Ms. Wydler an opportunity

25        if she needs to lodge any objections to my

Page 25

1       questions.  So just, I guess, try to be patient with

2       it.

3            THE WITNESS:  Yes.  I don't -- I don't

4       anticipate your deposition lasting super long, so...

5  BY MR. HANNAH:

6       Q    All right.  At some point in time -- strike

7  that.

8            During the time that you were an IDEA

9  investigator at FIU, did you receive any further

10  training, education, coursework, anything hike that, as

11  to how to conduct your investigations?

12      A    Yes.

13      Q    Can you tell me about that, the kind of

14  training, coursework, education, that you received with

15  regard to the conducting of EEO type investigations.

16      A    I had attended -- and I don't remember the

17  dates, but I know I had attended training with ATIXA.

18      Q    ATIXA?

19      A    Yes.

20      Q    Was -- was that in order to get that you talked

21  about before, or was that --

22           Actually, you got that certificate in 2013.  So

23  that would have been before, but you took further classes

24  or courses --

25      A    Yes.

Page 26

1      Q      -- with ATIXA?

2             Okay.  Did you receive any further certificates

3      from that organization or was it just the one you talked

4      about earlier?

5      A      Yes.  I gained additional certificates.

6      Q      Okay.  And certificates of what kind?  What

7      were the certificates in, if you recall?

8      A      I know that one was in gender equity, athletic

9      equity, and I believe I -- I can't -- I know another one

10     was in Title IX coordinating, and I think that's it.

11     Q      Okay.  And Title IX, that deals with students,

12     right, who are being discriminated against or not

13     discriminated against, correct?

14     A      There's a portion of our students, yes.

15     Q      And did you also receive education, training on

16     Americans with Disabilities Act, the ADA?

17     A      Yes.

18     Q      And can you tell me what you're training,

19     education, background are -- and experience are, with

20     regard to the issue of the Americans with Disabilities

21     Act, also known as the ADA, as it applied to students at

22     the university?

23     A      So I took ATIXA training on ADA, and that's --

24     that's basically it.

25     Q      Okay.

Page 27

```
 1      A    Uh-huh.

 2      Q    And I guess part of your training also was

 3  on-the-job experience --

 4      A    Yes.

 5      Q    -- in handling investigations --

 6      A    Yes.

 7      Q    -- correct?

 8      A    Yes, yes.

 9      Q    Did you receive any guidance instruction from

10  Ms. McWhorter, with regard to these issues as well?

11      A    Yes.

12      Q    And did you ever receive any type of

13  certificate from ATIXA, or any other organization, on --

14  on investigating discrimination matters?

15      A    Yes.

16      Q    Okay.  You actually received a certificate

17  along those lines?

18      A    Yes, I believe it was a...

19      Q    And you received those certificates from ATIXA,

20  or training from ATIXA on conducting the investigations,

21  prior to becoming an IDEA investigator with FIU?

22      A    I don't remember those.  I remember going.  I

23  remember the training, but I don't remember the contents

24  of the training, the certificate training, because ATIXA

25  offers varied, varied types of training, so I don't
```

Page 28

1   remember.

2       Q    Okay.  At some point in time, you resigned your

3   position as the IDEA investigator, correct?

4       A    Yes, yes.

5       Q    That's okay.

6            I'm going to show you documents.  I heard you,

7   so I'm sorry --

8       A    Oh, okay.  I didn't know.

9       Q    I'm sorry for my pause.

10      A    Okay.

11      Q    I'm showing you what's been previously marked

12  as Exhibit Number 35 -- Plaintiff's Exhibit Number 35,

13  which appears to be an October 3rd, 2020, letter to

14  Shirlyon McWhorter, or Ms. McWhorter.  And I believe it's

15  from you.  I don't know.  The signature looks a little

16  faded there.

17           Do you recognize this document as being your --

18      A    Yes.

19      Q    -- resignation letter from the IDEA?

20      A    Yes.

21      Q    Where it says, Please accept this letter as

22  formal notice of my resignation from a position as EEO

23  investigator at Florida International University --

24      A    Yes.

25      Q    -- first sentence.

Page 30

1   responsibilities, though, with IDEA were to investigate

2   complaints of discrimination?

3        A    Yes.

4        Q    Was that the actual job title, as referenced in

5   your letter here, EEO investigator?

6        A    Yes.

7        Q    Okay.  Now "EEO" stands for equal employment

8   opportunity, correct?

9        A    Yes.

10       Q    Okay.  But your investigator role was beyond

11  just employment discrimination matters, correct?

12       A    Yes.

13       Q    Including complaints being made by students who

14  felt that they had suffered some form of discrimination,

15  correct?

16       A    Yes.

17       Q    Which would fall more under Title IX, correct?

18       A    No.

19       Q    That would be the ADA, and the Section 504 of

20  the Rehabilitation Act; are you familiar with those --

21  those statutes?

22       A    I am a little familiar with it but, no.  That's

23  not how it --

24            No.  It would have been under FIU's policy.  I

25  think it's 106.  So it would not have been -- anything

Page 31

1    under ADA would have been under FIU' policy 106.

2         Q    Okay.  And that related to compliance with the

3    ADA, that policy?

4         A    Yes.

5         Q    Okay.  And tell me all of the reasons why you

6    resigned your position of IDEA investigator?

7         A    Sure.  So my father-in-law had unexpectedly

8    transitioned, and I'll try to get through this part

9    without getting emotional and --

10        Q    That's okay.  Take your time.

11             MS. WYDLER:  You don't have to go there.  I

12        don't want you to get upset.

13             MR. HANNAH:  What do you mean?  I don't

14        understand.  You just told the witness, You don't

15        have to go there --

16             MS. WYDLER:  She's trying --

17             MR. HANNAH:  I understand that.  I understand

18        that.  Well, I don't want her --

19             MS. WYDLER:  Okay.

20             MR. HANNAH:  If she has to take a break or

21        something, that's fine.

22    BY MR. HANNAH:

23        Q    I just would like to get on the record, the

24    reasons for -- if it's something sensitive like that, you

25    can just give me a general statement about it.  You know,

Page 38

1          And so I could interview someone.  Maybe

2    Courtney may interview someone, or afterwards, we have a

3    roundtable about the people I interviewed.

4          But solely with this case, I know that I -- I

5    interviewed -- I think -- I don't recall.  I'm getting

6    confused, but many cases that I probably have had out of

7    the ten or so.

8     Q    Okay.  So -- so I understand what your -- the

9    IDEA's process was when they received a complaint, there

10   was some meeting of everybody in IDEA -- McHenry,

11   yourself, and Shirlyon McWhorter -- to discuss how to

12   address the complaints, correct?

13    A    Yes.

14    Q    And somebody was assigned to be the

15   investigator?  There was somebody who had to interview

16   witnesses and gather information?

17    A    Yes.

18    Q    Okay.  And in Mr. Nehme's case, was that person

19   you?

20    A    Yes.

21    Q    And you then do your investigation.  You

22   interview witnesses, gather documentation and information

23   pertaining to his complaints.  And at some point in time,

24   a report is prepared, correct, of the findings, okay?

25    A    (No verbal response given.)

Page 39

1      Q     And before that report is prepared, is there

2   another gathering of the group, the IDEA group, to

3   discuss the findings and make the determination and give

4   a consensus about whether or not the discrimination has

5   occurred?

6      A     Absolutely.  Yes.

7      Q     Okay.  So you're not just discussing it for the

8   first -- one time at the beginning, you're discussing it

9   throughout the process and at the end of the process,

10  right?

11     A     Yes.

12     Q     Okay.  And you need to reach some kind of

13  consensus among the people at the IDEA -- McWhorter,

14  yourself, McHenry -- as to what the findings should be,

15  right?

16     A     Yes.

17     Q     All of you familiarized yourself with the

18  evidence of the witness statements, et cetera, before

19  making those types of decisions, correct?

20     A     Yes.

21     Q     So McWhorter -- Ms. McWhorter would know what

22  the witnesses were saying, what the evidence disclosed,

23  based on your reporting to her, and Mr. McHenry would

24  also know that, correct?

25     A     Yes.

Page 40

1      Q      And all three of you would know that before a

2   final decision is made and a final report is prepared,

3   correct?

4              MS. WYDLER:  Form.

5              THE WITNESS:  Yes.

6   BY MR. HANNAH:

7      Q      And with regard to actually drafting up the

8   report and writing the report with regard to Mr. Nehme's

9   matter, was that your responsibility?

10     A      Yes.

11     Q      Okay.  And then you would draft the report and

12  present it to Ms. McWhorter for finalization?

13     A      I believe at that time, it would have gone to

14  Mr. McHenry first.

15     Q      Okay.  He would look at it first, make sure

16  everything is okay and approve it.  And then it would go

17  to Ms. McWhorter, as the person who finally signed off on

18  the report, correct?

19     A      Yes.

20     Q      But the actual author of the report would be

21  you, correct?

22     A      Yes.

23     Q      And that's because you had most of the

24  firsthand information and knowledge from actually

25  conducting the investigation, correct?

Page 44

1          So to agree with that the final, final report I

2     did, that would -- that would be inaccurate on my part,

3     because that -- that's not -- that's not the sentiments.

4          Q     Okay.   The final report is the one that's

5     signed by Ms. McWhorter, right?

6          A     Yes.

7          Q     She uses your draft, in order to finalize this

8     report and sign off on it, correct?

9          A     It's the way you're forming the question.

10          She uses the draft, because remember, we've

11     already met and had several meetings on this.  And so

12     she's going over it to make sure that everything that was

13     discussed, everything is together, all of the points that

14     we made are together.  She goes over the analysis, she

15     goes over the sheet, does the findings, and that's it.

16          My job has always been to draft the reports

17     with the final -- with the -- with my -- what I've

18     learned throughout the investigation.

19          Q     Okay.   And I think, as you've previously

20     testified, before this report is prepared and finalized,

21     you, Mr. McHenry, Ms. McWhorter, all get together and

22     discuss the evidence, and the witness statements, and

23     discuss what the findings should be before the report is

24     prepared, right?

25          A     Yes, sir.

```
 1        Q     Okay.  And then there is a number of exhibits.
 2   These are documents that were gathered.  Documents and
 3   items that were gathered as part of the investigation; is
 4   that correct?
 5        A     Yes.
 6        Q     They were gathered by you, correct?
 7        A     Yes.
 8        Q     And in all of these person-involved categories
 9   here, the witnesses, the complainant, the respondent, Dr.
10   Havas, you were the one who was assigned to interview all
11   of those people, right?
12        A     I recall -- yes.  Those names look familiar,
13   yes.
14        Q     I took the deposition of Ms. McWhorter a few
15   days ago.  She indicated, or testified, that you were the
16   one who interviewed these witness, as reflected in this;
17   would she be accurate about that?
18        A     She --
19              MS. WYDLER:  Form.
20   BY MR. HANNAH:
21        Q     I'm sorry.  You can go ahead and answer.
22        A     Yes.
23        Q     Okay.  And you wouldn't be able to tell me what
24   any one witness said to you in the interviews that you
25   had of these witnesses, independent of looking at what
```

Page 52

1    statements and send it to us, yes.

2        Q    Okay.  But with Mr. Nehme's case, that wasn't

3    necessary.  You actually were able to meet with the

4    witnesses either remotely or by telephone, correct?

5        A    Yes, yes.

6        Q    And it's just your -- your job, as an

7    investigator, to report what the witnesses actually said

8    to you, correct?

9        A    Yes.

10       Q    And it's important for you to be accurate, as

11   to what the witnesses actually said to you when they

12   spoke with you, correct?

13            MS. WYDLER:  Form.

14            THE WITNESS:  Yes.

15   BY MR. HANNAH:

16       Q    Okay.  And it's important for you to be

17   thorough in the investigation, get all of the information

18   you can that relates to the issues, correct?

19            MS. WYDLER:  Objection.  Form.

20            THE WITNESS:  Yes.

21   BY MR. HANNAH:

22       Q    All right.  And going here to this page that's

23   showing on the screen.  It says, Specific allegations of

24   the complainant make -- complainants, it says --

25   obviously, a typo --

Page 63

1   for FIU and the IDEA, when you handled those

2   investigations, it was important for you to approach them

3   in an unbiased fashion, correct?

4        A    Yes.

5             MS. WYDLER:  Objection.  Form.

6   BY MR. HANNAH:

7        Q    It was also important for you to be thorough,

8   correct, in your investigation?

9             MS. WYDLER:  Form.

10            THE WITNESS:  Yes.

11   BY MR. HANNAH:

12        Q    Okay.  Now the next page of this document, this

13   report, shows a chart.

14            Is that chart, that you recall, something you

15   prepared, a time line?

16        A    I don't recall.

17        Q    Is that something you would normally do in a

18   report, prepare a time line of the events that were

19   significant to the issues?

20        A    Yes, yes.

21        Q    Looking at this chart, do you see the date,

22   January 6th, 2018?  It says, Student failed systems-based

23   practice; do you see that?

24        A    Yes.

25        Q    Okay.  What -- let me ask you this:  Where did

Page 64

1    this information come from that was placed in this chart?

2              MS. WYDLER:  Objection.  Form.

3              THE WITNESS:  I see a labeled -- the table, Mr.

4         Nehme's time line.  And so I'm going to say that

5         it's something Mr. Nehme may have given me.

6    BY MR. HANNAH:

7         Q    Okay.  But it also could be a time line you

8    might have prepared based on his history with FIU,

9    correct?

10        A    Could be, could be.

11        Q    You don't recall?

12        A    No, I don't recall.

13        Q    Okay.  But you wouldn't put anything in a time

14   line like this that would be false, right?

15             MS. WYDLER:  Objection.  Form.

16             THE WITNESS:  Right.  No, no.

17   BY MR. HANNAH:

18        Q    And it shows -- do you recall Mr. Nehme

19   actually having to go in front of this committee called

20   the MSEPC, three different occasions?

21        A    Is that on this document?

22        Q    Well, here.  We look at July 27th, 2017.  There

23   is an MSEPC Hearing Number 1; do you see that?

24        A    Yes.

25        Q    And the results of what the hearing were are --

Page 66

1      Q      Okay.  All right.  Going back to the chart, the
2   first page of the chart, January 6th, 2018.  It says,
3   Student failed system-based practice; do you see that?
4      A      Yes, sir.
5      Q      All right.  And then in the box next to it, it
6   says, Nehme did not receive accommodations for the final
7   exam; do you see where I just read that?
8      A      Yes, sir.
9      Q      What can you tell me about that when your --
10  are your findings that he did not receive accommodations
11  for the final exam and system-based practice?
12     A      I don't recall it.  I don't recall the story.
13  I don't.  I would have to read it.
14     Q      Do you know where this information came from?
15     A      Could have come from Mr. Nehme, it could have
16  came from something I put there.  I -- I don't recall.
17     Q      Okay.  Do you know what accommodation he did
18  receive for that particular exam?
19     A      That was 2018.  Based on what I read up there,
20  I would -- the minimum distraction room, that didn't fit
21  there.  So, no, I don't recall, because that was 2018.
22         And the report says it came in 2020.
23         No.  I don't recall what that accommodation
24  would have been --
25     Q      This was not some something -- I'm sorry.  I

Page 67

1    interrupted you.  Go ahead and finish.

2         A    I'm just reading here where it says, Nehme

3    confirmed that he received the accommodations that he

4    took.  So maybe it's the -- those testing accommodations.

5         Q    One of them may be one or the other?

6         A    Yes.

7         Q    Okay.  But that was not something you

8    investigated?  It's not part of his complaints about that

9    particular exam.

10             The exam he was complaining about was the

11   psychiatry shelf exam retake, right?

12        A    I don't know.  Can I see the chart?  Can you go

13   down?

14        Q    I don't know.  We just looked at his

15   allegations.

16        A    Okay.  Yes, yes.

17             I don't remember the name of the test.  Was it

18   the --

19        Q    The psychiatry shelf -- the psychiatry shelf --

20        A    Okay.

21        Q    -- exam retake?

22        A    Okay.

23        Q    Are you aware of --

24        A    I remember the word "high-stakes."  Okay.

25        Q    I know it's been a while, so I --

Page 91

```
 1      don't understand that part.
 2  BY MR. HANNAH:
 3      Q    Okay.  In the same paragraph, it says,
 4  According to Williams, she has never seen an ADA manual,
 5  she has never received any training accommodations, nor
 6  has she ever attended any ADA meetings; did I read that
 7  correct -- accurately?
 8      A    Yes, yes.
 9      Q    Okay.  And that's something she would have
10  actually, in fact, told you, correct?
11          MS. WYDLER:  Objection.  Form.  Predicate.
12          THE WITNESS:  Yes.
13  BY MR. HANNAH:
14      Q    All right.  So top of the next page.  It says,
15  Williams further stated that Teresita "Terry"
16  Reyes-Gavilan, issued a minimal distraction room, which
17  was a common room they have used before; do you see that?
18      A    Yes.
19      Q    And it says, Williams required getting
20  permission to place Nehme in AHC2, Room 495, from Terry,
21  since "that was the only conference room available."
22          Did I read that correctly?
23      A    Yes.
24      Q    Okay.  And the fact that you put that statement
25  in quotes, you're actually quoting Ms. Williams at that
```

Page 92

1   point, correct?

2       A    Yes.

3            MS. WYDLER:  Form.

4            THE WITNESS:  Yes.

5   BY MR. HANNAH:

6       Q    Now, the last paragraph here, Ms. Williams'

7   statement -- interview statements to you, According to

8   Williams, she described room AHC 2, Room 495, is a

9   conference room with mirrored windows; however, to ensure

10  that the building's area remains quiet, she posted a note

11  on the door that indicates the students are testing --

12      A    Yes.

13      Q    -- did I read that correctly?

14      A    Yes, yes.

15      Q    And it goes further to say, Williams described

16  a minimal distraction room is a room without windows and

17  should be away from heavy foot traffic areas; did I read

18  that correctly?

19      A    Yes, yes.

20      Q    All right.  And that's an accurate reflection

21  of what Ms. Williams actually said to you that day when

22  you interviewed her?

23           MS. WYDLER:  Objection.  Form.  Predicate.

24           THE WITNESS:  Yes.

25  BY MR. HANNAH:

Page 93

1    Q    And according to what her understanding of

2    minimal distraction room was, room AHC2, Room 495, would

3    not qualify as a minimal distraction room, correct?

4    A    I didn't see that.  Is that what the -- what

5    her statement says?

6    Q    It says, Williams described a minimal

7    distraction room as a room without windows --

8    A    Okay.

9    Q    -- and should be away from heavy foot traffic

10   areas.

11        And then she also said in the sentence before

12   that, that the room that Mr. Nehme was placed in, AHC 2,

13   Room 495, as a conference room with mirrored windows; do

14   you see that?

15   A    Yes, I see it.

16   Q    And based on your recollection of the

17   interviews that you held in your investigation of Mr.

18   Nehme's complaints, isn't it true that the room he was

19   placed in for the retake of the psychiatry shelf exam,

20   AHC 2, Room 495, not only had windows, but had heavy foot

21   traffic outside the area, correct?

22        MS. WYDLER:  Objection.  Form.

23   BY MR. HANNAH:

24   Q    Do you remember that?

25   A    Yes.  Yeah, I remember the windows --

Page 94

1     Q     Is that --

2     A     -- the hallway, yes.

3     Q     That room that Mr. Nehme was placed in, AHC 2,

4  Room 495, would not qualify as a minimal distraction room

5  as described by Maritere Williams, correct?

6           MS. WYDLER:  Objection.  Form.

7           THE WITNESS:  Based on Ms. Williams'

8     definition, yes.

9  BY MR. HANNAH:

10    Q     Okay.  And based on your understanding of your

11 interview with Ms. Williams, she was the one who was

12 required to assign Mr. Nehme to a particular room for his

13 taking of the High -- High-Stakes psychiatry shelf exam

14 retake, correct?

15          MS. WYDLER:  Form.

16          THE WITNESS:  I believe we read that earlier,

17    yes.  I read that earlier up here.

18 BY MR. HANNAH:

19    Q     Okay.

20    A     All right.  Yeah.

21    Q     And it was also, according to Ms. Williams, the

22 responsibility of Ms. Reyes-Gavilan to put Mr. Nehme in a

23 proper minimal distraction room, or assign him to a

24 proper minimal distraction room, correct?

25    A     Yes.

Page 100

```
1    that correctly?

2        A    Yes.

3        Q    Do you actually remember having that discussion

4    with Dean Jones, and other witnesses, about the issue of

5    changing the name of in-class quizzes to "readiness

6    assignments"?

7        A    No, I don't.  I don't recall.

8        Q    That was one of the issues, though, that Mr.

9    Nehme complained about, not being accommodated for these

10   in-class quizzes, or what they ultimately became known as

11   readiness assignments, correct?

12       A    Yeah.  I remember reading it up top on the

13   first page, yes.

14       Q    Okay.  Going to the next page.  The second full

15   paragraph.  Do you see where it says, According to Jones?

16       A    Uh-huh.

17       Q    Do you see that?

18       A    Yes.

19       Q    Yes?

20       A    Yes.

21       Q    Says, According to Jones, Nehme is a respectful

22   young man that, "some day will be a great doctor."

23            Did I read that correctly?

24       A    Yes.

25       Q    All right.  In that, you're actually setting
```

Page 101

1    forth a -- actually, a verbatim quote made by Dean Jones

2    to you in the interview, correct?

3        A    Yes.

4        Q    And did he say anything else about Nehme?  Do

5    you recall him saying anything else about Nehme not being

6    a great doctor, or not being able to do well in medical

7    school, anything along those lines?

8        A    I don't recall anything about that.  No, no.

9        Q    If he had said stuff like that to you, it would

10   have been contained in this report, right?

11       A    Yes.

12       Q    And there is -- do you see Vivian Obeso, Dr.

13   Vivian Obeso or Obeso; do you see that --

14       A    Yes.

15       Q    -- a witness --

16       A    Yes, yes.

17       Q    And do you remember interviewing Dr. Obeso

18   remotely on June 17th, 2020?

19       A    Yes.

20       Q    And she was one of the witnesses who was

21   selected by your office to -- to be interviewed, correct,

22   in connection with Mr. Nehme's complaints, correct?

23       A    Yes.

24       Q    And, again, with regard to Dr. Obeso,

25   everything that you attribute to her telling you, the

Page 112

```
 1              THE WITNESS:  Yes.

 2    BY MR. HANNAH:

 3        Q    Let's go to -- our next witness is Dr. Nancy

 4    Havas.  It's a little lengthy narrative.

 5              And everything that is in the interview of Dr.

 6    Nancy Havas was held, which is indicated as -- indicated

 7    as June 12th, 2020.  Everything that Nancy Havas told you

 8    in this interview was accurately recorded in this account

 9    of what -- of the interview, correct?

10              MS. WYDLER:  Objection.  Form.

11              THE WITNESS:  I'm going to say yes, yes.

12    BY MR. HANNAH:

13        Q    Okay.  Now, the next section, page 27 of this

14    document, that says "analysis"; do you see that?

15        A    Yes.

16        Q    There is whole section of analysis here.

17    Talking about the ADA, and Section 504 of the

18    Rehabilitation Act of 1973; do you see that?

19        A    Uh-huh.

20        Q    Yes?

21        A    Yes.  I'm sorry.  Yes.

22        Q    Talks about the elements that are supposed to

23    be established through the claim of discrimination, under

24    both Section 504 of the Rehabilitation Act and the ADA;

25    do you see that paragraph?  I think it's the third full
```

Page 113

1    paragraph on the page -- on the screen?

2         A    Yes.

3         Q    And there is a list of questions there that are

4    being answered; do you see that?

5         A    Yes.  I may be above the --

6         Q    Okay.  Let me know if there's problems.

7         A    I can hear you now.  Go ahead.

8              You were saying something about --

9         Q    I was just looking at --

10             You see there is questions in boldface on -- on

11   this analysis section --

12        A    Yes.

13        Q    -- and that are being answered by the IDEA,

14   correct?

15        A    Yes.

16        Q    And are these determinations that are made by

17   you, or are these determinations made by Ms. McWhorter,

18   or is it some type of consensus determination that is

19   being made?

20             MS. WYDLER:  Form.

21   BY MR. HANNAH:

22        Q    You can answer.

23        A    Okay.  So, I'm -- I'm reading this and I don't

24   remember this, right?  I don't remember this

25   specifically.

Page 114

1           We do not use or we do not reflect -- because

2      we -- you know, we are not the ADA, all right.  We have

3      an FIU policy.

4           And so in our analysis, you know, we can only

5      speak upon what FIU's policy is.

6           And so when I see these elements and I see the

7      mentioning of ADA, I cannot attest to this -- this is my

8      work.

9           It appears that maybe something else was added.

10     I -- I cannot say that I -- I actually -- this is my

11     analysis.

12        Q    Okay.  Well, I took Ms. McWhorter's deposition

13     a couple of days ago, and she said you prepared this

14     report for her to sign?

15        A    Well...

16        Q    So is this something you would have prepared,

17     or is that something -- or is she inaccurate?

18        A    I don't recall.  I can't recall.

19        Q    All right.  You would rely on her recollection

20     if you can't recall?

21        A    No.

22        Q    Any reason why she would make that up?

23             MS. WYDLER:  Objection.  Form.

24             THE WITNESS:  No.

25     BY MR. HANNAH:

1      Q    Okay.  This actually gives an analysis of Mr.

2    Nehme's complaints under both Section 504 of the

3    Rehabilitation Act and the ADA, correct?

4      A    Yes.

5      Q    I'm sorry?

6      A    Yes.  I apologize --

7      Q    Okay.  And the first question.  Nehme -- is

8    Nehme a qualified individual in their meaning of the ADA,

9    and that's the very first question, right?

10     A    Yes.

11     Q    And the answer that's given by your department,

12   and by the ADA, is that Nehme is a qualified individual,

13   based upon an evaluation from a qualified professional,

14   Dr. Desmarais, from the HWCOM Student Counseling and

15   Wellness Center; do you see that?

16     A    Yes, it does say so --

17     Q    Did you still stand behind that conclusion?

18          MS. WYDLER:  Form.

19   BY MR. HANNAH:

20     Q    You can answer.

21     A    Okay.  Is this the doctor -- I'm sorry to

22   rephrase it in a question.  Is this the doctor that, if I

23   recall, that works in the -- that worked in the College

24   of Medicine as the Wellness -- yeah.  If that is -- yes,

25   yes.  I stand by that.

Page 116

1      Q    Okay.  So you agree with that conclusion,

2  correct?

3      A    Yes, yes.

4      Q    All right.  Then the next question.  You would

5  also agree that Mr. Nehme was a -- determined to have --

6  be suffering from disabilities, correct, as based upon

7  the evaluation of Dr. Desmarais?

8      A    Yes.  She's the -- this is the same lady.  She

9  was a psychiatrist.  Yes.  I have that correct.

10     Q    She might be a psychologist?

11     A    Oh, okay.

12     Q    Okay.  Number 2.  Was Nehme excluded from

13  participation and/or being denied benefits of services,

14  programs, or activities, which the university is

15  responsible, or is otherwise being discriminated against

16  by the university; do you see that question?

17     A    Yes.

18     Q    And then the answer provided in this report

19  says, In reviewing all of the information provided,

20  Nehme's testing accommodations for the professional test,

21  that is CanvasMed, were not granted.  And the use of AHC

22  2, Room 495, for the High-Stakes psychiatry shelf

23  examination did not meet the standard for minimal

24  distraction; did I read that correctly?

25     A    Yes, you did.

Page 117

1       Q    That was your office's conclusion after this

2   thorough investigation?

3            MS. WYDLER:   Form.

4            THE WITNESS:   If it's here, yes.

5   BY MR. HANNAH:

6       Q    And it goes on further to say, There is

7   evidence to corroborate his belief that, Number 1,

8   Nehme's placement in AHC 2 495 (a conference room), did

9   not meet the standard for a minimal distraction room

10  identified by ADA.  And this impacted his ability to

11  effectively concentrate while taking this High-Stakes

12  psychiatry shelf exam, which violated his disability

13  testing accommodation; did I read that directly?

14      A    Yes.

15      Q    And do you still stand behind that statement

16  today?

17      A    I have not read this whole report.  If it's

18  here, then yes.

19      Q    Okay.  Then you would agree that the witness

20  statements and evidence supported that conclusion?

21      A    We didn't go over all of the witnesses, but if

22  it's here, yes.  I stand by what's here, yes.

23      Q    Okay.  And then there is a couple -- or three

24  bullet points; do you see that afterwards?

25      A    Yes.

Page 120

```
 1              We will have this document marked Exhibit
 2      Number -- let's see where we're at.  Exhibit Number 40.
 3      It's going to be --
 4              THE COURT REPORTER:  I'm sorry.  You said it's
 5          Exhibit Number 40?
 6              MR. HANNAH:  Yeah.  40.  And we're doing it
 7          consecutively from the other deposition.  So this
 8          will be a new exhibit.  Plaintiff's Exhibit Number
 9          40.
10              (Plaintiff's Exhibit Number 40 was referenced
11      and will later be marked for identification.)
12      BY MR. HANNAH:
13          Q    Ms. Hall, I'm going to show you a document, A
14      Memorandum to File, prepared by you as the EEO
15      investigator, dated June 4th, 2020, regarding Elie Nehme,
16      the complainant.
17              Do you recognize this -- this memo?  It's two
18      pages.  Or, actually, it's three pages.  It has got some
19      photographs attached to it; do you see that?
20          A    Yes.
21          Q    Do you remember preparing this memo?
22          A    No.
23          Q    Any reason to believe you didn't prepare this
24      memo?
25          A    No.  It's not -- you know, I -- I could have
```

Page 121

1    prepared it.  I just don't remember preparing it or my

2    reason why I would prepare it.  I don't remember.

3        Q    Let's take a look at what you wrote here.  This

4    was something you were preparing for the case file, but

5    you copied Ms. McWhorter on it, correct?

6        A    Yes, yes.

7        Q    Was this something you normally did when you

8    did investigations, do some memos to the case files?

9        A    No.

10       Q    All right.  It says in this memo you wrote,

11   this memorandum serves as a document concerns regarding

12   the pending dismissal status of Mr. Elie Nehme; did I

13   read that correctly?

14       A    Yes.

15       Q    So did you have certain concerns about Mr.

16   Nehme's pending dismissal from the medical school, that

17   you needed it felt -- that you needed to document

18   something?

19       A    When I read that first sentence, it tells me

20   that maybe the time of -- that was allowed to get the

21   investigation done.

22            This looks like this was in June.  And I think

23   the investigation -- I'm not sure when it ended.

24            When did it end?  When did --

25       Q    The report -- the report was August 25th, 2020.

Page 122

1      And there were witness --

2           A    So yes.

3           Q    -- who were interviewed after this -- this memo

4      was prepared by you.

5           A    Yeah.  So it was -- when I see something like

6      this and it's because of a dismissal, and dismissals are

7      time sensitive matters, this may be a way of me getting

8      an extension from --

9           Q    An extension of what?

10          A    From him being dismissed.

11          Q    You write here, Mr. Nehme claims that he was --

12               At this time, Mr. Nehme had already lodged his

13     formal internal complaint of discrimination, correct?

14          A    When?  Was it March or --

15          Q    I'll show you the -- I'll show you the previous

16     exhibit that will help.

17          A    Okay.  Let's go look.

18          Q    It shows the day when he complained.

19               May 13th, 2020.

20               So this came afterwards, right?

21          A    Right.  So this is in June.

22          Q    You are already interviewing witnesses,

23     including Mr. Nehme, right?

24          A    Uh-huh.

25          Q    Yes?

Page 123

1      A      Yes.  I'm sorry.  Yes.

2      Q      Okay.

3      A      So this is May 27th.

4      Q      Go going back to Exhibit Number 40 now.  Your

5   memo, the file.

6      A      Uh-huh.

7      Q      There's a typo, I guess, in the second

8   sentence.  It says, Mr. Heme, but it should Mr. Nehme,

9   right?

10     A      Yes.

11     Q      Claims that he was given accommodations on his

12  systems-based practice examination on most of his

13  in-class quizzes.

14            Additionally, Mr. Nehme added that during the

15  psychiatry shelf exam, he received a partial

16  accommodation in the form of time.

17            Mr. Nehme shared that he has not received the

18  accommodation of being placed in a minimal distraction

19  room where taking any -- when taking any examinations, as

20  supported by the Disability Resource Center, DRC; did I

21  read that correctly?

22     A      Yes.

23     Q      It goes on further to say that the room he was

24  placed in for his psychiatry shelf exam was A -- AHC 2

25  495.  This is a conference room with glass windows that

Page 124

1   has access to a major hallway where there is an

2   auditorium and classrooms.

3           Mr. Nehme further communicated that when he

4   took the exam on March 2nd, 2020, there were numerous

5   students walking up and down the hallway, speaking

6   loudly.

7           Mr. Nehme admits that he did not bring any of

8   these violations to the attention of any Herbert Wertheim

9   College of Medicine staff; did I read all of that

10  correctly?

11      A    Yes.

12      Q    Okay.  So this is what Mr. Nehme reported to

13  you, correct?

14      A    Yes.

15      Q    You were just recounting what he said to you,

16  correct?

17      A    Yes.

18      Q    And you understood this being part of his

19  discrimination complaints, correct?

20      A    Yes.

21      Q    Okay.  It says, In the course of the

22  investigation of his concerns, the following actions have

23  been taken:  Number 1:  An audit of Mr. Nehme -- Elie

24  Nehme's ADA accommodations was requested.

25           So you requested that?

Page 125

1      A    Yes.

2      Q    Okay.  Number 2:  A review of the audit

3   revealed a missing BMS 6067 systems based practice exam.

4   It only listed one psychiatry examination test.

5           The second request was placed for those

6   classes.

7           All right.  That's something you -- you

8   requested, right?

9      A    Yes.

10      Q    All a part of your investigation, correct?

11      A    Yes.

12      Q    And then it goes to Number 3:  The in-class

13   quiz has been a part of a major discussion with HWCOM's

14   curriculum and education departments.  And there have

15   been minimal recommendations or resolutions of the

16   concerns that have arisen because of this practice; did I

17   read that correctly?

18      A    Yes.

19      Q    This is a finding you made, right?

20      A    Yes.

21      Q    A conclusion you reached, correct?

22           MS. WYDLER:  Form.

23           THE WITNESS:  It's a concern.  Sorry.

24   BY MR. HANNAH:

25      Q    It seems to be a concern of more of a

Page 126

1    system-wide practice.  You're not just talking about Mr.

2    Nehme there, correct?

3              MS. WYDLER:  Form.

4              THE WITNESS:  Yes.

5    BY MR. HANNAH:

6        Q    Okay.  And then Number 4.  IDE -- IDEA has

7    obtained of AHC 2, Room 495, where Mr. Nehme was told to

8    take his examination; did I read that correctly?

9        A    Yes.

10       Q    Okay.  And who took those photos; do you know?

11       A    I think the campus is close to -- so it would

12   have been FIU Police Department.

13       Q    All right.  There is an attachment to your

14   memo.  It shows two photographs.  It appears to be the

15   room, the hallway, and the window of the room and the

16   window outside; do you see that?

17       A    Yes.

18       Q    Is it your understanding that that -- those

19   photographs themselves reveal -- reveal that this was

20   probably not an appropriate minimal distraction room --

21             MS. WYDLER:  Form.

22   BY MR. HANNAH:

23       Q    -- for Mr. Nehme to be accommodated?

24       A    It -- what it revealed to me was the location.

25   I needed something, since I wasn't there, to see -- to

Page 127

1    get the feel for the environment, to see how the -- you

2    know, what it looked like, the hallway, since -- if I

3    recall, when we read earlier, it was something about the

4    traffic in the hallway.  And so that was -- I needed to

5    see that.

6              And since it was Covid, we couldn't get there.

7              This is my best way of looking at it.

8        Q    Right.  It indicated a window.  See the window

9    on the first photograph?

10       A    Yes, I see the window.

11       Q    Okay.  And a long hallway, with doors in the

12   hallway, correct?

13       A    Yes.

14       Q    And, actually, there is a -- a right angle in

15   the hallway heading into the right, correct?

16       A    Yes.

17       Q    Okay.  And do you know what's located over here

18   on the right-hand side across from the room?

19       A    I want to say an -- do I recall something like

20   an elevator?  Was it an elevator or something?

21       Q    Okay.  That's what you recall.

22       A    Yeah, I think so.

23       Q    All right.  Let's go back to the text of

24   your -- your memo to the file.

25             You say after all those four numbers there.

Page 128

1   Based on the photos, this location does appear to meet

2   the criteria for a minimum distraction room?

3       A    Okay.

4       Q    Why would you say that?

5       A    Let's go back to the photos.

6       Q    Sure.

7       A    I don't know if it's the windows.  I don't

8   recall.  I don't know.

9       Q    So Mr. Nehme had told you that there was a lot

10  of foot traffic going on in the hallway outside the room,

11  correct?

12      A    Uh-huh.  Yes.

13      Q    Yes?

14      A    Yes.

15      Q    Assuming that to be the case, then would that

16  information and the photos of the minimal distraction

17  room, it was easy for you to conclude that Mr. Nehme was

18  not provided a minimal distraction room for the retake of

19  the psychiatry shelf exam, correct?

20          MS. WYDLER:  Objection.  Form.

21  BY MR. HANNAH:

22      Q    You can answer.

23      A    I'm going to say yes.  I -- yes.

24      Q    It's your conclusion that you reached, based on

25  what Mr. Nehme told you?  And do you have any reason to

Page 129

1   not believe that there was a lot of foot traffic outside

2   the room, right?  You actually spoke to him about it,

3   people speaking loudly in the hallway.  He told you that.

4   And then you took photos of the room, where you could see

5   the hallway, and you could see the window.

6          And based on that information, you concluded

7   that -- in fact, you just say based on the photos, this

8   location does not appear to meet the criteria for a

9   minimal distraction room.

10          But you also have the added benefit of knowing

11   from Mr. Nehme that there was a lot of foot traffic

12   outside the room that day.

13          So it was your conclusion the that he was

14   not -- just from the photos and what he told you, that he

15   was not provided with a proper minimal distraction room,

16   correct?

17          MS. WYDLER:  Objection.  Form.

18          THE WITNESS:  Yes.

19   BY MR. HANNAH:

20     Q     Okay.  And then you provide -- DRC defines

21   minimal distraction testing as the following, and there

22   is a definition; do you see that?

23     A     Yes, yes.

24     Q     Did you get that from DRC, that definition?

25     A     Yes.  It says, DRC defines -- yes.

Page 130

1      Q    It says, This student is tested in an

2  environment which minimizes distractions for the student.

3  Each student has different levels of distractibility, of

4  different stimuli -- stimuli which may distract them.

5           Typically, students need an environment which

6  minimized both auditory and visual distractions.

7           A distraction-reduced environment does not

8  necessitate the student's testing in a private room, nor

9  does it mean an environment is completely distraction

10 free; did I read that correctly?

11     A    Yes.

12     Q    Okay.  And that came directly from the DRC,

13 right?  The Disability Resource Center, correct?

14     A    Yes.

15     Q    All right.  And then you conclude your memo.

16 This is before you actually even complete your entire

17 investigation.  This suggests that his claim of not

18 receiving his accommodations for his testing in all

19 capitals, bold face, true; do you see that?

20     A    Yes.

21     Q    And you still agree with that statement today?

22     A    Uh-huh.

23           Once again, looking at these dates, I have no

24 idea why -- and this is not a common practice.  Why would

25 I say that, unless as you suggest, I was basing it based

1          MS. WYDLER:  Objection.  Form.

2          THE WITNESS:  What is the findings?  Can I see

3     the end of the report?  I'm at page 28.  Isn't it

4     normally --

5  BY MR. HANNAH:

6     Q    Nehme's -- Nehme -- it says here -- this is

7  your finding, your office's finding.  Nehme's placement

8  in AHC2 495, the conference room, did not meet the

9  standard for a minimal distraction room, identified by

10 the ADA.  And this impacted his ability to effectively

11 concentrate while taking his High-Stakes psychiatry shelf

12 exam, which violated his disability testing

13 accommodation.

14    A    Yes.

15    Q    So the failure of your findings and the

16 evidence supported, at least in the opinion of the IDEA,

17 that the -- the failure to provide Mr. Nehme with a

18 minimal distraction room accommodation, had a -- an

19 adverse impact upon his ability to perform on that retake

20 examination, correct?

21    A    Based on what it says here, yes, yes.

22         MS. WYDLER:  I think the witness had requested

23    to see the -- the findings at the end of the

24    document.

25         THE WITNESS:  Right.  There used to be a

Page 140

1          MS. WYDLER:  Objection.  Form.

2          THE WITNESS:  Yes.

3  BY MR. HANNAH:

4      Q    Okay.  And then the last paragraph here.  It

5  says, According to Gavilan, on March 2nd, 2020, the day

6  Nehme took his shelf examination, there were several

7  meetings in the conference rooms and three OSCI

8  stimulation rooms near AHC 2, 495, where Nehme was

9  testing.  These meetings had approximately 20

10 participants each; did I read all of that correctly?

11     A    Yes.

12     Q    And as reflected here, this is an accurate

13 statement of what was told to you by Ms. Gavilan or Ms.

14 Reyes-Gavilan, correct?

15         MS. WYDLER:  Objection.  Form.

16         THE WITNESS:  Yes.

17 BY MR. HANNAH:

18     Q    I'm sorry?

19     A    Yes.

20     Q    Ms. Gavilan added that no student should have

21 been assigned to take a test in AHC 2, Room 495, because

22 of the amount of people on that floor; did I read that

23 correct?

24     A    Yes.

25     Q    And you stand by her making that statement to

Page 141

1    you as reflected in this report, correct?

2              MS. WYDLER:  Objection.  Form.  Predicate.

3              THE WITNESS:  Yes.

4    BY MR. HANNAH:

5       Q    So if Ms. Reyes-Gavilan said that she never

6    made that statement to you, that would not be a truthful

7    statement by Ms. Reyes-Gavilan, correct?

8              MS. WYDLER:  Objection.  Form.

9    BY MR. HANNAH:

10      Q    You can answer.

11      A    It's here.  If it's here, she said it.

12      Q    Okay.  Great.

13           And then finally she says, according to your

14   report, or this report of the interview, which she told.

15   It says, She stated that she normally catches these

16   situations and understands that a student may have felt

17   uncomfortable with the arrangement; did I read that

18   correctly?

19      A    Yes.

20      Q    And, again, what's stated here is what she told

21   you that day of the interview, correct?

22             MS. WYDLER:  Objection.  Form.

23             THE WITNESS:  Yes.

24   BY MR. HANNAH:

25      Q    And did that indicate to you -- or does that

Page 142

1   indicate to you that Ms. Reyes-Gavilan should have taken

2   some other type of activity, or action, to make a change

3   of the conference room for that AHC 2, 495, for Mr.

4   Nehme?

5       A    Yes, yes.

6       Q    And if I indicated to you that she knew about

7   all of these conditions at -- outside of room AHC 2, 495,

8   on the day in question, right?

9       A    I want to say no.  It doesn't indicate that she

10  knew.  It says here that she stated that she normally

11  catches it.  So I'm going to state that she may have not

12  known, or...

13      Q    Certainly, when she was talking to you, she

14  indicated what the conditions were that day, right?

15          MS. WYDLER:  Objection.  Form.

16          THE WITNESS:  Yes.

17  BY MR. HANNAH:

18      Q    I'm sorry; the answer?

19      A    Yes, she did.

20      Q    Okay.  And she as the scheduling person should

21  have that knowledge of what's being scheduled around the

22  so-called minimal distraction room on the day in

23  question, correct?

24          MS. WYDLER:  Form.

25          THE WITNESS:  Well, yes.

Page 148

```
 1      recalling at all.
 2  BY MR. HANNAH:
 3      Q    I understand.  That's why we have the document
 4  here.
 5      A    Okay.  Uh-huh.
 6      Q    So I'm showing you a document that was done
 7  back in 2020, by your office and by you as the
 8  investigator.  And I'm trying to make sure that what you
 9  stated is accurate, truthful, and -- and not something
10  that's embellished, or fake, or -- or manufactured, or
11  fabricated.  This is something your office actually, with
12  your involvement, prepared, correct?
13              MS. WYDLER:  Form.
14  BY MR. HANNAH:
15      Q    Mr. Nehme didn't prepare this document,
16  correct?
17      A    No.
18      Q    Okay.  This was based on an independent,
19  thorough investigation by you and the IDA -- the IDEA
20  office, correct?
21      A    Yes.
22      Q    And you were involved in preparing this
23  document, correct?
24      A    Yes.
25      Q    And you still stand behind the interview
```

Page 149

1   statements that were recounted here, and the findings and

2   conclusions of this document, correct?

3       A    Yes.

4            MS. WYDLER:  Objection.  Form.

5   BY MR. HANNAH:

6       Q    You never told anyone at IDEA, Ms. McWhorter,

7   Mr. McHenry, I disagree with these findings, I have no

8   part of these findings, anything like that?

9            MS. WYDLER:  Objection.  Form.

10           THE WITNESS:  What -- you keep bringing up

11       findings.  This is an analysis.  An analysis is

12       different from the findings.  I never do findings.

13  BY MR. HANNAH:

14      Q    You didn't disagree with this analysis either,

15  right?

16           You never told anybody, I disagree with this

17  analysis, this is wrong, this is not what the evidence

18  shows, you never told anybody that, correct?

19           MS. WYDLER:  Objection.  Form.

20           THE WITNESS:  What -- what I'm recalling and

21       what I'm reading here, I'm going to stand by it

22       because it's here.  I --

23  BY MR. HANNAH:

24      Q    You're going to stand by your memo, too --

25           THE COURT REPORTER:  Guys, please stop --

Page 152

1   High-Stakes psychiatry shelf exam, which violated the

2   disability testing accommodation.

3           So the finding, or the analysis being done by

4   the IDEA, indicates there is evidence to corroborate that

5   fact, correct?

6       A    Yes.

7       Q    And going back to that paragraph you were

8   looking at.  The last sentence says, based on this

9   information, the IDEA believes that there is not -- there

10  was not a legitimate, nondiscriminatory reason for

11  scheduling Nehme to test in a room that did not meet the

12  standards of a minimum distraction room; did I read that

13  correctly?

14      A    Yes.

15      Q    And you still agree with and stand by that

16  analysis in that sentence, correct?

17      A    Yes.

18           MS. WYDLER:  Form.

19  BY MR. HANNAH:

20      Q    Was that a yes?

21      A    Yes.

22      Q    Basically, there was not a good excuse for them

23  to not have put him in a proper minimum distraction room

24  just based on room availability, correct?

25           MS. WYDLER:  Objection.  Form.

1    circumstances of this investigation, there is sufficient

2    evidence to support a violation of FIU 106, as it

3    pertains to discrimination, based on disability against

4    the HWCOM; did I read that correctly?

5         A    Yes.

6         Q    And that's where I think you mentioned earlier,

7    a policy that you analyzed, as well, FIU 106, correct?

8         A    Yes.

9         Q    And FIU 106 incorporates issues of the ADA and

10   all the other antidiscrimination statutes, correct?

11             MS. WYDLER:   Form.

12             THE WITNESS:   I believe, yes, yes.

13   BY MR. HANNAH:

14        Q    And the findings that were number 1, lack of

15   accommodations for readiness assignments, was one of his

16   complaints, right?

17        A    Yes.

18        Q    And your office and you found that to be

19   substantiated, right?

20        A    Yes.

21        Q    And number 2:   Providing -- providing

22   noncompliant minimal distraction room, that, your office

23   also found to be substantiated, correct?

24        A    Yes.

25        Q    And you still stand behind those findings

1   today, right?

2        A     Based on what we've gone by so far, if it's

3   here, yes.  I have to.  It is here.  It's here.

4        Q     Okay.  And then number 3 was the Dr. Havas

5   retaliation complaint.  Violating random drug testing

6   protocol was found to be unsubstantiated, correct?

7             MS. WYDLER:  Objection.  Form.

8             THE WITNESS:  Based on what it says up top,

9        yes.  Under the findings, yes.

10  BY MR. HANNAH:

11       Q     All right.  Now there is -- see the section

12  that says, additional information, under the findings --

13  additional findings section; do you see that?

14       A     Yes.

15       Q     In examining the information in its totality,

16  it would be difficult for one to argue the following

17  points of contention.  All right.  First, bullet point,

18  the history of denying students testing accommodations

19  and quizzes, flip chart -- flip charts, assignments, and

20  classroom activity dates back to the inception of HWCOM

21  in 2009; did I read that first bullet correctly?

22       A     You did, yes.

23       Q     That was an additional finding made by you and

24  your office, correct?

25             MS. WYDLER:  Objection.  Form.

Page 156

1   today, right?

2        A    Based on what we've gone by so far, if it's

3   here, yes.  I have to.  It is here.  It's here.

4        Q    Okay.  And then number 3 was the Dr. Havas

5   retaliation complaint.  Violating random drug testing

6   protocol was found to be unsubstantiated, correct?

7             MS. WYDLER:  Objection.  Form.

8             THE WITNESS:  Based on what it says up top,

9        yes.  Under the findings, yes.

10  BY MR. HANNAH:

11       Q    All right.  Now there is -- see the section

12  that says, additional information, under the findings --

13  additional findings section; do you see that?

14       A    Yes.

15       Q    In examining the information in its totality,

16  it would be difficult for one to argue the following

17  points of contention.  All right.  First, bullet point,

18  the history of denying students testing accommodations

19  and quizzes, flip chart -- flip charts, assignments, and

20  classroom activity dates back to the inception of HWCOM

21  in 2009; did I read that first bullet correctly?

22       A    You did, yes.

23       Q    That was an additional finding made by you and

24  your office, correct?

25             MS. WYDLER:  Objection.  Form.

Page 157

1    BY MR. HANNAH:

2        Q    Yes or no?

3        A    I'm going to add that I don't -- this

4    additional section is something that was not a practice

5    that was done.  And if it's here, then you say me and my

6    office.  I would prefer that's general when it says the

7    office, because I have no recollection about doing

8    additional information, because that's not typically my

9    area.

10            Anything below -- even in the analysis, it's

11    the -- the collaborative information that the office

12    used, and we do.

13            Potentially, this could have been added on by

14    Director McWharter at the end, so -- as an additional

15    whatever.  That's not something we do or did while I was

16    present.

17            If they're doing it now?  I don't know.  I

18    don't know.

19        Q    They did it here, right?

20        A    Yeah, I see it.  I see it.

21        Q    Okay.

22        A    Director McWhorter signed it.  I didn't sign

23    it.

24        Q    And you -- and you prepared this report, right,

25    for her to sign?

Page 158

1      A    I prepared a draft of the report that did not

2    include some of this -- from what I recall, some of this

3    that I see.

4      Q    So --

5      A    I don't know.  And it's been some time, and it

6    may be different.  Maybe I did do it, but I don't recall

7    this.  So --

8      Q    So --

9      A    So I don't want to say yes or no, but go ahead.

10     Q    If I did a metadata analysis of this document,

11   would it show you as the author of the document?

12     A    No, it would.  It would definitely show me as

13   the originator of it, yes.

14     Q    This final version that's here, it wouldn't

15   show you as the author of the document?

16          MS. WYDLER:  Objection.  Form.

17   BY MR. HANNAH:

18     Q    You know what metadata is, right?

19     A    Yes, I do.

20     Q    You would rely on whatever that metadata -- if

21   I did a metadata analysis on this particular document and

22   it showed, Valerie Hall, as the author, you would then

23   have to agree that you were the author of this document?

24          MS. WYDLER:  Objection.  Form.

25          THE WITNESS:  I'm going to say yes.

1   BY MR. HANNAH:

2        Q    Okay.   Thank you.

3             All right.   So these conclusions here, the

4   additional information, the bullet points that we're

5   starting to look at, this -- these conclusions go beyond

6   just Mr. Nehme, right?

7        A    Please restate that question.   I'm still stuck

8   on that.

9        Q    These conclusions go beyond just Mr. Nehme's

10  complaints of discrimination and failure to provide

11  accommodations, correct?

12            MS. WYDLER:   Form.

13            THE WITNESS:   When you say go beyond...

14  BY MR. HANNAH:

15       Q    Yes.   They don't just deal with him, they deal

16  with the medical school system-wide, correct?

17       A    Yes.   It seems like it.

18       Q    All right.   Do you agree with me -- and you can

19  read through these.   I don't have a problem with you

20  doing that -- that these bullet points are basically

21  pointing out systemic concerns about the provision of

22  testing accommodations to students within the medical

23  school, correct?

24            MS. WYDLER:   Objection.   Form.

25  BY MR. HANNAH:

Page 160

1        Q     You can answer.

2        A     It does appear that they are referring to

3   HWCOM.   May have some issues.

4              If it's systemic, I don't -- I wouldn't -- I

5   wouldn't know based on this report.

6        Q     Okay.   Well, let's take a look at them the

7   first one I read to you.

8              The second one HWCOM administrators acknowledge

9   that the college provided testing accommodations for

10  students on an inconsistent basis; did I read that

11  correctly?

12       A     Yes.

13       Q     Do you stand by that conclusion still today?

14       A     If it's here, sir, I do.

15       Q     Okay.   And, certainly, that's not flattering

16  statement about the HWCOM administrators, correct?

17             MS. WYDLER:   Objection.   Form.

18             THE WITNESS:   I mean, if I was the

19        administrator over...

20             (Zoom glitch.)

21  BY MR. HANNAH:

22       Q     You froze.   There you go.   You're back.   You

23  froze for a second in the middle of your answer.

24             You were the administrator?

25       A     I said, if I was the administrator in HWCOM, I

Page 161

1    would not consider it to be flattering, but I'm not, so

2    you may have to ask them.

3          Whatever is here -- whoever puts this here is,

4    basically, what I guess the -- must be whatever is

5    happening during that time.

6    BY MR. HANNAH:

7          Q    Okay.  Then based on --

8          A    I'm not --

9          Q    This is based on evidence that was found during

10   the investigation, right?

11         A    Okay.  It's here, yes.

12         Q    Part of your office's responsibility, IDEA

13   offices, when they conduct investigations, if there

14   were -- was evidence of system-wide problems, or systemic

15   problems, to bring those to light, as part of your

16   investigative report?

17         A    I mean, while I was there, there were concerns.

18   Some -- many of them, I didn't have -- you know, any

19   parts of, as you -- I guess, it mentions it and Dean

20   Adrian Jones was there for meetings.  So when I see that,

21   and I know that there were two or three concerns, that

22   statement would be considered true.

23         Q    Certainly, Dean Jones brought to light that

24   there were problems with providing accommodations that

25   they were going to address by coming up with an ADA

Page 162

1   manual and having more detailed guidance about getting

2   more accommodations, correct?

3       A    Yes.  I remember reading that, yes.

4       Q    So there was evidence to support these types of

5   conclusions being reached or findings being reached by

6   your office, correct?

7               MS. WYDLER:  Objection.  Form.

8               THE WITNESS:  Yes.

9   BY MR. HANNAH:

10      Q    Okay.  And then the third bullet point.  There

11  were many meetings to address testing accommodation

12  concerns with no resolution achieved; did I read that

13  correctly?

14      A    Yes, yes.

15      Q    And do you still stand by that finding?

16      A    It's here.  I'm -- I'm stating that since it's

17  here, there must have been something there to support it.

18      Q    Okay.  You never expressed disagreement with

19  any finding like that, did you?

20              MS. WYDLER:  Objection.  Form.

21              THE WITNESS:  No.

22  BY MR. HANNAH:

23      Q    Fourth bullet point.  The information suggests

24  HWCOM administrators' complicity and awareness of the

25  testing accommodations process; did I read that

Page 163

```
 1    correctly?

 2         A     Yes.

 3         Q     You would stand behind that bullet point as

 4    well?

 5         A     Yes.

 6         Q     Okay.  And then the final bullet point.

 7    Although HWCOM's intentions may not have been malicious

 8    in nature, it violated the student's rights; and did I

 9    read that correctly?

10         A     Yes.

11         Q     And you still stand behind that today, right?

12         A     It's here, so I have to stand by the work

13    that's here.

14         Q     It goes on further to say in that particular

15    bullet point, HWCOM testing accommodations and the

16    process for accommodations has been outlined by the

17    college.  And then it refers to an Exhibit 8, correct?

18               Did I read that accurately?

19         A     It's -- yeah.  Yes, you did.

20         Q     And then it goes on to say, retaliation.  It

21    talks about Dr. Havas and this report being appealed.  It

22    talks about the appeal process, correct, that a student

23    can take to appeal any of the findings --

24         A     Yes.

25         Q     -- of the -- of the IDEA, correct?  Yes?
```

Page 171

1    to get the information.

2          And the only person I knew who could do it was

3    Maritere, I guess, but that's what I remember.

4          I remember her calling, asking about did I

5    interview the test proctor?

6          And my response was, no.  And her asking for a

7    contact person, how could she get the test proctor's

8    information?  The only person I could think of was the

9    supervisor who was Maritere.

10    Q    Maritere Williams?

11    A    I think so, yeah.  I think that's the --

12    Q    Okay.  Is it your understanding that somebody

13    interviewed the actual test proctor after the initial

14    report came out?

15    A    No, because I moved on.  I moved on.  I had

16    another case that was pending, so I moved on to my other

17    case.

18    Q    Okay.  In looking at this report, which appears

19    to be, for the most part, very similar to the original

20    report.  There is some formatting changes, I guess, and

21    some other minor changes.  Otherwise, for the most part,

22    the witness statements all look the same, except that

23    there is an additional witness statement added of a

24    person by the name of Innah, I-n-n-a-h, Lachica,

25    L-a-c-h-i-c-a, who appears to be the test proctor for the

Page 172

1    test that Mr. Nehme claims he wasn't provided a

2    reasonable accommodation.

3             And I want to show that to you.  You can tell

4    me if you have ever seen it before or read it before.

5             Let's get to that point.  It says, Innah

6    Lachica was interviewed remotely on August 31st, 2020,

7    which would have been after the initial report was

8    prepared and submitted.

9             And have you ever read this or seen this

10   account of what Ms. Lachica said in her interview?

11        A    No.

12        Q    This would be the first time you're seeing

13   that?

14        A    Yes.

15        Q    Did Ms. McWhorter ever sit down with you, after

16   August 31st, 2020 and before September 14th, 2020, when

17   this amended report was issued, to tell you or discuss

18   with you her findings or -- or account of what Ms.

19   Lachica said in the interview?

20        A    No.

21        Q    So you weren't aware that Ms. Lachica provided

22   further evidence in the investigation -- her statements

23   provided further evidence to support a finding that Mr.

24   Nehme had not been provided a proper minimal distraction

25   room accommodation for the psychiatric shelf exam test?

Page 173

1        A    No.

2        Q    I want to go to the analysis section again,

3    which appears to be the same questions.  Do you see that

4    on the screen?  Do you see that on the screen, this --

5        A    I see it, yes.

6        Q    All right.  They appear to be the same

7    conclusions that were reached or same analysis that was

8    reached in the first report.

9             And then with regard to the third question, it

10   appears to be a little bit more broken down into topics.

11   One is readiness assignments.

12            The second is the minimum distraction room

13   issue.

14            And, finally, the drug testing issue; do you

15   see that?

16       A    Yes.

17       Q    A little bit different format than the first

18   report, correct?

19       A    Yeah, based on what I see, yes.

20       Q    Okay.  And then the findings section is a

21   little bit different than the original one.

22            Remember the original one, you said a

23   finding -- under the finding heading about Dr. Havas?

24   Now, we actually have --

25       A    Yes.  Hold on.

1      A    No.  I'm not aware, no.

2      Q    Now, what I notice when I look at this Amended

3  Report -- remember that whole section about additional

4  findings, and the bullet points, and what appear to be

5  system-wide issues in the medical school about providing

6  accommodations; do remember that section?

7      A    I remember it on the other exhibit, yes.

8      Q    Now they are completely missing from this

9  report; do you see that?

10          There is nothing there at all about that.

11     A    Yeah, yes.

12     Q    Did you have any discussions with Ms. McWhorter

13  about eliminating those bullet points or those additional

14  findings from the summary report or additional summary

15  report?

16     A    No.

17     Q    Can you think of any reason to think why those

18  would no longer be part of the report, those findings?

19     A    No, no.

20     Q    And you still would agree, though, those

21  findings were something that you could stand behind and

22  being supported by the evidence found in your

23  investigation, correct?

24     A    Yes.  On the report, yes.  I don't know about

25  this amended stuff but, yes.

Page 183

1    before?

2         A     No.

3         Q     Not something you prepared, right?

4         A     No.

5         Q     It's not something you were asked by Ms.

6    McWhorter to prepare, the chart of this history of

7    accommodations or readiness assignments?

8         A     No.

9         Q     So do you know what Dr. Bejar is -- is

10   referring to here by the subsequent independent review by

11   IDEA, in that sentence we just read?

12        A     No, no.

13        Q     Nothing you did, right?  You didn't do any

14   subsequent reviews for the benefit of the provost office,

15   correct?

16        A     Correct.  Yes.  No.

17        Q     She goes, Based upon subsequent independent by

18   IDEA, there is no indication that your allegations -- Mr.

19   Nehme's allegations, had an adverse impact on his

20   academic performance -- calls it your academic

21   performance, but he's -- she's referring to Mr. Nehme.

22             Based upon the analysis that was done by your

23   office as set forth, at least in your report, that's not

24   a -- an accurate statement, correct?

25             MS. WYDLER:  Objection.  Form.

Page 184

1          THE WITNESS:  Yes, yes.

2          MR. HANNAH:  I'm going to take just a

3     two-minute break; just ask my client if he has any

4     further questions.

5          I think we're pretty much done with your

6     deposition, but I just want to make sure.

7          So let's take a bathroom break, a two-minute

8     bathroom break, and then we will get back on.  And,

9     hopefully for you, there is no further questions.

10    So let's do that.

11         (Recess taken.)

12    BY MR. HANNAH:

13    Q    Okay.  I have a couple of questions, not very

14    long.

15         With regard to Mr. Nehme's report, which you

16    were involved in the investigation, and you prepared the

17    report, at least certainly the initial report.  You were

18    involved in that preparation where there was

19    substantiation found of discrimination occurring and a

20    violation of Mr. Nehme's rights.

21         Throughout the time that you were an EEO

22    investigator, or IDEA investigator for the IDEA, are you

23    aware of any other student complaints of disability

24    discrimination, or discrimination of any kind, other than

25    Mr. Nehme's, where the conclusion that was reached was

Page 185

1    that the claims were substantiated?

2         A    No.

3         Q    And throughout the time that you were an IDEA

4    investigator, do you recall how many investigations you

5    performed that resulted in a final summary report of

6    findings and conclusions?

7         A    Say it one more time.

8         Q    You did a full investigation in Mr. Nehme's

9    matter, you issued -- prepared and issued the final

10   report, the summary report of the findings and

11   conclusions.  My question to you is -- this is from Mr.

12   Nehme.  My question to you is:  For all of the student

13   discrimination investigations that you handled and

14   prepared reports for, how many of those actually resulted

15   in final findings and conclusions that were set forth in

16   the report?

17             MS. WYDLER:  Objection.  Form.

18   BY MR. HANNAH:

19        Q    That you recall?

20        A    Okay.  You know, I don't recall, because my job

21   is mostly to draft the report.

22             There is assistance on analysis and findings.

23   So if I had to come up with a number, I couldn't.  I

24   couldn't.  I couldn't.

25        Q    Can you give me an estimate of was it more than