UNITED STATES DISTRICT COURT
SOUTHERN DISTRCIT OF FLORIDA

CASE NO. 20-cv-24649-CANNON

ELIE NEHME,

    Plaintiff,

vs.

FLORIDA INTERNATIONAL UNIVERSITY
BOARD OF TRUSTEES,

    Defendant.
_____/

**PLAINTIFF'S LOCAL RULE 56.1 STATEMENT OF DISPUTED MATERIAL FACTS[1]**

Plaintiff ELIE NEHME ("Plaintiff"), through undersigned counsel, and pursuant to S.D. Fla. Local Rule 56.1, for his Statement of Disputed Material Facts, responds to Defendant FLORIDA INTERNATIONAL UNIVERSITY BOARD OF TRUSTEES' ("FIU") Statement of Material Facts [ECF No. 56][2] ("Defendant's Statement") as follows:

1. Undisputed; however, the contention that Plaintiff was denied admission to more than 20 medical schools is a not a material fact as to any of the issues in this case.

2. Undisputed.

3. Disputed. The FIU College of Medicine ("COM") had what was referred to interchangeably as the "Disability Accommodations Committee" or "ADA Committee", one of

---

[1] In support of its Statement of Material Facts, Defendant separately filed a Notice of Filing [ECF No. 55] of various documents, exhibits, and deposition excerpts that it referenced in its Statement. However, Defendant's Notice does not list or include a number of documents and deposition excerpt pages that were referenced in the Statement. Plaintiff attaches as Exhibit "A" a designation highlighting the unlisted and missing documents.

[2] Plaintiff notes that Defendant's Statement of Material Facts violates this Court's February 24, 2021 Order Setting Trial, etc. [ECF No. 26] as to "Form of Filings", which requires all filings to be double-spaced. Defendant's Statement, not including footnotes, is 1.5 spacing. If Defendant properly spaced its Statement, it would have well exceeded the 10-page limit of S.D. Fla. Local Rule 56.1(b)(1)(A). In all fairness, Plaintiff should be able, as Defendant did, to present his Statement with the same 1.5 spacing, and thus does so here. If the Court desires double spacing, then Plaintiff respectfully requests that he be allowed to refile this Statement and be granted leave, based on good cause and the length of Defendant's Statement, to exceed the Local Rule's page limitations.

the purposes of which was, according to Dean Adrian Jones, COM's Associate Dean of Student Affairs, to ensure that disabled students received their accommodations as directed by the FIU Disability Resource Center ("DRC"). Jones Depo. p. 23/ ln 23 – p. 24/ln 25.  Dean Jones was the Chairman of the Committee from 2015 through 2018 and was followed in that capacity by Dr. Nancy Havas. Jones Depo. p. 9/ln 16-19, p. 19/ln 14 – p. 20/ln 11, p. 26/ln 13-19; Havas Depo. p. 37/ln 20 – p. 38/ln 1, p. 45/ln 19-24.

      4.    Undisputed that in Period 1 Plaintiff failed Genes, Molecules, and Cells and then successfully remediated the course with a grade of "U/75" per the COM student handbook. Pl. Depo. p. 54/ln 18 – p. 55/ln 13.  Further undisputed are the facts in footnote 2 of Defendant's Statement.[3] Plaintiff adds that throughout Period 1 he had not yet been diagnosed with a disability or been awarded any testing accommodations and was struggling with medical and personal family issues of which the COM administrators were aware. Pl. Depo. p. 55/ln 11-17. p. 32/ln 9 – p. 33/ln 15; Obeso Depo. p. 20/ln 16 – p. 21/ln 2.

      5.    Undisputed that Plaintiff received scores of 79 in the three other Period 1 courses but disputed as to the remaining alleged facts.  Specifically disputed is the assertion that his three 79 grades evidenced a lack of knowledge in basic sciences.  Course grades of 75 and above were *passing* grades at COM and there were students who ultimately graduated with cumulative grade point averages under 80. Jones Depo. p. 135/ln 8-14; Obeso Depo. p. 51/ln 7 – p. 52/ln 1-15. Plaintiff successfully passed his entire Period 1 and was promoted to Period 2 to continue his medical education, which would have required a determination by the Medical Student Evaluation and Promotion Committee ("MSEPC") – the sole arbiter designated to make student promotion decisions – that Plaintiff had made "satisfactory academic progress and maintained a degree of professionalism necessary to become a physician." Obeso Depo. p. 171/ln 10 – p. 173/ln 20.

      6.    Disputed.  Plaintiff did request accommodations:  he informed MSEPC in his first hearing before them, on July 27, 2017, that he was experiencing health issues, that he would benefit from extra time on testing due to his processing speed, and that he was working with the FIU Medical Student and Wellness Center ("Wellness Center") to address the processing speed issue. Pl. Depo. p. 72/ln 14 – p. 73/ln 9.

---

[3] Defendant in its Statement regularly drops single-spaced footnotes with additional purported "undisputed" facts, such as in footnote 2.  Plaintiff will address those additional footnoted "facts" in the body of his Statement.

7. Undisputed as to the first two sentences. Plaintiff submits the additional facts in the paragraph are immaterial to the substantive issues in this case.

8. Undisputed as to the first two sentences and to the assertion that Dr. Desmarais requested an accommodation of extended time for Plaintiff's exams. That Dr. Desmarais did not also specifically recommend the accommodation of a minimal distraction room for testing is immaterial as, according to Dr. Stephen Loynaz of the DRC, once a student is accommodated with extra time to take exams, the accommodation of a minimal distraction room is also necessarily awarded. Loynaz Depo. p. 58/ln 8 - p. 61/ln 23. Loynaz issued the memo to Dean Jones acknowledging that Plaintiff had a disability requiring Plaintiff be given the accommodations of extra time and a minimal distraction room for his exams. Jones Depo. p. 69/ln 16 – p. 77/ln 21, Pl. Exh. 18. Jones confirmed that Plaintiff would be given the two accommodations per Loynaz's memo. Jones Depo. p. 77/ln 5-21.

9. Undisputed as to the main statements in paragraph 9 but disputed as to the "factual" statements in footnote 3. Loynaz's use of the term "interactive" process in his affidavit (and FIU counsel's use of it in the footnote) is misleading and legally incorrect. The Americans with Disabilities Act ("ADA") regulations refer to the term "interactive process" the "informal" process engaged in by both parties to identify what accommodations are reasonable and necessary once an individual is determined to have a disability.[4] Here, the undisputed evidence is that once the disability has been determined and the accommodations have been awarded by the DRC, COM had an obligation to implement and provide those accommodations to the student and ensure that the student received them. Jones Depo. p. 50/ln 6 – p. 51/ln 9. Plaintiff was also specifically told it was COM's duty to *automatically* provide the accommodations; Plaintiff did not have to ask for them or inform every professor that he needed them in order to get them. Pl. Depo. p. 48/ln 8-22, p. 67/ln 12-16.

10. Disputed as to the main sentences in the paragraph. Plaintiff failed only *two* courses when he was called before the MSEPC the first time -- Genes, Molecules, and Cells in Period 1 (which he successfully remediated) and Cardiovascular and Respiratory Systems in Period 2. Pl.

---

[4] *See Frazier-White v. Gee,* 818 F.3d 1249, 1257 (11th Cir. 2016) ("The regulations state that an employer may in some circumstances need to 'initiate an informal, interactive process' with a disabled employee to determine the appropriate reasonable accommodation. 29 C.F.R. §1630.2(o)(3).").

3

Depo. p. 54/ln 18 – p. 55/ln 13, p. 55/ln 6 –p. 56/ln 13.  The additional "factual" statements in footnote 4 are undisputed.

11.  Undisputed as to the main sentences in the paragraph.  Disputed as to the statement in footnote 5 as it does not refer to anything in paragraph 11 and thus is confusing and vague in its reference to "remediation".

12.  Undisputed as to the first sentence of the paragraph.  Disputed as to the second sentence.  Plaintiff testified that he did not receive an advance email communication of room assignment for his first exam and that he had to notify Dr. Bonnin he had not received the advance email notice.  Pl. Depo. p. 66/ln 11-24.  Only thereafter did Plaintiff receive emails telling him when and where to take his exams and certain quizzes. Pl. Depo. p. 67/ln 17-21.

13.  Undisputed.

14.  Undisputed as to the main content of paragraph 14 but disputed as to footnote 7, which references absences not in the PIR.  Plaintiff's "excused" absences and any attendance events that occurred *after* issuance of the PIR are irrelevant and immaterial to this case.  Indeed, COM administrators testified that Plaintiff had no further professionalism issues from April 2018 until his dismissal in 2020.  Jones Depo. p. 201/ln 18 – p. 202/ln 3; Obeso Depo. p. 41/ln 16-21, p. 137/ln 3-20.  In addition, the PIR contained false and misleading accusations against Plaintiff as to his classroom conduct, as evidenced by the letter from Plaintiff's former classmate, Dr. Estavao Santos, who eye-witnessed that Plaintiff did not engage in the alleged classroom misconduct described in the PIR.  Obeso Depo. p. 123/ln 20 – p. 125/ln 19; Pl. Depo. Exh. 27.[5]  In addition, many of Plaintiff's absences described in the PIR were because of his ongoing medical problems, i.e., the radiculopathy in his neck and lumbar region for which he was prescribed drugs that impacted his cognitive abilities. Pl. Depo. p. 32/ln 9 – p. 33/ln 15, p. 81/ln 3-6.

15.  Disputed.  While Plaintiff did fail the Systems Based Practice final exam the first time he took it, he was not provided his required accommodations for that exam. McWhorter Depo. p. 42/ln 18 – p. 44/ln 6; Hall Depo. p. 63/ln 21 – p. 64/ln 16, p. 66/ln 1 – p. 67/ln 6; Pl. Depo. Exh. 12.  Plaintiff also was not allowed to take the remediation exam for the course, even though all

---

[5] Plaintiff used only one set of consecutively numbered deposition exhibits for all the depositions he took. Accordingly, the deposition exhibits referenced herein are separately listed in Plaintiff's Appendix/Notice of Filing in Opposition to Summary Judgment [ECF No. 63] and are designated here as "Pl. Depo. Exh." followed by the exhibit number.

students are entitled, without limit, to one retake exam if they failed an exam the first time. Pl. Depo. p. 80/ln 19 – p. 81/ln 2; Obeso Depo. p. 8/ln 21 – p. 60/ln 8. Instead, Plaintiff went on an approved leave of absence to attend to and recover from his neurological condition. Pl. Depo. p. 80/ln 4 – p.81/ln 9; Jones Depo. p. 110/ln 12-19. It was while he was on this leave of absence that MSEPC called Plaintiff into a second hearing, triggered this time by the PIR and the failure of Systems Based Practice. Pl. Depo. p. 80/ln 4-8; Jones Depo. p. 110/ln 12-19; Obeso Depo. p. 81/ln 17-25. As Plaintiff was aware that his leave of absence would affect his ability to continue with his Period 2 class and that he also needed to take care of his medical issues to avoid future absences, Plaintiff offered in a meeting with Dean Jones and Dr. Havas to repeat his entire second year to properly continue his medical studies. Pl. Depo. p. 80/ln 19 – p. 82/ln 5, p. 84/ln 18 – p.85/ln 9.

   16. Disputed as to the first two sentences and undisputed as to the third and fourth sentences. Plaintiff was called before MSEPC a second time solely because of the PIR and his failure of Systems Based Practice, the final exam for which he had neither received required accommodations nor been allowed to take a remediation exam. Jones Depo. p. 110/ln 12-19; Hall Depo. p. 63/ln 21 – p. 64/ln 16, p. 66/ln 1 – p. 67/ln 6; Pl. Exh. 12.. MSEPC agreed to allow Plaintiff, as he had requested, to repeat Period 2 upon his return from the leave of absence, noting in its decision that during the hearing Plaintiff had stated that "he is ready to return to the medical school in early April if he is allowed the opportunity to repeat Period 2." Pl. Depo. p. 78/ln 15-24, p. 81/ln 16-23; Def. Exh 3.[6]

   17. Disputed. While it is undisputed Plaintiff repeated the entire Period 2 upon his return from the leave of absence, when he returned, he performed successfully in *all* of his classes: he tallied a cumulative GPA for the entire term of 84.27, well into the competency range for a medical student. Jones Depo. p. 123/ln 3-10; Obeso Depo. p. 39/ln 19 – p. 40/ln 14; Pl. Exh. 20. With the exception of two passing grades of 79 and 76 and two pass/fail courses he passed, Plaintiff passed all of his second-year courses – 12 in total -- with grades in the 80s and 90s. Jones Depo. p. 121/ln 25 – p. 122/l. 18; Obeso Depo. p. 39/ln 3-18; Pl. Exh. 20. Plaintiff also had a cumulative GPA at COM through his second year of 84.27, again evidencing competency as an FIU medical student. Jones Depo. P. 121/ln 12 – p. 125. Ln. 10, Pl. Exh. 20. According to Obeso, Plaintiff overall was *competent* and showed "satisfactory performance" in the courses he passed. Obeso

---

[6] Exhibits that Defendant used in taking Plaintiff's deposition are designated as "Def. Exh." followed by the exhibit number.

Depo. p. 40/ln 1 – p. 41/l 13, p. 49/ln 1-22.  Also specifically disputed is the last sentence of the paragraph as not being a statement of a fact but argumentative. Furthermore, Obeso testified that by promoting Plaintiff from Period 2 to Period 3, MSEPC would have made a determination that Plaintiff had achieved "satisfactory academic performance".  Obeso Depo. p. 35/ln 15 – p. 36/ln 17.

      18. Undisputed.

      19. Undisputed.

      20. Undisputed but disputed as to being incomplete, and not painting a full picture of Plaintiff's actual, overall academic performance in his Period 3 clerkships.  The only clerkship Plaintiff failed in Period 3 was the Psychiatry clerkship, where he failed both the final exam and its retake. Jones Depo. p. 112/ln 5-10; Pl. Exh. 20; Obeso Depo. p. 75/ln 1-16; Pl. Exh. 23.  It is undisputed, however, that, with the exception of one pass/fail clerkship that he passed, Plaintiff passed *all* of his clerkships in Period 3 up until the time of the Psychiatry clerkship exam and its retake with course grades above 80, evidencing *competency* in those courses.  Jones Depo. p. 117/ln 16 – 25, p. 123/ln 20 – p. 124/ln 10, p. 131/ln 12-17, p. 131/ln 18-21, p.132/ln 15-22; Pl. Exh. 20; Obeso Depo. p. 42/ln 2 – p. 46/ln 17, p. 49/ln 1-22.  As a result of his course grades in the clerkships, Plaintiff had a Period 3 term GPA of 86.23, and his cumulative GPA at COM had increased to 82.62, both evidencing *competency* by COM standards. Jones Depo. p. 132/ln 23 – p. 133/ln 11; Obeso Depo. p. 49/ln 1 – p. 51/ln 6; Pl. Exh. 20.  Indeed, Plaintiff did extremely well, with only positive physician evaluations and no negative ones, in the "very important' clinical component -- i.e.., the patient diagnosis and treatment component – for each clerkship, including Psychiatry. Obeso Depo. p. 56/ln 24 – p. 58/ln 11, p. 63/ln 10 – p. 73/ln 8, p. 71/ln 20 – p. 72/ln 13; Clinical Evaluations (Def. Bates stamped nos. 115 – 119).[7]  The clinical component for each clerkship carried the same 30% weight of the student's overall grade as did the final exam. Obeso Depo. p. 53/ln 12 – p. 56/ln 19,; Pl. Exh. 22.  According to Obeso, had Plaintiff passed all his clerkships, including Psychiatry – the only one he failed – he would have been eligible for promotion from Period 3 to Period 4. Obeso Depo. p. 47/ln 11-19.  Obeso testified that there were

---

[7] Copies of the actual clinical evaluations were used as an exhibit in Obeso's deposition and were shown to and discussed with her. They should have been marked as an exhibit but inadvertently were not.  They are referenced by Defendant's Bates stamp numbers on the documents, which were specifically identified in the deposition. *See* Obeso Depo. p. 73/ln 15 – p. 74/ln 22.

COM students who were promoted from Period 3 to Period 4 with GPAs less than 80, and also students who graduated from COM with cumulative GPAs less than 80. Obeso Depo. p. 48/ln 10-25. P. 51/ln 7 – p.52/ln 15.

21. Undisputed.

22. Undisputed as to the first sentence of the paragraph but disputed as to the second sentence. Although her testimony fluctuated wildly, Reyes-Gavilan testified in deposition that there were at least six, and as much as eight, rooms that were used by the COM as minimal distraction rooms. Reyes-Gavilan Depo. p. 22/ln 5 – p. 23/ln 24 (six rooms), p. 25/ln 24 – p. 37/ln 2 (six to eight rooms), p. 104/ln 8-16 (seven rooms); Pl. Exh. 13 at pp. 22-23 of IDEA Amended Summary of the Complaint of Disability Discrimination ("Amended IDEA Report") (six rooms).

23. Undisputed as to all sentences except the last one and disputed as to there being no other rooms available as minimal distraction rooms. In addition to Reyes-Gavilan's statements that multiple rooms other than AHC2 495 and AHC1 335 were used as minimal distraction rooms, when Reyes-Gavilan, as testing room scheduler, was interviewed by FIU's Office of Inclusion, Diversity, Equity, and Access ("IDEA") – the FIU office responsible for fully investigating student internal complaints of discrimination – she informed the investigator, Valerie Hall, that, at the time Plaintiff was scheduled for the Psychiatry exam retake in room AHC2 495, there were several meetings in other conference rooms and three OSCE[8] simulation rooms near room AHC2 495, with each meeting having 20 participants each. Reyes-Gavilan Depo. P. 114/ln 15 – p. 115/ln 1, 119/ln 5-10; Pl. Exh. 13 at pp. 22-23 of Amended IDEA Report; Hall Depo. p. 140/ln 4-11. Reyes-Gavilan also informed the IDEA investigator – who confirmed that all statements made to her by Reyes-Gavilan as set forth in the Amended IDEA Report were accurate (Hall Depo. p. 11/ln 1-4) – "that no student should have been assigned to take a test in AHC2 495 because of the amount of people on that floor." Reyes-Gavilan Depo. p. 120/ln 16 – p. 121/ln 1; Pl. Exh. 13 at p. 23 of Amended IDEA Report; Hall Depo. p. 140/ln 4-24; Pl. Exh. 12 and 13. Reyes-Gavilan further informed investigator Hall that "she normally catches these situations and understands that a student may have felt uncomfortable with the arrangement." *Id.* Reyes-Gavilan admitted that her responsibilities included knowing what other events were going on around the rooms assigned as minimal distraction rooms. Reyes-Gavilan Depo. p. 54/ln 7-11. Hall testified further that Reyes-

---

[8] Objective Structure Clinical Examinations ("OSCE").

Gavilan, as the room scheduler, should have had knowledge of what the conditions were around AHC2 495 on the day in question, and that Reyes-Gavilan should have taken action to change the room for Plaintiff. Hall Depo. p. 141/ln 25 – p. 142/ln 25.  Although she claimed not to remember what she had told Hall when interviewed, Reyes-Gavilan in her deposition attempted repeatedly to disavow and contradict her interview statements when confronted with them, suggesting that Hall, an unbiased, experienced IDEA/discrimination investigator, was making everything up. Reyes-Gavilan Depo. p. 108/ln 2 – p. 135/ln 11.  In contrast, Hall testified that if Reyes-Gavilan had testified (as she did) that she had not made the statements attributed to her in the Amended IDEA Report, then Reyes-Gavilan's testimony would be inaccurate. Hall Depo. p. 11/ln10 – p. 112/ln 1.  Loynaz confirmed in his deposition that the activities going on around a room should be taken into consideration when designating a room as a minimal distraction room.  Loynaz Depo. p. 30/ln 4-12.

      24. Undisputed.

      25. Undisputed.

      26. Undisputed as to first sentence of the paragraph.  The second sentence is disputed as being immaterial and irrelevant to the substantive issues in this case.

      27. Undisputed.

      28. Undisputed as to the first two sentences of the paragraph.  Disputed and incomplete as to the remainder as additional material facts have been omitted. First, Exhibit 3 to Lachica's deposition does *not* evidence three bathroom breaks by Plaintiff during the exam; instead, Exhibit 3 is an email string between Lachica and others regarding the room being "freezing cold" and requiring a heater. Lachica Depo. p. 82/ln 10 – p. 85/ln 10; Pl. Exh. 3.  Although Lachica testified there were three *total* breaks taken during the exam – two of one minute or less duration and one of three minutes – she did not remember what the breaks were for, guessing that the two shorter breaks were for Plaintiff to drink water. Lachica Depo. p. 73/ln 8 – p. 76/ln 12; Pl. Exh. 2.  Second, although his back faced the large, frosted window in room AHC2 495, Plaintiff was still able to view the shapes of persons passing by outside hallway from his "periphery" when he lifted his head from his computer.  Pl. Depo. p. 100/ln 4 – p. 101/ln 23.  Third, while a heater was brought into the room, it was brought at Lachica's request as she described the room as "freezing cold" and alerted Maritere Williams by email to that fact. Lachica Depo. p. 77/ln 20 – p. 87/ln 3; Pl. Exh. 3.  The heater was not brought into the room until approximately halfway into the exam and

Lachica testified that both the freezing room temperature and eventual heater set up process near Plaintiff were distractions and disruptive, and also distractions for her. Lachica Depo. p. 80/ln 6-9, p. 85/ln 10-13, p. 86/ln 2 – p. 87/ln 3, p. 96/ln 3-12. Additional facts evidencing the numerous additional distractions Plaintiff encountered throughout his exam retake are set forth in the "Additional Facts" section below.

29. Undisputed; however, additional material facts have been omitted. Specifically omitted is the fact Lachica, the proctor, had the power to stop the exam if distractions occurred in the room. Loynaz Depo. p. 107/ln 17 – p. 108/ln 9. In addition, in the event there was heavy foot traffic and excessive noise occurring outside the room designated as a minimal distraction room, the proctor should go and ask the persons outside the room to quiet down. Loynaz Depo. p. 39/ln 6–22, p. 41/ln 16-24. Lachica herself testified that if she realized the exam room was not a minimal distraction room, she had the responsibility to stop the exam or alert someone that the room was not a minimal distraction room. Lachica Depo. p. 53/ln 15 – p. 54/ln 7. Lachica further testified that even though she was aware of numerous distractions in the exam room, including the temperature and repeated loud noises and moving shapes of foot traffic in the hallway, ignoring the "be quiet" sign she had posted, she chose not to do anything about them and allowed the numerous distractions to continue. Lachica Depo. p. 91/ln 19 – p. 92/ln 10, p. 94/ln 8–20, p. 117/ln 13 – p. 122/ln 22; Pl. Exh. 13 at pp. 23-24 pf Amended IDEA Report.

30. Undisputed.
31. Undisputed.
32. Undisputed.
33. Undisputed.
34. Undisputed.
35. Undisputed.
36. Undisputed but incomplete as to material both disputed and undisputed and which have been omitted, which are set forth in the "Additional Facts" section below.
37. Undisputed.
38. Undisputed. However, additional relevant and material facts have been omitted as set forth in the "Additional Facts" section below.
39. Undisputed as to the first sentence of the paragraph but disputed as to the remainder as it misrepresents the material facts and omits additional relevant and material facts. Specifically,

the "additional information" Dr. Bejar requested from IDEA prior to denying Plaintiff's appeal was only related to Plaintiff's performance in relation to quizzes and readiness assignments for which he had not been given testing accommodations. Bejar Depo. p. 117/ln 5 – p. 126/ln 19, p. 131/ln 14 – p. 132/ln 4; McWhorter Depo. p. 94/ln 8 – p. 99/ln 10; Pl. Exh. 15. Bejar never requested IDEA to address Plaintiff's performance on the Psychiatry shelf exam retake, which IDEA had already determined was adversely impacted by his not being placed in a proper minimal distraction room. McWhorter Depo. p. 99/ln 5-10; Pl. Exh. 13 at p. 29 of Amended IDEA Report. Additional omitted facts are set forth in the "Additional Facts" section below.

40. Disputed. Plaintiff's situation was unique. He was the only disabled student at COM who ever complained internally about not being accommodated for his testing, whose complaint was fully investigated by FIU through its IDEA office, and whose complaint allegations of not being accommodated were found to be substantiated. McWhorter Depo. p. 25/ln 15 – p. 27/ln 11, p. 63/ln 18-22; Hall Depo. p. 184/ln 21 – p. 185/ln 2. Additional omitted material facts are set forth in the "Additional Facts" section below.

41. Undisputed as to the first sentence of the paragraph. As to the second sentence, while the statement is factually accurate, the statement is immaterial to this case as Plaintiff had no legal obligation under the Title II of the ADA to exhaust any administrative remedies prior to filing suit.

## Additional Facts

42. When Plaintiff sat for the Psychiatry shelf exam retake, there were numerous visual, auditory, and environmental distractions in and around room AHC2 495: Plaintiff testified that the room had windows on both sides, was next to a busy hallway where administrative offices and OSCE simulation rooms were located, and was close to the elevator. Pl. Depo. p. 95/ln 23 – p. 96/ln 6. Plaintiff further testified that., while he was seated with his back to the large, frosted window in the room, he could see student faces and shapes passing in the hallway from his "periphery". Pl. Depo. p. 101/ln 16-23. Plaintiff testified that the movement of students in the hallway was constant throughout the exam and the people in the hallway were walking, yelling, and talking. Pl. Depo. p. 102/ln 13– 22. He further testified that the constant noise and movement from the hallway caused him to lose focus and was very distracting, and that, even though he had earplugs in, he could still hear people talking and yelling outside. Pl. Depo. p. 111/ln 18-21. Plaintiff acknowledged that at some point in time a heater was brought into the room. Pl. Depo. p. 104/ln 6-12. During the exam, Plaintiff would look up at the proctor, Lachica, to express his

frustration but the proctor did not do anything. Pl. Depo. p. 103/ln 2-13. Plaintiff did not alert the proctor to the many distractions because he was trying his best to focus and did not know he had the option to stop the exam or request a room change. Pl. Depo. p. 11/ln 11-17.

43. Lachica confirmed the numerous distractions both inside and outside room AHC2 495 the day Plaintiff took the exam. Lachica Depo. p. 68/ln 5 – p. 117/ln 3, p. 179/ln 17-p.180/ln5, p.200/ln9 – p. 202/ln 25. She confirmed the room was not the preferred room for accommodations because of its location near a large conference room, stairs, and an elevator, and because of the room's freezing cold temperature. Lachica Depo. p. 105/ln 22 – p. 106/ln7, p. 110/ln 3-9; Pl. Exh. 4. She agreed that no student should have been assigned to the room as a minimal distraction room on the date in question given the other events scheduled to take place outside the room. Lachica Depo. p. 157/ln 25 – p. 158/ln 15; Pl. Exh. 4. Lachica testified that the room had a large translucent window occupying approximately 80% of the wall that had gaps through which one could see into the hallway. Lachica Depo. p. 68/ln 5-21, p. 69/ln 7-10, p. 105/ln 16-21; Pl. Exh. 4. Lachica testified that one could see the shapes and shadows of people through the window and could hear the noise of people talking loudly in the hallway as they walked by. Lachica Depo. p. 68/ln 5-21. P. 89/ln 1 – p.91/ln 18, p. 95/ln 18-25, p. 112/ln 4 – p. 117/ln 3, p. 132/ln 8-17, p. 179/ln 17 – p. 180/ln 5, p. 200/ln 9 – p. 202/ln 25; Pl. Exh. 4. She confirmed that there was lots of noise and movement distractions during the exam to the point even she was distracted. Lachica Depo. p. 96/ln 3-12, p. 110/ln 22 – p. 111/ln 2, p. 112/ln 4 – p. 113/ln 23. She observed and experienced both auditory and visual distractions, including groups and crowds of people, as often as every 15 minutes, passing by and talking loudly over each other and at the same time. Lachica Depo. p. 89/ln 1 – p. 91/ln 18, p. 95/ln 18-25, p. 112/ln 4 – p. 117/ln 3, p. 132/ln 8-17, p. 179/ln 17 – p. 180/ln 5, p. 200/ln 9 – p. 202/ln 25; Pl. Exh. 4. Lachica also stated that although she put a sign on the door for people to be quiet, they ignored the sign. Lachica Depo. p. 91/ln 22 – p. 92/ln 10; Pl. Exh. 4. Lachica further confirmed that the room was "freezing cold", that she believed the temperature to be a distraction to Plaintiff, and that she ordered a heater be brought into the room which involved the added distraction of its setup. Lachica Depo. p. 84/ln 13 – p. 87/ln 3; Pl. Exh. 3. Lachica also testified to an additional auditory distraction during the exam: a loudspeaker in the hallway that repeatedly announced when students could return to their OSCE simulation rooms. Lachica Depo. p. 201/ln 25 – p. 202/ln 19. Although Lachica was aware of these numerous distractions, and although she had the responsibility and authority to tell those in the hallway to be

quiet, stop the exam, and/or request a room change – which she could have done -- she chose to do nothing at all (except request the room heater). Lachica Depo. p. 53/ln 15 – p. 54/ln 7, p. 91/ln 12 – p. 94/ln 20, p. 117/ln 13 – p. 122/ln 22; Loynaz Depo. p. 39/ln 6–22, p. 41/ln 16-24, p. 107/ln 17 – p. 108/ln 9.  Lachica's only excuse for not taking action to help Plaintiff was because she was afraid it would cause even more distractions, even though she could have notified Ms. Williams about the situation by computer as she had done with the room temperature situation. Lachica Depo. p. 122/ln 10-22, p. 132/ln 22 – p. 133/ln 9; Pl. Exh. 4.

44. The sole, triggering reason for Plaintiff being called before MSEPC a third time for hearing, and which resulted in the decision that led to his dismissal from COM, was his failure of the Psychiatry shelf exam retake for which he had not been provided a proper minimal distraction room. Bejar Depo. p. 92/ln 9-23; Jones Depo. P. 130/ln 12 – p. 131/ln 8; Obeso Depo. p. 126/ln 12 – p. 127/ln 10, p. 141/ln 18 – p. 142/ln 16; Pl. Exh. 10.  Obeso confirmed that if Plaintiff had passed all of his clerkships in Period 3, including Psychiatry, he would have been eligible or promotion to Period 4. Obeso Depo. p. 47/ln 11-19.  Significantly, Jones, who had full knowledge of MSEPC's dismissal recommendation and its reasoning and of Plaintiff's entire academic performance at COM, stated to IDEA when he was interviewed in their investigation that Plaintiff "will be a great doctor, someday" . Hall Depo. p. 100/ln 21 – p. 101/ln 3; Pl. Exh. 13 at p. 18 of Amended IDEA Report.  Although he initially denied ever making such a statement, when confronted by the statement in IDEA's report, he admitted to making it. Jones Depo. p. 135/ln 20 – p. 136/ln 13, p. 151/ln 6 – p. 152/ln 6.

45. Plaintiff's internal complaint with FIU's IDEA office was thoroughly investigated, by Shirlyon McWhorter, the IDEA Director, and Valerie Hall, an experienced discrimination investigator, both FIU employees at the time. McWhorter Depo. p. 37/ln 14-23; Hall Depo. p. 52/ln 16-20, p. 148/ln 18 – p. 149/ln 3; Pl. Ex. 13; Pl. Exh. 14.  McWhorter at the time had been the IDEA Director for 11 years, is currently a practicing attorney, was formerly a Miami-Dade County Court judge, was formerly a Miami-Dade County School Board Office of Civil Rights investigator, and was and is experienced in student and employee discrimination investigations and the ADA. McWhorter Depo. p. 6/ln 8 – p. 17/ln 10.  Hall at the time had been a discrimination investigator for IDEA for four years, is still employed by FIU as an instructor, is a retired Miami-Dade Police detective, is a former discrimination investigator for Florida Memorial University, and is experienced and trained in discrimination investigations and the ADA.  Hall Depo. p. 12/ln 10 –

p. 27/ln 11; Pl. Exh. 35. Hall interviewed all of the witnesses in connection with the IDEA investigation, except Lachica who was interviewed by McWhorter. McWhorter Depo. p. 75/ln 24 – p. 76/ln 2; Hall Depo. p. 38/ln 14-20, p. 49/ln 8-22, p. 171/ln 18 – p. 173/ln 1.

46. Shortly after the investigation commenced, Hall had photographs taken of room AHC2 495 and issued a memorandum in which she concluded that the room was probably not an appropriate minimal distraction room and that Plaintiff's claim that he had not received his testing accommodation was "true". Hall Depo. p. 120/ln 13 – p. 130/ln 22; Pl. Exh. 40. After completing her investigation, Hall drafted the investigative report which was reviewed and agreed upon by the entire IDEA investigative staff, and was issued under McWhorter's signature. Hall Depo. p. 39/ln 1 – p. 40/ln 22, p. 44/ln 19-25; McWhorter Depo. p. 40/ln 13 – p. 41/ln 17, p. 57/ln 8-16; Pl. Exh. 12; Pl. Exh. 15. The report thoroughly analyzed Plaintiff's claims under the ADA and Section 504 of the Rehabilitation Act, and made significant findings, including: (1) that Plaintiff was a qualified individual with a disability within the meaning of the ADA; (2) that Plaintiff's placement in room AHC2 4905 for the High-Stakes Psychiatry shelf exam "did not meet the standard for a minimal distraction room identified by the ADA and this impacted his ability to concentrate while taking the … exam which violated his disability testing accommodation"; (3) that Plaintiff "did not receive testing accommodations for pop quizzes/readiness assignments"; and (4) that COM did not have legitimate non-discriminatory reasons for denying Plaintiff his accommodations. McWhorter Depo. p. 51/ln 3 – p. 58/ln 9; Hall Depo. p. 112/ln 13 – p. 117/ln 6-22; Pl. Exh. 12 at pp. 27-30 of Initial IDEA Report. The IDEA report found that Plaintiff's allegations of being discriminated against and not being accommodated were "substantiated". McWhorter Depo. p. 60/ln 8-11; Hall Depo. p. 155/ln 14-24; Pl. Exh. 12 at p. 31 of Initial IDEA Report. Although the initial IDEA report found COM to be in violation of FIU-106, Hall testified that FIU-106 related to compliance with the ADA. Hall Depo. p. 30/ln 10 – p. 31/ln 4.

47. In its initial investigative report, IDEA also made "additional findings" delineating various historical and systemic problems with COM in giving disabled students their required testing accommodations. McWhorter Depo. p. 64/ln 1 – p. 69/ln 6; Hall Depo. p. 156/ln 15 – p. 163/ln 13; Pl. Exh. 12 at p. 31 of Initial IDEA Report. The systemic problems included: (1) that COM had a history of denying students testing accommodations dating back to 2009; (2) that COM administrators acknowledged that COM provided testing accommodations to students on an inconsistent basis; (3) that there were many meetings addressing testing accommodation concerns

with no resolution; (4) that COM administrators were aware and complicit in this testing accommodations process; and (5) that, although COM may not have been malicious, it violated student's rights. Hall Depo. p. 156/ln 15 – p. 163/ln 13; Pl. Exh. 12 at p. 31 of Initial IDEA Report.

48. After issuing the initial IDEA Report, McWhorter met with FIU's in-house counsel, Iris Elijah, which resulted in McWhorter interviewing an additional witness -- exam proctor Lachica -- who further supported IDEA's finding that Plaintiff had been discriminated against in not being placed in the required minimal distraction room for the Psychiatry retake exam. McWhorter Depo. p. 72/ln 3 – p. 77/ln 14. McWhorter's meeting with Elijah also resulted in McWhorter issuing an "amended" report in which Lachica's interview narrative was added and which, without explanation, eliminated *all* of the separate COM systemic problem findings that had been made in the original report. McWhorter Depo. p. 77/ln 23 – p. 78/ln 21, p. 93/ln 7-15; Hall Depo. p. 176/ln 20-25; Pl. Exh. 13. Even though the amended report eliminated the systemic findings, McWhorter and Hall both testified that they stood behind *all* their findings in both reports. McWhorter Depo. p. 90/ln 17-23; Hall Depo. p. 176/ln 20-25. Shortly after the "amended" IDEA report was issued, both McWhorter and Hall resigned from IDEA. McWhorter Depo. p. 16/ln 14-23; Hall Depo. p. 28/ln 24; Pl. Exh. 35.

49. McWhorter testified that following the issuance of the IDEA reports substantiating Plaintiff's discrimination complaints and the failure to accommodate him, COM should have taken remedial action, including looking to her as IDEA Director to remedy the situation. McWhorter Depo. p. 118/ln 11 – p. 122/ln 14. However, in Plaintiff's case and without explanation, she was not consulted about remedial action and nothing was done. McWhorter Depo. p. 121/ln 1-16. Obeso in her deposition acknowledged that students who failed a clerkship retake exam, as Plaintiff did, could be allowed to repeat the clerkship. Obeso Depo. p. 76/ln 20-23. Although Dr. Bonnin emailed Plaintiff to inform him of his failure of the shelf exam retake and stating that Plaintiff would have to remediate the clerkship, Plaintiff was not allowed to do so and instead was dismissed from COM. Obeso Depo. p. 75/ln 1-16; Pl. Exh. 23.

50. In both IDEA reports, IDEA explicitly concluded that Plaintiff being denied the minimal distraction room for his exam retake adversely impacted his ability to concentrate on the exam and adversely affected his performance on the exam. McWhorter Depo. p. 52/ln 13 – p. 53/ln 13, p. 61/ln 4 – p. 62/ln 8, p. 99/ln 5-10; Pl. Exh. 13 at pp. 29–31 of Amended IDEA Report; Hall Depo. p. 117/ln 6-22, p. 136/ln15-21, p. 152/ln 7-21; Pl. Exh. 13. Despite this specific IDEA

finding of an adverse effect on Plaintiff's exam performance, Dr. Bejar, who purportedly thoroughly reviewed both IDEA reports, chose to ignore IDEA's conclusions and denied Plaintiff's appeal, incongruously and falsely representing in her denial letter that "there is *no indication*" that Plaintiff's allegations investigated by the IDEA "had an adverse impact upon" Plaintiff's "academic performance". Bejar Depo. p. 35/ln 11 – p. 36/ln 2; Pl. Exh. 14. Bejar repeatedly – and falsely -- testified in deposition that no one from the IDEA, including McWhorter, had told her that the failure to provide Plaintiff with the minimal distraction room for his retake exam had adversely affected is performance on the exam and there was nothing in the reports to this effect. Bejar Depo. p. 45/ln 5-18, p. 47/ln 4-17, p. 64,ln 4 – p.67/ln 19. Bejar's testimony is directly contradicted by the IDEA's explicit findings in both its reports and by McWhorter's and Halls' testimony that Bejar's conclusion in her letter was inaccurate. McWhorter Depo. p. 52/ln 13 – p. 53/ln 6, p. 61/ln 4 – p. 62/ln8, p. 99/ln 5-10, p. 114/ln 20 – p. 116/ln 1; Hall Depo. p. 117/ln 6-22, p. 136/ln 15-21, p. 183/ln17 – p. 184/ln 1.

    51. In addition to the systemic problems IDEA found in its initial investigative report, those who were directly responsible for ensuring Plaintiff was properly accommodated for his Psychiatry retake exam had insufficient and improper training in the ADA and in minimal distraction rooms as a testing accommodation. Lachica, who could have taken action but did not with regard to rectifying the many distractions Plaintiff encountered in room AHC2 495, confirmed that she could not tell what a minimal distraction room was for purposes of the ADA, was not familiar with FIU guidelines on what a minimal distraction room was, and had never received any training on identifying what a minimal distraction room was. Lachica Depo. p. 125/ln 18 – p. 126/ln 17. Dean Jones admitted he was not aware of what the specifications were for a minimal distraction room even though he served for years as Chairman of COM's ADA Committee, which had responsibility for ensuring disabled students such as Plaintiff received the accommodations they were awarded. Jones Depo. p. 161/ln 19 – p. 164/ln 10. Maritere Williams, Reyes-Gavilan's supervisor who was also responsible for minimal distraction room assignments, stated to Hall, the IDEA investigator, that she had never received any accommodations training, had never attended any ADA meetings, and erroneously described a minimal distraction room as one completely without windows and away from heavy foot traffic. Hall Depo. p. 91/ln 3 – p. 92/ln 24 Hall confirmed that under Williams' definition, room AHC2 495 to which Plaintiff was assigned would not qualify as a minimal distraction room. Hall Depo. p. 94/ln 3-17.

Respectfully submitted,

RODERICK V. HANNAH, ESQ., P.A.
Attorneys for Plaintiff
4800 N. Hiatus Road
Sunrise, Florida 33351
Telephone: (954) 362-3800
Facsimile: (954) 362-3779
Email: rhannah@rhannahlaw.com


By /s/ *Roderick V. Hannah*
    Roderick V. Hannah
    Fla. Bar No. 435384

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 11th of April, 2022, a true and correct of the foregoing was electronically filed and served via transmission of Notice of Electronic Filing generated by CM/ECF on all counsel or parties of record on the Service List below:

Lourdes E. Wydler, Esq.
Email: lew@marrerolegal.com
MARRERO & WYDLER
2600 Douglas Road, PH-4
Coral Gables, FL 33134
(305) 446-5528
(305) 446-0995 (fax)

*Attorneys for Defendant FIU BOT*


/s/ *Roderick V. Hannah*
    Roderick V. Hannah