```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2
                       CASE NO. 20-CV-24649-AMC
 3
      ELIE NEHME,
 4                                        Miami, Florida
                Plaintiff(s),
 5                                        July 6, 2022
           vs.
 6
      FLORIDA INTERNATIONAL UNIVERSITY
 7    BOARD OF TRUSTEES,

 8
                     Defendant(s).      Pages 1 - 79
 9    ------------------------------------------------------------

10                         MOTION HEARING
            TRANSCRIBED FROM DIGITAL AUDIO RECORDING
11          BEFORE THE HONORABLE ALICIA M. OTAZO-REYES
                 UNITED STATES MAGISTRATE JUDGE
12
      APPEARANCES:
13
      FOR THE PLAINTIFF(S):   RODERICK V. HANNAH, ESQ.
14                            RODERICK V. HANNAH, P.A.
                              4800 North Hiatus Road
15                            Sunrise, FL 33351
                              954-362-3800
16                            rhannah@rhannahlaw.com

17
      FOR THE DEFENDANT(S):   LOURDES E. WYDLER, ESQ.
18                            MARRERO & WYDLER
                              2600 Douglas Road
19                            Coral Gables, FL 33134
                              305-446-5528
20                            lew@marrerolegal.com

21

22    TRANSCRIBED BY:         Joanne Mancari, RPR, CRR, CSR
                              Court Reporter
23                            jemancari@gmail.com

24

25
```

1    Thereupon,

2    the following proceedings were held by Zoom videoconference:

3           THE DEPUTY CLERK:  Elie Nehme v. Florida International

4    University Board of Trustees, case No. 20 24649, civil, Cannon.

5           Counsel, please state your appearances for the record.

6           MR. HANNAH:  Yes.  Good morning.  May it please the

7    court, Rod Hannah on behalf of the plaintiff Elie Nehme.

8           Just to let you know, I am here with my client as

9    well.  Mr. Nehme is next to me.

10          MR. NEHME:  Good morning, your Honor.

11          THE COURT:  All right.

12          MS. WYDLER:  Good morning.  May it please the court,

13   Lourdes Wydler on behalf of Florida International University

14   Board of Trustees, and good morning also to the court

15   personnel.

16          THE COURT:  All right.  Thank you.

17          All right.  We are here on defendant's motion for

18   summary judgment.  There are two counts under the ADA --

19   failure to accommodate and wrongful dismissal.  FIU is seeking

20   summary judgment as to both counts.

21          There are various arguments being raised in terms of

22   the legal insufficiency of the claim, according to defendant,

23   based on the undisputed facts.

24          I note that there is a joint statement of undisputed

25   facts and there is plaintiff's disputed facts.  To be honest, I

```
 1    had a bit of a hard time figuring that one out.  I guess the
 2    reason why I had a hard time is because of the numbering.
 3    There is the same numbering system in both.  So I guess I
 4    should ask Mr. Hannah to clarify and explain to me how to read
 5    this.
 6              MR. HANNAH:  Actually, it is something that you just
 7    didn't even realize that that would become an issue, your
 8    Honor.
 9              THE COURT:  Well, it is not an issue if you explain
10    it.
11              MR. HANNAH:  I'll try my best.  I'll try my best.
12              This was a joint effort by Ms. Wydler and myself --
13              THE COURT:  Right.
14              MR. HANNAH:  -- because Judge Cannon required some
15    form of joint statement.
16              THE COURT:  Yes.
17              MR. HANNAH:  Ms. Wydler prepared the draft.  I looked
18    at the draft and I agreed with certain things and I didn't
19    disagree with a number of things.
20              What you have is what I agreed to, I guess, that I
21    considered undisputed from what was presented to me, but then,
22    of course, we had a separate party statement of facts.  There
23    is overlap.  I noticed there is overlap between the defendant's
24    statement of material facts and then I responded to that by
25    numbers, according to the local rule, and then added my own
```

1   statement of what I considered undisputed facts.  Then, of

2   course, Ms. Wydler replied to that.

3           I'm not sure how to reconcile it other than just to

4   recognize that there is overlap between the two, and most of

5   the overlap has to do with the fact that the draft joint

6   statement of facts that I received, and to which I either

7   disputed or undisputed it, and we agreed on a joint statement,

8   a lot of that is contained in the defendant's statement of

9   undisputed facts.  So that is where the overlap comes in, and

10  probably similarly numbered.  So I can see where the confusion

11  arises, your Honor.

12          I am not sure how to reconcile that other than to say

13  that there is overlap, generally overlap between the joint

14  statement and the defendant's statement.

15          When I responded, I responded saying this is disputed

16  or undisputed and then clarified, where I could, with the

17  record evidence and then added my own statement.  So I'm not

18  really 100 percent sure how to reconcile the numbering, other

19  than to go back and look at it and try to say this is restated

20  from defendant's statement, vice versa.

21          THE COURT:  OK.  So let me tell you, all I'm looking

22  for -- of course, I'm not trying to create work.  I'm just

23  trying to figure out how to read this.

24          So I am looking at your statement of disputed facts

25  and you said:  No. 1, undisputed; No. 2, undisputed; No. 3,

```
 1    disputed.

 2            Now, is this No. 3 the same one that in the joint

 3    statement appears as undisputed?  That's what I couldn't figure

 4    out.

 5            MR. HANNAH:  Let me take a look at that, what you just

 6    pointed out to me, your Honor.  Let me look at the joint --

 7            MS. WYDLER:  If I may assist, your Honor.  I do

 8    believe that plaintiff's response, as he indicated, was in

 9    response to the defendant's statement of facts.  So the

10    dispute, according to the plaintiff's statement of facts, is in

11    response to defendant's.

12            The joint statement of facts probably, without looking

13    specifically at No. 3 as an example, probably deleted a fact

14    that I had in the defendant's statement of fact that plaintiff

15    is claiming is disputed.

16            MR. HANNAH:  That would probably be the correct way to

17    approach it.  I agree with Ms. Wydler on that, that when I

18    disputed the proposed joint statement, and ultimately resulted

19    in a joint statement, when I said it was undisputed it was to

20    those sentences or that statement that I thought were

21    undisputed, but there might be a sentence or two of the

22    undisputed proposed version that I disagreed with and so it was

23    left out of the joint statement but Ms. Wydler included it in

24    her statement, even though I had disputed it from the joint

25    statement, and that is why I disputed it then when I did my
```

1 | response statement of disputed facts.  So that may be where

2 | some of the confusion lies, if there is a sentence missing from

3 | Ms. Wydler's statement of undisputed facts that was in the

4 | joint statement of facts.

5 |    THE COURT:  All right.  So let me put it another way.

6 | Docket entry 58, Joint Statement of Undisputed Material Facts.

7 | Is everything in there undisputed or should I read that *in pari*

8 | *materia* with your statement, and then, for example, compare No.

9 | 3 in docket entry 58 with No. 3 in docket entry 64 and kind of

10 | pare down and figure out, some of No. 3 is undisputed except

11 | for what plaintiff is telling me is disputed?  Is that how I

12 | should go about reading it?

13 |    MR. HANNAH:  I think that's probably the best way to

14 | approach it, your Honor, because from what I saw, Ms. Wydler,

15 | when she did her undisputed statement of facts, she included

16 | everything that she gave me in her draft when we did the joint

17 | but added sentences that I disagreed with.  So I think the best

18 | way is to compare her statement of undisputed facts which has

19 | the overlap with the joint statement to some extent with my

20 | statement of disputed facts.

21 |    THE COURT:  So is what I said correct?

22 |    MR. HANNAH:  I believe so.

23 |    THE COURT:  I am taking 3 as an example.  I read the

24 | joint No. 3 and then I read your No. 3 in docket entry 64 and I

25 | kind of like compare and contrast and say, wait, wait, let's

1    see, out of No. 3 this much is undisputed but the rest is

2    disputed.  Would that --

3              MR. HANNAH:  Yes.

4              THE COURT:  -- be how to do it?

5              MR. HANNAH:  Yes.  Yes.  That would be the way to do

6    it, I think, the clearest way to do it.

7              THE COURT:  So No. 58 is not truly a joint statement

8    of undisputed material facts.  It is partially undisputed.

9              Would that be an accurate statement?

10             MR. HANNAH:  No, not really.  When I got the draft

11   joint statement of disputed facts, it was prepared by

12   defendant's counsel and it had all the statements, alleged

13   statement of undisputed fact that they included in their

14   statement of undisputed facts, but when we were trying to come

15   down to a joint version, there were certain sentences within

16   the various paragraphs that I disagreed with.  I didn't think

17   it was -- it was not something that I considered undisputed.

18             So we took out those sentences when we did the joint

19   statement, but those sentences that were taken out were in the

20   defendant's statement.  So when I dispute something in a

21   comparable paragraph, I'm disputing probably those sentences I

22   originally asked them to take out from the joint statement.

23             THE COURT:  Now, is their original statement that they

24   gave you to review, is that part of the record?

25             MR. HANNAH:  No.  You mean the original draft

1   statement?

2          THE COURT:  That's not part of the record, right?

3          MR. HANNAH:  No, it's not.  I have probably a copy in

4   my file, but I don't know if that helps you.

5          THE COURT:  All right.  So let me then, with that

6   clarification, let me put it this other way.

7          Everything in docket entry 58 is undisputed, but you

8   are raising separately what you believe are material facts that

9   are in dispute in No. 64 and defendant is responding to those.

10  So I have to look at docket entry 58, overlay on that docket

11  entry 64 and 65, to come up with the universe of facts.  Some

12  of them undisputed, as shown in 58; some of them disputed, as

13  shown in 64 plus 65.

14         MR. HANNAH:  That would be correct.  I have probably a

15  redlined version.  When she sent me, Ms. Wydler sent me the

16  proposed joint statement and I looked at it and I crossed out

17  things that I disagreed with and winnowed it down to what

18  became the joint statement, I can send that to you, if that

19  helps.

20         MS. WYDLER:  Your Honor --

21         THE COURT:  Let me see.  If what I just said, if my

22  last statement is correct, then I can take everything in docket

23  entry 58 as the gospel and then I have to look at 64 and 65 and

24  determine if any of those disputed facts affect the outcome or

25  not.

1          MS. WYDLER:  Your Honor, if I may, I do believe that

2     56 -- I'm sorry, 58 is the gospel because that is undisputed,

3     stipulated by both counsel.

4          I will direct the court's attention to 56, which is

5     the defendant's statement of facts, which is what plaintiff's

6     response, 64, is responding to.

7          THE COURT:  OK.  So your original draft, then, you're

8     telling me is part of the record as docket entry 56.

9          MS. WYDLER:  Yes, it is.  56 is the defendant's

10    statement of facts, which is what I initially sent over to

11    plaintiff's counsel and then deleted what was not in agreement

12    to present as a joint statement.

13         THE COURT:  All right.  But out of 56 I need to peel

14    off whatever is in 58 because there is agreement in 58, right?

15    Because 56 is all of your facts, disputed and not disputed,

16    correct?

17         MS. WYDLER:  Yes.  Well, they are undisputed material

18    facts as presented by the defendant.

19         THE COURT:  Oh, yes, of course, but later disputed by

20    the plaintiff in docket entry 56 in part, not in whole.

21         MR. HANNAH:  Right.

22         THE COURT:  OK.  All right.  So I think I understand.

23         I think that the piece of the puzzle that was missing

24    that I didn't have before me is docket entry 56.  So to put the

25    puzzle together I look at 58 and then I look at 56 plus 64 plus

1   65.  Obviously not all of 56, whatever in 56 is not in 58.

2          MS. WYDLER:  Your Honor, to make it a complete puzzle,

3   for the facts that are allegedly disputed in 64 by the

4   plaintiff, I submit to the court docket entry 71, which is the

5   defendant's reply statement of facts referring to specific

6   portions of the record to show a lack of dispute.

7          THE COURT:  I'm sorry.  I meant to say 64, plaintiff's

8   statement of disputed facts.  I'm sorry.  I didn't mean to say

9   65.  I meant the combination.  I meant to make it 64 and 71.  I

10  just grabbed the wrong number.

11         You are correct.  64 and 71 are the cross-disputes,

12  together with 56, pared down 56.  OK.  I think I have my

13  roadmap based on your explanations.

14         All right.  Let's see.  So it is defendant's motion.

15  I have reviewed it.  I have had some experience with ADA cases.

16         So what I would like you to do, Ms. Wydler, and then,

17  of course, Mr. Hannah can respond, is just hit the highlights

18  of your argument in terms of basically what your grounds are

19  for summary judgment on Count I and Count II and basically, as

20  you kind of say in your introduction a little bit, and then

21  Mr. Hannah can respond.  And then anything in particular that

22  you want to draw my attention to you can either share screen or

23  point me to the docket entry and I will make a note of it.  All

24  right.

25         MS. WYDLER:  Yes, your Honor.  Thank you.

1          We are moving for summary judgment on both counts.

2     The threshold question that applies to both the failure to

3     accommodate and the disparate treatment claim is both that

4     Mr. Nehme is not qualified as the standard for the ADA.  We

5     cite to various precedent within our circuit -- Goldberg,

6     Zainulabeddin, J.A.M., Forbes, the Redding v. Nova case.  So

7     that is one argument that will apply to both counts.

8          In our reply we also, in footnote 4, because I did a

9     national search on this and I looked for every case where there

10    was an ADA claim and an individual student who was on

11    probation.  Probation, academic probation at FIU is a

12    distinguishing factor here in all of these cases because of

13    plaintiff's continued poor performance throughout his tenure at

14    the university.

15         With respect to Count I -- and I will proceed after I

16    go through the roadmap of the legal arguments on the academic

17    performance issue.

18         With respect to Count I, on the failure to accommodate

19    claim, it is FIU's position that during the time of the exam

20    FIU was not on notice of a lack of accommodation, mostly

21    because the plaintiff did not indicate to anyone during the

22    exam that he was allegedly disrupted by noise or by foot

23    traffic in the minimal distraction room.

24         THE COURT:  I'm sorry.  Which particular exam?

25    Because from what I saw there were various tests, quizzes,

1   exams, and so on.  Is there a particular exam?

2           MS. WYDLER:  Yes, your Honor.

3           THE COURT:  Maybe if you put it more like in chrono

4   order --

5           MS. WYDLER:  Sure.

6           THE COURT:  -- as to, did the plaintiff from the

7   get-go say I'm disabled, I need a quiet room and extra time, or

8   did this come up later?

9           MS. WYDLER:  It came up later.

10          Allow me to go through his academic record.

11          So Mr. Nehme started at FIU in August of 2016.  He

12  failed his first course, which was Genes, Molecules and Cells.

13  He was afforded the opportunity, like every other student, to

14  remediate, and he passed.  He got a U/75, which is the best

15  score you can get when you fail the first time.

16          THE COURT:  Hold on.  This was his first year, right?

17          MS. WYDLER:  Yes, ma'am.

18          THE COURT:  And that is the only course that he

19  failed?

20          MS. WYDLER:  Yes.

21          THE COURT:  So the other courses in his first year he

22  passed.

23          MS. WYDLER:  Correct.  They were of marginal

24  competency.  He had three courses of marginal competency, which

25  was a 79 percent score.  That was in Integrated Functions of

1    Human Body, Pharmacology and Pathology and Infectious Disease.

2         THE COURT:  All right.

3         MS. WYDLER:  That was period one.

4         THE COURT:  You have to put up with me.  I was

5    daughter-in-law to a doctor, married to a doctor, mother of a

6    doctor.  So I kind of went through medical school twice, but a

7    long time ago.

8         His first year he passed some of them marginally, but

9    he failed this particular course you're telling me about.

10        MS. WYDLER:  He failed it and then remediated --

11        THE COURT:  OK.

12        MS. WYDLER:  -- which is an opportunity that is given

13   to every student to retake the test, and then he passed it.

14        THE COURT:  At that point in time was he saying I need

15   accommodation or that hasn't come up yet?

16        MS. WYDLER:  Had not happened yet.

17        THE COURT:  OK.

18        MS. WYDLER:  Then period two commences.  Period two,

19   we are talking now May of 2017.

20        THE COURT:  If we do this old-fashioned, second year

21   med student.

22        MS. WYDLER:  Yes.

23        THE COURT:  OK.

24        MS. WYDLER:  There he failed Cardiovascular and

25   Respiratory Systems.  He also failed the remediation for that

1    course.

2         Under FIU's Handbook, because of the remediation

3    failure and the initial course failure, this is considered at

4    this point his third failure of medical school.

5         At or about this time is when he started realizing

6    that there might be some issues.  So he consulted with FIU.  He

7    went to the wellness center.  He was evaluated there by

8    Dr. Desmarais.

9         At the same time, while he was going through the

10   evaluation process, he had what's called his first MSEPC.  The

11   MSEPC hearing -- and the acronym stands for the Medical

12   Student's Evaluations and Promotion Committee.  This is a

13   committee comprised of generally 12 individuals who are the

14   professors to create medical doctors and are also physicians in

15   the community.

16        At that MSEPC hearing they allowed him to retake that

17   entire course with the next incoming class.  So where he would

18   have been graduating and taking the same course work with the

19   class of 2020, he was allowed to take that one class with the

20   class of 2021.

21        At that point Dr. Desmarais sent over to the FIU

22   Disability Resource Center --

23        THE COURT:  I'm sorry.  I'm sorry.  Let me pause and

24   make sure I understand what you are saying.

25        Did he fail this particular course at the end of his

```
 1   second year or was it somewhere along the way?

 2            MS. WYDLER:  That course was a double failure.

 3            THE COURT:  I know, but was the -- he failed the

 4   course or he failed an exam?

 5            MS. WYDLER:  The course.  The course.

 6            THE COURT:  OK.  So at the end of that year, second

 7   year, he was given an F in this particular course.

 8            MS. WYDLER:  He received a failed remediation and the

 9   failed course.  It was under a 75.

10            THE COURT:  All right.  Bear with me.  When you say

11   remediation, does it mean retake a final exam?

12            MS. WYDLER:  In this instance it is retaking the

13   course.

14            THE COURT:  Is it a year-long course?

15            MS. WYDLER:  No, ma'am.

16            THE COURT:  OK.  So as he is going along in his second

17   year, maybe one semester he takes X, Y, Z, and the second

18   semester he takes R, S and Z again because he is taking it

19   over.  Am I getting that part right?

20            MS. WYDLER:  Yes.  Yes.

21            THE COURT:  All right.  So then he takes the same

22   course twice in his second year and he flunks it both times.

23            MS. WYDLER:  That's correct.

24            THE COURT:  All right.  So then what happens next is

25   he moves along with his class, but for this particular course
```

```
 1    he is held back by one year and he has to repeat it with the
 2    next medical school class.
 3            MS. WYDLER:  At that point he only repeats that
 4    course --
 5            THE COURT:  Right.
 6            MS. WYDLER:  -- with the next incoming class.  He does
 7    eventually have to repeat an entire year later.
 8            THE COURT:  We are not there yet.
 9            MS. WYDLER:  We are not there yet.
10            THE COURT:  So at the end of his second year, he is
11    going into third year, which is where they do a lot more
12    clinical stuff, and as he is doing the clinical stuff with his
13    peers, he is retaking this basic sciences course.
14            MS. WYDLER:  No.  We are not there yet, your Honor.
15            THE COURT:  Not yet.
16            MS. WYDLER:  He is still in the course work.  So
17    period three hasn't happened yet.  We are still in the early
18    stages of period two.  And semesters, they don't operate by
19    semesters.
20            THE COURT:  I know.
21            MS. WYDLER:  It is different.
22            THE COURT:  Right.  Right.
23            MS. WYDLER:  But during period two, I think what is
24    important for the court to note is that during period two he
25    had two MSEPC hearings as a result of additional failures.  So
```

1    he failed the Cardiovascular and Respiratory Systems, which we

2    went over, he failed the remediation of the course, had the

3    first MSEPC hearing in July.

4           At that MSEPC hearing, so the court is aware of the

5    Handbook and the procedures, Mr. Nehme stopped being a student

6    in good standing for the rest of his medical career.  There are

7    three levels of standing at FIU -- there is good standing,

8    which is essentially there is nothing, you are just a student,

9    academic watch, and academic probation.

10          As of July of 2017 this student was placed on academic

11   probation.  Academic probation indicates an unsatisfactory

12   progress towards the medical degree and can be a precursor to

13   dismissal from the medical school.  That is in the Handbook.

14   It also places him specifically on notice that he can be

15   dismissed not only for failures, once you are in this status

16   you can be dismissed for continued poor performance.

17          The poor performance is a designation that is

18   determined by the MSEPC.  So he is already on academic

19   probation after his first year.  While he is in his second

20   year, now, since he is on academic probation, just about the

21   same time he gets qualified by the Disability Resource Center

22   for accommodations.  There is a letter --

23          THE COURT:  So the disability issue comes up while he

24   is on probation, on academic probation?

25          MS. WYDLER:  Yes, your Honor.

```
 1              THE COURT:  OK.  And that's the probation where he is
 2    on just watch, no?  He is on full-fledged probation?
 3              MS. WYDLER:  Full-fledged probation, where any misstep
 4    could lead to dismissal at this point.
 5              THE COURT:  OK.
 6              MS. WYDLER:  Then what happens next?  In December of
 7    2017 there is a professional incident report that is filed.  It
 8    is filed by the associate dean of medical education and
 9    curriculum on behalf of various professors for unexcused
10    absences.
11              At the same time, in January of 2018 -- this is all
12    still during period two -- he fails a course, he fails a test.
13    The course he failed is Systems Based Practice.
14              Immediately, within a week's time of that last test,
15    he requests a leave of absence from FIU due to medical
16    conditions.  FIU grants it.  At that point they permitted him
17    to continue with the class of 2021.  So he has to repeat at
18    this point his entire period two.
19              THE COURT:  Right.  So in terms of time frame, just so
20    I can get a calendar going here, he starts as a first-year
21    medical student in 2016?
22              MS. WYDLER:  Yes.
23              THE COURT:  2016.  He makes it to -- when does he get
24    put on probation?
25              MS. WYDLER:  He makes it to -- he is on probation on
```

1    7/27 of 2017.  That is his first MSEPC hearing.

2         THE COURT:  So he makes it through the first year with

3    this repeated course and stuff like that and then July 27,

4    2017, which is when he is starting, I'm assuming, his second

5    year, am I right, or do you not go by years?

6         MS. WYDLER:  At that point he had not started his

7    period academic year two yet.

8         THE COURT:  Right.  So he is still --

9         MS. WYDLER:  In period one.

10        THE COURT:  He is still in period one.  I will call it

11   period one instead of first year.

12        He is still in period one.  That's when he gets put on

13   probation, and he is moving along on probation and then he gets

14   the leave of absence.

15        MS. WYDLER:  Well, before he gets the leave of absence

16   he failed --

17        THE COURT:  Right.

18        MS. WYDLER:  He received a professional incident

19   report.

20        THE COURT:  Right.

21        MS. WYDLER:  In December of 2017, and then he fails

22   Systems Based Practice in January of 2018.

23        THE COURT:  Then he goes on probation when?

24        MS. WYDLER:  He was already on probation.

25        THE COURT:  I'm sorry.  A leave of absence.

```
1              MS. WYDLER:  Leave of absence takes place January 18th

2      of 2018 through April of 2018.

3              THE COURT:  All right.  So it is a three-month leave

4      of absence.

5              Is he in period two yet?

6              MS. WYDLER:  Yes.

7              THE COURT:  OK.

8              MS. WYDLER:  Your Honor, I believe I misstated

9      something.  Just so that the record is clear, by the time he

10     was in May of 2017, period two had already commenced.

11             THE COURT:  That is what I thought.

12             MS. WYDLER:  You were right, your Honor.  I'm sorry.

13     I missed my note.  I'm sorry.

14             So while the plaintiff is on leave of absence, he gets

15     called to a second MSEPC hearing, and there again the Committee

16     reviews his overall academic performance -- is he improving, is

17     he not improving.  That is when they make the determination

18     that he has to repeat the entire period two all over again,

19     and, based on the associate dean's testimony, it is because he

20     lacked a fund of knowledge to continue in the course work.

21             THE COURT:  That is when he gets put back with the

22     next class.

23             MS. WYDLER:  Correct.

24             Just for the court's knowledge, the Handbook states,

25     once you are placed on academic probation, you are on academic
```

1    probation for that academic period and the following academic

2    period.

3           So here we are, we have the student now who -- and

4    this is where, I believe, plaintiff's argument comes in.  You

5    have to look at only period three because he is going through

6    period one and period two and he is passing along.  But the

7    Committee doesn't look at his medical knowledge in a vacuum.

8    Even if we were to look at it in a vacuum in period three,

9    let's look at what happens in period three, and this is what

10   your Honor mentioned, that this is more in terms of the

11   rotations and the clerkships.

12          In period three there are various clerkships.

13   Mr. Nehme failed five clerkships, four of them with

14   accommodations.  So let's go through those period three

15   failures.

16          We have family medicine, where he scored a third

17   percentile.  If I may, the Handbook states that anything

18   between -- a 5 percent or above is passing.  The Handbook also

19   states that if you are a period three medical student, if you

20   have poor performance -- not even failures, but if you have

21   poor performance -- on three shelf exams, you may be called to

22   the MSEPC for review.  And poor performance, according to the

23   Handbook, would be 5 to 10 percent passage.

24          Here he failed, so he was under the 5 percent in

25   family medicine, in surgery, in neurology, and in the first

1    psychiatry shelf exam.

2           He also failed the retake, which is the subject exam

3    of the room that was allegedly not a minimal distraction room.

4           The MSEPC noted in the third review of this student

5    that he also scored low in OB-GYN, because he got 5 percent.

6    He barely passed it.  Then when he retook neurology, he again

7    was in the marginal competent area.

8           So all students, not students that are on probation,

9    but all students are afforded an opportunity to remediate.

10   Mr. Nehme had another opportunity to pass those courses.  So

11   while he failed the shelf exam for Family Medicine, Surgery,

12   Neurology, he ultimately ended up passing the shelf exams the

13   second time.

14          As I mentioned, the Handbook states if you are

15   performing poorly, you can be called to the MSEPC.  It also

16   doesn't erase the fact that he has been on probation and there

17   is continued poor performance.

18          One of these tests could have triggered the MSEPC

19   hearing.  The associate dean testified that just by his

20   performance alone on these shelf exams could have triggered it.

21          What happened here is that on the third test, which

22   was the March 20, 2020 test, the retake of the psychiatry shelf

23   exam, that he initially failed with accommodations, that is

24   where he is claiming that there was a failure to accommodate.

25          I just want to go through the chronology for the court

1    and then I am going to go back to that test, if it is OK with

2    your Honor.

3           THE COURT:  OK.

4           MS. WYDLER:  After he failed the retake, the third

5    MSEPC review of this student occurred.

6           At that point he was given the opportunity to discuss

7    what happened, would he change anything.  He said no, he

8    wouldn't change anything.  He offered the excuse that there was

9    a fire in his building that day and that he didn't know he

10   could reschedule the exam.  They brought up all of his poor

11   performance on the P3 shelf exams.  They also brought up his

12   past overall performance and the two other reviews that the

13   Committee had previously done and his prior failures while in

14   medical school.

15          At no point in time during that appeal was it brought

16   up that the room failed to meet the standards.

17          On the appeal -- which the school affords an appeal to

18   the student.  The MSEPC hearing resulted in a recommendation

19   that he be offered an opportunity to involuntarily withdraw or

20   to be -- to voluntarily withdraw or to involuntarily withdraw,

21   and he chose to appeal this.  There is an MSEPC Appeals

22   Committee.  Again, they review all of the issues that are

23   brought before the hearing.

24          In that particular instance the plaintiff submits a

25   document indicating where was there a failure in due process,

1    what additional new evidence is there to suggest that there was

2    excessiveness in the severity of the sanction.

3         Again in this appeal he does not bring up the fact

4    that there is a lack of accommodation.  He brings up the fire

5    in the morning, he brings up his father's medical condition,

6    which affected his surgery score on the shelf exam, and then

7    this time he brought up a car accident that came up before the

8    family medicine exam, the random drug test that the dean of

9    students had asked him to take a week before the psychiatry

10   retake, and an issue with respect to the person who was the

11   chair of the Committee.

12        By May of 2020 the Appeals Committee decided that

13   there was no material failure in plaintiff's due process rights

14   and the sanction was not excessive in light of the nature of

15   his ongoing overall academic performance.

16        What happens next?  On May 15th, the dean ends up

17   adopting the committee's recommendation.  Again the student is

18   entitled to an opportunity to appeal.  This time he appeals to

19   the provost designee.  There was the first time that he

20   mentioned in his appeal that he did not receive his usual

21   accommodations for the retake exam.

22        Immediately, once that alleged claim is made in the

23   appeal to the provost designee, Dr. Elizabeth Bejar forwarded

24   his appeals letter to the Office of Inclusion, Equity,

25   Diversity and Access.  They are the body at FIU that

1    investigates discrimination and retaliatory or harassment,

2    Title IX types of claims.  So they engaged in an investigation

3    related to the claims that he was making.

4         FIU ended up not making a final decision until it came

5    back after with a report, and then there was an amended report

6    to their investigation.  They did substantiate that there was

7    evidence to corroborate that he didn't perform well on the

8    psychiatry shelf exam and that he was disrupted based on the

9    room that he was placed in.

10        With that information Dr. Bejar went back to IDEA --

11   this is after three months of her asking for updates because

12   she withheld her decision.  She asked IDEA to conduct an audit

13   of his grades up until the point of the retake.

14        What FIU's IDEA office did is they essentially held

15   him harmless.  They gave him 100 percent on quizzes and

16   readiness assignments.

17        If I may, just a footnote here.  It is our position

18   based on the plaintiff's response, I believe, in one of his

19   footnotes, of footnote 4 of ECF-65, that they concede that the

20   lack of accommodations for quizzes and readiness assignments

21   never affected his grades because he passed all of them even

22   without accommodations.  So while that may have been pled, I

23   think that argument was abandoned.  So I focus our argument

24   solely on the alleged lack of accommodation related to the

25   minimal distraction room.

1       Dr. Bejar in her final decision, after receiving a

2   subsequent independent audit from IDEA related to his grades

3   and looking at all of the MSEPC memos, which IDEA never had the

4   benefit of -- IDEA never looked at his academics while he was

5   in school, but Dr. Bejar did, and her scope was limited.

6       Again, her scope is limited in the review of whether

7   or not he had due process, whether there was new information

8   that wasn't available at the time of the hearing, and whether

9   the severity of the sanction was excessive.  She determined

10   that his overall academic performance was not affected by any

11   claim, even if it included that there wasn't a minimal

12   distraction room provided.

13       Going to the minimal distraction room, Mr. Nehme had

14   failed the initial Psychiatry exam.  There is a scheduler who

15   is responsible for room reservations at FIU.  She looked for

16   the day, in coordinating with the P3 assessment person, the day

17   that he needed to take the exam.  He needed six hours.  He

18   needed his accommodations.  They wanted to provide him the six

19   hours and a room dedicated to him.

20       He is not required to get a private room.  He is only

21   required -- he qualified to receive a minimal distraction room.

22   This is not distraction free.  This is a reduced distraction

23   setting.  It is not in the same classroom as all of the other

24   students.

25       So for the retake there was limited availability.  All

of the conference rooms that were designated as ADA special

accommodation rooms, conference rooms, were already used for

other events.  What the scheduler did was move the event that

had more participants into Mr. Nehme's usual room, which is

what he stated in his appeal.  Not that he didn't have a

reasonable accommodation, but that he didn't receive his usual

accommodation.  He was used to taking his exams in the room

AHC1 335.

That room was taken for six hours, for a block within

the six hours that he needed to take his exam.  So what

Ms. Gavilan did, who happens to be a special education, has a

masters in special education, is she put him in the other

minimal distraction room, which was AHC2 495.

Allow me to describe this room.  He is the only person

in the room with the proctor.  This is consistent with what I

have seen in most of these cases considered a private setting.

Technically, there could have been another student taking the

exam with him, but it was just him and his proctor in this

conference room, that is located in the administrative suites.

It is in a hallway.  There is no seating, no lounge area right

in front.  There is the back door to a classroom along that

same hallway.

During the exam Mr. Nehme did not mention to the

proctor that he was being disrupted by any foot traffic.  He

was aware that this was a different location, that he had not

1    taken a test there before, and didn't object to taking the test

2    in that particular room.

3          The room itself -- and in fairness, it did have a

4    frosted glass window, but his back was turned to the back of

5    the window.  The frosted glass window is what faced the

6    hallway.  Mr. Nehme did testify that in his peripheral he could

7    see people passing by.

8          I submitted to the court the scheduling documents.

9    They are screenshots of the room reservations.  Now, what we

10   know from that floor is that that room had ten participants.

11   The room that was across from Mr. Nehme had a Neuro clerkship

12   exam review for 20 people that were there from 8 to 12.

13   Mr. Nehme's exam was from 8 a.m. to 2 p.m.  He finished at

14   12:43.  So he didn't even use the complete time, in light of

15   the fact that he is claiming that he was disrupted.

16         He did not complain to the proctor about any kind of

17   noise.  When there was an issue with respect to the

18   temperature, the proctor immediately requested a heater.  A

19   heater was brought into the room so that how cold it was would

20   not affect him.

21         There is a sign posted outside of the room that said:

22   Testing in progress.  Quiet, please.

23         He is the only one in the room with the proctor and,

24   most importantly, a fact that was not included in IDEA's

25   investigation is that FIU provided the plaintiff with earplugs,

1    and in his deposition he admitted that he was wearing them.

2        The proctor himself wasn't taking a test.  She wasn't

3    wearing earplugs.  Yes, she did see that there were individuals

4    that were walking by, but these tests can't be taken in a

5    bunker.  FIU had limited availability to provide him with a

6    room to give him the extra time that he needed for that

7    specific accommodation.

8        So with respect to Count I on a failure to

9    accommodate, there was no notice by FIU that any distraction

10   that was occurring outside of the room failed to meet his

11   subjective standard of what is a disruption.

12       We have testimony from the individual who serves as

13   his liaison between the Disability Resource Center and the

14   medical school that a disruption and what is a distraction is

15   subjective to each student, and when we rely on the Stewarts v.

16   Happy Herman's Grocery case, we know that it is the plaintiff's

17   burden to show that he is not entitled to an accommodation of

18   choice but only a reasonable accommodation.

19       Here, this is not a case where FIU refused to provide

20   him an accommodation.  They qualified him for it.  They made

21   the effort to put him in there.  But there was a breakdown in

22   the interactive process.

23       I cited a Ninth Circuit case, and I want to bring it

24   to the court's attention.  I cite that Ninth Circuit case

25   because I'm aware from other cases where I have represented

1    other universities that the Office of Civil Rights uses that

2    Ninth Circuit EEOC case for its training to post-secondary

3    institutions to show that the interactive process does not end

4    at the time when the request for the accommodation is made, but

5    it follows through in terms of implementation.

6          Here, FIU lacked the notice that there was a problem

7    with the room while the test was being taken, during the MSEPC

8    hearing, and actually before the MSEPC hearing the record

9    indisputably shows that he met with the dean of students.   FIU

10   has a practice that before a student is called before the

11   Committee, they meet with the dean of students and they are

12   supposed to prepare them -- what could be the outcomes, do you

13   have any questions.  During that particular meeting there is no

14   evidence to suggest that he mentioned anything again about the

15   room not meeting his needs for the accommodation.

16         The appeal --

17         THE COURT:  I'm sorry.  When you talk about

18   interactive process, that seems to be a term of art.

19         Interactive process, do you mean a request for

20   accommodation, how it is handled and how it is used and so on

21   until the end?  So in this case for this test, this retake,

22   what you had named interactive process, would be he qualified

23   for this special setting?  So whenever he qualifies all the way

24   to the end of the testing, are those the bookends of the

25   interactive process?

```
1            MS. WYDLER:  Yes, until the end of the testing I think
2       would be the interactive process, where we can remediate at
3       that point.
4            What happened here is that plaintiff waited two months
5       and two decisions for recommendations for him to be dismissed
6       before he mentioned anything about a failure to accommodate.
7       That is the problem here.
8            THE COURT:  So interactive process -- so do you mean
9       by interactive process they give me an accommodation, I don't
10      like it, I want something better, back and forth?  Is that what
11      you mean?
12           MS. WYDLER:  I mean implementation.  I mean even if
13      you are qualified and we are going to give you this room that
14      is supposed to be designed for minimally distractive, but if
15      you don't put us on notice that it is not meeting your
16      disability needs or it is not accommodating you, this is part
17      of the interactive process.  It happens with employees and
18      employers if they provide a chair that doesn't work and they
19      have back problems, they ask for a new chair.
20           The process is ongoing when dealing with individuals
21      who suffer from disabilities, and FIU knows this.
22           Here, FIU was not made aware that the room was
23      disruptive to the plaintiff.  It doesn't matter whether the
24      proctor may have thought that there was foot traffic.  I will
25      point to the court that the proctor specifically said that each
```

1    time there was some noise outside, it lasts less than a minute,

2    and that was people moving from the back door of a classroom

3    through the corridor to get eventually to an elevator.

4            THE COURT:  So are you saying that even if the proctor

5    heard noise, because the plaintiff didn't complain to the

6    proctor, then FIU was not on notice of any problems with that

7    room?  Is that the legal conclusion you are sponsoring?

8            MS. WYDLER:  Yes, your Honor.  That is the position.

9    Because there are examples, that the air conditioner could have

10   gone off and on, and for the proctor, the proctor may not have

11   thought that that would have been disruptive, but if the student

12   makes a claim that that is disruptive, then we need to take

13   action to try and engage in this interactive process and

14   provide an accommodation that helps the student get to the

15   finish line.

16           THE COURT:  So that is what I was meaning by bookends.

17   He gets offered the room.  He goes there.  He sits down to take

18   the test.  He doesn't complain.  He finishes the test.  Is the

19   process done and you are saying that he went outside the

20   process by complaining about it two years later or however

21   period of time it was?  Is that your theory?

22           MS. WYDLER:  Yes.  Yes.

23           THE COURT:  OK.  All right.  I understand.

24           MS. WYDLER:  So in terms of Count I, FIU is not on

25   notice.  This is in addition to the threshold question of

1  whether or not he is qualified.  He is not on notice, and the

2  plaintiff has failed to meet the burden to establish that they

3  didn't reasonably provide him the accommodation and there was a

4  breakdown in the implementation of the interactive process, as

5  the court so aptly put, the bookend, which was the end of the

6  exam.

7         With respect to Count II, again we reiterate that this

8  is based on the disparate treatment theory of the case.  We

9  rely on several points here.

10        First of all, of course there is the continued poor

11  performance in spite of the examinations.  These would be the

12  shelf exams that were failed in period three.  We don't even

13  need to go back to period one or period two.  We can focus

14  solely on period three, plus the fact that he was on probation.

15        In the reply I cited several cases, at least ten,

16  where students that are on probation claiming ADA violations

17  summary judgment is granted on all of them because of the

18  deference that is given to the MSEPC committees, different

19  terms but the same academic body reviews this.

20        THE COURT:  You're saying once a student is on

21  probation, whether he claims disability or not, it is up to the

22  discretion of the school administration what to do next, I

23  think is what you are saying.

24        MS. WYDLER:  If there is poor academic performance to

25  support the academic decision.

1          THE COURT:  Well, he was put on probation to begin

2     with, right?

3          MS. WYDLER:  Correct.

4          THE COURT:  So are you saying that once somebody is on

5     probation, then it is almost like -- is there some level of

6     discretion that the school administrators are held to?

7          MS. WYDLER:  There is deference given to the school

8     administrators, but I will say this, your Honor.  There needs

9     to be a showing that there was still continued poor performance

10    with or without the accommodations, which is what we have here

11    in the record.  The accommodations were given for various shelf

12    exams, undisputed, and there were failures, and that is the

13    continued poor performance that was exhibited by the student

14    and led to his ultimate dismissal.

15         In addition, the record doesn't have any animus.  We

16    provided several students who either repeated a year, failed

17    shelf exams, repeated a course, took leaves of absences, were

18    in front of the MSEPC multiple times, all of those were

19    nondisabled students.  All of those ended up being dismissed

20    from FIU to show that there is no validity to the disparate

21    treatment claim.

22         Now, I know counsel and plaintiff will argue you don't

23    need to show comparator evidence, but it shows that there is no

24    animus in this record when there are other nondisabled students

25    who were similar in certain aspects and who performed poorly

1   and were subjected to the MSEPC hearings and also to dismissal.

2            The last point with respect to the Count II is any

3   claim for compensatory damages requires deliberate

4   indifference.

5            Our position is that Dr. Elizabeth Bejar did not act

6   with deliberate indifference, that she acted in a way that the

7   plaintiff wanted her to act after the IDEA report came in, that

8   is true, but there was meaning behind all of the actions.

9            She was the first one to forward the complaint to have

10  it investigated.  The record shows that she checked in on

11  updates for three months.  Once the investigative report came

12  back, she asked IDEA to conduct an audit of his grades and hold

13  him harmless on the quizzes to make the determination if in

14  fact that one test would have affected his overall academic

15  performance.  She came to the conclusion that it did not.

16           So for those reasons, based on the Committee's

17  decision, the Appeals Committee's decision, the dean's adoption

18  of that, the dismissal was upheld.

19           I want to bring to the court's attention, because I

20  know plaintiff has hung the hat on IDEA's report.  IDEA made a

21  finding two months, more than two to three months after the

22  dismissal decisions had been made.  They did not review his

23  academic record.

24           In IDEA's report -- this is a critical component and

25  why it is not material to this court's analysis.  IDEA reviews

1    its internal guidelines of what is a minimal distraction room,

2    what are the standards internally within FIU.  When IDEA

3    reviewed Mr. Nehme's case, they automatically considered him a

4    qualified individual.  In fact, I believe the language that

5    they say is that he is qualified because he has a documented

6    disability and because he is a registered disability student.

7         That is their definition of qualified.  That is not

8    the definition of qualified under the ADA standard.  I think

9    the reason for that is because IDEA is not an academic body.

10   They are not going to be evaluating people's progress in an

11   academic sense.  They are only looking at it as you are a

12   disabled person registered with the school, this is what we

13   qualified you to have as far as accommodations go, and did you

14   receive them, did you not receive them.

15        That is a clear distinction in IDEA's analysis that

16   does not affect this court because qualified individual under

17   IDEA's definition is not what it is under the ADA.

18        The other point I want to say, in terms of its

19   finding, was that IDEA did not explicitly find that there was a

20   failure to accommodate.  In the amended report it actually

21   states, quote, There is evidence to corroborate his belief that

22   Nehme's placement and ACH2 495 impacted his ability to

23   effectively concentrate while taking his high-stakes Psychiatry

24   exam.  This is ECF-71, paragraph 50.  I cite there specifically

25   from the amended report that particular finding.

1          No one can say one way or the other whether the

2    minimally distracted room -- by the way, there is no guidance.

3    I looked under distraction free, which is different from a

4    reduced distraction room, I looked for minimal distraction,

5    there is no guidance in the statute.  There is barely any

6    guidance in the case law, with the exception of the Forbes

7    case.

8          In the Forbes case, which was helpful to the

9    university, and we cited it, the Eleventh Circuit affirmed

10   summary judgment, but what is interesting is that particular

11   student wanted to have a private setting.  Indeed, she didn't

12   have the medical documentation for a private setting.  She was

13   given a distraction reduced room.

14         She took the exam with four individuals but never

15   complained about the accommodations until after she got her

16   grades.  Very similar to Mr. Nehme.  So there is nothing in

17   this Circuit that specifically gives us any kind of guidance on

18   what is a minimal distraction room except for what FIU itself

19   internally believes it to be a minimal distraction room, which

20   is less distractions than a general classroom.

21         It is FIU's position that the room that he was placed

22   in offered less distractions than had he been placed in a

23   general classroom.  So for those reasons the IDEA report

24   doesn't address the law within the Eleventh Circuit nor does it

25   address the ADA standard, which is the threshold question on

1   whether or not a person is qualified, and that applies to both

2   of the counts in this case.

3          Judge Cannon -- we moved to dismiss Count II.  The

4   court's order before indicated that it was a close call and

5   that it may be in fact be something left for summary judgment

6   if in fact his academic record showed the way that it was being

7   demonstrated on our motion to dismiss.  So for those reasons we

8   state that there is no *prima facie* case of an ADA violation

9   because Mr. Nehme was not a qualified individual.

10          THE COURT:  When you say he is not qualified, you are

11   saying he is not qualified I guess to be a medical student with

12   or without accommodation or he is not qualified to become a

13   doctor?  So what is he not qualified to do?

14          MS. WYDLER:  The first, your Honor.  He was not

15   qualified as a medical student with or without the -- in spite

16   of the accommodations that were provided to him while he was

17   enrolled at FIU because of his continued poor performance and

18   overall academic performance.

19          In terms of employment law, which we have a lot more

20   cases to guide us, and we turn to it sometimes, he didn't meet

21   the essential functions of being a medical student and meeting

22   the criteria under FIU's Handbook.

23          THE COURT:  Right.  You kind of like tie that back to

24   him having been on probation, the fact that he was on

25   probation, sort of like from FIU's point of view, he wasn't

1    meeting the standards of a medical student.  That's why he was

2    on probation.

3          MS. WYDLER:  Right.

4          THE COURT:  And eventually got dismissed once he was

5    given all of the opportunities and all of the remediations.

6    That seems to be your logic.

7          Then this whole process at the end with this Dr. Bejar

8    and all of that and she kicks it back to the accommodation

9    office, you're saying even though the accommodation office came

10   back and said they thought, based on their investigation, that

11   that room that he was placed in may not have been sufficient

12   accommodation, you're saying, if I heard you right, Dr. Bejar

13   took that into consideration but looked at everything else and

14   still thought that he should be dismissed, and you're saying

15   that those administrative people are given some level of

16   deference when looking at their decisions.  That's sort of like

17   connecting the dots, it seems to me.

18         MS. WYDLER:  Yes, the deference that we have seen in

19   the U.S. Supreme Court cases of the Ewing case, of the Horowitz

20   case.  Dr. Bejar reviewed 12 individuals who are physicians,

21   who are training these doctors.  Those were the initial people

22   who had the hearing with Mr. Nehme.  They were the ones who

23   heard his reasons for not doing well in his shelf exams, and

24   they were the ones who reviewed his past performance, along

25   with the fact that he is in probation standing.

1          He needed to show improvement to be able to make it as

2     a P4 student and go into rotations, but because of his academic

3     performance on these shelf exams and the fact that there wasn't

4     improvement with five shelf exams that were failures, plus a

5     low OB-GYN shelf exam performance, this is continued poor

6     performance.  That is in the definition of the school's

7     standards.

8          The technical standards of the school required more

9     while you're on probation, and he had continued poor

10    performance.  That's the language in the Handbook, and that is

11    what required his dismissal from an overall holistic academic

12    standpoint.

13         THE COURT:  You're saying people who are not claiming

14    disability, you are kind of saying, and I will hear, I'm sure,

15    from plaintiff, but you are kind of saying, look, they do this

16    for people without disability so that kind of negates the

17    animus, is what you are saying, and the counter to that is

18    these are not comparators, they are not comparators to him,

19    sounds to me, because how do you compare nondisability with

20    disability people?

21         MS. WYDLER:  Yes, your Honor.

22         THE COURT:  It kind of threw me a little bit that you

23    were doing that comparison.

24         MS. WYDLER:  Yes.  To be fair, what we look at from an

25    academic standpoint -- and the deference that is given to these

1    academics is how many times did they go to the MSEPC, how many

2    times did they have to repeat a course, how many times did they

3    have to repeat a period, did they take leaves of absences.

4    These are the academic moments that are reviewed in addition to

5    the actual grades.  Because the grades, I think, go to the

6    disability portion.

7            There are nondisabled individuals who were treated the

8    same, and the treatment is that if you are performing poorly

9    academically, you are going to be dismissed by the university.

10           THE COURT:  All right.  Mr. Hannah, do you need a

11   little break to get your thoughts together or can we just jump

12   right in?  You are muted.

13           MR. HANNAH:  Sorry, your Honor.

14           THE COURT:  Yes.

15           MR. HANNAH:  I didn't want to interrupt.  I don't

16   think I need a break, your Honor.  I think I am ready to

17   address the issues.

18           THE COURT:  OK.

19           MR. HANNAH:  Thank you, your Honor.

20           THE COURT:  Of course, I will give you plenty of -- if

21   you feel you need to correct anything where I was asking

22   Ms. Wydler things about when things happened, if she got

23   anything wrong, I think she kind of corrected herself.

24           MR. HANNAH:  I will see if I can clarify at least from

25   our perspective, the plaintiff's perspective.

```
 1              THE COURT:  Right.
 2              MR. HANNAH:  The time line of events is important as
 3    far as the otherwise qualified argument is concerned.
 4              Some things that you need to know, your Honor, and I
 5    think it is all fairly well set forth in the statement of facts
 6    and statement of disputed facts that we presented.  The first
 7    time Mr. Nehme went in front of the MSEPC in July, I believe,
 8    of 2017, it was already into his second year.  When he went in
 9    front of them at that time --
10              THE COURT:  I thought we can't call them second year.
11    We call them period two.
12              MR. HANNAH:  I'm sorry.  Period two.  I will be
13    consistent, your Honor, yes.  Thank you.
14              Period two.  It was already into period two.  He had
15    successfully completed period one, his first year of medical
16    school, and the MSEPC, you have to understand, your Honor, is
17    also not just a committee that meets to address performance
18    issues.  They also are the ones who make the determination
19    whether the person is qualified to be promoted from period one
20    to period two, period two to period three, etc.  In order for
21    the person to be promoted they have to be qualified to get
22    promoted.  So they made that determination clearly for
23    Mr. Nehme from being promoted from period one to period two.
24              Now, when he went in front of -- he had had a few
25    failures, granted, but when he went in front of the MSEPC, the
```

1    first time he did tell them, and it is in the fact statement,

2    that he had issues and needed more time to take the exams, that

3    he had certain health issues and concerns, and at that time he

4    was actually already starting to work with the wellness center

5    at FIU in order to address those issues, which are his

6    disability issues.

7          So he ultimately was awarded by the DRC, the

8    Disability Resource Center, at FIU two accommodations.  In

9    particular, for his exams, his final exams.  One was 50 percent

10   extra time and the other was the minimal distraction room.

11         They have a definition.  It is not the greatest

12   definition in the world, not the clearest, but it is a

13   definition that the room has to be not free, completely 100

14   percent free of distractions, but certainly very, very reduced

15   distractions.

16         So Mr. Nehme was awarded those accommodations.  He

17   then failed the Systems Based Practice exam.  Shortly prior to

18   that -- and counsel has said that he had requested a leave of

19   absence after failing Systems Based Practice.  That is not

20   true.  He had already requested and been awarded a leave of

21   absence because he had various other medical issues going on

22   that he had to take a leave of absence when he actually took

23   the Systems Based Practice exam.

24         He failed it.  There is record evidence, if you look

25   at the IDEA report, that he was not provided an accommodation

1    for that exam, and also he was not allowed to retake that exam,

2    like every student who fails an exam one time can do a retake.

3    He didn't.  He actually had gone on his leave of absence.  Then

4    while he was on his leave of absence, he was called before the

5    MSEPC because of the failure of that Systems Based Practice

6    exam.

7          Then when he went in front of the MSEPC, and this is

8    towards the end of period two -- he had pretty much completed

9    most of period two by the time he went the second time in front

10   of MSEPC -- he is the one who offered to repeat the entire

11   second year to accommodate him because he had been away from

12   school, he had been on his leave of absence.  He felt

13   uncomfortable with going forward without having to go back and

14   redo everything to make sure he was competent and doing

15   everything correctly.

16         They, at that second MSEPC hearing, allowed him that

17   request to repeat his entire second year.

18         Ms. Wydler makes it sound like they are the ones who

19   said you need to repeat your second year.  He was the one who

20   offered that, and they agreed to allow him to do that.

21         When he came back from his leave of absence, he did

22   his entire second year of medical school, and he completed that

23   without incident.  He completed that with very good grades.  He

24   had a cumulative GPA for that term of 84.27.  There is a copy

25   of his transcript in there for the entire second year repeat

1    and the third year, with the clerkships, and he got grades in

2    the 90s, he got grades in the 80s.  There were a couple of 76s,

3    I believe, around there, 76 and 79, but the 84.27 indicates,

4    under their own Handbook, that he was competent.

5         The MSEPC, obviously, thought the same because they

6    promoted him to the third year.  It is true, he was on

7    probation from the very first time he was on the MSEPC time.

8    They put him on probation -- they put you on probation forever

9    there if you get put on probation.  It doesn't mean you can't

10   do the school, it doesn't mean you should be kicked out.  You

11   don't equate that with you are not competent as a doctor or

12   potentially as a medical student.  I'm sorry.

13        So Mr. Nehme repeated his entire second year.  There

14   were no professional incidents, professionalism incidents.  He

15   got good grades.  He passed all of his classes.  He passed them

16   at the competency level, and he was promoted to the third year,

17   the clerkship year, period three.

18        Now we get to period three and there is an issue they

19   bring up that, oh, he was not a good student because he failed

20   some final exams.  That is true, he did, but he remediated the

21   exams and he passed all of them.  In fact, he did very well in

22   all the aspects of the clerkships.  If you look at his grades,

23   he got in the 80s for all those clerkships.  He passed them all

24   except Psychiatry.

25        So we get to the Psychiatry clerkship and he takes the

1   first exam and he fails the first time around.  By that time he

2   had taken most of clerkships and passed them, in the 80s,

3   showing competency.  Then he gets the clerkship for Psychiatry.

4   I guess he studies the wrong materials and fails.  He is given

5   the accommodations for the first exam.  There is no issue about

6   that.  Agreed.

7          The second time he takes it, the retake, that he is

8   allowed to take like every student is allowed to take, he is

9   put in a room that has so many distractions that it is obvious,

10  even to the proctor, that there are distractions.  It is

11  interesting that FIU in its statement of facts doesn't talk

12  about any of that testimony of the proctor.

13         I put it in paragraph 43 of Ms. Lachica, statement

14  from Ms. Lachica in her deposition.  She was very honest in her

15  deposition.  She states the following.  She says that this room

16  that he was placed in is not the preferred room for

17  accommodations because of its location near a large conference

18  room, stairs, and an elevator, and because the room also has

19  freezing cold temperature.  It apparently had a reputation of

20  having a freezing cold temperature in the room.

21         She agreed that no student should have been assigned

22  to the room as a minimal distraction room on the date in

23  question given the other events that had been scheduled to take

24  place outside the room.

25         There were all these other events going on in the

1    various rooms in the hallway, the same hallway as the so-called

2    minimal distraction room.

3         The room had a large window, occupying most of the

4    wall of the room.  It had gaps in the window that you could see

5    through into the hallway.  She testified that one could see

6    shapes and shadows of people through the window and could hear

7    the noise of people talking loudly in the hallway as they

8    walked by.  She confirmed that there was lots of noise and

9    movement distractions during the exam to the point that even

10   she was distracted.

11        She observed and experienced both auditory and visual

12   distractions, including groups and crowds of people, as often

13   as every 15 minutes during this exam, passing by and talking

14   loudly over each other and at the same time.

15        Counsel downplays this by saying, oh, there was only

16   maybe one minute of distractions.  It is not.  It is every 15

17   minutes there are groups of people going by, talking loudly,

18   and even she testified that they were ignoring her sign that

19   was put out there to be quiet.

20        She testified the room was freezing cold, that she

21   also believed that that could be a distraction to the

22   plaintiff, freezing cold temperature.  She ordered a heater be

23   brought into the room, which involved the added distraction of

24   the heater being set up on the table where Mr. Nehme was taking

25   the exam.

1          She also testified to an additional auditory

2     distraction during the exam.  Because of the OSCE simulations

3     that were going on, the O-S-C-E simulations that were going on,

4     where lots of students were going in and out of rooms, there

5     was a loudspeaker out in the hallway basically telling the

6     students:  You can come in now, you need to go out, you need to

7     come in.  That is going on during the time that Mr. Nehme is

8     trying to take the exam.  Ms. Lachica testified about this,

9     somebody who has no stake in this case.

10          She testified that although she was aware of these

11     numerous distractions and that she had the authority and

12     responsibility to keep the room quiet and to stop what was

13     going on there that she chose not to do so because she thought

14     that if she went up and told people to be quiet that it would

15     be further distracting to Mr. Nehme.

16          The distractions were so obvious that even she was

17     aware of it.  She had the authority to do somebody about it and

18     she didn't do something about it.

19          So that is all missing from their statement of facts.

20     I have put them all in paragraph 43 of my statement of facts,

21     the plaintiff's statement of facts.

22          THE COURT:  But who is the judge of the distractions,

23     the proctor or the test-taker?

24          MR. HANNAH:  Well, probably both, probably both to

25     some extent, but Mr. Nehme was under the impression -- sorry.

1          THE COURT:  Did she testify that Mr. Nehme told her, I

2     can't keep going with all these distractions, you have to find

3     me another room?  Is there anything in the record -- I

4     understand what you are saying from what this proctor said, but

5     she wasn't the one taking the test.  It was Mr. Nehme, to the

6     point that Ms. Wydler was saying, well, was he supposed to say,

7     hey -- sort of like the example of they give you a chair and

8     the chair doesn't work to keep your back straight so you ask

9     for another chair.

10         Was Mr. Nehme supposed to say I can't go on with all

11    these horrible noises and stuff like that or was he supposed to

12    keep taking the test even though from what the proctor is

13    saying the accommodation was not satisfied?

14         If you can address that question just to clarify.

15         MR. HANNAH:  Mr. Nehme, from his standpoint, was

16    taking the test.  He had to concentrate on the test, doing the

17    best he can to concentrate on it.

18         First of all, no one told him that if you have a

19    problem with the accommodations that you need to tell them that

20    you're not getting the accommodations.

21         THE COURT:  So it is up to FIU to have given him

22    instructions to say, this is the room we are giving you but if

23    there are any problems, let the proctor know.  You think that

24    is what was lacking, that he was sort of like in a

25    take-it-or-leave-it situation?

```
 1          MR. HANNAH:  I think that is the problem, yes.  That
 2    is the issue, that he was there, he expected to be
 3    accommodated, accommodations weren't there.  True, he didn't
 4    get up and tell her, look, it is very distracting, I can't take
 5    the test.  I would have to say that is undisputed that he
 6    didn't say anything during the exam about the test.
 7          THE COURT:  Right.
 8          MR. HANNAH:  This interactive process goes both ways,
 9    I guess.  If somebody, who knows that the man needs to be in a
10    minimal distraction room, realizes it is not a minimal
11    distraction room, has the responsibility and authority, and
12    there is testimony that she had the responsibility to do
13    something about it and she didn't do something about it --
14          THE COURT:  She didn't.
15          MR. HANNAH:  Right, she chose not to.
16          THE COURT:  She kind of tells this horrible scenario
17    at her deposition, but she didn't do anything about it, and
18    Mr. Nehme didn't complain about it.  From there you want a
19    finding that he was not accommodated?
20          MR. HANNAH:  I do, your Honor.  I don't think there is
21    a requirement of law that he had to say something at that time.
22    I mean, he did, he complained about it.  He eventually
23    complained about the situation.  It was investigated fully.
24          THE COURT:  Yes, but Ms. Wydler is saying he
25    complained some period of time later, right?
```

```
 1              MR. HANNAH:  Right.

 2              THE COURT:  Not during --

 3              MR. HANNAH:  The exam.

 4              THE COURT:  I guess she is saying way down the line.

 5              MR. HANNAH:  Not during the exam, right.

 6         To the extent that becomes a credibility issue for a

 7    jury as to whether Mr. Nehme really was distracted or not

 8    distracted, I think that is an issue for a jury to decide.  On

 9    a summary judgment, though, I don't think -- first of all,

10    there is no case law in the Eleventh Circuit about an

11    interactive process.  There is no case law.

12              THE COURT:  The issue is whether he was accommodated,

13    right?

14              MR. HANNAH:  Correct.

15              THE COURT:  Whether this room was a minimal

16    distraction room, right?

17              MR. HANNAH:  Right.

18              THE COURT:  But then the next issue is this notice

19    issue that Ms. Wydler is relying on that says, well, if it

20    wasn't, he should have spoken up, and he didn't.  So what is

21    the credibility issue here?

22              MR. HANNAH:  The credibility is, was he really

23    distracted or not.  If he didn't speak up, maybe he wasn't

24    distracted.  But he says he was.  He testified to that in his

25    deposition, that there were all these distractions, set forth
```

```
 1    in our statement.  He chose not to.

 2           I think he chose not to because he didn't think he

 3    could make that determination at that time.  He expected it to

 4    be automatically given to him every time he took a test and be

 5    put in the proper room, and he wasn't.  The law doesn't --

 6           THE COURT:  It is hard to comprehend that somebody

 7    decides after the fact that the room wasn't suitable.

 8           MR. HANNAH:  I don't understand why that would

 9    necessarily be hard to comprehend.  There are various reasons

10    we don't speak up, especially when it comes to

11    spur-of-the-moment type of situations.

12           He is under pressure to take an exam, retake an exam,

13    and he is sitting there trying to do the best he can with, I

14    guess he's got earplugs or whatever, headphones on.  He is

15    hoping that the noise doesn't continue throughout the exam, but

16    it does.  Unfortunately, he is distracted.  In fact, FIU --

17    this is one of the points we are trying to make -- FIU itself

18    conducted an investigation and made the same determination he

19    was saying, that he was distracted, that this was not a proper

20    minimal distraction room.  That is an admission by FIU, that he

21    was not provided a minimal distraction room, the required

22    minimal distraction room.

23           THE COURT:  That is the IDEA report.

24           MR. HANNAH:  The IDEA report, that has all the witness

25    statements, goes into great detail about what each of these
```

1  witnesses said, including Ms. Lachica, including

2  Ms. Reyes-Gavilan.

3          That is another point I wanted to make.

4  Ms. Reyes-Gavilan, the scheduler, the scheduler who says one

5  thing to the investigator, saying this is not a proper minimal

6  distraction room, she was aware of all these various

7  distractions that were going on around there, that she should

8  never have put him in that room.  That is what she tells the

9  investigators.  But in her deposition she said, I never said

10  that to the investigators and I believe I put him in a proper

11  minimal distraction room.

12          So we have a conflicting position taken by

13  Ms. Reyes-Gavilan.  That alone is an issue of fact as to

14  whether or not they knew that this was going to be a situation

15  where he would be exposed to distractions.  This is the

16  scheduler, who should know better, but didn't apparently take

17  action to fix the problem either.  I mean, she could have

18  nipped it in the bud before he ever even got put into the exam.

19  He should never have been put in that room in the first place.

20          THE COURT:  The scheduler, then the proctor, and the

21  plaintiff, and nobody did anything about it at the time.

22          MR. HANNAH:  At the time, no, nobody did anything

23  before he took the exam.  There were like seven rooms that

24  could have been used, and they stuck him in a room where there

25  was going to be known traffic outside the room and other things

1    going on, the OSCE simulations.

2              As Ms. Reyes-Gavilan told the investigator, which she

3    disavowed during her deposition, saying I never said that, as

4    if the investigator was lying for some reason, and I think that

5    alone is an issue of fact that a jury needs to decide.  It

6    definitely goes to credibility as to Ms. Reyes-Gavilan as to

7    the scheduling issue.

8              THE COURT:  So your Count I is that they failed to

9    accommodate him for that psychiatric exam retake --

10             MR. HANNAH:  Right.

11             THE COURT:  -- because they didn't put him in a room

12   that was minimally distractive.

13             MR. HANNAH:  Correct.

14             THE COURT:  That is, in a nutshell, your Count I.

15             MR. HANNAH:  That is Count One, but Count I also talks

16   about the issue of -- this is a little bit more nuanced.  I got

17   testimony in deposition and set forth in the statement of

18   facts -- I think it is paragraph 44 of my statement of facts --

19   that the failure of the Psychiatry shelf exam retake was the

20   triggering event for him to be called in front of the MSEPC the

21   third time.

22             Now, Ms. Wydler says, oh, he could have been brought

23   up before the MSEPC for, I want to call it the poor performance

24   on some of the other final exams.  The fact of the matter is he

25   wasn't brought up in front of the MSEPC for those other exams

1   because he passed all those courses.

2              THE COURT:  Right.  Those are the ones that he retook

3   and passed, right?

4              MR. HANNAH:  He passed them all and he passed the

5   clerkships in the 80s.  He got grades in the 80s.

6              THE COURT:  So the stumbling block, my word, was the

7   psychiatry exam.

8              MR. HANNAH:  Right.

9              THE COURT:  You're saying that that happened because

10  he wasn't accommodated.

11             MR. HANNAH:  Correct.  He wasn't accommodated, he

12  failed.  In fact, the MSEPC indicated there was corroborating

13  evidence that the reason he failed that exam, the retake, was

14  because of the failure to put him in a minimal distraction

15  room, which goes into this whole issue --

16             THE COURT:  I'm sorry.  Who said that?  I thought it

17  was IDEA that said that.

18             MR. HANNAH:  IDEA, yes, they said that.  They made

19  that finding.

20             THE COURT:  But you said MSEPC, and I didn't think --

21             MR. HANNAH:  Did I say that?

22             THE COURT:  Yes.

23             MR. HANNAH:  I apologize.  I'm getting all these --

24             THE COURT:  No, that is fine.

25             MR. HANNAH:  It is a letter smorgasbord here.

1           THE COURT:  I'm thinking of IDEA as the accommodation

2      people.

3           MR. HANNAH:  Right.

4           THE COURT:  And the other as the professor people.

5           MR. HANNAH:  IDEA is the agency within the university

6      that investigates discrimination issues.

7           THE COURT:  Right.  Right.

8           MR. HANNAH:  So they made a finding, after doing a

9      very thorough investigation by very experienced investigators,

10     one who is an attorney, one who is a retired police detective,

11     that, number one, they did make a finding to substantiate that

12     he was not placed in a proper minimal distraction room; number

13     two, that that factor, the evidence to corroborate, that that

14     impacted his performance on the Psychiatry clerkship

15     examination.

16          They made that finding.  Whether it is a true finding

17     or not, they made that finding.  You can't get around that.

18          It is interesting that FIU in their statement doesn't

19     mention anything about that, but it is a problem for them

20     because Dr. Bejar, who now has the benefit of all those

21     findings, what she does after she gets the finding, she goes

22     back, apparently, to IDEA, to Shirlyon McWhorter, who is in

23     charge of that department, and asks her to determine whether

24     his failure or whether his failure to be accommodated for

25     quizzes had a negative impact on his class performance.

1          They gave a spreadsheet, a chart, which indicates that

2     his performance on the quizzes, it was an impact for the

3     failure to accommodate but it did not cause him to fail any of

4     the courses.

5          What Dr. Bejar doesn't do, though, because she didn't

6     have to because she had it staring her right in the face, is

7     this issue about whether or not the failure to provide him with

8     a minimal distraction room for the Psychiatry exam retake had a

9     negative impact upon his performance and caused him to fail

10    that exam.

11         It is stated in black and white in the IDEA report.

12    She testified, interestingly enough, that there was nothing in

13    the report to indicate that it had a negative impact on his

14    performance.  That is absolutely not true.  It is right there

15    in black and white.

16         So she claimed that she had thoroughly reviewed the

17    reports, both the first report and the amended report, that

18    said basically the same thing, and I repeatedly asked her, was

19    there anything that was in the reports to indicate that this

20    failure to give him a minimal distraction room had a negative

21    impact on his performance, and she said no, there is nothing in

22    there at all, there were no findings made, and that is not

23    true.

24         So we have a discrepancy there on her testimony and

25    the reasoning, what she did in her final decision.  If you look

1   at the final letter, she says there is nothing -- she read the

2   reports and there is nothing indicated in there to indicate

3   that this had any impact upon his performance.  That is not

4   true.  That goes to the issue of, since I have to ultimately

5   prove this in a discrimination context, the pretext.  It goes

6   to pretext.  Was there a pretext here?

7        Dr. Bejar took the position that the IDEA did not make

8   such a finding, when in fact they did.  That also goes to the

9   issue of what we consider deliberate indifference, that she had

10  the benefit of the findings from the IDEA about the failure to

11  provide a minimal distraction room that caused him or had a

12  negative impact on his performance on the retake and she chose

13  to ignore that and still uphold the decision to dismiss him

14  from the medical school, where she could have done all

15  different kinds of things to remedy the situation of a failure

16  to accommodate.

17       Here is FIU itself saying this man failed to be

18  accommodated for his final exam that caused the MSEPC hearing.

19  Remedial action should have been taken.  Ms. McWhorter said

20  remedial action should have been taken, she should have been

21  consulted about it, about what remedial action could have been

22  done.  Certainly he could have retaken the Psychiatry

23  clerkship.  That would have been one thing that would have

24  happened, and hopefully passed that and continued on.  But they

25  didn't even allow him that opportunity.

 1          In fact, there is an email from Dr. Bonham that is in

 2     the record, who was part of this accommodations process, and

 3     Dr. Bonham stated, You're going to have to retake the

 4     Psychiatry clerkship.  So he was even suggesting it to

 5     Mr. Nehme, but that was totally ignored by Dr. Bejar.

 6          There was no remedy provided for him being, by FIU,

 7     found to be discriminated against for not being accommodated.

 8     At the very least, your Honor, this presents issues of fact

 9     that on the failure to accommodate claim should go to trial and

10     it should allow a jury to decide.

11          I don't see how you can't go to trial where FIU itself

12     finds he wasn't accommodated and now says that you should

13     ignore all of that and find that as a matter of law that they

14     did accommodate him or there was no failure to accommodate.  So

15     that is one issue.

16          THE COURT:  Let me get my time line straight.  He does

17     the retake, he fails it, and when he fails it, the MS -- I want

18     to get the letters room.

19          MR. HANNAH:  MSEPC.

20          THE COURT:  -- MSEPC calls him in.

21          MR. HANNAH:  Yes.  They say there is testimony saying

22     that is the triggering event that got him in front of the MSEPC

23     the third time.

24          THE COURT:  And then at that time is when they decide

25     that he should be dismissed and then the whole appeal process

1   starts.

2           MR. HANNAH:  Right.  Right.  Honestly, we are not

3   attacking the MSEPC's initial decision because they were not

4   aware of this failure to accommodate issue at the time, and we

5   are not attacking his first level of appeal either because it

6   was not an issue there before the Appeals Committee.

7           It was Mr. Nehme that actually instigated the

8   reporting to the IDEA of the failure to accommodate before it

9   actually got to Dr. Bejar's desk, and Dr. Bejar then sent his

10  appeal to the IDEA for further investigation, which they did.

11          They did that thorough investigation, that resulted in

12  a report finding that FIU had failed to accommodate him for the

13  retake of the Psychiatry clerkship exam.  Then it went back to

14  Dr. Bejar to make the final decision on appeal.

15          She certainly could have been in a position to say,

16  you know, this is not proper because this man was discriminated

17  against on the Psychiatry clerkship, we should allow him to

18  retake that Psychiatry clerkship, which students have been

19  allowed to retake entire courses.  In fact, Mr. Nehme back in

20  his first year was allowed to take one of the courses.  They

21  could have remedied the situation.

22          THE COURT:  Let me ask you this.  If he fails the

23  retake exam, then he has to take the course over; is that how

24  the process goes?

25          MR. HANNAH:  Yes.  They have the discretion to allow

1    that.  They can say, since you re-failed the retake, we can

2    allow you to take the entire course over again as an ability to

3    remediate.  They have the discretion.  They don't have to do

4    that, but they have that discretion within their own Handbook.

5         They chose to not do that.  They chose to uphold the

6    dismissal, even in light of pretty substantial evidence from

7    the IDEA, a finding by the IDEA, probably the only one in its

8    entire existence, according to their testimony, where they

9    actually substantiated the failure to accommodate, and as a

10   result of that, even with that evidence staring Dr. Bejar in

11   the face, she chose to ignore it and uphold the dismissal,

12   knowing that he is disabled, knowing that he was not

13   accommodated.  That is where we believe there is evidence of

14   deliberate indifference.  It is certainly a pretextual issue as

15   well.

16        So I think certainly on the -- it is our position

17   certainly on the failure to accommodate claim, viewing the

18   report of IDEA as an admission by FIU, which there is plenty of

19   case law, and I cite it in our motion, that that is considered

20   an admission of a party opponent, the findings of the IDEA, and

21   as admissible as such, you should consider that and that is

22   something that should go to the jury.

23        It is not a judicial admission, honestly, but it is an

24   evidentiary admission that should go to the jury, and it is for

25   them to consider whether or not FIU actually did discriminate

1    against Mr. Nehme by failing to accommodate him.

2         I looked through the cases they cite.  I have cases,

3    including one from the Middle District that I cite in my memo,

4    where clearly an investigative report about discrimination,

5    finding of discrimination by the employer, is considered an

6    admission, admissible admission of a party opponent.  In fact,

7    I think in that case they even gave summary judgment to the

8    plaintiff on that issue.

9         They cite some cases in their reply claiming that it

10   doesn't have to be an admission or it is not admissible, but

11   all the cases they cite are all distinguishable.  In fact, one

12   of the cases they cite, Doe 1 v. City of Chicago, is where the

13   plaintiffs moved for summary judgment and wanted the judge to

14   find that the internal report finding sexual harassment by the

15   employer was a judicial admission as opposed to just an

16   evidentiary admission.  The judge held that it should not be a

17   judicial admission; they are still subject to

18   cross-examination, etc.; you can still attack it during the

19   trial.  So that does not indicate that it should not be allowed

20   admissible.

21        Certainly there are cases -- I found even more

22   cases -- that held that on a motion for summary judgment it is

23   appropriate for the court to take that into consideration as

24   admissible evidence.  Two different bases, actually.

25   Admissible as an admission of a party opponent and as an

 1   official record of the company, because these are official

 2   records of the company, where they have to conduct internal

 3   investigations and report their findings.  So it is admissible

 4   evidence and your Honor should look at that in deciding whether

 5   there are issues of fact on the issue of failure to

 6   accommodate.

 7        THE COURT:  Again, I don't know --

 8        MR. HANNAH:  And also --

 9        THE COURT:  It seems like FIU is saying, OK, IDEA

10   found this, but sort of too little too late.  I think we talked

11   a little bit about complain, don't complain.  You're saying

12   that what I was calling the bookends, the end of the exam,

13   you're saying, no, the bookend is all the way past Dr. Bejar

14   and the whole process until he was dismissed.  Is that how you

15   view it in terms of the interactive process?

16        MR. HANNAH:  Right.

17        THE COURT:  I'm kind of struggling a little bit with

18   this concept of the interactive process in the sense of, if the

19   chair doesn't fit so you complain and you get a new chair or

20   you don't complain and you're stuck with the chair.

21        So here he didn't complain and then it happened way

22   down at the end.  That seems to be something that FIU is

23   hanging their hat on.

24        MR. HANNAH:  Well, the interactive process, as you

25   said, your Honor, was a term of art.

1          The Eleventh Circuit -- I have looked through all the

2     Eleventh Circuit case law on this issue of interactive process.

3     The interactive process in the Eleventh Circuit is not

4     something that the ADA requires.  It is not in the language of

5     the ADA.

6          What they view the interactive process are, and I cite

7     a case, it is an informal process where there is a back and

8     forth between the person who is disabled and, let's say, the

9     employer, or here the school, to come up with a reasonable

10    accommodation.  I mean, the student says he's disabled, he

11    needs to be accommodated, and then that triggers an interactive

12    process between the student and the school to come up with an

13    accommodation that is reasonable.

14         That is what the Eleventh Circuit looks at it.  They

15    cite to a Ninth Circuit case.  It is funny.  In the Ninth

16    Circuit, unlike the Eleventh Circuit, the Ninth Circuit, the

17    interactive process is required.  They view it as a requirement

18    of the ADA.  There is no case in the Eleventh Circuit that says

19    that.  But in the Ninth Circuit it is a requirement.

20         She argues the Ninth Circuit says interactive process

21    continues all the way through, even though accommodations are

22    already established, if the student or a person doesn't get the

23    accommodation they have to speak up.  If they don't speak up,

24    then they lose the right to protest about the accommodation.

25              THE COURT:  Right.

1          MR. HANNAH:  That is their argument.  That is what I

2     get their argument to be.

3          THE COURT:  Yes.

4          MR. HANNAH:  What our position is -- first of all,

5     interactive means it goes both ways.  It is not just one-sided.

6          There could be a situation, and certainly this --

7     let's assume that case law even applies here, the Ninth

8     Circuit.  There could be a situation where, and I've got

9     testimony, and I cite to it in my statement of facts, where the

10    accommodations, once they are awarded, are automatically

11    applied in every case.  But there could be situations, such as

12    here, where the issue is so obvious, not only necessarily maybe

13    to the student but also to the person who is supposed to be

14    providing that accommodation, that you can't just say the

15    student didn't say something, even though I knew something

16    should have happened, because the student didn't say something

17    I'm off the hook.  That is kind of what they're saying, that,

18    oh, Mr. Nehme didn't speak up.  There could be gunshots outside

19    of the room.  Because the student didn't say something about

20    that, I am not going to have to do anything about it.

21          Here I have testimony from Ms. Lachica saying that she

22    had the responsibility -- not only Ms. Lachica, I think the

23    head of the DRC, Steven Loynaz, also there is testimony from

24    him saying they are obligated -- if, for example, the proctor

25    knows there is a very distracting situation, they are obligated

1    to stop the exam or find another room or do something about it,

2    tell people to quiet down, for example.

3              Ms. Lachica testified she was aware of that

4    responsibility but she failed to take action because she

5    thought if she got up and said something, that would be more

6    distracting even to Mr. Nehme.

7              So I think at the very least that is an issue of fact

8    on whether or not there was a breakdown of the interactive

9    process, as defense counsel would like to say.  Certainly

10   enough to go to a jury and let the jury decide that issue.

11             THE COURT:  So it sounds to me like the interactive

12   process is coming up with the accommodation, but then you

13   are -- it sounded to me like that was it.  Back and forth, what

14   do you need.  I need a chair that doesn't turn or whatever.

15   Here's your accommodation.  But obviously there has to be

16   follow-through.  If it is a chair, they supply the chair and

17   that's it.  But with a testing situation they have to provide

18   the room.

19             Now, supposedly if the room has been qualified as a

20   minimal noise room, then that's it.  But you're saying in this

21   instance the room that was used was not qualified as such.

22             MR. HANNAH:  Yes.

23             THE COURT:  Am I correct so far?

24             MR. HANNAH:  My understanding is that this room had

25   sometimes -- Mr. Nehme had never been put in this room before

1    for any exam, even when he was accommodated.  My understanding

2    was that this could be one of the rooms they could use, but

3    given what was going on that day around the room, which should

4    have been known by Ms. Reyes-Gavilan -- she even told the

5    investigator she was aware of this, that there were a lot of

6    things going on outside the room that would increase the

7    distractions, and she told the investigator no one should have

8    been put in that room, I missed it, and I should have caught it

9    but I missed it.  That is what she told the investigator, and

10   then her testimony in deposition said I never told the

11   investigator that.  So certainly a very glaring credibility

12   issue on that issue of scheduling him in the first place to

13   that room.

14        On top of that, once he got in that room, as the exam

15   progressed there was so much going on out there that

16   Ms. Lachica was aware that there was a lot of distraction.  She

17   did take some action by getting the heater because it was very

18   freezing.

19        THE COURT:  What about giving him the earplugs and

20   putting him with his back to the window, who decided to do

21   that?  Was that the proctor, who kind of like took care of this

22   room accommodation?

23        MR. HANNAH:  There is no evidence about that.  There

24   is no evidence about that.  There is no testimony on why he was

25   put where he was put in the room.  There is some testimony

1    about the earplugs.

2            THE COURT:  Now he got earplugs, right?

3            MR. HANNAH:  Earplugs, but even with that, all the

4    movement -- it wasn't just the auditory distractions, it was

5    the visual distractions too, because he could see movement

6    going on in the room, in the hallway.

7            THE COURT:  I think there Ms. Wydler referenced

8    something that Mr. Nehme said that his peripheral --

9            MR. HANNAH:  Right.  I did in my response.  I did in

10   my response.  They didn't mention that in their statement of

11   facts.  I think it is paragraph 42 of my additional facts.

12   Mr. Nehme's testimony that he can see what was going on from

13   his peripheral vision.  His back was not so far away from the

14   wall that he couldn't see things.

15           THE COURT:  So there has to be some testimony that he

16   had his back to the window, right?

17           MR. HANNAH:  Yes, yes.

18           THE COURT:  To propose that he could still see it on

19   the periphery.

20           MR. HANNAH:  He even testified that even though he had

21   earplugs in, he could still hear people talking and yelling

22   outside.

23           THE COURT:  OK.

24           MR. HANNAH:  He also looked up at the proctor to

25   express his frustration but the proctor did not do anything.

```
 1              THE COURT:  OK.
 2              MR. HANNAH:  He did learn that the proctor -- he was
 3    trying his best to focus and he did not know he had the option
 4    to stop the exam or request a room change.
 5              THE COURT:  Right.
 6              MR. HANNAH:  That is the reason why he testified he
 7    didn't say anything.
 8              THE COURT:  OK.  All right.  So then you are basically
 9    hanging your hat on the failure to accommodate, that the
10    accommodation office said this was not an accommodating room.
11              MR. HANNAH:  That's for the failure to accommodate
12    claim, yes.  Also on the dismissal claim, because the ultimate
13    dismissal decision rested with Dr. Bejar.
14              THE COURT:  Right.
15              MR. HANNAH:  Dr. Bejar was aware of his disability,
16    was aware of his accommodations, was aware of the findings, all
17    the findings apparently of the IDEA, and still chose to dismiss
18    him even with a statement in her final letter saying there is
19    no evidence, even despite these findings there is no evidence
20    that this had a negative impact upon his performance, which is
21    not true given the IDEA.
22              THE COURT:  So you're saying that she was -- are you
23    saying because of the supposed deference that is given, are you
24    saying that it was sort of like, my word, an abuse of
25    discretion on her part or are you saying that she had an
```

1    ulterior motive to have him dismissed and that's why she denied

2    that there was any evidence of failure accommodate?

3         MR. HANNAH:  The latter.  I think deliberate

4    indifference, that she chose not to change the decision around

5    even in light of the evidence from the IDEA.  She chose to

6    ignore that and still uphold the dismissal and get rid of him.

7         THE COURT:  So deliberate indifference.  I thought I

8    heard Ms. Wydler say that goes to compensatory damages.

9         MR. HANNAH:  It does, and that is why we have an

10   argument for compensatory damages that should go to the jury as

11   well.

12        THE COURT:  Right, but in terms of her upholding the

13   dismissal decision of the panel, which you do not find fault

14   with because you're saying they didn't have all the facts,

15   you're saying even though she had all the facts after --

16   because this is an ADA case.  So you have to ultimately show

17   that he was dismissed even though he was qualified and could

18   perform further without accommodation.

19        MR. HANNAH:  Right.  Right.

20        THE COURT:  So your whole thing is, yes, he was

21   qualified to perform with a minimal noise room.

22        MR. HANNAH:  Right.

23        THE COURT:  So it goes back to the essence of the

24   case.

25        MR. HANNAH:  There is a lot of overlap between the two

1    claims, honestly, your Honor, because the failure to

2    accommodate claim, the causal events, I guess, that occur from

3    that is his failure to pass the Psychiatric clerkship, which

4    gets him in front of the MSEPC, which results in his dismissal

5    ultimately.

6         So there is a chain of events that happened arising

7    out of the failure to accommodate.  They are not divorced from

8    each other.  It is not one failure -- it is not like we are

9    pointing out the exam he took in period two and said we failed

10   to accommodate him and then we are looking at the dismissal

11   separately from that.  There is an overlap and connection

12   between the two claims, honestly, though each can survive.

13   Failure to accommodate claim can survive even the

14   discriminatory dismissal claims.

15        THE COURT:  Right.  I understand that.  That is sort

16   of like the genesis.

17        MR. HANNAH:  Right.

18        THE COURT:  But what I'm saying is, for dismissal in

19   violation of the ADA you have the essential element that he has

20   to have been qualified with or without accommodation --

21        MR. HANNAH:  Right.

22        THE COURT:  -- for it to be a dismissal in violation

23   of the ADA.

24        MR. HANNAH:  Right.

25        THE COURT:  I think what Ms. Wydler was saying is he

1    wasn't qualified because of all this history and he was on

2    probation and so on and so you're finding fault with what the

3    doctor decided just because he didn't take into account the

4    accommodation office's decision.

5           It seems to me that is why you're saying it is a

6    pretext, the fact that in her letter she said there was no

7    evidence because she has discretion to take everything into

8    account and decide whether to dismiss him or not, right?

9           MR. HANNAH:  Right.  Keep him in the medical school

10   and let him do something else, like repeat the clerkship, for

11   example.

12          The way I look at it, your Honor, and the way it seems

13   to be the law on discrimination issues is that a company once

14   it is notified of a discriminatory issue has a duty to

15   investigate that issue, and if it finds that there is

16   discrimination, it has a duty then to remediate that

17   discrimination, to remedy it.

18          We have a situation here where there was an internal

19   complaint made of discrimination, that was substantiated, but

20   no remedy was given at all.  Instead of the remedy they just

21   upheld the dismissal, where they could have remedied the

22   situation.  That is the fault of FIU, not the fault of

23   Mr. Nehme.

24          Now, on the qualification issue, I think what they're

25   saying, they want to have a holistic approach, but if you take

1    that -- if you look at his actual academic performance, he

2    passes period one, moves on to period two.  He has some

3    problems with period two, most likely related to his disability

4    and his issues.  He takes a leave of absence.  They allow him

5    to do that.  They allow him, at his request, to come back and

6    go back and redo all of period two.  He had to retake the

7    entire period two, even though he had almost pretty much

8    finished it by the time he asked for that allowance.

9           He goes back.  He passes period two fully without

10   problem, passes every class, does well, in fact, 90s and 80s,

11   and then he gets promoted to period three.  He passes every

12   class in period three up to the Psychiatry clerkship.  He does

13   poorly maybe on one or two, I think it was three final exams,

14   where he failed and was allowed to remediate.  But if you look

15   at his whole performance in each of those classes, it is good

16   enough to get him grades in the 80s on his transcript, which is

17   competency.  So he is competent in all those clerkships.

18          So our view is that there is no question that he was

19   qualified to continue on.  If he had passed -- in fact, there

20   is testimony, and it is in my statement, from Dr. Obeso, who

21   says that if he had passed the Psychiatry clerkship

22   successfully, he would have been promoted to period four.

23          That is all they needed from him.  They never gave him

24   that opportunity.  Instead, he was discriminated against and

25   dismissed and he lost his entire medical career as a result,

1    after putting in four years of time and all the money that is

2    involved there, which he has to pay back still.

3          What we have here is a situation where -- it is like

4    an employment situation, where you have an employee who is

5    discriminated against and terminated and in order to justify

6    the termination they bring up stuff, disciplinary issues he had

7    three or four years ago, to try to justify the termination,

8    even though ultimately that really had nothing to do with the

9    termination decision.

10         Here, what triggered him going to be dismissed was the

11   failure of the Psychiatry clerkship and class.  That is the

12   only triggering event.  It is not because he did not as good on

13   the final exams on the other clerkships.  While Ms. Wydler says

14   or defendant says they could have done that, the fact of the

15   matter is they didn't.  The fact of the matter is they brought

16   him to the MSEPC the third time only because of the Psychiatry

17   clerkship final exam failure.  That's it.

18         So that is the triggering event, and that leads to the

19   dismissal, leads to his appeals, leads to him filing an

20   internal complaint, that is substantiated, and even in light of

21   that substantiate, they ignore it.  Basically Dr. Bejar ignores

22   the findings and upholds the dismissal.  That's where we're at.

23         THE COURT:  All right.  I will give you an

24   opportunity, Ms. Wydler, to reply.

25         MS. WYDLER:  Thank you for the rebuttal time, your

1    Honor.  A couple of things.

2          In the sequence of events for this court to make its

3    determination and its analysis, the majority of plaintiff's

4    arguments rest on there are issues of fact, there are issues of

5    fact related to the accommodation, there are issues of fact

6    related to the decision of the dismissal after receiving the

7    IDEA report.  All of that comes after the horse.

8          The *prima facie* case is whether or not the plaintiff

9    is qualified under the ADA.  Everything else is a red herring.

10         I want to bring the court's attention, because I think

11   that this was touched upon, I want to read into the record a

12   portion of Dr. Bejar's final decision letter.  It doesn't

13   specifically note the Psychiatry retake exam scenario, but it

14   says:  Based upon a subsequent independent review by IDEA,

15   there is no indication that your allegations had an adverse

16   impact on your academic performance.  Thus, your dismissal from

17   HWCOM was a result of your academic performance.  The remaining

18   bases for your appeal are without merit.  The determination of

19   the college remains undisturbed.

20         This is based, like she testified, on his holistic

21   overall academic performance.

22         The triggering event is not the failure of the

23   clerkship alone.  It is the fact, undisputed, that this

24   gentleman was on probation.  The academic probation portion of

25   this case is what makes Mr. Nehme not qualified under the ADA.

1        Let's not also discount all of the opportunities that

2    FIU provided to Mr. Nehme for him to show an improvement in his

3    knowledge and depth of these medical disciplines.

4        She did not, Dr. Bejar did not make a finding based on

5    deliberate indifference.  She considered the facts that came

6    in, and again looking at the entirety of his entire academic

7    performance.

8        When we're looking at the IDEA report, the IDEA

9    report, again, it is not an admission.  I cited the same Middle

10   District court case that the plaintiff did.  The reason why it

11   is not an admission specific to the ADA is because they only

12   reviewed internal guidelines.

13       The standard, if we look -- I will give the court the

14   cite.  The report specifically states that the evidence to

15   corroborate was on DE 55-10, page 34.  It refers to the

16   violation of FIU policy.  When we look at the qualification,

17   how they define IDEA, how IDEA defines qualified individual, it

18   did not look at his academic record, it did not look at his

19   ability to meet the essential functions as a medical student.

20       THE COURT:  I'm sorry.  I thought Mr. Hannah was

21   saying it was an admission that the room was not an

22   accommodating room.  That's what I heard him say as an

23   admission, not as to qualification.

24       MS. WYDLER:  It's --

25       THE COURT:  You're saying that the accommodation

1    office of FIU is not qualified to decide what an accommodating

2    room is?

3         MS. WYDLER:  The IDEA is the body to determine within

4    FIU what would be a minimal distraction room based on FIU's

5    definition, based on the explanation given by FIU's witnesses,

6    but that is not what is necessary under the ADA for a

7    reasonable accommodation of a less distractive room.

8         THE COURT:  Right, but I think what Mr. Hannah is

9    saying is it is an admission in the sense that you can't just

10   sweep it under the rug.  It is there.  He says if the case goes

11   to trial the jury should be able to hear it.  I think that is

12   what he is saying.  He doesn't go so far as saying it's

13   determinative.  He is saying it can be challenged.

14        It sounds to me like you are talking two different

15   types of admission there.  I don't think that he is saying that

16   IDEA is treating him as a qualified individual is an admission.

17   I didn't hear him say that.

18        MR. HANNAH:  No, that is not what I'm saying.

19        THE COURT:  So that is different.

20        MS. WYDLER:  I will address the court's comment on

21   footnote 1 of my DE-57, which is the motion for summary

22   judgment.

23        I specifically cite the Shaikh v. Lincoln Memorial

24   University case.  It says, basically, despite a university's

25   failure to abide its own policies, where they conducted an

1    investigation internally the relevant inquiry is whether or not

2    the university violated the ADA.

3         So it is different.  So even if we take the admission

4    that the plaintiff wants us to accept, it still does not answer

5    the questions before the court under the ADA because FIU was

6    solely looking at the MDR, the minimally distractive room,

7    under its own internal guidelines.

8         Again, that is putting the cart before the horse

9    because before we even get there we have to look at the

10   threshold question of whether or not this individual was

11   qualified, and the most glaring, obvious thing that does not

12   come up from the plaintiff's perspective is that he was on

13   probation.  That renders him different from other individuals

14   who may or may not have gotten the accommodation that was

15   sufficient to meet his needs, as the court had pointed out.

16        This individual was in medical school for four years

17   and had not even completed three years of medical school, went

18   to the MSEPC three times, was afforded the opportunity to

19   repeat courses.

20        I cited two cases in my reply, because I couldn't find

21   anything in the Eleventh Circuit that talks about -- the

22   plaintiff wants to tout his GPA, but those GPAs don't consider

23   all of the remediations of the tests that were given, they

24   don't give the failing grades, and it was the Redding case and

25   Halpern v. Wake Forest case from the Fourth Circuit.

1          In those cases it specifically states that you can't

2     discount the opportunities that were given to the student as

3     part of their failures in their overall academic progress.  So

4     that is what we have here.  We have a student who had multiple

5     opportunities to get to the finish line.

6          FIU is responsible to the community to graduate

7     students who have the fitness, the skills to be able to

8     competently assume the responsibilities of a medical doctor and

9     treat patients.

10          With the P3 failures that showed continued poor

11     performance under the probation standard of the Handbook,

12     Mr. Nehme doesn't qualify as an individual since he was failing

13     those courses with and without accommodations, and that is the

14     point that Dr. Bejar made when she upheld the decision of the

15     dismissal after the hail mary shot was thrown that there was a

16     lack of accommodations and he never complained about it until

17     the eleventh hour.

18          THE COURT:  All right.  Well, thank you very much.  I

19     appreciate your input.

20          We will prepare a report for Judge Cannon.

21          MS. WYDLER:  Thank you, your Honor.

22          THE COURT:  Thank you.

23          MR. HANNAH:  Thank you for your time, your Honor.

24          THE COURT:  Thank you.

25          THE DEPUTY CLERK:  Court's adjourned.   (Adjourned)

C E R T I F I C A T E


        I hereby certify that the foregoing is an accurate

transcription to the best of my ability of the digital audio

recording in the above-entitled matter.


September 9, 2022        s/ Joanne Mancari
                         Joanne Mancari, RPR, CRR, CSR
                         Court Reporter
                         jemancari@gmail.com

MR. HANNAH: [82]
MR. NEHME: [1]  2/10
MS. WYDLER: [70]  2/12 5/7 8/20 9/1
9/9 9/17 10/2 10/25 12/2 12/5 12/9
12/17 12/20 12/23 13/3 13/10 13/12
13/16 13/18 13/22 13/24 15/2 15/5 15/8
15/12 15/15 15/20 15/23 16/3 16/6 16/9
16/14 16/16 16/21 16/23 17/25 18/3 18/6
18/22 18/25 19/6 19/9 19/15 19/18 19/21
19/24 20/1 20/6 20/8 20/12 20/23 23/4
31/1 31/12 32/8 32/22 32/24 33/24 34/3
34/7 38/14 39/3 39/18 40/21 40/24 74/25
76/24 77/3 77/20 79/21
THE COURT: [149]
THE DEPUTY CLERK: [2]  2/3 79/25

## 1

10 [2]  21/23 76/15
100 [3]  4/18 25/15 43/13
12 [3]  14/13 28/12 39/20
12:43 [1]  28/14
15 [2]  47/13 47/16
15th [1]  24/16
18th [1]  20/1

## 2

20 [3]  2/4 22/22 28/12
20-CV-24649-AMC [1]  1/2
2016 [3]  12/11 18/21 18/23
2017 [8]  13/19 17/10 18/7 19/1 19/4
19/21 20/10 42/8
2018 [4]  18/11 19/22 20/2 20/2
2020 [3]  14/19 22/22 24/12
2021 [2]  14/20 18/17
2022 [2]  1/5 80/8
24649 [1]  2/4
2600 [1]  1/18
27 [2]  19/1 19/3

## 3

305-446-5528 [1]  1/19
33134 [1]  1/19
33351 [1]  1/15
335 [1]  27/8
34 [1]  76/15
3800 [1]  1/15

## 4

42 [1]  68/11
43 [2]  46/13 48/20
44 [1]  54/18
4800 [1]  1/14
495 [2]  27/13 36/22

## 5

50 [2]  36/24 43/9
55-10 [1]  76/15
5528 [1]  1/19
56 [13]  9/2 9/4 9/8 9/9 9/13 9/15 9/20
9/24 9/25 10/1 10/1 10/12 10/12
57 [1]  77/22
58 [12]  6/6 6/9 7/7 8/7 8/10 8/12 8/23
9/2 9/14 9/14 9/25 10/1

## 6

64 [12]  6/9 6/24 8/9 8/11 8/13 8/23 9/6
9/25 10/3 10/7 10/9 10/11
65 [6]  8/11 8/13 8/23 10/1 10/9 25/19

## 7

7/27 [1]  19/1
71 [4]  10/4 10/9 10/11 36/24
75 [2]  12/14 15/9
76 [1]  45/3
76s [1]  45/2
79 [3]  1/8 12/25 45/3

## 8

80s [5]  45/2 45/23 46/2 55/5 55/5 73/10
73/16
84.27 [2]  44/24 45/3

## 9

90s [2]  45/2 73/10
954-362-3800 [1]  1/15

## A

a.m [1]  28/13
abandoned [1]  25/23
abide [1]  77/25
ability [4]  36/22 61/2 76/19 80/5
able [3]  40/1 77/11 79/7
about [44]  6/12 13/9 14/5 17/20 28/16
30/14 30/17 31/6 32/20 37/15 41/22 46/5
46/12 48/8 48/17 48/18 50/6 50/13 50/13
50/17 50/18 50/22 50/23 51/10 52/25
53/21 54/16 56/19 57/7 58/10 58/21
58/21 62/4 63/11 64/24 65/19 65/20 66/1
67/19 67/23 67/24 68/1 78/21 79/16
above [2]  21/18 80/6
above-entitled [1]  80/6
absence [15]  18/15 19/14 19/15 19/25
20/1 20/4 20/14 43/19 43/21 43/22 44/3
44/4 44/12 44/21 73/4
absences [3]  18/10 34/17 41/3
absolutely [1]  57/14
abuse [1]  69/24
academic [39]  11/11 11/16 12/10 17/9
17/9 17/10 17/11 17/18 17/20 17/24 19/7
20/16 20/25 20/25 21/1 21/1 24/15 26/10
33/19 33/24 33/25 35/14 35/23 36/9
36/11 38/6 38/18 40/2 40/11 40/25 41/4
73/1 75/16 75/17 75/21 75/24 76/6 76/18
79/3
academically [1]  41/9
academics [2]  26/4 41/1
accept [1]  78/4
Access [1]  24/25
accident [1]  24/7
accommodate [28]  2/19 11/3 11/18
22/24 29/9 31/6 36/20 44/11 54/9 57/3
58/16 59/9 59/14 59/14 60/4 60/8 60/12
61/9 61/17 62/1 63/6 69/9 69/11 70/2
71/2 71/7 71/10 71/13
accommodated [12]  50/3 50/19 51/12
55/10 55/11 56/24 58/18 59/7 59/12
61/13 64/11 67/1
accommodating [4]  31/16 69/10 76/22
77/1
accommodation [40]  11/20 13/15 24/4
25/24 27/2 27/6 27/7 29/7 29/17 29/18
29/20 30/4 30/15 30/20 31/9 32/14 33/3
38/12 39/8 39/9 39/12 43/25 49/13 56/1
64/10 64/13 64/23 64/24 65/14 66/12
66/15 67/22 69/10 70/18 71/20 72/4 75/5
76/25 77/7 78/14
accommodations [25]  17/22 21/14 22/23
24/21 25/20 25/22 26/18 34/10 34/11
36/13 37/15 38/16 43/8 43/16 46/5 46/17

49/18 49/20 50/3 59/2 64/21 65/10 69/16
69/13 75/16
according [5]  2/22 3/25 5/10 21/22 61/8
account [2]  72/3 72/8
accurate [2]  7/9 80/4
ACH2 [1]  36/22
acronym [1]  14/11
across [1]  28/11
act [2]  35/5 35/7
acted [1]  35/6
action [7]  32/13 53/17 58/19 58/20 58/21
66/4 67/17
actions [1]  35/8
actual [2]  41/5 73/1
actually [11]  3/6 30/8 36/20 43/4 43/22
44/3 60/7 60/9 61/9 61/25 62/24
ADA [22]  2/18 10/15 11/4 11/10 27/1
33/16 36/8 36/17 37/25 38/8 64/4 64/5
64/18 70/16 71/19 71/23 75/9 75/25
76/11 77/6 78/2 78/5
added [4]  3/25 4/17 6/17 47/23
addition [3]  32/25 34/15 41/4
additional [4]  16/25 24/1 48/1 68/11
address [7]  37/24 37/25 41/17 42/17
43/5 49/14 77/20
adjourned [2]  79/25 79/25
administration [1]  33/22
administrative [2]  27/19 39/15
administrators [2]  34/6 34/8
admissible [7]  61/21 62/6 62/10 62/20
62/24 62/25 63/3
admission [20]  52/20 61/18 61/20 61/23
61/24 62/6 62/6 62/10 62/15 62/16 62/17
62/25 76/9 76/11 76/21 76/23 77/9 77/15
77/16 78/3
admitted [1]  29/1
adopting [1]  24/17
adoption [1]  35/17
adverse [1]  75/15
affect [3]  8/24 28/20 36/16
affected [4]  24/6 25/21 26/10 35/14
affirmed [1]  37/9
afforded [3]  12/13 22/9 78/18
affords [1]  23/17
after [18]  11/15 17/19 23/4 25/5 25/11
26/1 35/7 35/21 37/15 43/19 52/7 56/8
56/21 70/15 74/1 75/6 75/7 79/15
again [15]  15/18 20/15 20/18 22/6 23/22
24/3 24/17 26/6 30/14 33/7 61/2 63/7
76/6 76/9 78/8
against [5]  59/7 60/17 62/1 73/24 74/5
agency [1]  56/5
ago [2]  13/7 74/7
agree [1]  5/17
agreed [6]  3/18 3/20 4/7 44/20 46/6
46/21
agreement [2]  9/1 9/14
AHC1 [1]  27/8
AHC2 [1]  27/13
air [1]  32/9
ALICIA [1]  1/11
all [85]
allegations [1]  75/15
alleged [3]  7/12 24/22 25/24
allegedly [3]  10/3 11/22 22/3
allow [10]  12/10 27/14 44/20 58/25
59/10 60/17 60/25 61/2 73/4 73/5
allowance [1]  73/8
allowed [10]  14/16 14/19 44/1 44/16
46/8 46/8 55/19 60/20 62/19 73/14

**A**

almost [2]  34/5 73/7
alone [4]  22/20 53/13 54/5 75/23
along [7]  15/1 15/16 15/25 19/13 21/6
 27/21 39/24
already [9]  17/18 19/24 20/10 27/2 42/8
 42/14 43/4 43/20 64/22
also [25]  2/14 11/8 13/25 14/14 17/14
 21/18 22/2 22/5 22/15 23/11 35/1 42/17
 42/18 44/1 46/18 47/21 48/1 54/15 58/8
 63/8 65/13 65/23 68/24 69/12 76/1
although [1]  48/10
am [10]  2/8 4/12 4/24 6/23 15/19 19/5
 23/1 41/16 65/20 66/23
AMC [1]  1/2
amended [4]  25/5 36/20 36/25 57/17
analysis [3]  35/25 36/15 75/3
animus [3]  34/15 34/24 40/17
another [7]  6/5 22/10 27/17 49/3 49/9
 53/3 66/1
answer [1]  78/4
any [18]  8/24 18/3 26/10 27/24 28/16
 29/9 30/13 32/6 34/15 35/2 37/5 37/17
 46/12 49/23 57/3 58/3 67/1 70/2
anyone [1]  11/21
anything [19]  10/21 21/17 23/7 23/8
 30/14 31/6 41/21 41/23 49/3 50/6 50/17
 53/21 53/22 56/19 57/19 65/20 68/25
 69/7 78/21
apologize [1]  55/23
apparently [4]  46/19 53/16 56/22 69/17
appeal [15]  23/15 23/17 23/17 23/21
 24/3 24/18 24/20 24/23 27/5 30/16 59/25
 60/5 60/10 60/14 75/18
appeals [7]  23/21 24/12 24/18 24/24
 35/17 60/6 74/19
appearances [2]  1/12 2/5
appears [1]  5/3
applied [1]  65/11
applies [3]  11/2 38/1 65/7
apply [1]  11/7
appreciate [1]  79/19
approach [3]  5/17 6/14 72/25
appropriate [1]  62/23
April [1]  20/2
aptly [1]  33/5
are [105]
area [2]  22/7 27/20
argue [1]  34/22
argues [1]  64/20
argument [9]  10/18 11/7 21/4 25/23
 25/23 42/3 65/1 65/2 70/10
arguments [3]  2/21 11/16 75/4
arises [1]  4/11
arising [1]  71/6
around [6]  45/3 46/1 53/7 56/17 67/3
 70/4
art [2]  30/18 63/25
as [76]  2/8 2/20 5/3 5/8 5/13 6/23 8/12
 8/12 8/23 9/8 9/12 9/18 10/19 11/4 12/6
 15/16 16/12 16/25 17/10 18/20 22/14
 26/23 27/1 29/12 33/4 36/11 36/13 36/13
 38/15 40/1 42/2 42/3 45/11 45/12 46/22
 47/1 47/7 47/12 47/13 51/7 53/13 54/2
 54/3 54/6 54/6 56/1 56/4 59/13 61/2
 61/9 61/14 61/18 61/21 61/21 62/15
 62/23 62/25 62/25 63/24 64/17 65/11
 66/9 66/19 66/21 67/14 70/10 73/25
 74/12 76/19 76/22 76/23 77/12 77/16
 78/15 79/2 79/12

ask [4]  3/4 31/19 49/8 60/22
asked [6]  7/25 34/25 35/12 35/12 37/10
 73/8
asking [2]  25/11 41/21
asks [1]  56/23
aspects [2]  34/25 45/22
assessment [1]  26/16
assigned [1]  46/21
assignments [2]  25/16 25/20
assist [1]  5/7
associate [3]  18/8 20/19 22/19
assume [2]  67/7 79/8
assuming [1]  19/4
at [91]
attack [1]  62/18
attacking [2]  60/3 60/5
attention [5]  9/4 10/22 29/24 35/19 75/10
attorney [1]  56/10
audio [2]  1/10 80/5
audit [3]  25/12 26/2 35/12
auditory [1]  47/11 48/1 68/4
August [1]  12/11
authority [3]  48/11 48/17 50/11
automatically [2]  36/3 52/4 65/10
availability [2]  26/25 29/5
available [1]  26/8
aware [14]  17/4 27/25 29/25 31/22 48/10
 48/17 53/6 60/4 66/3 67/5 67/16 69/15
 69/16 69/16
away [2]  44/11 68/13

**B**

back [33]  4/19 16/1 20/21 23/1 25/5
 25/10 27/21 28/4 28/4 31/10 31/19 32/2
 33/13 35/12 38/23 39/8 39/10 44/13
 44/21 49/8 56/22 60/13 60/19 64/7 66/13
 67/20 68/13 68/16 70/23 73/5 73/6 73/9
 74/2
barely [2]  22/6 37/5
based [19]  2/23 10/13 18/13 19/22 20/19
 25/8 25/18 33/8 35/16 39/10 43/17 43/19
 43/23 44/5 75/14 75/20 76/4 77/4 77/5
bases [2]  62/24 75/18
basic [1]  16/13
basically [7]  10/18 10/19 48/5 57/18 69/8
 74/21 77/24
be [83]
Bear [1]  15/10
became [1]  8/18
because [72]  3/2 3/14 6/14 9/2 9/14 9/15
 11/8 11/12 11/21 11/25 14/2 15/18 20/19
 21/5 22/5 25/11 25/21 29/25 32/5 32/9
 33/17 35/19 36/5 36/6 36/9 36/16 38/9
 38/17 40/2 40/19 41/5 43/21 44/5 44/11
 45/5 45/16 46/17 46/18 48/2 48/13 52/2
 54/11 55/1 55/9 55/14 56/20 57/5 57/6
 60/3 60/5 60/16 63/1 65/16 65/19 66/4
 67/17 68/5 69/12 69/23 70/14 70/16 71/1
 72/1 72/3 72/7 74/12 74/16 75/10 76/11
 78/5 78/9 78/20
become [2]  3/7 38/12
becomes [1]  51/6
been [30]  14/18 22/16 25/22 27/17 32/11
 35/22 37/22 38/24 39/11 43/20 44/11
 44/12 46/21 46/23 53/19 53/24 54/22
 58/19 58/20 58/20 58/21 58/23 60/15
 60/18 66/19 66/25 67/4 67/8 71/20 73/22
before [22]  1/11 9/24 19/15 23/23 24/7
 24/9 28/1 30/8 30/10 31/6 38/4

44/4 53/18 53/23 54/23 60/6 60/8 66/25
 63/7 78/8 78/9
begin [1]  34/1
behalf [3]  2/7 2/13 18/9
behind [1]  35/8
being [11]  2/21 17/5 27/24 30/7 34/19
 38/6 38/21 42/23 47/24 59/6 59/7
Bejar [21]  24/23 25/10 26/1 26/5 35/5
 39/7 39/12 39/20 56/20 57/5 58/7 59/5
 60/9 60/14 61/10 63/13 69/13 69/15
 74/21 76/4 79/14
Bejar's [2]  60/9 75/12
belief [1]  36/21
believe [12]  5/8 6/22 8/8 9/1 20/8 21/4
 25/18 36/4 42/7 45/3 53/10 61/13
believed [1]  47/21
believes [1]  37/19
benefit [3]  26/4 56/20 58/10
best [9]  3/11 3/11 6/13 6/17 12/14 49/17
 52/13 69/3 80/5
better [2]  31/10 53/16
between [9]  3/23 4/4 4/13 21/18 29/13
 64/8 64/12 70/25 71/12
bit [6]  3/1 10/20 40/22 54/16 63/11 63/17
black [2]  57/11 57/15
block [2]  27/9 55/6
BOARD [3]  1/7 2/4 2/14
body [5]  13/1 24/25 33/19 36/9 77/3
Bonham [1]  59/1 59/3
bookend [2]  33/5 63/13
bookends [3]  30/24 32/16 63/12
both [15]  2/20 3/3 9/3 11/1 11/2 11/3
 11/7 15/22 38/1 47/11 48/24 48/24 50/8
 57/17 65/5
break [2]  41/11 41/16
breakdown [3]  29/21 33/4 66/8
bring [4]  24/3 29/23 35/19 45/19 74/6
 75/10
brings [2]  24/4 24/5
brought [10]  23/10 23/11 23/15 23/23
 24/7 28/19 47/23 54/22 54/25 74/15
bud [1]  53/18
building [1]  23/9
bunker [1]  29/5
burden [2]  29/17 33/2
but [85]

**C**

calendar [1]  18/20
call [5]  19/10 38/4 42/10 42/11 54/23
called [8]  14/10 20/15 21/21 22/15 30/10
 44/4 47/1 54/20
calling [1]  63/12
calls [1]  59/20
came [9]  12/9 24/7 25/4 35/7 35/11
 35/15 39/9 44/21 76/5
can [29]  4/10 8/18 8/22 10/17 10/21
 10/22 12/15 17/12 17/12 17/14 17/16 18/20
 22/15 31/23 33/13 37/1 41/11 41/24 44/2
 48/6 49/14 49/17 52/13 61/1 61/1 64/18
 68/12 71/12 71/13 77/13
can't [11]  29/4 42/10 45/9 49/2 49/10
 50/4 56/17 59/11 65/14 77/9 79/1
Cannon [4]  2/4 3/14 38/3 79/20
car [1]  24/7
Cardiovascular [2]  13/24 17/1
care [1]  67/21
career [1]  17/6 73/25
cart [1]  78/8
case [39]  1/2 2/4 11/6 11/9 29/16 29/19

**C**

case... [33]  29/23 29/24 30/2 30/21 33/8
  36/3 37/6 37/7 37/8 38/2 38/8 39/19
  39/20 48/9 51/10 51/11 61/19 62/7 64/2
  64/7 64/15 64/18 65/7 65/11 70/16 70/24
  75/8 75/25 76/10 77/10 77/24 78/24
  78/25
cases [16]  10/15 11/12 27/16 29/25
  33/15 38/20 39/19 62/2 62/2 62/9 62/11
  62/12 62/21 62/22 78/20 79/1
caught [1]  67/8
causal [1]  71/2
cause [1]  57/3
caused [3]  57/9 58/11 58/18
Cells [1]  12/12
center [6]  14/7 14/22 17/21 29/13 43/4
  43/8
certain [4]  3/18 7/15 34/25 43/3
certainly [10]  43/14 58/22 60/15 61/14
  61/16 61/17 62/21 65/6 66/9 67/11
certify [1]  80/4
chain [1]  71/6
chair [12]  24/11 31/18 31/19 49/7 49/8
  49/9 63/19 63/19 63/20 66/14 66/16
  66/16
challenged [1]  77/13
change [4]  23/7 23/8 69/4 70/4
charge [1]  56/23
chart [1]  57/1
checked [1]  35/10
Chicago [1]  62/12
choice [1]  29/18
chose [12]  23/21 48/13 50/15 52/1 52/2
  58/12 61/5 61/5 61/11 69/17 70/4 70/5
chrono [1]  12/3
chronology [1]  22/25
circuit [22]  11/5 29/23 29/24 30/2 37/9
  37/17 37/24 51/10 64/1 64/2 64/3 64/14
  64/15 64/16 64/16 64/16 64/18 64/19
  64/20 65/8 78/21 78/25
cite [14]  11/5 29/24 36/24 61/19 62/2
  62/3 62/9 62/11 62/12 64/6 64/15 65/9
  76/14 77/23
cited [5]  29/23 33/15 37/9 76/9 78/20
City [1]  62/12
civil [2]  2/4 30/1
claim [15]  2/22 11/3 11/10 11/19 24/22
  26/11 32/12 34/21 35/3 59/9 61/17 69/12
  69/12 71/2 71/13
claimed [1]  57/16
claiming [6]  5/15 22/24 28/15 33/16
  40/13 62/9
claims [6]  25/2 25/3 33/21 71/1 71/12
  71/14
clarification [1]  8/6
clarified [1]  4/16
clarify [3]  3/4 41/24 49/14
class [13]  14/17 14/19 14/19 14/20
  15/25 16/2 16/6 18/17 20/22 56/25 73/10
  73/12 74/11
classes [2]  45/15 73/15
classroom [5]  26/23 27/21 32/2 37/20
  37/23
clear [2]  20/9 36/15
clearest [2]  7/6 43/12
clearly [2]  42/22 62/4
clerkship [17]  28/11 45/17 45/25 46/3
  56/14 58/23 59/4 60/13 60/17 60/18 71/3
  72/10 73/12 73/21 74/11 74/17 75/23
clerkships [10]  21/11 21/12 21/13 45/1

45/22 45/23 46/2 55/5 73/17 74/11
client [1]  2/8
clinical [2]  16/12 16/12
close [1]  38/4
cold [5]  28/19 46/19 46/20 47/20 47/22
college [1]  75/19
combination [1]  10/9
come [10]  7/14 8/11 12/8 13/15 48/6
  48/7 64/9 64/12 73/5 78/12
comes [5]  4/9 17/23 21/4 52/10 75/7
coming [1]  66/12
commenced [1]  20/10
commences [1]  13/18
comment [1]  77/20
committee [11]  14/12 14/13 20/15 21/7
  23/13 23/22 24/11 24/12 30/11 42/17
  60/6
committee's [1]  24/17 35/16 35/17
committees [1]  33/18
community [2]  14/15 79/6
company [3]  63/1 63/2 72/13
comparable [1]  7/21
comparator [1]  34/23
comparators [2]  40/18 40/18
compare [4]  6/8 6/18 6/25 40/19
comparison [1]  40/23
compensatory [3]  35/3 70/8 70/10
competency [5]  12/24 12/24 45/16 46/3
  73/17
competent [5]  22/7 44/14 45/4 45/11
  73/17
competently [1]  79/8
complain [9]  28/16 32/5 32/18 50/18
  63/11 63/11 63/19 63/20 63/21
complained [5]  37/15 50/22 50/23 50/25
  79/16
complaining [1]  32/20
complaint [3]  35/9 72/19 74/20
complete [1]  10/2 28/14
completed [5]  42/15 44/8 44/22 44/23
  78/17
completely [1]  43/13
component [1]  35/24
comprehend [2]  52/6 52/9
comprised [1]  11/3
concede [1]  25/19
concentrate [3]  36/23 49/16 49/17
concept [1]  63/18
concerned [1]  42/3
concerns [1]  43/3
conclusion [2]  32/7 35/15
condition [1]  24/5
conditioner [1]  32/9
conditions [1]  18/16
conduct [3]  25/12 35/12 63/2
conducted [2]  52/18 77/25
conference [4]  27/1 27/2 27/19 46/17
confirmed [1]  47/8
conflicting [1]  53/12
confusion [4]  4/10 6/2
connecting [1]  39/17
connection [1]  71/11
consider [4]  58/9 61/21 61/25 78/22
consideration [2]  39/13 62/23
considered [9]  3/21 4/1 7/17 14/3 27/16
  36/3 61/19 62/5 76/5
consistent [2]  27/15 42/13
consulted [2]  14/6 58/21
contained [1]  4/8
context [1]  58/5

continue [4]  18/17 20/20 52/15 73/19
continued [1]  1/13 19/6 22/17 35/10
  34/9 34/13 38/17 40/5 40/9 58/24 79/10
continues [1]  64/21
contrast [1]  6/25
coordinating [1]  26/16
copy [2]  8/3 44/24
Coral [1]  1/19
correct [15]  5/16 6/21 8/14 8/22 9/16
  10/11 12/23 15/23 20/23 34/3 41/21
  51/14 54/13 55/11 66/23
corrected [1]  41/23
correctly [1]  44/15
corridor [1]  32/3
corroborate [4]  25/7 36/21 56/13 76/15
corroborating [1]  55/12
could [34]  4/16 18/4 22/18 22/20 23/10
  27/17 28/6 30/12 32/9 47/4 47/5 47/6
  47/21 52/3 53/17 53/24 54/22 58/14
  58/21 58/22 60/15 60/21 65/6 65/8 65/11
  65/18 67/2 67/2 68/5 68/18 68/21 70/17
  72/21 74/14
couldn't [3]  5/3 68/14 78/20
counsel [8]  2/5 7/12 9/3 9/11 34/22
  43/18 47/15 66/9
Count [10]  10/19 10/19 11/15 11/18 29/8
  32/24 33/7 35/2 54/8 54/14 54/15
  54/15
counter [1]  40/17
counts [5]  2/18 2/20 11/1 11/7 38/2
couple [2]  45/2 75/1
course [37]  3/22 4/2 4/22 9/19 10/17
  12/12 12/18 13/9 14/1 14/3 14/17 14/18
  14/25 15/2 15/4 15/5 15/5 15/7 15/9
  15/13 15/14 15/22 15/25 16/4 16/13
  16/16 17/2 18/12 18/13 19/3 20/20 33/10
  34/17 41/2 41/20 60/23 61/2
courses [9]  12/21 12/24 22/10 55/1 57/4
  60/19 60/20 78/19 79/13
court [21]  1/1 1/22 2/7 2/12 2/14 10/4
  16/24 17/4 22/25 28/8 31/25 33/5 36/16
  39/19 62/23 75/2 76/10 76/13 78/5 78/15
  80/9
court's [9]  9/4 20/24 29/24 35/19 35/25
  38/4 75/10 77/20 79/25
create [4]  4/22 14/14
credibility [5]  51/6 51/21 51/22 54/6
  67/11
criteria [1]  38/22
critical [1]  35/24
cross [2]  10/11 62/18
cross-disputes [1]  10/11
cross-examination [1]  62/18
crossed [1]  8/16
crowds [1]  47/12
CRR [2]  1/22 80/8
CSR [2]  1/22 80/8
cumulative [1]  44/24
curriculum [1]  18/9
CV [1]  1/2

**D**

damages [3]  35/3 70/8 70/10
date [1]  46/22
daughter [1]  13/5
daughter-in-law [1]  13/5
day [4]  23/9 26/16 26/16 67/3
DE [2]  76/15 77/21
DE-57 [1]  77/21
dealing [1]  31/20

**D**

dean [6]  18/8 22/19 24/8 24/16 30/9
30/11
dean's [2]  20/19 35/17
December [2]  18/6 19/21
decide [7]  51/8 54/5 59/10 59/24 66/10
72/8 77/1
decided [3]  24/12 67/20 72/3
decides [1]  52/7
deciding [1]  63/4
decision [18]  25/4 25/12 26/1 33/25
35/17 35/17 57/25 58/13 60/3 60/14
69/13 70/4 70/13 72/4 74/9 75/6 75/12
79/14
decisions [3]  31/5 35/22 39/16
dedicated [1]  26/19
defendant [6]  1/8 1/17 2/22 8/9 9/18
74/14
defendant's [14]  2/17 3/23 4/8 4/14 4/20
5/9 5/11 5/14 7/12 7/20 9/5 9/9 10/5
10/14
defense [1]  66/9
deference [6]  33/18 34/7 39/16 39/18
40/25 69/23
define [1]  76/17
defines [1]  76/17
definitely [1]  54/6
definition [8]  36/7 36/8 36/17 40/6 43/11
43/12 43/13 77/5
degree [1]  17/12
deleted [2]  5/13 9/11
deliberate [7]  35/3 35/6 58/9 61/14 70/3
70/7 76/5
demonstrated [1]  38/7
denied [1]  70/1
department [1]  56/23
deposition [9]  29/1 46/14 46/15 50/17
51/25 53/9 54/3 54/17 67/10
depth [1]  76/3
describe [1]  27/14
designated [1]  27/1
designation [1]  17/17
designed [1]  31/14
designee [2]  24/19 24/23
desk [1]  60/9
Desmarais [2]  14/8 14/21
despite [2]  69/19 77/24
detail [1]  52/25
detective [1]  56/10
determination [8]  20/17 35/13 42/18
42/22 52/3 52/18 75/3 75/18
determinative [1]  77/13
determine [3]  8/24 56/23 77/3
determined [2]  17/18 26/9
did [60]  5/25 6/15 6/16 7/18 11/8 11/21
12/6 12/8 14/25 24/20 25/6 25/14 26/5
27/3 27/11 27/23 28/3 28/6 28/16 29/3
35/5 35/15 35/22 36/13 36/14 36/19 41/1
41/2 41/2 41/3 43/1 44/21 45/20 45/21
49/1 50/22 53/3 53/22 55/21 56/11 57/3
57/25 58/7 58/8 59/14 60/10 60/11 61/25
67/17 68/9 68/9 68/25 69/2 69/3 74/12
76/4 76/4 76/10 76/18 76/18
didn't [43]  3/7 3/18 7/16 9/24 10/8 23/9
25/7 27/5 27/6 28/1 28/14 32/5 33/3
37/11 38/20 41/15 44/3 48/18 50/3 50/6
50/13 50/14 50/19 51/16 52/2 52/13
52/2 53/16 54/11 55/20 57/5 58/25 63/21
65/15 65/16 65/18 65/19 68/10 69/7
70/14 72/3 74/15 77/17

different [10]  16/21 27/25 33/18 37/3
38/5 62/2 71/4 71/7 75/5 76/15
digital [2]  1/10 80/5
direct [1]  9/4
disabilities [1]  31/21
disability [16]  14/22 17/21 17/23 29/13
31/16 33/21 36/6 36/6 40/14 40/16 40/20
41/6 43/6 43/8 69/15 73/3
disabled [3]  12/7 36/12 61/12 64/8 64/10
disagree [1]  3/19
disagreed [4]  5/22 6/17 7/16 8/17
disavowed [1]  54/3
disciplinary [1]  74/6
disciplines [1]  76/3
discount [2]  76/1 79/2
discrepancy [1]  57/24
discretion [7]  33/22 34/6 60/25 61/3 61/4
69/25 72/7
discriminate [1]  61/25
discriminated [4]  59/7 60/16 73/24 74/5
discrimination [9]  25/1 56/6 58/5 62/4
62/5 72/13 72/16 72/17 72/19
discriminatory [2]  71/14 72/14
discuss [1]  23/6
Disease [1]  13/1
dismiss [5]  38/3 38/7 58/13 69/17 72/8
dismissal [25]  2/19 17/13 18/4 34/14
35/1 35/18 35/22 60/1 61/6 61/11 69/12
69/13 70/6 70/13 71/4 71/10 71/14 71/18
71/22 72/21 74/19 74/22 75/6 75/16
79/15
dismissed [13]  17/15 17/16 31/5 34/19
39/4 39/14 41/9 59/25 63/14 70/1 70/17
73/25 74/10
disparate [3]  11/3 33/8 34/20
dispute [4]  5/10 7/20 8/9 10/6
disputed [22]  2/25 4/7 4/15 4/24 5/1 5/15
5/18 5/24 5/25 6/1 6/11 6/20 7/2 7/11
8/12 8/24 9/15 9/15 9/19 10/3 10/8 42/6
disputes [1]  10/11
disputing [1]  7/21
disrupted [4]  11/22 25/8 27/24 28/15
disruption [2]  29/11 29/14
disruptive [3]  31/23 32/11 32/12
distinction [1]  36/15
distinguishable [1]  62/11
distinguishing [1]  11/12
distracted [8]  37/2 47/10 51/7 51/8 51/23
51/24 52/16 52/19
distracting [4]  48/15 50/4 65/25 66/6
distraction [39]  11/23 22/3 25/25 26/12
26/13 26/21 26/22 26/22 27/13 29/9
29/14 36/1 37/3 37/4 37/4 37/13 37/18
37/19 43/10 46/22 47/2 47/21 47/23 48/2
50/10 50/11 51/16 52/20 52/21 52/22
53/6 53/11 55/14 56/12 57/8 57/20 58/11
67/16 77/4
distractions [19]  37/20 37/22 43/14
43/15 46/9 46/10 47/9 47/12 47/16 48/11
48/16 48/22 49/2 51/25 53/7 53/15 67/7
68/4 68/5
distractive [4]  31/14 54/12 77/7 78/6
DISTRICT [4]  1/1 1/1 62/3 76/10
Diversity [1]  24/25
divorced [1]  71/7
do [41]  4/5 5/7 7/4 7/5 7/6 9/1 10/16
13/20 16/11 19/5 30/12 30/19 31/8 33/22
38/13 40/15 40/19 41/10 44/2 44/20
45/10 48/13 48/17 48/18 50/12 50/13
50/17 50/20 52/13 57/5 61/3 61/5 65/20

66/1 66/14 67/20 68/25 70/13 72/10 73/5
74/8
docket [13]  6/6 6/6 6/9 6/9 6/24 8/7 8/10
8/10 8/22 9/8 9/20 9/24 10/4 10/23
doctor [7]  13/5 13/5 13/6 38/13 45/11
72/3 79/8
doctors [2]  14/14 39/21
document [1]  23/25
documentation [1]  37/12
documented [1]  36/5
documents [1]  28/8
Doe [2]  62/12
does [16]  15/11 16/6 18/23 24/3 30/3
36/16 37/24 52/16 56/21 59/16 62/19
70/9 73/10 73/12 78/4 78/11
doesn't [22]  21/7 22/16 31/18 31/23
32/18 34/15 37/24 45/9 45/10 46/11 49/8
52/5 52/15 56/18 57/5 62/10 63/19 64/22
66/14 75/12 77/12 79/12
doing [6]  16/12 39/23 40/23 44/14 49/16
56/8
don't [21]  8/4 16/18 31/9 31/15 33/12
34/22 41/15 45/11 50/20 51/9 52/8 52/10
59/11 61/3 63/7 63/11 63/20 64/23 77/15
78/22 78/24
done [5]  23/13 32/19 58/14 58/22 74/14
door [2]  27/21 32/2
dots [1]  39/17
double [1]  15/2
Douglas [1]  1/18
down [8]  6/10 7/15 8/17 10/12 32/17
51/4 63/22 66/2
downplays [1]  47/15
Dr. [28]  14/8 14/21 24/23 25/10 26/1
26/5 35/5 39/7 39/12 39/20 39/20 56/20 57/5
58/7 59/1 59/3 59/5 60/9 60/9 60/14
61/10 63/13 69/13 69/15 73/20 74/21
75/12 76/4 79/14
Dr. Bejar [19]  25/10 26/1 26/5 39/7
39/12 39/20 56/20 57/5 58/7 59/5 60/9
60/14 61/10 63/13 69/15 74/21
76/4 79/14
Dr. Bejar's [2]  60/9 75/12
Dr. Bonham [1]  59/1 59/3
Dr. Desmarais [2]  14/21
Dr. Elizabeth [2]  24/23 35/5
Dr. Obeso [1]  73/20
draft [7]  3/17 3/18 4/5 6/16 7/10 7/25 9/7
draw [1]  10/22
DRC [2]  43/7 65/23
drug [1]  24/8
due [4]  18/15 23/25 24/13 26/7
during [18]  11/19 11/21 16/23 16/24
18/12 23/15 27/23 30/7 30/13 47/9 47/13
48/2 48/7 50/6 51/2 51/5 54/3 62/18
duty [2]  72/14 72/16

**E**

each [7]  29/15 31/25 47/14 52/25 71/8
71/12 73/15
early [1]  16/17
earplugs [8]  28/25 29/3 52/14 67/19 68/1
68/2 68/3 68/21
ECF [2]  25/19 36/24
ECF-65 [1]  25/19
ECF-71 [1]  36/24
education [3]  18/8 27/11 27/12
EEOC [1]  30/2
effectively [1]  36/23
effort [2]  3/12 29/21

**E**

either [5] 4/6 10/22 34/16 53/17 60/5
element [1] 71/19
elevator [2] 32/3 46/18
eleventh [11] 37/9 37/24 51/10 64/1 64/2
 64/3 64/14 64/16 64/18 78/21 79/17
ELIE [3] 1/3 2/3 2/7
Elizabeth [2] 32/23 35/5
else [3] 39/13 72/10 75/9
email [1] 59/1
employee [1] 74/4
employees [1] 31/17
employer [3] 62/5 62/15 64/9
employers [1] 31/18
employment [2] 38/19 74/4
end [12] 14/25 15/6 16/10 30/3 30/21
 30/24 31/1 33/5 39/7 44/8 63/12 63/22
ended [3] 22/12 25/4 34/19
ends [1] 24/16
engage [1] 32/13
engaged [1] 25/2
enough [3] 57/12 66/10 73/16
enrolled [1] 38/17
entire [15] 14/17 16/7 18/18 20/18 44/10
 44/17 44/22 44/25 45/13 60/19 61/2 61/8
 73/7 73/25 76/6
entirety [1] 76/6
entitled [3] 24/18 29/17 80/6
entry [13] 6/6 6/9 6/9 6/24 8/7 8/10 8/11
 8/23 9/8 9/20 9/24 10/4 10/23
equate [1] 45/11
Equity [1] 24/24
erase [1] 22/16
especially [1] 52/10
ESQ [2] 1/13 1/17
essence [1] 70/23
essential [3] 38/21 71/19 76/19
essentially [2] 17/8 25/14
establish [1] 33/2
established [1] 64/22
etc [2] 42/20 62/18
evaluated [1] 14/7
evaluating [1] 36/10
evaluation [1] 14/10
Evaluations [1] 14/12
even [44] 3/7 5/24 21/8 21/20 25/21
 26/11 28/14 31/12 32/4 33/12 39/9 46/10
 47/9 47/18 48/16 49/12 53/18 58/25 59/4
 61/6 61/10 62/7 62/21 64/21 65/7 65/15
 66/6 67/1 67/4 68/3 68/20 68/20 69/18
 69/19 70/5 70/15 70/17 71/13 73/7 74/8
 74/20 78/3 78/9 78/17
event [6] 27/3 54/20 59/22 74/12 74/18
 75/22
events [17] 27/3 42/2 46/23 46/25 71/2
 71/6 75/2
eventually [4] 16/7 32/3 39/4 50/22
ever [1] 53/18
every [11] 11/9 12/13 13/13 44/2 46/8
 47/13 47/16 52/6 63/15 73/10 73/11
everything [9] 6/7 6/16 8/7 8/22 39/13
 44/14 44/15 72/7 75/9
evidence [22] 4/17 24/1 25/7 30/14
 34/23 36/21 43/24 55/13 56/13 61/6
 61/10 61/13 62/24 63/4 67/23 67/24
 69/19 69/19 70/2 70/5 72/7 76/14
evidentiary [2] 61/24 62/16
Ewing [1] 39/19
exam [64] 11/19 11/22 11/24 12/1 15/4
 15/11 22/1 22/2 22/11 22/23 23/10 24/6

24/8 24/21 25/8 26/14 26/17 27/10 27/18
27/23 28/12 28/13 36/6 36/24 37/14 40/5
43/17 43/23 44/1 44/1 44/2 44/6 46/1
46/5 47/9 47/13 47/25 48/2 48/8 50/6
51/3 51/5 52/12 52/12 52/15 53/18 53/23
54/9 54/19 55/7 55/13 57/8 57/10 58/18
60/13 60/23 63/12 66/1 67/1 67/14 69/4
71/9 74/17 75/13
examination [2] 56/15 62/18
examinations [1] 33/11
example [7] 5/13 6/8 6/23 49/7 65/24
 66/2 72/11
examples [1] 32/9
exams [21] 12/1 21/21 22/12 22/20
 23/11 27/7 33/12 34/12 34/17 39/23 40/3
 40/4 43/2 43/9 43/9 45/20 45/21 54/24
 54/25 73/13 74/13
except [3] 6/10 37/18 45/24
exception [1] 37/6
excessive [2] 24/14 26/9
excessiveness [1] 24/2
excuse [1] 23/8
exhibited [1] 34/13
existence [1] 61/8
expected [2] 50/2 52/3
experience [1] 10/15
experienced [2] 47/11 56/9
explain [2] 3/4 3/9
explanation [1] 77/5
explanations [1] 10/13
explicitly [1] 36/19
exposed [1] 53/15
express [1] 68/25
extent [3] 6/19 48/25 51/6
extra [3] 12/7 29/6 43/10

**F**

face [2] 57/6 61/11
faced [1] 28/5
facie [2] 38/8 75/8
fact [41] 4/5 5/13 5/14 7/13 22/16 24/3
 28/15 28/24 33/14 35/14 36/4 38/5 38/6
 38/24 39/25 40/3 43/1 45/21 52/7 52/16
 53/13 54/5 54/24 55/12 58/8 59/1 59/8
 60/19 62/6 62/11 63/5 66/7 72/6 73/10
 73/19 74/14 74/15 75/4 75/5 75/5 75/23
factor [2] 11/12 56/13
facts [46] 2/23 2/25 2/25 3/22 3/24 4/1
 4/6 4/9 4/24 5/9 5/10 5/12 6/1 6/3 6/4
 6/6 6/15 6/18 6/20 7/8 7/11 7/14 8/8
 8/11 8/24 9/5 9/10 9/15 9/18 10/3 10/5
 10/8 42/5 42/6 46/11 48/19 48/20 48/21
 54/18 54/18 65/9 68/11 68/11 70/14
 70/15 76/5
fail [4] 12/15 14/25 57/3 57/9
failed [38] 12/12 12/19 13/9 13/10 13/24
 13/25 15/3 15/4 15/8 15/9 17/1 17/2
 18/13 19/16 21/13 21/24 22/2 22/11
 22/23 23/4 23/16 26/14 29/10 33/2 33/12
 34/16 43/17 43/24 45/19 54/8 55/12
 55/13 58/17 60/12 61/1 66/4 71/9 73/14
failing [4] 43/19 62/1 78/24 79/7
fails [9] 18/12 18/12 19/21 44/2 46/1
 46/4 59/17 59/17 60/22
failure [42] 2/19 11/2 11/18 14/3 14/3
 14/4 15/2 22/24 23/25 24/13 29/8 31/6
 36/20 44/5 54/19 55/14 56/24 56/24 57/3
 57/7 57/20 58/10 58/15 59/9 59/14 60/4
 60/8 61/9 61/17 63/5 69/9 69/11 70/2
 71/1 71/3 71/7 71/9 71/11 74/1 74/17

75/22 77/25
failures [10] 16/25 17/19 21/13 21/20
 23/13 34/12 40/4 42/25 79/3 79/10
fair [1] 40/24
fairly [1] 42/5
fairness [1] 28/3
family [4] 21/16 21/25 22/11 24/8
far [5] 36/13 42/3 66/23 68/13 77/12
fashioned [1] 13/20
father's [1] 24/5
fault [4] 70/13 72/2 72/22 72/22
feel [1] 41/21
felt [1] 44/12
few [1] 42/24
figure [3] 4/23 5/3 6/10
figuring [1] 3/1
file [1] 8/4
filed [2] 18/7 18/8
filing [1] 74/19
final [15] 15/11 25/4 26/1 43/9 45/20
 54/24 57/25 58/1 58/18 60/14 69/18
 73/13 74/13 74/17 75/12
find [7] 36/19 49/2 59/13 62/14 66/1
 70/13 78/20
finding [18] 35/21 36/19 36/25 50/19
 55/19 56/8 56/11 56/16 56/16 56/17
 56/21 58/8 60/12 61/7 62/5 62/14 72/2
 76/4
findings [9] 56/21 57/22 58/10 61/20
 63/3 69/16 69/17 69/19 74/22
finds [2] 59/12 72/15
fine [1] 55/24
finish [2] 32/15 79/5
finished [2] 28/13 73/8
finishes [1] 32/18
fire [2] 23/9 24/4
first [32] 12/12 12/15 12/16 12/21 13/8
 14/10 17/3 17/19 18/20 19/1 19/2 19/11
 21/25 24/19 33/10 35/9 38/14 42/6 42/15
 43/1 45/7 46/1 46/1 46/5 49/18 51/9
 53/19 57/17 60/5 60/20 65/4 67/12
first-year [1] 18/20
fit [1] 63/19
fitness [1] 79/7
FIU [49] 2/19 11/11 11/20 12/11 14/6
 14/21 17/7 18/15 18/16 24/25 25/4 26/15
 28/25 29/5 29/9 29/19 30/6 30/9 31/21
 31/22 32/6 32/24 34/20 36/2 37/18 38/17
 43/5 43/8 46/11 49/21 52/16 52/17 52/20
 56/18 58/17 59/6 59/11 60/12 61/18
 61/25 63/9 63/22 72/22 76/2 76/16 77/1
 77/4 78/5 79/6
FIU's [8] 11/19 14/2 25/14 37/21 38/22
 38/25 77/4 77/5
five [2] 21/13 40/4
fix [1] 53/17
FL [2] 1/15 1/19
fledged [2] 18/2 18/3
floor [1] 28/10
FLORIDA [5] 1/1 1/4 1/6 2/3 2/13
flunks [1] 15/22
focus [3] 25/23 33/13 69/3
follow [1] 66/16
follow-through [1] 66/16
following [3] 2/2 21/1 46/15
follows [1] 30/5
foot [1] 11/22 27/24 31/24
footnote [4] 11/8 25/17 25/19 77/21
footnotes [1] 25/19
Forbes [1] 11/6 37/6 37/8

## E

foregoing [1]  80/4
Forest [1]  78/25
forever [1]  45/8
form [1]  3/15
forth [6]  31/10 42/5 51/25 54/17 64/8
 66/13
forward [2]  35/9 44/13
forwarded [1]  24/23
found [3]  59/7 62/21 63/10
four [6]  21/13 37/14 73/22 74/1 74/7
 78/16
Fourth [1]  78/25
frame [1]  18/19
free [4]  26/22 37/3 43/13 43/14
freezing [5]  46/19 46/20 47/20 47/22
 67/18
front [12]  27/21 34/18 42/7 42/9 42/24
 42/25 44/7 44/9 54/20 54/25 59/22 71/4
frosted [2]  28/4 28/5
frustration [1]  68/25
full [2]  18/2 18/3
full-fledged [2]  18/2 18/3
fully [2]  50/23 73/9
functions [3]  12/25 38/21 76/19
fund [1]  20/20
funny [1]  64/15
further [3]  48/15 60/10 70/18

## G

Gables [1]  1/19
gaps [1]  47/4
gave [6]  6/16 7/24 25/15 57/1 62/7 73/23
Gavilan [7]  27/11 53/2 53/4 53/13 54/2
 54/6 67/4
general [3]  37/20 37/23
generally [2]  4/13 14/13
Genes [1]  12/12
genesis [1]  71/16
gentleman [1]  75/24
get [23]  12/7 12/15 18/20 18/23 26/20
 32/3 32/14 41/11 42/21 45/9 45/18 45/25
 50/4 56/17 59/16 59/18 63/19 64/22 65/2
 70/6 73/16 78/9 79/5
get-go [1]  12/7
gets [11]  17/21 19/12 19/13 19/15 20/14
 20/21 32/17 46/3 56/21 71/4 73/11
getting [4]  15/19 49/20 55/23 67/17
give [9]  29/6 31/9 31/13 41/20 49/7
 57/20 74/23 76/13 78/24
given [21]  13/12 15/7 23/6 33/18 34/7
 34/11 37/13 39/5 39/15 40/25 46/4 46/23
 49/21 52/4 67/3 69/21 69/23 72/20 77/5
 78/23 79/2
gives [1]  37/17
giving [2]  49/22 67/19
glaring [2]  67/11 78/11
glass [2]  28/4 28/5
gmail.com [1]  1/23 80/9
go [25]  4/19 6/12 11/16 12/7 12/10 19/5
 21/14 22/25 23/1 33/13 36/13 40/2 41/1
 41/5 44/13 48/6 49/10 59/9 59/11 61/22
 61/24 66/10 70/10 73/6 77/12
goes [16]  19/23 32/17 50/8 52/25 54/6
 55/15 56/21 58/4 58/5 58/8 60/24 65/5
 70/8 70/23 73/9 77/10
going [32]  14/9 15/16 16/11 18/20 21/5
 23/1 26/13 31/13 36/10 41/9 43/21 44/13
 46/25 47/17 48/3 48/3 48/4 48/7 48/13
 49/2 53/7 53/14 53/25 54/1 59/3 65/20

67/3 67/6 67/15 68/6 68/12 74/10
Goldberg [1]  1/15
gone [2]  32/10 44/3
good [11]  2/6 2/10 2/12 12/4 17/6 17/7
 44/23 45/15 45/19 73/15 74/12
gospel [2]  8/23 9/2
got [20]  7/10 12/14 22/5 37/15 39/4
 41/22 45/1 45/2 45/15 45/23 52/14 53/18
 54/16 55/5 59/22 60/9 65/8 66/5 67/14
 68/2
gotten [1]  78/14
GPA [2]  44/24 78/22
GPAs [1]  78/22
grabbed [1]  10/10
grades [15]  25/13 25/21 26/2 35/12
 37/16 41/5 41/5 44/23 45/1 45/2 45/15
 45/22 55/5 73/16 78/24
graduate [1]  79/6
graduating [1]  14/18
granted [2]  33/17 42/25
grants [1]  18/16
great [1]  52/25
greatest [1]  43/11
Grocery [1]  29/16
grounds [1]  10/18
groups [2]  47/12 47/17
guess [9]  3/1 3/3 3/20 38/11 46/4 50/9
 51/4 52/14 71/2
guidance [4]  37/2 37/5 37/6 37/17
guide [1]  38/20
guidelines [3]  36/1 76/12 78/7
gunshots [1]  65/18
GYN [2]  22/5 40/5

## H

had [83]
hail [1]  79/15
hallway [6]  27/20 27/22 28/6 47/1 47/1
 47/5 47/7 48/5 68/6
Halpern [1]  78/25
Handbook [13]  14/2 17/5 17/13 20/24
 21/17 21/18 21/23 22/14 38/22 40/10
 45/4 61/4 79/11
handled [1]  30/20
hanging [2]  63/23 69/9
HANNAH [9]  1/13 1/14 2/7 3/4 10/17
 10/21 41/10 76/20 77/8
happened [11]  13/16 16/17 22/21 23/7
 31/4 41/22 55/9 58/24 63/21 65/16 71/6
happens [6]  15/24 18/6 21/9 24/16 27/11
 31/17
Happy [1]  29/16
harassment [2]  25/1 62/14
hard [4]  3/1 3/2 52/6 52/9
harmless [2]  25/15 35/13
has [29]  4/5 6/18 16/1 18/17 20/18 22/16
 27/11 30/10 33/2 35/20 36/5 43/13 43/18
 46/9 46/18 48/9 50/11 52/24 56/20 60/23
 66/15 66/19 68/15 71/19 72/7 72/14
 72/16 73/2 74/2
hasn't [2]  13/15 16/17
hat [3]  35/20 63/23 69/9
have [109]
having [5]  38/24 44/13 46/20
he [382]
he's [2]  52/14 64/10
head [1]  65/23
headphones [1]  52/14
health [1]  43/3
hear [14]  4/17 47/6 68/21 77/11 77/17

heard [5]  32/5 39/12 39/23 70/8 76/22
hearing [16]  7/16 7/24 17/4 18/1 17/4
 19/1 20/15 22/19 23/18 23/23 26/8 30/8
 30/8 39/22 44/16 58/18
hearings [1]  16/25 35/1
heater [5]  28/18 28/19 47/22 47/24
 67/17
held [6]  2/2 16/1 25/14 34/6 62/16 62/22
helpful [1]  37/8
helps [3]  8/4 8/19 32/14
her [29]  5/24 6/15 6/16 6/18 25/11 25/12
 26/1 26/5 26/6 35/7 37/15 46/14 46/14
 47/18 49/1 50/4 50/17 53/9 54/3 56/23
 57/6 57/18 57/24 57/25 67/10 69/18
 69/25 70/12 72/6
here [28]  2/8 2/17 11/12 18/20 21/3
 21/24 22/21 25/17 29/19 30/6 31/4 31/7
 31/22 33/9 34/10 51/21 55/25 58/6 58/17
 63/21 64/9 65/7 65/12 65/21 72/18 74/3
 74/10 79/4
Here's [1]  66/15
hereby [1]  80/4
Herman's [1]  29/16
herring [1]  75/9
herself [1]  41/23
hey [1]  49/7
Hiatus [1]  1/14
high [1]  36/23
high-stakes [1]  36/23
highlights [1]  10/17
him [78]  14/16 17/14 18/16 24/9 25/15
 25/15 26/18 26/19 27/12 27/18 27/18
 28/20 29/5 29/6 29/20 29/20 29/21 31/5
 33/3 35/13 36/3 38/16 38/24 40/18 44/11
 44/16 44/20 45/6 45/8 49/18 49/21 52/4
 53/8 53/10 53/24 54/9 54/11 54/20 55/14
 57/3 57/7 57/9 57/20 58/11 58/13 58/25
 59/6 59/14 59/20 59/22 60/12 60/17 62/1
 65/24 67/12 67/19 67/20 69/18 70/1 70/6
 71/4 71/10 72/8 72/9 72/10 73/4 73/5
 73/16 73/23 73/23 74/10 74/16 74/19
 76/2 76/22 77/16 77/17 78/13
himself [1]  29/2
his [124]
history [1]  72/1
hit [1]  10/17
hold [2]  12/16 35/12
holistic [3]  40/11 72/25 75/20
honest [2]  2/25 46/14
honestly [4]  60/2 61/23 71/1 71/12
Honor [36]  2/10 3/8 4/11 5/6 5/7 6/14
 8/20 9/1 10/2 10/25 12/2 16/14 17/25
 20/8 20/12 21/10 23/2 32/8 34/8 38/14
 40/21 41/13 41/16 41/19 42/4 42/13
 42/16 50/20 59/8 63/4 63/25 71/1 72/12
 75/1 79/21 79/23
HONORABLE [1]  1/11
hook [1]  65/17
hopefully [1]  58/24
hoping [1]  52/15
Horowitz [1]  39/19
horrible [2]  49/11 50/16
horse [2]  75/7 78/8
hour [1]  79/17
hours [4]  26/17 26/19 27/9 27/10
how [19]  3/4 4/3 4/12 4/18 4/23 6/11 7/4
 28/19 30/20 30/20 40/19 41/1 41/1 41/2
 59/11 60/23 63/14 76/17 76/17
however [1]  32/20
Human [1]  13/1

**H**

hung [1] 35/20
HWCOM [1] 75/17

**I**

I'll [2] 3/11 3/11
I'm [30] 4/3 4/17 4/21 4/22 4/22 7/21 9/2
 10/7 10/8 11/24 12/7 14/23 14/23 19/4
 19/25 20/12 20/13 29/25 30/17 40/14
 42/12 45/12 55/16 55/23 56/1 63/17
 65/17 71/18 76/20 77/18
I've [1] 65/8
IDEA [43] 25/10 25/12 25/14 26/2 26/3
 26/4 35/7 35/12 35/20 35/25 36/2 36/9
 36/19 37/23 43/25 52/23 52/24 55/17
 55/18 56/1 56/5 56/22 57/11 58/7 58/10
 60/8 60/10 61/7 61/7 61/18 61/20 63/9
 69/17 69/21 70/5 75/7 75/14 76/8 76/8
 76/17 76/17 77/3 77/16
IDEA's [5] 28/24 35/20 35/24 36/15
 36/17
if [62] 3/9 5/7 6/2 8/4 8/18 8/21 8/21 8/24
 9/1 12/3 13/20 21/8 21/17 21/19 21/19
 21/20 22/14 23/1 25/17 26/1 31/12
 31/14 31/18 32/4 32/11 33/24 35/13 38/6
 39/12 41/8 41/20 41/22 41/24 43/24 45/9
 45/22 48/14 49/14 49/18 49/22 50/9
 51/19 51/23 54/4 57/25 60/22 63/18
 64/22 64/23 65/24 66/16 66/16 66/19
 72/15 72/25 73/1 73/14 73/19 73/21
 76/13 77/10 78/3
ignore [5] 58/13 59/13 61/11 70/6 74/21
ignored [1] 59/5
ignores [1] 74/21
ignoring [1] 47/18
II [4] 10/19 33/7 35/2 38/3
immediately [3] 18/14 24/22 28/18
impact [9] 56/25 57/2 57/9 57/13 57/21
 58/3 58/12 69/20 75/16
impacted [2] 36/22 56/14
implementation [3] 30/5 31/12 33/4
important [2] 16/24 42/2
importantly [1] 28/24
impression [1] 48/25
improvement [3] 40/1 40/4 76/2
improving [2] 20/16 20/17
in [319]
incident [3] 18/7 19/18 44/23
incidents [2] 45/14 45/14
included [5] 5/23 6/15 7/13 26/11 28/24
including [4] 47/12 53/1 53/1 62/3
Inclusion [1] 24/24
incoming [2] 14/17 16/6
increase [1] 67/6
Indeed [1] 37/11
independent [2] 26/2 75/14
indicate [5] 11/21 57/13 57/19 58/2
 62/19
indicated [4] 5/8 38/4 55/12 58/2
indicates [3] 17/11 45/3 57/1
indicating [1] 23/25
indication [1] 75/15
indifference [1] 35/4 35/6 58/9 61/14
 70/4 70/7 76/5
indisputably [1] 30/9
individual [10] 11/10 29/12 36/4 36/16
 38/9 76/17 77/16 78/10 78/16 79/12
individuals [7] 14/13 29/3 31/20 37/14
 39/20 41/7 78/13
Infectious [1] 13/1

informal [1] 64/7
information [2] 15/10 26/7
initial [4] 14/3 26/14 39/21 60/3
initially [2] 9/10 22/23
input [1] 79/19
inquiry [1] 78/1
instance [3] 15/12 23/24 66/21
instead [3] 19/11 72/20 73/24
instigated [1] 60/7
institutions [1] 30/3
instructions [1] 49/22
insufficiency [1] 2/22
Integrated [1] 12/25
interactive [26] 29/22 30/3 30/18 30/19
 30/22 30/25 31/2 31/8 31/9 31/17 32/13
 33/4 50/8 51/11 63/15 63/18 63/24 64/2
 64/3 64/6 64/11 64/17 64/20 65/5 66/8
 66/11
interesting [1] 37/10 46/11 56/18
interestingly [1] 57/12
internal [7] 36/1 62/14 63/2 72/18 74/20
 76/12 78/7
internally [3] 36/2 37/19 78/1
INTERNATIONAL [1] 1/6 2/3 2/13
interrupt [1] 41/15
into [16] 16/11 27/4 28/19 39/13 40/2
 42/8 42/14 47/5 47/23 52/25 53/18 55/15
 62/23 72/3 72/7 75/11
introduction [1] 10/20
investigate [1] 72/15
investigated [2] 35/10 50/23
investigates [2] 25/1 56/6
investigation [9] 25/2 25/6 28/25 39/10
 52/18 56/9 60/10 60/11 78/1
investigations [1] 63/3
investigative [2] 35/11 62/4
investigator [7] 53/5 54/2 54/4 67/5 67/7
 67/9 67/11
investigators [3] 53/9 53/10 56/9
involuntarily [2] 23/19 23/20
involved [7] 47/23 74/2
is [479]
issue [38] 3/7 3/9 11/17 17/23 24/10
 28/17 45/18 46/5 50/2 51/6 51/8 51/12
 51/18 51/19 51/21 53/13 54/5 54/7 54/16
 55/15 57/7 58/4 58/9 59/15 60/4 60/6
 61/14 62/8 63/5 64/2 65/12 66/7 66/10
 67/12 67/12 72/14 72/15 72/24
issues [18] 14/6 23/22 41/17 42/18 43/2
 43/3 43/5 43/6 43/21 56/6 59/8 63/5
 72/13 73/4 74/6 75/4 75/4 75/5
it [259]
it's [8] 8/3 76/24 77/12
its [10] 30/2 36/1 36/18 46/11 46/17 61/7
 75/2 75/3 77/25 78/7
itself [5] 28/3 37/18 52/17 58/17 59/11
IX [1] 25/2

**J**

J.A.M [1] 11/6
January [3] 18/11 19/22 20/1
jemancari [2] 1/23 80/9
Joanne [1] 1/22 80/8 80/8
joint [26] 2/24 3/12 3/15 4/5 4/7 4/13 5/2
 5/6 5/12 5/18 5/19 5/23 5/24 6/4 6/6
 6/16 6/19 6/24 7/7 7/11 7/15 7/18 7/22
 8/16 8/19 9/12
judge [7] 1/11 3/14 38/3 48/22 62/13
 62/16 79/20
judgment [12] 2/18 2/20 10/19 11/1

judicial [3] 61/23 62/15 62/17
July [5] 1/5 17/3 17/10 19/3 42/7
jump [1] 41/11
jury [10] 51/7 51/8 54/5 59/10 61/22
 61/24 66/10 66/10 70/10 77/11
just [28] 2/8 3/6 4/3 4/22 5/5 8/21 10/10
 10/17 17/8 17/20 18/2 18/19 20/9 20/24
 22/19 22/25 25/17 27/18 41/11 42/17
 49/14 62/15 65/5 65/14 68/4 72/3 72/20
 77/9
justify [2] 74/5 74/7

**K**

keep [5] 48/12 49/2 49/8 49/12 72/9
kicked [1] 45/10
kicks [1] 39/8
kind [6] 6/9 6/25 10/20 13/6 28/16
 37/17 38/23 40/14 40/15 40/16 40/22
 41/23 50/16 63/17 65/17 67/21
kinds [1] 58/15
knew [2] 53/14 65/15
know [15] 2/8 8/4 15/3 16/20 23/9 28/10
 29/16 34/22 35/20 42/4 49/23 53/16
 60/16 63/7 69/3
knowing [2] 61/12 61/12
knowledge [4] 20/20 20/24 21/7 76/3
known [2] 53/25 67/4
knows [3] 31/21 50/9 65/25

**L**

Lachica [8] 46/13 46/14 48/8 53/1 65/21
 65/22 66/3 67/16
lack [6] 10/6 11/20 24/4 25/20 25/24
 29/16
lacked [2] 20/20 30/6
lacking [1] 49/24
language [3] 36/4 40/10 64/4
large [2] 46/17 47/3
last [3] 8/22 18/14 35/2
lasts [1] 32/1
late [1] 63/10
later [6] 9/19 12/8 12/9 16/7 32/20 50/25
latter [1] 70/3
law [13] 13/5 37/6 37/24 38/19 50/21
 51/10 51/11 52/5 59/13 61/19 64/2 65/7
 72/13
lead [1] 18/4
leads [3] 74/18 74/19 74/19
learn [1] 69/2
least [4] 33/15 41/24 59/8 66/7
leave [16] 18/15 19/14 19/15 19/25 20/1
 20/3 20/14 43/18 43/20 43/22 44/3 44/4
 44/12 44/21 49/25 73/4
leaves [1] 34/17 41/3
led [1] 34/14
left [2] 5/23 38/5
legal [3] 2/22 11/16 32/7
less [4] 32/1 37/20 37/22 77/7
let [14] 2/8 4/21 5/5 5/6 6/5 8/5 8/6 8/21
 14/23 49/23 59/16 60/22 66/10 72/10
let's [6] 6/25 10/14 21/9 21/14 64/8 65/7
 76/1
letter [7] 17/22 24/24 55/25 58/1 69/18
 72/6 75/12
letters [1] 59/18
level [4] 34/5 39/15 45/16 60/5
levels [1] 17/7
lew [1] 1/20

liaison [1] 29/13
lies [1] 6/2
light [5] 24/14 28/14 61/6 70/5 74/20
like [29] 6/25 10/16 12/3 12/13 19/3
31/10 34/5 38/23 38/25 39/16 44/2 44/18
46/8 49/7 49/11 49/24 53/23 63/9 66/9
66/11 66/13 67/21 69/24 71/8 71/16
72/10 74/3 75/20 77/14
likely [1] 73/3
limited [4] 26/5 26/6 26/25 29/5
Lincoln [1] 77/23
line [5] 32/15 42/2 51/4 59/16 79/5
little [7] 10/20 40/22 41/11 54/16 63/10
63/11 63/17
local [1] 3/25
located [1] 27/19
location [2] 27/25 46/17
logic [1] 39/6
long [1] 13/7 15/14
look [26] 4/19 5/5 5/6 8/10 8/23 9/25
9/25 21/5 21/7 21/8 21/9 40/15 40/24
43/24 45/22 50/4 57/25 63/4 72/12 73/1
73/14 76/13 76/16 76/18 76/18 78/9
looked [11] 3/17 8/16 11/9 26/4 26/15
37/3 37/4 39/13 62/2 64/1 68/24
looking [10] 4/21 4/24 5/12 26/3 36/11
39/16 71/10 76/6 76/8 78/6
looks [1] 64/14
lose [1] 64/24
lost [1] 73/25
lot [6] 4/8 16/11 38/19 67/5 67/16 70/25
lots [2] 47/8 48/4
loudly [3] 47/7 47/14 47/17
loudspeaker [1] 48/5
lounge [1] 27/20
LOURDES [2] 1/17 2/13
low [2] 22/5 40/5
Loynaz [1] 65/23
lying [1] 54/4

## M

ma'am [2] 12/17 15/15
made [15] 24/22 29/20 30/4 31/22 35/20
35/22 42/22 52/18 55/18 56/8 56/16
56/17 57/22 72/19 79/14
MAGISTRATE [1] 1/11
majority [1] 75/3
make [17] 10/2 10/9 10/23 14/24 20/17
35/13 40/1 42/18 44/14 52/3 52/17 53/3
56/11 58/7 60/14 75/2 76/4
makes [6] 18/23 18/25 19/2 32/12 44/18
75/25
making [2] 25/3 25/4
man [3] 50/9 58/17 60/16
Mancari [1] 1/22 80/8 80/8
many [4] 41/1 41/1 41/2 46/9
March [1] 22/22
marginal [3] 12/23 12/24 22/7
marginally [1] 13/8
MARRERO [1] 1/18
marrerolegal.com [1] 1/20
married [1] 13/5
mary [1] 79/15
masters [1] 27/12
materia [1] 6/8
material [7] 3/24 6/6 7/8 8/8 9/17 24/13
35/25
materials [1] 46/4
matter [6] 31/23 54/24 59/13 74/15

74/15 80/6
may [19] 2/6 2/12 57/6/11 9/1 18/19
20/10 21/17 21/21 24/12 24/16 25/17
25/22 31/24 32/10 38/5 39/11 78/14
78/14
maybe [6] 12/3 15/17 47/16 51/23 65/12
73/13
McWhorter [2] 56/22 58/19
MDR [1] 78/6
me [35] 2/9 3/4 3/21 4/21 5/5 5/6 5/6 6/5
6/11 6/16 8/5 8/6 8/15 8/15 8/21 9/8
9/24 10/23 12/10 13/4 13/9 14/23 15/10
27/14 31/9 39/17 40/19 40/22 49/3 59/16
60/22 66/11 66/13 72/5 77/14
mean [13] 7/25 10/8 15/11 30/19 31/8
31/11 31/12 31/12 45/9 45/10 50/22
53/17 64/10
meaning [2] 32/16 35/8
means [1] 65/5
meant [3] 10/7 10/9 10/9
med [1] 13/21
medical [33] 13/6 14/4 14/11 14/14 16/2
17/6 17/12 17/13 18/8 18/15 18/21 21/7
21/19 23/14 24/5 29/14 37/12 38/11
38/15 38/21 39/1 42/15 43/21 44/22
45/12 58/14 72/9 73/25 76/3 76/19 78/16
78/17 79/8
medicine [4] 21/16 21/25 22/11 24/8
meet [7] 23/16 29/10 30/11 33/2 38/20
76/19 78/15
meeting [5] 30/13 30/15 31/15 38/21
39/1
meets [1] 42/17
memo [1] 62/3
Memorial [1] 77/23
memos [1] 26/3
mention [5] 27/23 56/19 68/10
mentioned [5] 21/10 22/14 24/20 30/14
31/6
merit [1] 75/18
met [1] 30/9
Miami [1] 1/4
Middle [2] 62/3 76/9
might [2] 5/21 14/6
minimal [30] 11/23 22/3 25/25 26/11
26/13 26/21 27/13 36/1 37/4 37/18 37/19
43/10 46/22 47/2 50/10 50/10 51/15
52/20 52/21 52/22 53/5 53/11 55/14
56/12 57/8 57/20 58/11 66/20 70/21 77/4
minimally [4] 31/14 37/2 54/12 78/6
minute [2] 32/1 47/16
minutes [2] 47/13 47/17
missed [3] 20/13 67/8 67/9
missing [3] 6/2 9/23 48/19
misstated [1] 20/8
misstep [1] 18/3
Molecules [1] 12/12
moment [1] 52/11
moments [1] 41/4
money [1] 74/1
month [1] 20/3
months [5] 25/11 31/4 35/11 35/21 35/21
more [11] 12/3 16/11 21/10 27/4 35/21
38/19 40/8 43/2 54/16 62/21 66/5
morning [5] 2/6 2/10 2/12 2/14 24/5
most [8] 4/4 27/16 28/24 44/9 46/2 47/3
73/3 78/11
mostly [1] 11/20
mother [1] 13/5
motion [7] 1/10 2/17 10/14 38/7 61/19

62/22 77/21
motive [1] 70/7
move [1] 27/3
moved [2] 38/3 62/13
movement [3] 47/9 68/4 68/5
moves [2] 15/25 73/2
moving [3] 11/1 19/13 32/2
Mr. [49] 2/9 3/4 10/17 10/21 11/4 12/11
17/5 21/13 22/10 26/13 27/4 27/23 28/6
28/11 28/13 36/3 37/16 38/9 39/22 41/10
42/7 42/23 43/16 45/13 47/24 48/7 48/15
48/25 49/1 49/5 49/10 49/15 50/18 51/7
59/5 60/7 60/19 62/1 65/18 66/6 66/25
68/8 68/12 72/23 75/25 76/2 76/20 77/8
79/12
Mr. Hannah [6] 3/4 10/17 10/21 41/10
76/20 77/8
Mr. Nehme [39] 2/9 11/4 12/11 17/5
21/13 22/10 26/13 27/23 28/6 28/11
37/16 38/9 39/22 42/7 42/23 43/16 45/13
47/24 48/7 48/15 48/25 49/1 49/5 49/10
49/15 50/18 51/7 59/5 60/7 60/19 62/1
65/18 66/6 66/25 68/8 72/23 75/25 76/2
79/12
Mr. Nehme's [4] 27/4 28/13 36/3 68/12
MS [1] 59/17
Ms. [36] 3/12 3/17 4/2 5/17 5/23 6/3 6/14
8/15 10/16 27/11 41/22 44/18 46/13
46/14 48/8 49/6 50/24 51/19 53/1 53/2
53/4 53/13 54/2 54/6 54/22 58/19 65/21
65/22 66/3 67/4 67/16 68/7 70/8 71/25
74/13 74/24
Ms. Gavilan [1] 27/11
Ms. Lachica [8] 46/13 46/14 48/8 53/1
65/21 65/22 66/3 67/16
Ms. McWhorter [1] 58/19
Ms. Reyes-Gavilan [6] 53/2 53/4 53/13
54/2 54/6 67/4
Ms. Wydler [19] 3/12 3/17 4/2 5/17 5/23
6/14 8/15 10/16 41/22 44/18 49/6 50/24
51/19 54/22 68/7 70/8 71/25 74/13 74/24
Ms. Wydler's [1] 6/3
MSEPC [44] 14/10 14/11 14/16 16/25
17/3 17/4 17/18 19/1 20/15 21/22 22/4
22/15 22/18 23/5 23/18 23/21 26/3 30/7
30/8 33/18 34/18 35/1 41/1 42/7 42/16
42/25 44/5 44/7 44/10 44/16 45/5 45/7
54/20 54/23 54/25 55/12 55/20 58/18
59/19 59/20 59/22 71/4 74/16 78/18
MSEPC's [1] 60/3
much [5] 7/1 44/8 67/15 73/7 79/18
multiple [2] 34/18 79/4
muted [1] 41/12
my [28] 2/8 3/11 3/11 3/25 4/17 5/25
6/19 8/4 8/21 10/12 10/22 20/13 48/20
54/18 55/6 59/16 62/3 65/9 66/24 67/1
68/9 68/10 68/11 69/24 73/20 77/21
78/20 80/5
myself [1] 3/12

## N

named [1] 30/22
national [1] 11/9
nature [1] 24/14
near [1] 46/17
necessarily [2] 52/9 65/12
necessary [1] 77/6
need [16] 9/13 12/7 13/14 32/12 33/13
34/23 41/10 41/16 41/21 42/4 44/19 48/6
48/6 49/19 66/14 66/14

## N

needed [8]   26/17 26/17 26/18 27/10 29/6 40/1 43/2 73/23
needs [7]   30/15 31/16 34/8 50/9 54/5 64/11 78/15
negates [1]   40/16
negative [6]   56/25 57/9 57/13 57/20 58/12 69/20
NEHME [42]   1/3 2/3 2/7 2/9 11/4 12/11 17/5 21/13 22/10 26/13 27/23 28/6 28/11 37/16 38/9 39/22 42/7 42/23 43/16 45/13 47/24 48/7 48/15 48/25 49/1 49/5 49/10 49/15 50/18 51/7 59/5 60/7 60/19 62/1 65/18 66/6 66/25 68/8 72/23 75/25 76/2 79/12
Nehme's [5]   27/4 28/13 36/3 36/22 68/12
Neuro [1]   28/11
neurology [3]   21/25 22/6 22/12
never [12]   25/21 26/3 26/4 37/14 53/8 53/9 53/19 54/3 66/25 67/10 73/23 79/16
new [4]   24/1 26/7 31/19 63/19
next [10]   2/9 14/17 15/24 16/2 16/6 18/6 20/22 24/16 33/22 51/18
Ninth [9]   29/23 29/24 30/2 64/15 64/15 64/16 64/19 64/20 65/7
nipped [1]   53/18
no [60]   1/2 2/4 4/25 4/25 4/25 5/2 5/13 6/8 6/9 6/10 6/24 6/24 7/1 7/7 7/10 7/25 8/3 8/9 15/15 16/14 18/2 23/7 23/15 24/13 27/20 27/20 29/9 30/13 34/20 34/23 37/1 37/2 37/5 38/8 45/14 46/5 46/21 48/9 49/18 51/10 51/11 53/22 55/24 57/21 57/22 59/6 59/14 63/13 64/18 67/7 67/23 67/24 67/24 69/19 69/19 72/6 72/20 73/18 75/15 77/18
nobody [2]   53/21 53/22
noise [9]   11/22 28/17 32/1 32/5 47/7 47/8 52/15 66/20 70/21
noises [1]   49/11
nondisability [1]   40/19
nondisabled [3]   34/19 34/24 41/7
nor [1]   37/24
North [1]   1/14
not [174]
note [5]   2/24 10/23 16/24 20/13 75/13
noted [1]   22/4
nothing [7]   17/8 37/16 57/12 57/21 58/1 58/2 74/8
notice [9]   11/20 17/14 29/9 30/6 31/15 32/6 32/25 33/1 51/18
noticed [1]   3/23
notified [1]   72/14
Nova [1]   11/6
now [16]   5/2 7/23 13/19 17/20 21/3 28/9 34/22 42/24 45/18 48/6 54/22 56/20 59/12 66/19 68/2 72/24
nuanced [1]   54/16
number [4]   3/19 10/10 56/11 56/12
numbered [1]   4/10
numbering [3]   3/2 3/3 4/18
numbers [1]   3/25
numerous [1]   48/11
nutshell [1]   54/14

## O

O-S-C-E [1]   48/3
OB [2]   22/5 40/5
OB-GYN [2]   22/5 40/5
Obeso [1]   73/20

object [1]   28/1
obligated [2]   69/24 69/25
observed [1]   47/11
obvious [4]   46/9 48/16 65/12 78/11
obviously [3]   10/1 45/5 66/15
occupying [1]   47/3
occur [1]   71/2
occurred [1]   23/5
occurring [1]   29/10
off [3]   9/14 32/10 65/17
offered [6]   23/8 23/19 32/17 37/22 44/10 44/20
office [7]   24/24 25/14 30/1 39/9 39/9 69/10 77/1
office's [1]   72/4
official [2]   61/3 63/1
often [1]   47/12
oh [5]   9/19 45/19 47/15 54/22 65/18
OK [20]   4/21 9/7 9/22 10/12 13/11 13/17 13/23 15/6 15/16 18/1 18/5 20/7 23/11 23/3 32/23 41/18 63/9 68/23 69/1 69/8
old [1]   13/20
old-fashioned [1]   13/20
on [158]
once [10]   17/15 20/25 24/22 33/20 34/4 35/11 39/4 65/10 67/14 72/13
one [49]   3/1 5/2 11/7 13/3 14/19 15/17 16/1 19/9 19/10 19/11 19/12 21/6 22/18 25/18 28/23 33/13 35/9 35/14 37/1 37/1 42/15 42/19 42/23 43/9 44/2 44/10 44/19 47/5 47/16 49/5 49/18 52/17 53/4 54/15 56/10 56/10 56/11 58/23 59/15 60/20 61/7 62/3 62/11 65/5 67/2 67/7 71/8 73/2 73/13
one-sided [1]   65/5
ones [5]   39/22 39/24 42/18 44/18 55/2
ongoing [2]   24/15 31/20
only [16]   12/18 16/3 17/15 21/5 26/20 27/14 28/23 29/18 36/11 47/15 61/7 65/12 65/22 74/12 74/16 76/11
operate [1]   16/18
opponent [3]   61/20 62/6 62/25
opportunities [4]   39/5 76/1 79/2 79/5
opportunity [11]   12/13 13/12 22/9 22/10 23/6 23/19 24/18 58/25 73/24 74/24 78/18
opposed [1]   62/15
option [1]   69/3
or [64]   4/7 4/16 5/20 5/21 6/7 8/24 10/22 11/22 12/7 13/15 14/5 15/1 15/4 19/5 21/18 23/19 23/20 25/1 26/7 31/16 32/20 33/1 33/13 33/21 34/10 37/1 38/1 38/12 38/12 38/15 41/11 45/11 48/23 49/11 49/25 51/7 51/23 52/14 53/14 56/17 56/24 57/7 58/11 59/14 61/25 62/10 63/19 64/9 64/22 66/1 66/1 66/8 66/14 69/4 69/25 71/20 72/8 73/13 74/7 74/14 75/8 78/1 78/10 78/14
order [5]   12/4 38/4 42/20 43/5 74/5
ordered [1]   47/22
original [3]   7/23 7/25 9/7
originally [1]   7/22
OSCE [2]   48/2 54/1
OTAZO [1]   1/11
OTAZO-REYES [1]   1/11
other [27]   4/3 4/12 4/18 8/6 12/13 12/21 23/12 26/23 27/3 27/12 29/25 30/1 34/24 36/18 37/1 43/10 43/21 46/23 46/25 47/14 53/25 54/24 54/25 56/4 71/8 74/13 78
otherwise [1]   42/3
ought [2]   69/14 69/15
out [12]   11/5 11/8 25/17 25/23 35/8 38/7 41/25 52/1 61/16 61/19 65/4 73/18
out [21]   3/1 4/23 5/4 5/6 5/23 6/10 7/1 7/18 7/19 7/22 8/16 9/13 45/10 47/19 48/4 48/5 48/6 67/15 71/7 71/9 78/15
outcome [1]   8/24
outcomes [1]   30/12
outside [9]   28/21 29/10 32/1 32/19 46/24 53/25 65/18 67/6 68/22
over [8]   9/10 14/21 15/19 17/2 20/18 47/14 60/23 61/2
overall [9]   20/16 23/12 24/15 26/10 35/14 38/18 40/11 75/21 79/3
overlap [10]   3/23 3/23 4/4 4/5 4/9 4/13 4/13 6/19 70/25 71/11
overlay [1]   8/10
own [6]   3/25 4/17 45/4 61/4 77/25 78/7

## P

P.A [1]   1/14
p.m [1]   28/13
P3 [3]   23/11 26/16 79/10
P4 [1]   40/2
page [1]   76/15
Pages [1]   1/8
panel [1]   70/13
paragraph [6]   7/21 36/24 46/13 48/20 54/18 68/11
paragraphs [1]   7/16
pare [1]   6/10
pared [1]   10/12
pari [1]   6/7
part [9]   7/24 8/2 9/8 9/20 15/19 31/16 59/2 69/25 79/3
partially [1]   7/8
participants [2]   27/4 28/10
particular [13]   10/21 11/24 12/1 13/9 14/25 15/7 15/25 23/24 28/2 30/13 36/25 37/10 43/9
party [4]   3/22 61/20 62/6 62/25
pass [2]   22/10 71/3
passage [1]   21/23
passed [18]   12/14 12/22 13/8 13/13 22/6 25/21 45/15 45/15 45/15 45/21 45/23 46/2 55/1 55/3 55/4 55/4 58/24 73/19 73/21
passes [4]   73/2 73/9 73/10 73/11
passing [5]   21/6 21/18 22/12 28/7 47/13
past [3]   23/12 39/24 63/13
Pathology [1]   13/1
patients [1]   79/9
pause [1]   14/23
pay [1]   74/2
peel [1]   9/13
peers [1]   16/13
people [17]   28/7 28/12 32/2 39/15 39/21 40/13 40/16 40/20 47/6 47/7 47/12 47/17 48/14 56/2 56/4 66/2 68/21
people's [1]   36/10
percent [9]   4/18 12/25 21/18 21/23 21/24 22/5 25/15 43/9 43/14
percentile [1]   21/17
perform [3]   25/7 70/18 70/21
performance [44]   11/13 11/17 17/16 17/17 20/16 21/20 21/21 21/22 22/17 22/20 23/11 23/12 24/15 26/10 33/11 33/24 34/9 34/13 35/15 38/17 38/18 39/24 40/3 40/5 40/6 40/10 42/17 54/23 56/14 56/25 57/2 57/9 57/14 57/21 58/3 58/12 69/20 73/1 73/15 75/16 75/17

**P**

performance... [3]  75/21 76/7 79/11
performed [1]  34/25
performing [2]  22/15 41/8
period [59]  13/3 13/18 13/18 16/17 16/18
16/23 16/24 18/12 18/18 19/7 19/9 19/10
19/11 19/12 20/5 20/10 20/18 21/1 21/2
21/5 21/6 21/6 21/8 21/9 21/12 21/14
21/19 32/21 33/12 33/13 33/13 33/14
41/3 42/11 42/12 42/14 42/14 42/15
42/19 42/20 42/20 42/20 42/23 42/23
44/8 44/9 45/17 45/18 50/25 71/9 73/2
73/2 73/3 73/6 73/7 73/9 73/11 73/12
73/22
peripheral [3]  28/6 68/8 68/13
periphery [1]  68/19
permitted [1]  18/16
person [10]  24/10 26/16 27/14 36/12
38/1 42/19 42/21 64/8 64/22 65/13
personnel [1]  2/15
perspective [3]  41/25 41/25 78/12
Pharmacology [1]  13/1
physicians [2]  14/14 39/20
piece [1]  9/23
place [4]  20/1 46/24 53/19 67/12
placed [8]  17/10 20/25 25/9 37/21 37/22
39/11 46/16 56/12
placement [1]  36/22
places [1]  17/14
plaintiff [27]  1/4 1/13 2/7 5/14 6/11 9/20
10/4 11/21 12/6 20/14 23/24 28/25 31/4
31/23 32/5 33/2 34/22 35/7 35/20 40/15
47/22 53/21 62/8 75/8 76/10 78/4 78/22
plaintiff's [15]  2/25 5/8 5/10 9/5 9/11 10/7
11/13 21/4 24/13 25/18 29/16 41/25
48/21 75/3 78/12
plaintiffs [1]  62/13
please [4]  2/5 2/6 2/12 28/22
pled [1]  25/22
plenty [2]  41/20 61/18
plus [5]  8/13 9/25 9/25 33/14 40/4
point [10]  10/23 13/14 14/4 14/21 16/3
18/4 18/16 18/18 19/6 23/6 23/15 25/13
31/3 31/25 35/2 36/18 38/25 47/9 49/6
53/3 79/14
pointed [2]  5/6 78/15
pointing [1]  71/9
points [2]  33/9 52/17
police [1]  56/10
policies [1]  77/25
policy [1]  76/16
poor [17]  11/13 17/16 17/17 21/20 21/21
21/22 22/17 23/10 33/10 33/24 34/9
34/13 38/17 40/5 40/9 54/23 79/10
poorly [4]  22/15 34/25 41/8 73/13
portion [3]  41/6 75/12 75/24
portions [1]  10/6
position [10]  11/19 25/17 32/8 35/5
37/21 53/12 58/7 60/15 61/16 65/4
post [1]  30/2
post-secondary [1]  30/2
posted [1]  28/21
potentially [1]  45/12
practice [7]  18/13 19/22 30/10 43/17
43/19 43/23 44/5
precedent [1]  11/5
precursor [1]  17/12
preferred [1]  46/16
prepare [2]  30/12 79/20
prepared [2]  3/17 7/11

present [1]  9/12
presented [3]  3/21 9/19 42/6
presents [1]  59/8
pressure [1]  52/12
pretext [4]  58/5 58/6 58/6 72/6
pretextual [1]  61/14
pretty [3]  44/8 61/6 73/7
previously [1]  23/13
prima [2]  38/8 75/8
prior [2]  23/13 43/17
private [4]  26/20 27/16 37/11 37/12
probably [11]  4/10 5/12 5/13 5/16 6/13
7/21 8/3 8/14 48/24 48/24 61/7
probation [42]  11/11 11/11 11/11 17/9
17/11 17/11 17/19 17/20 17/24 17/24
18/1 18/2 18/3 18/24 18/25 19/13 19/13
19/23 19/24 20/25 21/1 22/8 22/16 33/14
33/16 33/21 34/1 34/5 38/24 38/25 39/2
39/25 40/9 45/7 45/8 45/8 45/9 72/2
75/24 75/24 78/13 79/11
problem [7]  30/6 31/7 49/19 50/1 53/17
56/19 73/10
problems [4]  31/19 32/6 49/23 73/3
procedures [1]  17/5
proceed [1]  11/15
proceedings [1]  2/2
process [38]  14/10 23/25 24/13 26/7
29/22 30/3 30/18 30/19 30/22 30/25 31/2
31/8 31/9 31/17 31/20 32/13 32/19 32/20
33/4 39/7 50/8 51/11 59/2 59/25 60/24
63/14 63/15 63/18 63/24 64/2 64/3 64/6
64/7 64/12 64/17 64/20 66/9 66/12
proctor [25]  27/15 27/18 27/24 28/16
28/18 28/23 29/2 31/24 31/25 32/4 32/6
32/10 32/10 46/10 46/12 48/23 49/4
49/12 49/23 53/10 65/24 67/21 68/24
68/25 69/2
professional [3]  18/7 19/18 45/14
professionalism [1]  45/14
professor [1]  56/4
professors [2]  14/14 18/9
progress [4]  17/12 28/22 36/10 79/3
progressed [1]  67/15
promoted [8]  42/19 42/21 42/22 42/23
45/6 45/16 73/11 73/22
Promotion [1]  14/12
proper [6]  52/5 52/19 53/5 53/10 56/12
60/16
propose [1]  68/18
proposed [5]  5/18 5/22 8/16
protest [1]  64/24
prove [1]  58/5
provide [9]  26/18 29/5 29/19 31/18 32/14
33/3 57/7 58/11 66/17
provided [8]  26/12 28/25 34/16 38/16
43/25 52/21 59/6 76/2
providing [1]  65/14
provost [2]  24/19 24/23
psychiatric [2]  54/9 71/3
psychiatry [23]  22/1 22/22 24/9 25/8
26/14 36/23 45/24 45/25 46/3 54/19 55/7
56/14 57/8 58/22 59/4 60/13 60/17 60/18
73/12 73/21 74/11 74/16 75/13
put [31]  6/5 8/6 9/24 12/3 13/4 18/24
19/12 20/21 27/12 29/21 31/15 33/5 34/1
45/8 45/8 45/9 46/9 46/13 47/19 48/20
52/5 53/8 53/10 53/18 53/19 54/11 55/14
66/25 67/8 67/25 67/25
putting [3]  67/20 74/1 78/8
puzzle [3]  9/23 9/25 10/2

**Q**

qualification [3]  72/24 76/16 76/23
qualified [36]  11/4 17/21 26/21 29/20
30/22 31/13 33/1 36/4 36/5 36/7 36/8
36/13 36/16 38/1 38/9 38/10 38/11 38/12
38/13 38/15 42/3 42/19 42/21 66/19
66/21 70/17 70/21 71/20 72/1 73/19 75/9
75/25 76/17 77/1 77/16 78/11
qualifies [1]  30/23
qualify [1]  79/12
question [7]  11/2 32/25 37/25 46/23
49/14 73/18 78/10
questions [2]  30/13 78/5
quiet [6]  12/7 28/22 47/19 48/12 48/14
66/2
quizzes [6]  11/25 25/15 25/20 35/13
56/25 57/2
quote [1]  36/21

**R**

raised [1]  2/21
raising [1]  8/8
random [1]  24/8
re [1]  61/1
re-failed [1]  61/1
read [7]  3/4 4/23 6/7 6/23 6/24 58/1
75/11
readiness [2]  25/16 25/20
reading [1]  6/12
ready [1]  41/16
realize [1]  50/10
realizes [1]  50/10
realizing [1]  14/5
really [5]  4/18 7/10 51/7 51/22 74/8
reason [6]  3/2 36/9 54/4 55/13 69/6
76/10
reasonable [5]  27/6 29/18 64/9 64/13
77/7
reasonably [1]  33/3
reasoning [1]  57/25
reasons [5]  35/16 37/23 38/7 39/23 52/9
rebuttal [1]  74/25
receive [5]  24/20 26/21 27/6 36/14 36/14
received [3]  4/6 15/8 19/18
receiving [2]  26/1 75/6
recognize [1]  4/4
recommendation [2]  23/18 24/17
recommendations [1]  31/5
reconcile [1]  4/3 4/12 4/18
record [21]  2/5 4/17 7/24 8/2 9/8 10/6
12/10 20/9 30/8 34/11 34/15 34/24 35/10
35/23 38/6 43/24 49/3 59/2 63/1 75/11
76/18
recording [2]  1/10 80/6
records [1]  63/2
red [1]  75/9
Redding [2]  11/6 78/24
redlined [1]  8/15
redo [2]  44/14 73/6
reduced [4]  26/22 37/4 37/13 43/14
referenced [1]  68/7
referring [1]  10/5
refers [1]  76/15
refused [1]  29/19
registered [2]  36/6 36/12
reiterate [1]  33/7
related [6]  25/3 25/24 26/2 73/3 75/5
75/6
relevant [1]  78/1
rely [2]  29/15 33/9

**R**

relying [1]  51/19
remaining [1]  75/17
remains [1]  75/19
remedial [3]  58/19 58/20 58/21
remediate [6]  12/14 22/9 31/2 61/3
72/16 73/14
remediated [2]  13/10 45/20
remediation [5]  13/25 14/2 15/8 15/11
17/2
remediations [2]  39/5 78/23
remedied [2]  60/21 72/21
remedy [5]  58/15 59/6 72/17 72/20 72/20
renders [1]  78/13
repeat [12]  16/1 16/7 18/17 20/18 41/2
41/3 44/10 44/17 44/19 44/25 72/10
78/19
repeated [4]  19/3 34/16 34/17 45/13
repeatedly [1]  57/18
repeats [1]  16/3
replied [1]  4/2
reply [6]  10/5 11/8 33/15 62/9 74/24
78/20
report [28]  18/7 19/19 25/5 25/5 35/7
35/11 35/20 35/24 36/20 36/25 37/23
43/25 52/23 52/24 57/11 57/13 57/17
57/17 60/12 61/18 62/4 62/14 63/3 75/7
76/8 76/9 76/14 79/20
Reporter [2]  1/22 80/9
reporting [1]  60/8
reports [3]  57/17 57/19 58/2
represented [1]  29/25
reputation [1]  46/19
request [5]  30/4 30/19 44/17 69/4 73/5
requested [3]  28/18 43/18 43/20
requests [1]  18/15
required [7]  3/14 26/20 26/21 40/8 40/11
52/21 64/17
requirement [1]  50/21 64/17 64/19
requires [2]  35/3 64/4
reschedule [1]  23/10
reservations [2]  26/15 28/9
Resource [4]  14/22 17/21 29/13 43/8
respect [7]  11/15 11/18 24/10 28/17 29/8
33/7 35/2
Respiratory [2]  13/25 17/1
respond [2]  10/17 10/21
responded [3]  3/24 4/15 4/15
responding [2]  8/9 9/6
response [8]  5/8 5/9 5/11 6/1 9/6 25/18
68/9 68/10
responsibilities [1]  79/8
responsibility [5]  48/12 50/11 50/12
65/22 66/4
responsible [2]  26/15 79/6
rest [3]  7/1 17/6 75/4
restated [1]  4/19
rested [1]  69/13
result [4]  16/25 61/10 73/25 75/17
resulted [3]  5/18 23/18 60/11
results [1]  71/4
retake [13]  13/13 14/16 15/11 22/2
22/22 23/4 24/10 24/21 25/13 26/25
30/21 44/1 44/2 46/7 52/12 54/9 54/19
55/13 57/8 58/12 59/3 59/17 60/13 60/18
60/19 60/23 61/1 73/6 75/13
retaken [1]  58/22
retaking [2]  15/12 16/13
retaliatory [1]  25/1
retired [1]  56/10

retook [2]  22/6 55/2
review [9]  22/4 22/8 22/4 23/5 23/22
26/6 28/12 35/22 75/14
reviewed [7]  10/15 36/3 39/20 39/24
41/4 57/16 76/12
reviews [4]  20/16 23/12 33/19 35/25
REYES [7]  1/11 53/2 53/4 53/13 54/2
54/6 67/4
rhannah [1]  1/16
rhannahlaw.com [1]  1/16
rid [1]  70/6
right [79]  2/11 2/16 2/17 3/13 6/5 8/2 8/5
9/13 9/14 9/21 9/22 10/14 10/24 12/16
13/2 15/10 15/19 15/21 15/24 16/5 16/22
16/22 18/19 19/5 19/8 19/17 19/20 20/3
20/12 27/20 32/23 34/2 38/23 39/3 39/12
41/10 41/12 42/1 50/7 50/15 50/25 51/1
51/5 51/13 51/16 51/17 54/10 55/2 55/3
55/8 56/3 56/7 56/7 57/6 57/14 60/2
60/2 63/16 64/24 64/25 68/2 68/9 68/16
69/5 69/8 69/14 70/12 70/19 70/19 70/22
71/15 71/17 71/21 71/24 72/8 72/9 74/23
77/8 79/18
rights [2]  24/13 30/1
Road [2]  1/14 1/18
roadmap [2]  10/13 11/16
Rod [1]  2/7
RODERICK [2]  1/13 1/14
room [110]
rooms [7]  27/1 27/2 27/2 47/1 48/4
53/23 67/2
rotations [2]  21/11 40/2
RPR [2]  1/22 80/8
rug [1]  77/10
rule [1]  3/25

**S**

said [29]  4/25 5/19 6/21 8/21 23/7 28/21
31/25 39/10 43/18 44/19 49/4 53/1 53/9
53/9 54/3 55/16 55/17 55/18 55/20 57/18
57/21 58/19 63/25 66/5 67/10 68/8 69/10
71/9 72/6
same [17]  3/3 5/2 14/9 14/18 15/21
17/21 18/11 26/23 27/22 33/19 41/8 45/5
47/1 47/14 52/18 57/18 76/9
sanction [3]  24/2 24/14 26/9
satisfied [1]  49/13
saw [2]  6/14 11/25
say [33]  4/12 4/19 6/25 10/7 10/8 10/20
12/7 15/10 34/8 36/5 36/18 37/1 38/10
49/6 49/10 49/22 50/5 50/6 50/21 55/21
59/21 60/15 61/1 64/8 65/15 65/15 65/16
65/19 66/9 69/7 70/8 76/22 77/17
saying [54]  4/15 13/14 14/24 32/4 32/19
33/20 33/23 34/4 38/11 39/9 39/12 39/14
40/13 40/14 40/15 40/17 47/15 49/4 49/6
49/13 50/24 51/4 52/19 53/5 54/3 55/9
58/17 59/21 63/9 63/11 63/13 65/17
65/21 65/24 66/20 69/18 69/22 69/23
69/24 69/25 70/14 70/15 71/18 71/25
72/5 72/25 76/21 76/25 77/9 77/12 77/12
77/13 77/15 77/18
says [16]  46/15 51/19 51/24 53/4 54/22
58/1 59/12 64/10 64/18 64/20 73/21
74/13 74/14 75/14 77/10 77/24
scenario [2]  50/16 75/13
scheduled [1]  46/23
scheduler [6]  26/14 27/3 53/4 53/4 53/16
53/20
scheduling [3]  28/8 54/7 67/12

school [23]  13/6 14/4 16/2 17/13 23/14
23/17 26/5 29/14 33/23 34/6 38 54/7 36/12
40/8 42/16 44/12 44/22 45/10 58/14 64/9
64/12 72/9 78/16 78/17
school's [1]  40/6
sciences [1]  16/13
scope [2]  26/5 26/6
score [3]  12/15 12/25 24/6
scored [2]  21/16 22/5
screen [1]  10/22
screenshots [1]  28/9
search [1]  11/9
seating [1]  27/20
second [22]  13/20 15/1 15/6 15/16 15/17
15/22 16/10 17/19 19/4 20/15 22/13 42/8
42/10 44/9 44/11 44/16 44/17 44/19
44/22 44/25 45/13 46/7
secondary [1]  30/2
see [14]  4/10 7/1 8/21 10/14 28/7 29/3
41/24 47/4 47/5 59/11 68/5 68/12 68/14
68/18
seeking [1]  2/19
seems [7]  30/18 39/6 39/17 63/9 63/22
72/5 72/12
seen [2]  27/16 39/18
semester [2]  15/17 15/18
semesters [2]  16/18 16/19
send [1]  8/18
sense [2]  36/11 63/18 77/9
sent [5]  8/15 8/15 9/10 14/21 60/9
sentence [2]  5/21 6/2
sentences [6]  5/20 6/17 7/15 7/18 7/19
7/21
separate [1]  3/22
separately [2]  8/8 71/11
September [1]  80/8
sequence [1]  75/2
serves [1]  29/12
set [4]  42/5 47/24 51/25 54/17
setting [5]  26/23 27/16 30/23 37/11
37/12
seven [1]  53/23
several [3]  33/9 33/15 34/16
severity [2]  24/2 26/9
sexual [1]  62/14
shadows [1]  47/6
Shaikh [1]  77/23
shapes [1]  47/6
share [1]  10/22
she [101]
shelf [17]  21/21 22/1 22/11 22/12 22/20
22/22 23/11 24/6 25/8 33/12 34/11 34/17
39/23 40/3 40/4 40/5 54/19
Shirlyon [1]  56/22
Shortly [1]  43/17
shot [1]  79/15
should [30]  3/4 6/7 6/12 39/14 45/10
46/21 51/20 53/7 53/16 53/19 58/19
58/20 58/20 59/9 59/10 59/12 59/25
60/17 61/21 61/22 61/24 62/16 62/19
63/4 65/16 67/3 67/7 67/8 70/10 77/11
show [8]  10/6 29/17 30/3 34/20 34/23
40/1 70/16 76/2
showed [2]  38/6 79/10
showing [2]  34/9 46/3
shown [2]  8/12 8/13
shows [3]  30/9 34/23 35/10
sided [1]  65/5
sign [2]  28/21 47/18
similar [2]  34/25 37/16

**S**

similarly [1]  4/10
simulations [3]  48/2 48/3 54/1
since [4]  17/20 58/4 61/1 79/12
sits [1]  32/17
sitting [1]  52/13
situation [13]  49/25 50/23 53/14 58/15
  60/21 65/6 65/8 65/25 66/17 72/18 72/22
  74/3 74/4
situations [2]  52/11 65/11
six [4]  26/17 26/18 27/9 27/10
skills [1]  79/7
smorgasbord [1]  55/25
so [128]
so-called [1]  47/1
solely [3]  25/24 33/14 78/6
some [23]  3/14 6/2 6/10 6/19 8/11 8/12
  10/15 13/8 14/6 32/1 34/5 39/15 42/4
  45/20 48/25 50/25 54/4 54/24 62/9 67/17
  67/25 68/15 73/2
somebody [5]  34/4 48/9 48/17 50/9 52/6
something [21]  3/6 7/17 7/20 20/9 31/10
  38/5 48/18 50/13 50/13 50/21 61/22
  63/22 64/4 65/15 65/15 65/16 65/19 66/1
  66/5 68/8 72/10
sometimes [2]  38/20 66/25
somewhere [1]  15/1
sorry [16]  9/2 10/7 10/8 11/24 14/23
  14/23 19/25 20/12 20/13 30/17 41/13
  42/12 45/12 48/25 55/16 76/20
sort [7]  38/25 39/16 49/7 49/24 63/10
  69/24 71/15
sound [1]  44/18
sounded [1]  66/13
sounds [3]  40/19 66/11 77/14
SOUTHERN [1]  1/1
speak [5]  51/23 52/10 64/23 64/23 65/18
special [4]  27/1 27/11 27/12 30/23
specific [3]  10/5 29/7 76/11
specifically [5]  5/13 17/14 31/25 36/24
  37/17 75/13 76/14 77/23 79/1
spite [2]  33/11 38/15
spoken [1]  51/20
sponsoring [1]  32/7
spreadsheet [1]  57/1
spur [1]  52/11
stages [1]  16/18
stairs [1]  46/18
stake [1]  48/9
stakes [1]  36/23
standard [6]  11/4 29/11 36/8 37/25
  76/13 79/11
standards [5]  23/16 36/2 39/1 40/7 40/8
standing [4]  17/6 17/7 17/7 39/25
standpoint [3]  40/12 40/25 49/15
stands [1]  14/11
staring [1]  57/6 61/10
started [3]  12/11 14/5 19/6
starting [1]  19/4 43/4
starts [2]  18/20 60/1
state [2]  2/5 38/8
stated [3]  27/5 57/11 59/3
statement [67]  2/24 3/15 3/22 3/24 4/1
  4/6 4/7 4/8 4/14 4/14 4/17 4/20 4/24 5/3
  5/9 5/10 5/12 5/14 5/18 5/19 5/24 5/25
  5/24 5/25 6/1 6/3 6/4 6/6 6/8 6/15 6/18
  6/19 6/20 7/7 7/9 7/11 7/13 7/14 7/19
  7/20 7/22 7/23 8/1 8/16 8/18 8/22 9/5
  9/10 9/12 10/5 10/8 42/5 42/6 43/1
  46/11 46/13 48/19 48/20 48/21 52/1

54/17 54/18 56/18 65/9 68/10 69/18
  73/20
statements [7]  7/12 52/25
states [10]  1/1 1/11 20/24 21/17 21/19
  22/14 36/21 46/15 76/14 79/1
status [1]  17/15
statute [1]  37/5
Steven [1]  65/23
Stewarts [1]  29/15
still [17]  16/16 16/17 18/12 19/8 19/10
  19/12 34/9 39/14 58/13 62/17 62/18
  68/18 68/21 69/17 70/6 74/2 78/4
stipulated [1]  9/3
stop [3]  48/12 66/1 69/4
stopped [1]  17/5
straight [2]  49/8 59/16
struggling [1]  63/17
stuck [2]  53/24 63/20
student [43]  11/10 12/13 13/13 13/21
  17/5 17/8 17/10 18/21 21/3 21/19 22/4
  23/5 23/18 24/17 27/17 29/15 30/10
  32/11 32/14 33/20 34/13 36/6 37/11
  38/11 38/15 38/21 39/1 40/2 44/2 45/12
  45/19 46/8 46/21 64/10 64/12 64/22
  65/13 65/15 65/16 65/19 76/19 79/2 79/4
Student's [1]  14/12
students [15]  22/8 22/8 22/9 24/9 26/24
  30/9 30/11 33/16 34/16 34/19 34/24 48/4
  48/6 60/18 79/7
studies [1]  46/4
stuff [5]  16/12 16/12 19/3 49/11 74/6
stumbling [1]  55/6
subject [2]  22/2 62/17
subjected [1]  35/1
subjective [2]  29/11 29/15
submit [1]  10/4
submits [1]  23/24
submitted [1]  28/8
subsequent [2]  26/2 75/14
substantial [1]  61/6
substantiate [3]  25/6 56/11 74/21
substantiated [3]  61/9 72/19 74/20
successfully [2]  42/15 73/22
such [4]  58/8 61/21 65/11 66/21
suffer [1]  31/21
sufficient [2]  39/11 78/15
suggest [2]  24/1 30/14
suggesting [1]  59/4
suitable [1]  27/19
suites [1]  27/19
summary [12]  2/18 2/20 10/19 11/1
  33/17 37/10 38/5 51/9 62/7 62/13 62/22
  77/21
Sunrise [1]  1/15
supply [1]  66/16
support [1]  33/25
supposed [7]  30/12 31/14 49/6 49/10
  49/11 65/13 69/23
supposedly [1]  66/19
Supreme [1]  39/19
sure [7]  4/3 4/12 4/18 12/5 14/24 40/14
  44/14
surgery [2]  21/25 22/11 24/6
survive [2]  71/12 71/13
sweep [1]  77/10
system [1]  3/3
Systems [8]  13/25 17/1 18/13 19/22
  43/17 43/19 43/23 44/5

**T**

table [1]  47/24
take [30]  5/5 7/22 8/22 14/19 24/9 26/17
  27/10 32/12 32/17 41/3 43/2 43/22 46/8
  46/8 46/23 48/8 49/25 50/4 52/4 52/13 53/16
  60/20 60/23 61/2 62/23 66/4 67/17 73/2
  72/7 72/25 78/3
take-it-or-leave-it [1]  49/25
taken [9]  7/19 27/9 28/1 29/4 30/7 46/2
  53/12 58/19 58/20
taker [1]  48/23
takes [5]  15/17 15/18 15/21 20/1 45/25
  46/7 73/4
taking [12]  6/23 14/18 15/18 27/7 27/17
  28/1 29/2 36/23 47/24 49/5 49/12 49/16
talk [2]  30/17 46/11
talked [1]  63/10
talking [6]  13/19 47/7 47/13 47/17 68/21
  77/14
talks [2]  54/15 78/21
technical [1]  40/8
Technically [1]  27/17
tell [5]  4/21 43/1 49/19 50/4 66/2
telling [4]  6/11 9/8 13/9 48/5
tells [2]  50/16 53/8
temperature [4]  28/18 46/19 46/20 47/22
ten [2]  28/10 33/15
tenure [1]  11/13
term [3]  30/18 44/24 63/25
terminated [1]  74/5
termination [3]  74/6 74/7 74/9
terms [11]  2/21 10/18 18/19 21/10 30/5
  32/24 33/19 36/18 38/19 63/15 70/12
test [23]  13/13 18/12 18/14 22/21 22/22
  23/1 24/8 28/1 28/1 29/2 30/7 30/21
  32/18 32/18 35/14 48/23 49/5 49/12
  49/16 49/16 50/5 50/6 52/4
test-taker [1]  48/23
testified [13]  22/19 47/5 47/18 47/20
  48/1 48/8 48/10 51/24 57/12 66/3 68/20
  69/6 75/20
testify [2]  28/6 49/1
testimony [17]  20/19 29/12 46/12 50/12
  54/17 57/24 59/21 61/8 65/9 65/21 65/23
  67/10 67/24 67/25 68/12 68/15 73/20
testing [4]  28/22 30/24 31/1 66/17
tests [4]  11/25 22/18 29/4 78/23
than [7]  4/3 4/12 4/19 32/1 35/21 37/20
  37/22
thank [10]  2/16 10/25 41/19 42/13 74/25
  79/18 79/21 79/22 79/23 79/24
that [619]
that's [16]  5/3 6/13 8/2 15/23 18/1 19/12
  39/1 39/16 40/10 66/17 66/20 69/11 70/1
  74/17 74/22 76/22
their [19]  7/13 7/23 25/6 36/7 39/10
  39/16 45/4 48/19 56/18 61/4 61/8 62/9
  63/3 63/23 65/1 65/2 68/10 79/3 79/3
them [24]  7/22 8/12 8/12 13/8 21/13
  25/21 29/1 30/12 33/17 36/14 36/14 42/9
  42/10 42/11 43/1 45/15 45/21 45/23 46/2
  48/20 49/19 55/9 56/19 61/25
then [57]  3/21 3/24 3/25 4/1 4/16 4/17
  5/25 6/8 6/24 8/5 8/22 8/23 9/7 9/11
  10/15 10/16 10/20 10/21 13/10 13/13
  13/18 15/21 15/24 18/6 19/3 19/13 19/21
  19/23 22/6 23/2 34/5 34/8 34/12 34/20
  34/5 39/7 43/17 44/3 44/7 46/3 51/18
  53/20 59/24 59/25 60/9 60/13 60/23
  63/21 64/11 64/24 66/12 66/20 67/10

**T**

then... [4]  69/8 71/10 72/16 73/11
theory [2]  32/21 33/8
there [178]
Thereupon [1]  1/25
these [22]  11/12 22/18 22/20 27/16 29/4
33/11 39/21 40/3 40/18 40/25 41/4 46/25
48/10 49/2 49/11 51/25 52/25 53/6 55/23
63/1 69/19 76/3
they [123]
they're [2]  65/17 72/24
thing [5]  53/5 57/18 58/23 70/20 78/11
things [11]  3/18 3/19 8/17 41/22 41/22
42/4 53/25 58/15 67/6 68/14 75/1
think [42]  6/13 6/17 7/6 9/22 9/23
10/12 16/23 25/23 31/1 33/23 36/8 41/5
41/16 41/16 41/23 42/5 49/23 50/1 50/20
51/8 51/9 52/2 52/2 54/4 54/18 55/20
61/16 62/7 63/10 65/22 66/7 68/7 68/11
70/3 71/25 72/24 73/13 75/10 77/8 77/11
77/15
thinking [1]  56/1
third [12]  14/4 16/11 21/16 22/4 22/21
23/4 45/1 45/6 45/16 54/21 59/23 74/16
this [120]
thorough [2]  56/9 60/11
thoroughly [1]  57/16
those [28]  5/20 7/18 7/19 7/21 8/9 8/24
21/14 22/10 30/24 34/19 35/16
37/23 38/7 39/15 39/21 43/5 43/16 45/23
54/25 55/1 55/2 56/20 73/15 73/17 78/22
79/1 79/13
though [13]  5/24 39/9 49/12 51/9 57/5
64/21 65/15 68/20 70/15 70/17 71/12
73/7 74/8
thought [13]  5/20 20/11 31/24 32/11
39/10 39/14 42/10 45/5 48/13 55/16 66/5
70/7 76/20
thoughts [1]  41/11
three [25]  12/24 16/17 17/7 20/3 21/5
21/8 21/9 21/12 21/14 21/19 21/21 25/11
33/12 33/14 35/11 35/21 42/20 45/17
45/18 73/11 73/12 73/13 74/7 78/17
78/18
three-month [1]  20/3
threshold [4]  11/2 32/25 37/25 78/10
threw [1]  40/22
through [17]  11/16 12/10 13/6 14/9 19/2
20/2 21/5 21/14 22/25 30/5 32/3 47/5
47/6 62/2 64/1 64/21 66/16
throughout [2]  11/13 52/15
thrown [1]  79/15
Thus [1]  75/16
tie [1]  38/23
time [58]  3/1 3/2 11/19 12/7 12/15 13/7
13/14 14/5 14/9 17/21 18/11 18/14 18/19
20/9 22/13 23/15 24/7 24/18 24/19 26/8
28/14 29/6 30/4 32/1 32/21 42/2 42/7
42/9 43/1 43/2 43/3 43/10 44/2 44/9
44/9 45/7 46/1 46/1 46/7 47/14
48/7 50/21 50/25 52/3 52/4 53/21 53/22
54/21 59/16 59/23 59/24 60/4 73/8 74/1
74/16 74/25 79/23
times [6]  15/22 34/18 41/1 41/2 41/2
78/18
Title [1]  25/2
together [3]  9/25 10/12 41/11
told [8]  48/14 49/1 49/18 54/2 67/4 67/7
67/9 67/10
too [3]  63/10 63/10 68/5

took [10]  7/18 34/17 37/14 39/13 43/22
52/4 53/23 53/7 67/21 71/9
top [1]  67/14
totally [1]  59/5
touched [1]  75/11
tout [1]  78/22
towards [2]  17/12 44/8
traffic [4]  11/23 27/24 31/24 53/25
training [2]  30/2 39/21
TRANSCRIBED [2]  1/10 1/22
transcript [2]  44/25 73/16
transcription [1]  80/5
treat [1]  79/9
treated [1]  41/7
treating [1]  77/16
treatment [4]  11/3 33/8 34/21 41/8
trial [4]  59/9 59/11 62/19 77/11
triggered [3]  22/18 22/20 74/10
triggering [5]  54/20 59/22 74/12 74/18
75/22
triggers [1]  64/11
true [10]  35/8 43/20 45/6 45/20 50/3
56/16 57/14 57/23 58/4 69/21
truly [1]  7/7
TRUSTEES [3]  1/7 2/4 2/14
try [3]  31/1 31/4 19/12 32/13 74/7
trying [7]  4/22 4/23 7/14 48/8 52/13
52/17 69/3
turn [2]  38/20 66/14
turned [1]  28/4
twice [2]  13/6 15/22
two [46]  2/18 4/4 5/21 13/18 13/18 16/18
16/23 16/24 16/25 18/12 18/18 19/7 20/5
20/10 20/18 21/6 23/12 31/4 31/5 32/20
33/13 35/21 35/21 42/11 42/12 42/14
42/14 42/20 42/20 42/23 43/8 44/8 44/9
56/13 62/24 70/25 71/9 71/12 73/2 73/3
73/6 73/7 73/9 73/13 77/14 78/20
type [1]  52/11
types [2]  25/2 77/15

**U**

U.S [1]  39/19
U/75 [1]  12/14
ulterior [1]  70/1
ultimate [2]  34/14 69/12
ultimately [7]  5/18 22/12 43/7 58/4 70/16
71/5 74/8
uncomfortable [1]  44/13
under [19]  2/18 14/2 15/9 21/24 36/8
36/16 36/17 37/3 38/22 45/4 48/25 52/12
75/9 75/25 77/6 77/10 78/5 78/7 79/11
understand [7]  9/22 14/24 32/23 42/16
49/4 52/8 71/15
understanding [2]  66/24 67/1
undisputed [32]  2/23 2/24 3/21 4/1 4/7
4/9 4/16 4/25 4/25 5/3 5/19 5/21 5/22
6/3 6/6 6/7 6/10 6/15 6/18 7/1 7/8 7/8
7/13 7/14 7/17 8/7 8/12 9/2 9/17 34/12
50/5 75/23
undisturbed [1]  75/19
unexcused [1]  18/9
Unfortunately [1]  52/16
UNITED [2]  1/1 1/11
universe [1]  8/11
universities [1]  30/1
university [9]  1/6 2/4 2/13 11/14 37/9
41/9 56/5 77/24 78/2
university's [1]  77/24
unlike [1]  64/16

unsatisfactory [1]  17/11
until [7]  15/4 25/13 30/21 31/1 37/15
63/14 79/16
up [41]  8/11 12/8 12/9 13/4 13/15 17/23
22/12 23/10 23/11 23/16 24/3 24/4 24/5
24/7 24/7 24/16 25/4 25/13 33/21 34/19
45/19 47/24 48/14 49/21 50/4 51/20
51/23 52/10 54/23 54/25 64/9 64/12
64/23 64/23 65/18 66/5 66/12 68/24
73/12 74/6 78/12
updates [2]  25/11 35/11
upheld [3]  35/18 72/21 79/14
uphold [4]  58/13 61/5 61/11 70/6
upholding [1]  70/12
upholds [1]  74/22
upon [5]  57/9 58/3 69/20 75/11 75/14
us [4]  31/15 37/17 38/20 78/4
use [2]  28/14 67/2
used [5]  27/2 27/7 30/20 53/24 66/21
uses [1]  30/1
usual [3]  24/20 27/4 27/6

**V**

vacuum [2]  21/7 21/8
validity [1]  34/20
various [11]  2/21 7/16 11/5 11/25 18/9
21/12 34/11 43/21 47/1 52/9 53/6
versa [1]  4/20
version [3]  5/22 7/15 8/15
very [16]  37/16 43/14 43/14 44/23 45/7
45/21 46/14 50/4 56/9 56/9 59/8 65/25
66/7 67/11 67/17 79/18
vice [1]  4/20
videoconference [1]  2/2
view [5]  38/25 63/15 64/6 64/17 73/18
viewing [1]  61/17
violated [1]  78/2
violation [4]  38/8 71/19 71/22 76/16
violations [1]  33/16
vision [1]  68/13
visual [2]  47/11 68/5
voluntarily [1]  23/20

**W**

wait [2]  6/25 6/25
waited [1]  31/4
Wake [1]  78/25
walked [1]  47/8
walking [1]  29/4
wall [2]  47/4 68/14
want [13]  10/22 22/25 29/23 31/10 35/19
36/18 41/15 50/18 54/23 59/17 72/25
75/10 75/11
wanted [5]  26/18 35/7 37/11 53/3 62/13
wants [2]  78/4 78/22
was [255]
wasn't [17]  26/8 26/11 29/2 29/2 38/25
40/3 49/5 51/20 51/23 52/5 52/7 54/25
55/10 55/11 59/12 68/4 72/1
watch [2]  17/9 18/2
way [19]  5/16 6/5 6/13 6/18 7/5 7/6 8/6
15/1 30/23 35/6 37/1 37/2 38/6 51/4
63/13 63/21 64/21 72/12 72/12
ways [2]  50/8 65/5
we [74]  2/17 3/22 4/7 6/16 7/14 7/18
7/18 11/1 11/4 11/8 13/19 13/20 16/8
16/9 16/14 16/17 17/1 21/3 21/3 21/8
21/16 28/9 29/12 29/15 29/16 31/2 31/13
32/12 33/7 33/8 33/12 33/13 34/10 34/15
36/12 37/9 38/3 38/7 38/19 38/20 39/18

**W**

we... [33]  40/24 41/11 42/6 42/10 42/11 45/18 45/25 49/22 52/10 52/17 53/12 57/24 58/9 60/2 60/4 60/17 61/1 61/13 63/10 70/9 71/8 71/9 71/10 72/18 74/3 76/13 76/16 78/3 78/9 78/9 79/4 79/4 79/20
we're [2]  74/22 76/8
wearing [2]  29/1 29/3
week [1]  24/9
week's [1]  18/14
well [17]  2/9 3/9 9/17 19/15 25/7 34/1 39/23 42/5 45/21 48/24 49/6 51/19 61/15 63/24 70/11 73/10 79/18
wellness [2]  14/7 43/4
went [14]  13/6 14/7 17/2 25/10 32/19 42/7 42/8 42/24 42/25 44/7 44/9 48/14 60/13 78/17
were [45]  2/2 5/20 7/14 7/15 7/19 7/19 11/25 12/23 20/12 21/8 27/1 27/2 28/12 29/3 29/4 33/12 34/11 34/12 34/17 34/18 34/25 35/1 38/16 39/21 39/22 39/24 40/4 40/23 41/7 45/2 45/14 46/25 47/18 48/3 48/3 48/4 48/16 51/25 53/7 53/23 57/22 60/3 67/5 78/23 79/2
weren't [1]  50/3
what [96]
what's [1]  14/10
whatever [4]  9/14 10/1 52/14 66/14
when [45]  4/15 5/17 5/19 5/25 6/15 6/16 7/10 7/14 7/18 7/20 8/15 12/15 14/5 15/10 18/23 19/4 19/12 19/23 20/17 20/21 22/6 28/17 29/15 30/4 30/17 31/20 34/24 36/2 38/10 39/16 41/22 42/8 42/24 42/25 43/22 44/7 44/21 52/10 58/8 59/17 59/24 67/1 76/8 76/16 79/14
whenever [1]  30/23
where [41]  4/9 4/10 4/16 6/1 11/9 14/17 16/11 18/1 18/3 21/4 21/16 22/24 23/25 29/19 29/25 31/2 33/16 41/21 47/24 48/4 53/15 53/24 58/14 59/11 61/8 61/13 62/4 62/12 63/2 64/7 65/8 65/9 65/12 67/25 72/18 72/21 73/14 74/4 74/4 74/22 77/25
whether [24]  26/6 26/7 26/8 31/23 33/1 33/21 37/1 38/1 42/19 51/7 51/12 51/15 53/14 56/16 56/23 56/24 57/7 61/25 63/4 66/8 72/8 75/8 78/1 78/10
which [45]  4/6 6/18 9/4 9/5 9/10 10/4 11/24 12/12 12/14 12/24 13/12 16/11 17/1 17/8 19/4 22/2 22/21 23/17 24/6 26/3 27/4 27/13 33/5 34/10 37/3 37/8 37/19 37/25 38/19 43/5 47/23 54/2 55/15 57/1 60/10 60/18 61/18 67/3 69/20 70/13 71/3 71/4 73/16 74/2 77/21
while [14]  14/9 17/19 17/23 20/14 22/11 23/13 25/22 26/4 30/7 36/23 38/16 40/9 44/4 74/13
white [2]  57/11 57/15
who [43]  11/10 14/13 21/3 24/10 26/14 27/11 29/12 31/21 34/16 34/25 34/25 39/20 39/21 39/22 39/22 39/24 40/13 41/7 42/18 44/2 44/10 44/18 44/19 48/9 48/22 50/9 53/4 53/16 55/16 56/10 56/10 56/20 56/22 59/2 64/8 65/13 67/20 67/21 73/20 74/4 78/14 79/4 79/7
whole [7]  9/20 39/7 55/15 59/25 63/14 70/20 73/15
why [11]  3/2 5/25 35/25 39/1 52/8 67/24 69/6 70/1 70/9 72/5 76/10
will [16]  9/4 10/23 11/7 11/15 19/10

window [8]  28/4 28/5 28/5 47/3 47/4 47/6 67/20 68/16
winnowed [1]  8/17
withdraw [3]  23/19 23/20 23/20
withheld [1]  25/12
within [9]  7/15 11/5 18/14 27/9 36/2 37/24 56/5 61/4 77/3
without [13]  5/12 25/22 34/10 38/12 38/15 40/16 44/13 44/23 70/18 71/20 73/9 75/18 79/13
witness [1]  52/24
witnesses [2]  53/1 77/5
word [2]  55/6 69/24
work [7]  4/22 14/18 16/16 20/20 31/18 43/4 49/8
world [1]  43/12
would [27]  3/7 5/16 7/2 7/5 7/9 8/14 10/16 14/17 21/23 23/7 28/19 30/22 31/2 32/11 33/11 35/14 48/14 50/5 52/8 53/15 58/23 58/23 66/5 66/9 67/6 73/22 77/4
wouldn't [1]  23/8
wrong [3]  10/10 41/23 46/4
wrongful [1]  2/19
WYDLER [22]  1/17 1/18 2/13 3/12 3/17 4/2 5/17 5/23 6/14 8/15 10/16 41/22 44/18 49/6 50/24 51/19 54/22 68/7 70/8 71/25 74/13 74/24
Wydler's [1]  6/3

**Y**

year [36]  12/16 12/21 13/8 13/20 15/1 15/6 15/7 15/14 15/17 15/22 16/1 16/7 16/10 16/11 17/19 17/20 18/20 19/2 19/5 19/7 19/11 34/16 42/8 42/10 42/15 44/11 44/17 44/19 44/22 44/25 45/1 45/6 45/13 45/16 45/17 60/20
year-long [1]  15/14
years [6]  19/5 32/20 74/1 74/7 78/16 78/17
yelling [1]  68/21
yes [40]  2/6 3/16 7/3 7/5 7/5 9/9 9/17 9/19 10/25 12/2 12/17 12/20 13/22 15/20 15/20 17/25 18/22 20/6 29/3 31/1 32/8 32/22 32/22 39/18 40/21 40/24 41/14 42/13 50/1 50/24 55/18 55/22 59/21 60/25 65/3 66/22 68/17 68/17 69/12 70/20
yet [9]  13/15 13/16 16/8 16/9 16/14 16/15 16/17 19/7 20/5
you [143]
you're [21]  9/7 13/9 33/20 39/9 39/12 39/14 40/9 40/13 49/20 55/9 59/3 63/11 63/13 63/20 66/20 69/22 70/14 70/15 72/2 72/5 76/25
your [64]  2/5 2/10 3/7 4/11 4/24 5/6 5/7 6/8 6/14 6/24 8/20 9/1 9/7 9/15 10/2 10/13 10/18 10/18 10/20 10/25 12/2 16/14 17/25 20/8 20/12 21/10 23/2 31/15 32/8 32/21 34/8 38/14 39/6 40/21 41/11 41/13 41/16 41/19 42/4 42/13 42/16 44/19 49/8 50/20 54/8 54/14 59/8 63/4 63/25 66/15 69/9 70/20 71/1 72/12 74/25 75/15 75/16 75/16 75/17 75/18 79/19 79/21 79/23 79/23

**Z**

Zainulabeddin [1]  11/6
Zoom [1]  2/2

**31**

31/24 34/8 34/22 40/14 41/20 41/24 41/24 74/23 76/19 77/20 79/20