UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT PIERCE DIVISION
CASE NO. 20-24649-CIV-CANNON

ELIE NEHME,

            Plaintiff,                 FORT PIERCE, FLORIDA

      vs.

                                    OCTOBER 18, 2022

FLORIDA INTERNATIONAL UNIVERSITY
BOARD OF TRUSTEES,

                                PAGES 1 - 41

            Defendant.
_____/

TRANSCRIPT OF MOTION FOR SUMMARY JUDGMENT HEARING
BEFORE THE HONORABLE AILEEN M. CANNON
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES:</u>

FOR THE PLAINTIFF:      RODERICK V. HANNAH, ESQ.
                      Roderick V. Hannah, Esq., P.A.
                      4800 North Hiatus Road
                      Sunrise, FL  33351

FOR THE DEFENDANT:     LOURDES E. WYDLER, ESQ.
                      Marrero & Wydler
                      Douglas Centre
                      2600 Douglas Road PH-4
                      Coral Gables, FL  33134

                      IRIS A. ELIJAH, ESQ.
                      Office of General Counsel
                      Florida International Univisity
                      11200 S.W. 8th Street PC 511
                      Miami, FL  33199

REPORTED BY:            DIANE M. MILLER, RMR, CRR, CRC
                      Official Court Reporter
                      U.S. District Court
                      diane_miller@flsd.uscourts.gov

TUESDAY, OCTOBER 18, 2022.

```
 1                    P-R-O-C-E-E-D-I-N-G-S
 2          THE COURT:  Thank you.  You may be seated.
 3          THE COURTROOM DEPUTY:  Calling case Nehme versus
 4   Florida International University Board of Trustees, case number
 5   20-CV-24649.  Counsel please make your appearance.
 6          MR. HANNAH:  Morning, Your Honor; Roderick Hannah for
 7   the plaintiff, Elie Nehme.  I'm here with my client, Mr. Nehme
 8   as well.
 9          THE COURT:  Good morning; and good morning to you,
10   sir.
11          MS. WIDLER:  Good morning, Your Honor; may it please
12   the Court, Lourdes Wydler on behalf of Florida International
13   University Board of Trustees; and with me is Ms. Iris Elisah,
14   associate general counsel.
15          THE COURT:  Good morning to you both.
16          All right.  We are here for argument on the report
17   and recommendation and the subsequent objection in response.  I
18   have reviewed Judge Otazo-Reyes' recommendation which
19   recommends that Defendant's motion for summary judgment be
20   denied.  I have also reviewed pertinent portions of the record
21   and the parties' filings, so I'm prepared to hear argument, and
22   I would like to focus in on the qualifying individual factor
23   first.
24          So with that introduction, Ms. Wydler, why don't you
25   start us off, since it is your objection to the R and R.
```

TUESDAY, OCTOBER 18, 2022.

1          MS. WIDLER:  Your Honor, since the last time that we

2     were here via Zoom, we argued on the motion to dismiss, and the

3     Court's order specifically noted that it was a close call and

4     wanted a fully developed record.  Since then, since spring of

5     2021, we have produced thousands of records, pages of documents

6     as well as ten depositions in this case, and the argument does

7     not change based on the allegations that were once made on the

8     amended complaint.

9          The academic record of Mr. Nehme showed a

10    consistently poor performance.  This was noted in the report

11    and recommendation; however, all of the issues of fact that

12    Magistrate Judge Otazo-Reyes relied on were all on the report

13    by the IDEA office at FIU.  I would note procedurally the

14    report and recommendation did not address the amended report,

15    although substantively it did not change many of its

16    conclusions, but it did not reference the amended report which

17    is one issue.

18          But most importantly, when relying on that report, we

19    have provided case law to that.  The investigation was about

20    internal guidelines.  It did not apply the legal framework that

21    is required under the ADA.  The otherwise qualified individual

22    prong of prima facie requires looking at whether or not this

23    individual can meet the academic and technical standards of the

24    medical school program.

25          He has to show that with or without accommodations,

1    he can meet those standards, and we have an academic record

2    here that is undisputed, and the most important part that gave

3    absolutely -- it was mentioned in the facts that this was a

4    student on probationary status since period one, since 2017.

5    And while the plaintiff will argue that we need to look at the

6    record starting at period three, we can -- and even looking at

7    it with that myopic lens, we still see a continued pattern of

8    poor performance.

9           Allow me to just go over the academic history,

10   because that is what was reviewed by the provost designee in

11   final agency action.

12          So what we have starting in August of 2016, when he

13   matriculated at FIU, he failed genes, molecules, and cells.  He

14   remediated the course which is permitted by all of the

15   students, and he passed with a 75.  That's the lowest passing

16   score that one can get even when they remediate.  Then he had

17   marginally competent scores between 75 to 79 in three separate

18   courses in period one.

19          We then had in period two, in May of 2017, a

20   failure -- an entire failure of cardiovascular and respiratory

21   systems.  He also failed the remediation, the opportunity to

22   retake the course and pass it.  That was his third failure in

23   period one -- between period one and period two.  At that point

24   in time, to support the fact that FIU did not have any sort of

25   discriminatory intent, they recommended that he perhaps engage

1    and look into accommodation, so he went to the FIU Mental

2    Health and Wellness Counseling Center.  There, a clinical

3    psychologist provided the testing and determined that he had

4    anxiety disorder as well as ADHD.  He afforded him the

5    opportunity to have additional time.  There is testimony in the

6    record that in order to have additional time, you have to have

7    a minimal distraction room because the logistics of giving time

8    and bringing in other students while other classes are going

9    on, it is just not feasible at times.  So he was eligible for

10   two accommodations.

11          And again, allow me to just refresh the Court's

12   recollection.  There were two counts:  Failure to accommodate

13   as well as the disparate treatment claim.  From that point on,

14   in -- July of 2017 was the first MSEPC hearing.  That is the

15   medical school evaluations and promotions committee.  At that

16   point, they reviewed his academic record and placed him on

17   academic probation.  This is a significant point in this

18   individual's medical school career because once a student is

19   placed on academic probation, they are on it for that year and

20   the following year, and it means that they are not meeting the

21   expectations of the committee.

22          The committee, Your Honor, is comprised of

23   physicians, comprised of academics, and there is also a student

24   representative on that board.  That was their recommendation;

25   and at that point, he started to get the accommodations once

TUESDAY, OCTOBER 18, 2022.

1   the university received the letter from the -- from

2   Dr. Desmarias.

3          About eight weeks later, there was a professional

4   incident report which showed unexcused absences, multiple

5   requests to delay the testing; and then about a month later, he

6   failed Systems Based Practice.  This is also in period two.

7          What did that do?  That triggered another MSEPC

8   hearing.  So this is the second time that this individual was

9   given the opportunity to present his case before the committee.

10          Allow me to just interject that right -- while he was

11   set for the second MSEPC hearing, FIU granted him a leave of

12   absence for three months which permitted him the opportunity to

13   not only what he did before, which was retake one of the

14   classes with the following class, but now because he was given

15   the opportunity -- it was a medical leave of absence, but now

16   that he was given the opportunity to take about three months

17   off, he was going to be given the opportunity to repeat period

18   two.  So he repeats period two; and, as what would be expected,

19   he did fairly well having done most of the class work.

20          Fast-forward to period three, and this is where I

21   believe that the plaintiff would like the Court to focus, so I

22   will focus on this specifically.  Period three, he is still on

23   academic probation.  Period three, the students engage in what

24   are called "clerkships," and you have to take what is called a

25   "shelf" exam.  Students are afforded two opportunities, and

1   giving the breakdown of the scores, you have to get a fifth

2   percentile or above to pass.  Five to ten percentile means that

3   you are "marginally competent," and above that is "competent."

4        When it came to the shelf exams and he had

5   accommodations, he failed family medicine; neurology; surgery;

6   and the two psychiatry exams, one of them being the subject of

7   the failure to accommodate claim, the retake.

8        And so Your Honor is aware, there were no complaints

9   about the room when he scored on the third percentile for

10  family medicine, when he scored on the fourth percentile for

11  surgery, when he scored on the second percentile for neurology;

12  and interestingly enough, when he took psychiatry the first

13  time with accommodations and no complaints, he scored on the

14  second percentile, the same that he got on the day that he

15  complained that the retake did not provide him a compliant

16  room.

17       Something that was not evidence in the allegations of

18  the complaint when we were here on the motion to dismiss is an

19  academic policy that when you are in your third period, if you

20  show poor performance on three or more shelf exams, not even

21  failure, poor performance, then that will trigger an MSEPC

22  hearing.  Again, the academic policy for academic probation is

23  if you have a failure or continued poor performance.

24       The Court had the benefit of the MSECP memorandum

25  attached to the amended complaint, and there it explained that

1    the MSEPC had a great concern over the continued poor

2    performance.  This was an individual who couldn't get above

3    water, and this is what the cases show.  All of the cases

4    involving otherwise qualified individuals, all of them from the

5    Eleventh Circuit that deal with post-secondary educational

6    institutions grant the summary judgment on that basis if there

7    is a pattern of poor performance, and I'll go through them.

8            THE COURT:  Plaintiff draws what Plaintiff considers

9    to be material distinctions.  What is your view on that?

10           MS. WIDLER:  From my perspective, there is no

11   distinctions because we have got a student in probationary

12   status.  The one that most applies to that is the *Forbes* case.

13   We have also provided the *Cooney* versus *Barry* case which is

14   also another student in probationary status where dismissal was

15   upheld; and then we have a sister court case with *Ellis versus*

16   *Morehead* [sic] from the Northern District of Georgia that

17   hasn't been taken up on appeal.  All of the cases show a common

18   theme; and that is consistently poor performance; that is

19   opportunities of retakes, remediations, leaves of absences

20   which we all have here.

21           I will address the elephant in the room which is the

22   report that FIU issued, and I believe that that is their one

23   distinction on where they are hanging their hat on why this

24   should go to a jury trial.

25           The report itself, there are limited cases in this

TUESDAY, OCTOBER 18, 2022.

1    context, and I have done a very comprehensive national search

2    on all of these cases.  The one most similar was the *Shaikh*

3    case, from the Sixth Circuit that I cited both in my reply and

4    in the objection.  The reason being --

5              THE COURT:  The *Shaikh*, can you spell that for me?

6              MS. WIDLER:  S-H-E-I-H-K.

7              THE COURT:  S-H-E-I-H-K?

8              MS. WIDLER:  I believe so.

9              THE COURT:  Okay.

10             MS. WIDLER:  In that case, it says the court does not

11   condone whether the university followed its policies or not,

12   but the relevant inquiry here is whether or not the ADA statute

13   was violated.  And we can tell and I can bring it out to your

14   Court's honor -- to your Court's attention, let's bring out the

15   report that was relied upon by the magistrate, as well as

16   Plaintiff for probably filing this suit.

17             If we look at the amended report which is docket

18   entry 55-10, page 29, "Nehme is a qualified individual based

19   upon an evaluation from a qualified professional, Dr. Desmarais

20   of the HW COM Student Counseling and Wellness Center.  The

21   testing and assessment center received documentation from a

22   qualified professional who made an individualized assessment of

23   Nehme that supports the need for the requested testing

24   accommodations.  Based on his need for an accommodation and his

25   documented illness, Nehme was designated as a student with a

```
 1    disability by the DRC."
 2           He is a qualified individual because he has a
 3    disability.  That is what IDEA determined which is not the
 4    legal framework; and, quite frankly, it didn't even address
 5    what constitutes a disability under the ADA which would require
 6    substantial impairment on someone's major life activities.
 7           IDEA has a purpose for FIU, and I don't want to
 8    discount its value within the university; but in every student
 9    case or every employment case, it's different.  And the
10    difference here is that IDEA did not get engaged until two
11    academic decisions were made.  This is very similar to the
12    Forbes case versus St. Thomas University where the Eleventh
13    Circuit upheld the summary judgment motion because the
14    individual student believed that when she was placed in a room
15    with four other students and the proctor, that was not
16    considered a minimally distracted room, and that complaint only
17    came out after she had received a failing grade; very similar
18    to our case here.
19           So with that --
20           THE COURT:  The date of the IDEA report that you read
21    from, what is that again?
22           MS. WIDLER:  That would be the amended report, and it
23    is dated -- I know it is in September.  The cover here is not
24    attached to 55-10.  The initial report was in August, I believe
25    August 26; and I think that this one came out September, but
```

```
 1   I'm not certain if that's accurate.
 2          THE COURT:  You are welcome to wrap up, then I would
 3   like to turn to Mr. Hannah.
 4          MS. WIDLER:  So the most important part about this
 5   report is the whole reason we are even here is that it did not
 6   have the benefit of his academic record.  They did not look at
 7   his academic record like the provost did, when she upheld the
 8   decision by the MSEPC.  The MSEPC had the benefit of two prior
 9   MSEPC prior memorandums.  The appeals committee had the benefit
10   of his MSECP folder which had all of his academics; the dean
11   did as well; and so did she.
12          Your Honor, I will wrap up and answer any other
13   questions that the Court has, but I do insist that -- the
14   United States Supreme Court has given guidance to provide
15   deference on academic decisions where there are experts in this
16   field and here is a group of individuals in academia and
17   physicians that did not believe he could meet the essential
18   functions of not only being a student but moving on to being a
19   physician and providing a responsibility to the community.  The
20   cases that we rely on are Zenulebidan, Goldberg,
21   J.A.M., Forbes, Cooney.  Those are the main cases, all of which
22   are PC decisions from the Eleventh Circuit, all of which show
23   consistently poor academic performance and finding that there
24   was no discrimination based on the ADA and the dismissals were
25   upheld.
```

TUESDAY, OCTOBER 18, 2022.

 1              Thank you.

 2              THE COURT:  All right.  Thank you.

 3              Mr. Hannah, so let's focus on period three which I

 4    think is where you are zooming in.  Given the undisputed facts,

 5    why is a jury trial necessary on this issue given the

 6    undisputed academic performance in the record?

 7              MR. HANNAH:  Your Honor, I'm not just focusing in on

 8    period three, and my argument applies to his entire academic

 9    record --

10              THE COURT:  Okay.  Well, then, zoom out then --

11              MR. HANNAH:  Focusing just period three.

12              Period three is important, but if you look at his

13    entire academic record, and that's what I believe the evidence

14    presented shows is that if you look just at period one, which

15    is his first year of medical school, Mr. Nehme did fail one

16    final exam.  He was allowed to retake it, he passed that, so he

17    basically passed everything he needed to pass period one.

18              He moved on to period two, and the MSEPC is the same

19    entity that decides whether you move on or not, whether you are

20    qualified, I guess, to move on from period one to period two,

21    or period two to period three.  So they recommended he move on

22    to period two, and in period two is where he ran into some

23    issues with regard to his disabilities.

24              He was able to complete period one without any

25    accommodations whatsoever.  He wasn't awarded any

1    accommodations for period one, but period two is when he began

2    having problems not only I think, at that time, problems with

3    his ADD, et cetera, but also problems with family issues I

4    think is one of the reasons he took this leave of absence.  So

5    he had various issues coming up in period two, when he took it

6    the first time.

7            He did fail a course in period two, the exam and the

8    retake, but there was another systems based practice exam which

9    he only took the exam the first time and then he went on his

10   leave of absence.  So he never had the opportunity to retake

11   that exam like everybody else does, so they considered that, I

12   guess, failure of that systems based practice.

13           He had been awarded at that time already his

14   accommodations by the DRC, and they had been giving him his

15   accommodations for the exams up to that point in time except

16   systems based practice.  There is evidence that there was not

17   provided accommodation for that.  It is also noted in the

18   IDEA's report that he was not provided an accommodation for

19   that failure of the systems based practice.  I believe it was

20   not extra time that he was given that he should have been

21   given, as noted by the IDEA, but he never challenged that, at

22   that time, when instead he went from the MSEPC, while he was

23   still on a leave of absence.  They -- at his suggestion, he

24   wanted to repeat entire period two.  It was his idea, he

25   presented it to them, that's what the record shows.  And they

1    went ahead and said, okay, we will let you do -- when you come

2    back from your leave of absence, you will do all of period two.

3    And it was all by that time that he had that professional

4    incident report which I think involved a lot of his failing to

5    come to class because he had various family issues going on.

6         Anyway, he came back after his leave of absence.  He

7    did the entire period two and he did well.  He had grades in

8    the 80s, for the most part.  His cumulative GPA -- and that's

9    in the record for period two, retaking it, was 84.227 which

10   shows competency in their own handbook.  His cumulative GPA was

11   over 80, also 81.127.  So here he was, he was doing

12   competently.  He, per the MSEPC, was allowed to go from period

13   two to period three.  There was no further professional

14   incident reports.  There was no failures.

15        He went to his clerkships in period three, did fail a

16   number of the exams the first time, but he did really well in

17   his -- in the clinical aspects of his clerkship which is the

18   same equal weight as an exam, 30 percent of the grade; and he

19   was able to get more than 80s in all of those clerkships, even

20   though he did fail exams the first time.  He retook them; he

21   did pass them.  When you pass them, the best you can get is

22   like a 75, I think, even if you did 100 on the exam, but he was

23   able to get grades.

24        THE COURT:  But isn't undisputed that at least, I

25   think, on two of the shelf retake exams, he still scored in

1    that low range, per the handbook?

2         MR. HANNAH:  He did have low ranks on the retakes of

3    the exam, but he was a pass still.  And I think even Magistrate

4    Judge Otazo-Reyes indicated that in her statement of facts,

5    when she recited the statement of facts, he did not necessarily

6    do great on the retakes, but he passed them.

7         THE COURT:  But under the handbook, which I think

8    would establish the technical and academic standards, it is

9    undisputed that he still scored extremely low at least on two

10   of the shelf retake exams.

11        MR. HANNAH:  He did admittedly so, Your Honor;

12   however, if you look at the whole course, he did well.  I mean,

13   he still got in the 80s, and he was able to get -- actually

14   raise his cumulative GPA for the entire medical school from the

15   81.27 to 82.62.  So that's a competency range, it means your

16   competent to be able to -- the whole issue here is whether or

17   not he is qualified to go through medical school and ultimately

18   graduate from medical school with or without accommodation.

19        And the problem arose when he took the clerkship, and

20   that's where the rub lies.  I guess on this one is that when he

21   took the clerkship the first time, whatever reason, he studied

22   the wrong materials; he failed that one the first time.

23        THE COURT:  You are talking about the psychiatry one.

24        MR. HANNAH:  Psychiatry clerkship, Your Honor, yes.

25   When he took the psychiatry clerkship, that's where the whole

1    issue about not being accommodated came up.

2         THE COURT:  Even if you set that aside for a minute,

3    you still have that low score per the handbook on two other

4    retakes, excluding for a moment even the psychiatry one that is

5    the subject of the claim.  And so I guess my question is:

6    Given that undisputed performance and the requirements as set

7    forth in the handbook, how, at this point, can you create a

8    fact issue on whether he is a qualifying individual?

9         MR. HANNAH:  Because up until that point, he wasn't

10   being called into the MSEPC.  The event that triggered him

11   going to the MSPC [sic] -- and there is evidence of that in

12   testimony -- is his failure of the retake of the psychiatry

13   clerkship and the failure of the psychiatry clerkship course.

14   That's what triggered.  There is no mention about these low

15   scores as being the events that triggered.

16        For every MSEPC hearing, there is, like, a summary of

17   what triggers him being called there, and I established that

18   from testimony and the documentation that the one event that

19   triggered him going the third time was this clerkship failure,

20   and that was because he failed the retake.

21        THE COURT:  So just legally, though, what authority

22   do you have that would sort of limit the inquiry solely to the,

23   quote, event that triggered the request to go before the

24   hearing other than -- rather than looking at sort of the full

25   scope of the performance?

1          It sounds like you are looking only at that

2   psychiatry test and saying "that's what triggered, therefore he

3   is qualifying because" -- but my question is:  Why do I only

4   look at that triggering event?

5          MR. HANNAH:  You don't, you look at the testimony of

6   the people who were involved in that process.  And I believe it

7   was Dr. Obeso, her testimony, and she was involved in this

8   process with him with the MSEPC.  I asked her specifically if

9   he had passed all of his clerkships, would he have gone on to

10  period four; and she said, "Yes, he would have gone on to

11  period four."

12         So here we have this issue of causation, I guess, of

13  why he didn't go on to period four, why he went to the MSEPC

14  and got dismissed, and that's because there was a failure to

15  accommodate which they admit.  They admit that there was a

16  failure to accommodate through the IDEA report.  That's an

17  internal business record of FIU, every one of it's branches.

18  Actually, the branch designated to do these investigations and

19  make these determinations that did a very thorough

20  investigation by a former circuit court judge, Shirley Ann

21  McWhorter; her investigator, Valerie Hall was, I believe, a

22  former police detective, very well-versed in all of this.  They

23  did a very thorough investigation.  It is all in the record,

24  and it was established that that there was a failure to

25  accommodate with regard to the minimum distraction room.

1          I did want to make a comment about the amended

2     report.  I'm not introducing the amended report or any findings

3     of the amended report that he was a qualified individual.  The

4     purpose of the report is to show their admission that he failed

5     to be accommodated.  That's really what the report is there

6     for.

7          THE COURT:  Right.

8          MR. HANNAH:  I get their argument about, you know,

9     they are not -- they are not necessarily qualified to make that

10    determination about a qualified individual.  You look at a more

11    holistic approach.  That's what we are doing is looking at that

12    holistic approach here through all of his years of medical

13    school.  If he had passed psychiatry clerkship, the testimony

14    that is on the record is that he would have moved on to period

15    four.  He would not have been called in front of the MSMEPC

16    [sic].  All they are presenting is speculation with regard to

17    that.

18          The actual event that triggered him was the failure

19    of the clerkship.  And why did he fail the clerkship?  The

20    evidence is that they failed to accommodate him with a minimal

21    distraction room, and there lies our failure to accommodate

22    claim, and also that leads into the dismissal claim because he

23    did not bring up that failure to accommodate issue until it was

24    on the last leg of his appeal, all right.  At that point in

25    time, it was in front of Dr. Bejar.  She was the final decision

1    maker alone.  And I think an issue of fact has risen as to the

2    reasons of the determination by her letter itself, as the

3    magistrate judge found in her recommendation, that she said

4    there was nothing in the reports that were provided to her to

5    indicate that his academic performance with regard -- certainly

6    where regard to the psychiatry clerkship was impacted by this

7    the failure to accommodate, and that's contrary to what is in

8    the report and contrary to the testimony of Shirley Ann Mick

9    wetterrer and Valerie Hall.  And I think that leads into the

10   dismissal and into the issue of whether or not it was

11   deliberate indifference with regard to the dismissal.

12          So I believe the record evidence is there that it

13   should go to the jury.  It is up to the jury to decide whether

14   the clerkship failure led to him going to the MSEPC, led to his

15   dismissal.  The evidence is there that it did.  And then there

16   is, of course, credibility issues when it comes to the reasons

17   for the termination which I think is best for the jury to

18   decide, Your Honor.

19          THE COURT:  So on the retaliation claim --

20          MR. HANNAH:  There is no --

21          THE COURT:  I'm sorry, on the wrongful termination,

22   excuse me.

23          MR. HANNAH:  Right.

24          THE COURT:  On that, I guess what is your best

25   authority for the deliberate indifference piece?

```
1              MR. HANNAH:  I believe my best authority was --
2              THE COURT:  That's an exacting standard, you have to
3    show the defendant knew that harm to a federally protected
4    right was substantially likely and failed to act on that
5    likelihood.  It is higher than a standard of ordinary
6    negligence.
7              MR. HANNAH:  Right.  We cite all of that case law,
8    and I think it kind of talks in the general terms, most of the
9    case law.  It is really a fact based issue when it comes to did
10   Dr. Bejar act or potentially act with deliberate indifference
11   when she was confronted.  And she testified that she reviewed
12   these reports of the IDEA.  And if you look in the report, it
13   is unequivocal in it there that they say there is evidence that
14   the failure to give him the minimal distraction room led to the
15   failure of the psychiatry clerkship.  She testified there was
16   nothing in the reports to indicate that.  Valerie Hall and
17   Shirley Ann McWhorter and the report itself say just the
18   opposite.  So I think that is a credibility issue that a jury
19   certainly can -- if they -- if they look at her testimony and
20   the testimony of Shirley And McWhorter and Valerie Hall and the
21   report, they can reach a conclusion that she ignored the
22   findings of the report.  That's deliberate indifference; and if
23   she had actually reviewed the report and actually maybe even
24   sat down with Shirley Ann McWhorter, there is testimony from
25   Ms. McWhorter that she was not even contacted about the remedy
```

1    issues, et cetera, with regard to the failure to accommodate

2    and that she should have been.

3            But if Dr. Bejar had actually -- let's assume she had

4    read the records, then she deliberately ignored the findings of

5    the reports.  If she failed to read the reports, even though

6    she testified she did, then that could also rise to the level

7    of deliberate indifference as to what is in the reports because

8    she should have read what's in there.

9            THE COURT:  So in terms of this -- the notion that

10   she ignored findings, I guess what record evidence do you feel

11   creates that triable question because, I mean --

12           MR. HANNAH:  The report.

13           THE COURT:  I think it is undisputed she did wait

14   until the IDEA completed its review.  She requested additional

15   information; she reviewed a report that analyzed whether

16   certain exams taken by the plaintiff in the past have been

17   taken without accommodations and then she did some correlation;

18   she reviewed his academic performance rather than focusing on

19   the psychiatry retakes.  So in that universe of facts -- tell

20   me if I'm wrong -- where do you see difference?

21           MR. HANNAH:  I see in her statement denying the

22   appeal nothing in the report indicated that it had any bad

23   impact upon his academic permanence which is untrue.  We have

24   Valerie Hall, we have Shirley Ann McWhorter, their direct

25   testimony that what Dr. Bejar was stating was incorrect and not

 1    true, all right; that they had specified in the report -- they
 2    backed up exactly what was in the report that his not being
 3    given the minimal accommodation -- the minimal distraction room
 4    accommodation had a negative impact upon his performance on the
 5    psychiatry shelf exam retake, ultimately causing him to fail
 6    and fail the course.
 7              If he had passed that course, the evidence, of
 8    course, is that he would have moved on, at least that's the
 9    record evidence I presented to the Court and that the jury
10    should hear.
11              I did want to make some comments upon some of the
12    cases they cite.  There are a lot of cases out there, I agree.
13    It seems to be a very difficult standard out there, I
14    acknowledge that.  But each one of those cases are
15    distinguishable and none of those cases involve a situation as
16    it did here where there was an internal investigation done, and
17    it was found that his rights were violated, you know, by not
18    being given an accommodation.  None of those cases involved
19    that.
20              The *Forbes* case is interesting.  They rely heavily on
21    the *Forbes* case.  But the *Forbes* case involved a person who was
22    already dismissed, was trying to get readmission into the
23    medical school, and it was after the fact, after she had
24    already been dismissed and never brought anything up prior to
25    the dismissal that she was trying to get readmitted then

1    bringing up the issue of not being accommodated.  That's not

2    the case with Mr. Nehme.  He brought this issue up while he was

3    still a medical student there.  He was still was matriculated

4    at the school.  His dismissal situation had not been finalized.

5    They had the opportunity to remedy the situation, and they

6    didn't.

7            And if you look at Shirley Ann McWhorter's testimony,

8    she said, "They should have done something about it, they

9    should have at least contacted me about it and discussed with

10   me, and they didn't."  She doesn't know why.

11           Dr. Bejar did ask for some additional review of the

12   quizzes.  I know there was an issue about him not being

13   accommodated for quizzes which is not really an issue anymore

14   in this case.  We are not pursuing that issue.  She focused

15   only on the quizzes, and there seemed to have been some issue

16   that even with accommodations, he was still able to pass

17   quizzes even without accommodations -- I'm sorry, he was still

18   able to pass quizzes.  But she never asked for any further

19   input from Shirley Ann McWhorter or Valerie Hall or IDEA at all

20   about this issue about did the failure to accommodate him for

21   the most important thing, the psychiatry clerkship final exam,

22   did that have a negative impact upon his performance because

23   she didn't really need to do that because it was already there

24   in the report, the finding was there.

25           Shirley Ann McWhorter and Valerie Hall both testified

1    that her conclusion was inaccurate and incorrect, so I think

2    that raises an issue of fact, Your Honor, at least something

3    that the jury should be able to decide.  And they may buy into

4    what Dr. Bejar says and say, okay, we think he would have been

5    dismissed anyway, that's fine.  But they should be given that

6    opportunity to at least make a finding in favor of Mr. Nehme

7    that Dr. Bejar ignored the findings of the report --

8    deliberately ignored the findings of the report.  I think it

9    meets the standard, Your Honor.

10           THE COURT:  All right.  Thank you very much.

11           Let me turn to Ms. Wydler for any rebuttal either on

12   the qualifying individual point or the wrongful termination

13   discussion we have been having.

14           MS. WYDLER:  A few minutes of rebuttal for the

15   Court's personal time.

16           Clarification, the record evidence shows that before

17   the third MSEPC hearing, the documents have a big "probation"

18   stamp above Mr. Nehme's picture.  This is a distinguishing

19   factor regardless of whether or not there was an accommodation

20   on the psychiatry shelf exam.  The trigger issue is potentially

21   because of his probationary status.  That's what the MSEPC

22   committee reviewed.  That's also, of course, what all of the

23   other levels of review looked at.

24           Turning to what the actual findings were in the

25   amended report, if I read straight from the report, it says,

1    "Based on the totality of the circumstances of the

2    investigation, there is sufficient evidence to support a

3    violation of FIU 106."  One oh six, Your Honor, is just their

4    anti-discrimination, anti-harassment, anti-retaliation policy;

5    it is not their disability policy.  There is no law referenced

6    in this report on what is an "accommodation."

7            THE COURT:  I don't think Mr. Hannah is trying to use

8    the report for final legal conclusions, at least with respect

9    to whether he is a qualifying individual.  So perhaps there is

10   no -- there is no disagreement on that front, unless I'm

11   misunderstanding your point.

12           MS. WYDLER:  I'm getting there.

13           THE COURT:  Okay.

14           MS. WYDLER:  The point would be that in terms of what

15   is a reasonable accommodation, IDEA only looked at what DRC

16   says was a reasonable accommodation, not what the law says was

17   a reasonable accommodation.  DRC says that it just had to be

18   minimally distractive for audio and visual purposes, it was not

19   distraction free.  And the reason why they came to their

20   conclusion was because they supported the evidence that he was

21   distracted.  That's the basis for the conclusion of a failure

22   for accommodate, that the student was distracted not that FIU

23   set him in a room by himself with a proctor, gave him the extra

24   time; when it was cold inside of the room, they brought him a

25   heater; he had ear plugs from FIU.  And as much as the

```
 1   investigators here are lovely individuals that I do know, the
 2   initial investigation did not include an interview with the
 3   actual proctor, the proctor who testified that during the exam,
 4   he never complained about any distractions, and it only came at
 5   the 11th hour right before the dismissal notice.
 6          And I want to go back to the letter and clarify
 7   Dr. Elizabeth Bejar's testimony.  It specifically says in --
 8          THE COURT:  I'm sorry to interrupt.
 9          Mr. Porter, if you are here for Judge Moore's
10   hearing, he is in the magistrate judge's courtroom.
11      (Discussion off the record).
12          MS. WYDLER:  Document 55-10, which is the letter
13   dated September 30th of 2020 to Mr. Nehme, it does say, "Based
14   upon a subsequent independent review by IDEA," which, by the
15   way, that subsequent independent review, as the Court noted,
16   was her request to get follow-up information meaning
17   Dr. Bejar's, and they held him harmless for any testing he got
18   100 percent.  So in Dr. Bejar's eyes with respect to deliberate
19   indifference, if he is given 100 percent and it didn't affect
20   his holistic -- that was her word, "holistic" academic record,
21   that's what her testimony said, then it was on the basis of his
22   performance, not to discrimination, not a failure to
23   accommodate that he was being dismissed.  And the scope of her
24   review is obviously limited because she is looking at the
25   academics as well as the decision made by the dean.
```

```
 1          THE COURT:  Mr. Hannah says there are other witnesses
 2   who have basically said that what she said is, at a minimum,
 3   incomplete and that creates enough of a credibility question on
 4   the deliberate indifference prong, if I understood the gist of
 5   his position on that.  What is your response?
 6          MS. WYDLER:  Your Honor, the individuals would be the
 7   individuals who completed the investigation and had an
 8   incomplete record themselves.  They did not have the academic
 9   record.  So we don't have to jump to get to that factual issue,
10   when they cannot establish that this student could meet the
11   essential functions of being an FIU medical student.
12          THE COURT:  Well, I agree, that's why I think the
13   threshold question is the most dispositive in this case and
14   that's why I wanted to start there.
15          So turning back to that, Mr. Hannah says that there
16   is testimony that he would have moved on to a period four, and
17   therefore, although it is undisputed that he performed poorly
18   on those shelf retakes, according to the handbook, that is
19   ultimately not summary judgment worthy.  In other words, we
20   should have a trial because there is testimony that he would
21   have moved on from a causation perspective to period four.  I
22   guess what is your response to that?
23          MS. WYDLER:  All of the cases address that issue in
24   terms of whether or not a jury could conclude this individual
25   was otherwise qualified; and then if we also turn to the
```

 1   McDonald Douglas shifting framework analysis which are
 2   essentially the same analysis, it is interesting in this ADA
 3   context that it is both prima facie and the burden shifting.
 4   But the issue here is that he was on probation at the time of
 5   the exam, that's one issue.
 6          And something that I do want to point out to the
 7   Court why this is not a disability discrimination case and
 8   hasn't been brought up at all in Plaintiff's responses are the
 9   seven students that we provided records on where they performed
10   in the same manner that the plaintiff did.  All of them were
11   non-disability students, all of them had repeated repeats, had
12   opportunities, had multiple MSEPC hearings, so for the Court to
13   not only find that this individual would -- that the
14   circumstances within this case would lead to a jury trial, it
15   would mean essentially eliminating all of the academic
16   decisions that have been made about these individuals that are
17   going to be trusted doctors in the future, and they have been
18   dismissed just like Mr. Nehme.
19          If the Court doesn't seek anything else for
20   clarification, I do want to bring up that, as part of the
21   investigation.  There is sufficient case law to support that
22   when it comes to a reasonable accommodation, if this is the
23   crux of the case, that psychiatry retake exam, ADA does not
24   allow someone to choose their accommodation.  They can request
25   it, they become eligible for it, and they try to implement it.

1   And I cited that Ninth Circuit case which I know the Office of

2   Civil Rights uses to train post-secondary educational

3   institutions that the interactive process does apply not only

4   in the request portion but in the implementation, which is why

5   we are here.  And FIU provided this individual with a separate

6   date, separate room, and they actually had limited rooms on

7   that day.  They made a schedule change in order to accommodate

8   him to take the test by himself with his proctor.  That is a

9   reasonable accommodation and the fact that the investigative

10  body gave credence to the allegations because that's what the

11  finding is.  The finding is not that they failed to

12  accommodate, the finding is that there is sufficient evidence

13  to corroborate the plaintiff's allegations, and they

14  substantiated it because he was distracted, because there were

15  other rooms with students that happened to have been walking

16  by, but that doesn't mean that FIU didn't give him a reasonable

17  accommodation on the day of the psychiatry retake exam.

18          And we rely on *Happy Store* [phonetic]; we rely on the

19  *Palmer* case that is cited in my reply and also in the objection

20  which is a critical, critical fact here that during the test,

21  Mr. Nehme went to the bathroom three times.  When you are a

22  medical student, you have to sign in and sign out, and there is

23  a document showing, and you have a couple minutes to use the

24  restroom.  If there was a distraction there, we would have

25  noted it in the documents.  There would have been a record

1    evidence here.  And Ms. La Chica and Mr. Nehme both acknowledge

2    that on the day of the exam, he did not complain, and that was

3    a breakdown in the interactive process.

4          The *Palmer* case that I cite in my reply –– and I

5    understand that this is not the threshold issue because it is

6    focused on the day of that exam, if the institution is missing

7    a piece of information on the day that there was supposed to be

8    an accommodation, the employer in that particular case cannot

9    be found liable, and that's the reason why FIU can –– must be

10   granted summary judgment, aside from the threshold issue of the

11   student not being able to meet the essential requirements of

12   being a medical student at FIU, and because the academic record

13   in its entirety shows that he couldn't pass even with the

14   accommodations exclusive of the retake.

15         Thank you.

16         THE COURT:  All right, thank you.

17         Mr. Hannah, a few minutes, if you would like to offer

18   any additional thoughts, and then we will be in recess.

19         MR. HANNAH:  Just in response to the final argument

20   they were making about this interactive process issue.

21         There is major credibility issues with regard to the

22   person who was scheduling him.  If you review the reports and

23   her statements that she made to the investigator in the report,

24   Teresa Reyes-Gavalon, she squarely stated there he should not

25   have been put in that room on that day because of all of the

activity that was going on outside of that room and the nature

of the room itself.  When I took her deposition, she came with

a completely opposite story and said, "No, that's not true,"

and she came up with this issue about, you know, that was the

only room he could be in, even though that also is a shaky

testimony given my examination of her which I presented also.

So that's another credibility issue that a jury needs to

decide.

          Also, there is evidence, including the testimony of

Mr. Nehme, that he didn't have to request any particular

accommodation.  He is awarded an accommodation.  I think there

is an e-mail exchange between him and Dr. Bonnon [phonetic] who

was in charge of disability issues making sure students got the

accommodations where he even asked Dr. Bonnon, "Do I have to

tell the people or tell the professors, do I need to have this

accommodation for this exam."

          And he said, "No, it is automatic, you are supposed

to get it."

          Plus there is a plethora of testimony from Lena

La Chica, the proctor, or from Steven Loynez [phonetic], the

person in charge of the DRC, that these individuals were

proctoring had the authority, if they realized there was a

distraction issue to take charge of that and stop the exam or

change the situation.

          I took the deposition of Lena La Chica who truthfully

1    said that "I chose not to do that because I thought it would

2    cause more distraction to Mr. Nehme to do that."

3         So in addition to all of the other testimony she gave

4    about how distracting it was and it was extremely distracting

5    not only to Mr. Nehme but to her as well, so I think there is

6    more than enough testimony to at least raise this issue of

7    whether that was a proper minimal distraction room, whether the

8    process broke down on FIU's side to give him the proper

9    accommodation because we have Teresa Reyes-Gavalon telling the

10   IDEA that he should have never been placed in that room --  "I

11   should have never placed him in that room because of all of

12   these things going on" -- which she was aware of.  So I think

13   that's another issue of fact that should go -- certainly a

14   credibility issue that should go to the jury on this issue

15   about this interactive process which my view the Eleventh

16   Circuit on that, they view the interactive process just as

17   that, that informal process that's engaged in between the

18   entity and the individual to come up with an accommodation in

19   the first place, you know, when somebody needs an accommodation

20   and they go back and forth and decide what would be an

21   accommodation.

22        Here we have an individual who already was awarded

23   the accommodations.  They should have known -- awarded by the

24   DRC, they should have known what was going on and how to

25   accommodate him for that exam.  It shouldn't have fallen on

 1    him, at that point in time to say "you are not accommodating

 2    me" at the time he is under the pressure of taking an exam.  So

 3    I think those are all, again, issues of fact that a jury should

 4    decide.

 5              Thank you.  That's all I wanted to say.

 6              THE COURT:  All right, thank you.  I appreciate the

 7    parties' assistance.

 8              I know deadlines are currently stayed pending the

 9    Court's resolution of the R and R and motion for summary

10    judgment, so I will enter an order as soon as I can on that.

11              I have nothing further, so thank you for being here.

12    The court is in recess.

13              MR. HANNAH:  Thank you, Your Honor.

14              MS. WYDLER:  Thank you, Your Honor.

15         (PROCEEDINGS ADJOURNED AT 11:02 a.m.)

16

17

18

19

20

21

22

23

24

25

TUESDAY, OCTOBER 18, 2022.

1          **C-E-R-T-I-F-I-C-A-T-E**

2              I hereby certify that the foregoing is

3          an accurate transcription and proceedings in the

4          above-entitled matter.

5

   *12/9/2022*                  */s/DIANE MILLER*
6   DATE                    DIANE MILLER, RMR, CRR, CRC
                            Official Court Reporter
7                           United States District Court
                            101 South U.S. Highway 1
8                           Fort Pierce, FL  34950
                            772-467-2337
9

10

11   ) #

12

13

14

15

16

17

18

19

20

21

22

23

24

25

TUESDAY, OCTOBER 18, 2022.

Elie Nehme vs. Florida International Univ. Board
Case 1:20-cv-24649-AMC Document 98 Entered on FLSD Docket 12/14/2022 Page 35 of 41

Page 35

**MR. HANNAH:**
**[16]** 2/6 12/7 15/2
15/11 15/24 16/9
17/5 18/8 19/20
19/23 20/1 20/7
21/12 21/21 30/19
33/13
**MS. WIDLER: [8]**
2/11 3/1 8/10 9/6
9/8 9/10 10/22
11/4
**MS. WYDLER: [7]**
24/14 25/12
25/14 26/12 27/6
27/23 33/14
**THE COURT: [31]**
2/2 2/9 2/15 8/8
9/5 9/7 9/9 10/20
11/2 12/2 12/10
14/24 15/7 15/23
16/2 16/21 18/7
19/19 19/21 19/24
20/2 21/9 21/13
24/10 25/7 25/13
26/8 27/1 27/12
30/16 33/6
**THE**
**COURTROOM**
**DEPUTY: [1]** 2/3

**/**
**/s/DIANE [1]** 34/5

**1**
**10 [3]** 9/18 10/24
26/12
**100 [1]** 14/22
**100 percent [2]**
26/18 26/19
**101 [1]** 34/7
**106 [1]** 25/3
**11200 [1]** 1/20
**11:02 [1]** 33/15
**11th [1]** 26/5
**12/9/2022 [1]** 34/5
**18 [1]** 1/5

**2**
**20-24649-CIV-CA**
**NNON [1]** 1/2
**20-CV-24649 [1]**
2/5

**2016 [1]** 4/12
**2017 [3]** 4/4 4/19
5/14
**2020 [1]** 26/13
**2021 [1]** 3/5
**2022 [2]** 1/5 34/5
**2337 [1]** 34/8
**24649 [1]** 2/5
**26 [1]** 10/25
**2600 [1]** 1/17
**29 [1]** 9/18

**3**
**30 percent [1]**
14/18
**30th [1]** 26/13
**33134 [1]** 1/17
**33199 [1]** 1/20
**33351 [1]** 1/14
**34950 [1]** 34/8

**4**
**41 [1]** 1/7
**4800 [1]** 1/14

**5**
**511 [1]** 1/20
**55-10 [3]** 9/18
10/24 26/12

**7**
**75 [3]** 4/15 4/17
14/22
**772-467-2337 [1]**
34/8
**79 [1]** 4/17

**8**
**80 [1]** 14/11
**80s [3]** 14/8 14/19
15/13
**81.127 [1]** 14/11
**81.27 [1]** 15/15
**82.62 [1]** 15/15
**84.227 [1]** 14/9
**8th [1]** 1/20

**A**
**a.m [1]** 33/15
**above [5]** 7/2 7/3
8/2 24/18 34/4
**above-entitled [1]**
34/4
**absence [7]** 6/12

6/15 13/4 13/10
13/23 14/2 14/6
**absences [2]** 6/4
8/19
**absolutely [1]** 4/3
**academia [1]**
11/16
**academic [27]**
3/9 3/23 4/1 4/9
5/16 5/17 5/19
6/23 7/19 7/22
7/22 10/11 11/6
11/7 11/15 11/23
12/6 12/8 12/13
15/8 19/5 21/18
21/23 26/20 27/8
28/15 30/12
**academics [3]**
5/23 11/10 26/25
**accommodate**
**[16]** 5/12 7/7
17/15 17/16 17/25
18/20 18/21 18/23
19/7 21/1 23/20
25/22 26/23 29/7
29/12 32/25
**accommodated**
**[4]** 16/1 18/5 23/1
23/13
**accommodating**
**[1]** 33/1
**accommodation**
**[25]** 5/1 9/24
13/17 13/18 15/18
22/3 22/4 22/18
24/19 25/6 25/15
25/16 25/17 28/22
28/24 29/9 29/17
30/8 31/11 31/11
31/16 32/9 32/18
32/19 32/21
**accommodations**
**[16]** 3/25 5/10
5/25 7/5 7/13 9/24
12/25 13/1 13/14
13/15 21/17 23/16
23/17 30/14 31/14
32/23
**according [1]**
27/18
**acknowledge [2]**
22/14 30/1
**act [3]** 20/4 20/10

20/10
**action [1]** 4/11
**activities [1]** 10/6
**activity [1]** 31/1
**ADA [6]** 3/21 9/12
10/5 11/24 28/2
28/23
**ADD [1]** 13/3
**addition [1]** 32/3
**address [3]** 3/14
8/21 10/4 27/23
**ADHD [1]** 5/4
**ADJOURNED [1]**
33/15
**admission [1]**
18/4
**admit [2]** 17/15
17/15
**admittedly [1]**
15/11
**afforded [2]** 5/4
6/25
**agency [1]** 4/11
**AILEEN [1]** 1/10
**allegations [4]**
3/7 7/17 29/10
29/13
**allow [4]** 4/9 5/11
6/10 28/24
**allowed [2]** 12/16
14/12
**alone [1]** 19/1
**although [2]** 3/15
27/17
**amended [10]** 3/8
3/14 3/16 7/25
9/17 10/22 18/1
18/2 18/3 24/25
**analysis [2]** 28/1
28/2
**analyzed [1]**
21/15
**Ann [8]** 17/20
19/8 20/17 20/24
21/24 23/7 23/19
23/25
**answer [1]** 11/12
**anti [3]** 25/4 25/4
25/4
**anti-discriminatio**
**n [1]** 25/4
**anti-harassment**
**[1]** 25/4

**anti-retaliation [1]**
25/4
**anxiety [1]** 5/4
**anymore [1]**
23/13
**appeal [3]** 8/17
18/24 21/22
**appeals [1]** 11/9
**appearance [1]**
2/5
**APPEARANCES**
**[1]** 1/12
**applies [2]** 8/12
12/8
**apply [2]** 3/20
29/3
**appreciate [1]**
33/6
**approach [2]**
18/11 18/12
**argue [1]** 4/5
**argued [1]** 3/2
**argument [6]**
2/16 2/21 3/6 12/8
18/8 30/19
**arose [1]** 15/19
**aspects [1]** 14/17
**assessment [2]**
9/21 9/22
**assistance [1]**
33/7
**associate [1]**
2/14
**assume [1]** 21/3
**attached [2]** 7/25
10/24
**audio [1]** 25/18
**August 26 [1]**
10/25
**authority [4]**
16/21 19/25 20/1
31/22
**automatic [1]**
31/17
**awarded [5]**
12/25 13/13 31/11
32/22 32/23

**B**
**Barry [1]** 8/13
**basis [3]** 8/6
25/21 26/21
**bathroom [1]**

Page 36

Elie Nehme vs. Florida International Univ., Board
Case 1:20-cv-24649-AMC   Document 98   Entered on FLSD Docket 12/14/2022   Page 36 of 41

**B**

bathroom... [1] 29/21
Bejar [7] 18/25 20/10 21/3 21/25 23/11 24/4 24/7
Bejar's [3] 26/7 26/17 26/18
benefit [4] 7/24 11/6 11/8 11/9
board [4] 1/6 2/4 2/13 5/24
body [1] 29/10
Bonnon [2] 31/12 31/14
branch [1] 17/18
branches [1] 17/17
breakdown [2] 7/1 30/3
burden [1] 28/3
business [1] 17/17

**C**

C-E-R-T-I-F-I-C-A-T-E [1] 33/16
CANNON [2] 1/2 1/10
cardiovascular [1] 4/20
career [1] 5/18
causation [2] 17/12 27/21
cells [1] 4/13
center [3] 5/2 9/20 9/21
Centre [1] 1/16
certify [1] 34/2
cetera [2] 13/3 21/1
challenged [1] 13/21
charge [3] 31/13 31/21 31/23
Chica [3] 30/1 31/20 31/25
choose [1] 28/24
chose [1] 32/1
circuit [7] 8/5 9/3 10/13 11/22 17/20 29/1 32/16
circumstances [2] 25/1 28/14

cite [3] 20/7 22/12 30/4
cited [3] 9/3 29/1 29/19
CIV [1] 1/2
Civil [1] 29/2
claim [6] 5/13 7/7 16/5 18/22 18/22 19/19
clarification [2] 24/16 28/20
clarify [1] 26/6
class [3] 6/14 6/19 14/5
classes [2] 5/8 6/14
clerkship [15] 14/17 15/19 15/21 15/24 15/25 16/13 16/13 16/19 18/13 18/19 18/19 19/6 19/14 20/15 23/21
clerkships [4] 6/24 14/15 14/19 17/9
client [1] 2/7
clinical [2] 5/2 14/17
close [1] 3/3
cold [1] 25/24
COM [1] 9/20
comment [1] 18/1
comments [1] 22/11
committee [6] 5/15 5/21 5/22 6/9 11/9 24/22
common [1] 8/17
community [1] 11/19
competency [2] 14/10 15/15
competent [4] 4/17 7/3 7/3 15/16
competently [1] 14/12
complaint [4] 3/8 7/18 7/25 10/16
complaints [2] 7/8 7/13
complete [1] 12/24
completed [2]

21/14 27/7
compliant [1] 7/15
comprehensive [1] 9/1
comprised [2] 5/22 5/23
concern [1] 8/1
conclude [1] 27/24
conclusion [4] 20/21 24/1 25/20 25/21
conclusions [2] 3/16 25/8
condone [1] 9/11
confronted [1] 20/11
consistently [3] 3/10 8/18 11/23
constitutes [1] 10/5
context [2] 9/1 28/3
continued [3] 4/7 7/23 8/1
contrary [2] 19/7 19/8
Cooney [3] 8/13 11/21
Coral [1] 1/17
correlation [1] 21/17
corroborate [1] 29/13
counts [1] 5/12
court [19] 1/1 1/24 1/25 2/12 6/21 7/24 8/15 9/10 11/13 11/14 17/20 22/9 26/15 28/7 28/12 28/19 33/12 34/6 34/7
Court's [6] 3/3 5/11 9/14 9/14 24/15 33/9
courtroom [1] 26/10
cover [1] 10/23
CRC [2] 1/24 34/6
create [1] 16/7
creates [2] 21/1 27/3

credence [1] 29/10
credibility [6] 19/16 20/18 27/3 30/21 31/7 32/14
critical [2] 29/20 29/20
CRR [2] 1/24 34/6
crux [1] 28/23
cumulative [3] 14/8 14/10 15/14
CV [1] 2/5

**D**

deadlines [1] 33/8
dean [2] 11/10 26/25
decide [6] 19/13 19/18 24/3 31/8 32/20 33/4
decides [1] 12/19
decision [3] 11/8 18/25 26/25
decisions [4] 10/11 11/15 11/22 28/16
defendant [3] 1/7 1/15 20/3
Defendant's [1] 2/19
deference [1] 11/15
delay [1] 6/5
deliberate [7] 19/11 19/25 20/10 20/22 21/7 26/18 27/4
deliberately [2] 21/4 24/8
denied [1] 2/20
denying [1] 21/21
deposition [2] 31/2 31/25
depositions [1] 3/6
designated [2] 9/25 17/18
designee [1] 4/10
Desmarais [1] 9/19
Desmarias [1] 6/2
detective [1]

17/22
determination [2] 18/10 19/2
determinations [1] 17/19
determined [2] 5/3 10/3
developed [1] 3/4
diane [4] 1/24 1/25 34/5 34/6
difference [1] 10/10 21/20
difficult [1] 22/13
direct [1] 21/24
disabilities [1] 12/23
disability [7] 10/1 10/3 10/5 25/8 28/7 28/11 31/13
disagreement [1] 25/10
discount [1] 10/8
discrimination [4] 11/24 25/4 26/22 28/7
discriminatory [1] 4/25
discussion [2] 24/13 26/11
dismiss [2] 3/2 7/18
dismissal [8] 8/14 18/22 19/10 19/11 19/15 22/25 23/4 26/5
dismissals [1] 11/24
dismissed [6] 17/14 22/22 22/24 24/5 26/23 28/18
disorder [1] 5/4
disparate [1] 5/13
dispositive [1] 27/13
distinction [1] 8/23
distinctions [2] 8/9 8/11
distinguishable [1] 22/15
distinguishing [1] 24/18
distracted [4]

## D

**distracted...** [4] 10/16 25/21 25/22 29/14

**distracting** [2] 32/4 32/4

**distraction** [10] 5/7 17/25 18/21 20/14 22/3 25/19 29/24 31/23 32/2 32/7

**distractions** [1] 26/4

**distractive** [1] 25/18

**DISTRICT** [6] 1/1 1/1 1/10 1/25 8/16 34/7

**DIVISION** [1] 1/2

**docket** [1] 9/17

**document** [2] 26/12 29/23

**documentation** [2] 9/21 16/18

**documented** [1] 9/25

**documents** [3] 3/5 24/17 29/25

**Douglas** [3] 1/16 1/17 28/1

**Dr** [1] 20/10

**Dr.** [14] 6/2 9/19 17/7 18/25 21/3 21/25 23/11 24/4 24/7 26/7 26/17 26/18 31/12 31/14

**Dr. Bejar** [6] 18/25 21/3 21/25 23/11 24/4 24/7

**Dr. Bejar's** [2] 26/17 26/18

**Dr. Bonnon** [2] 31/12 31/14

**Dr. Desmarais** [1] 9/19

**Dr. Desmarias** [1] 6/2

**Dr. Elizabeth** [1] 26/7

**Dr. Obeso** [1] 17/7

**draws** [1] 8/8

## DRC [6] 10/1 13/14 25/15 25/17 31/21 32/24

## E

**e-mail** [1] 31/12

**ear** [1] 25/25

**educational** [2] 8/5 29/2

**eight** [1] 6/3

**elephant** [1] 8/21

**Eleventh** [4] 8/5 10/12 11/22 32/15

**ELIE** [2] 1/3 2/7

**eligible** [2] 5/9 28/25

**ELIJAH** [1] 1/18

**eliminating** [1] 28/15

**Elisah** [1] 2/13

**Elizabeth** [1] 26/7

**Ellis** [1] 8/15

**employer** [1] 30/8

**employment** [1] 10/9

**engage** [2] 4/25 6/23

**engaged** [2] 10/10 32/17

**enter** [1] 33/10

**entirety** [1] 30/13

**entitled** [1] 34/4

**entity** [2] 12/19 32/18

**entry** [1] 9/18

**equal** [1] 14/18

**ESQ** [4] 1/13 1/13 1/15 1/18

**essential** [3] 11/17 27/11 30/11

**essentially** [2] 28/2 28/15

**establish** [2] 15/8 27/10

**established** [2] 16/17 17/24

**et** [2] 13/3 21/1

**evaluation** [1] 9/19

**evaluations** [1] 5/15

**event** [5] 16/10 16/18 16/23 17/4

18/18

**events** [1] 16/15

**everybody** [1] 13/11

**evidence** [17] 7/17 12/13 13/16 16/11 18/20 19/12 19/15 20/13 21/10 22/7 22/9 24/16 25/2 25/20 29/12 30/1 31/9

**exacting** [1] 20/2

**exam** [22] 6/25 12/16 13/7 13/8 13/9 13/11 14/18 14/22 15/3 22/5 23/21 24/20 26/3 28/5 28/23 29/17 30/2 30/6 31/16 31/23 32/25 33/2

**examination** [1] 31/6

**exams** [9] 7/4 7/6 7/20 13/15 14/16 14/20 14/25 15/10 21/16

**exchange** [1] 31/12

**excluding** [1] 16/4

**exclusive** [1] 30/14

**excuse** [1] 19/22

**expectations** [1] 5/21

**experts** [1] 11/15

**extra** [2] 13/20 25/23

**extremely** [2] 15/9 32/4

**eyes** [1] 26/18

## F

**facie** [2] 3/22 28/3

**fact** [11] 3/11 4/24 16/8 19/1 20/9 22/23 24/2 29/9 29/20 32/13 33/3

**factor** [2] 2/22 24/19

**facts** [5] 4/3 12/4 15/4 15/5 21/19

**factual** [1] 27/9

**fail** [7] 12/15 13/7 14/15 14/20 18/19 22/5 22/6

**failed** [11] 4/13 4/21 6/6 7/5 15/22 16/20 18/4 18/20 20/4 21/5 29/11

**failing** [2] 10/17 14/4

**failure** [26] 4/20 4/20 4/22 5/12 7/7 7/21 7/23 13/12 13/19 16/12 16/13 16/19 17/14 17/16 17/24 18/18 18/21 18/23 19/7 19/14 20/14 20/15 21/1 23/20 25/21 26/22

**failures** [1] 14/14

**fallen** [1] 32/25

**family** [4] 7/5 7/10 13/3 14/5

**Fast** [1] 6/20

**Fast-forward** [1] 6/20

**favor** [1] 24/6

**feasible** [1] 5/9

**federally** [1] 20/3

**field** [1] 11/16

**fifth** [1] 7/1

**filings** [1] 2/21

**final** [6] 4/11 12/16 18/25 23/21 25/8 30/19

**finalized** [1] 23/4

**findings** [7] 18/2 20/22 21/4 21/10 24/7 24/8 24/24

**FIU** [16] 3/13 4/13 4/24 5/1 6/11 8/22 10/7 17/17 25/3 25/22 25/25 27/11 29/5 29/16 30/9 30/12

**FIU's** [1] 32/8

**FL** [4] 1/14 1/17 1/20 34/8

**FLORIDA** [6] 1/1 1/4 1/6 1/19 2/4 2/12

**flsd.uscourts.gov** [1] 1/25

## focus [4] 2/22 6/21 6/22 12/3

**focused** [2] 23/14 30/6

**focusing** [3] 12/7 12/11 21/18

**folder** [1] 11/10

**follow-up** [1] 26/16

**Forbes** [6] 8/12 10/12 11/21 22/20 22/21 22/21

**foregoing** [1] 34/2

**former** [2] 17/20 17/22

**FORT** [3] 1/2 1/4 34/8

**fourth** [1] 7/10

**framework** [3] 3/20 10/4 28/1

**frankly** [1] 10/4

**free** [1] 25/19

**front** [3] 18/15 18/25 25/10

**functions** [2] 11/18 27/11

## G

**Gables** [1] 1/17

**Gavalon** [2] 30/24 32/9

**general** [3] 1/19 2/14 20/8

**genes** [1] 4/13

**Georgia** [1] 8/16

**gist** [1] 27/4

**Goldberg** [1] 11/20

**GPA** [3] 14/8 14/10 15/14

**grade** [2] 10/17 14/18

**grades** [2] 14/7 14/23

**graduate** [1] 15/18

**grant** [1] 8/6

**granted** [2] 6/11 30/10

**great** [2] 8/1 15/6

**group** [1] 11/16

**guidance** [1]

**G**

**guidance... [1]**
11/14
**guidelines [1]**
3/20

**H**

**Hall [7]**  17/21
19/9 20/16 20/20
21/24 23/19 23/25
**handbook [6]**
14/10 15/1 15/7
16/3 16/7 27/18
**hanging [1]**  8/23
**HANNAH [10]**
1/13 1/13 2/6 11/3
12/3 12/11 25/7
27/1 27/15 30/17
**Happy [1]**  29/18
**harassment [1]**
25/4
**harm [1]**  20/3
**harmless [1]**
26/17
**hat [1]**  8/23
**Health [1]**  5/2
**hearing [9]**  1/9
5/14 6/8 6/11 7/22
16/16 16/24 24/17
26/10
**hearings [1]**
28/12
**heater [1]**  25/25
**heavily [1]**  22/20
**hereby [1]**  34/2
**Hiatus [1]**  1/14
**higher [1]**  20/5
**Highway [1]**  34/7
**history [1]**  4/9
**holistic [4]**  18/11
18/12 26/20 26/20
**honor [17]**  2/6
2/11 3/1 5/22 7/8
9/14 11/12 12/7
15/11 15/24 19/18
24/2 24/9 25/3
27/6 33/13 33/14
**HONORABLE [1]**
1/10
**hour [1]**  26/5
**HW [1]**  9/20

**I**

**IDEA's [1]**  13/18
**ignored [5]**  20/21
21/4 21/10 24/7
24/8
**illness [1]**  9/25
**impact [3]**  21/23
22/4 23/22
**impacted [1]**  19/6
**impairment [1]**
10/6
**implement [1]**
28/25
**implementation**
**[1]**  29/4
**inaccurate [1]**
24/1
**incident [3]**  6/4
14/4 14/14
**incomplete [2]**
27/3 27/8
**incorrect [2]**
21/25 24/1
**independent [2]**
26/14 26/15
**indifference [7]**
19/11 19/25 20/10
20/22 21/7 26/19
27/4
**individual [18]**
2/22 3/21 3/23 6/8
8/2 9/18 10/2
10/14 16/8 18/3
18/10 24/12 25/9
27/24 28/13 29/5
32/18 32/22
**individual's [1]**
5/18
**individualized [1]**
9/22
**individuals [7]**
8/4 11/16 26/1
27/6 27/7 28/16
31/21
**informal [1]**  32/17
**information [3]**
21/15 26/16 30/7
**initial [2]**  10/24
26/2
**input [1]**  23/19
**inquiry [2]**  9/12
16/22

**insist [1]**  11/13
**instead [1]**  13/22
**institution [1]**
30/6
**institutions [2]**
8/6 29/3
**intent [1]**  4/25
**interactive [5]**
29/3 30/3 30/20
32/15 32/16
**interject [1]**  6/10
**internal [3]**  3/20
17/17 22/16
**INTERNATIONAL**
**[4]**  1/6 1/19 2/4
2/12
**interrupt [1]**  26/8
**interview [1]**  26/2
**introducing [1]**
18/2
**introduction [1]**
2/24
**investigation [8]**
3/19 17/20 17/23
22/16 25/2 26/2
27/7 28/21
**investigations [1]**
17/18
**investigative [1]**
29/9
**investigator [2]**
17/21 30/23
**investigators [1]**
26/1
**IRIS [2]**  1/18 2/13
**issue [34]**  3/17
12/5 15/16 16/1
16/8 17/12 18/23
19/1 19/10 20/9
20/18 23/1 23/2
23/12 23/13 23/14
23/15 23/20 24/2
24/20 27/9 27/23
28/4 28/5 30/5
30/10 30/20 31/4
31/7 31/23 32/6
32/13 32/14 32/14
**issued [1]**  8/22
**issues [10]**  3/11
12/23 13/3 13/5
14/5 19/16 21/1
30/21 31/13 33/3

**J**

**J.A.M., [1]**  11/21
**J.A.M., Forbes [1]**
11/21
**judge [7]**  1/10
2/18 3/12 15/4
17/20 19/3 26/9
**judge's [1]**  26/10
**judgment [7]**  1/9
2/19 8/6 10/13
27/19 30/10 33/10
**jump [1]**  27/9
**jury [13]**  8/24
12/5 19/13 19/13
19/17 20/18 22/9
24/3 27/24 28/14
31/7 32/14 33/3

**L**

**La [3]**  30/1 31/20
31/25
**law [6]**  3/19 20/7
20/9 25/5 25/16
28/21
**lead [1]**  28/14
**leads [2]**  18/22
19/9
**led [3]**  19/14
19/14 20/14
**leg [1]**  18/24
**legal [3]**  3/20 10/4
25/8
**legally [1]**  16/21
**Lena [2]**  31/19
31/25
**lens [1]**  4/7
**letter [4]**  6/1 19/2
26/6 26/12
**levels [1]**  24/23
**liable [1]**  30/9
**life [1]**  10/6
**likelihood [1]**
20/5
**limit [1]**  16/22
**limited [3]**  8/25
26/24 29/6
**logistics [1]**  5/7
**LOURDES [2]**
1/15 2/12
**lovely [1]**  26/1
**lowest [1]**  4/15
**Loynez [1]**  31/20

**M**

**magistrate [5]**
3/12 9/15 15/3
19/3 26/10
**mail [1]**  31/12
**main [1]**  11/21
**major [2]**  10/6
30/21
**maker [1]**  19/1
**manner [1]**  28/10
**marginally [2]**
4/17 7/3
**Marrero [1]**  1/16
**material [1]**  8/9
**materials [1]**
15/22
**matriculated [2]**
4/13 23/3
**matter [1]**  34/4
**McDonald [1]**
28/1
**McWhorter [8]**
17/21 20/17 20/20
20/24 20/25 21/24
23/19 23/25
**McWhorter's [1]**
23/7
**medical [14]**  3/24
5/15 5/18 6/15
12/15 15/14 15/17
15/18 18/12 22/23
23/3 27/11 29/22
30/12
**medicine [2]**  7/5
7/10
**meeting [1]**  5/20
**memorandum [1]**
7/24
**memorandums**
**[1]**  11/9
**Mental [1]**  5/1
**Miami [1]**  1/22
**Mick [1]**  19/8
**miller [4]**  1/24
1/25 34/5 34/6
**minimal [6]**  5/7
18/20 20/14 22/3
22/3 32/7
**minimally [2]**
10/16 25/18
**minimum [2]**
17/25 27/2

**M**

**missing** [1]  30/6
**misunderstanding** [1]  25/11
**molecules** [1]  4/13
**moment** [1]  16/4
**month** [1]  6/5
**months** [2]  6/12  6/16
**Moore's** [1]  26/9
**Morehead** [1]  8/16
**motion** [6]  1/9  2/19 3/2 7/18  10/13 33/9
**MR** [1]  12/11
**Mr.** [20]  2/7 3/9  11/3 12/3 12/15  23/2 24/6 24/18  25/7 26/9 26/13  27/1 27/15 28/18  29/21 30/1 30/17  31/10 32/2 32/5
**Mr. Hannah** [6]  11/3 12/3 25/7  27/1 27/15 30/17
**Mr. Nehme** [12]  2/7 3/9 12/15 23/2  24/6 26/13 28/18  29/21 30/1 31/10  32/2 32/5
**Mr. Nehme's** [1]  24/18
**Mr. Porter** [1]  26/9
**Ms.** [5]  2/13 2/24  20/25 24/11 30/1
**Ms. Iris** [1]  2/13
**Ms. La** [1]  30/1
**Ms. McWhorter** [1]  20/25
**Ms. Wydler** [2]  2/24 24/11
**MSECP** [2]  7/24  11/10
**MSEPC** [19]  5/14  6/7 6/11 7/21 8/1  11/8 11/8 11/9  12/18 13/22 14/12  16/10 16/16 17/8  17/13 19/14 24/17

**MSEPC** [1]  24/21 28/12
**MSMEPC** [1]  18/15
**MSPC** [1]  16/11
**multiple** [2]  6/4  28/12
**myopic** [1]  4/7

**N**

**national** [1]  9/1
**nature** [1]  31/1
**necessary** [1]  12/5
**negative** [2]  22/4  23/22
**negligence** [1]  20/6
**NEHME** [18]  1/3  2/3 2/7 2/7 3/9  9/18 9/23 9/25  12/15 23/2 24/6  26/13 28/18 29/21  30/1 31/10 32/2  32/5
**Nehme's** [1]  24/18
**neurology** [2]  7/5  7/11
**Ninth** [1]  29/1
**non** [1]  28/11
**non-disability** [1]  28/11
**none** [2]  22/15  22/18
**North** [1]  1/14
**Northern** [1]  8/16
**notice** [1]  26/5
**notion** [1]  21/9
**number** [2]  2/4  14/16

**O**

**Obeso** [1]  17/7
**objection** [4]  2/17  2/25 9/4 29/19
**offer** [1]  30/17
**office** [3]  1/19  3/13 29/11
**Official** [2]  1/24  34/6
**oh** [1]  25/3
**opportunities** [3]  6/25 8/19 28/12

**opportunity** [10]  4/21 5/5 6/9 6/12  6/15 6/16 6/17  13/10 23/5 24/6
**opposite** [2]  20/18 31/3
**order** [4]  3/3 5/6  29/7 33/10
**ordinary** [1]  20/5
**Otazo** [3]  2/18  3/12 15/4
**Otazo-Reyes** [2]  3/12 15/4
**Otazo-Reyes'** [1]  2/18

**P**

**P-R-O-C-E-E-D-I-N-G-S** [1]  2/1
**P.A** [1]  1/13
**page** [1]  9/18
**pages** [2]  1/7 3/5
**Palmer** [2]  29/19  30/4
**part** [4]  4/2 11/4  14/8 28/20
**parties'** [2]  2/21  33/7
**pass** [9]  4/22 7/2  12/17 14/21 14/21  15/3 23/16 23/18  30/13
**passed** [7]  4/15  12/16 12/17 15/6  17/9 18/13 22/7
**passing** [4]  4/15
**pattern** [2]  4/7 8/7
**PC** [2]  1/20 11/22
**pending** [1]  33/8
**people** [2]  17/6  31/15
**percentile** [6]  7/2  7/2 7/9 7/10 7/11  7/14
**performance** [17]  3/10 4/8 7/20 7/21  7/23 8/2 8/7 8/18  11/23 12/6 16/6  16/25 19/5 21/18  22/4 23/22 26/22
**perhaps** [2]  4/25  25/9
**period** [45]

**permanence** [1]  21/23
**permitted** [2]  4/14 6/12
**person** [3]  22/21  30/22 31/21
**personal** [1]  24/15
**perspective** [2]  8/10 27/21
**pertinent** [1]  2/20
**PH** [1]  1/17
**PH-4** [1]  1/17
**phonetic** [3]  29/18 31/12 31/20
**physician** [1]  11/19
**physicians** [2]  5/23 11/17
**picture** [1]  24/18
**piece** [2]  19/25  30/7
**PIERCE** [3]  1/2  1/4 34/8
**place** [1]  32/19
**plaintiff** [10]  1/4  1/13 2/7 4/5 6/21  8/8 8/8 9/16 21/16  28/10
**plaintiff's** [2]  28/8  29/13
**plethora** [1]  31/19
**plugs** [1]  25/25
**Plus** [1]  31/19
**point** [14]  4/23  5/13 5/16 5/17  5/25 13/15 16/7  16/9 18/24 24/12  25/11 25/14 28/6  33/1
**police** [1]  17/22
**policies** [1]  9/11
**policy** [4]  7/19  7/22 25/4 25/5
**poor** [9]  3/10 4/8  7/20 7/21 7/23 8/1  8/7 8/18 11/23
**poorly** [1]  27/17
**Porter** [1]  26/9
**position** [1]  27/5
**post** [2]  8/5 29/2
**post-secondary** [2]  8/5 29/2

**permanence** ...

**potentially** [2]  20/10 24/20
**practice** [5]  6/6  13/8 13/12 13/16  13/19
**prepared** [1]  2/21
**present** [1]  6/9
**pressure** [1]  33/2
**prima** [2]  3/22  28/3
**probation** [6]  5/17 5/19 6/23  7/22 24/17 28/4
**probationary** [4]  4/4 8/11 8/14  24/21
**problem** [1]  15/19
**problems** [3]  13/2  13/2 13/3
**procedurally** [1]  3/13
**proceedings** [2]  33/15 34/3
**process** [9]  17/6  17/8 29/3 30/3  30/20 32/8 32/15  32/16 32/17
**proctor** [6]  10/15  25/23 26/3 26/3  29/8 31/20
**proctoring** [1]  31/22
**professional** [5]  6/3 9/19 9/22 14/3  14/13
**professors** [1]  31/15
**program** [1]  3/24
**promotions** [1]  5/15
**prong** [2]  3/22  27/4
**proper** [2]  32/7  32/8
**protected** [1]  20/3
**provost** [2]  4/10  11/7
**psychiatry** [18]  7/6 7/12 15/23  15/24 15/25 16/4  16/12 16/13 17/2  18/13 19/6 20/15

**P**

psychiatry... [6]
21/19 22/5 23/21
24/20 28/23 29/17
psychologist [1]
5/3
purposes [1]
25/18
pursuing [1]
23/14

**Q**

qualified [12]
3/21 8/4 9/18 9/19
9/22 10/2 12/20
15/17 18/3 18/9
18/10 27/25
qualifying [5]
2/22 16/8 17/3
24/12 25/9
question [5] 16/5
17/3 21/11 27/3
27/13
questions [1]
11/13
quizzes [5] 23/12
23/13 23/15 23/17
23/18
quote [1] 16/23

**R**

raise [2] 15/14
32/6
raises [1] 24/2
range [2] 15/1
15/15
ranks [1] 15/2
reach [1] 20/21
readmission [1]
22/22
readmitted [1]
22/25
realized [1] 31/22
rebuttal [2] 24/11
24/14
recess [2] 30/18
33/12
recited [1] 15/5
recollection [1]
5/12
recommendation
[6] 2/17 2/18 3/11
3/14 5/24 19/3

recommended [2]
4/25 12/21
recommends [1]
2/19
record [27] 2/20
3/4 3/9 4/1 4/6 5/6
5/16 11/6 11/7
12/6 12/9 12/13
13/25 14/9 17/17
17/23 18/14 19/12
21/10 22/9 24/16
26/11 26/20 27/8
27/9 29/25 30/12
records [3] 3/5
21/4 28/9
reference [1] 3/16
referenced [1]
25/5
refresh [1] 5/11
relied [2] 3/12
9/15
rely [4] 11/20
22/20 29/18 29/18
relying [1] 3/18
remediate [1]
4/16
remediated [1]
4/14
remediation [1]
4/21
remediations [1]
8/19
remedy [2] 20/25
23/5
repeated [1]
28/11
reply [3] 9/3
29/19 30/4
report [43]
Reporter [2] 1/24
34/6
reports [8] 14/14
19/4 20/12 20/16
21/5 21/5 21/7
30/22
representative [1]
5/24
request [5] 16/23
26/16 28/24 29/4
31/10
requested [2]
9/23 21/14
requests [1] 6/5

required [1] 3/21
requirements [2]
16/6 30/11
resolution [1]
33/9
respiratory [1]
4/20
response [4] 2/17
27/5 27/22 30/19
responses [1]
28/8
responsibility [1]
11/19
restroom [1]
29/24
retake [15] 4/22
6/13 7/7 7/15
12/16 13/8 13/10
14/25 15/10 16/12
16/20 22/5 28/23
29/17 30/14
retakes [6] 8/19
15/2 15/6 16/4
21/19 27/18
retaking [1] 14/9
retaliation [2]
19/19 25/4
retook [1] 14/20
review [7] 21/14
23/11 24/23 26/14
26/15 26/24 30/22
Reyes [4] 3/12
15/4 30/24 32/9
Reyes' [1] 2/18
Reyes-Gavalon
[2] 30/24 32/9
rights [2] 22/17
29/2
rise [1] 21/6
risen [1] 19/1
RMR [1] 1/24 34/6
Road [2] 1/14
1/17
RODERICK [3]
1/13 1/13 2/6
room [20] 5/7 7/9
7/16 8/21 10/14
10/16 17/25 18/21
20/14 22/3 25/23
25/24 29/6 30/25
31/1 31/2 31/5
32/7 32/10 32/11
rooms [2] 29/6

29/15
rub [1] 15/20

**S**

S-H-E-I-H-K [2]
9/6 9/7
S.W [1] 1/20
sat [1] 20/24
schedule [1] 29/7
scheduling [1]
30/22
school [10] 3/24
5/15 5/18 12/15
15/14 15/17 15/18
18/13 22/23 23/4
scope [2] 16/25
26/23
score [2] 4/16
16/3
scored [6] 7/9
7/10 7/11 7/13
14/25 15/9
scores [3] 4/17
7/1 16/15
search [1] 9/1
second [4] 6/8
6/11 7/11 7/14
secondary [2] 8/5
29/2
seek [1] 28/19
September 30th
[1] 26/13
seven [1] 28/9
Shaikh [2] 9/2 9/5
shaky [1] 31/5
shelf [8] 6/25 7/4
7/20 14/25 15/10
22/5 24/20 27/18
shifting [2] 28/1
28/3
Shirley [9] 17/20
19/8 20/17 20/20
20/24 21/24 23/7
23/19 23/25
sic [3] 8/16 16/11
18/16
side [1] 32/8
sign [2] 29/22
29/22
sister [1] 8/15
situation [4]
22/15 23/4 23/5
31/24

Sixth [1] 9/3
solely [1] 16/22
someone's [1]
10/6
soon [1] 33/10
sounds [1] 17/1
South [1] 34/7
SOUTHERN [1]
1/1
specified [1] 22/1
speculation [1]
18/16
spell [1] 9/5
spring [1] 3/4
squarely [1]
30/24
St [1] 10/12
stamp [1] 24/18
standard [4] 20/2
20/5 22/13 24/9
standards [3]
3/23 4/1 15/8
starting [2] 4/6
4/12
stated [1] 30/24
statement [3]
15/4 15/5 21/21
statements [1]
30/23
STATES [4] 1/1
1/10 11/14 34/7
status [4] 4/4
8/12 8/14 24/21
statute [1] 9/12
stayed [1] 33/8
Steven [1] 31/20
Store [1] 29/18
story [1] 31/3
straight [1] 24/25
Street [1] 1/20
student [17] 4/4
5/18 5/23 8/11
8/14 9/20 9/25
10/8 10/14 11/18
23/3 25/22 27/10
27/11 29/22 30/11
30/12
students [9] 4/15
5/8 6/23 6/25
10/15 28/9 28/11
29/15 31/13
subsequent [3]
2/17 26/14 26/15

## S

**substantial [1]** 10/6

**substantially [1]** 20/4

**substantiated [1]** 29/14

**substantively [1]** 3/15

**sufficient [3]** 25/2 28/21 29/12

**suggestion [1]** 13/23

**suit [1]** 9/16

**summary [8]** 1/9 2/19 8/6 10/13 16/16 27/19 30/10 33/9

**Sunrise [1]** 1/14

**support [3]** 4/24 25/2 28/21

**supported [1]** 25/20

**supports [1]** 9/23

**Supreme [1]** 11/14

**surgery [2]** 7/5 7/11

**systems [6]** 4/21 6/6 13/8 13/12 13/16 13/19

## T

**technical [2]** 3/23 15/8

**Teresa [2]** 30/24 32/9

**termination [3]** 19/17 19/21 24/12

**terms [4]** 20/8 21/9 25/14 27/24

**test [3]** 17/2 29/8 29/20

**testimony [21]** 5/5 16/12 16/18 17/5 17/7 18/13 19/8 20/19 20/20 20/24 21/25 23/7 26/7 26/21 27/16 27/20 31/6 31/9 31/19 32/3 32/6

**thank [11]** 2/2 12/1 12/2 24/10

30/15 30/16 33/5 33/6 33/11 33/13 33/14

**theme [1]** 8/18

**Thomas [1]** 10/12

**thorough [2]** 17/19 17/23

**thought [1]** 32/1

**thoughts [1]** 30/18

**thousands [1]** 3/5

**threshold [3]** 27/13 30/5 30/10

**time [26]** 3/1 4/24 5/5 5/6 5/7 6/8 7/13 13/2 13/6 13/9 13/13 13/15 13/20 13/22 14/3 14/16 14/20 15/21 15/22 16/19 18/25 24/15 25/24 28/4 33/1 33/2

**times [2]** 5/9 29/21

**totality [1]** 25/1

**TRANSCRIPT [1]** 1/9

**transcription [1]** 34/3

**treatment [1]** 5/13

**triable [1]** 21/11

**trial [4]** 8/24 12/5 27/20 28/14

**trigger [2]** 7/21 24/20

**triggered [8]** 6/7 16/10 16/14 16/15 16/19 16/23 17/2 18/18

**triggering [1]** 17/4

**triggers [1]** 16/17

**trusted [1]** 28/17

**TRUSTEES [3]** 1/6 2/4 2/13

**truthfully [1]** 31/25

**turning [2]** 24/24 27/15

## U

**U.S [2]** 1/25 34/7

**ultimately [3]** 15/17 22/5 27/19

**undisputed [8]** 4/2 12/4 12/6 14/24 15/9 16/6 21/13 27/17

**unequivocal [1]** 20/13

**unexcused [1]** 6/4

**UNITED [4]** 1/1 1/10 11/14 34/7

**universe [1]** 21/19

**university [7]** 1/6 2/4 2/13 6/1 9/11 10/8 10/12

**Univisity [1]** 1/19

**unless [1]** 25/10

**untrue [1]** 21/23

**upheld [4]** 8/15 10/13 11/7 11/25

**us [1]** 2/25

## V

**Valerie [7]** 17/21 19/9 20/16 20/20 21/24 23/19 23/25

**value [1]** 10/8

**versed [1]** 17/22

**versus [4]** 2/3 8/13 8/15 10/12

**via [1]** 3/2

**violated [2]** 9/13 22/17

**violation [1]** 25/3

**visual [1]** 25/18

**vs [1]** 1/5

## W

**walking [1]** 29/15

**weight [1]** 14/18

**welcome [1]** 11/2

**well-versed [1]** 17/22

**Wellness [2]** 5/2 9/20

**wetterrer [1]** 19/9

**whatsoever [1]** 12/25

**witnesses [1]** 27/1

**worthy [1]** 27/19

**wrap [2]** 11/2 11/12

**wrongful [2]** 19/21 24/12

**WYDLER [5]** 1/15 1/16 2/12 2/24 24/11

## Z

**Zenulebidan [1]** 11/20

**zoom [2]** 3/2 12/10

**zooming [1]** 12/4